## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

NAVAJO NATION HUMAN RIGHTS
COMMISSION; PEGGY PHILLIPS; MARK
MARYBOY; WILFRED JONES; TERRY
WHITEHAT; BETTY BILLIE FARLEY;
WILLIE SKOW; and MABEL SKOW,

Case No. 2:16-cv-00154 JNP

Plaintiffs,

v.

SAN JUAN COUNTY; JOHN DAVID
NIELSON, in his official capacity as San Juan
County Clerk; and PHIL LYMAN, BRUCE
ADAMS, and REBECCA BENALLY, in their
official capacities as San Juan County
Commissioners,

Defendants.

**PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
AND MEMORANDUM IN
SUPPORT OF MOTION**

**ORAL ARGUMENT
REQUESTED**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 2

II.   STATEMENT OF FACTS ................................................................................. 2

      A.    Impact of Voting Procedures on Navajo Voters in San Juan County.................... 2

      B.    Defendants Have Denied Requests to Completely Reopen Polling
            Sites and Provide Effective Language Assistance .................................................. 3

      C.    June 2016 Primary Elections ................................................................................... 4

      D.    2016 General Election Plans ................................................................................... 5

III.  ARGUMENT ..................................................................................................... 6

      A.    Plaintiffs are Likely to Succeed on the Merits of Their Claims
            under Section 203 and Section 2 of the Voting Rights Act .................................... 7

            1.    Plaintiffs are Likely to Succeed on the Merits of Their Claim
                  that San Juan County Failed Its Duty to Provide Language
                  Assistance under Section 203 ......................................................................... 7

                  a.    San Juan County's Decision to Switch to a Mail-
                        Only Voting System Violates Section 203 of the Voting
                        Rights Act. .......................................................................................... 9

                  b.    San Juan County Failed to Provide the Public with Election
                        Information in Navajo. ....................................................................... 10

                  c.    San Juan County Failed to Provide Effective Navajo
                        Language Translation .......................................................................... 10

      B.    Plaintiffs' Are Likely to Succeed on the Merits of Their Equal
            Opportunity Claim under Section 2 of the Voting Rights Act .............................. 11

            1.    The County's Reduction in Polling Places Disproportionately
                  Burdens Navajo Citizens in San Juan County. ............................................ 14

                  a.    If the County Restricts In-Person Voting to Monticello,
                        Navajo Citizens will be Disproportionately Burdened. ................... 14

                  b.    If the County Conducts the Elections Using Four
                        Polling Locations, Navajo Citizens will be
                        Disproportionately Burdened. ........................................................... 15

            2.    The Totality of the Circumstances Supports a Violation of
                  Section 2 ....................................................................................................... 18

                  a.    Senate Factor 1: History of Official Discrimination
                        Affecting the Right of Minorities to Participate in
                        the Democratic Process .................................................................... 19

                  b.    Senate Factor 2: Racially Polarized Voting ...................................... 19

c.    Senate Factor Three: Use of Unusually Large Election Districts or Other Voting Practices Enhancing Opportunity for Discrimination ........................................................................... 20

d.    Senate Factor Five: Effects of Discrimination on Socioeconomic Status .................................................... 20

e.    Senate Factor Six: Use of Racial Appeals in Political Campaigns .................................................... 22

f.    Senate Factor Seven: Extent to Which Minorities Have Been Elected to Public Office ............................................... 22

C.    Irreparable Injury Will Result Absent Preliminary Relief .................................... 23

D.    The Injury to Plaintiffs Greatly Outweighs Any Purported Injury to Defendants ............................................................................. 24

E.    The Public Interest Weighs in Favor of Granting Immediate Injunctive Relief .............................................................................. 25

IV.   CONCLUSION ................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) ..........................................................12, 14

*Brooks v. Gant*, No. CIV. 12-5003-KES,
  2012 WL 4482984 (D.S.D. Sept. 27, 2012)................................................................................14

*Brown v. Dean*, 555 F. Supp. 502 (D. R.I. 1982) ..........................................................................13

*Chinese for Affirmative Action v. Leguennec*,
  580 F.2d 1006 (9th Cir. 1978), *cert. denied*, 439 U.S. 1129 (1979)....................................8, 25

*Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780 (10th Cir.1964) ........................................6

*Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347 (M.D. Ala. 1986).................................................23

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc),
  *aff'd on other grounds, Ariz. v. Inter Tribal Council of Ariz. Inc.*,
  133 S.Ct. 2247, 186 L. Ed. 2d 239 (2013) .................................................................13, 14, 18

*Harper v.Va. State Bd. of Elections*, 383 U.S. 663 (1966) ...........................................................25

*Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984)...........................................................7, 26

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003).................................................6, 7

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989)............................24

*Johnson v. Halifax County, N.C.*, 594 F. Supp. 161 (E.D. N.C. 1984)........................................25

*Meyers By & Through Meyers v. Bd. of Educ. of San Juan Sch. Dist.*,
  905 F. Supp. 1544 (D. Utah 1995)..............................................................................................20

*Miss. State Chapter of Operation PUSH, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) .........12, 13

*Navajo Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253, 1253 (D. Utah 2015) ..........................19

*Navajo Nation v. San Juan Cnty.*, No. 2:12-CV-00039,
  2015 WL 1137587 (D. Utah Mar. 12, 2015) .......................................................................17, 19

*Navajo Nation v. San Juan Cty.*, No. 2:12-cv-00039-RJS-DPB,
  2016 WL 697120 (D. Utah Feb. 19, 2016) ...........................................................................19, 20

*Nick v. City of Bethel*, No. 3:07-CV-0098, ECF No. 327,
  Order (D. Alaska July 30, 2008).............................................................................................8, 25

*Obama for Am v. Husted.*, 697 F.3d 423 (6th Cir. 2012)...............................................................25

*Otero Sav. & Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275 (10th Cir.1981)........................6

*Puerto Rican Organization for Politcal Action v. Kusper,* 350 F. Supp. 606
(N.D. Ill. 1972).....................................................................................................................23

*Quick Bear Quiver v. Nelson*, 387 F. Supp. 2d 1027 (D. S.D. 2005) ............................................26

*Resolution Trust Corp. v. Cruce,* 972 F.2d 1195 (10th Cir.1992) ..................................................6

*Reynolds v. Sims,* 377 U.S. 533 (1964)...............................................................................23, 26

*Sanchez v. State of Colo.,* 97 F.3d 1303 (10th Cir. 1996).........................................................12, 20

*Spirit Lake Tribe v. Benson Cnty., N.D.*, Civil No. 2:10-cv-095,
2010 WL 4226614 (D.N.D. Oct. 21, 2010) ...............................................................13, 21, 22

*Taylor v. Louisiana*, 419 U.S. 522 (1975) .....................................................................................25

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ...............................................................11, 12, 18, 22

*United States Postal Serv. v. Beamish,* 466 F.2d 804 (3d Cir. 1972) ............................................24

*United States v. Berks County,* 250 F. Supp. 2d 525 (E.D. Pa 2003) ...............................23, 25, 26

*United States v. Metropolitan Dade County, Fla.,* 815 F. Supp. 1475
(S.D. Fla. 1993)....................................................................................................................7, 23

*United States v. Raines*, 362 U.S. 17 (1960)..................................................................................26

*Wesberry v. Sanders,* 376 U.S. 1 (1964).........................................................................................25

*Yanito v. Barber*, 348 F. Supp. 587 (D. Utah 1972) .....................................................................19

## STATUTES

Fed. R. Civ. P. 65(a) .........................................................................................................................1

42 U.S.C. 1973j(d) ...........................................................................................................................7

42 U.S.C. § 1973 .............................................................................................................................24

42 U.S.C.A.§ 1973aa-1a(b)(3)(A) ...................................................................................................8

42 U.S.C.A.§ 1973aa-1a(c).............................................................................................................8

52 U.S.C.A. § 10301(a) ..................................................................................................................11

52 U.S.C.A. § 10301(b) ................................................................................................11

52 U.S.C.A. § 10308(d) ...............................................................................................24

52 U.S.C.A. § 10503 ..............................................................................................*passim*

52 U.S.C.A. § 10503(c) ............................................................................................8, 9

Utah Election Code 20A-3-306(2)(b) ...........................................................................3

Utah Election Code, 20A-3-601(1) .............................................................................15

Utah Election Code, 20A-3-601(2) .............................................................................15

Utah Election Code, 20A-3-601(3) .............................................................................15

Utah Election Code 20A-3-603 ..................................................................................15

## REGULATIONS

28 CFR § 55.2 .............................................................................................................8

28 C.F.R. § 55.2(b) ......................................................................................................8

28 C.F.R. § 55.18(e) ...................................................................................................10

28 C.F.R. § 55.19(b) .....................................................................................................8

28 C.F.R. § 55.20 .....................................................................................................8, 9

28 C.F.R. § 55.20(a) ...............................................................................................9, 10

## OTHER AUTHORITIES

Janai S. Nelson, *The Causal Context of Disparate Vote Denial*,
    54 B.C. L. Rev. 579, 596 (2013)..........................................................................18

Navajo Reservation. U.S. Census Bureau, *San Juan County,*
    *Utah - Profile of General Population and Housing Characteristics* (2010) ...........................2

Pursuant to Fed. R. Civ. P. 65(a) and D.S.D. Civ. LR 7.1, Plaintiffs Navajo Nation Human Rights Commission ("NNHRC"), Peggy Phillips, Mark Maryboy, Wilfred Jones, Terry Whitehat, Betty Billie Farley, Willie Skow and Mabel Skow ("Plaintiffs") respectfully move this Court for a preliminary injunction ordering Defendants to fully comply with their obligations under Section 2 and Section 203 of the Voting Rights Act by (1) reopening the polling sites available prior to the 2014 decision to switch to a mail-only voting system; (2) creating at least three satellite offices on the Navajo Reservation to allow early in-person voting; and (3) fully complying with their obligations to provide full translation and assistance services to Navajo speaking voters prior to the 2016 general election and for future elections, until further order of the Court. This motion is supported by the memorandum below and the declarations filed separately. Plaintiffs request oral argument.

Specifically, as further detailed in the accompanying Proposed Order, Plaintiffs respectfully request this Court require Defendants to:

1. Reopen polling places available in the 2012 elections;

2. Open at least three satellite office on the portion of San Juan County covered by the Navajo Reservation for early in-person voting;

3. Employ bilingual coordinators;

4. Ensure *all* election materials provided in English are also provided in Navajo;

5. Recruit bilingual poll workers or translators;

6. Provide mandatory training for poll workers and interpreters;

7. Provide sample ballots in audio form in Navajo with equipment to play it on;

8. Provide pre-election publicity in Navajo.

9. Ensure the accuracy of translations;

10. Provide a Navajo glossary of election terms;

11. Submit pre-election and post-election progress reports; and

12.     Generate and provide Plaintiffs with election data.

# I.     INTRODUCTION

Plaintiffs seek a preliminary injunction prohibiting Defendants from continuing to violate Section 2 and Section 203 of the Voting Rights Act. Plaintiffs seeks this relief because of the continuous nature of Defendants' violations and because Plaintiffs will suffer immediate and serious harm if Defendants do no open a sufficient number of polling places and Defendants do not comply with the minority language requirements of the Voting Rights Act. Without relief, Navajo residents will not receive their statutorily mandated language assistance or have the same access to in-person voting as white residents in this November's general election.

# II.     STATEMENT OF FACTS

## A.     Impact of Voting Procedures on Navajo Voters in San Juan County

San Juan County is located in the southeastern corner of Utah and contains a substantial portion of the Navajo Reservation. U.S. Census Bureau, *San Juan County, Utah - Profile of General Population and Housing Characteristics* (2010). The Navajo Indian population of San Juan County constitutes 50.4 percent of the total county population. *Id.* Navajo is historically an unwritten language, and a large proportion of the Navajo Indians residing in San Juan County are unable to speak, write, or read the English language. Declaration of Leonard Gorman (NNHRC Decl.), ¶ 6, attached hereto as Exhibit A; American Community Survey Selected Population Tables 2006-2010, DP02.

In 2014, San Juan County officials decided to close polling places and move to a mail-only voting system. NNHRC Decl. ¶ 5. Under that system, the only possible location to vote in person was in Monticello. *Id.* ¶¶ 4-5. All of the mail-in ballots and accompanying written materials were in English only. NNHRC Decl. ¶ 7. During the 2014 election, ballots were mailed

on October 10, which gave voters only three weeks to receive ballots, complete them, obtain language assistance if necessary, and return the ballots.[1] NNHRC Decl. ¶ 8.

Under a mail-only system, Navajo citizens have to travel, on average, 103.57 minutes to vote in Monticello (the only location for in-person voting) as compared with an average travel time of just 34.66 minutes for white voters. Declaration of Dr. Gerald R. Webster (Webster Decl.), Ex. 1, attached hereto as Exhibit B. When each precinct had a polling place, as was the case in 2012, the average travel time for Navajo residents to get to a polling place was just 13.94 minutes. *Id.*

Furthermore, the fact many Navajo live in rural areas of the County complicates mail delivery and means they are less likely to receive their mail, including their ballots. In addition, the experience and expectation of hostility associated with traveling to Monticello is a significant deterrent for many Navajo in San Juan County. As discussed more below, historical discrimination against Navajo in San Juan is well documented so it is no surprise Plaintiffs and other Navajo residents would avoid going to the majority white town of Monticello to vote early in person. Declaration of Plaintiff Terry Whitehat (Whitehat Decl.) ¶¶ 2-3, attached hereto as Exhibit C.

**B.** **Defendants Have Denied Requests to Completely Reopen Polling Sites and Provide Effective Language Assistance**

Prior to 2014 there were nine physical polling locations with a total of at least 24 translators or trained language assistants in San Juan County to assist Navajo speaking voters cast their ballots on Election Day. NNHRC Decl., Ex. 4 at ¶ 8. After investigating, the NNHRC

---

[1] Utah election code considers a ballot returned by mail valid only if it is "(i) clearly postmarked before election day, or otherwise clearly marked by the post office as received by the post office before election day; and (ii) received in the office of the election officer before noon on the day of the official canvass...." Utah Election Code 20A-3-306(2)(b).

passed a resolution to oppose San Juan County's decision to switch to a mail-only electoral system on September 4, 2015. NNHRC Decl. ¶ 9. NNHRC and the Lawyers' Committee for Civil Rights Under Law, in partnership with the American Civil Liberties Union, sent letters in early September opposing closure of polling sites. NNHRC Decl. ¶ 10. In his September 17, 2015 response to this letter, the County Clerk stated the County would not reconsider opening any polling places for the upcoming elections, and did not commit to doing so for any future elections. *Id.* The NNHRC sent a follow up letter asking the County to reconsider on October 12, 2015. *Id.* The County did not respond in writing to that letter. *Id.* On February 25, 2016, having received no written commitment from the County to reopen polling places, Plaintiffs filed their Complaint. ECF No. 2.

On March 31, 2016, Defendants filed their Answer to the Complaint and a Counterclaim for Declaratory and Other Relief. ECF Nos. 41, 40.[2] In the Answer and Amended Counterclaim, Defendants claimed in-person voting polls will be available at four locations within San Juan County for all future elections: Monticello, Montezuma Creek, Oljato, and Navajo Mountain. ECF No. 41 ¶ 7; ECF No. 74 ¶ 39. In their filings, Defendants also claimed they would provide Navajo-language assistance services to voters and they would publicize the three additional polling places. ECF No. 41 ¶ 7; ECF No. 74 ¶¶ 41-43.

### C.  June 2016 Primary Elections

During the June 28, 2016 primary, four polling locations were open on Election Day. Declaration of Maya Kane, Esq. (Kane Decl.), Ex. 1, Part 1 at 50:23-51:4, attached hereto as Exhibit D. To date, beyond a press release the County Clerk says he sent in March 2016 to two newspapers, Defendants have not issued any written statement to the general public to inform

---

[2] On May 31, 2016, Defendants filed an Amended Counterclaim. ECF No. 74.

San Juan County citizens about the County's plans for the 2016 general elections in November. In fact, neither of the San Juan County's Rule 30(b)(6) designees knew whether any public notice was issued about the changes for the June primary election. *Id.*, Ex. 1, Part 2 at 142:7-17, Part 1 at 51:16-20.

In addition, the County did not provide Navajo-speaking voters with a translation of the primary ballot. NNHRC Decl. ¶ 14. Rather, the County posted audio to its website listing the offices up for election for each party and the names of the candidates running for those offices. *Id.* Furthermore, the website failed to provide a Navajo translation of the voter registration form, the candidate filing information, and other documents, though these documents were available in English. NNHRC Decl. ¶ 14, Ex. 8.

The fact many Navajo voters live in remote areas of the County means mail is often delayed, resulting in fewer days to vote than white voters who receive mail more expeditiously. NNHRC Decl. ¶ 17; Whitehat Decl. ¶ 4 (noting he received his ballot for the June 2016 primary almost two weeks after the County mailed them out); *cf.* Kane Decl., Ex. 4 (County Commission notes dated October 6, 2014, in which the Clerk informs commissioners ballots for the 2014 general election would be mailed out on October 10th and received four days later on October 14th).

### D.      2016 General Election Plans

Defendants have not publicly committed to how the County intends to conduct the 2016 general election in a form readily available and understandable to all voters of San Juan County. Instead, Defendants have submitted a declaration in this action from Mr. Nielson, the County Clerk, in which Mr. Nielson states for the 2016 elections, the County has "determined" it will have four total polling sites and will take certain measures to informing the public of the process and provide language assistance. *See* ECF No. 62 ¶¶ 8, 12, 13. Mr. Nielson also states he sent a

press release, the contents of which he does not specify, to two newspapers that circulate in San Juan County. *See id.* at ¶¶ 20-21. In describing the County's plans, Mr. Nielson limits his statements to the 2016 elections and does not expressly indicate the County's plans for future elections. *See id.* ¶¶ 8, 11, 20.

When asked about the County's plans to make voters – particularly Navajo-speaking voters – aware of the County's stated plans, including the exact polling locations, one of the County's Rule 30(b)(6) designees, Edward Tapaha, spoke in general terms about attending one chapter meeting per each of five Navajo chapters in San Juan County to discuss the County's plans. *See* Kane Decl., Ex. 1, part 2 at 22-24. Mr. Tapaha implied he had visited all of the chapters before the primaries, but did not indicate whether the County planned to send him again to speak to the chapters before the 2016 general election, or if the County planned to rely on his previous visits. *Id.*

## III.    ARGUMENT

A movant is entitled to a preliminary injunction upon establishing the following:

> (1) [the movant] will suffer irreparable injury unless the injunction issues; (2) the threatened injury ... outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits.

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (brackets in original); *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992). It is "the movant's burden to establish that each of these factors tips in his or her favor." *Heideman*, 348 F.3d at 1188-89. The Tenth Circuit has adopted a "liberal definition of the 'probability of success' requirement." *Otero Sav. & Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275, 278 (10th Cir.1981), and has held if the movant establishes "the three 'harm' factors tip *decidedly* in its favor, the 'probability of success requirement' is somewhat relaxed." *Heideman*, 348 F.3d at

1188-89 (citing *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1246 (10th Cir. 2001); *Continental Oil Co. v. Frontier Ref. Co.,* 338 F.2d 780, 781-82 (10th Cir.1964) (same). In *Heideman*, the Tenth Circuit noted "[a] hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules" and, therefore, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." 348 F.3d at 1188.

Plaintiffs are authorized by statute to seek preliminary relief for Voting Rights Act violations. *See* 42 U.S.C. 1973j(d). Moreover, using the same standard employed by the Tenth Circuit, courts have granted preliminary relief for Voting Rights Act violations very similar to the relief Plaintiffs seek here. *See, e.g., Harris v. Graddick,* 593 F. Supp. 128 (M.D. Ala. 1984) (granting preliminary injunction in Section 2 case); *United States v. Metropolitan Dade County, Fla.,* 815 F. Supp. 1475 (S.D. Fla. 1993) (granting preliminary injunction in Section 203 case). All four requirements for the issuance of a preliminary injunction are met in this case both for Plaintiffs' Section 203 (language assistance) claim and Section 2 (equal opportunity) claim.

### A. Plaintiffs are Likely to Succeed on the Merits of Their Claims under Section 203 and Section 2 of the Voting Rights Act

#### 1. Plaintiffs are Likely to Succeed on the Merits of Their Claim that San Juan County Failed Its Duty to Provide Language Assistance under Section 203

Plaintiffs are likely to prevail on the merits of their Section 203 claim, as Defendants have failed to provide effective language assistance to Navajo voters in San Juan County.[3]

---

[3] Section 203 of the Voting Rights Act provides a state or political subdivision has special language assistance obligations for elections if:

    1. "more than 5 percent" of a jurisdiction's residents are "are members of a single language minority and are limited-English proficient," or

Section 203 requires all "voting materials" provided in English must also be provided in each language triggering Section 203 coverage. 42 U.S.C.A.§§ 1973aa-1a(b)(3)(A), 1973aa-1a(c). According to Section 203, covered jurisdictions are required to "[provide] any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process" in the applicable minority language. 52 U.S.C.A. § 10503(c). Translations must be "clear, complete and accurate." 28 C.F.R. § 55.19(b).

That Navajo is an unwritten language does not alleviate San Juan of its 203 obligations. Rather, Section 203 requires jurisdictions with minority languages that are historically unwritten to "furnish oral instructions, assistance, or other information relating to registration and voting" in the relevant language at every stage of the election process. *See* 52 U.S.C.A. § 10503(c); 28 C.F.R. § 55.20.

Compliance with Section 203's language requirements is measured by an "effectiveness" standard. 28 CFR § 55.2. The two basic requirements for jurisdictions covered by Section 203 are "(1) That materials and assistance should be provided in a way designed to allow members of …language minority groups to be *effectively informed of* and *participate effectively in* voting-connected activities; and (2) That an affected jurisdiction should take all reasonable steps to achieve that goal." 28 C.F.R. § 55.2(b) (emphasis added). Even if a covered jurisdiction is making a good faith attempt at compliance with minority language requirements, violations of Section 203 are actionable if they are not effective. *See Nick v. City of Bethel*, No. 3:07-CV-

---

2.  more than 5 percent of the Native American citizens of voting age within an Indian reservation are "members of a single language minority and are limited-English proficient" (for jurisdictions with containing all or part of an Indian reservation) or
3.  the "illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate," 52 U.S.C.A. § 10503.

San Juan is covered by Section 203 for the Navajo language.

0098, ECF No. 327, Order at 5-8 (D. Alaska July 30, 2008); *Chinese for Affirmative Action v. Leguennec*, 580 F.2d 1006, 1008-09 (9th Cir. 1978), *cert. denied*, 439 U.S. 1129 (1979).

While Defendants represent they will provide audio translations of election materials, publicity in Navajo, and effective translations, the County made the same representation prior to the 2016 primary election, but failed to do so. Most egregiously, the County failed to provide an audio translation of the ballots. NNHRC Decl. ¶¶ 13-14. Instead, the translation was simply a recitation of the offices up for election and who was running for them for each party. *Id.* ¶ 14 Moreover, Defendants did not provide translations of other election-related materials. *Id.* A preliminary injunction requiring effective translations of all relevant materials, therefore, is necessary to ensure the County meets its obligations.

<blockquote>

a.        **San Juan County's Decision to Switch to a Mail-Only Voting System Violates Section 203 of the Voting Rights Act**

</blockquote>

Because Navajo is an unwritten language, Section 203 requires San Juan County to provide oral translations of all election material. *See* 52 U.S.C.A. § 10503(c); 28 C.F.R. § 55.20. A mail-only electoral system[4] which requires an ability to read English in order to vote, such as San Juan's, is fundamentally incompatible with Section 203's translation requirements for unwritten languages like Navajo. *See* 52 U.S.C.A. § 10503(c); 28 C.F.R. § 55.20; NNHRC Decl. ¶ 6.

Based on its performance during the 2016 primary elections, including its failure to translate the ballots into Navajo, making three additional polling places during the 2016 general election will not ensure the County meets its language assistance obligations under Section 203.

---

[4] Although San Juan County provided an in-person voting location in Monticello, the inability of San Juan County's Navajo population to access the Monticello polling place for in-person oral assistance meant voters requiring language access were not able to "participate effectively" in the election. *See* 28 C.F.R. § 55.20(a). Monticello is 89.7% white. 2010-2014 American Community Survey 5-Year Estimates, Table B02001.

**b.**  **San Juan County Failed to Provide the Public with Election Information in Navajo**

The U.S. Attorney General has issued regulations regarding oral assistance and election-related publicity mandated by Section 203 for unwritten languages: "Announcements, publicity, and assistance should be given in oral form to the extent needed to enable members of the applicable language minority group to participate effectively in the electoral process." 28 C.F.R. § 55.20(a). Specifically, jurisdictions should publicize information including "the display of appropriate notices, in the minority language, at voter registration offices, polling places, etc., the making of announcements over minority language radio or television stations, the publication of notices in minority language newspapers, and direct contact with language minority group organizations." 28 C.F.R. § 55.18(e).

Though Defendants have made promises regarding their plans to inform Navajo voters of the election process and polling place changes, they failed to do so for the 2016 primary election. For instance, although information regarding the election was provided in English on the San Juan website, no translations were provided in Navajo, apart from a short, incomplete explanation (but not translation) of the primary ballots. The County did not provide translations of any other election materials, including the voter registration form, election information, and candidate filing information, in violation of their Section 203 requirements on its website or anywhere else. *See* NNHRC Decl., Ex. 8; 28 C.F.R. § 55.18(e).

**c.**  **San Juan County Failed to Provide Effective Navajo Language Translation**

On the occasions when San Juan County provided Navajo translation, the translations were inadequate and ineffective. While the website provided an explanation of the ballot for the 2016 primary election, the Navajo translation was not certified or checked in any way, and as a result is inconsistent and inaccurate. NNCRC Decl. ¶ 14. Mr. Tapaha, the Navajo liaison for the

County, provides translation services for the County, but his translations are not reviewed by a trained translator or anyone employed by the County. Kane Decl., Ex. 1, Part 2 at 32:1-13. Mr. Tapaha testified his wife sometimes reviews his translations, but she has not been trained in translation. *Id.*

Translators are recruited informally by Mr. Tapaha and translators are not required to have any relevant qualifications. Kane Decl. Ex. 1, Part 2 at 91:10-17.  Mr. Tapaha has expressed concerns that the lack of formal training for translators means there is a risk translators "misword[ ]" when they try to translate the ballot. *Id.* at 98:8-18. Without effective translators, San Juan County cannot fulfill its Section 203 obligation to provide effective assistance to Navajo speakers.

### B.      Plaintiffs' Are Likely to Succeed on the Merits of Their Equal Opportunity Claim under Section 2 of the Voting Rights Act

Plaintiffs are likely to succeed on the merits of their claim under Section 2. Plaintiffs have "less opportunity" to vote given the significantly greater distance they must travel to take advantage of in-person voting, compared to white citizens, combined with the depressed socioeconomic status of and current and historical discrimination against Navajo people in San Juan County. Section 2 prohibits a political subdivision from imposing or applying any voting practice or procedure "in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group]." 52 U.S.C.A. § 10301(a). A violation of Section 2:

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) [of this section] in that its members have *less opportunity than other members of the electorate to participate in the political process* and to elect representatives of their choice.

*Id.* § 10301(b) (emphasis added). A violation of Section 2 does not require discriminatory intent. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986) ("Congress substantially revised § 2 [in 1982] to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test[.]'").

The plain language of the statute requires the Court to assess whether a violation of Section 2 has occurred based upon the "totality of the circumstances." The factors the Court may consider in assessing the "totality of the circumstances" include, but are not limited to:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
> (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> (6) whether political campaigns have been characterized by overt or subtle racial appeals;
> (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Sanchez v. State of Colo.,* 97 F.3d 1303, 1310 n.11 (10th Cir. 1996).[5] These factors are referred to as the "Senate Factors."

Section 2 does not require a showing that voters cannot register or vote under any circumstance. *See, e.g., Miss. State Chapter of Operation PUSH, Inc. v. Mabus ("Operation*

---

[5] Two other factors are also probative in the totality-of-the-circumstances test: (8) "a significant lack of response from elected officials to the needs of the minority group," and (9) whether "the policy underlying the jurisdiction's [action was] tenuous." *Bone Shirt v. Hazeltine,* 461 F.3d 1011, 1022 (8th Cir. 2006) (citing *Gingles,* 478 U.S. at 44).

*PUSH I"),* 932 F.2d 400 (5th Cir. 1991) (restriction on voter registration violated Section 2 even though the challenged law did not absolutely bar any citizen from registering to vote, and notwithstanding it was possible, with a sufficient expenditure of effort, for citizens to overcome the obstacles to registration imposed by the restriction); *Spirit Lake Tribe v. Benson Cnty., N.D.*, Civil No. 2:10-cv-095, 2010 WL 4226614, at **1-2 (D.N.D. Oct. 21, 2010) (granting a preliminary injunction based on a Section 2 claim enjoining the county from closing polling places on the Reservation even though mail-in balloting was available); *Brown v. Dean*, 555 F. Supp. 502, 504-06 (D.R.I. 1982) (enjoining relocation of a polling place where plaintiffs allege such change would make it "considerably more difficult" – but not impossible – for Black voters to vote, due in part to the limitations of public transportation and lack of access to private vehicles). Rather, Section 2 involves a comparative standard: whether political processes "are not equally open to participation" by minority voters because those voters are given "less opportunity" than white voters to participate in elections and elect their representatives of choice.

Accordingly, in a Section 2 case of this type, the Court must analyze, based upon the totality of the circumstances, whether the challenged practice imposes unequal burdens on minority voters and/or unequally benefits white voters. This showing can be made, for example, by a statistical analysis showing the limitation bears more heavily upon minority citizens. (i.e., that minorities have "less opportunity" than whites to participate). *See Operation PUSH I*, 932 F.2d at 413 ("It . . . was appropriate for the court to consider evidence of statewide [voter registration] disparity to determine if Mississippi's [registration] procedures violated § 2."). However, the reviewing court must also assess the "totality of the circumstances" relevant to the challenged practice. *Operation PUSH I*, 932 F.2d at 405; *Gonzalez v. Arizona*, 677 F.3d 383, 405-06 (9th Cir. 2012) (en banc) (considering the Senate Factors in evaluating a Section 2

challenge to Arizona's voter ID law), *aff'd on other grounds, Ariz. v. Inter Tribal Council of Ariz. Inc.*, 133 S.Ct. 2247, 186 L. Ed. 2d 239 (2013); *Brooks v. Gant*, No. CIV. 12-5003-KES, 2012 WL 4482984, at *6 (D.S.D. Sept. 27, 2012).

### 1.   The County's Reduction in Polling Places Disproportionately Burdens Navajo Citizens in San Juan County

Navajo residents of San Juan will be disproportionately impacted by the County's reduction in polling places in the 2016 general election, regardless of whether San Juan (1) conducts the 2016 general elections using the same four polling sites as used in the primary, or (2) restricts in-person voting to Monticello, as was the case in the 2014 and 2015 elections.

### a.   If the County Restricts In-Person Voting to Monticello, Navajo Citizens will be Disproportionately Burdened

Plaintiffs do not know how many polling sites the County intends to open for the 2016 general election.[6] If the County reverts back to the mail-only system it used prior to Plaintiffs' Complaint being filed, Navajo citizens will have to travel, on average, 103.57 minutes to vote in-person, as compared with an average travel time of just 34.66 minutes for white voters. Webster Decl., Ex. 1. In other words, Navajo citizens would have to travel more than three times as long as white residents in order to take advantage of in-person voting opportunities. Such unequal opportunity is exactly the kind of practice Section 2 is meant to prevent. See *Thornburg*, 478 U.S. at 43-47; *Bone Shirt*, 461 F.3d at 1017-18 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an

---

[6] The County has not produced any contemporaneous documentation of its decision to reopen polling places for 2016, other than a press release issued weeks after the complaint was filed. Furthermore, deponents for the County have been unable to explain when, precisely, the decision was made. If decisions can be made with such lack of formality, they can be "unmade" with similar nonchalance. Furthermore, though Defendants assert in unverified pleadings they will have four polling places open in "future election cycles," they offer no guarantee that will be the case. As discussed elsewhere, Defendants have given little reason for Plaintiffs to trust their claims given that Defendants failed to live up to the claims they made regarding the primary election.

inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred

[representatives].") *Thornburg*, 478 U.S. at 43-47; *Bone Shirt*, 461 F.3d at 1017-18.

> **b.    If the County Conducts the Elections Using Four Polling Locations, Navajo Citizens will be Disproportionately Burdened**

Even if the County maintains the four polling locations it opened for the June primary,

Navajo voters will still not have an equal opportunity to cast their ballot. Although the four

polling locations equalize travel distance to vote in person for Navajo and white residents, the

three polling locations in majority Navajo precincts will be open only on Election Day. ECF No.

41 ¶ 1 ("no voter in the County will be more than one hour's travel away from an in-person

polling place *on election day*.") (emphasis added). The polling place in the majority white

precinct, on the other hand, will be open not just on Election Day, but also for fourteen days of

in-person voting prior to Election Day.

Utah Election Code 20A-3-601(1)-(2) provides "[a]n individual who is registered to vote

may vote before the election day" and the "voting period shall [ ] begin on the date that is 14

days before the date of the election." Voting is conducted for a "minimum of four days during

each week" for local special elections and primary and general municipal elections; for all other

elections, voters can cast their ballots early any weekday. *Id.* at 20A-3-601(3). Utah Election

Code 20A-3-603 further requires election officers to "designate one *or more* polling places for

early voting." (emphasis added). In San Juan, however, the County provides early in-person

voting only in the county clerk's office in Monticello. NNHRC Decl. ¶ 4, Ex. 1 (Public Notice

indicating "[r]egistered voters of San Juan County Utah can cast an Early Vote ballot in the

clerks [sic] office weekdays from 8:00 A.M. to 5:00 P.M."); Kane Decl., Ex. 2 at 45:20-24

(deposition transcript of office manager of County Clerk's office in 2015, indicating voters could

vote "any time" at the Clerk's office in advance of the election). As noted in the Complaint, the

location of in-person voting in Monticello during the election process provides white residents, but not Navajo residents, with a number of benefits including the ability to easily troubleshoot a problem, get a replacement ballot, or provide identification if a voter has to vote by provisional ballot. ECF No. 2, ¶¶ 38-39. As the Office Manager for San Juan County has explained "[t]he advantage of having a polling location in our office is that we were able to resolve any of those [voting related] issues in our office." Kane Decl., Ex. 2 at 16:22-24.

In addition to not having equal access to polling sites in terms of hours, Navajo residents do not have equal access to polling sites under the 2016 primary scenario given socio-economic barriers. For example, Navajo residents are more likely to live below the poverty level and lack access to a car. 2009-2013 American Community Survey 5-Year Estimates, S1701. Accordingly, even if opening three additional in-person voting sites means "no voter in the County is more than one hour's drive away from an in-person voting location on election day" in San Juan, ECF No. 62 ¶ 10, the County has not created equal opportunity. For the great number of Navajo citizens in San Juan who are struggling to meet their basic needs, the cost of driving an hour to vote may be prohibitive.[7]

Furthermore, the fact many Navajo live in rural areas of the County complicates mail delivery and means they are less likely to receive their mail or experience delays in receiving their mail including their ballots. NNHRC Decl. ¶ 17; Whitehat Decl. ¶ 4 (noting a delay of almost two weeks from the date the County sent out ballots to the date Whitehat received his ballot); cf. Kane Decl., Ex. 4 (County Commission notes dated October 6, 2014, in which the Clerk informs commissioners ballots for the 2014 general election would be mailed out on October 10th and received four days later on October 14th). Emails produced during discovery in

---

[7] When each precinct had a polling place, the average travel time for Navajo residents to get to a polling place was just 13.94 minutes. Webster Decl., Ex. 1.

the current redistricting case[8] against San Juan highlight the problem of bad addresses. An October 7, 2014 email, presumably from an employee, Mark, at the mail service company hired by the County to help send out ballots, reads:

> David, I have processed the addresses for San Juan County ballots. I am concerned with the number of bad addresses that were detected during processing. On average when I process a list, the percentage of bad addresses is around 1-2%. With the list for San Juan County, the percentage is 8% (nearly 500 addresses).

Kane Decl., Ex. 3. The next email in the chain appears to be from a supervisor, David Baker, at the mail service company. Mr. Baker forwards Mark's email regarding the percentage of bad addresses to the former San Juan County Clerk, Norman Johnson, and notes "many if not most of the bad addresses will be returned" and asks how to proceed; Mr. Johnson's response is to "go ahead and proceed." *Id*. Unsurprisingly, Professor McCool explained he found many Navajo ballots were returned because of inadequate addresses in San Juan. Declaration of Dr. Dan McCool (McCool Decl.), Expert Witness Report at 183-84, attached hereto as Exhibit E. Even when Navajo residents do receive their mail, it is often much later than white residents. Whitehat Decl. ¶ 4 (noting he received his ballot almost two weeks after the County had mailed them out); *see also* McCool Decl., Expert Witness Report at 189-191.

Finally, the experience and expectation of hostility associated with traveling to Monticello is a significant deterrent for many Navajo in San Juan County. As discussed more below, historical discrimination against Navajo in San Juan is well documented so it is no surprise Plaintiffs and other Navajo residents would avoid going to the majority white town of Monticello to vote early in person. NNHRC Decl. ¶ 18.

---

[8] The suit, *Navajo Nation v. San Juan Cnty.*, No. 2:12-CV-00039, 2015 WL 1137587 (D. Utah Mar. 12, 2015) (*Navajo Nation I*), was filed in January 2012. The suit challenges the current district system in which, even though San Juan is majority Navajo, two of the three commission seats are traditionally held by white residents.

Again, as described above, in a Section 2 case of this type the Court analyzes, based upon the *totality of the circumstances*, whether the challenged practice imposes unequal burdens on minority voters and/or unequally benefits white voters. When considered within the totality of the circumstances, the difference in hours voting is available, socioeconomic status, poor mailing system and geographic nature of the County, and history of discrimination combine to provide "less opportunity" to Navajo voters in San Juan County to "participate in the political process."

> **2.     The Totality of the Circumstances Supports a Violation of Section 2**

The Senate Factors used to analyze the "totality of the circumstances" that are particularly pertinent to the type of Section 2 (unequal opportunities) claim at issue here include any history of official discrimination touching the right of minority citizens to register, to vote, or otherwise to participate in the democratic process (the first Senate Factor), and the extent to which socioeconomic disparities hinder minority citizens' ability to participate effectively in the political process (the fifth Senate Factor). *See Gonzalez*, 677 F.3d at 405-06; *see also* Janai S. Nelson, *The Causal Context of Disparate Vote Denial*, 54 B.C. L. Rev. 579, 596 (2013) ("Indeed, in *Gingles*, the Supreme Court underscored the importance of the fifth [Senate] factor, stating the 'essence of a § 2 claim is that a certain electoral law, practice, or structure *interacts with social and historical conditions* to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'") (emphasis in original).While it is not necessary to prove every Senate Factor, in considering the broader implications of providing unequal access to Indian voters, additional relevant Senate Factors are also discussed below. *See Thornburg*, 478 U.S. at 45 (noting "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other").

a.     **Senate Factor 1: History of Official Discrimination Affecting the Right of Minorities to Participate in the Democratic Process**

The first Senate Factor, a history of official discrimination related to voting, weighs heavily in favor of Plaintiffs. This Court has recognized San Juan County's discrimination against Navajo voters in a number of cases. In *Yanito v. Barber*, 348 F. Supp. 587 (D. Utah 1972), this Court considered whether the San Juan County clerk had intentionally discriminated against Navajo residents running for office and found in favor of plaintiffs, noting a history of discrimination against Native Americans, at the federal, state and county level. Similarly, in 1984 this Court found "'the process leading to the selection of County Commissioners in San Juan County' had failed to 'comply fully' with Section 2 of the Voting Rights Act." *Navajo Nation I*, 2015 WL 1137587, *1 (quoting *United States v. San Juan Cnty.,* No. C-83-1286W (D. Utah, April 4, 1984)). Most recently, this Court found San Juan County intentionally discriminated against its Navajo residents in failing to redraw county election districts in *Navajo Nation v. San Juan Cty.*, No. 2:12-cv-00039-RJS-DPB, 2016 WL 697120 (D. Utah Feb. 19, 2016) *(Navajo Nation II)* and the County's "school board districts violated the one-person, one vote rule" of the Equal Protection Clause. *Navajo Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253, 1253 (D. Utah 2015).

A more complete history of the official discrimination affecting the right of Navajo residents of San Juan to participate in the electoral process is found in Professor McCool's expert report. McCool Decl., Expert Witness Report.

b.     **Senate Factor 2: Racially Polarized Voting**

In San Juan County, biracial elections since 2000 have been racially polarized, with Native American voters supporting Native American candidates and non-Native American voters largely supporting only non-Native American candidates. *See* Declaration of Richard L.

Engstrom (Engstrom Decl.), Expert Witness Report at 7, 11, attached hereto as Exhibit F

("Native American voters were always cohesive in their support for Native American candidates,

and non-Native American voters invariably vetoed that choice when elections were held in a

context in which a majority of the VAP [voting age population] was not Native American.").

> c.    **Senate Factor Three: Use of Unusually Large Election Districts or Other Voting Practices Enhancing Opportunity for Discrimination**

As discussed above, this Court has recognized San Juan's intentional use of voting

districts which discriminate against Navajo residents. *Navajo Nation II*, 2016 WL 697120, at *9

("San Juan County expressly admits that District Three was intentionally created by the

Commission to have a heavy concentration of American Indians.") (internal quotations omitted);

*id.* at *4 (School Board election districts were maintained for over 20 years although they never

complied with the constitutional one-person, one-vote requirement.).

> d.    **Senate Factor Five: Effects of Discrimination on Socioeconomic Status**

Senate Factor Five examines the "extent to which members of the minority group… bear

the effects of discrimination in such areas as education, employment and health, which hinder

their ability to participate effectively in the political process." *Sanchez,* 97 F.3d at 1310 n.11.

Navajo residents of San Juan "bear the effects of discrimination" in all these areas. For instance,

there have been a number of cases concerning discriminatory education practices in San Juan.

"In 1974, Native American students residing in San Juan County brought an action against

District, county and state officials alleging that they had 'pursued a longstanding pattern of deep-

rooted racial discrimination' resulting in 'unequal educational opportunities for Native American

children attending the San Juan public schools.'" *Meyers By & Through Meyers v. Bd. of Educ.*

*of San Juan Sch. Dist.*, 905 F. Supp. 1544, 1552 (D. Utah 1995). Similarly, in 1995, this Court

heard a case in which Navajo school children successfully challenged the San Juan school board to compel them to provide secondary school facilities in remote area of Navajo reservation. *Id*. Unfortunately, disparities in education continue today in San Juan: although 91.3% of white residents in San Juan have at least a high school degree, only 72% of American Indian residents do. 2006-2010 American Community Survey Selected Population Tables DP-02.

Furthermore, poverty rates are also drastically different: while only 11.2% of whites in the County live below the poverty level, 42.3% of American Indians live below the poverty line. 2009-2013 American Community Survey 5-Year Estimates, S1701. Nearly a third of American Indian households in the county live off an income of less than $10,000. 2009-2013 American Community Survey 5-Year Estimates B19001C. Given the high rates of poverty among Navajo residents of the County, it is unsurprising less than one percent of white households in San Juan have no vehicle, while one in ten American Indian households are without a vehicle. 2006-2010 American Community Survey Selected Population Tables, DP04.

These are precisely the type of factors the District of North Dakota considered in granting a preliminary injunction in favor of American Indian plaintiffs in a case very similar to the one here. In the *Spirit Lake* case*,* Benson County, North Dakota, closed seven out of eight polling places – ostensibly for financial reasons – after adopting a vote by mail plan it claimed was an adequate substitute for in-person voting. The sole remaining in-person polling place was located in the county seat. The court found a number of factors contributed to the inability of American Indian voters to get to the sole remaining polling place in the county, including: a "lack of reliable vehicles," a "lack of sufficient buses to transport voters," a "lack of sufficient funds to pay for transportation" and "the sheer distance between the more remote areas of the reservation and Minnewauken [the remaining polling place]." *Spirit Lake Tribe v. Benson Cnty*., N.D., No.

2:10-CV-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010).

### e.   Senate Factor Six: Use of Racial Appeals in Political Campaigns

Multiple political campaigns in San Juan have been characterized by racial appeals. In a 1990 election, for instance, a flyer was distributed advising residents that "Utah Navajos are 60% of all the people in San Juan County, so if they all vote, they can always control the county." McCool Decl., Expert Witness Report at 129. Then just four years ago, in 2012, supporters of Bruce Adams, one of the current county commissioners, ran an ad warning his Navajo candidate (Willie Grayeyes) was "campaigning on promises that if he is elected he will use San Juan County money for projects on the reservation…" *Id.*

### f.   Senate Factor Seven: Extent to Which Minorities Have Been Elected to Public Office

Navajo candidates have had limited success being elected to office. Navajo residents have never been elected to a majority of seats in the county commission or school board. *Id.* at 82-94; Engstrom Decl., Expert Witness Report ¶¶ 14-18. Navajo candidates have consistently lost to white candidates: for instance, in 1990 Indian candidates ran for five of six countywide seats and lost in each race. Engstrom Decl., ¶¶ 19-36. No Navajo has ever won a countywide election and, before the U.S. Department of Justice filed suit against the County, no Navajo resident had been elected to County office. McCool Decl., Expert Witness Report at 82-94; Engstrom Decl. ¶¶ 14-18. After the DOJ lawsuits, and the creation of single-member districts, a Navajo has been elected to the third district every election. However, while Navajo candidates have had limited success in recent years, such success does not weaken Plaintiffs' argument under factor seven, when considered within the totality of the circumstances. *See Gingles*, 478 U.S. at 76 (noting "sporadic" success by minority candidates cannot be used to defend a discriminatory voting system).

### C.      Irreparable Injury Will Result Absent Preliminary Relief

Because of both the importance of the constitutional right to vote and the very nature of voting itself, abridgment of the equal right to vote constitutes irreparable harm. As the Supreme Court has recognized, the "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964). Denial of the right to participate in an election is by its nature an irreparable injury that could never be remedied by monetary compensation. *See id.,* 377 U.S. at 585 (once it has been established Section 2 has been violated, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan").

Federal courts have recognized the holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to the voters. *See, e.g., Puerto Rican Organization for Politcal Action v. Kusper,* 350 F. Supp. 606, 609-11 (N.D. Ill. 1972) (granting preliminary injunction to prevent violation of Section 4(e)); *United States v. Metropolitan Dade Cnty Fla.,* 815 F. Supp. 1475, 1478 (S.D. Fla. 1993) (granting temporary restraining order to prevent violation of Section 203); *Dillard v. Crenshaw Cnty.,* 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (granting preliminary injunction to prevent violation of Section 2); *United States v. Berks County*, 250 F. Supp. 2d 525, 540 (E.D. Pa 2003) (collecting citations).

Moreover, Congress' specific provision for injunctive relief in the Voting Rights Act supports a finding of irreparable harm. The Voting Rights Act authorizes the Attorney General to seek "preventative relief, including an application for a temporary or permanent injunction" whenever any person has engaged or there are reasonable grounds to believe a person is about to engage in a violation of the Voting Rights Act. 52 U.S.C.A. § 10308(d). It is well established Congress's specific provision for injunctive relief in a statute establishes Congress's

determination that irreparable harm will result if proscribed acts are not enjoined. *See, e.g.,*

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 803 (3d Cir. 1989) (citing *Gov't*

*of Virgin Islands, Dep't of Conservation and Cultural Affairs v. Virgin Islands Paving,* 714 F.2d

283, 286 (3d Cir. 1983)) ("a statutory provision authorizing preliminary injunctive relief upon a

showing of probable cause to believe that the statute is being violated may be considered a

substitute for a finding of irreparable harm"); *see also United States Postal Serv. v. Beamish,* 466

F.2d 804, 806 (3d Cir. 1972). Thus, Congress has determined irreparable injury occurs and

preliminary relief should be provided when a protected class will have "less opportunity than

other members of the electorate to participate in the political process and to elect representatives

of their choice." 52 U.S.C. § 10503.

Here, the irreparable harm is clear. Without an injunction, Plaintiffs will not have the

same access to the ballot as their white counterparts in the upcoming election.

### D.      The Injury to Plaintiffs Greatly Outweighs Any Purported Injury to Defendants

As has been shown above, Plaintiffs are being deprived of their constitutional right to

vote. Therefore, the threatened injury to Plaintiffs outweighs any damage an injunction might

cause Defendants. Once the opportunity to participate fully in the electoral process, with the

same opportunities and conveniences white voters have with respect to voting, is lost for a

certain election, it cannot be regained. The requested relief, however, would represent a minimal

burden on Defendants. Plaintiffs have requested Defendants take steps necessary to provide

Navajo voters equal access to the electoral process. "Although these reforms may result in some

administrative expenses for Defendants, such expenses are likely to be minimal and far

outweighed by the fundamental right at issue." *Berks County*, 250 F.Supp. 2d at 541; *see also*

*Johnson v. Halifax County, N.C.*, 594 F. Supp. 161, 171 (E.D. N.C. 1984); *Taylor v. Louisiana*,

419 U.S. 522, 535 (1975). Furthermore, the type of relief requested is consistent with the relief established in similar cases concerning jurisdictions covered by Section 203. *See e.g., Nick v. City of Bethel*, No. 3:07-CV-0098, ECF No. 327, Order (D. Alaska July 30, 2008); *United States v. Bernalillo Cnty.*, No. CV-98-156-BB/LCS, Consent Order (D.N.M. April 27, 1998).

Moreover, Plaintiffs have filed their Motion for Preliminary Injunction nearly three months before the November 8th general elections. Courts have ordered the type of relief Plaintiffs request within far shorter time periods for Defendants to comply. *See Chinese for Affirmative Action*, 580 F.2d at1008 (plaintiffs entitled to injunctive relief in a Section 203 case, even though defendant had "only a few days" before the next election); *see also Berks Cnty*, 250 F.Supp.2d at 541 (citing injunctions granted just days in advance of elections).

### E.    The Public Interest Weighs in Favor of Granting Immediate Injunctive Relief

Finally, public interest favors injunctive relief and the immediate reopening of polling sites equally accessible to Navajo voters, as well as the establishment of full translation, interpretation and assistance services to Navajo speaking voters. The right to vote is a "precious" and "fundamental" right and other rights risk becoming illusory when the right to vote is undermined. *See Harper v.Va. State Bd. of Elections* , 383 U.S. 663, 670 (1966); *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964). Policies that extend this fundamental right to "permit[] as many qualified voters to vote as possible" further the public interest. *Obama for Am v. Husted.*, 697 F.3d 423, 436-37 (6th Cir. 2012).

There is no question ordering Defendants to conduct elections in compliance with the Voting Rights Act so all citizens may participate equally serves the public interest. As the Supreme Court noted in *Reynolds,* "[u]ndoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." 377 U.S. at 561-62; *see also Harris,* 593 F. Supp. at 136

("when Section 2 is violated the public as a whole suffers irreparable injury."). Further, when the Voting Rights Act and other federal statutes protecting constitutional rights are enforced, the "core principles of our democracy," *Berks Cnty.*, 250 F.Supp. 2d at 541, are strengthened and the public interest is served. *See Quick Bear Quiver v. Nelson*, 387 F. Supp. 2d 1027, 1034 (D. S.D. 2005) ("The public has an interest in ensuring compliance with federal laws, namely the VRA."); *see also United States v. Raines*, 362 U.S. 17, 27 (1960) (reversing denial of preliminary injunction in voting rights case and holding "there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights..."). Fully reopening physical polling sites so voters have access to the same polling locations as in 2012, opening satellite offices on the portion of San Juan County covered by the Navajo reservation so Navajo voters can take advantage of early in-person voting, and providing full translation, interpretation and assistance services to Navajo speaking voters would ensure Navajo residents have the same voting opportunities as others, thereby advancing the purpose of the Voting Rights Act and serving the public interest.[9]

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court order Defendants to (1) reopen polling sites equally accessible to Navajo voters as to white voters; (2) creating at least three satellite offices on the Navajo Reservation to allow early in-person voting; and (3) fully comply with their obligations under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503, to provide full translation, interpretation and assistance services to Navajo speaking voters, to govern the November 2016 general election, and other elections until further order of

---

[9] If the Court orders the County to reopen precinct-based polling places (i.e., polling places in which a voter can only vote a regular ballot at the polling place for their precinct), Plaintiffs request the Court also order the County to engage in a full public education campaign to ensure voters know where to go to vote on Election Day.

this Court. Because a detailed structure is necessary to measure and monitor compliance with the

language provisions of the Voting Rights Act, Plaintiffs have submitted a Proposed Order drawn

from orders in similar Section 203 cases and the 1983 settlement agreement between the U.S.

and San Juan County.

RESPECTFULLY SUBMITTED,

/s/ John Mejia_____
John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
American Civil Liberties Union of Utah
355 North 300 West
Salt Lake City, UT 84103
T: (801) 521-9862
jmejia@acluutah.org
lfarrell@acluutah.org

M. Laughlin McDonald*
American Civil Liberties Union Foundation
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 500-1235
lmcdonald@aclu.org

Ezra D. Rosenberg*
M. Eileen O'Connor*
Arusha Gordon*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., Suite 400
Washington, D.C. 20005
T: (202) 662-8600
erosenberg@lawyerscommittee.org
eoconnor@lawyerscommittee.org
agordon@lawyerscommittee.org

Maya Kane*
10 Town Square, #52
Durango, Colorado  81301
T: (970) 946-5419
mayakanelaw@gmail.com

Raymond M. Williams*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
T: (215) 656-3300
raymond.williams@dlapiper.com

*Admitted pro hac vice