Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : : : : : : : | |
| Plaintiffs, | : : | **DEFENDANTS' APPENDIX OF EXHIBITS** |
| v. | : : | Case No. 2:16-cv-00154 JNP |
| SAN JUAN COUNTY; JOHN DAVID NIELSON, in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, | : : : : : : : | Judge Jill N. Parrish  Magistrate Judge Brooke C. Wells |
| Defendants. | : : | |

---

SAN JUAN COUNTY; JOHN DAVID            :
NIELSON; PHIL LYMAN, BRUCE             :
ADAMS; and REBECCA BENALLY             :
                                       :
        Counterclaim Plaintiffs,       :
                                       :
v.                                     :
                                       :
NAVAJO NATION HUMAN RIGHTS             :
COMMISSION; PEGGY PHILLIPS; MARK       :
MARYBOY; WILFRED JONES; TERRY          :
WHITEHAT; BETTY BILLIE FARLEY;         :
WILLIE SKOW; and MABEL SKOW,           :
                                       :
        Counterclaim Defendants.       :
                                       :

## **TABLE OF CONTENTS**

Declaration of John David Nielson (May 12, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 1

DOJ Flyer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 2

Declaration of John David Nielson (August 11, 2016). . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 3

Declaration of John David Nielson (August 15, 2016). . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 4

Third Declaration of Norman Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 5

Deposition of Gail Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 6

Exhibit 15 to Deposition of Gail Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 7

Declaration of Kimball William Brace. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 8

Deposition of Edward Tapaha (June 24, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 9

Navajo Language Election Terminology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 10

Deposition of Norman Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 11

Deposition of Edward Tapaha (June 24, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 12

30(b)(6) Deposition of San Juan County (James Francom).. . . . . . . . . . . . . . . . . . . Exhibit 13

Navajo Times June 8, 2016 Article. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 14

Declaration of Kendall G. Laws.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 15

Declaration of James Francom.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 16

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2016, I electronically filed the foregoing

document with the U.S. District Court for the District of Utah.  Notice will automatically be

electronically mailed to the following individual(s) who are registered with the U.S. District

Court CM/ECF System:

| | |
|---|---|
| John Mejia (Bar No. 13965)<br>Leah Farrell (Bar No. 13696)<br>American Civil Liberties Union of Utah<br>355 North 300 West<br>Salt Lake City, UT 84103<br>T: (801) 521-9862<br>jmejia@acluutah.org<br>lfarrell@acluutah.org<br>*Attorneys for Plaintiffs* | Ezra D. Rosenberg*<br>M. Eileen O'Connor*<br>Arusha Gordon*<br>Lawyers' Committee for Civil Rights Under Law<br>l401 New York Ave., Suite 400<br>Washington, D.C. 20005<br>T: (202) 662-8600<br>erosenberg@lawyerscommittee.org<br>eoconnor@lawyerscommittee.org<br>agordon@lawyerscommittee.org<br>*Attorneys for Plaintiffs* |
| M. Laughlin McDonald*<br>American Civil Liberties Union<br>Foundation<br>2700 International Tower<br>229 Peachtree Street, NE<br>Atlanta, GA 30303<br>T: (404) 500-1235<br>lmcdonald@aclu.org<br>*Attorneys for Plaintiffs* | Maya Kane*<br>10 Town Square, #52<br>Durango, Colorado 81301<br>T: (970) 946-5419<br>mayakanelaw@gmail.com<br>*Attorneys for Plaintiffs* |
| William A. Rudnick*<br>DLA Piper LLP (US)<br>203 North LaSalle Street, Suite 1900<br>Chicago, IL 60601<br>T: (312) 368-4000<br>william.rudnick@dlapiper.com<br>*Attorneys for Plaintiffs* | Raymond M. Williams*<br>DLA Piper LLP (US)<br>One Liberty Place<br>1650 Market Street, Suite 4900<br>Philadelphia, PA 19103<br>T: (215) 656-3300<br>raymond.williams@dlapiper.com<br>*Attorneys for Plaintiffs* |

| Patrick Castaneda<br>DLA Piper, LLC<br>One Liberty Place<br>1650 Market Street, Suite 4900<br>Philadelphia, PA 19103-7300<br>Telephone: 215-656-3378<br>patrick.castaneda@dlapiper.com | |
| --- | --- |

/s/ jesse c. trentadue

*T:\7000\7788\1\DEFENDANTS APPENDIX OF EXHIBITS.wpd*

# EXHIBIT 1

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : <br> : <br> : <br> : <br> : <br> : | |
| Plaintiffs, | : <br> : | **DECLARATION OF JOHN DAVID NIELSON** |
| v. | : <br> : <br> : | |
| SAN JUAN COUNTY; JOHN DAVID NIELSON, in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, | : <br> : <br> : <br> : <br> : <br> : <br> : | Case No. 2:16-cv-00154 JNP <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Brooke C. Wells |
| Defendants. | : <br> : | |

| | |
|---|---|
| SAN JUAN COUNTY; JOHN DAVID NIELSON; PHIL LYMAN, BRUCE ADAMS; and REBECCA BENALLY | : : : |
| | : |
| Counterclaim Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : : : : : |
| | : |
| Counterclaim Defendants. | : |
| | : |

Pursuant to 28 U.S.C. §1746, **JOHN DAVID NIELSON** submits this *Declaration*:

1. I am an adult citizen and resident of San Juan County, Utah.

2. The purpose of this *Declaration* is to present evidence and information to the Court in this lawsuit. The statements in this *Declaration* are true and correct.

3. The statements are also based upon my personal knowledge. Furthermore, if I were present in Court and testifying, I would testify to the facts exactly as set forth in this *Declaration*.

4. I am the San Juan County Clerk/Auditor. I have held that Office since January 1, 2015.

2

5.      As the San Juan County Clerk, I am responsible for overseeing elections within the County and performing the election functions specifically assigned to county clerks under Utah's Election Code, Utah Code § 20A-1-101 *et seq*. As Clerk/Auditor, my duties include, among other duties, publishing the notice of elections, providing ballots, supervision of the polls on election day, setting up and taking down of the polls, counting the votes and reporting the results to the State of Utah Lieutenant Governors Office of Elections.

6.      For elections held in 2014, San Juan County determined, pursuant to *Utah Code* § 20A-3-302, to implement a vote-by-mail system whereby all registered voters received absentee ballots which could be mailed to the County Clerk's Office in Monticello and, for those wishing to cast a ballot in person, the County Clerk's office in Monticello, Utah was a polling place open on election day.

7.      In connection with the implementation of the vote-by-mail system, San Juan County sent its Navajo Liaison/Elections Coordinator, Mr. Edward Tapaha, to each of the Navajo chapter meetings to explain the vote-by-mail system and answer questions. In addition, the County maintained a telephone line manned by Mr. Tapaha to answer any questions that might arise in connection

with the election.

8. For elections held in 2016 (for which there will be a county-wide primary election in addition to the general election), San Juan County determined that, in addition to the County Clerk's office in Monticello, there will be three additional polling places open on election day to accommodate those voters who wish to cast their ballot in person.

9. The locations of the three additional polling locations, all of which are located on the Navajo Reservation, are as follows:

> Navajo Mountain Chapter House
> Navajo Route 16, mile marker 36.15
> Navajo Mountain, Utah
>
> Oljato Senior Center
> County Road 422, 15 miles north of Gouldings' Store
> Oljato, Utah
>
> Montezuma Creek Fire Station
> 15 South Texaco Road
> Montezuma Creek, Utah 84543

10. These three locations were selected so as to ensure that no voter in the County is more than a one-hour drive away from an in-person voting location.

11. For the 2016 election cycle, a San Juan County election official able to provide Navajo-language voting assistance will be available at each of the

polling locations.

12.    In addition, San Juan County will have a link on the Elections page of its website by which voters may access a Navajo-language audio explanation of the vote-by-mail system, including a translation of the ballot itself, which will also be available at each in-person voting location.   The website also identifies Mr. Edward Tapaha as the County's Navajo Liaison/Elections Coordinator and gives his telephone number and extension.

13.    As in prior election years, San Juan County will have Mr. Edward Tapaha atttend meetings of each of the Navajo Chapters to explain in the Navajo language the voting system and answer any questions about the election process, as well as placing Navajo-language radio announcements about the election, vote-by-mail process and in-person voting locations.

14.    San Juan County's decision to change the mail-in-voting system to better accommodate voters who would prefer to vote in person was made before the County was served with this lawsuit.  In fact, by late January or early February of 2016 the County had already made the decision to open three additional polling locations within the Navajo Reservation.

15.    San Juan County began considering possible changes after receiving

comments and concern from County voters about the mail-in-voting system, as well as the investigation conducted by the United States Department of Justice (the "DOJ"), which included a visit to San Juan County from at least October 21 through October 29, 2015.

16.     In the course of meetings with County officials in October, 2015, the DOJ did not indicate that the County's vote-by-mail system as implemented for the 2014 elections (and the 2015 municipal elections) was contrary to law or failed to meet the County's obligation to provide bilingual voting assistance to Navajo voters, but indicated that it would continue watching the way in which the mail-in-voting system affected County residents and particularly its Navajo citizens.

17.     Based on flyers, a photo of one of which is attached hereto as Exhibit A, that were posted at various County locations prior to the arrival of the DOJ staff and before any County official had even been notified that the DOJ would be visiting the County, it appears that the DOJ's investigation of San Juan County's vote-by-mail system was initiated at the request of the Navajo Nation Human Rights Commission.

18.     The DOJ did not however, either in the course of its investigation or since, notify the County that it was required to abandon or modify the County's

6

vote-by-mail system, and the DOJ is not a party to this lawsuit.

19.    Nevertheless, on October 29, 2015, the day that the DOJ met with County officials in Monticello, San Juan County began to consider making changes to improve the vote-by-mail system to add in-person polling places on the Navajo Reservation.

20.    The final decision as to the locations of the three additional polling places was made on or before February 16, 2016.  Thereafter, I sent a press release to the local newspapers about the 2016 elections, including the County's decision to open additional in-person polling locations.

21.    I sent that press release via email to *The San Juan Record* and *The Navajo Times* on March 9, 2016.   However, that press release had been prepared by the San Juan County Attorney approximately a week earlier.

22.    The County and individual County officials, including myself, named as defendants in this lawsuit were served with the *Complaint* in this lawsuit on March 16, 2016.

23.    The records maintained by the San Juan County Clerk's Office show that Plaintiff Peggy Phillips acted as an election official, including serving as a Navajo-language interpreter, in prior elections, most recently in connection with

the 2012 elections, which contradicts the allegations of the *Complaint* in this lawsuit that she needs assistance from a translator.

24.     Furthermore, the election records maintained by the San Juan County Clerk's Office also show that, contrary to the allegations of the *Complaint* in this lawsuit, Peggy Phillips did vote by mail in the 2014 election, as well as in the 2015 municipal elections.

25.     The election records maintained by the San Juan County Clerk's Office also show that Plaintiff Peggy Phillips acted as an election official and was compensated for delivering ballots to polling places in 2012, suggesting a contradiction to the allegations in the *Complaint* in this lawsuit that Plaintiff Peggy Phillips has no access to a vehicle.

26.     The election records maintained by the San Juan County Clerk's Office also show that, in 2012, Plaintiff Terry Whitehat, filed an affidavit requesting an absentee ballot and expressing a preference to vote by absentee ballot in all future elections, and did in fact vote by absentee ballot in the 2012 election, contrary to the allegations of the *Complaint* in this lawsuit that he prefers to vote in person.

27.     To my knowledge, neither Plaintiff Navajo Nation Human Rights

8

Commission (including its executive director, Mr. Leonard Gorman) nor any of the individual Plaintiffs in this lawsuit have ever communicated with the County Clerk's office with a request to meet to discuss ways in which to improve voting access, including Navajo-language assistance, for Navajo-speaking voters in San Juan County. Rather, the Navajo Nation Human Rights Commission has only demanded that all polling places be re-opened.

28. To my knowledge, neither did Plaintiffs' counsel ever communicate with the County Clerk's office with a request to meet to discuss ways in which to improve voting access, including Navajo-language assistance, for Navajo-speaking voters in San Juan County. Rather, Plaintiffs' counsel brought this lawsuit demanding that all polling places be re-opened.

29. Furthermore, the election records maintained by the San Juan County Clerk's Office show that the 2014 election in which vote-by-mail was implemented resulted in a substantial increase in voter turn out as a result of allowing voters the option of voting by mail, especially among Navajo voters.

30. In fact, during the 2014 election the number of Navajo voting more than doubled compared to previous elections without the vote-by-mail option.

31. The election records maintained by the San Juan County

9

Clerk's Office, for example, show that during the 2014 election voter participation in precincts with a heavy concentration of Navajo voters went from 25% during the 2012 election using only in-person voting at polls to 54% with vote-by-mail in 2014.

32.    This significant increase in voter participation occurred despite the fact that the 2014 election was not a national election which tends to produce a higher number of voters.

33.    The increased voter participation among Navajo voters is undoubtedly attributable in part to the fact that the mail-in-ballot process allows voters who work away from their homes on the Navajo Reservation or who are away at college or in the military, to participate in elections without having to appear at a polling place or make advance application for an absentee ballot.

34.    The increased voter participation among Navajo voters was also undoubtedly attributable to the fact that the mail-in-ballot process allows elderly voters who have no means of transportation to a polling location to vote from their homes by use of the mail-in-ballot.

35.    There are benefits to a vote-by-mail system over an in-person voting system, including, among others: (a) providing voters the opportunity to consider their election decisions over a longer period of time; (b) accommodating the needs

of voters who regularly work outside of the immediate area of their residence, are at school or in the military, without their having to apply personally for an absentee ballot which may be particularly of benefit to a significant number of Navajo voters who work away from their homes due to the limited availability of jobs in San Juan County; (c) allowing voters to make their ballot decisions away from candidates campaign efforts in close proximity to polling places; and (d) allowing limited-English proficiency voters to seek assistance from family members or other trusted acquaintances if they so choose rather than having to rely on interpreters provided by the County.

36.    San Juan County is comprised of three County Commission Districts, with the voters in each District electing a County Commission.

37.    San Juan County Commission District Three is home to a majority of the County's Navajo voters.

38.    The election records maintained by the San Juan County Clerk's Office show that, historically,  Mark Maryboy, his brother Kenneth Maryboy and/or Manual Morgan have been the only persons elected as the County Commissioner from District Three.

39.     In 2014, however, Rebecca  Benally was elected to the office of County Commissioner from District Three.

40.     Mark Maryboy, his brother Kenneth Maryboy and/or Manual Morgan are members of the Navajo Nation and so, too, is Commissioner Benally.

41.     During the 2014 election in which vote-by-mail was first implemented, the election records maintained by the San Juan County Clerk's Office show that  Commissioner Benally defeated both Kenneth Maryboy and Manual Morgan in the Commission District Three race.

42.     Pursuant to 28 U.S.C. §1746  I, JOHN DAVID NIELSON, hereby declare under the penalty of perjury that the information stated above is true and correct to the best of my knowledge.

EXECUTED in Monticello, Utah this 12th day of May, 2016.

 /s/ John David Nielson  
John David Nielson

*T:\7000\7788\I\DECLARATION_JOHN DAVID NEILSON.wpd*

## CERTIFICATION

I, Jesse C. Trentadue, hereby certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

Dated this 12th day May, 2016.

/s/ jesse c. trentadue

13

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of May, 2016, I electronically filed the foregoing document with the U.S. District Court for the District of Utah.  Notice will automatically be electronically mailed to the following individual(s) who are registered with the U.S. District Court CM/ECF System:

John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
American Civil Liberties Union of Utah
355 North 300 West
Salt Lake City, UT 84103
T: (801) 521-9862
jmejia@acluutah.org
lfarrell@acluutah.org
*Attorneys for Plaintiffs*

Ezra D. Rosenberg*
M. Eileen O'Connor*
Arusha Gordon*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., Suite 400
Washington, D.C. 20005
T: (202) 662-8600
erosenberg@lawyerscommittee.org
eoconnor@lawyerscommittee.org
agordon@lawyerscommittee.org
*Attorneys for Plaintiffs*

M. Laughlin McDonald*
American Civil Liberties Union Foundation
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 500-1235
lmcdonald@aclu.org
*Attorneys for Plaintiffs*

Maya Kane*
10 Town Square, #52
Durango, Colorado 81301
T: (970) 946-5419
mayakanelaw@gmail.com
*Attorneys for Plaintiffs*

William A. Rudnick*
DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
T: (312) 368-4000
william.rudnick@dlapiper.com
*Attorneys for Plaintiffs*

Raymond M. Williams*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
T: (215) 656-3300
raymond.williams@dlapiper.com
*Attorneys for Plaintiffs*

/s/ jesse c. trentadue

# EXHIBIT 2

# SAN JUAN COUNTY UTAH
# Mail-in Ballot
## OCT 21.15 - OCT 26.15

## MEETING DATES WITH
## United States Department of Justice

**OCT 21, 2015**   **Meeting Location TBA**
Navajo Mountain

**OCT 22, 2015**   **Meeting Location TBA**
Oljato/Monument Valley
Dennihotso | Haltchito

**Oct 23, 2015**   **Meeting Location TBA**
Mexican Water | White Mesa
West Water

**Oct 25, 2015**   **Meeting Location TBA**
Aneth | Montezuma Creek

**Oct 26, 2015**   **Meeting Location TBA**
Red Mesa | Teec Nos Pos

*What is your experience with San Juan County Utah, Mail-in Ballot syste*

*ontact the NNHRC at 928-871-7436 if you have any questi*

# EXHIBIT 3

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

|  |  |  |
|---|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : : : : : : : | **DECLARATION OF JOHN DAVID NIELSON** |
|   Plaintiffs, | : : | |
| v. | : : | |
| SAN JUAN COUNTY; JOHN DAVID NIELSON, in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, | : : : : : : : | Case No. 2:16-cv-00154 JNP  Judge Jill N. Parrish  Magistrate Judge Brooke C. Wells |
|   Defendants. | : : | |

| | |
|---|---|
| SAN JUAN COUNTY; JOHN DAVID NIELSON; PHIL LYMAN, BRUCE ADAMS; and REBECCA BENALLY | : : : |
| | : |
| Counterclaim Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : : : : : |
| | : |
| Counterclaim Defendants. | : |
| | : |

Pursuant to 28 U.S.C. §1746, **JOHN DAVID NIELSON** submits this *Declaration*:

1.      I am an adult citizen and resident of San Juan County, Utah.

2.      The purpose of this *Declaration* is to present evidence and information to the Court in this lawsuit. The statements in this *Declaration* are true and correct.

3.      The statements are also based upon my personal knowledge. Furthermore, if I were present in Court and testifying, I would testify to the facts exactly as set forth in this *Declaration*.

4.      I am the San Juan County Clerk/Auditor.  I have held that Office since January 1, 2015.

2

5.     As the San Juan County Clerk, I am responsible for overseeing elections within the County and performing the election functions specifically assigned to county clerks under Utah's Election Code, Utah Code § 20A-1-101 *et seq.*

6.     As Clerk/Auditor, my duties include, among other duties, publishing the notice of elections, providing ballots, supervision of the polls on election day, setting up and taking down of the polls, counting the votes and reporting the results to the State of Utah Lieutenant Governors Office of Elections.

7.     For the 2016  county-wide primary election, which was held on Tuesday, June 28, 2016,  in addition to the County Clerk's office in Monticello, there were three additional polling places open on election day to accommodate those voters who wish to cast their ballot in person.

8.     The locations of the three additional polling locations, all of which were located on the Navajo Reservation, are as follows:

> Navajo Mountain Chapter House
> Navajo Route 16, mile marker 36.15
> Navajo Mountain, Utah
>
> Oljato Senior Center
> County Road 422, 15 miles north of Gouldings' Store
> Oljato, Utah

> Montezuma Creek Fire Station
> 15 South Texaco Road
> Montezuma Creek, Utah 84543

9.     These three locations were selected so as to ensure that no voter in the County is more than a one-hour drive away from an in-person voting location.

10.     The records maintained by the San Juan County Clerk's Office show that during the 2016 Primary Election Plaintiff Peggy Phillips attempted to vote twice, once in person at the Oljato polling location and also by mail-in-ballot.

11.     The election records maintained by the San Juan County Clerk's Office also show that during the 2016 Primary Election Plaintiff Terry Whitehat voted at the Navajo Mountain polling location.

12.     Pursuant to 28 U.S.C. §1746  I, JOHN DAVID NIELSON, hereby declare under the penalty of perjury that the information stated above is true and correct to the best of my knowledge.

EXECUTED in Monticello, Utah this 11th day of August, 2016.

 /s/ John David Nielson
 John David Nielson

*T:\7000\7788\J\SECOND DECLARATION OF JOHN DAVID NEILSON.wpd*

**<u>CERTIFICATION</u>**

I, Jesse C. Trentadue, hereby certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

Dated this 11th day August, 2016.

<u>  /s/ jesse c. trentadue    </u>

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of August, 2016, I electronically filed the foregoing document with the U.S. District Court for the District of Utah.  Notice will automatically be electronically mailed to the following individual(s) who are registered with the U.S. District Court CM/ECF System:

John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
American Civil Liberties Union of Utah
355 North 300 West
Salt Lake City, UT 84103
T: (801) 521-9862
jmejia@acluutah.org
lfarrell@acluutah.org
*Attorneys for Plaintiffs*

Ezra D. Rosenberg*
M. Eileen O'Connor*
Arusha Gordon*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., Suite 400
Washington, D.C. 20005
T: (202) 662-8600
erosenberg@lawyerscommittee.org
eoconnor@lawyerscommitee.org
agordon@lawyerscommittee.org
*Attorneys for Plaintiffs*

M. Laughlin McDonald*
American Civil Liberties Union Foundation
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 500-1235
lmcdonald@aclu.org
*Attorneys for Plaintiffs*

Maya Kane*
10 Town Square, #52
Durango, Colorado 81301
T: (970) 946-5419
mayakanelaw@gmail.com
*Attorneys for Plaintiffs*

William A. Rudnick*
DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
T: (312) 368-4000
william.rudnick@dlapiper.com
*Attorneys for Plaintiffs*

Raymond M. Williams*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
T: (215) 656-3300
raymond.williams@dlapiper.com
*Attorneys for Plaintiffs*

/s/ jesse c. trentadue

# EXHIBIT 4

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | **THIRD DECLARATION OF JOHN DAVID NIELSON** |
| Plaintiffs, | |
| v. | |
| | Case No. 2:16-cv-00154 JNP |
| SAN JUAN COUNTY; JOHN DAVID NIELSON, in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, | Judge Jill N. Parrish |
| | Magistrate Judge Brooke C. Wells |
| Defendants. | |

| SAN JUAN COUNTY; JOHN DAVID | : |
| NIELSON; PHIL LYMAN, BRUCE | : |
| ADAMS; and REBECCA BENALLY | : |
| | : |
|          Counterclaim Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| NAVAJO NATION HUMAN RIGHTS | : |
| COMMISSION; PEGGY PHILLIPS; MARK | : |
| MARYBOY; WILFRED JONES; TERRY | : |
| WHITEHAT; BETTY BILLIE FARLEY; | : |
| WILLIE SKOW; and MABEL SKOW, | : |
| | : |
|          Counterclaim Defendants. | : |
| | : |

Pursuant to 28 U.S.C. §1746, **JOHN DAVID NIELSON** submits this

*Declaration*:

    1.     I am an adult citizen and resident of San Juan County, Utah.

    2.     The purpose of this *Declaration* is to present evidence and

information to the Court in this lawsuit. The statements in this *Declaration* are

true and correct.

    3.     The statements are also based upon my personal knowledge.

Furthermore, if I were present in Court and testifying, I would testify to the facts

exactly as set forth in this *Declaration*.

    4.     I am the San Juan County Clerk/Auditor.  I have held that Office

since January 1, 2015.

5.     As the San Juan County Clerk, I am responsible for overseeing elections within the County and performing the election functions specifically assigned to county clerks under Utah's Election Code, Utah Code § 20A-1-101 *et seq*.

6.     As Clerk/Auditor, my duties include, among other duties, publishing the notice of elections, providing ballots, supervision of the polls on election day, setting up and taking down of the polls, counting the votes and reporting the results to the State of Utah Lieutenant Governors Office of Elections.

7.     For the 2016  county-wide primary election, which was held on Tuesday, June 28, 2016,  in addition to the County Clerk's office in Monticello, there were three additional polling places open on election day to accommodate those voters who wish to cast their ballot in person.

8.     The locations of the three additional polling locations, all of which were located on the Navajo Reservation, are as follows:

> Navajo Mountain Chapter House
> Navajo Route 16, mile marker 36.15
> Navajo Mountain, Utah
>
> Oljato Senior Center
> County Road 422, 15 miles north of Gouldings' Store
> Oljato, Utah

Montezuma Creek Fire Station
15 South Texaco Road
Montezuma Creek, Utah 84543

9.     These three locations were selected so as to ensure that no voter in the
County is more than a one-hour drive away from an in-person voting location, and
that fact is confirmed by the Declaration of Plaintiffs' "time and travel" expert,
Gerald R. Webster.

10.     Buried deep within Webster's 53-page report is his assessment of the
Navajo and non-Indian travel times with respect to the four polling locations used
in the recent 2016 county-wide primary election.  Webster says that Navajo voters
had a mean travel distance to the nearest poll in order to vote in-person of only
15.24 miles while the mean distance to the nearest polling location for non-Indians
voters was 20.39 miles.[1]

11.     For the 2016  county-wide primary election, which was held on
Tuesday, June 28, 2016,  a San Juan County election official able to provide
Navajo-language  voting assistance was available at each of the polling locations.

12.     Those persons providing language assistance during the June 28,
2016 county-wide primary election were Ella Greyeyes and Maryetta Stevens at

---

[1]  Dkt. 94-2, p. 51.

the Navajo Mountain polling location; Ed Tapaha at the Montezuma Creek polling location; Edyteh Tahe at the Oljato polling location; and Fermina Keith at the Monticello polling location.

13. In addition, for the 2016 county-wide primary election held on Tuesday, June 28, 2016, San Juan County had a link on the Elections page of its website by which voters could access a Navajo-language audio translation of the ballot itself, and that audio was also available at each of the four in-person voting locations. The Count's website likewise identified Ed Tapaha as the County's Navajo Liaison/Elections Coordinator and gives his telephone number and extension.

14. Furthermore, as in prior election years, prior to the 2016 county-wide primary election San Juan County had Edward Tapaha atttend meetings of each of the Navajo Chapters to explain in the Navajo language the voting system and answer any questions about the election process.

15. These same procedures discussed in paragraphs 8, 9 11, 12 13 and 14 above, which were used in the 2016 county-wide primary election, will also be used in the November of 2016 general election.

16. With respect to the June 28, 2016 county-wide primary election, the

records maintained by the San Juan County Clerk's Office show that Plaintiff

Peggy Phillips attempted to vote twice, once in person and again by mail-in-ballot;

that Plaintiffs Mark Maryboy and Terry Whitehat voted in person; that Plaintiffs

Willie Skow and Mabel Skow voted by mail; and that Plaintiffs Wilfred Jones and

Billie Farley did not vote.

17.    Pursuant to 28 U.S.C. §1746  I, JOHN DAVID NIELSON, hereby

declare under the penalty of perjury that the information stated above is true and

correct to the best of my knowledge.

EXECUTED in Monticello, Utah this 15th day of August, 2016.

 /s/ John David Nielson  
John David Nielson

*T:\7000\7788\1\THIRD DECLARATION OF JOHN DAVID NEILSON.wpd*

6

**CERTIFICATION**

I, Jesse C. Trentadue, hereby certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

Dated this 15th day August, 2016.

/s/ jesse c. trentadue

7

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of August, 2016, I electronically filed the foregoing document with the U.S. District Court for the District of Utah. Notice will automatically be electronically mailed to the following individual(s) who are registered with the U.S. District Court CM/ECF System:

John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
American Civil Liberties Union of Utah
355 North 300 West
Salt Lake City, UT 84103
T: (801) 521-9862
jmejia@acluutah.org
lfarrell@acluutah.org
*Attorneys for Plaintiffs*

Ezra D. Rosenberg*
M. Eileen O'Connor*
Arusha Gordon*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., Suite 400
Washington, D.C. 20005
T: (202) 662-8600
erosenberg@lawyerscommittee.org
eoconnor@lawyerscommitee.org
agordon@lawyerscommittee.org
*Attorneys for Plaintiffs*

M. Laughlin McDonald*
American Civil Liberties Union Foundation
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 500-1235
lmcdonald@aclu.org
*Attorneys for Plaintiffs*

Maya Kane*
10 Town Square, #52
Durango, Colorado 81301
T: (970) 946-5419
mayakanelaw@gmail.com
*Attorneys for Plaintiffs*

William A. Rudnick*
DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
T: (312) 368-4000
william.rudnick@dlapiper.com
*Attorneys for Plaintiffs*

Raymond M. Williams*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
T: (215) 656-3300
raymond.williams@dlapiper.com
*Attorneys for Plaintiffs*

/s/ jesse c. trentadue

# EXHIBIT 5

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, LORENA ATENE, TOMMY ROCK, HARRISON (HUTCHINGS) HUDGINS, WILFRED JONES, ELSIE BILLIE, and HERMAN FARLEY, | : : : : : : | **THIRD DECLARATION OF NORMAN JOHNSON** |
| Plaintiffs, | : : : | |
| v. | : : | Civil No. 2:12-cv-00039-CW |
| SAN JUAN COUNTY, a Utah governmental sub-division; BRUCE ADAMS, San Juan County Commissioner/ Commission Chair; PHIL LYMAN, San Juan County Commissioner; KENNETH MARYBOY, San Juan County Commissioner; and NORMAN L. JOHNSON, San Juan County Clerk/Auditor, | : : : : : : : : | Judge Clark Waddoups |
| Defendants. | : : | |

---

Pursuant to 28 U.S.C. §1746, **NORMAN L. JOHNSON** submits this *Declaration*:

1.       I am an adult citizen and resident of San Juan County, Utah.

2.      The purpose of this *Declaration* is to present evidence and information to the Court in this lawsuit.   The statements in this *Declaration* are true and correct.

3.      The statements are also based upon my personal knowledge.  Furthermore, if I were present in Court and testifying, I would testify to the facts exactly as set forth in this *Declaration*.

4.      I was the San Juan County Clerk/Auditor.  I held that Office from 1999 until I retired in 2015.

5.      As the San Juan County Clerk, I was responsible for overseeing elections within the County and performing the election functions specifically assigned to county clerks under Utah's Election Code, Utah Code § 20A-1-101 *et seq*.  As Clerk/Auditor, my duties included, among other duties, publishing the notice of elections, providing ballots, supervision of the polls on election day, setting up and taking down of the polls, counting the votes and reporting the results to the State of Utah Lieutenant Governor's Office of Elections.

6.      I have noted during my years as San Juan County Clerk Auditor that there are several distinct voting patterns with respect to the election of San Juan County officials.

7.      First, in general elections for San Juan County offices the voting is fairly evenly split between Democrat and Republican.  In fact, I would say that when  it comes

2

to electing County officials the Democrat verses Republican vote has been approximately 50/50 with neither political party having an overwhelming majority.

8.      Second I have noted, too, that in those precincts where the voters are primarily members of the Navajo Nation (such as Bluff, Montezuma Creek, Aneth, Mexican Hat, Oljato, Navajo Mountain and Red Mesa), during general elections for County offices votes are primarily cast along party lines.  In other words, Navajo voters seem to prefer Democratic candidates.

Pursuant to 28 U.S.C. §1746  I, NORMAN L. JOHNSON, hereby declare under the penalty of perjury that the information stated above is true and correct to the best of my knowledge.

EXECUTED  this 28th day of October, 2015.

/s/  Norman L. Johnson
Norman L. Johnson
Declarant

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

_____

NAVAJO NATION, a federally    )
recognized Indian tribe, et al., )
                                  )
           Plaintiffs,    )
                                  )
v.                               )Civil No.
                              )2:12-cv-00039-RS
SAN JUAN COUNTY, a Utah    )
government subdivision     )
                                 )
          Defendant.    )
                                 )
                                 )
_____ )
                                 )
Attorney:                    )
                                 )
Steven C. Boos, Esquire    )
Eric P. Swenson, Esquire    )
Maya Leonard Kane, Esquire    )
MAYNES, BRADFORD, SHIPPS &    )
SHEFTEL, LLP                )
835 E. Second Avenue, Ste. 123  )
Durango, Colorado 81302-2717    )
Phone: (970) 247-1755      )
E-mail: sboos@mbssllp.com    )
       mkane@mbssllp.com    )
       E.Swenson4@comcast.net  )
_____

**DEPOSITION OF GAIL JOHNSON**

_____

    BE IT REMEMBERED that on, to wit, the 24th day of
June, 2015, this matter came on for the taking of the
deposition of **GAIL JOHNSON** before Beverly E. King,
Certified Shorthand Reporter and Notary Public of the firm
of ANIMAS REPORTING SERVICE, 919 County Road 142,
Durango, Colorado 81303, taken at the San Juan County,
Utah Administrative Offices, Monticello, Utah, at the hour
of 1:04 p.m.

```
 1                    A P P E A R A N C E S

 2

 3

 4     FOR THE PLAINTIFFS:

 5
                    Steve C. Boos, Esquire
 6                  Eric P. Swenson, Esquire
                    Maya Leonard Kane, Esquire
 7                  MAYNES BRADFORD SHIPPS & SHEFTEL, LLP
                    835 E. Second Avenue, Ste. 123
 8                  Durango, Colorado 81302-2717
                    Phone:  (970) 247-1755
 9                  Fax:    (970) 247-8827
                    E-mail: sboos@mbssllp.com
10                          mkane@mbssllp.com
                            E.Swenson4@comcast.net
11

12

13     FOR THE DEFENDANT SAN JUAN COUNTY:

14
                    Jesse C. Trentadue, Esquire
15                  SUITTER AXLAND, PLLC
                    8 East Broadway, Ste. 200
16                  Salt Lake City, Utah 84111
                    Phone:  (801) 532-7300
17                  Fax:    (801) 532-7355
                    E-mail: jesse32@sautah.com
18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                                                    PAGE

 3    APPEARANCES                                       2

 4    Witness -   GAIL JOHNSON

 5        Examination by Mr. Swenson                    4

 6        Examination by Mr. Trentadue                 54

 7        Further Examination by Mr. Swenson           60

 8        Further Examination by Mr. Trentadue         64

 9    Witness' Signature/Correction Pages              67
      Reporter's Certificate                           69
10
                      E X H I B I T S
11                                                  MARKED/
                                                  IDENTIFIED
12    EXHIBIT                                         PAGE

13    10  Letter of November 26, 1984 of Gail          18
          Johnson to State of Utah Office of
14        the Secretary of State

15    11  San Juan County Commission Meeting           24
          Minutes of January 20, 1986
16
      12  Map of San Juan County Commission            27
17        Districts 2012

18    13  Table 1, Population by Race and Spanish       27
          Origin for Election Precincts in
19        San Juan County, Utah, April 1, 1980

20    14  Excerpt of Minutes of August 11, 1980        30
          Re Al Haskins' Concerns of Census Count
21
      15  Letter of November 2, 1983 of Ms. Gail       58
22        Dalton to Mr. Calvin Black

23    16  Copy of San Juan Record Ad of                47
          September 19, 2012
24
      17  Letter of January 29, 1992 to Ms. Gail       52
25        Northern from State of Utah Division of
          Information Techology Services
```

1                        **GAIL JOHNSON,**

2    was called as a witness by the Plaintiff, and, having been

3    first duly sworn, testified upon her oath as follows, to

4    wit:

5                        EXAMINATION

6    BY MR. SWENSON:

7        Q    Well, if you can state your name and spell it for

8    her, she will need it for the record.

9        A    Gail Johnson, G-a-i-l J-o-h-n-s-o-n.

10       Q    Okay.  I am Eric Swenson representing the

11   plaintiffs in this case.  I am going to ask you a few

12   questions.  Some of it goes back quite a ways, because you

13   were county clerk --

14       A    Way back.

15       Q    -- yeah, way back.  So, I expect that is going to

16   be a bit of a challenge in terms of memory, but see if we

17   can't get through it.

18            I just have a number of things that involves you

19   back when you were clerk and maybe shed some lights on

20   things in this case.

21            What are you doing now?  You said off the record

22   even though you live here you still -- are you working

23   still here in town?

24       A    No, I am full time on the ranch with my husband.

25       Q    So, you haven't held a County position in quite a

1    while?

2         A    No.

3         Q    But you tried to get back in after you ran for

4    commissioner in 2012, was it?

5         A    Right.

6         Q    Maybe we will start with that a little bit and

7    then work back to some of the earlier history.

8              As I remember, you ran as an independent?

9         A    No.  When I ran for county commissioner --

10        Q    Right.

11        A    -- about three years ago?  I was unaffiliated.

12        Q    Oh --

13        A    Independent is a recognizable party, and as an

14   unaffiliated you are not attached to any party.

15        Q    Okay.  Since I have never voted for an

16   independent, I wouldn't know that.

17             So, you ran against -- let's see, who was it?

18        A    Bruce Adams.

19        Q    Bruce Adams?

20        A    Willy Grayeyes.

21        Q    Navajo, yeah.  And you lost.  You came in second?

22        A    I think so.

23        Q    Was that the way it worked?

24        A    Yeah.

25        Q    I have been getting the newspaper all of these

1   years here, so I followed it a little to a certain extent.

2         Did you do much campaigning down on the

3   reservation?

4   A     I went to Oljato and Navajo Mountain to chapter

5   meetings.  And I went to Monument Valley.

6   Q     Okay.

7   A     I don't know how many times, but once I can

8   remember, and I am not sure, but I would tell you two or

9   three times.

10  Q     And did you ever encounter Willy Grayeyes on the

11  campaign trail at all?

12  A     On Navajo Mountain, yes.

13  Q     Well, I will start with him and get on to Bruce.

14  I am interested in whether you had campaign issues with

15  Willy in particular that you may have exchanged, some sort

16  of a -- any sort of an issue that you may have raised that

17  involved him at all?

18  A     I guess maybe I am not understanding what you

19  would call an issue.

20  Q     I mean a campaign issue of some sort.

21  A     Other than he was Democrat and I was more

22  conservative, but, no.

23  Q     Bruce Adams, for instance, the two of you had a

24  number of campaign issues that you discussed.  That is why

25  I was interested in Willy, whether or not he had --

1      A    No.

2      Q    Okay.  Well, there were some ads in the newspaper

3   and there were some other things.  I noticed you and

4   Bruce -- well, there was an issue in an ad he wrote about

5   that old lawsuit in the 1980s.  Do you remember that, the

6   two voting cases brought by the Department of Justice?

7   And so that was -- that became a campaign issue in 2012 to

8   some extent?

9      A    I don't think that it did.  He brought it up in

10   one ad.

11      Q    That is why I asked the question.

12      A    But it hadn't been an issue.  It hadn't been

13   talked about and no one mentioned it to me.  I don't know

14   if they had to him or not.  He brought it up in an ad and

15   I thought he misrepresented it, you know.  So, the

16   following week I responded with what I felt was a

17   correction of what he said.

18      Q    Sure.  I have seen both of those things.  Well,

19   maybe we will get it into the record in awhile, but seemed

20   to me he felt that there was some problem with that case

21   and maybe it is your fault?

22      A    That is how I read it, that is was all my fault.

23      Q    That is how I read it, too.

24      A    Yeah.  And there was much more to it.  It was

25   easy to take the blame and if it is all one person's fault

1    that would be nice, but the case wasn't as simple as that.

2        Q    What in particular, not just the ad, but what you

3    heard him saying on the campaign trail, what was it he was

4    saying that you were responsible for in terms of the

5    outcome of the case?  What seemed to be bothering him

6    about what you did?

7        A    I don't really know.  I don't know.  Because when

8    he and I had a few conversations and stuff like that,

9    which were always civil when we were together, and, of

10   course, I have known Bruce all my life, that has never

11   come up.  And it has never come up with anybody I talked

12   with --

13       Q    Okay.

14       A    -- even before or after that ad.  So, I don't

15   know what the point of the -- really what his problem was

16   with that.

17       Q    Well, I didn't either, which is why I asked you,

18   to see if there was some issue concerned in that case.

19   Because the cases do -- they are still important to some

20   extent.

21            So, were there other campaign issues that you

22   addressed?  I think I saw something about a concern over

23   the county finances.

24       A    That was probably one of the major reasons, that

25   I had a group of people who came and asked me to run for

1    county commission because they were concerned about how

2    the money was being spent.  I didn't really just volunteer

3    that I would run against Bruce, I had people who

4    approached me and asked me.

5        Q    I got the impression that was the case, just

6    watching from a distance.

7        A    Uh-huh.

8        Q    But I remember you used to keep pretty close

9    track of the county finances when you were in office, and

10   it sounds like you remain fairly familiar with the

11   financial situation?

12       A    To some extent.  Not as much as before, but to

13   some extent.  But some of the things that were troubling

14   to people, they brought it to me and they said they would

15   really like a change.  So, I dug in a little deeper.

16       Q    Let me get a short list from you as to what those

17   were in a general way.  What sort of issues?

18       A    As far as the financing was?

19       Q    Yes.

20       A    One was the amount of money that the County had

21   spent and given to the Four Corners School.  The purchase

22   of the land out here by the fairgrounds.

23            Boy, off the top of my head it is kind of hard to

24   know.  Cold turkey like this it is hard to remember.

25       Q    Let me prompt you a little bit.  Hasn't the

1    County's assessed valuation gone down?

2        A    That was one of the issues I raised.  Another was

3    an expansion of the jail.  They paid a million dollars

4    towards the expansion of the jail that never was going to

5    happen.

6            The assessed valuation was actually doing fairly

7    well, you know, during those years, 2005 to 2010 or '12,

8    but you would feel it kind of creeping down.  But what was

9    concerning to me was overspending the budget, plus

10   spending the reserves, plus all the new growth.  So, you

11   are spending any new growth you get, plus you are dipping

12   into the reserves, and that is what was concerning to me.

13       Q    That was something I was going to ask you about.

14   Somebody brought it to my attention.  Well, she called it

15   a rainy day fund.

16       A    Well, I don't know if you would call it a -- you

17   know, the reserve.  The County is allowed to have a

18   reserve fund up to a certain amount.

19       Q    Right.

20       A    And to me that was something you shouldn't touch

21   because when -- when the valuations do fall they need to

22   have that there to continue on with the services as

23   normal.

24       Q    That would be county-wide services?

25       A    Uh-huh.  Whatever services they feel they needed,

1     sure.

2          Q     All right.  Then was it ever an issue when you

3     were campaigning about any expenses related to this

4     lawsuit at all?  Did that ever come up?

5          A     Never mentioned.

6          Q     Okay.  Let me get the dates when you were

7     actually county clerk.  I am not sure -- well, go ahead

8     and tell me, if you could.  Do you remember?

9          A     I think I started in January of 1983 and I left

10    in probably August of '94.

11         Q     I have it as July.  I got the end date --

12         A     It was just before I went back to teaching

13    school.

14         Q     That is when you left?

15         A     And that is why I left.  There was an opening

16    back at the school, and that worked better for my family,

17    so I went back to teaching school.  It was either July or

18    August.

19         Q     And Gail Northern was the next one?

20         A     And Gail Northern was the one who replaced me.

21         Q     You were in charge of elections at the time you

22    were --

23         A     Right.

24         Q     -- in office.  Did you have any particular

25    education or training in regards to elections at all?

1    A    Prior to becoming county clerk?

2    Q    Either way, either before or after.

3    A    No.  But I worked extensively with Vernon Carr.
4    He not only did printing the ballots, but he knew the
5    election laws.

6    Q    From Salt Lake?

7    A    Yeah, from Salt Lake.  And also Lieutenant
8    Governor Val Overson was excellent.

9    Q    Sounds like you did on-the-job training pretty
10   much was what it was.

11   A    Uh-huh.

12   Q    So, your first election when you were in office
13   would have been --

14   A    '84.

15   Q    -- 1984.

16   A    The lawsuits came in '83, so I got sued before I
17   ever had done an election.

18   Q    Well, I will resist the temptation to make humor
19   with that.  That is right, they were filed, both of them
20   were filed in '83.  You were a defendant in both cases as
21   I recall.

22        I am interested in how that all unfolded.  The
23   court records show that it was very brief in both cases.
24   It was filed, settled, court entered an order and then
25   everybody went on from there.  But in 1984 the County as a

1  result of those cases decided to go from an at-large

2  county commission election system to a district.

3      A    Right.

4      Q    And you were involved in that switchover?

5      A    Uh-huh.

6      Q    As I recall, the County sought a referendum on

7  which they had on the ballots several different types of

8  suggested apportionments.

9      A    Well, it wasn't really a referendum.

10  Schermerhorn, I think his name was James Schermerhorn, was

11  the attorney at the time from the justice department.  And

12  he had procedures that he wanted to follow to whatever.

13  And the commissioners felt like -- of course, they are not

14  here to answer for themselves, but the way I remember it,

15  they were concerned about damage drawing the lines, and

16  the lines ought to be drawn by the -- should be input from

17  the people when lines would be drawn.

18          So, Schermerhorn didn't want anything on the

19  ballot, per se.  And so when they had -- back then they

20  had the primary elections in August, I think.  And so we

21  attached -- I shouldn't say we attached, but we included

22  with that another ballot that had, oh, I don't remember,

23  three or four different ways of dividing up the county and

24  just kind of -- I think they called it a straw poll, just

25  to get kind of a -- more of a poll of getting a sense from

1    the county before they dealt -- before the commissioners

2    were willing to sign off on anything.

3         Q    Who was it that made the decision as to which one

4    of the possible changes would be on the ballot?

5         A    I don't know that it came up with anything more

6    than what was on there.  So, I don't know if there was

7    anything that was ever filled out.  I don't remember.

8         Q    That was my next question.  We found in the

9    records, the various records, that there were a number of

10   individuals and entities who submitted proposed

11   redistricting alternatives.

12        A    And I don't remember how it was determined what

13   ones were put on.  I don't remember how many were -- I

14   don't know.

15        Q    You don't remember seeing any of the alternatives

16   coming in?

17        A    I remember the things coming in, but exactly how

18   many there were and what they were, I don't remember that.

19   In fact, I don't remember how many was on that --

20        Q    Well, let me ask you about who did -- there were

21   a few people that said UNDC -- you remember UNDC?

22        A    I do.

23        Q    They submitted some.  Do you remember that?

24        A    I assume they would have.  I don't remember

25   specifically, but I am sure they would have.

1    Q    How about the Navajo tribe?

2    A    I don't know.  I don't know.

3    Q    Does the name Ron Faich -- Ron Faich sound

4    familiar to you?

5    A    No.

6    Q    Did you have anything to do with him?

7    A    No, I don't know.

8    Q    There were some individuals that sent some in

9    too, as I understand it.  Don't remember any particular

10   person?

11   A    No, I don't remember the details of that.

12   Q    And you don't recall exactly who made the

13   decision about which one of the alternatives would be on

14   that ballot?

15   A    Well, I am assuming that it would have been the

16   commissioners with the advice of the county attorney, you

17   know, that they did that, but I don't know.  I don't know.

18   Q    And then eventually there was a decision made to

19   actually certify and implement a change in the county

20   commission election districts.

21   A    Right.

22   Q    I want to show that to you.

23   A    Not the election districts, but commission

24   districts.  It didn't change the election districts.

25   Q    You are talking about precincts?

1    A    Right.

2    Q    By election districts, I mean -- you can call

3    them commission districts, that is okay.

4    A    As long as we are on the same thing.

5    Q    That is right.  By the way, while I am looking

6    for that and I am thinking about it, do you remember Tully

7    Lameman?

8    A    I do.

9    Q    He ran for county commission in that time period.

10   A    I remember that.

11   Q    My next question is -- if you don't remember he

12   ran, my next question which was he withdrew his candidacy

13   and he did that, but you signing off on the declaration,

14   you don't remember any of that?

15   A    I remember Tully Lameman and I remember he

16   worked -- I believe he worked UNDC in Blanding.

17   Q    Yes.

18   A    But I don't remember if he -- you know, I don't

19   specifically remember him running and withdrawing.  If

20   that is what it shows in that, then that is what happened.

21   I believe he passed away, didn't he?

22   Q    My last knowledge is he is quite ill and blind.

23   A    I knew that he built the same place in Blanding,

24   so I don't know.

25   Q    No, he is further south on the reservation and

1    disabled unfortunately.

2         A    Too bad.

3         Q    Yes, it is.  Why don't we -- I will put in the

4    record -- this is what we believed that was the final plan

5    to change the election commission districts that was sent

6    in under your signature.  So, can we have that marked.

7         A    I can remember, though, I don't remember

8    specifically who made the decisions, but I do remember we

9    went all over the county from Spanish Valley to Navajo

10   Mountain.  And we had -- flannel boards isn't the thing,

11   but we had all these maps that we had made up of all the

12   different proposals.  We went to chapter meetings, we went

13   to -- we had meetings in Monticello and Blanding, and we

14   went to Spanish Valley and we went all over the county

15   presenting those different options and getting input from

16   the different areas of the county.

17        Q    What was your sense of how you were received and

18   those plans?  Was there a particular plan that people

19   favored?

20        A    Oh, I don't remember.  I don't remember.

21        Q    When you were on the reservation did you receive

22   any comments from people down there about a particular

23   plan that you can remember?

24        A    I can remember in -- I don't know if it was when

25   we went to one of those meetings, but I remember Willy

1    Grayeyes was I believe the chapter president at the time

2    or he was on the tribal counsel of Navajo Mountain or

3    whatever, and he was always really good and good to work

4    with.  When they selected the Commission District 1 which

5    we currently now have, which is Oljato and Navajo Mountain

6    to Spanish Valley, I remember they talked with him, a

7    representative of that area, before they went ahead with

8    that.

9                (Exhibit No. 10 marked for identification.)

10    Q    (BY MR. SWENSON:)  You can take a look at that

11    and let us know if you can if that is what you sent in.

12    A    Well, I don't remember it specifically, but that

13    is my signature, so I am sure that is what was --

14    Q    Should have the signatures in the back there.

15    A    It does.  Unfortunately, I am the only one left

16    alive.

17    Q    Well, we checked and I think all the

18    commissioners are gone.

19    A    All the commissioners are gone.  They are all

20    gone.

21    Q    I compared that.  I want you to correct me if I

22    am wrong, but I compared that, the one that was finally

23    adopted with the two that were on the election ballot and

24    they are not the same.

25    A    No, I think it was three or four different

1 proposals.

2  Q Yeah, there were several different proposals.

3  A Oh, this wasn't on the ballot?  This one isn't?

4  Q That is the way I look at it when I was comparing

5 them.  I am just wondering if that -- if anybody brought

6 that to your attention at that time?

7  A Well, no.  I have always thought that what was on

8 the ballot -- well, it may not have been.

9 Mr. Schermerhorn was -- for lack of a better word, he was

10 difficult to work with.  From my point of view he was

11 difficult to work with.  And he didn't even want that

12 straw poll being done.  So, he may not have been agreeable

13 to any of the three that were on the ballot.

14  Q I want to ask you about Jim a bit, because I

15 remember working with him back then.  Let me ask you, who

16 made the decision to approve that final redistricting

17 plan, do you know?  Do you remember if it was the county

18 commissioners?

19  A Well, it should be in the minutes of the county

20 commission.  I am sure it was.  But I know that --

21 Schermerhorn wouldn't sign off on anything unless he

22 approved of it.  He wouldn't let anything go through

23 unless he approved of it.

24  Q Let's stay with him for a second.

25  A That is the way I remember it.  Because he didn't

1    even want them to have just the poll, just the straw poll

2    and have these meetings with the County and get the feel

3    from the people.  He didn't even want that done.

4        Q    Well, the consent decree by and large left that

5    process to San Juan County; isn't that your understanding

6    of it?

7        A    Uh-huh.

8             MR. BOOS:  "Yes" or "no."

9        Q    (BY MR. SWENSON:)  Oh, I am sorry.  When Ed

10   Tapaha was here this morning he kept nodding.  We had to

11   keep reminding him.

12       A    She can't hear the rattle in my head?

13            But I do remember, I do remember specifically

14   Mr. Schermerhorn was not happy with them putting this with

15   the election.  And I remember Calvin, and you know how

16   Calvin was very outspoken, he said, "I want to get a sense

17   from the people, you know, get some input from them and we

18   will come up with what we can."

19            What was done there -- you know, but I do

20   remember Schermerhorn was not happy that -- they would

21   draw different lines and different maps.  You know, he

22   seemed to want to be -- I didn't feel like the County

23   had -- up to them without his okay.

24       Q    Okay.  That was your impression of it?

25       A    That was my impression.

1    Q    Did he ever, that you remember, said okay,

2    this -- referring to this exhibit, was this the one that

3    he actually approved?  Do you remember if he approved one?

4    A    Specifically do I remember him saying or doing

5    that, no.  But my sense of how things were at the time, I

6    didn't feel like we could move ahead forward thinking

7    until he had approved it.  So, I would say from my point

8    of view, this would be in place if he hadn't approved of

9    it.

10    Q    Okay.  But you don't remember him actually doing

11    that?

12    A    No.  Not specifically, no.  But I do remember the

13    sense that I had was we couldn't move forward without him,

14    you know, approving the things that we did.

15    Q    Do you know who actually wrote the document that

16    contains the -- that is on the --

17    A    I am assuming the county attorney did.

18    Q    That is an interesting idea.

19    A    You would have to talk to Bruce.  Bruce was

20    county attorney at the time, and I am assuming that he

21    would have typed that up.

22    Q    So, putting Bruce aside for a minute, would there

23    be anybody else in your office who might be delegated to

24    do work like that?

25    A    To type it up?

1  Q  To type it up and actually put the terms and

2 substance in there.

3  A  No. We might have typed it up, but never

4 prepared it itself, no. I am assuming that I typed this

5 beginning letter with the initials "hs" for herself,

6 but -- because I didn't have anybody in my office. I

7 usually give my own --

8  Q  Is there anything in that document who tells you

9 who did do it?

10  A  We all used the same kind of old Select

11 typewriters then. So, I don't know. But I would think

12 that it was either drafted by Bruce and maybe somebody in

13 the clerk's office typed it up for him. Maybe the girl

14 who clerked the commission, my deputy clerk or Bruce's

15 secretary typed it up. As far as preparing it and

16 drafting it, I am sure it would have come from the county

17 attorney.

18  Q  What was your understanding at the time this was

19 adopted about how or even whether the commission district

20 should be changed? Was there a process that you had in

21 mind that would do that if changes were needed?

22  A  I guess maybe I am not -- you mean moving from

23 at-large to --

24  Q  Well, no. Once you had the three districts in

25 place and you want to revise those three election

1     districts in some way, do you have any impression at the

2     time as to how that process would have occurred?

3     A     If they had wanted to revise what they had done?

4     Q     Yes.

5     A     I don't remember that even being --

6     Q     You don't recall any discussion about that?

7     A     About changing this --

8     Q     Right.

9     A     -- no.

10     Q     Just to move on to that point, I notice in the

11     records in 1986 you actually changed some of the

12     precincts. I want to show you this thing, because it is a

13     very brief notation in the county commission notes, but

14     apparently you made a few changes to the county

15     commission -- here, I will show this to you. Then you

16     presented it to the county commission. And I am really

17     interested in that process and what you did.

18     A     Changing the commission districts?

19     Q     Yes. At least I see from the look of surprise

20     that maybe you don't think you did that?

21     A     I don't recall that. I remember making a

22     precinct, a voting precinct on the White Mesa, because

23     they were included in Blanding, but that is the only...

24     Q     Let's have this as the next -- this we will mark

25     as an exhibit. This is county commission meeting minutes

1    from January 20.  I can't read it real well, looks like it

2    is an "8," 1986.  And it says -- let's get these marked

3    first and then I will ask you.  While she is doing one of

4    those, I will just tell you what it says is that -- go

5    ahead.

6              (Exhibit No. 11 marked for identification.)

7       Q    (BY MR. SWENSON:)  Drawing your attention halfway

8    down the page there, you see the heading of the text

9    "Voting Precincts."  Why don't you take a look at that.

10      A    (Reviewing.)  Boy, I don't know what that was.

11   It affected school board lines, too.  Oh, I do think --

12   oh, I -- don't quote me on this, but you are going to

13   quote me on this, I think at the time -- I think at the

14   time Oljato and Mexican Hat, which would be Precincts 12

15   and 13, I believe they are -- are they the same school

16   board precincts?

17      Q    Without looking at an '86 map, I sure wouldn't

18   want to -- just tell me what you think you remember of it

19   and let's see where we go from there.

20              MR. TRENTADUE:  For point of clarification,

21   is this commission district or school board districts?

22              THE WITNESS:  The reason I am trying to

23   remember, it says this would affect the county commission

24   district and would also affect the school board lines.  I

25   am trying to think -- what I am thinking is, you know --

1    we had to use the 1980 census a lot.  And, you know, where

2    they -- where the people -- where they, you know, did

3    their thing.  And I believe that our -- the census --

4    again, don't quote me on this, you can probably go back

5    and check to see if I am remembering correctly, but seems

6    like Oljato extended further east and the Mexican Hat

7    precinct was not -- did not go as far west.  And based on

8    the census lines and where they were going to do those,

9    they put more of what used to be the Oljato precinct in

10   the Mexican Hat precinct.  But I am not sure that is a

11   school board line though.

12       Q    (BY MR. SWENSON:)  The county commission and

13   school boards lines are different.

14       A    Uh-huh.  But they may not be here.  You know,

15   there is two school board precincts, election districts on

16   the reservation.  That is why I don't -- it seems like 12

17   and 13 and 14 were all in one school board precinct.  I

18   might not even be remembering correctly.  That is kind of

19   what I am thinking.  I was thinking Oljato used to be

20   geographically bigger.  Then based on the census numbers

21   or something -- you are probably asking the wrong person.

22   I don't know what I did.

23       Q    Well, I wonder if there is some other way we can

24   get at this to prompt your memory.  Do you remember

25   drawing any maps during that time period?

1      A    Oh, I drew lots of maps.  In fact, I drew this
2  map (indicating).
3      Q    What is the date on this?
4      A    This says "2012," but this right here is all my
5  handwriting (indicating).  Well, maybe not mine, but it is
6  the same map and things like that.  The election precincts
7  have changed, the voting precincts have changed.  So, I
8  guess that is not my handwriting there.  None of this has
9  changed as far as any of those things.
10          So, I -- you know, when we made commission
11  districts I drew maps of the three commission districts
12  and showed where the voting precincts were so we can make
13  sure we had the right ballots at the right area.  Plus I
14  had had the map of the school board precincts and things
15  like that.  But that is just how I kind of remember.  But
16  I -- I can't be sure if that is where it was.
17                    MR. SWENSON:  Can we mark that, Counsel?
18                    MR. TRENTADUE:  Sure.
19                    MR. SWENSON:  Because she has referred to it
20  now.  We will just use the one copy.
21                    THE WITNESS:  Oh, it was on the 1990 census.
22  I mentioned the 1990 census.  So, I don't know why we made
23  a change to it.  I don't know if it didn't affect any --
24      Q    (BY MR. SWENSON:)  Do you remember seeking the
25  advice of anybody when you did that?

1    A    I just don't remember.

2    Q    Did you talk to the --

3    A    I would have talked to the county attorney before

4    I did anything and the commissioners.  But I don't --

5    because they would have had to -- you know, come up with

6    the new land description, you know, for the voting

7    precincts when that was done.  Was Craig the county

8    attorney?

9    Q    No, that is Bruce.  He was still county attorney,

10   I think.

11   A    See, this says 1996.  It is dated 1986.  This

12   must be 1986.

13   Q    Sure.  Let me show you another document.

14   A    There is a typo there, so I don't know.

15   Q    Okay.  Well, just to add to the confusion, I did

16   find a 1980 in the county records, a 1980 table that

17   appears to come from the census department.  So, let's --

18   you want to stop a minute and let's mark all that stuff.

19            MR. TRENTADUE:  Off the record.

20            (Exhibit Nos. 12 and 13 marked for

21            identification.)

22   Q    (BY MR. SWENSON:)  Maybe you could tell us if you

23   have seen that before, Exhibit 13?

24   A    I am sure I probably have, but this is 1980.  Of

25   course, I didn't take office until '83.  But it was

1    probably part of what we did when we were doing these maps

2    and stuff.  So, I don't know.

3        Q    Do you recall whether during the time of the

4    lawsuits when the Department of Justice commission special

5    census, 1980 census count?

6        A    I don't know.

7        Q    You don't know about that.  Okay.  So, is there

8    any other way that we could get out just exactly how it is

9    you came about to do what you did or even the details of

10   what it was?

11       A    I was going to say, I wish we had a map prior to

12   this, you know, the precinct map, a precinct map prior

13   to -- well, 1986 or '83 when we started drawing these

14   commission districts, and then I think we would see the

15   difference where these voting precincts are.  I am

16   thinking it was between 12 and 13, but like I say, I am

17   not sure.

18       Q    Another thing it says in the commission is,

19   drawing your attention back to that exhibit, it says that

20   you explained the new lines do not affect the population

21   with any of the precincts.  Do you remember how you got to

22   that conclusion?

23       A    I don't know.

24       Q    I didn't think you would, but does that jog your

25   memory at all?

1     A    No, it doesn't.  It doesn't, I don't know.

2     Q    The three commissioners that were present that

3   day, they are all deceased.  I guess Jerry Holiday is

4   deceased?

5     A    He is gone, yes.

6     Q    Bailey is gone, so is Cal.

7     A    But like I say, I wouldn't have done this without

8   working with the county attorney.

9     Q    We have heard in some other depositions that some

10  people believe that the three commission districts can't

11  be changed because of the lawsuit.  Did you ever have an

12  understanding about that?

13     A    I don't know about that.  I don't know.

14     Q    Did you ever consider -- in 1990 you were still

15  clerk?

16     A    Right.

17     Q    There was a 1990 census.  Did you ever consider

18  as a result of the 1990 census to change either the

19  commission districts or the school board districts?

20     A    I can't -- I don't know about the school board at

21  all, because we didn't have anything to do with that.

22     Q    Well, let's stop there.  That is an interesting

23  question.  Is it your understanding that -- well, who

24  reported to the school district election districts?  Would

25  that be the County who does that?

1    A   I would think it would be the school board, but I

2    don't know. I don't know. I don't know what the code

3    says, you know, who draws those lines up at the school

4    board. In 1990 -- I don't remember if they specifically

5    looked at it. I assume they probably did and there wasn't

6    a significant change in population and where they were at.

7    I would assume they would have maybe gotten something like

8    this. I don't know.

9    Q   So, at any time -- were you involved at all at

10    any time in the reapportionment of school district,

11    election districts?

12    A   No, never was.

13    Q   Just to make sure I understand what you said, you

14    don't know who had the authority to actually make the

15    changes in those districts?

16    A   For the school district?

17    Q   School district.

18    A   I don't know. I don't know.

19    Q   Okay. I will put one other document in. Let me

20    go to try to find that thing. Seems it is not admitted in

21    this notebook, so I will deal with that. Let me mark

22    another exhibit here. This is before your time, but deals

23    with an issue I want to ask you about.

24             MR. SWENSON: You want to mark that.

25             (Exhibit No. 14 marked for identification.)

1    Q    (BY MR. SWENSON:)  Were you given two of those?

2    A    No, this is the preceding page.  This is page

3    122, this is page 123.

4    Q    Okay.  You can see if you go down to sort of the

5    middle of the page or down toward the bottom Al Haskins

6    raised a concern about the census count in San Juan

7    County.  Do you see what I am referring to there?

8    A    Uh-huh.  I don't know what the date of this is.

9    Q    It is before you were in office.  I am just

10   giving that to you to orient you to that issue.

11   A    August of 1980.

12   Q    I am just wondering if at the time you were in

13   office there was ever any concern or question that was

14   brought to your attention about whether or not the Bureau

15   of Census had made a correct census count in San Juan

16   County?

17   A    I don't remember anything like that.

18   Q    Let me go back to the previous one.  We talked

19   about that.

20        You have said you weren't involved in any

21   reapportionment issues for the commission districts

22   following the 1990 census?

23   A    Huh-uh.

24   Q    That you can remember?

25   A    No.

1     Q   I think that is a "no"?

2     A   Sorry, no.

3     Q   It is tough to do sometimes.  You forget that she

4 has to take that down.

5          According to my -- what I see here, you left in

6 July of -- you say August, of 1991.  The school board

7 might have been reapportioned, the school board election

8 districts might have been reapportioned in 1992.  Were you

9 involved in that in any way even though you weren't in

10 office?

11    A   No.

12    Q   Since you have left office have you been involved

13 in any reapportionment matters concerning either the

14 county commission or the school district?

15    A   No.

16    Q   Other than maybe addressing it briefly in your

17 campaign of 2012.

18    A   No.

19    Q   Okay.  And they have never consulted with you at

20 all about any of this; is that correct?

21    A   No.

22    Q   Did you hire Ed Tapaha?

23    A   Before I left, yeah.

24    Q   Before you left?

25    A   Before I left.

1    Q    So, his hiring and your leaving overlapped by a

2    month or two?

3    A    Just by a month or two, yeah.  Edward had always

4    been very helpful to me, but he wasn't a hired-on employee

5    because he was working with I think the health district or

6    whatever, and then when we moved forward with that

7    coordinated position I hired him the summer before.

8    Q    What did you hire him for?

9    A    He was the bilingual coordinator.

10   Q    What does a bilingual coordinator do?

11   A    Well, the job description pretty much was spelled

12   out in that decree in the lawsuits that involved the way

13   elections were held in the county and what the county

14   clerk did.  So, he was to oversee the -- you know, getting

15   bilingual election judges, you know, bilingual

16   advertising, you know, notices, those kind of things.

17   Q    Did you have any other written description of

18   what his duties were at that time?

19   A    I am sure we probably wrote up a job description,

20   and I don't remember, you know, exactly what that was, and

21   had it on a pay scale, but I don't recall for sure.

22   Q    Did you schedule any training for him of any

23   sort?

24   A    I don't remember.  He came on just before I left

25   and it was not an election year.  So, he may have done

1    some training after that.

2        Q    Do you remember what, if anything, he did in the

3    short time you were together?

4        A    No.

5        Q    That moves us forward a little bit.  But I want

6    to go back and pick up, because we are interested in

7    reapportionment and the Voting Rights Act.  I found a

8    letter that you wrote to Cal Black in 1983.  Can I show

9    that to you?

10       A    You bet.

11       Q    I want to ask you some questions about that.

12                 MR. TRENTADUE:  Do you have an extra copy?

13                 MR. SWENSON:  Let me look at something.

14                 MR. TRENTADUE:  Don't want me to look at

15   your notes?

16                 MR. SWENSON:  Looks like I did that, didn't

17   I.  Boy, you read really well upside down.  I will have to

18   watch you.

19       Q    (BY MR. SWENSON:)  Why don't you look that over,

20   all those pages, and then I will ask you some questions.

21       A    (Reviewing.)  Well, I don't recall that letter,

22   but I did a really good job.

23       Q    Well --

24       A    I put some homework in there.

25       Q    Okay.  Now, you don't remember writing the

1    letter?

2       A    No, I don't.

3       Q    I was going to ask you about what information you

4    accessed in order to come to the conclusions you did in

5    that letter and the information that you included in the

6    letter?

7       A    Well, I would have gotten that off of the

8    election results from the canvas.

9       Q    I see.  But you don't remember actually doing

10    that?

11       A    Not specifically, no.  I can see myself doing

12    this.  I wouldn't deny that at all.  This is something

13    that I would, you know, do.  And I would have gotten the

14    information from the election, you know, results that were

15    filed in the clerk's office.

16       Q    The last page on that exhibit is a letter that

17    apparently -- there is a notation there it was never sent.

18    Is that your handwriting?

19       A    It could be.  I would say it is, but I don't

20    know.

21       Q    And there is -- I don't think that is the end of

22    that document, but that is all we were provided.

23       A    It looks like maybe it was --

24       Q    A rough draft or --

25       A    A draft.  This is the day before word processors,

1    you know.  So, I would say it was probably a draft letter

2    and I reworked it or whatever.

3        Q    While you were in office did you ever have

4    anybody to your knowledge appear before the county

5    commission and ask or make suggestions about changing the

6    election districts at all, county commission election

7    districts?

8        A    Not that I remember.

9        Q    Or the school board districts?

10       A    Not that I remember.

11       Q    I think it is after your time, but there were a

12   couple of times people came into the commission and

13   suggested that perhaps the county commission should go

14   from three districts to five districts.  Did anyone

15   ever -- was a suggestion ever made to you along those

16   lines at any time?

17       A    When I was county clerk?

18       Q    While you were county clerk.

19       A    Not that I remember, no.

20       Q    I think I saw something in your election

21   materials for 2012 that you suggested that going to a

22   five-member commission would be something you would favor?

23       A    I would.

24       Q    Okay.  Now, why?

25       A    Well, there is several reasons.  I think three

1    members -- well, you know, it is a large geographic

2    county.  It is diverse between -- I mean, there is a big

3    difference in culture and, you know, community interests

4    from Monticello to Spanish Valley.  So, when you add in

5    Blanding and further south, and there can be a difference

6    between Montezuma Creek and Navajo Mountain.  And I think

7    you have better representation of each of the districts if

8    you went to five member.  I think five member is still

9    workable.

10          And I also think if you have a very dominant kind

11    of personality of one of the commissioners, sometimes when

12    there is only three they can kind of overpower the other

13    two or -- I don't know how do --

14    Q    Would you be talking about Cal Black, for

15    instance?

16    A    No.  No.  I never saw Calvin -- you know, he was

17    a dominant, controlling kind of man, but I never saw him

18    try to sway or influence another commissioner.  I have

19    seen commissioners since then, I felt they have

20    manipulated other commissioners.  I think it is easier --

21    I think commissioners are easier swayed, you know.  When

22    you only have to sway one, then you have got your way.  If

23    you have got five, it is a little more difficult, and be

24    able to have a bit more debate and discussion before

25    decisions are made.

1    Q    Did you ever draw a map of how those five

2    districts would look?

3    A    Oh, no.  No.

4    Q    Did you ever look at any population data?

5    A    I never went any further than just speculating

6    the philosophy of it.  Partly because to do that you would

7    have to get a -- you would have to go through the whole

8    code and -- you know, to change to do all those kind of

9    things, you know, and have it on the ballot and that kind

10    of thing.  Just an idea that I always felt would be worth

11    looking at.

12    Q    Let me ask you a couple of questions about the

13    resources you had in your office when you were there.

14    There is computer software that can perform redistricting

15    type of tasks and redraw maps for election districts,

16    things of that sort.  Was there anything like that in your

17    office at the time you were there?

18    A    The County wasn't even computerized then.

19    Q    When did the County computerize?

20    A    The finances were, I should say, sort of kind of

21    computerized.  We typed all the checks, you know, by hand

22    and everything, and we would send it to data processing

23    unit, and then they would put it all in and we would get

24    it back.  Then the latter part of '83, just after I came

25    back into office, we shopped around, and that is when John

1    Fellmeth came on board.  And we began doing our finances

2    ourselves and doing our own data processing with that.

3         Q    Was that '93 you said?

4         A    '83.

5         Q    Oh, '83.

6         A    '83.  And we didn't have a computer, you know,

7    all we had was typewriters.  Up until about '83 typed up

8    all the checks.  '84 -- I don't know when we started, you

9    know -- even PCs weren't around much until the latter part

10   of the '80s, you know.  So, we wouldn't have any -- not

11   nearly what is available today.

12        Q    So, none of the election process was regulated or

13   involved computers in any way?

14        A    No.

15        Q    During your time.

16        A    In fact, many of the -- we still used paper

17   ballots and hand counted.  A lot of the counties in the

18   state of Utah have punch cards, and that is all there was

19   available in the election was punch cards.  I hesitated to

20   go to punch cards simply because of the -- well, they are

21   confusing if you can't read and write English, punch cards

22   are.

23             I didn't want to move to anything -- before I

24   left office I had investigated new optical scan software

25   and hardware that was coming out, and I think the tribe

1    was just beginning to use that as well. And then I had

2    that information. But I didn't want to -- I didn't pursue

3    it until I passed it on to Gail Northern.

4         I think after that it became a little bit more

5    economical to use and a little bit more -- gone through a

6    lot of the testing and things like that to where it wasn't

7    quite so scary to use.

8    Q    Now, you had the county surveyor office available

9    all of the time you were in office?

10   A    Oh, yeah.

11   Q    And they draw maps and do things of that sort.

12   A    Yeah.

13   Q    Do they possess any software computerized at all?

14   A    Not that I know of, but I don't know.

15   Q    Who was the --

16   A    Doug Therson, T-h-e-r-s-o-n.

17   Q    Do you remember ever being contacted by anybody

18   who would -- state official or some other office who

19   indicated they would have districting type of software or

20   other of those types of resources?

21   A    No.

22   Q    All during this time that you were in office you

23   were being monitored by the federal government in terms of

24   the elections?

25   A    Yes.

1     Q    Okay.  When did that start, do you recall?

2     A    Well, the lawsuit was filed in, I think, June or

3  July of '83.  So, the first time we had to, you know,

4  actually do an election and comply was in '84 from then

5  on.

6     Q    When did the examiners first start to monitor the

7  polls that you recall?

8     A    I would assume '84, but I don't know.  I can't

9  remember.  I am just assuming they would have been there

10  in '84.  Whether they came and monitored every election

11  and stuff, I don't remember.

12     Q    Did you ever work with the monitors at all?

13     A    No.

14     Q    They were completely separate from your office?

15     A    I never knew if they were there or not.

16     Q    Okay.  That is the entire time you were in

17  office?

18     A    Right.

19     Q    They never reported to you?

20     A    No.

21     Q    Expressed any concerns to you about the way the

22  elections were being handled?

23     A    No.

24     Q    I see here that in 1990 there was a full slate of

25  candidates for all the county offices.

1    A    Yes.

2    Q    It appears that Navajo candidates ran for most,

3    if not all, of the county offices?

4    A    The way I remember, yes.

5    Q    Did you run for election that year?

6    A    I did.

7    Q    Who did you run against?

8    A    I want to say her name was -- I believe it was

9    Nakai.  I am not sure, but I believe it was a Nakai.

10   Q    That will do it for now.  Do you remember what

11   the campaign issues were between you and her during the

12   election?

13   A    No.

14   Q    Does anything come to mind?

15   A    No.

16   Q    I remember from being here there was a

17   considerable amount of publicity attendant to that

18   election.  Did you have discussions with the county

19   commissioners concerning the election at all?  Was there

20   anything?

21   A    I don't remember any.

22   Q    I see Mark Maryboy was on the county commission

23   at that point?

24   A    In 1990 he would have been, yes.

25   Q    He was from Commission District 3?

1       A     3, yes.

2       Q     In the time you were in office, did anyone

3    express any complaints or concerns about the population

4    that was in District 3?

5       A     Not that I recall.

6       Q     It is heavily Native American, as you know.

7       A     Yes.

8       Q     You don't recall anyone bringing to your

9    attention that that may have violated the law in any way?

10      A     Not to me.  They may have done to commissioners

11   where it should have been addressed, but not to me.

12      Q     But you don't remember them doing that?

13      A     No.

14      Q     Did anybody in the Department of Justice complain

15   about that particular district that you know?

16      A     No.

17      Q     How about the Navajo tribe?  Did you have any

18   contact with them?

19      A     No.  UNDC was much more --

20      Q     They are defunct now?

21      A     They are defunct now, but they were more of our

22   contact when it came to any kind of government our

23   anything with Navajo.

24      Q     Well, did you hear anything from UNDC --

25      A     Not that I remember.

1    Q    -- people about the elections?

2    A    Not to me, no.

3    Q    In 1990 was the question of County services on

4    the reservation a campaign issue?  If not in your election

5    in some of the others; do you recall?

6    A    I don't recall.  Was there a commission race at

7    that time?  There must have been one of them, a commission

8    race at that time.

9    Q    I believe so.  You don't remember any controversy

10   concerning the quality or quantity of the County services

11   that were being provided to the Navajo Reservation?

12   A    No.

13   Q    In 1990?

14   A    Not in 1990, no

15   Q    Okay.

16   A    That was the time I believe Calvin had resigned

17   because he -- I think Calvin had resigned, hadn't he?  He

18   had cancer.  Didn't he die about 1990?

19   Q    I thought it was a little later.

20   A    He resigned because his health was so bad.  I

21   think Bill had been appointed to take his place.  And I

22   think Calvin might have -- may have died in '91.  As far

23   as any issues, I don't remember those kind of things at

24   all.

25   Q    Broadening that issue of disparity of services

1    between reservation and non-reservation, did that come up

2    at any time while you were in elected office, any of the

3    years that you were --

4        A    There were always people complaining about roads

5    in any part of the county, thinking they are not getting

6    their fair share for road maintenance.  You went anywhere

7    in the county you would always get somebody complaining

8    about the roads.

9        Q    Do you remember anything about reservation roads

10   that was an issue?

11       A    No.

12       Q    The county commission districts were

13   reapportioned in 2011, and I am wondering if you were

14   involved in that in any way?  Did they consult you at all?

15       A    No.  I was lucky, all I did was read about it in

16   the paper.

17       Q    Then in 2014 the County went to the mail-in

18   ballot process.

19       A    Right.

20       Q    Were you involved in that in any way in terms of

21   setting it up or did they consult with you at all about

22   it?

23       A    No.

24       Q    With your experience you would think they would,

25   but nobody called you?

1      A      Nobody.  Nobody called me.

2      Q      Oh, okay.  I would have called you.

3      A      Well, thank you.  One thing I learned a lot was

4    doing elections in San Juan County, but they didn't call

5    me at all.

6      Q      Do you have an opinion how the mail-in ballot

7    system is working?

8                    MR. TRENTADUE:  Objection, foundation.

9                    You can answer anyway.

10                   THE WITNESS:  Based on where I live, you

11    know, I get a mail-in ballot all the time, so I am happy

12    with it.  But I don't know how it works in the more

13    populated areas, I don't know.

14     Q      (BY MR. SWENSON:)  That was my next question.

15    But you don't know how it worked elsewhere?

16     A      I don't know.

17                   MR. SWENSON:  Want to stop for a minute.  It

18    has been a little over an hour.

19                   MR. TRENTADUE:  Off the record.

20                   (Recess taken at 2:08 p.m. and

21                   back in session at 2:16 p.m.)

22     Q      (BY MR. SWENSON:)  I want to go back and look

23    at --

24     A      Let me interrupt you here.

25     Q      Go ahead.  Anything you want to say that helps?

1     A     Why does the campaign in 2012 have anything to do

2     with this?  I don't understand the relevance there.

3     Q     Because it does relate to the general overall

4     picture of elections, which, of course is what we have to

5     do is establish a general history.  But you are on the

6     record.  You did tell us that you weren't involved in the

7     reapportionment in 2011.

8     A     No.

9     Q     I asked you questions about the earlier time

10    periods.  I think we're fairly clear about that, aren't

11    we?

12    A     Right.

13    Q     But generally County services, I was going to ask

14    you a question about how to -- I have to find that ad.  It

15    is going to be difficult to read, but I want to put it in

16    just -- I don't know what we will call this thing.

17                  (Exhibit No. 16 marked for identification.)

18                  THE WITNESS:  Reviewing.  Wow.

19    Q     (BY MR. SWENSON:)  That is tough.  I will ask you

20    a couple questions, but I won't -- this is a mistake we

21    made in terms of not getting this thing magnified.  I

22    thought we had, but it didn't.

23    A     I remember that.

24    Q     If I am reading something into this, you tell me.

25    It seems to be suggesting that you are going to spend

1    money down at the reservation you shouldn't.  Is that sort

2    of what he is trying to hint at?

3        A    Well, that was a whole different take than --

4        Q    What was your take?

5        A    My take is that the reason the County entered

6    this whole election umbrella, whatever, is because I was

7    lousy at my job as county clerk.

8        Q    Well, I think we talked about that a little

9    earlier.

10       A    We mentioned that before, yeah.  Maybe there is

11   another part of this, I am not sure.

12       Q    He is talking about -- you go down to that second

13   column, and he is talking about money spent down there.

14       A    I think he intimates that Willy Grayeyes will,

15   you know, do projects on the reservation, blah, blah,

16   blah, which is what you would expect in a campaign.

17           I guess my take is more on the left-hand side,

18   the left column there.  He is more or less, I think -- it

19   is my fault we have commission districts.  We have all

20   this, you know, oversight by the federal government with

21   the elections.

22           To me on the right side he is talking about you

23   don't want to vote for Willy Grayeyes because you don't

24   want Willy Grayeyes to be the commissioner because

25   everything will be on the reservation and you will see not

1    a dime up here.  That is my take on it.

2        Q    Sure.  But that is not your position?

3        A    No, no, no, that is not my position.  I think

4    that is what he was saying, you know.

5            One of the things that didn't come off in the --

6    maybe I shouldn't say this.

7                MR. TRENTADUE:  Now you have to.

8                THE WITNESS:  One of the things I had people

9    talk to me about that never was put in any kind of an ad

10   was "Gail, we can't vote for you.  We would like to vote

11   for you, but if we vote for you then Willy Grayeyes will

12   win."

13       Q    (BY MR. SWENSON:)  Because they are worried about

14   a Navajo getting in, is that it?

15       A    I guess, or they are worried about, you know,

16   "Because you will split the vote off the reservation and

17   then Willy Grayeyes will get in, we won't even get who we

18   want" or that kind of thing.  "So, we got to stick with

19   Bruce, because of the three candidates he is the one most

20   likely" -- anyway, that is something that was never put in

21   any ad.  But I think this is what this eludes to.  You

22   shouldn't vote for Gail because she is a lousy county

23   clerk, and it is her fault that we have all these election

24   problems.  And you shouldn't vote for Willy Grayeyes, or

25   if you do get Willie Grayeyes as your commissioner, if you

1    vote for Gail you are going to get Willie Grayeyes, and if

2    you get Willie Grayeyes then everything is going to go to

3    the reservation and you guys will see nothing.  That is my

4    take on it.

5        Q    Did you have a comeback to those accusations?

6        A    As best I could.  As best I could.  I never felt

7    that I would split the vote.  I never felt that -- I felt

8    if anybody has got a right to run, Willy has got a right

9    to run.  I got a right to run on any ticket or whatever

10    and let the people make their choice.  So -- and I even

11    went back and looked at -- well, you know, looking at

12    election results and voter turnouts and those kind of

13    things.  And I never could come up to where I felt that if

14    I ran then it would split the vote between me and Bruce

15    and Willy would be the shoe-in.  I never came up with any

16    figures that would even show that kind of a thing.  That

17    was a scare tactic that was being used and people

18    approached me about, you know.

19        Q    Okay.  Now, I don't have the tabulation in front

20    of me, but I am not sure the other two candidates made a

21    difference in your defeat looking at the numbers.

22        A    Well, I think if you look at the numbers, Bruce

23    and I didn't split the votes, Willie Grayeyes and I split

24    the vote and Bruce won.

25        Q    That is right.  But that wasn't because you were

1    running?

2        A    No.  I don't think so.

3        Q    That is your take on it.

4        A    I don't think so.  I don't think so.  And Bruce

5    did very well in Oljato.  He did extremely well in Oljato.

6    And I expected that he would, you know.

7        Q    Did he campaign on the reservation?

8        A    I don't know.

9        Q    Most of the county commission district that you

10   were campaigning in, of course, is not on the reservation.

11       A    Well, there is the two are --

12       Q    Two --

13       A    -- the rest are not.  So, I hit every precinct.

14   I hit every precinct.

15       Q    Okay.  But I am still interested in District

16   No. 3, which was Mark Maryboy's district to start with.  I

17   want to make sure that I understand that you had no

18   involvement in the creation of that district.  You didn't

19   draw it, you didn't mandate that there would be a certain

20   population in that district?

21       A    No, I had no authority to do that.

22       Q    You weren't involved in that at all.  Is it your

23   understanding that district could be changed at any time?

24       A    I don't know.  I never even -- I knew -- I have

25   always felt, maybe I am wrong in this, I always felt the

1    law is if we changed, like from a 3 to a 5, we would have

2    to go to a referendum or initiative or something like

3    that.

4            I don't know if I ever even thought about -- I

5    guess maybe I just assumed that that was done just like

6    senate and legislatures have done after census were done.

7    I don't know how the process works, so, I don't know.

8            MR. SWENSON:  Okay.  Let me quickly run

9    through my outline for a minute and see if there is

10   anything else here.  I want to talk to Steve.  And I think

11   we're probably getting pretty close.

12           You look like you need a nap.

13           MR. TRENTADUE:  I always look that way.

14           (Short pause.)

15   Q    (BY MR. SWENSON:)  During your time as clerk did

16   you ever have anything to do with something called the

17   Division of Information Technology Services?  Have you

18   ever heard of that?

19   A    (Inaudible response.)

20   Q    Let me have this letter marked.  This came to

21   Gail Northern after you left, but I want to just --

22           (Exhibit No. 17 marked for identification.)

23           THE WITNESS:  (Reviewing.)

24   Q    (BY MR. SWENSON:)  Never heard of that?  You

25   don't know who Dennis Goreham is?

1    A    No.

2    Q    You are not familiar with the acronyms, the AGRC,

3    the GIS technology.  Do you know what GIS technology --

4    A    I do now, but --

5    Q    Back then you wouldn't?

6    A    No.

7    Q    You never got any communication from an agency

8    like this?

9    A    Not -- no.

10   Q    Okay.  Just to clarify, in your election do you

11   think Bruce was trying to say that if Willy Grayeyes was

12   elected there would be a disproportionate amount of

13   resources spent on the reservation?

14            MR. TRENTADUE:  Objection, speculation.

15   Objection, foundation.

16   Q    (BY MR. SWENSON:)  Do you interpret what he said

17   that way?

18   A    I don't know what he was trying to do.

19   Q    Would that be your opinion?

20   A    I don't know.

21   Q    Okay.  How about you, do you think if Willy had

22   won that election there would be a disproportionate amount

23   of county resources directed to the reservation?

24   A    I have known Willy off and on, you know, just

25   that he is a very likeable fellow.  I would think he would

1    try to -- I would hope that he would try to do the best

2    job to take care of everybody, but I have no idea how he

3    would be as a commissioner.

4              MR. SWENSON:  I think we're done.

5                        EXAMINATION

6    BY MR. TRENTADUE:

7        Q    A few questions for you, ma'am.

8        A    Okay.

9        Q    My name is Jesse Trentadue, and I represent

10   San Juan County in this lawsuit.  I wonder if you would

11   grab 12 and 10 and have that in front of you.  It will be

12   a little quicker that way.  10 is right there to your

13   left.  Just sort of set them out.

14       A    Okay.

15       Q    Now, as I understand in 1983 or 1984 there is a

16   lawsuit by the federal government commencing -- several

17   against San Juan County?

18       A    Right.

19       Q    Were you named in that lawsuit?

20       A    Yes.

21       Q    And it was run by the United States Department of

22   Justice?

23       A    Right.

24       Q    Out of Washington DC?

25       A    Right.

1      Q    And Mr. Schermerhorn was sort of the lead person

2  on that for the Department of Justice?

3      A    Right.

4      Q    And as a result of that lawsuit there was a

5  consent decree and court orders entered about what San

6  Juan County must do?

7      A    Right.

8      Q    One was to go from an at-large commission

9  elections to three districts?

10      A    Right.

11      Q    And one of them had to guarantee that a Navajo

12  would always be a county commissioner?

13      A    I don't know if the word was "guarantee," but it

14  was certainly to be more favorable for them to be able to

15  do so.

16      Q    But it was to be heavily loaded with Navajo

17  voters?

18      A    Right.

19      Q    As I understand it, Exhibit 10 is notifying the

20  State of Utah of the three districts that were drawn or

21  created as a result of that lawsuit, the court orders?

22      A    Right.

23      Q    And Exhibit 12 is a map of the three districts?

24      A    Right.

25      Q    That are referred to in Exhibit 10?

56

```
 1        A    Right.

 2        Q    Now, this is important, that is why I want to ask

 3   you.  I tell you why.  You may be the only person

 4   remaining with knowledge about happened.  You said that

 5   Commissioner Black is deceased?

 6        A    Right.

 7        Q    Commissioner Bailey is deceased?

 8        A    Right.

 9        Q    Commissioner Low is deceased?

10        A    Yes.

11        Q    Several times you said during your testimony you

12   have said, "Well, maybe I shouldn't say that."  I realize

13   we were all brought up and the things we know and things

14   we say, well, maybe I shouldn't say that about that person

15   because it is cruel, or it is mean or it may be hurtful

16   but it is true.  Have you ever heard the expression "Bless

17   his heart" or "Bless her heart"?

18        A    Yes.

19        Q    Where I am from they usually precede saying

20   something truthful but awful about somebody.  You say,

21   "Bless his heart, he would steal his mother blind."

22   "Bless her heart, you couldn't find a sorrier woman."  I

23   mean, that is the way it is typically used.

24        A    Right.

25        Q    I want you to think in terms of that when I start
```

1    asking you questions about Mr. Schermerhorn.

2         A    Okay.

3         Q    You danced around it by saying repeatedly he was

4    difficult to work with.

5         A    Yes.

6         Q    He made it clear to say, ma'am, it was his way or

7    the highway?

8         A    I felt so.

9         Q    He said, "I am here from the United States

10   government, and we're going to do it the way the United

11   States government wants and not what the people in

12   San Juan County want"?

13        A    Right.

14        Q    And when you came to drawing these districts, he,

15   Mr. Schermerhorn, acting on behalf the federal government,

16   told you --

17             MR. SWENSON:   Objection, I think that

18   assumes a fact not in evidence, which, of course, is that

19   she drew them.

20        Q    (BY MR. TRENTADUE:)   Let me say these proposals,

21   when these proposals were presented -- these proposals

22   were presented to Mr. Schermerhorn, were they not?

23        A    Yes.

24        Q    He made it very clear to you that he on behalf --

25   Mr. Schermerhorn on behalf of the federal government was

1    going to decide which one you were going to adopt, didn't

2    he?

3        A    Whatever we adopted he had to approve of it or it

4    wouldn't fly.

5        Q    In other words, "You will do what we want"?

6        A    He didn't sit down and draw lines, "This is the

7    way I want the lines drawn." He allowed, you know, the

8    commission to come up with something, but he had to have

9    the final say before it was approved. That is how I felt.

10       Q    If he said no, that is it?

11       A    That's right.

12       Q    Is it fair to say that he left you with the

13    impression that you could not touch the lines you came up

14    with on Exhibit 12 without the government's approval?

15       A    Well, I felt that way.

16       Q    That that was locked in stone, written in stone,

17    that until the government of the United States said you

18    could change the lines on 12 you couldn't?

19       A    I guess so.

20       Q    It is more than a guess, he left you with that

21    impression, didn't he?

22       A    He left me with that impression.

23           (Exhibit No. 15 marked for identification.)

24       Q    (BY MR. SWENSON:) Now, this is interesting.

25    This is Exhibit 15. You wrote this. This is talking

59

1      about the results of which election was it?

2          A     I believe in the '70s.

3          Q     Oh, '72, '76 and 1980.  Did I understand this

4      correctly -- it was interesting reading, I had never

5      thought about this before.  This says, "It appears as

6      though in these elections Navajo voters would vote for a

7      non-Navajo Democrat before they would a Republican Navajo

8      candidate."

9          A     That is the conclusion that it looked like to me.

10         Q     They voted party lines?

11         A     Uh-huh.

12         Q     You have to say "yes."

13         A     Yes.

14         Q     So, in many of these cases you focus clearly on a

15     non-Navajo takes the votes in these predominantly voting

16     areas from a Navajo candidate who happens to be the Navajo

17     candidate that is Republican?

18         A     Right.

19         Q     Was that your experience throughout your time as

20     the clerk in the elections you oversaw?

21         A     Yes.  Yes.

22         Q     They go predominantly -- party line is Democrat?

23         A     Party line is Democrat.

24         Q     And it doesn't matter whether the candidate is

25     non-Indian --

1      A    It is not very often you would have a Navajo who

2    would be Republican, but they tend to be more Democrat.

3      Q    But if they were Republican they are not going to

4    do well?

5      A    Probably not.

6            MR. SWENSON:  Objection, speculation.

7      Q    (BY MR. TRENTADUE:)  In your experience they

8    didn't do well, did they?

9      A    No.

10           MR. TRENTADUE:  No further questions.

11                   FURTHER EXAMINATION

12   BY MR. SWENSON:

13     Q    Let me just follow up quickly.  Did

14   Mr. Schermerhorn ever write you a letter saying or giving

15   you any writing at all saying that he has the right to

16   tell you what to do in any way?

17     A    I don't think -- when it comes to the commission

18   district, I never was directly involved with him.  It was

19   with the county commission and county attorney.  But I was

20   told when we would have the meetings and when we met at

21   district court in Salt Lake and things like that.  But I

22   do know he was very upset when the commission wanted to

23   have, you know, the county vote on it.

24     Q    Did he tell you that himself?

25     A    I remember him saying that, yes, I do.  Because

1   he did not want it on the ballot.  And so instead of

2   having it on the ballot we drew up a separate ballot of

3   our own, and it was handed out at the time of the

4   election.  It wasn't part of the official election.

5       Q    Did he ever personally tell you that he had the

6   right of approval of what the county did in the end?

7       A    No, he didn't tell me personally, no.

8       Q    To your knowledge did he tell anybody else that?

9   I know you have said he left the impression, but did he

10  actually tell anybody that?

11      A    Well, boy, I don't remember specific

12  conversations, but I do remember that I felt like the way

13  he talked or the way things went, any districts that we

14  came up with had to be approved by him.

15      Q    What was the answer to the question?

16      A    What is the question again?

17      Q    Would you read that back.  I got distracted just

18  as I was --

19              (Requested portion of the record

20              was read back.)

21              THE WITNESS:  Was that the answer to your

22  question?

23      Q    (BY MR. SWENSON:)  My question was whether or not

24  you had any direct communications with him in which he

25  said to you --

1    A    No, not to me personally, not to me directly.  He

2    would have done that with the county commission.

3    Q    But you don't have any knowledge that he actually

4    did that with the county commission, that he actually came

5    in and said "I am in charge" --

6    A    I don't know.

7    Q    "You got to do it my way"?

8    A    I don't remember.  I don't know.

9             MR. SWENSON:  We will just be a minute.

10            (Mr. Boos and Mr. Swenson leave the room.)

11            MR. TRENTADUE:  Off the record.

12            (Recess taken at 2:38 p.m. and

13            back in session at 2:40 p.m.)

14    Q    (BY MR. SWENSON:)  I don't recall if I asked you,

15    but let's just get it on the record.  Who is Jim

16    Schermerhorn?

17    A    He was the attorney for the justice department.

18    Q    Do you know when his -- what position he held in

19    the department?

20    A    I don't remember, other than he was the attorney

21    representing the justice department.

22    Q    Do you know on what authority he had to deal with

23    these matters, do you?

24    A    I do know -- the way I remember it, he may not

25    have been the lead attorney, but I thought he was, but he

1    may not have been, because I referred to it as the March

2    through Georgia, because the justice department had gone

3    to a couple of counties in New Mexico, and then in

4    northern Arizona, and then they came to us doing these

5    kind of consent decrees and those kind of things.

6         Q    So, was Jim in those cases?

7         A    I thought he was, but I am not sure.  I don't

8    know.

9         Q    Did you meet any other attorneys, personally meet

10   or talk to any of the other attorneys at the department

11   that were working on the case?

12        A    Not that initial -- not initially with

13   Mr. Schermerhorn.  I believe two or three years later, it

14   might have even been a little longer than that, there

15   was -- was it another lawsuit along the voting rights?

16   Not with the commission districts.  It seems like there

17   was a -- maybe it was just a revamping of the first one,

18   because there was another attorney from the justice

19   department that came in more specifically saying

20   specifically what the radio announcements had to be and

21   those kind of things.  And that is when we hired the

22   bilingual coordinator was a result of that.  I think it

23   was the second lawsuit or maybe it was just --

24        Q    Would it have been, just to refresh your memory,

25   a complaint about purging of voters?

1     A     No, there was an attorney from the justice

2   department.  It wasn't Schermerhorn.  I don't remember his

3   name.  He was a younger fellow with brown hair.

4     Q     Do you remember getting any complaints about

5   purging Navajo voters from the registration rolls during

6   your time in office?

7     A     Yes.  Not just Navajo voters.  I shouldn't say

8   complaints about Navajos.  I got complaints about -- from

9   the justice department about purging the voting records.

10    Q     Did you purge any of the voters from the records?

11    A     Well, the Utah law requires you, you know, to

12  purge every four years.

13    Q     As a result of those complaints was anybody added

14  back into the rolls?

15    A     Yes.  Yes.

16    Q     Were they all added back in the rolls?

17    A     I am assuming that they were.  I remember that

18  we -- I know people we had on the rolls two or three times

19  that there was a request to put them back on.

20              MR. SWENSON:  That is all I have.

21              MR. TRENTADUE:  One more question I forgot

22  to ask the first time around.

23                       FURTHER EXAMINATION

24  BY MR. TRENTADUE:

25    Q     You testified about the federal election monitors

1    that would came out and from Washington to watch.  You

2    never heard anything from them?

3        A    When and where they came, I don't know.

4        Q    You certainly never received anything, any

5    criticism or reports from them?

6        A    No, I did not.

7        Q    Would you as the clerk auditor, had there been

8    negative reports, would you have expected to receive them?

9        A    Well, yes, if they wanted me to comply they would

10   have needed to tell me that, yeah.

11            MR. TRENTADUE:  No further questions, ma'am.

12            MR. SWENSON:  We're done as well.  Thanks.

13   Appreciate you coming in to do this.

14            MR. TRENTADUE:  Read and sign.  What are we

15   going to do?

16            MR. SWENSON:  That is up to you.  You can

17   read the whole thing and make your corrections and

18   whatever you want to do and then sign it if you would

19   like.

20            THE WITNESS:  Right now?

21            MR. SWENSON:  No --

22            THE WITNESS:  Because, you know, I am

23   impressed.

24            MR. SWENSON:  She is not that good.

25            THE WITNESS:  This new technology is really

1    something, isn't it?

2                    MR. SWENSON:  Got her on that one.

3                    MR. TRENTADUE:  At your leisure.  Give you

4    30 days.

5                    THE WITNESS:  I would like to read it, yeah.

6                    (Deposition concluded at 2:44 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    SIGNATURE OF WITNESS

 2

 3          I, GAIL JOHNSON, hereby certify that I have read

 4     the foregoing transcript of my deposition taken on the

 5     24th day of June 2015, and that I have listed all

 6     corrections thereto on the following page herein.  Except

 7     for said corrections, it is a true and correct copy of my

 8     testimony given on that day.

 9

10                          _____

11                               GAIL JOHNSON

12                          (  )  NO CORRECTIONS

13                          (  )  CORRECTIONS ATTACHED

14

15

16     STATE OF COLORADO     )
                             )  ss.
17     COUNTY OF             )

18

19          Subscribed and sworn to before me this _____

       day of _____, _____.
20

21                          _____
                                  Notary Public
22

23     My commission expires:_____

24

25
```

| | PAGE | LINE | CORRECTION | REASON |
|---|------|------|------------|--------|
| 1 | | | | |
| 2 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 3 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 4 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 5 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 6 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 7 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 8 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 9 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 10 | \_\_\_\_\_ | \_\_\_\_\_ | _____ | _____ |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1   STATE OF COLORADO   )
                      ) ss.
2   COUNTY OF ARCHULETA )

3

4          I Beverly E. King, Certified Shorthand Reporter,

5   and Notary Public, DO HEREBY CERTIFY that I did administer

6   the oath to the witness herein prior to the taking of this

7   deposition; that I did thereafter report in stenographic

8   shorthand the questions and answers set forth herein, and

9   the foregoing is a true and correct transcription of the

10   proceedings had upon the taking of this deposition.

11          I FURTHER CERTIFY that I am neither employed by

12   nor related to any of the parties or attorneys in this

13   case, and that I have no interest whatsoever in the final

14   disposition of this case in any court.

15          I FURTHER CERTIFY that I have delivered the

16   Original Copy of this deposition to ANIMAS REPORTING

17   SERVICE, in ASCII format, for production, distribution,

18   and retention.

19          WITNESS MY HAND AND SEAL THIS 24th day of

20   June, 2015.

21               _____
                Beverly E. King, CSR
22

23

24

25   MY COMMISSION EXPIRES:  1/27/2016

# Exhibit 7



570 - 572

**COUNTY OFFICERS**
KENNETH R. BAILEY, Commissioner
CALVIN BLACK, Commissioner
ROBERT R. LOW, Commissioner
GAIL L. DALTON, Clerk and Auditor
MARY LOU MOSHER, Recorder
BARBARA MONTELLA, Assessor
MARIAN BAYLES, Treasurer
S. RIGBY WRIGHT, Sheriff
BRUCE K. HALLIDAY, Attorney

599' 1976
Elec Mtn

**MONTICELLO, UTAH 84535**

November 2, 1983

Mr. Calvin Black
Commission Chairman
Blanding, UT 84511

Calvin:

Here is some information regarding voting practices in San Juan
County

Mr. Schermerhorn of the U.S. Justice Dept. is basing much of his
recommendations on the theory of polarization. Some of the county's
elections results are interesting to look at in regard to this idea.
Results of general elections for 1972, 1976, and 1980 are attached. There
were Navajo candidates in the commission races in these years. The 1974
primary election also included a Navajo commission candidate.

In 1972, Navajo candidates Yanito and Bigman ran as Independents.
Seth Bigman ran against Case Broderick and Marion Hazelton in the 4-year
commission race. Bigman received 34% of the votes cast in this race in
the Bluff precinct, while Broderick and Hazelton each received 33% of the
votes. In the Montezuma Creek precinct, Bigman only received 14% of the
votes in this race, whereas Broderick received 31% and Hazelton received 55%.
Hazelton also won in Aneth with 60%. Bigman received 22% and Broderick
received 18%. Hazelton also won in Mexican Hat with 36% of the votes in
this race. Bigman received 28% and Broderick received 22%. The Oljato
area supported Broderick with 55% and Hazelton with 27%. Bigman received
18%. Navajo Mountain also went with Broderick, giving him 41%. Hazelton
received 34% and Bigman had 25%. Bigman lost in all but one Navajo precinct
where he only won by 1% or 2 votes. The highest percentages went to
Hazelton. Hazelton ran on the Democratic ticket and Broderick on the
Republican ticket.

In the 2-year commission race, Bennie Yanito ran against Dale Holmes.
There was no Democratic candidate. Holmes won in Bluff, 55% to 45% of the
votes cast in this race. Holmes won in Montezuma Creek, 65% to 36%.
Holmes won in Aneth, 54% to 46%. Holmes won in Mexican Hat, 72%; also in
Oljato with 91% to 9%. Holmes also won in Navajo Mountain, receiving 75%
of the votes in this race.



G Johnson

**EXHIBIT NO. 15**

ANIMAS REPORTING SERVICE

Calvin Black
Page Two
November 2, 1983

Polarization in the predominately Navajo precincts is not shown in these races of Bigman and Yanito. It is also interesting to note from the number of total votes cast versus votes cast in these two races that a number of voters declined to vote for any of these candidates. A great deal of interest in these races was not shown in the precincts mentioned.

In the 1974 primary, MacArthur Norton ran as a Republican for the 2-year commission seat. The totals indicate that there was more interest shown in this race than any of the others as more total votes were cast. Nielson won with 67%. Norton received 37% of the votes. However in looking at the individual precinct results, the polarization theory isn't definite. In Bluff where there is a heavy Navajo population, Norton received only 22% of the total precinct votes and Nielson received 78%. In the predominate-Navajo area of Aneth, only 10 votes were cast. Norton received 6 and Nielson received 4. In Mexican Hat, of the 13 votes cast, Norton received 7 and Nielson received 6. The Blanding precinct results are also very interesting. In Blanding North where we would expect Nielson to run away with the votes, he received only 55% of the votes and Norton received 45%. In Blanding South, Norton won with 59% while Nielson received only 41% of the votes. The polarization theory isn't supported in these results.

In the 1976 general-election, Norton ran again; again the polarization theory isn't supported very well. Results of signal precincts are as follows: (The lower percentage figure is the percentage of total votes cast in the election in the precinct. The upper figure is the percentage of votes cast in this particular race.)

|  | GUYMON | NORTON |
|---|---|---|
| Bluff | 69%<br>59% | 31%<br>26% |
| Montezuma Creek | 45%<br>38% | 55%<br>46% |
| Aneth | 63%<br>53% | 37%<br>31% |
| North Monticello | 48%<br>46% | 52%<br>49% |
| South Monticello | 49%<br>47% | 51%<br>49% |
| North Blanding | 57%<br>56% | 43%<br>43% |
| South Blanding | 45%<br>45% | 55%<br>54% |
| Mexican Hat | 65%<br>56% | 35%<br>30% |

Calvin Black
Page Three
November 2, 1983

|                  | GUYMON | NORTON |
|------------------|--------|--------|
| Oljato           | 48%    | 52%    |
|                  | 44%    | 47%    |
| Navajo Mountain  | 47%    | 53%    |
|                  | 44%    | 50%    |
| Red Mesa         | 41%    | 59%    |
|                  | 39%    | 56%    |

With polarization, Norton should have fared much better in Bluff, Montezuma Creek, Aneth, Mexican Hat, Oljato, Navajo Mountain and Red Mesa. In some instances, he only won by a matter of a few votes. Guymon should have easily won in the Monticello and Blanding precincts. Guymon ran on the Democratic ticket; Norton on the Republican ticket.

Also, Norton did receive more total votes than his Republican counterpart in the 4-year commission race.

Perhaps the 1980 general election results show a polarization tendency. Saltclah, a Navajo candidate, ran for the 4-year commission seat against Bailey. However, Saltclah lost in the Oljato precinct which is predominately Navajo. Saltclah ran on the Democratic ticket; Baily on the Republican ticket.

In looking at precinct results in some of the other races, Democrats tend to win in the Navajo areas. Perhaps the question of the Navajo having a chance to fairly compete against a white is not the real question, since quite often the Navajo voter doesn't support the Navajo candidate. Perhaps the question should be: "Does the Navajo vote for a Navajo or a Democrat?"

Sincerely,

Gail L. Dalton
Clerk/Auditor

/hs

Encs.

# Exhibit 8

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT   84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendant*

---

### UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, et al., | : | |
| | : | |
| Plaintiffs, | : | **DECLARATION OF KIMBALL WILLIAM BRACE** |
| | : | |
| v. | : | |
| | : | Civil No. 2:12-cv-00039-RJS |
| SAN JUAN COUNTY, a Utah governmental sub-division; | : | |
| | : | Judge Robert J. Shelby |
| Defendant. | : | Magistrate Judge Dustin B. Pead |
| | : | |

---

Pursuant to 28 U.S.C. §1746 I, Kimball William Brace, hereby submit this

*Declaration*:

1.      I am the President of Election Data Services, Inc.   I founded

Election Data Services, Inc. in 1977.

2.      Election Data Services, Inc. is a consulting firm that specializes in redistricting, election administration, and analysis and presentation of census and political data.   I have been retained as an expert witness on behalf of Defendant San Juan County in this matter.   The purpose of this *Declaration* is to present evidence and information to the Court in this lawsuit.

3.      The statements in this *Declaration* are true, and correct.   Furthermore, if I were present in Court and testifying, I would testify to the facts exactly as set forth in this *Declaration*.   The data and facts set forth herein are also based upon my professional and expert knowledge and familiarity with U.S. Census Bureau data and data files through my direct involvement over the past four decades with redistricting around the nation.   During that time, I have participated or assisted with both state and local redistricting in more than half the states.

4.      My expert report, including my *Vita*, is already filed as part of the record this case.[1]   In this *Declaration*, I will set out a summary of my findings with respect to an analysis of Census data for San Juan County both as to the

_____

[1]   Doc. 186.

2

Commission Election Districts and the School Board Election Districts.   However, prior to doing so it is important to address the legal standard upon which alleged malapportionment issues are reviewed in the context of redistricting, including assessing the need for reconfiguring any kind of election districts.

5.     Plaintiffs and their redistricting experts, William S. Cooper and David Ely, repeatedly represent to the Court that the one-person, one-vote requirement of the *Constitution* is strictly determined by a mathematical formula whereby: (a) the total population of the area, as determined by the decennial Census, is divided equally among all election districts thereby establishing the "ideal population distribution"; (b) the "population deviation" is the percentage or raw number by which the actual population assigned to an election district is different from what it should be under the "ideal population distribution"; and (c) the "overall deviation" of election districts is the sum of the percent and raw number deviation of the district with the largest deviation above the ideal size plus the absolute value of the percent deviation of the district with the largest deviation below the ideal size. According to Plaintiffs and their experts, an overall deviation of 10% or more (5% above and 5% below the ideal population distribution) is an automatic and

irrefutable violation of the *Equal Protection Clause* of the *Fourteenth Amendment*.
But that is not necessarily so because there are very few absolutes when it comes to
redistricting or determining the need to do so.

6.      Plaintiffs and their experts have correctly stated the formula for
determining population deviations (raw number and percentages) between and
among election districts.   However, the law on the issue of alleged
malapportionment is not quite so simple as Plaintiffs and their experts would have
the Court to believe.

7.      To begin with, a 10% or less deviation from the "ideal population" is
considered to be a minor deviation that does not establish a "*prima facie*" case of
invidious discrimination in violation of the *Fourteenth Amendment*.[2]   Neither are
deviations above the 10% standard *per se* violations of the *Equal Protection
Clause*.   It is also important to recognize that the 10% standard for analyzing
purported violations of the *Fourteenth Amendment* and *Voting Rights Act* was
devised for elections in large electoral units or populations.[3] Simply stated, each

---

[2]   *See Brown v. Thomas*, 462 U.S.835, 843 (1983).

[3]      *See Frank v. Forest County Potawatomi Community of Wisconsin*, 336 F.3d 570, 573 (7th Cir. 2003)

claim of an alleged malapportionment in election districts is judged as to the particular facts of the case and the reasons, if any, for the malapportionment. This comports with my long standing belief and practice, as evident from my 1998 article on the use of the 65% Rule in court cases.[4]

8.     Thus, an election district exceeding this 10% standard is not violative of the *Fourteenth Amendment* if it furthers legitimate governmental policies such as maintaining the integrity of political subdivisions, the maintenance of compactness and contiguity of election districts, the recognition of natural or historical boundary lines, etc.[5]   More importantly, the 10% deviation from the ideal population standard has generally been only applied to large population areas; whereas a wider deviation margin is used in redistricting sparsely populated counties such as San Juan County because a few people can constitute a significant percentage of the population and it is difficult to maintain compactness and

---

[4]   "The 65 Percent Rule in Legislative Districting for Racial Minorities: The Mathematics of Minority Voting Equality," *Law and Policy*, January 1988 (with B. Grofman, L. Handley, and R. Niemi)

[5]   *See Swann v. Adams*, 385 U.S. 440, 443-44(1967).

5

contiguity of districts and/or precincts in sparsely populated areas.[6]

9.      Under this case-by-case approach to analyzing alleged

malapportionment, the key elements are the existence of a legitimate governmental

policy being advanced by the election districts as drawn, and the absence of

arbitrariness or discrimination in creating those district boundaries.   Thus, under

this approach deviations of as much as 80% have been allowed.[7]   Furthermore

there is a redistricting trend, and rightfully so, to accept a greater than 10%

deviation from the ideal population in smaller populations because a very few

people can result in a significant percentage, which is especially true in the case of

San Juan County.

10.     The issue of redistricting both the San Juan County Commission and

the San Juan School Board Election Districts based upon the result of the 2010

Census present both novel and challenging questions.   With the first such question

being whether there is a need to change the current Commission Election District

---

[6]   *See Frank,* 336 F.3d 570 (7th Cir. 2003)(18% deviation did not violate either *Fourteenth Amendment* or *Voting Rights Act* in a county of 1,014 square miles and 10,000 people; whereas San Juan County contains 8,104 square miles and just 14,746 people).

[7]   *See Brown*, 462 U.S. at 835.

boundaries when the 2010 population of San Juan County had only increased by 333 people since the 2000 Census to a total population of just 14,746 people.

11.    There are three County Commission districts in the County, and under standard redistricting practices, the ideal population distribution would be 4,915 residents within each of the three Districts (14,746/3=4,915).   Once the 2010 census results were released, Norman Johnson, the San Juan County Clerk Auditor, and County staff believed that two of the three existing County Commission districts were out of acceptable deviation range.   Commission District 1 had a total population of 5,374, which is 459 above the ideal district size, or 9.3313% over populated. District 2 had a population of 4,557, or 358 people under the ideal district size, or 7.2901% under populated.   Only District 3 was within acceptable range, reporting a population of 4,815, or just 100 people under the ideal district size, or 2.0412% under populated.

12.    As a result, the overall deviation of the existing plan at the start of redistricting was 16.6215%, or just 817 people, which in my opinion met the one-person, one-vote standard for a large but sparsely populated county such as San Juan County.   Hence, there was no need to redistrict.

7

13.     Nevertheless, based upon the results of the 2010 Census, the County redistricted the County Commission Election Districts.   During the County's redistricting process, County staff recommended changing just two precincts, out of the County's overall 20 precincts, to the existing plan in order to bring the deviations down to acceptable levels and to leave District 3 unchanged, which they understood was required of them by the   *Consent Degree* of April 4, 1994 that had been entered in *United States of America v. San Juan County, Utah et al.*[8] Specifically, they moved the Ucolo and Cedar Point Precinct from District 1 to District 2.

14.     The redistricting plan was approved by the County Commission in November of 2011.   As approved by the County Commission, the population of Commission District 1 is now 5,061, the population in District 2 is 4,870 and the population of District 3 is 4,815.   As currently drawn, District 1 deviates from the ideal population by 146 people or 2.9635%, District 2 deviates from the ideal population by 45 people or -.9223%; and District 3 deviates from the ideal population by 100 people or -2.0412%. Therefore, the overall plan deviation is just

---

[8]   District of Utah, Civil No. 83-cv-1286-W.

8

5.0047%, or just 246 in total raw number deviation, well within normal redistricting practices.

15.     It is noteworthy, too, that even Plaintiffs expert, Mr. Cooper, admitted in his deposition that the 2011 *Commission Plan* has an overall deviation of 3.60% between the largest and smallest districts under his counting mythology.   More importantly, under cross-examination, Mr. Cooper conceded that as currently drawn the County Commission Election Districts meet the one-person one-vote standard of the *Fourteenth Amendment* and that it met "constitutional muster."[9]

16.     Another complicating factor is the geographic size of San Juan County and the population distribution within the County.   San Juan County is one of the largest counties in the United States. It is comprised of approximately 8,103 square miles. Vast regions of the County are uninhabited and according to Norman Johnson, the former San Juan County Clerk-Auditor, only about 25% of the County's registered voters have a physical address.[10] The remainder use only a post office box for their address.   Hence, it is difficult to place those persons without a

---

[9]   *Cooper Depo.*, p. 79.

[10]   *Norman Johnson Depo.*, p. 96.

physical address within or without a particular election district or precinct and that very problematic given the small population in San Juan County.

17.     The small population is a serious problem for any redistricting or analysis of the need to reconfigure election districts because one hundred and forty-seven people, for example, would be 1% of the County's total population and ninety-seven people would 1% of the County's voting-age population.   Thus, when Plaintiffs' expert, Mr. Ely, initially concludes that the total population of County Commission District 1 is 5,279 and Plaintiffs' other expert, Mr.  Cooper, initially put the population of District 1 at 5,350,[11] that difference is not insignificant when you are dealing with a small population and claiming, as do Plaintiffs, that election districts are malapportioned based upon the percentage of population that is living in a district.

18.     Other complicating factors are how election districts are established and how Census data are gathered and reported.   In San Juan County, as with most of the counties in the State of Utah, County Commission and School Board Election Districts are drawn along section boundaries.   Census data, on the other

---

[11]   It is also noteworthy that these two experts differ in that, according to Mr. Cooper, Mr. Ely was retained to "vouch" for Cooper's report.   *Cooper Depo.*, p. 87.

hand, is gathered and reported by geographical areas known as "*Census Blocks*."

19.   Unlike sections, which are surveyed and have legal descriptions, *Census Blocks*, especially in a sparsely populated area such as San Juan County, are defined by physical features that can be seen and documented by a census worker, such a streets, streams, railroads, etc.   These different geographies pose yet another difficult problem in determining whether there is a need to redistrict and, if so, how to accomplish the redistricting process after each census.

20.   This problem arises because *Census Blocks* are not consistent with section lines.   *Census Blocks* can cross, and usually do cross section boundaries and election district and precinct boundaries, which then results in what are referred to as "*Split Census Blocks*."   The problem inherent in *Split Census Blocks* is how to allocate the population within that *Census Block* that is *Split* to the two or more election districts that may comprise a particular *Census Block*.   This is made even more difficult when so many people in San Juan County do not have a physical address whereby one can easily determine where within the *Split Census Block* they reside and, therefore, into which election district they should be placed.

21.   When *Split Census Blocks* exist whereby part of the population in that

11

*Census Block* lives in one election district and part in another election district, in order to properly establish the population of both election districts the populations within that *Census Block* that is *Split* must be allocated to the election district in which they reside; otherwise, the population of the election districts will not be accurate for determining the need to redistrict and/or how any redistricting should be done.

22. There are 4,546 *Census Blocks* in San Juan County, but only 815 (or only 17.9%) are reported in the 2010 Census as having people living in them. In addition, only 17 blocks have more than 100 persons living there, with the largest populated block having just 328 people. In doing his population analysis or calculations with respect to the 2010 Census data, Mr. Cooper states in his expert report that he "**did not apply a formula to split the population blocks**." According to Mr. Cooper, "**I simply assigned the blocks *en toto* to one district or the other based upon a visual assessment**,"[12] and that is very disconcerting. It is disconcerting because according to the 2010 Census the San Juan County Commission Election Districts have 442 people in *Split Census Blocks*, which is

---

[12] *Cooper Second Supplemental Declaration*, Doc. 172-9, ¶ 20.(emphasis added).

more than either of Plaintiffs' experts are willing to concede, and that is 3% of the total population.   Therefore, depending into which Commission or School Board Election District these people were assigned, it could have and would have a significant effect on any alleged malapportionment.

23.    In a normal situation, the assignment of a *Split Census Block* population to the election district or precinct where those people lived, it would be done by the street address of each person.   One could tell by the person's physical address where within the *Split Census Block* that person lived and place them in the election district that encompassed people living in that particular area so as to accurately determine the population of each election district or precinct for redistricting purposes.

24.    But that cannot be done in San Juan County because so few registered voters have a street address, the rest have a Post Office Box.   Rather than assign the *Split Census Block* populations *en toto* to a particular County Commission Election District or School Board Election District the better and, in my opinion, more accurate approach is to consult persons with mapping skills and knowledge of the County's residents, which is the method I employed to help resolve the *Split*

*Census Block* issue.

25.     During the course of my work in this case, I traveled to San Juan County and met with individuals who were involved in the technical work behind the 2011 redistricting process including: John Fellmeth, the County's IT director and GIS technician, County Clerk-auditor Norm Johnson, and Dr. Douglas E. Wright, Superintendent of the San Juan County School District.   In extensive discussions with these individuals and other San Juan County personnel, including traveling the highways and back-roads of the County to gain a sense of its immense size and sparse population, I was able to get an understanding of the methodology and practice that they used in generating the populations for the precincts that the County then used to create the 2011 Election Districts.   More importantly, this information was invaluable in enabling me to correctly assign the *Split Census Block* populations into the proper election districts or precincts rather than to do so in a arbitrary fashion.

26.     Another analytical problem inherent in analyzing Census data for San Juan County is that the 2000 and 2010 Census questionnaires allowed those responding to designate or claim up to six racial categories: White, African

American, American Indian or Alaska Native, Asian, Pacific Islander or "some other race."   This is a problem because there are at least three basic ways to calculate the racial breakdown for the 2000 and 2010 Census.

27.   The first is a "Race-Alone Method", whereby individuals who mark more than one race are placed in a separate "multiple-race" category.   Thus, the racial make of San Juan County would be separately shown for the six categories listed on the Census questionnaire, plus an additional category containing those persons of multiple races.

28.   The second method is the "Combo Method" whereby persons who mark more than one race are separately counted as belonging to each racial or ethnic groups with which they identify.   Thus, for example, a person who identified his or herself as white and American Indian, would be counted twice, once as a white person and also as an American Indian.   This method tends to create a maximum number of individuals for each racial group thus resulting in a number that is more than 100% of the total population when the racial groups are added together.

29.   The final method is the one recommended by the Federal Office of

15

Management and Budget for use by federal agencies.   Known as the "OMB Method", it recommends that persons who identify themselves as being both white and another racial group essentially be counted as part of the particular racial group that you want to maximize for whatever reasons and not to count them as being white.   Plaintiffs' expert, Mr. Cooper, used the OMB Method for his County Commission and School Board Election Districts analysis.[13]

30.     According to Mr. Cooper, anyone who identified themself as American Indian and another race was counted solely as American Indian.   In fact, Mr. Cooper was asked in his deposition how he would have reported the racial data if all 14,746 people living in San Juan County had identified themselves as being both white and American Indian, and he said: "People who identified as American Indian and white would be considered American Indian" under his "Any-Part Indians" definition.[14]

31.     In his deposition, Mr. Cooper also conceded under cross-examination that by using the OMB Method he was able to claim that the American Indian

---

[13]   *See id.* at. P. 73.

[14]   *Cooper Depo.*, pp. 65-67.

16

voting-age population of San Juan County was 58.33 % and that American Indians comprised 52.17% of the County's total population.[15]    Mr. Cooper said that he felt comfortable in doing this even though to designate yourself as "American Indian" on the Census questionnaire you did not have to be a member of a federally recognized tribe.[16]

32.    Mr. Cooper, however, conceded on cross-examination that without using his "Any-Part Indian" definition that according to the 2010 Census data the total population of San Juan County was approximately 50% American Indian and 50% non-Indian, and the voting-age population was 49.57% American Indian,[17] which means that non-Indians comprised 50.03% of the voting-age population.

33.    Using the 2010 Census data, I calculated the American Indian population and voting-age population of San Juan County using all three of the methods described herein above.    Under the Race-Alone Method, there are 7,431 American Indians in the County, which is 50.39% of the population, and the

---

[15]  *Id.* at pp. 67-68.

[16]  *Id.* at p. 71.

[17]  *Id.* at pp. 69-70.

17

American Indian voting-age population is 4,806 or 49.40% of the voting-age population.

34.     Under the Combo Method, there are 7,693 American Indians in the County, which is 52.17% of the total population, and the American Indian voting-age population is 4,897 or 50.33% of the voting-age population.   However, as noted in the discussion of this method above, it actually inflates the percentage since persons of multiple races are counted more than once.   Consequently, when all of the racial categories are totaled, they add up to 102.34% of the total population and 101.24% of the voting-age population.

35.     Under the OMB Method whereby individuals who identified themselves as American Indian and some other race are counted solely as American Indian, the American Indian population of San Juan County is 7,536, which is 51.11% of the total population.   The County's voting-age American Indian population under the OMB Method is 4,873 or 50.09%.

36.     The 2010 Census shows that San Juan County had a total population of 14,746 people of which 9,729 or 65% were of voting-age.   Most individuals reported just a single race, but 339 or 2.3% said that they were of two or more

18

races.   Thus, depending upon how race is determined *(i.e.*, Race-Alone Method, Combo Method or OMB Method), the American Indian total population in San Juan County for 2010 varies from 7,431 up to 7,693 people, which constitutes between 50.39% and 52.17% of the total population.   For those persons of voting-age, the American Indian population ranges between 4,806 and 4,897 persons, which constitutes between 49.40% and 50.33% of the voting-age population.

37.   With respect to the current 2011 County Commission Election Districts, District 1 has a population of 5,061, which is over-populated by 146 people from the ideal size of 4, 915.   District 2 and 3, on the other hand, are under-populated compared to the ideal size of 4,915.   District 2 has a population of 4,870, which is 45 people fewer than the ideal number of 4,915 and District 3's population is 4,815, which is 100 fewer than the ideal number.

38.   Admittedly, depending upon how you determine American Indian status, District 3 has an American Indian population of between 91.63% and 93.78% and an American Indian voting-age population of between 91.41% and 92.50%.   Again, depending upon the method used to determine American Indian

19

status, in District 2 American Indians comprise between 26.84% and 30.0% of the

total population and between 27.26%   and 28.94% of the voting-age population.

In District 1, American Indians comprise between 31.40% and 33.91% of the total

population and between 29.96% and 31.32% of the voting-age population.

39.    It is important to note, however, that District 3 with its concentration

of American Indians is also the District with the lowest population totals, which

means in one-person, one-vote terms that it is the most over-represented of the

three Districts.    And that is highly significant in terms of there being a need to

redistrict because one of the cardinal principles of representative government is the

concept that every person's voice and vote should have equal weight as every other

person.

40.    In redistricting circles, it is common to refer to people in a district

with fewer individuals as being "over-represented" because their individual vote

carries more weight when there are less people.   Conversely, when a district has

more people that the average or ideal it is described as being "under-represented"

because that individual voter voice carries less weight when there are many more

people.   The same over-represented situation exists in Commission Election

District 2.

41.     School Board elections are nonpartisan. There are five members of
 the San Juan County School Board, who are elected from five districts.

42.      District 1 is in the northern part of the County and borders Grand
County, Utah.     In 2011, the School Board and the County Commission approved
a process whereby a portion of the County population in the "Spanish Valley" of
District 1 near Moab, Utah was transferred to the Grand County School Board for
the administration of the schools in that remote area.   This did not change who
lived in San Juan County, but it did change the overall School Board population by
moving 487 out of the base population to be considered for configuration of the
School Board.

43.      Attached hereto as Exhibit A is a map of the San Juan County School
Board Election Districts, showing the public schools within each district, and the
de-annexation of the Spanish Valley portion of District 1, which removed 487
people from the total population of District 1 of which 350 were of voting-age.
Also shown on Exhibit A are the current elected members of the School Board of
whom two are Navajo, Elsie Dee and Nelson Yellowman.

44.     With removal of the 487 people form District 1, the ideal size for each of the five Districts would be 2,852 in population.   Under the 10% standard, each of the five School Board Districts would have to be within 143 people above and/or below the ideal population figure.

45.     After assigning the *Split Census Block* populations as described herein above, District 1 has a population of 3,285, which is 433 people more than the ideal population size of 2,852; District 2 had a population of 2,820, which was 32 people less that the ideal number; District 3 had a population of 2,899, 47 more people than the ideal number; District 4 contains 3,060 people, 208 more than the ideal number; and District 5 with a population of 2,195 is 657 people short of the ideal number of 2,852 persons.

46.     School Board Election Districts 2, 3 and 4 all fall within the 10% standard.   However, because of Districts 1 and 5, the overall all deviation for the School Board Election Districts is 38.22%.   Those people residing in Districts 3, 4 and 5, which include the individual Plaintiffs in this case, are also over-represented and, therefore, cannot mount a challenge to the current School Board Election Districts because "injury results only to those persons domiciled in the

22

under-represented voting districts."[18]

47.    Using the three methods for determining race described herein above, including allocation the 1,002 people residing in *Split Census Blocks* within the five School Board Election District boundaries, the voting-age population of District 1 is 2,263 and the American Indian voting-age population ranges between 3.74% and 5.23%; the voting-age population of District 2 is 1,847 and the American Indian voting-age population ranges from 22.96% to 24.58%; the voting-age population of District 3 is 1,923 of which American Indians comprise from 54.89% to 56.46%; the voting-age population of District 4 is 1,959 of which between   96.60% and 97.94% are American Indian; and in District 5 the total voting-age population is 1,387 with American Indians comprising between 94.52% and 95.37%.   American Indians, therefore, constitute a majority of the voting-age population in three out of the five School Board Election Districts.[19]   48.    The current School Board Election Districts have been in existence

---

[18]    *Farley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974). (citing *Skolnick v. Board of Commissioners of Cook County*, 435 F.2d 361 (7th Cir.1970) .

[19]    Attached as Exhibits B and C are, respectively, maps showing the total voting-age population and American Indian voting-age population for each of the San Juan County School Board Election Districts after the Spanish Valley de-annexation.

since 1992 and while the School Board Election Districts' overall deviation of

38.22% could be construed as being high under traditional redistricting standards,[20]

one must also take into account the very small population that is scattered over

8,103 square miles; the isolated communities and community schools; the historic

nature of the School Board Election District boundaries; the fact that following the

2000 Census and 2010 Census the School Board, including its Navajo members,

opted not to redistrict and so informed the County; and the "School Community"

concept that the School Board is trying to foster, as described by Dr. Wright in his

*Declaration,* whereby individual Board members represent a community and the

schools in that community so as to have a strong interest in supporting the schools

within their community and be easily accessible to the parents whose children

attend those school.

49.    Ignoring the fact that American Indians comprise a majority of the

voting-age population in three of the five School Board Election Districts, Mr.

Cooper has presented the Court with two plans that will "create three

majority-Indian voting-age election districts."   These appears as Exhibits S-2 and

---

[20]   This 38.22% figure is larger than the 37.69% deviation identified by Mr. Cooper.   *See* Doc.
173, p. 3.

T-2 of his expert report.[21]   But in both proposals there is not a school in District 3,

which means that an elected representative from District 3 would have little

interest in supporting schools in other Districts or any schools for that matter.

    50.    Plaintiffs and their experts seem to suggest that redistricting is

required across the boards because the American Indian population in San Juan

County has dramatically increased over the decades.   But this fact is not supported

by the Census data.

    51.    Between the 2000 and 2010 Census, the total population of San Juan

County grew by 2.31% or 333 people.   During this same time period, depending

upon which of the three methods is used for determining race from the Census

data, the American Indian population of the County has fallen significantly since

the 2000 Census when it ranged between 55.14% to 56.64% of the population;

whereas the 2010 Census puts that range as between 49.40% and 52.17% of the

County's total population.   In raw numbers, the Indian population actually

dropped between -470 and -640 people between 2000 and 2010, depending on how

one counts the Indian population.   At the same time, the white population in the

---

[21]   Doc. 172-, p. 5 and 172-7, p. 9.

25

county increased by between +764 and +959 people.

52.      It is widely recognized by redistricters such as myself that the Census is not totally accurate because of over-counting and undercounting. But when dealing with large populations these mistakes tend to cancel each other out.   But this should not be presumed to occur when dealing with very small populations like that of San Juan County, where over-counting and/or undercounting by a few hundred people can make a significant difference with respect to any deviation from the ideal population for an election district. With that in mind, it appears to me that in actuality the total population of San Juan County and the voting-age population of the County are both approximately equally split between American Indians and non-American Indians.

53.      Finally, with respect to the County Commission Election Districts the American-Indian population, including voting-age population, is concentrated in District 3.   Thus, even though District 3 is the least populated of the three Commission Election Districts, American Indians are virtually guaranteed to always elect one member of the County Commission, which appears to have been the purpose of the 1984 Consent Decree.

I declare under penalty of perjury in accordance with the laws of the United States of America that the foregoing facts are true and correct to the best of my knowledge.

DATED this 9th day of September, 2015.

_____
Kimball William Brace

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

_____

| | |
|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil No. ) 2:12-cv-00039-RS |
| SAN JUAN COUNTY, a Utah government subdivision | ) ) ) |
| Defendant. | ) ) ) |

_____

)
Attorney:                            )
                                     )
Steven C. Boos, Esquire              )
Eric P. Swenson, Esquire             )
Maya Leonard Kane, Esquire           )
MAYNES, BRADFORD, SHIPPS &            )
SHEFTEL, LLP                         )
835 E. Second Avenue, Ste. 123       )
Durango, Colorado 81302-2717         )
Phone: (970) 247-1755                )
E-mail: sboos@mbssllp.com            )
        mkane@mbssllp.com            )
        E.Swenson4@comcast.net       )

_____

## DEPOSITION OF EDWARD TAPAHA

_____

BE IT REMEMBERED that on, to wit, the 24th day of June, 2015, this matter came on for the taking of the deposition of **EDWARD TAPAHA** before Beverly E. King, Certified Shorthand Reporter and Notary Public of the firm of ANIMAS REPORTING SERVICE, 919 County Road 142, Durango, Colorado 81303, taken at the San Juan County, Utah Administrative Offices, Monticello, Utah, at the hour of 9:02 a.m.

```
1                    A P P E A R A N C E S

2


3


4    FOR THE PLAINTIFFS:

5
             Steve C. Boos, Esquire
6            Eric P. Swenson, Esquire
             Maya Leonard Kane, Esquire
7            MAYNES BRADFORD SHIPPS & SHEFTEL, LLP
             835 E. Second Avenue, Ste. 123
8            Durango, Colorado 81302-2717
             Phone:  (970) 247-1755
9            Fax:    (970) 247-8827
             E-mail: sboos@mbssllp.com
10                   mkane@mbssllp.com
                     E.Swenson4@comcast.net
11


12


13   FOR THE DEFENDANT SAN JUAN COUNTY:

14
             Jesse C. Trentadue, Esquire
15           SUITTER AXLAND, PLLC
             8 East Broadway, Ste. 200
16           Salt Lake City, Utah 84111
             Phone:  (801) 532-7300
17           Fax:    (801) 532-7355
             E-mail: jesse32@sautah.com
18


19


20


21


22


23


24


25
```

1                        I N D E X

2                                                PAGE

3   Appearances                                    2

4   Witness -   **EDWARD TAPAHA**

5       Examination by Mr. Boos                     4

6       Examination by Mr. Trentadue               87

7       Further Examination by Mr. Boos            98

8       Further Examination by Mr. Trenadue       100

9   Witness' Signature/Correction Pages           102

10  Reporter's Certificate                        104

11

12

13                    E X H I B I T S

                                              MARKED/
14                                            IDENTIFIED
        EXHIBIT                                 PAGE
15
        8   Diary of Edward Tapaha               87
16
        9   Navajo Language Election Terminology  87
17          Handbook

18

19

20

21

22

23

24

25

1                        **EDWARD TAPAHA,**

2    was called as a witness by the Plaintiff, and, having been

3    first duly sworn, testified upon his oath as follows, to

4    wit:

5                            EXAMINATION

6    BY MR. BOOS:

7        Q    Good morning.  Go ahead and state your name for

8    the record, please.  You might want to spell it for the

9    court reporter.

10       A    Edward Tapaha.  E-d-w-a-r-d.  Tapaha,

11   T-a-p-a-h-a.  Navajo.  I am from Red Mesa, Utah.

12       Q    Tell us a little bit about yourself.

13       A    You want my age?

14       Q    I have known you for a long time, so I don't

15   think --

16       A    Tapaha from Red Mesa.  Lived there.  I am

17   married.  I have three kids and got eight grandkids.  I

18   was born and raised in Red Mesa and still live there.

19   Never moved out of there except during my educational

20   process.

21       Q    Where did you go to school?

22       A    I went to -- when I was growing up I went to

23   board school, San Juan Board School in Shiprock.  Then I

24   went to Shiprock Boarding School.  Then I went out to

25   Intermountain in Brigham City in my younger years.  Then I

1  went to San Juan High School.  I am a product of San Juan

2  High School from my freshman year to my senior year.

3  Graduated in '69.  Then I also went to -- I hang around.

4  I want to go to -- what is that big event on the East

5  coast back in the '60s?  Hippies.

6  Q    Woodstock?

7  A    Yeah, I wanted to go there.  That is the reason

8  why I bum around for six months and try to make money and

9  go there, but it never happened.

10       But a friend of mine pulled me back in and said,

11  "Hey, let's go back to school."  I said, "Okay."  So, I

12  went to school, went to college in Price, College of

13  Eastern Utah, and majored in business management for a

14  couple of years and graduate from there.

15       I got interested in the health care system as a

16  nurse.  When I was growing up my mother had health

17  problems and so she used to go to Shiprock Hospital.  And

18  I used to go with her.  I used to talk for her.  As much

19  as I know as a young child, young lad, try to translate

20  medical information to my mother.  So, I did that.

21       And I always wanted to work as a nurse.  That

22  kept in the back of my mind.  So, that is one thing that

23  kept up through my years of school and college.  So, when

24  I graduate from business management I got a job in Price

25  with the migrant workers, and I was interpreting for the

1    public health nurse out there.  She said, "You know, your

2    heart is in health care," and that is what it was.  So, I

3    did that.  And she recommend me to the -- what do you call

4    interview board with the nursing program at College of

5    Eastern Utah.

6         Q    I am sorry, where?

7         A    In Price.

8         Q    Oh, Price.

9         A    They call it College of Eastern Utah.

10                   THE REPORTER:  Can you repeat that.

11                   THE WITNESS:  College of Eastern Utah.

12              I am so used to talking real fast, because I have

13    to talk fast at the chapter meetings, so that is why.

14              So, I went to school there to learn to become a

15    nurse in September of '73 -- '72, and graduate from that

16    nurse in LPN classes September of '73.  I almost quit

17    three-fourth's of the way because my instructor hassled

18    me, harassed me and all this and that.  So, I went and

19    graduated from there.

20              So, worked in a nursing home in Blanding for six

21    months as a nurse.  Then moved down to -- there was an

22    opening for an LPN position, became a LPN licensed

23    practical nurse working in Montezuma Creek.  Was at that

24    time UDC, Utah Development Council Health Care Program.

25    So, I work at Montezuma Creek in the clinic as a staff

1    nurse and been there for 17 years.  I did clinical nurse,

2    school nurse, community health nurse assistant, and

3    whatever they require for me to do I did.  I assist the

4    doctors, the nurse.  At that point in time went to Mexican

5    Hat where they had a clinic there, and they had a clinic

6    in Navajo Mountain.  I used to fly out with Dr. Benedict

7    and other providers.  So, I did that for the 17 years.

8           But then the last ten years -- my last two years

9    in that organization I became administrator for the

10   clinic.  I was put into an administrative position and I

11   didn't enjoy that.  I still practice but I wasn't cut out

12   for administration position.  So, when the position came

13   up with the County, I thought maybe it is time for me to

14   change.

15        Q    (BY MR. BOOS:)  What position was that?

16        A    That was outreach worker, voter's outreach

17   worker.  So, that position came up.  So, I thought,

18   well -- I think there was about five or six of us that

19   applied for that.  I was one of them that applied for it

20   and got interviewed.  And a couple weeks later I got a

21   call from Gail Johnson.  She says, "Mr. Tapaha, you are

22   hired."

23        Q    What year was that?

24        A    Huh?

25        Q    What year was that?

1      A      '91, I believe it was.  1991.  So, I started

2   working since then.  And I was told as my

3   responsibility -- at that point in time I think the County

4   was in a consent decree with voters issues with federal

5   observers and all that.  So, I got put in that position.

6   One was a traveling to become acquaintance with the

7   community.  Pretty well know where the communities are.

8   And I went and visit the chapters, different chapters at

9   Navajo Mountain or Oljato.  I pretty well know Red Mesa, I

10  was born and raised there.  So, Mexican Water, Aneth, and

11  off the reservation, Blanding community.  So, I did that.

12         I also worked -- at the same time I worked with

13  the county commissioner, kind of like liaison position

14  just to show -- just to find out what are the program that

15  we have, present the information to the community.  And

16  then the following year, even years, the election came up.

17  I was told to handle the election in the southern part.

18      Q      What does that mean, "handle the election"?

19      A      Huh?

20      Q      What does it mean, "handle the election"?

21      A      Handle the election is you go out there, provide

22  information, election information, voters awareness,

23  registration, explain what the polling place are.  So,

24  like, poll workers, help out select poll workers and train

25  them and -- the key ingredient is to tell the chapter

1    community, the chapter, that "There is an election coming

2    up this year, the filing date is in March, and these are

3    the positions of those candidates for filing.  And the

4    registration, voters registration is ongoing.  If you are

5    not registered, I encourage you to register."

6         And I have the list of names with me.  I have a

7    list from the county clerk, they gave me that.  And I have

8    that list of names and I utilize that name and usually

9    double-check.  Come to find out there is -- I guess back

10   in the early '70s it did a lot of -- University of Utah

11   student did a lot of voters registration.  I seen them

12   camp here and there.  And a lot of folks were double,

13   triple registered, and I tried to correct that.  I did

14   attempt to correct that information and help people to

15   re-register, make sure they have the correct information.

16   Make sure they have the correct name that is in there.

17        For example, some of the folks that were there,

18   Anglo translation, when you say "Tapaha," when I say my

19   name, "Tapaha," if I ask you to spell it, you probably

20   spell it T-a-b- -- I don't know, whatever way.  And then

21   another student would spell it differently.  So, you had

22   to kind of -- you had to correct those names to make sure

23   that you have the right person.  I usually ask them if

24   they have any ID, Social Security card, and we register

25   based on that.  And ask them where did they really live

1    specifically.  And they usually -- because a lot of the

2    Navajo in our community use box number for their address.

3    We don't have street address.  So, they use box number.  I

4    usually ask, okay, "In what direction do you live from

5    this specific chapter community, different area?"  They

6    usually say, "Well, way over there."  Some say, "Well, you

7    know where I live."  I say, "Yeah, I know where you live,

8    but tell me where you live."  They usually describe the

9    land transformation.  Based on that, okay, this person

10   lives in this precinct and this district area.  So, based

11   on that we put that name in that area and identify with

12   them.  So, that is election information.

13           I do radio announcement.  I did big-time radio

14   announcement at that time from KTNN.

15       Q    Back in '91 you are talking about?

16       A    Uh-huh.  '92.

17       Q    '92?

18       A    '92, '94, '96, all that even years that came.  I

19   did a lot of radio voters awareness information.  KTNN,

20   KNDN from Farmington.  And I use Cortez, one of the

21   stations, KRTZ, I believe it was.  And I come to find out,

22   ask questions -- usually ask questions, "What radio

23   station do you really listen to?"  And these two stations

24   were the main one.  I asked the folks, "Folks, what about

25   Colorado?"  The younger generation are country boys,

1    listen to KRTZ in Cortez.

2        Q    Are there any places in the Utah strip that you

3    can't get radio reception?

4        A    Navajo Mountain years back you couldn't really

5    get a good radio reception.  And then like Monument

6    Valley, certain area you get too many static.  Red Mesa,

7    some static.  Aneth, certain area, can't really get good

8    information because of static.  This is AM station,

9    because KTNN, KNDN were AM station.

10            Then back in the '90s or the '80s or '70s we had,

11    what you call it, KUT in Blanding.

12                    MR. SWENSON:  KUTA.

13                    THE WITNESS:  KUTA.

14        Q    (BY MR. BOOS:)  Wow, I don't remember that one.

15        A    And I used that station.  And that station only

16    can cover almost partial Aneth, partial Red Mesa, Mexican

17    Water toward area and anything north.  Communities north

18    of it you can get.

19        Q    Being Todahaidekani?

20        A    Yeah, Todahaidekani, that area, all that.

21    Monument Valley, I don't know -- I think you get poor

22    reception.  What do you call those radio waves lower than

23    the other station.  So -- and Navajo Mountain you couldn't

24    really receive anything there.

25        Q    I haven't thought about this in years.  It was

1    difficult to get reception in Bluff, wasn't it?

2    A    Yes, it was very poor.  Especially if you live in

3    the valley, very valley area.  If you live a little bit

4    higher, depending on what kind of radio you have, you

5    probably could get good -- some reception.

6    Q    When did KUTA go out of business?  I have no

7    memory of that station.

8    A    When I start working they were still in business.

9    Went out of business late '90.  They couldn't get a good

10    strong local business support, advertisements, so they

11    just went out of business.

12    Q    So, when Ms. Johnson hired you, what did she say

13    your duties were going to be?

14    A    She told me that one is that I work with the

15    county commissioner as a liaison, helping out the county

16    commissioner to submit information, like public land

17    issues or the issues that reflect on the county and the

18    Navajo Reservation, working with them.

19    Also worked with Rick Bailey mostly because of

20    the road issues.  Sent me on some of these road committee

21    meetings at the chapter or agency, work with them.  And

22    then listening in Window Rock with the law enforcement and

23    other things.

24    That is the off-year election.  Which mean

25    off-year election is like odd years, '91, '93, '95, '97.

1          But even years my responsibilities is the

2     election.  When Gail hired me she just explained, "Well,

3     Ed, you are going to work with the commission during the

4     odd years.  You are going to work with the election even

5     years."  But she left before I started in '92, actually.

6     She resign her post right before that, probably October or

7     something like that.  I can't recall that one.  But she

8     was on that.  She told me, "Well, you are going to work

9     with the election in even years."

10     Q     So, after she left did that change?

11     A     Uh-huh.  Well, Gail Northern came in.  And I

12     guess she had to relearn everything from day one to even

13     years with the election.  She was kind of a laid-back

14     person, because she is new to it, but she still told me to

15     say, "Ed, go out and give out the election information,

16     radio announcement, chapter meetings, registration here

17     and there."

18     Q     Ms. Northern didn't stay that long, right?

19     A     Yeah.  She stayed -- I don't know, early '90s, I

20     believe it was, or maybe before that.  And she resigned

21     and moved to Phoenix with her husband.  So, Norman took

22     over after that.  And Norm stayed until last year when she

23     retired -- or he retired.

24     Q     When Norman took over, did your job duties change

25     at all or did you do pretty much the same thing?

1     A    Pretty much the same.  She give me -- he gave me

2    more responsibility.  "Ed, this is all yours.  You do what

3    seems to be feasible for you to do.  You can do more."

4     Q    What did that mean exactly, "do more"?

5     A    Meaning to be you are more flexible.  You can

6    attend meetings, you can do registration drive anywhere

7    you want to.

8          Like I usually -- during the election year, even

9    years, I usually park here and there.  Don't matter what

10   the hour is.  I usually hit those place like early morning

11   hours or late into evening hours, sitting there and

12   providing information, providing registration, tell them

13   about the dates.  And I have a sign that says "San Juan

14   County Voters Registration Office."

15    Q   Is that something that you weren't doing under --

16   when Ms. Johnson and --

17    A    I did.  I did.

18    Q   Okay.

19    A    And I have those information with me and I have

20   flag on my truck and everything.  Try to be very visible.

21   And I did that.

22         And Gail Johnson left right before the election,

23   so I worked with Gail Northern.  I just gave her the

24   information that I have these, and she said, "Yeah, go

25   ahead."  And she let me go to buying paper to do posters,

1    fliers, and I did that.  She kind of gives me more

2    opportunity.  And she gave me some limited opportunity to

3    visit Navajo Nation, but she still gave me the way --

4    said, "Don't say much, just provide the election

5    information."

6        Q    "Don't say much," what did she mean?

7        A    Meaning to say don't give yourself too much out

8    by saying we will extremely do this.  Meaning to say, many

9    hours that you spend, but say you are readily available

10   any time you need to do this.

11       Q    How did that change under Mr. Johnson?

12       A    It worked very well with him.  I just explained

13   to him what I am doing, and he said, "Well, keep going.

14   Keep doing that."

15       Q    Okay.

16       A    And that years we were under consent decree, so

17   we had the federal observer with us every election.  So, I

18   communicate with Gail Northern that year that we were

19   under federal observer and consent degree.

20            Plus Norman.  And I usually show, tell him "This

21   is what I am going to do.  This is probably work or it may

22   put more emphasis in this area and all that."  So, that is

23   what we did.

24       Q    When you started that job, did the County give

25   you any kind of training or did you take any kind of

1       training?

2           A    No.

3           Q    What did they tell you?  Just, "Go do this"?

4           A    They told me, "Well, Ed, we trust you."  Because

5   when I got hired, when I got interview I was asked by the

6   commissioner saying, "How much do you know about the

7   chapter?"  "Well, I am acquainted with the chapter

8   official, some I do."  And I was a chapter official at

9   that point in time, so I know how the chapter operates and

10  all that.

11          Q    You were an official in Red Mesa?

12          A    Yeah, chapter secretary.

13          Q    Yeah.

14          A    So, I guess that was a plus for me, because I

15  know how the chapter kind of operates in various area, and

16  I know some of the chapter officials because of my work

17  with UNDC Health.  We used to do a presentation at the

18  chapter when we are called to do so.  And I got a chance

19  to meet some of the officials.  So, based on that I pretty

20  well know what to do and how to operate and how to

21  approach the chapter official.  So, I did that.

22              And one of my responsibilities in reference to

23  the election is "I would like to attend your chapter

24  meeting and I would like to do a presentation when you

25  have your chapter meeting.  And this is the information

1    that I have that I would like to share with your

2    constituents, community."  And they were open to it, gave

3    me the opportunity.  So, I learned the presentation system

4    based on that.

5        Q    How did it get on the agenda?

6        A    It worked well, but some resistance because I

7    talk too much.

8                MR. TRENTADUE:  No.

9                THE WITNESS:  What I am saying there is that

10   I talk -- I want to let the people know and become aware

11   of what voting is and what election is all about.  So,

12   that takes more time to explain.

13       Q    (BY MR. BOOS:)  Would you say -- is it fair to

14   say that in Navajo culture there is more of an expectation

15   that people will take time to explain something fully?

16       A    Uh-huh, yeah.

17       Q    Talk about that a little bit.

18       A    Navajo community -- especially back in the '90s

19   versus today.  Back in the '90s or previously you have to

20   kind of do a show and tell, writing.  You have to write on

21   the board or do some writing on a presentation board, tell

22   them this is what it is, this is what it is going to be.

23   And because of my involvement in the chapter and being an

24   official, I seen presentation from other agency that comes

25   to the chapter meeting.  They just go word by word and

1    people didn't understand, people didn't accept it into

2    their train of thoughts.  So, they were hesitant to make a

3    decision.

4        Q    Is it fair to say that there is -- in Navajo

5    society there is more of an expectation that someone doing

6    a presentation will take a lot of time with it, will give

7    you a lot of background information?

8        A    Uh-huh.

9        Q    And that is very different than what is expected

10   in white society, where everything is a little more cut

11   down?

12       A    Uh-huh.

13       Q    You have to say "yes" or "no."

14       A    Yeah.  Yes.

15       Q    Tell me about that a little bit.

16       A    Like I said, Navajo wants to see.  They want to

17   look at it, they want to listen, they want to look at it.

18   This almost, like, say, touching it.  They want to feel

19   that.  And they want to know what is there involved in it

20   and what outcome it will provide by show and tell.  And

21   based on that it takes extra time.

22       Q    Okay.

23       A    I come to find out when I started there were more

24   elderlies, Navajo, having that tone of thoughts.  And

25   every year that I did, is like every three or four years

1   after, it is gradually changing, gradually changing versus

2   last year.

3       Q    I think I asked a couple questions about Navajo

4   Mountain.  It used to be that there were substantially

5   more people out there who spoke Navajo and didn't speak

6   English.  Is that still the case?

7       A    No.

8       Q    Really.

9       A    No.

10      Q    Tell me about that.

11      A    Navajo Mountain elderlies, the people that I

12  know, spoke highly Navajo.

13           They communicate -- the first chapter meeting

14  that I went to doing my presentation, when I was doing my

15  presentation I saw Navajo elderly sitting on one side,

16  elderly ladies sitting on the other side.  Tell me about

17  diversity.  Elderly Navajo men sit on one side, ladies sit

18  on the other side, they don't mingle.  Navajo elderlies

19  sit on the other side talk Navajo, and they are the ones

20  that brought up questions, and I relate with them in

21  Navajo, communicate with them.  Ladies didn't say much.

22  Men would want that.  But gradually it is starting to move

23  away from that.

24      Q    In what way?

25      A    Meaning to say they are not much versed in Navajo

1    like the old elderlies.  More like you would hear somebody

2    talking in English version than Navajo version, say, "You

3    know.  You know."  Starting to be like that now.

4        Q    So, it is less fluent than it used to be?

5        A    Huh?

6        Q    It is less fluent than it used to be?

7        A    Yeah.

8        Q    Is that amongst the younger people?

9        A    Younger people, yes.  But the younger people are

10   not really involved, because they think that the chapter

11   meetings is mostly for elderlies.

12       Q    If you had an elderly person out in Navajo

13   Mountain and they got a document, like a ballot from the

14   County, is it something that one of the younger people who

15   doesn't speak Navajo very fluently anymore could translate

16   for them?

17       A    No, probably not.

18       Q    Let's go back in history a little bit.  I know

19   some of this may not have -- may not be something you knew

20   about, but do you know anything about school board

21   election issues back in the 1980s?

22       A    I was school board member from 1980 to 1984.

23       Q    You were?

24       A    Yeah.  So, I guess I am aware of it.

25       Q    Tell me what you remember from back then about

1    the way in which the school board election districts were

2    divided up.

3        A    The division of the school board I guess I didn't

4    ask question.  I know which part of the district that I

5    represent and communicate with those district -- the

6    chapters.  But I do know that as an elected board position

7    you do also represent all districts in the county.

8        Q    Were there any discussions back when you were on

9    the board between '80 and '84 of reapportioning?  Do you

10   know what I mean when I say "reapportion"?

11       A    No, huh-uh.  No.

12       Q    Okay.  Population changes.  There is this idea

13   that as population changes you have to adjust the

14   boundaries of election districts to make sure that there

15   are approximately the same number of people in each

16   district.

17       A    I don't think I received any information.

18       Q    Do you remember any discussions about that back

19   then?

20       A    No.

21       Q    Okay.  Do you remember that in 1983 the United

22   States Department of Justice sued the County on election

23   issues?

24       A    Yes.

25       Q    Tell me what you remember about that.

1    A    What I remember is that there was a voters

2    registration information, and information wasn't very

3    correctly done or not done.  It was just not really in

4    Navajo word of translation information.

5    Q    The voting information --

6    A    Voting information.

7    Q    -- wasn't in Navajo?

8    A    And didn't really explain the ballot, what it

9    consist of, how the ballot looks like.  Did not explain

10   where you would vote, polling place, when the registration

11   deadline, when the registration begin.  That I did not

12   hear anything at that point in time.

13   Q    Do you remember anything about the creation of

14   the commission election districts back then?

15   A    Small information.  Not that much at that point

16   in time.  Even though as a chapter official we heard about

17   it, I heard about it, but limited information.

18   Q    What do you remember hearing about back then?

19   A    That there will be a change in the commissioner's

20   district to say that there will be a representation

21   position to be established.  Which I -- probably at that

22   point in time was District 3.

23   Q    When you say representation established, what do

24   you mean?

25   A    A Navajo representation.

1    Q    Did you understand that to be a district

2    specifically for Navajo?

3    A    Uh-huh.  Uh-huh.

4    Q    You have to say "yes" or "no."

5    A    Yes.

6    Q    Okay.  She can't do "uh-huhs."

7    A    Oh, really?

8    Q    Or nods of the head.

9    A    What I was going to say is I will explain it to

10   you in Navajo, you translate that.

11   Q    Sorry.

12        My Navajo is not that good, even after all these

13   years.  Mr. Swenson might be better, I don't know.

14        Well, what can you tell me about it in English, I

15   am sorry?

16   A    Huh?

17   Q    What can you tell me about the Navajo district in

18   English?  What did you understand or what do you

19   understand it was supposed to be about?

20   A    Run that by again.

21   Q    You are saying a special representative district

22   was being created.

23   A    Okay.

24   Q    What do you think that all meant at the time?

25   A    I guess my question at that time was, was there

1    ever a Navajo representation on the commission.

2        Q    You mean before then?

3        A    Before that time.  And with bits and information

4    that I would see at that time there wasn't.  And when that

5    position was established would that really help us to

6    promote or to have a better communication and better

7    understanding how a government will provide some service

8    to the community; how a county government would have some

9    understanding of what service was available now has to be

10   available to the community in the southern part of the

11   county.

12       Q    Do you think by creating District 3 it has helped

13   with those issues?

14       A    Yes.

15       Q    In what way?

16       A    I think based on information that this is how we

17   need to approach the County and asking for service.  How a

18   county government operates and utilize what needs to be

19   done with the southern part.  More communication from the

20   county government with representation to the chapter area.

21   And it helps to understand more of approaching the County

22   in requesting and asking for assistance in various areas

23   of service that would be available depending on what the

24   Navajo Nation says.

25       Q    What do you mean "depending on what the Navajo

```
 1    Nation" --

 2         A    Sovereignty issue.

 3         Q    You have to explain what you mean by that.

 4         A    I guess Navajo Nation Council and government says

 5    you have to go through us first before you do anything

 6    outside.  As a chapter official that is what we were

 7    instructed to do, but when we go ahead and ask for this is

 8    for the service of the people, we are asking for this.

 9         Q    Have there also been -- I don't know if you call

10    the rules, but concerns expressed by the County about

11    providing services on the Navajo Reservation better within

12    the county because there is a belief that the Navajo

13    Nation should be providing those services?

14              MR. TRENTADUE:  I am going to object on

15    foundation.

16         Q    (BY MR. BOOS:)  You can go ahead and answer

17    anyway.

18         A    I guess the interpreting of what service would be

19    readily available and interpreting by what service is

20    needed, reference to that, will that service really

21    benefit the community if there was a better understanding

22    of how to implement that service for the goodness of the

23    community.  It didn't really prohibit, the County didn't

24    really prohibit our understanding of how that service

25    would benefit.
```

1    Q    Can you give me an example?

2    A    Let's say road, county road.  The county road on

3    the reservation is a BIA road according to Navajo Nation.

4    Q    But also designated as a county road?

5    A    But it was designated by the County as a county

6    road.

7    Q    Okay.

8    A    So, certain number of the county road was a BIA

9    road that was designated to be a county road, and the

10   County put money into it.  Okay.  There is a private road

11   elsewhere, what is a private road to somebody else's home.

12   How can we work together based on that.  The County would

13   say, "Well, we need the bus route," the county road

14   designate that the BIA had.  But this new established

15   road, how do you justify saying that is a road.  So, the

16   County didn't want to deal because it was a newly

17   established road, a private road.  So, asking the Navajo

18   Nation to assist in qualifying this road to become a

19   county.

20         And even though the chapter asked the County to

21   take care of this road as a private road, become a county

22   road, and then they hesitate to do it because it is still

23   a private road.  The tribe hasn't -- the BIA hasn't

24   recognized that.

25   Q    To your knowledge, has the commissioner elected

1       from District 3 always been a member of the Navajo Nation?

2       A    Yes.

3       Q    Who was the first commissioner from District 3?

4       A    Mark Maryboy.

5       Q    Is Mark Maryboy Navajo?

6       A    Uh-huh, Navajo.

7       Q    Who were the commissioners elected from

8   District 3 after Mr. Maryboy?

9       A    After?

10      Q    After.

11      A    Manual Morgan.

12      Q    Is he Navajo?

13      A    Navajo.

14      Q    Who was after Mr. Morgan?

15      A    Kenneth Maryboy.

16      Q    Is he also Navajo?

17      A    Council delegate also.

18      Q    Council delegate on the Navajo Nation council?

19      A    Uh-huh.

20      Q    You have to say "yes" or "no."

21      A    Yes.

22      Q    Sorry.

23           And who is the third commissioner from

24   District 3?

25      A    Rebecca Benally.

28

1    Q    And is she also Navajo?

2    A    Yes.

3    Q    Have any of them ever been elected to serve as

4    chairman of the County commission?

5    A    No.

6    Q    Let's go back to the 1984 case.  In your job as

7    liaison have -- and an assistant to the commission, have

8    you ever discussed issues with the commission concerning

9    reapportionment or how the districts are set up,

10   commission districts?

11   A    No.

12   Q    Okay.  So, they have never once asked you a

13   question about how the district boundaries are drawn?

14   A    No.  I think that was done previously, so -- '84,

15   I don't know, because I wasn't employed at the County.

16   Q    Okay.  Did you have any involvement after the

17   lawsuit -- one of the purposes of the lawsuit is prior to

18   the lawsuit the County did at-large voting for commission

19   districts.  Then the County agreed, as far as that

20   lawsuit, to create three election districts, including

21   District 3, but they had to adopt boundaries.  And there

22   were a series of proposals that were floated out in the

23   community.  And then finally what was adopted was

24   different than any proposal that was floated out in the

25   community.  But did you have any involvement in any of

1   those proposals for the boundaries of the original three

2   districts?

3        A    In '83?

4        Q    Well, it would have been after 1984.

5        A    No.

6        Q    I think they were adopted in 1986.

7        A    No.

8        Q    Never came to you to the Red Mesa chapter and

9   said, "Here are our proposed districts"?

10       A    No.

11       Q    Okay.  So, when those districts were finally

12  adopted your chapter had never had any input into those?

13       A    Not to my knowledge, no.

14       Q    In 1986 -- you weren't on the school board at

15  that point, correct?

16       A    No.

17       Q    Okay.  Was that the last time you served on the

18  school board?

19       A    '80 to '84.

20       Q    Okay.  What were you doing -- were you at UNDC in

21  '86 did you say?

22       A    Uh-huh, employee.

23       Q    That is when you were running the clinic down in

24  Montezuma Creek?

25       A    No.

30

```
 1        Q    What were you doing for UNDC?

 2        A    Staff nurse.

 3        Q    Staff nurse.  So, you didn't have any involvement

 4   in administrative issues at that time?

 5        A    No.

 6        Q    You came to work for the County in 1991, I think

 7   you said, correct?

 8        A    Yeah.

 9        Q    When you came to work, did Ms. Johnson ask you

10   any questions about reapportionment at that time?

11        A    Gail Johnson?

12        Q    Yes.

13        A    No.

14        Q    She didn't -- did she ask you -- give you any

15   information about the 1990 census data?

16        A    No.

17        Q    Never asked you to do anything with that?

18        A    Huh-uh.

19        Q    So, your job was strictly to deal with elections?

20        A    Uh-huh.

21        Q    Not to -- you have to say "yes" or "no."

22        A    No.

23        Q    Okay.  You weren't asked any questions or asked

24   to do any work concerning the drawing of the boundaries

25   for --
```

1  A  No.

2  Q  -- the commission districts in 1990?

3     In 1992, as you are aware there are five election

4  districts for the school board.

5  A  Yes.

6  Q  Okay.  In 1992 there was an apportionment or they

7  redrew the boundary lines for the five school board

8  districts.

9  A  Uh-huh.

10  Q  Were you asked any questions about that in 1992?

11  A  No.

12  Q  You weren't asked for any input by Ms. Northern?

13  A  No.

14  Q  Were you asked for any input by the

15  commissioners?

16  A  No.

17  Q  There was a discussion in the early 1990s of

18  setting up a five-member county commission.  Were you

19  involved in any discussions --

20  A  No.

21  Q  -- concerning that?  You were asked no questions

22  about --

23  A  No.

24  Q  You were never given any information to convey

25  to --

1       A     Heard about it.

2       Q     Heard about it.  What did you hear about it?

3       A     Heard about there was a community -- appointed

4    community member that we are involved in discussion of

5    commissioners redistricting or boundary districting, but I

6    wasn't involved in it.

7       Q     The commission never asked you any questions?

8       A     No.

9       Q     Never asked you to convey any information to the

10   chapters?

11      A     No.  I believe that that was run with a group

12   that was designated.  They were the one that was doing the

13   presentation.

14      Q     Okay.  Do you understand how the federal census

15   works?

16      A     No.

17      Q     Okay.  Every ten years under the constitution a

18   census is conducted.

19      A     Uh-huh.

20      Q     And then the census bureau produces census data

21   that is publically available.  So, a census would have

22   been conducted in 1980, one in 1990, one in 2001, one in

23   2010.  After the census was conducted in 2000, did anyone

24   from the County talk to you about the census data?

25      A     Just brief information.

1    Q    Like what?

2    A    Just numbers.

3    Q    Like --

4    A    Like it was an inaccurate number.

5    Q    How so?

6    A    Didn't get the full picture of where that number

7    really appeared from.

8    Q    You mean when it came to you you didn't get --

9    A    Yeah.

10    Q    Okay.  And what do you think was inaccurate about

11    the number?  What number are you talking about then?

12    A    A number of residents in certain area, meaning,

13    let's say, for example, Red Mesa.  A number that was there

14    wasn't a sufficient number accurately that I would know.

15    Q    So, are you saying that the number, the census

16    number that was shared with you, was too small, it didn't

17    represent the total number of Navajos living in that area?

18    A    Yeah.  Yes.

19    Q    Okay.  Was any other information about the 2000

20    census shared with you?

21    A    No.

22    Q    Were there any discussions with the commission or

23    with Mr. Johnson in 2000 about changing the boundaries for

24    the commission?

25    A    Heard about it.

34

```
 1        Q    What did you hear?

 2        A    Heard that there is going to be a discussion in

 3    reference to that boundary issues or census number and

 4    redistricting.  I wasn't involved in it.

 5        Q    You weren't asked to --

 6        A    No.

 7        Q    -- convey any information to the chapters?

 8        A    No.

 9        Q    It was never discussed with you by the

10    commissioners?

11        A    Not with the commission, but with Norman.

12        Q    What did Norman --

13        A    This is -- the census number are this, and this

14    is where the boundary will be changed with the school

15    board.

16        Q    With the school board, not with the --

17        A    Uh-huh.  That is the one I know.

18        Q    Were the changes for the school -- and this was

19    in 2000, or after 2000 anyway?

20        A    After 2000 or -- 2000.

21        Q    So, all that happened is Mr. Johnson came and

22    told you they were looking at changes, but that is all you

23    ever heard?

24        A    Uh-huh.

25        Q    You have to say "yes" or "no."
```

```
 1        A    Yes.

 2        Q    Sorry.

 3             Mr. Johnson has told us that the federal

 4    monitoring of elections in San Juan County ended in 2002.

 5    Do you remember that?

 6        A    Uh-huh.

 7        Q    You have to say --

 8        A    Yes.  Sorry.

 9        Q    Do you remember when that ended?

10        A    The date?

11        Q    Not the exact date, but do you remember that it

12    ended in 2002?

13        A    Yes.

14        Q    What changed after the federal monitors went

15    away?

16        A    We went still the same as it is previously,

17    continued to do so.

18        Q    So, you are still providing a fair amount of

19    voter --

20        A    Yes.

21        Q    -- assistance in Navajo?

22        A    Yes.

23        Q    Did you think that was still necessary?

24        A    Yes.

25        Q    What kind of problems did you see with regard to
```

1    voter assistance?

2         A    What problems?

3         Q    What kind of voter assistance is typically needed

4    out on the res?

5         A    Present time?

6         Q    Well, in 2002, back when the monitoring ended.

7         A    Explaining the ballots and who -- explaining the

8    candidate.  And previously it would be the translation of

9    the amendment and proposition.  That was a challenge.

10        Q    Why was it a challenge?

11        A    Hard to interpret lawyers' terms.

12        Q    You mean translate them into Navajo?

13        A    Yeah.

14        Q    Was that a very involved process?

15        A    Huh?

16        Q    Is that a very involved process?

17        A    It is, yes.  I have to think real hard how to

18   translate words.  And I had to have help from other folks

19   how to translate.

20        Q    What kind of other folks did you have help?

21        A    Meaning the other outreach worker from the other

22   state of the other county.

23        Q    Which other state or other county?

24        A    Arizona, New Mexico.  Apache County, Navajo

25   County, Coconino County.

37

```
 1        Q    Were those Navajo folks?

 2        A    Yes.

 3        Q    Have they received training in how to translate

 4   complicated election documents into Navajo?

 5        A    No, but we had a person that is there that was

 6   fluent in writing Navajo.

 7        Q    Who was that; do you recall?

 8        A    Harold Noble.  And he is the one that -- he was

 9   Apache County outreach worker.  So, at the beginning we

10   work with him in translating the words, how to say -- what

11   is the proper way of saying it.  And he help us -- we

12   worked together with him to translate that information.

13        Q    Was he fluent in the traditional sense of that?

14        A    Yes.

15        Q    Maybe we should go into that a little bit.  I

16   have always understood that there are people who I -- I am

17   not a Navajo speaker.  I might hear them speaking Navajo,

18   and it might sound like they are speaking fluent Navajo,

19   but especially to elderly Navajos they would say, "That

20   person isn't very fluent," isn't that right?

21        A    Yes.

22        Q    There are some people in Navajo society,

23   especially older folk -- well, I have always been told

24   Peter McDonald, Senior, for example, are very, very

25   fluent; is that true?
```

38

1      A      Yes.

2      Q      And that with younger people their fluency has

3  started to decline because they don't know a lot of the

4  traditional forms for saying something, and a lot of

5  English words get mixed into what they are saying.  Isn't

6  that the case?

7      A      Yes.

8      Q      And as the generations have changed that has

9  gotten a little bit worse from one generation to the next,

10  correct?

11      A      Yes.

12      Q      So, people who are under 20, their level of

13  fluency is nothing like the level of fluency that an older

14  person might have?

15      A      Yes.

16      Q      Okay.  That change in fluency, did that -- what I

17  understand you are saying is Mr. Noble was one of those

18  class of Navajos who is an older person who spoke

19  extremely fluent Navajo?

20      A      Yes.

21      Q      Okay.  And he was someone you needed in order to

22  do a careful translation of English election documents

23  into Navajo, correct?

24      A      Yes.

25      Q      You couldn't do that with an 18 year old today,

1    could you?

2        A    No.

3        Q    All right.  Where were we.

4           There have been some changes in the number of

5    Navajo voters who have moved from active to inactive, or

6    in some cases names have been eliminated from the list, so

7    that between 2004 to 2006 there was a 25 percent reduction

8    in the number of voters.  Do you know anything about how

9    that happened?

10       A    Change of address, change from location of home

11    to another state.

12       Q    What do you mean by that?

13       A    Moving from one area that, say, for example, from

14    Montezuma Creek to New Mexico, Shiprock, or Oljato to

15    Kayenta due to work related.

16       Q    So, there were permanent changes of address?

17       A    Uh-huh.

18       Q    I have a question about -- do you understand how

19    most people get mail on the reservation?

20       A    Post office.

21       Q    Do the people have resident addresses?

22       A    No.

23       Q    Do they have little mailboxes on the front of

24    their house where a postal service worker comes and --

25    mailman comes and sticks mail in their door?

```
 1        A    No.  No.

 2        Q    Okay.  Where do most people go to get mail?

 3        A    Post office.

 4        Q    Do they have post office boxes?

 5        A    Uh-huh.  Yes.

 6        Q    Does everyone have a post office box?

 7        A    No.

 8        Q    Does everyone get their mail at a post office box

 9   near their house?

10        A    Near their house?

11        Q    Near.  Within ten miles.

12        A    No.  Well, yes.

13        Q    Most people do?

14        A    Post office box.  No post office box out there.

15        Q    Okay.  Out in the community you mean?

16        A    No.

17        Q    Where are the post office boxes usually located?

18        A    Montezuma Creek post office, Aneth post office

19   within the store, Oljato post office, Navajo Mountain

20   within the chapter they have a post office box.

21        Q    Okay.  Todahaidekani?

22        A    Bluff.  Bluff or Teec.

23        Q    Or Teec.  Teec Nos Pos?

24        A    Uh-huh, Teec Nos Pos.

25        Q    Teec Nos Pos in Arizona?
```

1     A    Uh-huh.

2     Q    How many miles from Todahaidekani to Teec Nos

3  Pos?

4     A    Approximately 40.  15 to Red Mesa, about 20 miles

5  from there to --

6     Q    Are you thinking on a dirt road?

7     A    Highway, dirt road.  There is a shortcut and then

8  there is --

9     Q    I remember that shortcut.  I always took the

10  highway.  On the highway how many miles would you say?

11     A    Probably about 30, longest distance.  30 to 40.

12  40 the most.

13     Q    Okay.  For example, the post office in Oljato,

14  does it have a sufficient number of post office boxes for

15  everyone?

16     A    No.  No.

17     Q    If you don't have a post office box in Oljato,

18  where can you get a post office box?

19     A    Kayenta.

20     Q    Kayenta is in Arizona, correct?

21     A    Arizona.  Then there is one in Mexican Hat.

22     Q    Right.  So, someone in Oljato might be able to

23  get a post office box in Oljato, but they might also have

24  a post office box in either Mexican Hat or Kayenta?

25     A    Yes.

1      Q     Do a lot of people in Utah have post office boxes

2    in Kayenta?

3      A     Yes.

4      Q     Would that have to do with the fact that a lot of

5    people work in Kayenta?

6      A     Yes, plus working there and not enough post

7    office box in Monument Valley or Oljato.

8      Q     How long does it take for -- let's say you were

9    mailing a letter from Mexican Hat to Kayenta.  How long

10   might it take a letter to get between those two points?

11           MR. TRENTADUE:  Objection, foundation.

12     Q     (BY MR. BOOS:)  Go ahead and answer.

13           MR. TRENTADUE:  You have to answer.

14           THE WITNESS:  About a day.

15     Q     (BY MR. BOOS:)  About a day?

16     A     Two days.

17     Q     Have you ever heard of mail taking longer to get

18   from Mexican Hat to Kayenta?

19     A     No.

20     Q     Okay.

21           MR. TRENTADUE:  Before you start on a new

22   point, how are you doing?

23           THE REPORTER:  Fine.

24           MR. BOOS:  What time is it?

25           MR. TRENTADUE:  Going about an hour.

```
 1                    MR. BOOS:  We can take a break if you would

 2     like.

 3                    MR. TRENTADUE:  Trying to take a break for

 4     the reporter.  I think of you.  She works very hard, so

 5     she --

 6                    MR. BOOS:  Want to take a break?

 7                    MR. TRENTADUE:  We will take a break,

 8     unless she says no.

 9                    MR. BOOS:  Well, we can give her spellings

10     for things like "Todahaidekani."

11                    MR. TRENTADUE:  It is very hard when the

12     names are not so common.

13                    MR. BOOS:  Can we go off the record.

14                    (Recess taken at 10:04 a.m. and

15                    back in session at 10:18 a.m.)

16     Q     (BY MR. BOOS:)  I asked you a few questions about

17     the commissioners in District 3.  There were a couple of

18     other commission districts I wanted to ask you about.

19                    In Commission District 2 has there ever been a

20     Navajo candidate for county commission?

21     A     Yes.

22     Q     Who was that?

23     A     Willie Grayeyes.

24     Q     G-r-a-y-e-y-e-s.

25                    MR. SWENSON:  I think it is an "e" not an
```

```
 1    "a."
 2              MR. BOOS:  I think it is an "a."  Oh, well.
 3    Q    (BY MR. BOOS:)  I think you might be confusing --
 4    District 2 is the district in Blanding.
 5    A    Oh, okay.  All right.  District 2.  Sorry.  Not
 6    that I know of from 1990.
 7    Q    So, no Navajo commissioner has ever been elected
 8    from District 2?
 9    A    No.
10    Q    In District 1, which is the Monticello going down
11    though Halls Crossing, ending up at the Navajo Mountain
12    district --
13    A    Oljato.
14    Q    -- has there ever been a Navajo candidate for
15    commissioner?
16    A    Yes.
17    Q    How many?
18    A    One.
19    Q    Who was that?
20    A    Willie Grayeyes.
21    Q    Where did Mr. Grayeyes live?
22    A    Page.
23    Q    What community does he typically represent?
24    A    Navajo Mountain.
25              MR. TRENTADUE:  Could we get some time frame
```

1    going.  You say since the district was created, obviously?

2             MR. BOOS:  Yes.

3             MR. TRENTADUE:  Okay.

4             MR. BOOS:  Well, more specifically the time

5    frame is the period that Mr. Tapaha actually has knowledge

6    of.  So, from 1990 forward.

7             MR. TRENTADUE:  Okay.

8    Q   (BY MR. BOOS:)  Are you aware of anyone, any

9    Navajo running for District 1 from 1984 -- I should say

10   1986 through 1990?

11   A   No.

12   Q   Are you aware of any candidates other than

13   Mr. Grayeyes who ran for commission in District 1 from

14   1990 to the present?

15   A   No.

16   Q   When Mr. Grayeyes -- is Mr. Grayeyes a member of

17   the Navajo Nation?

18   A   Yes.

19   Q   As far as you are aware, did Mr. Grayeyes win

20   that race?

21   A   No.

22   Q   Who was he running against?

23   A   Bruce Adams.

24   Q   Was Bruce Adams a non-Indian?

25   A   Yes.

1     Q    With regard to school board election districts,

2    Districts 1, 2 and 3, are you aware of any non- -- I am

3    sorry, aware of any Navajo candidates who have run in

4    school board District 1 since 1990?

5              MR. TRENTADUE:  Objection on the foundation.

6     Q    (BY MR. BOOS:)  Go ahead.

7     A    No.

8     Q    Are you aware of any Navajo commission -- Navajo

9    school board candidates who have run in School Board

10   District 2 since 1990?

11             MR. TRENTADUE:  Objection, foundation.

12             THE WITNESS:  No.

13    Q    (BY MR. BOOS:)  In School Board District 3 are

14   you aware of any Navajo candidates who have run since

15   1990?

16             MR. TRENTADUE:  Objection, foundation.

17        You can answer.

18             THE WITNESS:  No.

19    Q    (BY MR. BOOS:)  A census was done in 2010 --

20        Oh, I think I asked you this question, but just

21   in case.  Was Mr. Grayeyes elected in the District 1 race

22   against Mr. Adams?

23    A    No.

24    Q    In 2010 there was another federal census

25   conducted.  Were you aware of that?

```
 1        A    Yes.

 2        Q    What were you aware of?

 3        A    Information on the radio, TV, that it is a census

 4   count.

 5        Q    After that census was conducted was any of the

 6   census information shared with you in your job with the

 7   County?

 8        A    No.

 9        Q    Were you ever involved in any discussions with

10   the commission about reapportioning the commission

11   district?

12        A    No.

13        Q    Following 2010, I should say.

14        A    No.

15        Q    Following the 2010 census, were you ever involved

16   in any discussions with the commission about

17   reapportioning the school board election districts?

18        A    No.

19        Q    Did Mr. Johnson ask you following 2010 anything

20   about reapportioning the commission election districts?

21        A    Brief information in reference to what the

22   discussion is, but never involved in it.

23        Q    What was the brief information?

24        A    There was a plan or -- not plan in place, but

25   there was a discussion to redistrict discussion.
```

48

```
1       Q    Was this the commission or the school board?

2       A    School board and commission.

3       Q    And what was the nature of the information?

4       A    Say there is some discussion on the table to look

5    into it.

6       Q    And that is it, that is all you ever heard?

7       A    That is all.

8       Q    Do you know Leonard Gorman?

9       A    Yes.

10      Q    Are you aware that Leonard Gorman is the

11   executive director of the Navajo Nation Human Rights

12   Commission?

13      A    Yes.

14      Q    Were you present when Mr. Gorman met with the

15   county commission --

16      A    No.

17      Q    -- in 2011?

18      A    No.

19      Q    Were you involved in any discussions concerning

20   Mr. Gorman's presentation --

21      A    No.

22      Q    -- with the county commission?

23           You have supplied us with a copy of a diary for

24   2014, which unfortunately at this point we don't have

25   copies of to share with people.  I am going to make
```

1    references to this by date as we go through it, and then

2    later on we'll make copies of this and give copies to both

3    sides.  And I will show Mr. Trentadue the entry that I am

4    looking at as well.

5          So, I have in front of me a diary that you

6    evidently provided Mr. Trentadue for 2014.  Do you

7    recognize this --

8          A    Yes.

9          Q    -- diary?  This is a diary that you kept on a

10   regular basis?

11         A    Yes.

12         Q    So, these entries in the diary are all by you?

13         A    Yes.

14         Q    There are some things I wanted to ask about this.

15   I want to make sure I understand some of the entries.  So,

16   for example, you have got an entry on January 5th, 2014.

17   Could you explain that to me, what that all means.

18         A    Navajo?

19         Q    No.

20         A    January 5, 2014, went to the chapter meeting at

21   Oljado.  Went down there, sit there all day.  Give me the

22   opportunity to do presentation on election information to

23   the chapter.  Election information, registration date,

24   filing date, where the -- who the -- the candidate list of

25   position, and the voter's ID card that we will be sending

50

1    from the County will be forthcoming that will identify

2    where you are registered, and that you are registered, and

3    that helping you to qualify.  And then this is for your

4    record information also.  Voter registration shows the

5    precinct, your address, and also can be used for other

6    reference information.  And that means you are registered.

7    If you do not get the card, let me know.

8         Q    But you ask them to call you directly?

9         A    Uh-huh.

10        Q    Do you recall from the January 5th chapter

11   meeting in Oljato how many people were there?

12        A    I don't know.  Approximately 30.

13        Q    Let me ask you a question about how chapter

14   meetings work.  Do chapter meetings ordinarily start at

15   the times noticed for those meetings?

16        A    No.

17        Q    What usually happens?

18        A    They have to wait for a quorum, meaning a quorum

19   of 25 people to show up before they can start the chapter

20   meeting.

21        Q    That is 25 chapter members, right?

22        A    Uh-huh.

23        Q    You have to say "yes" or "no."

24        A    No.

25        Q    You need 25 chapter members before you have a

51

```
 1    quorum to start the meeting?

 2         A    Yes.

 3         Q    Do those people usually show up by the time a

 4    meeting is scheduled to start?

 5         A    No.

 6         Q    How long does it usually take before a quorum

 7    usually shows up?

 8         A    About two hours.

 9         Q    When the folks from the chapter meeting show up

10    and the meeting start, do they stay through the whole

11    meeting typically or does the makeup of the room change?

12         A    Majority of them stay for the whole meeting and

13    then they change.  Then some come in.

14         Q    So, you have people going in and out the whole

15    time?

16         A    Yes.

17         Q    So, it might not be the same people?

18         A    Yes.

19         Q    When you gave your presentation, the people that

20    you gave that presentation to might not have been the same

21    people who came in later, correct?

22         A    Yes.

23         Q    Okay.  What did you tell people at that meeting

24    about the vote-by-mail process?

25         A    By-mail voting process, that we will like to
```

1    present to the chapter for information that we will do a

2    by-mail voting.  And I show them what the ballots from a

3    previous election, meaning 2010 election ballots.  Give

4    that presentation; this is a sample ballot, this is what

5    you will receive in the mail.

6    Q    Ballot is a sample ballot from the Monticello

7    city election, correct?

8    A    No.

9    Q    From where?

10    A    I had my own ballot information I had from

11    Oljato, the southern part.

12    Q    Okay.  What kind of questions did people have

13    about that?

14    A    They asked when will that be.  And I told them if

15    we do have a primary election that is when we will

16    probably do so.

17    Q    Did they have any other questions about --

18    A    They say that "What happened if you are not

19    registered?  Will you receive that ballot in the mail?"  I

20    said, "No, that is the reason why you have to register.

21    Make sure you update your information in the

22    registration."

23    Q    Did anyone express any concerns about doing

24    mail-in ballots?

25    A    Yes.

1     Q     What were the concerns that were --

2     A     Concerns.  The elderlies that are homebound.

3     Q     What were the concerns about the elderly?

4     A     Will they receive a ballot in the mail, and if

5     they do, how are they going to vote.  And I usually say,

6     "Well, you as a family member of voters, if you are aware

7     that you receive this information, if you receive this

8     ballot you can help your elderly grandparents that you

9     know of and discuss the ballots with them."

10    Q     Did people think that was a good idea?

11    A     Uh-huh.  Yes.

12    Q     There is very many entries in your diary, and I

13    will just show you these.  I don't want you to read any of

14    the names, as we discussed before.  But, for example, on

15    January 6th and 7th there is a list of names that I

16    believe I recognize them as former clients of mine.  But,

17    there are a number of names of people that I believe are

18    elderly Navajos, and it shows you doing visits either

19    under the heading of "Waiver Or Alternative."  I take it

20    that these are visits, home visits, that you are making to

21    elderly Navajos --

22    A     Yes.

23    Q     -- in your capacity as an LPN, not --

24    A     With another name that is there, is "Darren" or

25    "Dalton," they are case manager, case manager worker.  I

54

1    go out in the field with them, helped out interpreting as

2    a case manager.

3        Q    Is this work that you do for the County?

4        A    Yes.

5        Q    What is your title when you are doing this work?

6        A    Case manager assistant.

7        Q    And it would appear that at least on January 6th,

8    7th and 8th, 2014 nearly everything you were doing on

9    those days was working as a case manager assistant; is

10   that right?

11       A    Yes.

12       Q    And so where we see entries in this diary at

13   other points where it talks about Darren or Dalton,

14   "Waiver Or Alternative," and then there is this list of

15   names, that is when you are working as a case manager

16   assistant --

17       A    Yes.

18       Q    -- for these home visits for elderly Navajos.

19   That wasn't associated with election issues, correct?

20       A    At the end I usually ask them "Did you receive

21   information or are you a registered voter?"

22       Q    You wouldn't do that every time though?

23       A    No.

24       Q    I have seen some names in there that appear

25   pretty regularly.  You wouldn't ask them that every time,

55

1    though, I take it?

2        A    No.

3        Q    Okay.  Let me borrow that back again, the diary.

4        A    (Witness complies.)

5        Q    Some people never change.

6            Can you tell me what percentage of your time you

7    were spending doing the job as a case manager assistant

8    versus your time as an election liaison?

9        A    At the beginning of the year it was like 50-50,

10    and then 50-50 for case manager, 50 percent for election.

11    Then as the month goes by it gets to be 60-40.

12        Q    Which is 60, which is 40?

13        A    60 is election, 40 percent of the time goes to

14    case manager.

15        Q    Are you being paid out of different funding

16    sources for the different jobs?

17        A    Same.  No.  Pay is the same amount -- or same

18    sources from the county clerk.  I am on loan.

19        Q    You are on loan?

20        A    Yeah.

21        Q    So, it is kind of long term permanent loan from

22    the county clerk to --

23        A    Yeah.  Yes.

24        Q    This is county social services that is doing

25    this?

1       A     County aging program.

2       Q     So, the clerk's office lends you out to the

3  county aging program for anywhere up to 50 percent of your

4  time during the year to do this?

5       A     A given election year.  At the beginning of the

6  year when things start to happen I go 50-50.  But when it

7  is close to the election, let's say primary election, I go

8  60-40.  Or when it is two months before the election

9  previously, like almost 90 percent of the time.

10      Q     Okay.  Take a look at the entry that you have got

11  for January 21st, 2014.

12      A     Holiday.

13      Q     No, the 21st, not the 20th.

14      A     21st?

15      Q     Yes.

16      A     Yes.

17      Q     I know the holiday would excite me, but...

18      A     2014 is on a Tuesday.  I come out here, meet with

19  Norman Johnson and James Francom, and we discuss election

20  activity.

21      Q     Were you meeting with the commission that day,

22  too?

23      A     No.

24      Q     The notation about the commission, that is wrong

25  or what?

57

```
 1      A    That is wrong.  It says 1-21 -- 4-21 -- so by
 2  that --
 3      Q    I think there is a notation on the 21st about the
 4  commission.  It says, "Norman Johnson and commission"?
 5      A    That is Norman was the one that was meeting with
 6  me.  He asked me -- don't have to, but I met with him
 7  after the meeting.
 8      Q    So, explain the topics that you have noted down
 9  there.
10      A    Norman Johnson, county clerk, and James Francom,
11  the deputy attorney -- deputy county clerk, we discussed
12  election activity.  And we also discussed by mail voting,
13  what it consist of, being how do we go about it, envelope,
14  what do we do, information that we need to send out right
15  away to the voters explaining step one, step two, step
16  three.
17          Then the radio announcement reflects on the
18  upcoming election, the primary election about by-mail
19  voting.  Sent the information to KTNN.  We discussed those
20  radio stations that we would do, the two stations.
21          Then the paper, Navajo Times, San Juan Record.
22          And then we discussed the signature issue saying,
23  okay, we have a registered voter that registered 10 or 15
24  years ago.  If we do by mail how do we identify that that
25  is a correct person registering with a ballot there,
```

1    because with the information on the by-mail voting you

2    have to sign your envelope at the bottom.  And if they

3    sign it and then we cross check with it, how do we do

4    that.  How do we identify that this person is the one

5    that's signature is here.

6         Q    What was the process you decided to use for doing

7    that?

8         A    We -- by mail voting?

9         Q    Uh-huh.  For the signature cross-checks.

10        A    Signature cross-check is we cross-check with the

11   registered voter's signature, previously registered voter.

12   With this signature on this ballot, let's say my name, and

13   my name over here when day one I register, does that

14   reflect the same thing.  And I ask that question, say,

15   "Will it change or will it not change?"  Okay.  I was 25

16   years old when I registered here, I am 65.  Does my

17   signature change?

18        Q    Uh-huh.

19             MR. TRENTADUE:  You have to say "yes."

20             THE WITNESS:  Eventually it will.  And how

21   do we know that this Tapaha registered over here the

22   signature reflects on this Tapaha over here.

23        Q    (BY MR. BOOS:)  So, what did you decide to do?

24        A    And we said the age bracket, the change from 20,

25   30 years ago reflects on there may be a difference.  But

1    the address will qualify, meaning to be the same person.

2    And if we have question, I ask that.  If we do have

3    questions, what do we do.  If we have questions during the

4    election date or during before the election when this mail

5    comes in, what do we do if we have question.  So, we

6    double-check that.  And if we do have question then I can

7    go out to that person.  I can go and see Ed Tapaha and

8    have him re-register, and re-register the information on

9    the registration form, re-signature, cross-check that and

10   come out.

11       Q    I want to understand more the dynamics of this

12   meeting.  When you went out to discuss all these issues,

13   including the announcements and what are you going to do

14   with the signature issue, was this something Mr. Johnson

15   was telling you this is the way he wanted you to do

16   something or was he asking you for input?

17       A    He asked us and we worked closely -- I worked

18   closely with him for input and what my thoughts would be.

19       Q    Did you express any reservations to him about

20   doing the mail-in ballot process?

21       A    No.

22       Q    Did you have any concerns that you didn't express

23   to him?

24       A    No.

25       Q    You were convinced that this was a good idea and

60

1 that you should go ahead and do it?

2 A Yes.

3 Q Let me borrow that back again.

4 A (Witness complies.)

5 Q This may not be the best example, but -- let me

6 see if I can find a better one than this.  Okay.

7 I want you to look at the entry for May 8th.  It

8 says "Bluff," and then "Election."  You frequently -- this

9 is just an example, but you frequently have days in the

10 diary where all it will say on that day is "Election."

11 What does that mean?

12 A It means that in Bluff from 7:30 to 4:30 I

13 stationed myself near the post office or near K and C

14 store to do registration and voters information.

15 Q So, on all these -- I think there is some other

16 days.

17 A Yeah, there is several places that I have entries

18 like that.

19 Q I saw some other ones, too.  So, on May 12th the

20 diary says "Mont. Ck," which I assume stands for Montezuma

21 Creek; is that right?

22 A Yes.

23 Q Then says "Election" underneath.

24 A Yes.

25 Q That is the same thing --

61

```
 1        A    Same thing.

 2        Q    -- you were stationed out there doing

 3   registration?

 4        A    Yes.

 5        Q    So, all the entries that say a place and then say

 6   "Election," you were doing registration work?

 7        A    Yes.

 8        Q    Okay.  Take a look at the entry on February 5th.

 9   Can you just take a look at that for a second and I will

10   ask you a couple of questions.

11        A    (Reviewing.)  Says "Monticello"?

12        Q    Right.  You were in Monticello that day?

13        A    I was here in Monticello.

14        Q    It says "Election," too.  Were you doing

15   registration?

16        A    Discussion.  Meeting with James Francom, Norman

17   Johnson.

18        Q    Okay.  Go ahead.

19        A    If I bring new registered voters that registered

20   or change of address of registration, I bring those in and

21   give it to James so he can process it.

22        Q    I see.  You evidently also had a discussion with

23   Mr. Francom that day; is that correct?

24        A    Yes.

25        Q    One of the topics listed under --
```

1   A    We discussed the public information, asking him

2   to print me a copy of the public notice so that I can post

3   them.  And also post office issues.

4   Q    What were the post --

5   A    The post office issues mean like if he has

6   questions like Teec, he asks me why some of the folks that

7   live in Red Mesa have the address in Teec, do we send them

8   the information over there?  I say if that person lives in

9   Teec of Red Mesa chapter and has address in Teec, send the

10  information to them, because they are registered in Utah.

11  Q    Was that something that he had not understood

12  before?

13  A    Yes.  He was a new worker, new employee.

14  Q    Had you ever had a similar discussion with

15  Mr. Johnson?

16  A    We talked about it and he understood that that is

17  how some of the folks registered or living in Utah still

18  registered -- not -- have a post office box in Teec.

19  Q    In Arizona?

20  A    In Arizona.  Because they live east of Red Mesa

21  chapter, so that is a shorter distance for them to go.

22  Q    Did you have any other discussion about post

23  office issues?

24  A    No.

25  Q    So, on February 17th there is a couple of

1    notations there.  First of all, you say "Holiday," double

2    exclamation point, which I assume was Presidents Day.  And

3    then you got a notation about Red Mesa chapter.  What was

4    that notation about?

5        A    Chapter meeting.

6        Q    So, you went on Presidents Day?

7        A    Yes.

8        Q    What did you discuss at the chapter meeting that

9    day?

10       A    Did the presentation on the election, upcoming

11   election, the filing date, March, primary date, June 20 --

12   last part of Tuesday of June, and then general election

13   date in November.  And there is a discussion that "I would

14   like to present to you by-mail voting.  This is what we

15   will go by.  If you are a registered voter we will

16   implement by-mail voting," which is still in the

17   discussion stage, meaning let's fine tune this information

18   first before we really send them out.  So, we are still at

19   that stage to fine tune them and do it right, but we will

20   implement by-mail voting.

21       Q    Did anyone at the chapter meeting express any

22   concerns about by-mail voting when you were there at Red

23   Mesa?

24       A    No.

25       Q    No questions?

1    A    No questions.

2    Q    Your entry on February 24th, the way I understand

3    that, you were in Monticello that day?

4    A    Yes.

5    Q    You had a meeting with Norm Johnson?

6    A    Yes.

7    Q    You discussed some election issues, including

8    radio announcements?

9    A    Yes.

10   Q    Can you explain what the notations about each of

11   the radio announcements mean?

12   A    Radio announcement means translating public

13   information, when the filing day will be, and that filing

14   date consists of what candidate position will be open for

15   the 2014 election.

16   Q    There is some notation that is say "KTNN," and

17   says "3XWK."  What does that mean?

18   A    The public service announcement, the election

19   information that we will put on the air, translation, play

20   three days -- three days times one week.

21   Q    I am sorry, for KTNN it says "2XWK."  I am

22   reading upside down.

23   A    Two times a day.

24   Q    Per day?

25   A    Per day.  Two times a day per week, for that

1    week.

2        Q    And then there is a notation for KNDN, which I

3    believe is the station in Farmington.  Says "3XWK"?

4        A    Same.

5        Q    Which means what?

6        A    It means radio announcement will happen three

7    times a day for a week.

8        Q    Okay.  At that point on February 24th had you

9    created the recordings yet?

10       A    Yes.

11       Q    Where did you do that?

12       A    Downstairs.

13       Q    You created the recordings in this building in

14   Monticello?

15       A    Yes.

16       Q    The old courthouse?

17       A    Yes.

18       Q    Do you still have copies of the recordings?

19       A    I don't have it.  Maybe the office may have.

20       Q    The recordings that you made -- were the

21   recordings actually being broadcast by February 24th?

22       A    It broadcast -- we sent the information to KTNN.

23   The filing date consists of -- okay, filing date starts on

24   March 14th, ends March 20.  So, called over, sent the

25   information by radio wave recording, and to do it one week

1  before.

2  Q   I am sorry, you will have to explain that again.

3  So, the broadcast actually began on March 7th?

4  A   7th -- no.  Broadcast starts before -- from the

5  3rd up to the 7th.

6  Q   Okay.  The broadcast that you started on the 3rd,

7  what was the content of them?  What did they say?

8  A   It says this is the date.  The filing date will

9  be March 14th through the 20th, one week.  "You need to

10  file if you want to become a candidate for these

11  positions," like county commissioner, school board, local

12  county department head, like the county treasurer, clerk,

13  county recorder, county assessor, county sheriff, all the

14  County head.  Then the State, the attorney general, I

15  believe it was, and the State house of representative.

16  Then we also have the national, like State congressional

17  house of representatives.

18  Q   At this point you were just -- the announcement

19  only had to do with filing deadlines, correct?

20  A   Yes.  Yes.

21  Q   The recording didn't say anything about the

22  election being a by-mail election?

23  A   No.

24  Q   The entry on March 7th, what does that refer to?

25  A   This is the election information by public

1    notice, the candidate list filing date.  Post them at the

2    post office, the clinic, Aneth chapter house, Aneth store,

3    Montezuma Creek clinic, Bluff post office, Montezuma Creek

4    post office, Red Mesa chapter, Aneth -- I mean, Oljato

5    chapter house, Mexican Water chapter house, Bluff post

6    office, Mexican Hat post office, Grooman store, K and C

7    store outside where you put up the posters, K and C store,

8    Navajo Mountain, and over at the gas company operation,

9    Resolute.

10        Q    The reference to Resolute, you are talking about

11    oil and gas headquarters in Montezuma Creek?

12        A    Used to be Mobil.

13        Q    Right.  Now Resolute owns it.  Navajo Nation owns

14    it.

15        A    Yeah.

16        Q    And that is in Montezuma Creek, right?

17        A    Montezuma Creek.

18        Q    So, all these were were notices about filing

19    deadlines, correct?

20        A    Yes.

21        Q    Nothing about it being a by-mail election at that

22    point?

23        A    No.

24        Q    Take a look at the entry for March 25th.  There

25    is some notations about affiliated voters and some issue

```
 1    that you were explaining evidently at the Montezuma Creek
 2    chapter.  What was that all about?
 3        A    This is when I set up my parking.  I park at
 4    Montezuma Creek giving out election information, affiliate
 5    registered voter within the primary election of the
 6    different party in June primary election.  Republican
 7    party always say you have to be affiliated voter.  That
 8    means you had to be a die-hard Republican registered voter
 9    before you can vote.
10        Q    You have to be registered as a Republican to vote
11    in their primary; is that correct?
12        A    Yes.
13        Q    Okay.
14        A    Democrat flexible.
15        Q    In what way?
16        A    In a way to where it says you can belong to any
17    party, but you can vote for Democrat party.
18        Q    So, if you are registered as a Republican in
19    Utah, you can go ahead and vote in the Democratic primary,
20    correct?
21        A    Yes.
22        Q    So, what was the issue that you were discussing
23    then?
24        A    I clarify saying that you have to be -- if you
25    want to vote in the primary election for the county
```

1    commissioner's candidate, you can re-register and become

2    aware that you can vote in Democrat party.  And then some

3    do ask me when they stop by, say, "I am a Republican

4    party.  If I don't want to vote for Democrat what do I

5    do?"  So, stay over there.

6         Q    What do you mean "stay over there"?

7         A    Stay over on the Republican side.

8         Q    Don't vote?

9         A    Don't vote.  Don't worry about it.

10        Q    Take a look at the entry for June 9th.  Evidently

11   you were in Monticello that day; is that correct?

12        A    Yes.

13        Q    You were doing some work on election issues.

14        A    Yes.

15        Q    It appears that you met with Mr. Johnson.

16        A    Yes.

17        Q    And you were talking about radio announcements?

18        A    Yes.

19        Q    What were you talking about on June 9th?

20        A    I am going to do recorded, and what information

21   do I need to really specify an instruction of the by-mail

22   voting, or if there is going to be a primary election what

23   information do I really need to use.  And saying so how

24   many days do I need to work with the radio station to give

25   out the information with the announcement.

1      Q    So, at that point you hadn't made a -- you hadn't

2   already produced the radio announcement?

3      A    With the filing date I did that.  That is taken

4   care of already, out of the picture.

5      Q    When you say the filing --

6      A    With this announcement, this is the day we

7   discussed to do the radio announcement for primary

8   election.

9      Q    Okay.  When did you actually create the

10  announcement?

11     A    I create the radio announcement on that day.

12     Q    "On that day" being the 9th?

13     A    9th.

14     Q    Okay.  Did you create that here in this building

15  again?

16     A    Yes.  I have a person that helps me.  John

17  Fellmeth is the computer specialist, knows how to do the

18  recording session.  He helped me out to operate that.  He

19  helped me out to turn it on and run it.

20     Q    Okay.

21     A    Then he rewind it, make sure what I say is

22  correct.  If I don't say it correctly, I would start all

23  over again.  Make sure we fine tune it.

24     Q    Okay.  You have got another entry on June 20th

25  concerning Farmington radio station recording.  What does

1    that mean?

2        A    Farmington station call us or call John Fellmeth.

3    The recording that we sent over did not record well.

4        Q    There was some flaws in it or something?

5        A    Yeah.

6        Q    Okay.

7        A    So, I decided to go to Farmington and re-record

8    it over there.

9        Q    That is what you did on the 20th?

10        A    Yes.

11        Q    Did KTNN or KNDN have trouble with those

12    recordings?

13        A    No.

14        Q    When did the -- so, you made the recording on the

15    9th.  When were those recordings sent to KNDN and KTNN?

16        A    John probably had the information he was going to

17    send out either the same day or the next day, which would

18    be the June 10th.

19        Q    But it was Mr. Fellmeth's responsibility to send

20    it out to the radio station?

21        A    We communicate with each another to send.

22        Q    He is the one that actually sent it out?

23        A    Yes.

24        Q    You think he would have sent it out within that

25    24-hour period?

1    A    Yes.

2    Q    Do you know for sure that he did?

3    A    I call him.

4    Q    What did he say?

5    A    He say yes.

6    Q    Did he send it by mail or did he send it

7  electronically?

8    A    Electronic.

9    Q    So, he created an Mp-3 file?

10   A    Yes.  John probably knows that.  I don't know

11  computers, so...

12   Q    Take a look at June 17th and 18th.  You have got

13  a slightly different notation on those days.  On the 17th

14  it says "Election" and then what appears to be "F/N

15  voter."  Same on the 18th, "Election" and then what

16  appears to be "F/N on voter."  What is that?  What do

17  those notations mean?

18   A    We sent out by-mail voting.  The State, when they

19  print the ballot and then sent it out and they got into

20  the mail on the -- I can't recall on that one.  But they

21  sent it out, and then some of the registered voter that

22  received the ballot sent the ballot back.  And with that

23  follow-up voters, if a voter did not sign the signature on

24  the ballot -- or not on the envelopes.  So, I picked those

25  up and take it back to the voters and locate them, and had

1    them sign the signature on the back -- not the ballot, but

2    the envelope.  Because when we start counting -- not

3    count, but we start looking at -- undoing the envelope and

4    feeding the ballot into the machine.

5            And the other is, like I said, is this Ed Tapaha

6    signature the same as Ed Tapaha signature now.  And if

7    there is a letter that don't seem cursive back 20 or 30

8    years ago, doesn't match with what he has on this

9    envelope, go back over there, find him, and re-sign his

10   registration form, and then match that with it.  Then

11   Norman make -- Norman makes a decision to count it.

12       Q    How many ballots were you taking out on the 17th

13   and 18th, and where did you -- these notations on the 17th

14   and 18th, it didn't say where you were going.  But which

15   communities did you go to that were on those days and how

16   many ballots did you have?

17       A    I usually had -- at the beginning I had about 20

18   of them.  I just went all over the place.  They were from

19   everywhere; Aneth, Montezuma Creek, Red Mesa, Bluff.

20       Q    Did you go out to Navajo Mountain?

21       A    Yes.

22       Q    Same on the 18th?

23       A    Yes.

24       Q    But you only have about 20 ballots; is that

25   right?

74

```
1        A     Yes.

2        Q     Those were the only days you were going out and

3   doing followup on ballots?

4        A     Yes.

5        Q     The general election was in November -- on

6   November 4th, correct?

7        A     Uh-huh.  Yes.

8        Q     So, I would like you to look at the -- the

9   notations for October 31st.  It says, "Monticello

10  election."  So, what were you doing on that day, October

11  31st?  That would have been Halloween.

12       A     I was up here.  We were opening the envelopes and

13  put the ballots in the machine.  And we were

14  cross-checking all the envelopes that came in with the

15  signature.

16       Q     Okay.

17       A     And that is what I was doing.

18       Q     On the following Monday and Tuesday you have got

19  notations for "Election" on the 3rd and the 4th.  You told

20  us before in earlier parts of the diary on the days that

21  you said election you were out doing voter registration?

22       A     No.  Yes.

23       Q     I assume this means something different on

24  November 3rd and 4th.  What were you doing on those days?

25       A     I stationed myself --
```

75

1    Q    You are pointing to the 3rd now.

2    A    Yeah.  November 3rd in Aneth and Montezuma Creek

3    and Bluff.  Like two hours here, two hours here, two hours

4    here to see if anybody still has questions and to drop off

5    their ballot.

6    Q    What do you mean "to drop off their ballot"?

7    A    The envelope.

8    Q    What do you mean drop off their envelope?

9    A    Envelope with their ballot in it.  I am

10   designated as election co-worker as a deputy county clerk.

11   I have the -- Norman gave me the responsibility "You can

12   collect those and bring it in."

13   Q    Collect ballots and bring them in?

14   A    The envelope.

15   Q    The envelope.

16   A    The envelope with the ballots in it.

17   Q    So, if someone on the 3rd of November, if they

18   walked up to you and said, "Here is my envelope with my

19   ballot in it, I don't want to put it in the mail, I want

20   to hand it to you"?

21   A    Yes.

22   Q    That is what you were there to deal with was to

23   receive that?

24   A    Yes.

25   Q    Okay.  What about on the 4th, on the day of

1    election?

2    A    Same thing if a person calls, because the

3    deadline to send in your by-mail voting was November 3rd,

4    has to be postmarked by then before it can be counted in

5    the election day.  So, I stop by the post office and wait

6    there.  If anybody has any ballot that -- if they mail it,

7    it will be postmarked November 4th or the next day.  But I

8    am stationed there to see if anybody could bring -- if

9    they are late with it I can pick it up and do the same

10    like I did on November 3rd.

11    Q    Were there people that you took envelopes from on

12    the 4th?

13    A    No.

14    Q    No one anywhere?

15    A    No one.

16    Q    I notice that on the days prior to the election,

17    a week before the election, you don't have any notices or

18    notations -- I have to take a break soon, I think.

19    You don't have any notations of followup with

20    voters.  So, you weren't doing any followup at this point?

21    A    Before the election?

22    Q    Before the general election on November 4th.

23    A    I did the same.

24    Q    Which days were you doing that on?

25    A    Probably with the "Election" on it, where it has

1    "Election" on it.  When the State sent out the ballot and

2    it start coming in, when it says "Monticello," that is

3    when we were opening up the envelopes and cross check with

4    the signature on the ballot.

5         Q    That is on October 17th you are talking about?

6         A    Yes.  Then after that when I have "Election,"

7    while I am there doing some of the followup with those

8    ballots that don't have a signature or change of address

9    or questionable.

10        Q    So, you are talking about a notation on the 20th

11   through the 24th it looks like.  So, there is a week

12   there, October 20th through the 24th.  And it says

13   "Election."  So, you would have been doing followup that

14   week as well?

15        A    Yes.

16        Q    How many ballots did you take out to those

17   communities on those days?

18        A    It has been a while.  I can't recall on that one.

19        Q    One of the things we noticed, there is a page

20   where you have got -- let's see if I can find it again.  A

21   contact for Stan Benally at the KTNN office and an e-mail

22   address for him.  Is he the person that you were talking

23   to at KTNN about the recording?

24        A    Yes.

25             MR. BOOS:  Okay.  So, we still need copies

1    of this so we can put it in the record at some point.

2                    MR. TRENTADUE:  We will need --

3                    MR. BOOS:  Shall we go off the record for a

4    minute.

5                    (Recess taken at 11:17 a.m. and

6                    back in session at 11:36 a.m.)

7        Q    (BY MR. BOOS:)  I want to go back to on the day

8    of the actual election on November 3rd and 4th.  You had

9    said that you were going to post offices on the 4th, for

10   example, and if someone had a ballot that they were trying

11   to mail you would offer to take that for them and turn it

12   in, because it wouldn't be postmarked in time if they put

13   it in the mail.  Where did you start that day, which post

14   office were you sitting at on the 4th?

15       A    Montezuma Creek and race over to Aneth.

16       Q    Raced over to Aneth, so you headed east?

17       A    Yes.  Ten, eight miles.

18       Q    If you had gotten a call for assistance from

19   Navajo Mountain that day and you were in Aneth, what did

20   you do?

21       A    I had a cell phone that I use.  And on the fliers

22   that I sent out on the mail, Norman's phone number is on

23   it, James' phone number was on it and the office.  My cell

24   phone number was on it.  And if the Navajo Mountain

25   resident had a question, family member or themself can

1    call me on my cell phone and explain the ballot.

2        Q    What if they are an elderly person who doesn't

3    have a cell phone?

4        A    Usually they have family member that are there

5    can help them out.  Or at the chapter they brought it in

6    or senior center brought it in, have question, and they

7    can call me.

8        Q    Okay.  Prior to 2014 how many people were --

9    well, where were the polling places on the reservation

10   prior to 2014?

11       A    Precinct No. 1 consist of Bluff community, Bluff

12   precinct.  Precinct No. 2 is Montezuma Creek fire station.

13   Precinct No. 3 is Aneth chapter house.  Precinct No. 16,

14   Red Mesa chapter house.  Precinct No. 12 at Mexican Hat.

15   We have problem with that.  We used to use the old school,

16   but we have the new fire station there, so we use the new

17   fire station at Mexican Hat.

18       Q    What about Halchita, did you have a chapter house

19   there?

20       A    Halchita used to be the El Rancho place that is

21   not there anymore.

22       Q    Right.

23       A    Now we use the new fire station right across.

24       Q    On the state side of the river?

25       A    Uh-huh.  We use Oljato chapter house, precinct 13

1    at the chapter house, and then Navajo Mountain precinct,

2    14, Navajo Mountain.

3        Q    People from Monument Valley or the Goulding area,

4    where do they go?

5        A    Oljato.

6        Q    Douglas Mesa, where do they go?

7        A    Mexican Hat.

8        Q    Prior to 2014 how many election judges and

9    translators would you have had at each one of those

10   polling places?

11       A    Three.

12       Q    Three.  How many of each?

13       A    Three at each polling place.

14       Q    Three judges or two judges and one translator?

15       A    Every one of them had that responsibility to be a

16   translator, all three of them.

17       Q    So, you had three judges.  All three judges were

18   Navajo?

19       A    Yes.

20       Q    All three judges were qualified to translate?

21       A    Yes.

22       Q    So, prior to 2014, then, how many -- sorry, I

23   didn't take down the number.  You said one, two, three,

24   four, five -- did you say five?

25       A    No.

81

```
 1       Q    Oh, Red Mesa, six.

 2       A    Red Mesa --

 3       Q    So, seven.  So, you would have had 21 people out

 4   there who could have helped provide voter assistance?

 5       A    Yes.

 6       Q    After 2014 when you went to the mail-in ballot

 7   system, you were the only one, correct?

 8       A    Yes.  And I asked the senior center, because I

 9   know who some of the poll workers were previously, "If

10   voters come in asking question, give them information,

11   because you were my previous poll workers."

12       Q    The people who worked at the senior center?

13       A    Yes.

14       Q    But that was on an unofficial basis?

15       A    That is unofficial, yes.

16       Q    How many people agreed to do that?

17       A    Three of them.

18       Q    Three out of the 21?

19       A    Yes.

20       Q    Which communities were they in?

21       A    Huh?

22       Q    Which communities were those three people in?

23       A    Oljato, Navajo Mountain and Red Mesa.  Aneth

24   chapter senior center was closed.

25       Q    So, there would have been no one in Aneth, Bluff,
```

82

1    Mexican Hat?

2        A    No.

3        Q    Okay.  You would have been in Montezuma Creek,

4    wouldn't you?

5        A    I was everywhere.

6        Q    You started the day in Montezuma Creek,

7    evidently.

8        A    Yes.

9        Q    I had a question come up in talking to

10   Mr. Johnson about people who were active voters and people

11   who were inactive voters.  If someone who was inactivated

12   had come up to you while you were sitting at the post

13   office in Montezuma Creek on the day of the election and

14   said "I didn't get a ballot, what do I do?" what would you

15   have told them?

16       A    I would say, "Let me call the office up here to

17   find out if he is still registered and to see if his

18   ballot came back in."  And if it did I would instruct "If

19   you have time to go up there and do so, tomorrow is

20   election day, it is open up until 8:00 p.m."

21       Q    This is on the 4th, on the day of the election.

22   So, what is their option?

23       A    Nothing.  Not much.  They can re-register if they

24   are inactive.  They can re-register and explain to them,

25   say, okay, in the next election they will be eligible.

1 Q But they had to re-register?

2 A Yes.

3 Q And that is what you would have told them?

4 A Yes.

5 Q What if they had decided to drive up to

6 Monticello and show up here and ask for a ballot, what

7 would have happened?

8 A If they were inactive and they find his name in

9 the inactive list, they can re-register and vote right

10 now.

11 Q On the day of the election?

12 A Yes.

13 Q When we were talking about post office boxes,

14 before you said there were some Navajos who have no post

15 office boxes at all.

16 A Yes.

17 Q How would they have gotten information about the

18 mail-in election?

19 A If they know that they don't have a box, in my

20 presentation at the chapter I usually say, "If you don't

21 have a box, please come and let me know."  And they

22 usually have a box of their own, a family member's box.

23 They share a box.  Some do.  Some general delivery.

24 Q So, the way -- let me make sure I remember how

25 general delivery works.  They would get a ballot, say,

84

1    with their name on it addressed to general delivery in

2    Kayenta.  Say they are from Monument Valley someplace.

3    They would then have to get down to Kayenta and ask the

4    postmaster "Do you have any general delivery mail for

5    me?"  Is that right?

6         A    Yes.

7         Q    Okay.  Did you have anyone contact you on -- let

8    me go back and ask you:  On the 4th did you have anyone

9    contact you about any problems they were having with

10   voting?

11        A    No.

12        Q    On the 3rd, the day before the election, did

13   anyone contact you with any questions about voting?

14        A    They called, say they have a ballot in their

15   hand, "So what do you want me to do now?  I fill all this

16   and that.  What is the next step?"

17             "Put it back in the envelope, sign it, mail it

18   today."

19        Q    And those were the only questions you had?

20        A    That usually is the only question they do have.

21   One question do rise saying, asking, "Okay, I don't know

22   all the candidates and I don't want to vote.  So, what do

23   I do?"

24             "Put the ballots in the envelope, don't do

25   anything.  Don't vote.  That is your voice, but to sign

85

1    the envelope to show that you were interested in the
2    election."
3        Q    Why would they do that?
4        A    I don't know.
5        Q    I mean, why would they want to sign it anyway to
6    show an interest?
7        A    Just to show that they got the ballot, but they
8    didn't want to do anything with the ballot, so they just
9    sent it back.
10       Q    When you were at any of the chapter houses on the
11   day of the election, did you see any ballots that had been
12   thrown in the trash or discarded without being sent back
13   in?
14       A    No.
15       Q    I understand that there is a way of checking your
16   registration status as a voter online, correct?
17       A    Yes.
18       Q    Do most Navajo people in the Utah strip have
19   internet access at their home?
20       A    No.
21       Q    How would they check their online registration
22   status then?
23       A    The younger generation, the younger people that
24   have access to it.  Or they can go to the chapter house
25   and ask there and do that.

1    Q    So, most of the older folks wouldn't have online

2    access?

3    A    No.

4    Q    And the only way they would get that is

5    through --

6    A    Find me.

7    Q    Find you.  Okay.

8         So, that wouldn't really be online access, that

9    would be access through Edward.

10    A    No, that's right.

11    Q    So, you are running all over the res.

12    A    Yes.

13    Q    Is there anyone else other than the people at the

14    senior centers that are helping you with all these issues?

15    A    Just brief information, but majority of the time

16    me.

17    Q    Did anyone contact you about the issue of when

18    their ballots needed to be postmarked?

19    A    We put the information on the radio, and from

20    both station I put information on the radio, "Postmarked

21    November 3rd.  You need to turn it in by then."

22    Q    Did you get any calls on November 4th about that

23    issue?

24    A    No.

25              MR. BOOS:  Okay.  All right.  Thank you.

```
 1                    MR. TRENTADUE:  I have a few questions.

 2      This will be 1?

 3                    MR. BOOS:  The notebook or the copies of it

 4      will be Exhibit 1 for the plaintiff.  Diary.

 5                    MR. TRENTADUE:  A few questions.  This will

 6      be Exhibit 2.

 7                    (Discussion was held off the record.)

 8                    (Exhibit Nos. 8 and 9 marked for

 9                     identification.)

10                    MR. BOOS:  The diary will be Exhibit No. 8

11      and Mr. Trentadue has just handed you a document entitled

12      "Navajo Language Election Terminology, San Juan County

13      Clerk Auditor," and that will be 9.

14                    MR. TRENTADUE:  Yes.

15                               EXAMINATION

16      BY MR. TRENTADUE:

17           Q    Mr. Tapaha, do you recognize Exhibit 9?

18           A    Exhibit 9 consists of Navajo Language Election

19      Terminology.

20           Q    Did you help prepare this?

21           A    Yes.

22           Q    Why did you prepare it?

23           A    We want to make sure that each worker in the

24      three states, Arizona, New Mexico and Utah, are saying the

25      right word that were in reference to the election
```

1    terminology, candidate positions and other words that

2    reflects on election.  And let's say interview and make

3    sure we're saying the right word in Navajo in both three

4    states the county consists of Coconino, Navajo County,

5    Apache County, San Juan County in New Mexico, San Juan

6    County in Utah, and then McKinley County in New Mexico.

7        Q    Are there dialects in the Navajo language?

8        A    There are various dialects that plays when we do

9    a pronunciation.  Like our New Mexico has a dialect

10   interchanged with the Pablo population, Zuni population

11   with the Navajo.  They have a different way of saying

12   things.  And then Navajo County, Apache County says the

13   same thing with a different dialect, because they are

14   affiliate -- because of the inter-marriage of the two --

15   the three tribes -- or the four tribes that live in

16   Arizona.

17       Q    If you look at page 3, for example, it says

18   "United States president."  That is how -- let me ask the

19   question.  Is that how for consistency everyone would

20   explain the office or identify the office for the United

21   States president?

22       A    Yes.

23       Q    I see you go through for state offices.

24       A    Yes.

25       Q    And county offices.

89

```
1       A    Yes.

2       Q    And local offices.

3       A    Yes.

4       Q    And this is used to describe the ballots?

5       A    Yes, at the polling place previously.

6       Q    And did you use that -- when you talk about

7   preparing your radio messages, did you use that same

8   terminology when you prepared that?

9       A    Yes.

10      Q    And you how long were your radio spots?  How long

11  did it last?

12      A    Previously it was like 15 minutes with the

13  by-mail voting.  Previously in 2010 were like two or three

14  minutes.

15      Q    You say the by-mail voting.  That obviously was

16  longer.  I assume you had more to explain?

17      A    Yes.

18      Q    What did you say in that ad?

19      A    I explained that you will receive a ballot in the

20  mail.  I explained the outside envelope that says

21  "Official Election Ballot," and "Then it will have your

22  address on it.  Then it will also have return address in

23  the corner.  And when you take that out, open the white

24  envelope that has a ballot.  And then you will see a blue

25  envelope and you will see a ballot in it.  Before you do
```

1  your ballots you look at the blue envelope, make sure the

2  name that you sent it back will have Norman Johnson, the

3  county clerk Monticello address.  At the far left corner

4  it will have your address on it and your name on it.  Then

5  you turn it over, make sure you fill in the line and say

6  where if you live in Red Mesa, make sure you put Red Mesa

7  on it and then print your name, and then sign it and then

8  do your ballot."

9       Q    Did you explain in there what the listeners were

10  to do if they did not receive a ballot?

11       A    Yes.

12       Q    What did you tell them?

13       A    I informed them that they need to call us, let us

14  know, and I give the phone number on the radio spot.

15       Q    Did you discuss with the voters in your radio ads

16  if they did not receive a voter ID card, identification

17  card?

18       A    "If you didn't receive identification card,

19  contact us and then we will get one for you."  Or if I

20  have it with me, then I go back.  And if they inform me of

21  it, go back and visit with them and re-register and give

22  them the card.

23       Q    You talked about your voter registration in your

24  truck.  Describe that for me.

25       A    Voters registration?

1    Q    Yes.

2    A    In the truck?

3    Q    Yes.

4    A    I have a registration form that I have a copy

5    that I do and look through the name.

6    Q    You have a list of registered voters?

7    A    Yes, I have a list of registered voters in the

8    whole county and I look it up.  If a person comes in

9    asking if they are still registered, I look up their name.

10   And if they have their name there, then I say "Yes, you

11   are still registered."  But see if your address still the

12   same as this address, yes.  If it is not, then correct the

13   address by re-register.

14   Q    The process itself, you drove out in your pickup

15   truck?

16   A    Yes.

17   Q    What did you do?

18   A    I drove my pickup and have all my election

19   material in it and park out in the community.  Let's say

20   Montezuma Creek.  I park my truck there alongside the

21   road, and I put flags up and put a sign that says "San

22   Juan County Voters Registration Office."

23   Q    Did any tourists go by?

24   A    Yes.

25   Q    What did they do?

1     A    Start shooting.

2     Q    With a gun or photograph?

3     A    With a camera.  They were so excited to see that

4 I was sitting there.  I usually try to shy away from it

5 and hide, and they say, "No, no, no, don't do that.  Stand

6 right there," and take a picture of it.

7     Q    How many hours do you think you did this leading

8 up to the election of 2014?

9     A    Many hours.  A given day is probably like ten

10 hours in the hot sun.

11     Q    Moving around from community to community?

12     A    Yes.

13     Q    You also talked about you did the outreach work

14 with the elderly.

15     A    Yes.

16     Q    Did you incorporate any of this election

17 information to the elderly when you were visiting them?

18     A    Yes.

19     Q    What would you typically do?

20     A    What I typically do is look up their name and

21 check their name.  If they are registered and if they are

22 active, then I usually just carry around with me a small

23 envelope that we use that we're going to use with the

24 ballots and show them.  "This is what the envelope you

25 will receive, and expect this in the mail at this point in

93

1    time."  And also explained when the voting will take place

2    by mail.

3        Q    Did you explain to them what to do if they didn't

4    receive a ballot?

5        A    Yes.

6        Q    What did you tell them?

7        A    Explain that they need to contact me.  Because I

8    usually go to them constantly.  And if they didn't get it,

9    let me know when I am there and we'll register it and look

10   it up in the registration document or the registration

11   list and based on that.  Then if I see that they are still

12   registered, they haven't get it, I usually call the County

13   out there, James.  Communicate with him, look it up.  He

14   usually tell me, "Well, we sent it out to them."  I

15   usually ask the person that is there, the elderly that I

16   talk to, and cross-reference with the registration listing

17   that I have, and ask them if they still have their address

18   the same.  If they say no, then I re-register and I

19   usually bring that information in.  Then we send out

20   another ballot.

21       Q    You mentioned that you received back about 20

22   ballots that were not signed.

23       A    Yes.

24       Q    As I understand from your testimony to Mr. Boos,

25   you actually went and looked these people up?

```
 1       A     Yes.

 2       Q     And had them sign their ballot?

 3       A     Yes.  Or the envelope.

 4       Q     Or the envelope.

 5       A     Yes.

 6       Q     Just so they can vote?

 7       A     Yes.

 8       Q     Do you like vote by mail?

 9       A     Yes.

10       Q     Why?

11       A     The reason is that you will receive a ballot two

12    or three weeks ahead of time, mostly two weeks ahead of

13    time.  You have every opportunity to look it through.  And

14    you will also share with your family member and have them

15    help you out with that election information on the ballot.

16    And then encourage the younger generation to become

17    involved in the election process because you have your

18    ballot right there with you and you explain it to them.

19    And then my train of thought is to say that this will

20    encourage the younger and the younger generation to become

21    involved in the election process so that they can -- when

22    they become of age they can register and vote.

23       Q     Mr. Johnson testified yesterday in working out

24    this vote-by-mail system that he had communicated with the

25    Navajo Election Administration, I think he said Mr. Edison
```

1    Wauneka.

2        A    Yes.

3        Q    Were you involved in any of that liaison work

4    with the Navajo Election Administration?

5        A    Yes.

6        Q    What did you all do?

7        A    He came up and visit with us, and we explain it

8    to him what we were doing.  And I believe that Mr. Johnson

9    also communicate with him by phone and explain by-mail

10   voting.

11       Q    Did Mr. Wauneka express to you any

12   dissatisfaction with by-mail voting, you know, say "I

13   don't like it"?

14       A    No.

15       Q    Did he ever say he liked it?

16       A    Yes.

17       Q    What can you remember him saying about it?

18       A    That election ballot will be in the person's hand

19   before the election and have a -- take time to look it

20   over instead of at the very last moment.

21       Q    This is a little aside.  You were asked about

22   members of the Navajo Nation who run for county

23   commission.  I believe you were asked about Mr. Grayeyes

24   in District 1?

25       A    Yes.

```
 1        Q    You said he lived in Page, Arizona?

 2        A    Yes.

 3        Q    Did he live in Page, Arizona at the time he ran

 4   for county commissioner?

 5        A    Yes.

 6        Q    Now, you voted in the Navajo elections, the

 7   Nation's elections, haven't you?

 8        A    Yes.

 9        Q    What is your understanding of what happens if you

10   fail to vote in the primary and a general election?

11        A    I will probably get taken off the list,

12   registration list.

13        Q    You are stricken from the registration list?

14        A    Yes.

15        Q    You mentioned that during -- was it the 1980s or

16   '90s the University of Utah put on a voter registration

17   drive on the reservation?

18        A    Yes.

19        Q    I think you say they actually sometimes triple

20   registered folks?

21        A    Yes.

22        Q    What did you mean by that?

23        A    When those university students came in they asked

24   the people and they wrote their name down.  Some of them

25   already registered already, but they didn't really explain
```

1   what the registration really is all about, but they were

2   voting.  There were communication difference, and they

3   re-registered just by listening to what the person say and

4   pronouncing the name.  Based on their own pronunciation

5   they registered people based on that.

6        Q    So, misspellings?

7        A    Yes.

8        Q    And did you have anything to do with trying to

9   clean up the triple registration?

10       A    Yes.

11       Q    What did you do?

12       A    I obtained the registration list when I started

13  working and look it over, and I found out there is about

14  three or four people that were with the same address.  And

15  I approached them and say, "Okay.  You are so and so, like

16  Ed Tapaha, Edward Tapaha, but your name is spelled

17  differently.  Is this the same you or not?"  And then I

18  usually ask them for an ID, and they usually -- Mr. Tapaha

19  will give me this ID and look it over and then correct

20  that.  And then with the new address, correct that.  And

21  then come back to the County and inform the County that

22  this is the real Ed Tapaha.

23       Q    Do you just -- I would assume then the registered

24  voter list shrinks?

25       A    Yes.

1      Q    There has been some talk about the Navajo

2    language.  I guess it is now a written language?

3      A    Yes.

4      Q    In your experience how many people read Navajo?

5      A    Only people that are a church member that have a

6    Navajo bible probably will read Navajo.  Maybe a few

7    number of people that will read because they study that,

8    and they are the ones that will probably will read.  The

9    majority of them probably won't be able to read it

10    because...

11      Q    So, your experience is most people don't read

12    Navajo?

13      A    No.

14            MR. TRENTADUE:  No further questions.

15            MR. BOOS:  Just a few.

16                FURTHER EXAMINATION

17    BY MR. BOOS:

18      Q    Edison Wauneka's title is director of the Navajo

19    Election Administration, correct?

20      A    Yes.

21      Q    He works under the oversight of the Navajo Nation

22    Board of Election supervisors, correct?

23      A    Yes.

24      Q    Did the Navajo Nation Board of Election

25    supervisors to your knowledge ever adopt a resolution

1     approving mail-in ballots in San Juan County, Utah?

2         A    No.

3         Q    Did the Navajo Nation Council ever adopt a

4     resolution or legislation, as they now call it,

5     approving --

6         A    I don't have any knowledge.

7         Q    Do you know what the Utah Navajo Commission is?

8         A    Yes.

9         Q    Did the Utah Navajo Commission ever adopt any

10    resolution approving mail-in ballots in San Juan County,

11    Utah?

12        A    No.

13        Q    So, to the best of your knowledge when Wauneka

14    says he is okay with mail-in ballots in Utah, that is his

15    personal opinion, not the official position of any Navajo

16    Nation government agency or entity, correct?

17        A    Yes.

18        Q    The Exhibit No. 9, the election terminology

19    handbook, I note that on the front page that it has a

20    notation that says, "Return To Clerks Office."  So, is

21    this property of the San Juan County Clerk?

22        A    Yes.

23        Q    Is it -- has it ever been left, intentionally

24    left at any chapter house?

25        A    Not that I know of.

1    Q    So, there are no copies of this handbook at

2    chapter houses on the Utah strip?

3    A    Not that I know of.

4    Q    Are there copies at senior centers?

5    A    No.

6    Q    Has any community member ever asked the clerk's

7    office for a copy of this?

8    A    No, not that I know of.  Not that I know of.

9    Q    So, if a family member of an elderly Navajo

10   person at Navajo Mountain were providing translation of

11   election documents to their elderly relative, they

12   wouldn't have very likely had a copy of this book in their

13   hands?

14   A    No.

15   Q    So, they would be on their own --

16   A    Yes.

17   Q    -- to figure out how to come up with -- what is

18   this -- 60 pages of translations of technical election

19   terms; is that correct?

20   A    Yes.

21            MR. BOOS:  I don't have any other questions.

22            MR. TRENTADUE:  I have one question.

23                  FURTHER EXAMINATION

24   BY MR. TRENTADUE:

25   Q    It is safe to assume, Mr. Tapaha, you would know

1    your own dialect in your own chapters in terms of what the

2    descriptions of the offices were, wouldn't you?

3        A    Yes.

4        Q    And this was to aid in communicating with other

5    dialects?

6        A    Yes.

7                MR. TRENTADUE:  No further questions.

8                MR. BOOS:  We're done.

9                MR. TRENTADUE:  Read and sign.

10            (Deposition concluded at 12:08 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    SIGNATURE OF WITNESS

2

3          I, EDWARD TAPAHA, hereby certify that I have read

4     the foregoing transcript of my deposition taken on the

5     24th day of June 2015, and that I have listed all

6     corrections thereto on the following page herein.  Except

7     for said corrections, it is a true and correct copy of my

8     testimony given on that day.

9

10                         _____

11                              EDWARD TAPAHA

12                         (  )  NO CORRECTIONS

13                         (  )  CORRECTIONS ATTACHED

14

15

16    STATE OF COLORADO     )
                            )  ss.
17    COUNTY OF             )

18
              Subscribed and sworn to before me this _____
19
      day of _____, _____.
20

21                         _____
                                    Notary Public
22

23    My commission expires:_____

24

25
```

| | PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|---|
| 1 | | | | |
| 2 | _____ | _____ | _____ | _____ |
| 3 | _____ | _____ | _____ | _____ |
| 4 | _____ | _____ | _____ | _____ |
| 5 | _____ | _____ | _____ | _____ |
| 6 | _____ | _____ | _____ | _____ |
| 7 | _____ | _____ | _____ | _____ |
| 8 | _____ | _____ | _____ | _____ |
| 9 | _____ | _____ | _____ | _____ |
| 10 | _____ | _____ | _____ | _____ |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1    STATE OF COLORADO    )
                          )  ss.
2    COUNTY OF ARCHULETA )

3

4        I Beverly E. King, Certified Shorthand Reporter,

5    and Notary Public, DO HEREBY CERTIFY that I did administer

6    the oath to the witness herein prior to the taking of this

7    deposition; that I did thereafter report in stenographic

8    shorthand the questions and answers set forth herein, and

9    the foregoing is a true and correct transcription of the

10   proceedings had upon the taking of this deposition.

11       I FURTHER CERTIFY that I am neither employed by

12   nor related to any of the parties or attorneys in this

13   case, and that I have no interest whatsoever in the final

14   disposition of this case in any court.

15       I FURTHER CERTIFY that I have delivered the

16   Original Copy of this deposition to ANIMAS REPORTING

17   SERVICE, in ASCII format, for production, distribution,

18   and retention.

19       WITNESS MY HAND AND SEAL THIS 24th day of

20   June, 2015.

21           _____
                 Beverly E. King, CSR
22

23

24

25   MY COMMISSION EXPIRES:  1/27/2016

# Exhibit 10

# NAVAJO LANGUAGE ELECTION TERMINOLOGY

> **SAN JUAN COUNTY**
> Clerk Auditor
> P.O. Box 338
> Monticello, UT 84535

Copyright © 1993          By: Apache County, Arizona



Tapaha
EXHIBIT NO. 9
ANIMAS REPORTING SERVICE

(9/93)

**RETURN TO CLERKS OFFICE ALONG WITH POLL & POSTING BOOKS**

# TABLE OF CONTENT

FEDERAL OFFICES...........................................Page 1

STATE OFFICES.............................................Page 2

COUNTY OFFICES...........................................Page 4

OTHER ELECTION TERMS IN ALPHABETICAL ORDER...............Page 7

VOWELS SOUNDS............................................Page 56

DIPHTHONGS...............................................Page 57

(9/93)

# NAVAJO LANGUAGE ELECTION TERMINOLOGY

A.      **FEDERAL OFFICIALS**

Wááshindoonjí  Naat'áanii  Daniliinii

**FEDERAL OFFICES**

Wááshindoonjí  Da'íníísh  Bi@  Nahaz'ánígíí

**UNITED STATES PRESIDENT**

Wááshindoon  Al@@j@'  Dah  Sidáhígíí

**UNITED STATES VICE PRESIDENT**

Wááshindoon  Akéé'góne'  Dah Sidáhígíí

**UNITED STATES SENATOR**

Wááshindoondi Adeií  Hooghanjí Naat'áanii

**UNITED STATES REPRESENTATIVE**

Wááshindoondi Ayaaí Hooghanjí  Naat'áanii

B.      **STATE OFFICIALS**

Nitsaa Hahoodzojí  Naat'áanii  Danilínígíí

**STATE OFFICES**

Nitsaa  Hahoodzoji  Da'iniish  Bi@ Nahaz'anigii

**GOVERNOR**

Nitsaa  Hahoodzoji  Naat'áanii  Al@@j@' Dah Sidáhígíí

**STATE SENATOR**

Nitsaa  Hahoodzo  Adeii Hooghanji  Naat'áanii

**STATE REPRESENTATIVE**

Nitsaa  Hahoodzo  Ayaai Hooghanji  Naat'áanii

**SECRETARY OF STATE**

Nitsaa  Hahoodzoji  Naaltsoos  ii@'iní  Nitsaaígíí

**STATE ATTORNEY GENERAL**

Nitsaa  Hahoodzoji  Agha'diit'aahii Nitsaaígíí

**STATE TREASURER**

Nitsaa  Hahoodzoji  Naat'áanii  Ínáolt@'í  Béeso
Yaa'áhályáni

4

(9/93)

**STATE SUPERINTENDENT OF**
**PUBLIC INSTRUCTION (Az)**
**STATE BOARD OF EDUCATION (NM)**

Nitsaa   Hahoodzojí   ólta' Binant'a'í

**STATE MINE INSPECTOR**

Nitsaa   Hahoodzojí Naat'áanii Ha'agééd   Nei@kaahígíí

**CORPORATION COMMISSIONER (AZ)**
**COMMISSION (NM)**

Nitsaa   Hahoodzohjí   Naat'áanii Naanish   Bi@   Dah

Da'ínééh   Yá Dah Naháaztánígíí

C.      **COUNTY OFFICIALS**

Á@ts'ísí   Hahoodzojí   Naat'áanii   Danilínígíí

**COUNTY OFFICES**

Á@ts'ísí   Hahoodzojí   Da'íníísh   Bi@ Nahaz'ánígíí

5

**COUNTY ASSESSOR**

Á@ts'ísí Hahoodzojí ínáolt@'í  Nei@kaahígíi

**COUNTY BOARD OF SUPERVISORS (AZ)**
**COUNTY COMMISSIONER (NM,UT)**

Á@ts'ísí  Hahoodzojí  Naat'áanii  Dah Nídinib@@hígíi

**COUNTY CLERK OF THE SUPERIOR COURT**

Á@ts'ísí  Hahoodzojí  Adeií  Aahwiinít'@@jí  Naaltsoos
A@kéé'  Yisnilígíi

**CONSTABLE**

Siláoshchíín

**(COUNTY)JUSTICE OF THE PEACE**

Á@ts'ísí  Hahoodzojí  Ayaaí Aahwiinít'@@jí

Nihwii'aahii

**COUNTY RECORDER (AZ)**
**COUNTY CLERK (NM)**

Á@ts'ísí  Hahoodzojí  Naat'áanii  Naaltsoos  Da'ílíinii

Yaa'áhályánígíi

6

(9/93)

**COUNTY SCHOOL SUPERINTENDENT**

Á@ts'ísí  Hahoodzojí  Da'ólta'  Binant'a'í


**COUNTY SHERIFF**

Á@ts'ísí  Hahoodzojí  Siláo  Binant'a'í


**COUNTY SUPERIOR COURT JUDGE**

Á@ts'ísí  Hahoodzojí  Adeii  Aahwiinít'@@jí
Nihwii'aahii


**COUNTY TREASURER**

Á@ts'ísí  Hahoodzojí  Naat'áanii  ínáolt@'í  Béeso
Yaa'áhályání

**PRECINCT COMMITTEEMEN**

Anída'iini@góó  Dzaanééz  dóó  Ch@@hyee'adilohii
Dah Deiíkáhii  Yíká'anájahígíí


**SCHOOL GOVERNING BOARD**

Ólta'  Bi  Binant'a'í  Dah  Nídinib@@hígíí

7

(9/93)

**FIRE DISTRICT BOARD MEMBERS**

Ko' Yini@tsésí  Bi@  Hahoodzojí  Dah Nídinib@@hígíí

D.       **ABSENTEE "EARLY" BALLOT**

Iná'ii'ni@  Bítséedi  Naaltsoos  Bee Iná'áta'ígíí

**ABSENTEE BALLOT CHALLENGE (NM)**
**ABSENTEE "EARLY" BALLOT CHALLENGE (AZ)**

I'ii'níí@  Bítséedi  i'oot'ah  Nít'éé'  Baa Saad
Hazl@@'

**ABSENTEE BOARD (NM)**
**ABSENTEE "EARLY" BOARD (AZ)**

I'ii'níí@ Bítséedi  I'iis'nilii  Yá  Dah
Nídinib@@hígíí

8

(9/93)

**ABSENTEE "EARLY" VOTING**

I'ii'níí@  Bítséedi  E'et'áad

**ABSENT UNIFORMED SERVICES VOTER**

Siláo@tsoií Anída'ii'ni@ígíí

**ACTIVE DATA PROCESSING MEDIA**

I'iis'ni@ át'éegi Bee A@kéé'yi'ni@go  Yaa Ha@ne'ígíí

**ACTIVE LISTING**

Aná'át'a'jí  yízhí  íl@@go  Naaltsoos  Bee  Si'áńígíí

**AFFIDAVITS (NM)**

(1)  Iná'át'a'jí  Naaltsoos  áhadadilne'ígíí  íl@@go
     álnééh

(2)  Iná'át'a'jí  Naaltsoos íl@@go álnééh

**AFFIRMATION**

Aoo'  T'áá'aaníí

**ALTERNATE MEMBER(S) BOARDS, COMMITTEE**

Héestíní

9

**AMENDMENT**

Bee  Haz'áanii  Nák'@@s


**APPEALS**

Baa  Nááhwiidínóót'@@@go  Wókeed


**APPELLATE COURTS**

Baa Nááhwiinít'@@jí  Góóldi


**APPLICABILITY**

Bídéét'i'ígíí

**ARGUMENT**

A@gha'dit'áago  Nabik'íyáti'


**ARIZONA REVISED STATUTE TITLE-16**

Hoozdo  Hahoodzo  Bibeehaz'áanii  Hast@'áadahgóne'

Si'ánígíí


**BALLOT**

Naaltsoos Bee  I'ii'ni@ígíí


**BALLOT BOX**

I'ii'níi@go  Tsits'aa'  Bii'j@'  I'ii'ni@ígíí

10

(9/93)

**BALLOT LABEL**

I'ii'níi@go  Naaltsoos  Bee ééhózinígíí


**BALLOT REPORT**

I'iis'ni@  Dóó  Bik'ij@'  Naaltsoos  Ahees'nilii  Bee

Baanáháne'ígíí


**BOARD**

Naat'áanii  Dah Nídinib@@hígíí

**BOARD OF REGISTRATION**

Hada'dilne'  Yá dah Nídinib@@hígíí


**BOND ELECTION**

Bee  Nit'oo'nish  Biniyé  Yáál  Wókeedjí  I'ii'níi@


**BOUNDARY**

Hoodzo


**BRIBERY**

Adeenáago  @a'da  Bíni'áhojilééh


**BURDEN OF PROOF**

Ts'ídá  T'áá'aaníi  Doolee@go  Bee Ééhooz@@hii


11

**CANDIDATE**

(1)  Naat'áanii  Adoodlee@go  Yilwo@ígíí

(2)  Naat'áanii  Yiniyé  Ádeehadoodz'ígíí


**CANDIDATES**

Naat'áanii  Adoodlee@go  Deiíjeehígíí


**CANDIDATES CAMPAIGN COMMITTEE**

Naat'áanii Adoodlee@go Deiíjeehíjí  Yá Dah
Naháaztánígíí


**CANDIDATE FILING DATE**

Naat'áanii Adoodlee@ Biniyé Naaltsoos Nehe'níí@


**CANDIDATE FILING DEADLINE**

Naat'áanii Adoodlee@go Naaltsoos  Nehe'ní@ígíí  Bee
E'e'aah


**CANVASS**

Ada'iis'nilígíí  íl@@go  ályaa


**CENSUS NUMBER**

(1)  Béésh  Názb@sí

(2)  Béésh  T@hí


12

(9/93)

**CENTRAL COUNTING BOARD (AZ)**
**COUNTING JUDGE (UT)**
**CANVASSING BOARD (NM)**

I'iis'nil  Wólta'  Yá Dah Nídinb@@hígíí


**CERTIFICATE(S)**

Honeeznáago Naaltsoos Bee Ééhóziniígíí

**CERTIFICATE FOR VOTING**

Naaltsoos  Binahj@'  I'doot'a@ígíí


**CHALLENGE**

Baa  Saad Hazl@@'


**CHECKER (AZ)**

I'ii'níí@ Haisídí


**CITY OR TOWN DISTRICT**

Kindahshijaa'  Bináhásdzo


**CITIZENS**

Ajíliigo Kéyah Bii' Kéédahojit'ínii


**CIVIL RIGHTS HAVE BEEN RESTORED**

Bee  Haz'áaniik'ehgo  T'áá@ahodit'éhee  Hódéét'i'ígíí

Haa

(9/93)

13

Nídeet'@

**CIVIL RIGHTS**

@ahodit'éhee  óhólníí ídéét'i'ígíí

**CLOSING OF POLLS**

I'ii'níí@ A@ch'@'  ánálnééh

**CODE**

Beehaz'áanii  Bee Ééhózinii

**COERCION OF EMPLOYEES**

Naalnishí Binílchxééh

**COERCION OF VOTERS**

Anida'a'a'ii  Bínílkad

**COMMISSION**

Bá Sinilígíí

**COMMITTEE**

Bits'áná'ni@ígíí

14

(9/93)

**CONGRESS**

Wááshindoon  Adeií  dóó  Ayaaí  Hooghanjí   Naat'áanii

Daniłíiniígíí

**CONGRESS WOMEN**
**CONGRESSMEN**

Wááshindoon Adeií dóó  Ayaaí  Hooganjí  Naat'áanii

**CONGRESSIONAL DISTRICT**

Wááshindoon Adeií dóó Ayaaí  Hooghanjí  Naat'áanii  Bi@

Hahoodzo

**CONSECUTIVELY**

T'áá' a@kéé'  Honí'@@go  Áhooníil

**CONSENT DECREE**

Bi'doolníi@go  Bee  Aha'deet'áanii

**CONSOLIDATED PRECINCTS**

Anída'ii'ni@  Bi@  Hadahwiisdzo  Ahíi'nil

**CONSPIRACY**

(1)  T'áánahont'inee  Binahat'á

(2)  T'áánahont'inee  Nahat'á

15

**CONSTITUTION**

Bee  Haz'áanii  Nitsaai  Bindii'a'
**CONTEMPT**

Doo Ak'ehól'@

**CONTEST OF ELECTION**

I'iis'ni@@@ Baa Saad Hazl@@'

**CONTRIBUTION**

Béeso Bee I'iilyeed

**CONVENTIONS**

Da'nílts'@@d@@'  L@'ígo  A@ah Aleeh

**CONVICTED**

Hak'ij@'  Nihoot'@

**CONVICTS**

(1)  Awáalyahótsaagóó  Bánihoot'áanii

(2)  Awáalyahótsaagóó  Bánidahwiist'áanii

**COUNTY DEMOCRAT PARTY CHAIRMAN**

Á@ts'ísí  Hahoodzojí  Dzaanééz  Bee  Dah Ooldah

Al@@-j@'

Dah Sidáhígíí

16

**COUNTY GOVERNMENT**

Á@ts'ísí Hahoodzo Bi Wááshindoon


**COUNTY REGISTER**

Á@ts'ísí Hahoodzo  Aná'ii'ni@jí  Naaltsoos  Yízhí  Bee
Si'ánígíí


**COUNTY REPUBLICAN PARTY CHAIRMAN**

Á@ts'ísí  Hahoodzojí  Ch@@hyee'adilohii Bee  Dah Ooldah
Al@@j@' Dah Sidáhígíí


**COUNTY VOTER LIST (S)**

(1)  Á@ts'ísí  Hahoodzo Aná'ii'ni@jí Naaltsoos Yízhí
Bee

Si'ánígíí

(2)  Á@ts'ísí  Hahoodzo  Aná'á'a'ii  Bízhi'  Naaltsoos
Bee  Si'ánígíí


**COURT OF APPEAL (AZ)**
**TRIAL COURT (NM)**

Adeií Aadahwiinít'@


**DATA PROCESSING BOARD**

Naaltsoos  Bee  éédahózinii  Hahindééh  Yá Dah
Nídinb@@hígíí

**DATE OF BIRTH**

17

(9/93)

(1)   Ho'dizhchí   Bij@@góne'

(2)   Ho'dizhch@@góne'

**Month:** Yizi@ígíí     **Date:** Yoo@ká@ígíí     **Year:** Yihahígíí

## DISCRIMINATE

Nahdi Kóho'dólzingo  Doo Ho@ ólta' Da

## DISTRICT

Bi@   Hahoodzo

## DOCUMENTS

Naaltsoos   Da'ílínígíí

## DOMICILE

Aních'í'a'ígi

## DOUBLE VOTING

Naakidi A@ch'ii'ah

## DUTIES AND POWERS

Na'anishji óhólnííh

## ELECTION

I'ii'níí@

(9/93)                    18

**ELECTION CODE**

I'ii'níí@  Bibeehaz'áanii


**ELECTIONEERING**

I'ii'níí@  Biniyé  Áyájí@ti'


**ELECTION OFFENSES**

I'ii'níí@  Bibeehaz'áanii  Bi@  Ni'iidzííh


**ELECTION SCHOOL (SEMINARS)**

I'ii'níí@  Bina'niltin


**ELECTION SUPPLIES**

(1)  I'ii'níí@ Bee Bina'anishii

(2)  I'ii'níí@jí  Bee  Ahodooníi@ii


**ELECTOR**

Aná'á'a'ii


**EMBLEMS**

Bee  ééhózin Biniyé  éé'élyaa


**EMERGENCY PAPER BALLOTS**

Honeezt@'ahgo  Naaltsoos  Bee  E'et'ádígíí

19

(9/93)

## ENFORCEMENT POWERS

óhólnííh  Bik'eh  áhodooníi@ii


## ENUMERATION DISTRICTS

(1)  Diné  ánéelt'e'  Binahj@'  Hahoodzo

(2)  Diné  ádanéelt'e'gi  Bi@ Hahoodzo


## ERROR

Oodzíí'


## EXPENDITURE STATEMENT

Béeso Chodaoz'@@d  Bee  Naaltsoos  Yah'anáhánilígíí


## EXPIRING

Bee  E'e'aah


## FALSE SWEARING

Yooch'íidgo  Ádeeha'doodzíí'


## FALSE VOTING

Yooch'íidgo  A'jíí'ah

**FEES**

Bik'é   Siláii


**FELONY**

Nitsaago   Ádihozhdii@t'i'


**FILE MAINTENANCE LIST**

Naaltsoos   Yízhí   Bee   A@kéé'yi'ni@go   Bina'anishígíí


**FIRE DISTRICT**

Ko' Niltséés   Bi@ Hahoodzo


**FLAG**

Dah Naat'a'í


**FORGERY**

Yízhí Nit'@@h


**FRAUD**

Na'adlo' Nahaaldee@


**GENERAL ELECTION**

Nitsaago   Iná'ii'ni@

21

**GENERAL PURPOSE POLITICAL COMMITTEE**

T'ááháájída  I'di'yoo'ni@go  Bee  A@kéé'ni'dooldah  Biniyé  Bits'áná'nilii

**GOVERN**

Hoot'áá@

**GOVERNMENT**

Wááshindoon  Si'@

**GROSS RECEIPT TAXES**

Na'iiznii'jí  ínáolt@'í  ahínéidzogo

**GUBERNATORIAL**

Nitsaa  Hahoodzo  Bá  Dahadínóodaa@jí

**HANDICAPPED VOTER**

(1)  Aná'á'a'ii  Bits'íís  B@@h Dahaz'áanii

(2)  Aná'á'a'ii  Bi@  Nahont@'áaígíí

**HEARING**

Nabik'í  Yáti'  Bá hoo'a'

**ILLITERATE VOTER**

Aná'á'a'ii  Doo íí@t'a'ii

**IMPERSONATION**

Na'adlo'  Bee  Nááná@a'  Diné  Béé'ázdólzin

**IMPOUNDING BALLOTS**

Naaltsoos  Aheesnil@@ Yiiltsood

**INACTIVE LISTING**

Aná'át'a'jí  yízhí  Doo Hózhó  Béédahózinígíí

**INALIENABLE RIGHTS**

Doo áts'áoliníígóó  ídadéét'i'ii

**INAUGURATION**

(1) Naat'áanii  Yá  Didiilníihgo

(2) Naat'áanii  Yá  Dadidiilníihgo

**INDEPENDENT CANDIDATE**

Nááná@a' Yee ádójíigo  Naat'áanii Yá Yilwo@ígíí

**INDEPENDENT PARTY(IES)**

23

(9/93)

Nááná@a'   Yee Ádadójíigo   Dah Deiíkáahii


**INDIGENT PERSON**

Baahojoobá'íí


**INITIATIVE**

Bee Haz'áanii   Doolee@go   Bohodeest'@


**INSANITY**

Bíni' B@@h Dahaz'áanii


**INSPECTION**

Haalzííd


**INSPECTION OF VOTING DEVICE**

Bee   I'ii'níí@ígíí   Haalzííd


**INSTRUCTION**

Bína'niltin


**INSTRUMENTS**

Chodao'íinii


24

**INTERACT**

Ahi@ Nidajilnish


**INTERFACE**

Bee Ahí'iildééh


**INTERMEDIATE RECORDS**

Naaltsoos T'óókonízaháj@' Bee ééhózinígíí


**INTERVENE**

Ata'ajighááh


**INTERVENTION**

Ata'na'adá


**INTERVIEW**

Na'ídíkid


**INTIMIDATION OF VOTERS**

Ida'iiníi@ii Bi@ Yéé'áhólzin

**INVESTIGATIONS**

Naalkaah


**JUDGE**

Ánihwii'aahii


**JUDGEMENT**

Bee Nihoot'áanii

**JUDGES**

Ánidahwii'aahii


**JUDGES - COURT OF APPEALS**

Ánohoot'@  Baa Nááhwiinít'@@hjí  Nidahwii'aahii


**JUDICIAL**

Aadahwiinít'@  Bi@  Haz'@@jí


**JUDICIAL DISTRICT**

Aadahwiinít'@ Bi@ Hahoodzo


**JURISDICTION**

Óhólnííh  Bídéét'i'ii

(9/93)

**JUROR**

Atah Ánihodoo'áa@ii

**JURY**

Ánidahodoo'áa@ii

**JUSTICE OF THE PEACE DISTRICT**

Ayaaí  Nihwiit'aa  Bi@  Hahoodzo

**LANGUAGE MINORITY**

A'ohgo  Ánéelt'e'  Kééhat'íinii  Bizaad

**LEGISLATIVE DISTRICT**

Naat'áanii  Bee  Haz'áanii  Adeii@'íinii  Bi@  Hahoodzo

**LEGISLATIVE DISTRICT(S)**

Naat'áanii  Bee  Haz'áanii  Adeii@'íinii  Bi@

Hadahwiisdzo

**LEGISLATURE**

Naat'áanii Bee Haz'áanii  ádeile'ígíí

**LEVY**

27

Beehaz'áanii  Binahj@' Náhádlááh

**LEVY OF TAXES**

Beehaz'áanii Binahj@' ínáolt@'í Náhidoodlah

**LOGIC AND ACCURACY TEST**

I'ii'níí@jí  Bee  Nída'óltahii  Hasht'eólzin

**MAJOR FRACTIONS**

T'áá@a'í  Béeso  Bik'ehgo  ólta'go  A@níí'bilááh

Dóóígíí  T'áá@a'  Bizhi'go  Wólta'

**MAIL BALLOT ELECTIONS**

E'a't'ááad T'óó Bi@ Ádahalne'ígíí

**MAILING ADDRESS**

Naaltsoos  Haaniná  Hájeehdi

**MAILING LABELS**

Naaltsoos Nináhájeehdi Dabiká'ígíí

**MARK SENSE BALLOT**

Naaltsoos Ahi'níí@ii Bee Naalkaahígíí

28

(9/93)

**MAY**

Bee L@

**MEASURES (Propositions)**

Bee  Haz'áanii  Dadoolee@ii

**MEMBER OF THE MERCHANT MARINE**

Diné Tá@káá'jí Binaanishii

**MESSENGERS**

Nidaal'a'í

**MILL LEVY (1/10 of 1 CENT)**

T'áá@á'í  Sindao  Neeznáágóó  A@ts'ánáádzooí,  T'áá@á'í
Haadzo  Bíighahgo  Wókeed

**MOTOR VOTER/DRIVER LICENSE VOTER REGISTRATION**

T'áá@ahj@'  Bik'eh  Na'ab@@sí  Dóó Aná'át'a'  Biniyé

Hada'dilne'

**MUNICIPAL ELECTIONS**

T@'óójí  Kindahnaazhjaa'  Biwááshindoonjí Aná'ii'ni@

29

**NAME**

Yízhí

**NAVAJO NATION GOVERNMENT**

Diné Biwááshindoon

**NAVAJO OUTREACH WORKERS**

T'áá Diné I'iiníí@jí Yínda'ni@tinígíí

**NOMINATION**

(1) Há'adi'yoo'ni@ Biniyé Hak'ihodiinííh

(2) Ak'ihodiinííh

**NOMINATION PETITION**

á'idi'yoo'ni@go Naaltsoos Yízhí Bee á@ah'álnéhígíí

**NONPARTISAN**

Doo Bee Atah'ídl@@jí

**OATH(S)**

Ya'di'diilníihgo ádeeha'didziih

**OBSERVERS**

(9/93)

30

Hada'asídí


**OCCUPATION**

Naanishii


**OFFICIAL RETURNS**

Ida'iis'nil   A@tso   Ahínídeiilta'go   Bik'ini'ít'áanii


**OVERRIDE**

Bínéidoodzohgo Wókeed


**OVERSEAS VOTER**

Tówónaníd@@' Aná'á'a'ii


**PARTY PREFERENCE**

Bee   Ajítahjí


**PENALTY**

Nályééh


**PERCENTAGE**

T'áá@á'í   Béeso Bee ólta'go Ahándáasdzo

(9/93)

```
100%   T'áá@á'í   Béeso Bíighahgo
75%    Hast@@yáál   Bíighahgo
50%    D@@yáál,   Doodaai' A@níí'dóó Bíighahgo
25%    Naaki Yáál Bíighahgo

100    T'áá@áhídí Neeznádiin
```

## PERSON AUTHORIZED TO ADMINISTER OATHS
Bik'ehgo Ya'di'diilnííhii


## PETITIONS
Naaltsoos   Yízhí   Bee   Á@ah'álnéhígíí


## PLACE OF BIRTH
Ho'dizch@@gi


## POLITICAL COMMITTEE
Nahat'á Bee Dah Ooldah · Bá   Bits'áná'nilígíí


## POLITICAL PARTY
Nahat'á   Bee Dah Ooldah


## POLL WATCHER (NM)

32

(9/93)

I'ii'níí@di  Ha'asídí

**POLLING PLACE**

I'ii'níí@ Bi@  Haz'ánígi

**POLLING PLACE AGREEMENT**

Idi'yoo'ni@ígi Bee Aha'deet'@

**POLL LIST**

Ada'iiníí@ii  Bízhi' Naaltsoos  Bikáá'  ádaalne'ígíí

**POST ELECTION**

I'iis'ni@  Dóó  Bik'ij@'

**POSTING**

Bee Dah'altsóós

**PRECINCT**

I'ii'níí@ Bi@ Hahoodzo

**PRECINCT BOARD WORKERS (AZ)**
**POLL OFFICIALS (NM,UT)**

I'ii'níí@gi  Ninádaalnishígíí

33

(9/93)

**INSPECTORS (AZ)**
**PRESIDING JUDGE (NM,UT)**

I'ii'níi@gi  Yik'idéez'@'ígíí

**JUDGES**

Bik'ehgo  I'ii'ní@ígíí

**MARSHAL**

I'ii'níi@gi  Siláoshchíín

**CLERK**

I'ii'níi@gi  Naaltsoos  Hadeiidile'ígíí

**TRANSLATOR**

I'ii'níi@gi  Ata'halne'é

**TRANSLATORS**

I'ii'níi@gi  Ata'dahalne'ígíí


**PRECINCT REGISTER**

Anída'ii'ni@gi  Naaltsoos  Yízhí  Bee Si'ánígíí


**PRECINCT VOTER LIST**

Anída'ii'ni@gi Naaltsoos Yízhí Bee Si'ánígíí


**PRESIDENTIAL ELECTORS**

Wááshindoon Doolee@ Biniyé Yá'anída'ii'ni@ígíí

(9/93)

**PRIMARY ELECTION**

B@@hanildééh  Biniyé  I'ii'níí@


**PROCLAMATION**

Áhodooníí@ii  Beenihoot'@


**PROGRAM RECORDS**

I'ii'níí@jí  Naaltsoos Bee  Sinilígíí


**PROPOSED INCREASE**

Bínéidoo'ni@  Ha'ní


**PROPOSITION**

Bee  Haz'áanii  ádoolníí@


**PUBLICATION**

Naaltsoos Bee Haníídee'


**PUBLICITY PAMPHLETS**

I'ii'níí@jí  Naaltsoos  Bee  éédahózinígíí

**PURGE**

I'ii'níí@jí   Yízhí   Hááhádzóóh


**QUALIFIED ELECTOR**

íl@@go   I'doo'a@ii


**RECALL**

B@@ní Hólóogo Aná'ii'níí@


**RECALL DECISION**

Beehaz'áanii   Bikáá'   Háádoot'ih   Biniyé   I'ii'níí@


**RECALL POSITION**

Naat'áanii   Ats'áadoolt'ee@   Biniyé   I'ii'níí@


**RECORDER'S CERTIFICATE**

Naaltsoos   íl@@go   Binahj@'   I'doo'a@ígíí


**RECOUNT**

Náólta'


**REDISTRICTING**

Nináhádzoh


**REFERENDUM**

Anída'ii'ni@ii  Nahat'á  Bich'@'  ánáálne'ii  Biniyé
I'ii'níí@


**REGISTRATION FORM (AZ)**

I'ii'níí@jí Naaltsoos Hadadilne'ígíí


**REPEALED**

Hanááltsooz


**REPORTING INDIVIDUAL**

@ahodit'éhéé Naaltsoos Bee ádaanáháne'


**RESIDENTAL ADDRESS**

Ííyisí  Haghangi

**RUN-OFF ELECTION**

Al@@j@'  Ahi'noolchxá'ígíí  Bá'íná'ii'níí@


**SAMPLE BALLOT**

Bá'ada'di'yoo'ni@ii  Yaa Halne'ígíí  Naaltsoos

37

**SCHOOL OF INSTRUCTION**

I'ii'níí@  Bína'niltin


**SCHOOL OVERRIDE ELECTION (AZ)**
**SPECIAL ELECTION (NM)**

Ólta'jí  Béeso  Báninádít'áhígíí @a' Bínéidoodzoh

Biniyé  I'ii'níí@


**SECONDARY PROPERTY TAX PROPOSED**

Eehólóonii  Bits'áádóó ínáolt@'í  Náhádláahii


**SHALL**

Ts'ídá ádooníí@


**SIGNATURE REQUIREMENTS**

Yízhí  ánéelte' Binahj@'  Nidi'doolwoo@ígíí


**SIGNATURE ROSTER**

I'ii'níí@go Naaltsoos  Bikáá'  Yízhí  Dadilt'i'ígíí


**SOCIAL SECURITY NUMBER**

Naaltsoos Bik'é  Na'anishí


38

**SPECIAL DISTRICT BOUNDARIES (AZ)**

T'áásahdii  Át'éego  Nidahasdzo


**SPECIAL TAXING DISTRICT**

T'áásahdii  Át'éego  ínáolt@'í  Nidandeeh  Bi@
Hahoodzo


**SPECIAL PURPOSE POLITICAL COMMITTEE**

T'áá@áhíjí  I'di'yoo'ni@go  Bee  A@kéé'ni'dooldah
Biniyé  Bits'áná'nilii


**SPECIAL VOTER LIST (NM)**

Anída'ii'ni@ii  Bízhi'  T'éiyá  Naaltsoos  Bee
Si'ánígíí


**SPOILED BALLOTS**

Naaltsoos  Bee  I'iis'nil@@  Dááchxo'ígíí


**STATE CAPITAL**

Nitsaa Hahoodzo Biwááshindoon Bi@ Haz'@


**STATE CONSTITUTIONAL AMENDMENT**

(9/93)

Nitsaa Hahoodzojí Bee Haz'áanii Bitsé Siláí Nák'aas

**(STATE) DEMOCRAT PARTY CHAIRMAN**

Nitsaa Hahoodzojí Dzaanéézjí Al@@j@' Yá Dah Nánídaahígíí

**STATE ELECTION OFFICER**

Nitsaa Hahoodzojí I'ii'níí@ Yá Dah Sidáhígíí

**STATE GOVERNMENT**

Nitsaa Hahoodzo Biwááshindoon

**STATE LEGISLATORS**

Nitsaa Hahoodzo Adeíí dóó Ayaaí Hooghanjí Naat'áanii Danilínígíí

**(STATE) REPUBLICAN PARTY CHAIRMAN**

Nitsaa Hahoodzojí Ch@@yee'adilohii Al@@j@' Yá Dah Nánidaahígíí

**STATISTICAL DATA**

Ázhnéelt'e'ígíí Bééhózingo Naaltsoos Bee Si'ánígíí

**STUB**

Naaltsoos  Bee  I'ii'níí@  Bidoodózígíí

**SUCCEEDING**

T'áánáás

**SUPERIOR COURT**

Adeií  Aahwiinít'@

**SUPERVISORIAL DISTRICTS (Az)**
**COMMISSION DISTRICTS (NM)**

Á@ts'ísí  Hahoodzo  Biyi'  Naat'áanii  Bi@

Hadahwiisdzoh

**SUPREME COURT**

Alátahdi  Nitsaago Aahwiinít'@  Bi@  Haz'@

**TALLY BOARD**

Ida'iis'ni@  Wólta'jí  Dah Nidinib@@hígíí

**TAMPERING WITH MACHINES**

I'ii'níí@jí Chodao'íinii  Bee  I'doodlohgo  Naagiz

**TERM**

Í'nízahj@'

41

**TERMS OF OFFICE**

Akónízahj@'  Naat'áanii @dl@

**THREATS**

I@yéé'  Áhólzin

**TIE VOTE**

I'iis'ni@@@  Aheelyaago  T'áadoo  Honeeznáa Da

**"TO BE VERIFIED BALLOT" (ENVELOPE)**

Íl@@go  Daats'í  I'oot'ah  Biihe'nilígíí

**TREASON**

Hakéyahjí  Bee Haz'áánii Bik'ij@'  Níjiiyá

**UNIFORMED SERVICES**

Siláo@tsooí

**UNITED STATES CAPITAL**

Ashdladiin Nitsaago Hahoodzo Biwááshindoondi

**UNOFFICIAL RETURNS**

I'iis'ni@ T'ááyah'ahindééhgóó  Baahane'ii

42

**VERIFICATION**

Doolaanaagóó

**VOLUNTEER**

T'óó  Aká'ajilyeed

**VOTE AGAINST**

Bits'@@jí  E'et'áád

**VOTE FOR**

Bich'ijí  E'et'áád

**VOTING MACHINE TECHNICIAN**

Bee I'ii'ni@ígíí Yinaalnishii

**VOTING DEVICE**

I'ii'níí@  Bee  Bina'anishígíí

**VOTER DATA**

Báhada'dilyaai  Naaltsoos  Bee  Si'@

**VOTERS FILE**

Báhada'dilyaai Naaltsoos Bee A@kéé'siniligíi

**VOTER RECEIPT**

Naaltsoos  Áhadilyaa  Béé'ályaaígíi

**VOTER REGISTRATION**

I'ii'níí@ Biniyé Hada'dilne'

**WHITE HOUSE**

Kináhálgaidi

**WITHDRAWAL OF CANDIDATES**

(1)  Bá  I'di'yoo'nil@@  Bi  Naaltsoos  T'@@'
     Hááyíí@tsooz

(2)  Yilwo@ígíi  Naaltsoos  T'@@  Hááyíí@tsooz

**WRITE-IN CANDIDATE**

Yízhí  T'éi  Álnééhji  Atahyilwo@ígíi

44

**WRITE-IN CANDIDATE(S)**

Yízhí  T'éi  Álnééhjí Atahdeiíjeehígíí

**WRIT OF MANDAMUS**

Beehaz'áanii  Bizht'oolíi@go  Bee  Hánohoot@

**COUNTIES**

T'áá'a@'@@'át'éego  Bee  Daojíigo  Á@ts'ísígo
Hadahazdzo

**APACHE COUNTY**

1.  Dzi@gh@'í  Hahoodzo

2.  Tsezhin Deez'áhí Bi@ Hahoodzo

**COCONINO COUNTY**

Góóhníinii  Hahoodzo

45

**McKINLEY COUNTY**

Na'nízhoozhí  Bi@  Hahoodzo

**NAVAJO COUNTY**

Naabeehó  Hahoodzo

**SAN JUAN COUNTY (UT)**

Dzi@dit@'oii  Hahoodzo

**SAN JUAN (NM)**

Kiniteel Hahoodzo

**STATES**

Nitsa  Hadahwiisdzo

**ARIZONA**

Hoozdo  Hahoodzo

**COLORADO**

Dibé  Nitsaa  Hahoodzo

**NEW MEXICO**

(9/93)

46

Yootó  Hahoodzo


**UTAH**

(1)  Sooléé  Hahoodzo

(2)  Ásh@@h  Bii'tó  Hahoodzo


## COUNTY SEATS

Á@ts'isí  Hadahwiisdzo  Biwááshindoon Bi@ Nahaz'@


**AZTEC,    NEW MEXICO**

Kinteel


**FLAGSTAFF,  ARIZONA**

Kin@ání


**GALLUP,  NEW MEXICO**

Na'nízhoozhí


**HOLBROOK,    ARIZONA**

T'iis  Yaa Kin


**MONTICELLO,  UTAH**

47

Maandiséloo

**ST JOHNS,    ARIZONA**

Tsézhin  Deez'áhí

**NAVAJO NATION CAPITAL**

Diné Biwááshindoon Bi@ Haz'@

**WINDOW ROCK,    ARIZONA**

Tséгháhoodzání

### DAYS OF THE WEEK
Tosots'id Jí dabízhi'ígíí

| | |
|---|---|
| **SUNDAY** | **THURSDAY** |
| Damóo  Bij@@góne' | Damóo Dóó D@'@j@ |
| **MONDAY** | **FRIDAY** |
| Damóo biiskání | Nida'iinííshgóne' |
| **TUESDAY** | **SATURDAY** |
| Damóo dóó Naakij@ | Damóoyázhígóne' |
| **WEDNESDAY** | |
| Damóo dóó tágíj@ | |

### MONTHS
Náhidizídí

| | |
|---|---|
| **JANUARY** | **JULY** |
| Yas Ni@t'ees | Ya'iishjáástsoh |
| **FEBRUARY** | **AUGUST** |
| Atsá Biyáázh | Bini'anit'@@ts'ózí |

(9/93)

48

| | |
|---|---|
| **MARCH** | **SEPTEMBER** |
| Wóózhch'@@d | Bini'anit'@@tsoh |
| **APRIL** | **OCTOBER** |
| T'@@'chil | G@@ja' |
| **MAY** | **NOVEMBER** |
| T'@@tsoh | Ní@ch'its'ósí |
| **JUNE** | **DECEMBER** |
| Ya'iishjááshchilí | Ní@ch'itsoh |

## SEASONS

A@'@@'ánáhoo'níi@go  Bee  Nináháháhígíí

| | |
|---|---|
| **SPRING** | **FALL** |
| D@@p | Aak'eego |
| **SUMMER** | **WINTER** |
| Sh@@p | Haigo |

49

| | |
|---|---|
| ALAMO | T'iistso sikaad |
| ANETH | T'áábíích'íidii |
| BACA | Kin@igaaí |
| BECENTI | T@'óóditsin |
| BECLABITO | Bit@'áábito' |
| BIRDSPRINGS | Tsídiito'í |
| BLACK MESA | Dzi@yíjiin |
| BODAWAY/GAP | Tsinaab@@z Habitiin |
| BREADSPRINGS | Bááhaal@ |
| BURNHAM | T'iistsoh Sikaad |
| CAMERON | Na'ní'á |
| CANONCITO | Tóhaijiileehé |
| CASAMERO LAKE | Tseta'toak'olí |
| CHICHILTAH | Chéch'i@tah |
| CHILCHINBETO | Chii@chinbii'tó |
| CHINLE | Ch'ínílí |
| CHURCHROCK | Kin@itso Sinilí |
| COALMINE MESA | @eejin Haagééd |
| COPPERMINE | Béésh Haagééd |
| CORNFIELDS | K'iiltsoitah |
| COUNSELOR | Bilaghaanasnééz |
| COVE | K'aabizhii |
| COYOTE CANYON | Ma'iitééhyít@izhí |

(9/93)

| CROWNPOINT | T'iists'óóznideeshgiizh |
|---|---|
| CRYSTAL | Tóni@ts'ílí |

| CUDEII | Gad'íí'áhí |
|---|---|
| DALTON PASS | Nahodeeshgiish |
| DENNEHOTSO | Denihootso |
| DILKON | Tsee'náákézí or Tó'á@ch'@dí |
| FOREST LAKE | Tsiyi'be'ak'id |
| FORT DEFIANCE | Tséhootsooí |
| FRUITLAND | Bááh díilid |
| GANADO | Lók'aahniteel |
| HARD ROCK | Tsédildó'ii |
| HOGBACK | Tsétaak@ |
| HOUCK | Ma'iito'í |
| HUERFANO | Hanáádl@ |
| INDIAN WELLS | Tóhahadleeh |
| INSCRIPTION HOUSE | Ts'ahbii'kin |
| IYANBITO | Ay@níbito' |
| JEDDITO | Jádító |
| KAIBETO | K'ai'bii'tó |
| KAYENTA | Tódinéeshzhee' |
| KINLICHEE | Kindah@chí'í or Kin@ichí'í |
| KLAGETOH | @eeyi'to' |
| LAKE VALLEY | Be'ak'idhalgaaí |
| LECHEE | @ichí'ii |
| LEUPP | Tsiizizii or Tooh |

51

| LITTLEWATER | Tó'a@ts'ísí |
| LOWER GREASEWOOD | Dówózhiibii'tó |

| LOW MOUNTAIN | Jeesáá'deez'á or Jeehdeez'á |
| LUKACHUKAI | Lók'aa'ch'égai |
| LUPTON | Tsési'ání |
| MANUELITO | Kin Nizhóní |
| MANY FARMS | Dá'ák'ehalání |
| MARIANO LAKE | Be'ak'id hóteelí |
| MEXICAN SPRINGS | Naakai Bito'í |
| MEXICAN WATER | Naakaitó |
| NAGEESI | Naayízí |
| NASCHITTI | Nahashch'idí |
| NAVAJO MOUNTAIN | Naatsis'áán |
| NAZLINI | Názlíní |
| NENAHNEZAD | Niinahnízaad |
| NEWCOMB | Bis doot@'izh |
| OAK SPRINGS | Tee@ch'ínt'i' |
| OJO ENCINO | Tséch'izhí bii'tó |
| OLJATO | Ooljée'tó |
| PINEDALE | Tóbééhwíísgani |
| PINON | Be'ak'id Baa'ahoodzání |
| PUEBLO PINTADO | Kiniteel |
| RAMAH | T@'ohchiní |
| RED LAKE #18 | Be'ak'idhalchíí' |
| RED MESA | Tsé@chíí'dah'azkání |

52

(9/93)

| RED ROCK | Tsé@ichíí' |
|----------|-----------|
| RED VALLEY | Tsé@ichii'dah'azkání |

| ROCK POINT | Tsénitsaadeez'áhí |
|------------|-------------------|
| ROCK SPRINGS | Tséch'ízhí |
| ROUGH ROCK | Tséch'ízhí |
| ROUND ROCK | Tséníkání |
| SAN JUAN | Kin@ichíí' |
| SANOSTEE | Tsé'a@náozt'i'í |
| SAWMILL | Ni'iijííhasání |
| SHEEPSPRINGS | Dibé bito' |
| SHIPROCK | Naat'áaniinééz |
| SHONTO | Sh@@'tóhí |
| TACHEE/BLUE GAP | Táchii' |
| TEEC NOS POS | T'iis Náz B@s |
| TEESTO | T'iistó |
| THOREAU | Dló'áyázhí |
| TOHATCHI | Tóhaach'i' |
| TOLANI LAKE | Tólání |
| TONALEA | Tonehel@@h |
| TORREON | Ya'niilzhin |
| TSAILE/WHEATFIELDS | Tódzís'á |
| TSAYATOH | Tséyaató |
| TSELANI/COTTONWOOD | Tsé L@ní Dóó Tsé@igai deez'áhí |
| TUBA CITY | Tónanéésdizí |
| TWIN LAKES | Tsénahadzoh |

(9/93)

| | |
|---|---|
| TWO GREY HILLS | Bis dah@itso |
| WHIPPOORWILL | Tsídiito'í |

| | |
|---|---|
| WHITECONE | Beak'id Baa'a'oogeed |
| WHITEHORSE LAKE | @íí@gaai Bito' |
| WHITEROCK | Tsé@gaai |
| WIDE RUINS | Kiniteel |
| NAHATA DZIIL | Nahatá Dziil |
| | |
| | |
| | |
| | |
| | |

54

THE SOUND SYSTEM OF NAVAJO

VOWELS:

The vowels have continental
values.  They are as follows,
the first example being a
Navajo word, the second the
closest approximation to that
sound in English.  Example:
  a  gad      (juniper) father
  e  'e'aah (west)    met
  i  sis    (belt)     sit
  o  hosh   (cactus)   note
Vowels may be either long or
short in duration, the long
duration vowel being indicated
by a doubling of the letter.
This never affects the quality
of the vowel, except that the
long duration i is always
pronounced as in the English
word see.  Examples:
 sis (belt) the vowel is short
 siziiz (my belt)
the second vowel sound is of
long duration.
Vowels with a hook (@) beneath
the letters are nasalized.
This means that some of the
breath passes through the nose
when sound is produced.  All
vowels following n are
nasalized though not marked.
Examples:
 biz@@s        (his, her wart)
 'ásh@@h       (salt)
 tsinaab@@s    (wagon)
 b@@h         (deer)
A little mark above the letter
(ó), indicates that the voice
rises on the letter.
Examples:
 ni    (you)       ní(he says)
 'azee' (medicine)'azéé (mouth)
 nil@  (he is)   nílí (you are)
 doo   (not)     dóó  (and)
When only the first element of
a long vowel has a mark above
it the tone falls.  If only

the last element is marked the
tone rises: Examples:
 a  (short,low) as a in father
 á  (short, high)
 @  (short, low, nasal)
 @  (short, high, nasal)

 aa (long, low)
 áá (long, high áa (falling)
   aá (rising)
 @@ (long, high, nasal)
   @@ (falling)  @á (rising)

 e  (short, low) as e in met.
 é  (short, high)
 @  (short, low, nasal)
 @  (short, high, nasal)

 ee (long, low)
 éé (long, high) ée (falling)
   eé (rising)
 @@ (long, low, nasal)
 @@ (long, high, nasal)
   @@ (falling)  @@ (rising)

 i  (short, low) as i in sit.
 í  (short, high)
 @  (short, low, nasal)
 @  (short, high, nasal)

 ii (long, low) as ee of
   English word see.
 íí (long, high) íi (falling)
   ií (rising)
 @@ (long, low, nasal)
 @@ (long, high, nasal)
   @@ (falling)  @@ (rising)

 o  (short,low) as o in note.
 ó  (short, high)
 o  (short, low, nasal)
 ó  (short, high, nasal)
 oo (long, low)
 óó (long, high) óo (falling)
   oó (rising)
 oo (long, low, nasal)
   óo (falling) oó (rising)

(9/93)

óó (long, high, nasal)
óo (falling) oó (rising)

DIPHTHONGS:

The Diphthongs are as follows:

ai - hal      (winter)
aai- shínaaí (my elder brother)
ao - daolyé  (they are called)
aoo - aoo'   (yes)
ei - 'ei      (that one)
eii-'ádaat'éii (that which are)
oi-deesdoi (it is warm, weather)
ooi-tséhootsooí (ft. Defiance,
Arizona)

CONSONANTS:
(') this is the most common
consonantal sound in Navajo,
and is called a glottal stop.
It sounds like the hiatus
between the two elements of
the English exclamation oh!
oh! and hunh unh.  in actual
speech the difference between
Johnnie Yearns and Johnnie
earns, is that the letter has
a glottal closure between the
two words.  More examples:

- haa'aah (east)
- a'áán (a hole in the ground)
- abe'      (milk)
- yá'át'ééh  (it is good)
- b-bááh (bread)-like p in
  spot
- ch- chizh(firewood)-like ch
  in church
- ch'-ch'ah (hat. cap)
- d- dibé (sheep)-like t in
  stop
- dl-dlóó (prairie dog)-
  something like gl in glow
- dz-dzi@  (mountains)
- g-gah (rabbit)-like k in sky
- gh- aghaa'   (wool)
- h- háadi  (where?) *
- hw- hwíídéelto (slippery
  place)-like wh in when
- j-jádi(antelope)-like j in
  jug
- k ké (shoes)-like k in

kitten
- k'- k'aa' (arrow)

- kw-kw'é (right here)-like qu
  in quick
- l-lájish(gloves)-like l in
  late
- @-@id (smoke)-like the in
  athlete
- m-mósí (cat)-like m in most
- n- naad@@'(corn)-like n in
  new
- s- sin (song)-like s in song
- sh-shash (bear)-like sh in
  she
- t-tin  (ice)
- t'-t'eesh   (charcoal)
- t@-t@ah (slave, ointment)
- t@'-t@'ízí (goat)
- ts- tsah(needle)-like ts in
  hats
- ts'-ts'ah   (sagebrush)
- w- Wááshindoon (washington)
  like w in washington
- x- yiyiisxí (he killed him)
- y-yá (sky)- like y in yello
- z- zas (snow)- like z in
  zebra
- zh- bízhi' (his name)-like a
  in pleasure


* h--represents the sound of
ch in German ich, as well as
that of h in English word
have.  Ordinarily, both of the
sounds are written h, but when
h follows a, it is necessary
to distinguish the resulting
sh sequence from the digraph
sh.  This is accomplished by
substitution of x for the h.
Thus: yiyiisxí (he killed him)
for yiyiishí.  x is also
employed to distinguish
between such forms as @itso
and @itsxo, the latter being
more strongly aspirated than
the former.

56

**APPOINTED OFFICIAL**

Naat'áanii  Bik'ihodiinii'ii


**APPOINTEE**

Naanish Biniyé  Bik'ihodiinii'ii


**CHAPTER HOUSE**

(1)   Táá'naaznilí  Bighan

(2)   Bii'á@ahná'ádleehí


**CHAPTER OFFICIALS**

Naat'áanii  Táá'sinilí


**CHAPTER PRESIDENT**

Táá'sinilí  Al@@j@'  Dah Sidáhígíí


**CHAPTER VICE PRESIDENT**

Táá'sinilí  Akéé'góne' Dah Sidáhígíí


57

## CHAPTER SECRETARY/TREASURER

Táá'sinilí  Yá  Naaltsoos  íí@'íní

## COMMUNITY  HEALTH REPRESENTATIVE

Ats'íís  Baa'áháy@@jí  Hootaagháhí

## COMMUNITY SERVICE COORDINATOR

Táá'sinilí  Yáhook'ee  Sidáhí

## COUNCIL DELEGATE

Béésh  B@@h  Dah Si'ání

## DEPARTMENT OF JUSTICE

(1)  Wááshindoondi  Nitsaago  Ídadéét'i'ii  Bi

K'i'adéezt'@@'  Bi@ Haz'@@jí

(2)  Wááshindoonjí Nitsaago Agha'diitáahii  Bi@ Haz'@@di

## ELECTED OFFICIALS

Naat'áanii  Bá'ada'iis'nilii

58

(9/93)

**FARM BOARD MEMBER**

Dá'ák'eh  Binant'a'í

**GRAZING COMMITTEE MEMBER**

(1)  Dibé  Binant'a'í

(2)  Dibé  Binaaltsoos  Binant'a'í

**INTERPRETER**

Ata'halne'é

**LAND BOARD MEMBER**

Kéyah Binant'a'í

**NAVAJO NATION PRESIDENT**

Diné Binant'a'í  Al@@j@'  Dah Sidáhígíí

**NAVAJO NATION VICE PRESIDENT**

Diné  Binant'a'í  Akéé'góne'  Dah Sidáhígíí

**NAVAJO RESERVATION (NAVAJO NATION)**

Diné  Bikéyah

(9/93)

59

**OFF-RESERVATION**

Diné  Bikéyah Dóó T@'óó'jígo


**SPEAKER OF THE COUNCIL**

Béésh B@@h Dah Si'ání Yá Dah Nánídaahígíí


**STAFF/WORKERS**

Deiílníishii


**SUPERVISOR**

Bá  Da'íníshígíí

60

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

———————————————————————————

| | |
|---|---|
| NAVAJO NATION, a federally recognized Indian tribe, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil No. ) 2:12-cv-00039-RS |
| SAN JUAN COUNTY, a Utah government subdivision | ) ) ) |
| Defendant. | ) ) ) |

———————————————————————————

Attorney:

Steven C. Boos, Esquire
Eric P. Swenson, Esquire
Maya Leonard Kane, Esquire
MAYNES, BRADFORD, SHIPPS &
SHEFTEL, LLP
835 E. Second Avenue, Ste. 123
Durango, Colorado 81302-2717
Phone: (970) 247-1755
E-mail: sboos@mbssllp.com
        mkane@mbssllp.com
        E.Swenson4@comcast.net

———————————————————————————

**DEPOSITION OF NORMAN JOHNSON**

———————————————————————————

    BE IT REMEMBERED that on, to wit, the 23rd day of
June, 2015, this matter came on for the taking of the
deposition of **NORMAN JOHNSON** before Beverly E. King,
Certified Shorthand Reporter and Notary Public of the firm
of ANIMAS REPORTING SERVICE, 919 County Road 142,
Durango, Colorado 81303, taken at the San Juan County,
Utah Administrative Offices, Monticello, Utah, at the hour
of 9:00 a.m.

```
 1                  A P P E A R A N C E S

 2

 3

 4     FOR THE PLAINTIFFS:

 5
                   Steve C. Boos, Esquire
 6                 Eric P. Swenson, Esquire
                   Maya Leonard Kane, Esquire
 7                 MAYNES BRADFORD SHIPPS & SHEFTEL, LLP
                   835 E. Second Avenue, Ste. 123
 8                 Durango, Colorado 81302-2717
                   Phone:  (970) 247-1755
 9                 Fax:    (970) 247-8827
                   E-mail: sboos@mbssllp.com
10                         mkane@mbssllp.com
                           E.Swenson4@comcast.net
11

12

13     FOR THE DEFENDANT SAN JUAN COUNTY:

14
                   Jesse C. Trentadue, Esquire
15                 SUITTER AXLAND, PLLC
                   8 East Broadway, Ste. 200
16                 Salt Lake City, Utah 84111
                   Phone:  (801) 532-7300
17                 Fax:    (801) 532-7355
                   E-mail: jesse32@sautah.com
18

19
       ALSO PRESENT:
20
                   James Francom
21

22

23

24

25
```

```
 1                        I N D E X

 2                                                    PAGE

 3     Appearances                                      2

 4     Witness -    NORMAN JOHNSON

 5          Examination by Mr. Boos                     4

 6          Examination by Mr. Trentadue              91

 7          Further Examination by Mr. Boos           97

 8          Further Examination by Mr. Trentadue      99

 9     Witness' Signature/Correction Pages            101

10     Reporter's Certificate                         103

11

12                      E X H I B I T S

13                                                MARKED/
                                                 IDENTIFIED
14     EXHIBIT                                      PAGE

15     1    E-mail Correspondence from Patty Murphy     22
            to "Bart" on 6-12-01
16
       2    San Juan County Commission Meeting          22
17          Minutes of November 26, 2001

18     3    Letter of April 30, 2003 to the San Juan    43
            County Clerk/Auditor from Bob Nagel,
19          Utah Automated Geographic Reference
            Center
20
       4    San Juan County Commission Meeting          44
21          Minutes of September 2, 2003

22     5    E-mail from Bill Fuhrmann to Norman         73
            Johnson of June 2, 2014
23

24

25
```

1                    NORMAN JOHNSON,

2    was called as a witness by the Plaintiff, and, having been

3    first duly sworn, testified upon his oath as follows, to

4    wit:

5                    EXAMINATION

6    BY MR. BOOS:

7        Q    Good morning.

8        A    Good morning.

9        Q    My name is Steve Boos.  I am an attorney for the

10   Navajo Nation.  I don't think we ever met before.  I lived

11   in Bluff for a really long time, but...

12       A    It rings a bell, but not a big bell.

13       Q    I came after Mr. Swenson down at the DNA office

14   in Mexican Hat.  But I don't think we ever met before.

15       A    Not unless it was years and years and years ago.

16       Q    Well, I left in 1992, I think.

17       A    Were you there in the '70s?

18       Q    No.

19                    MR. SWENSON:  That was me.

20       Q    (BY MR. BOOS:)  And then Herb Yazzie came after

21   him.  I came -- Herb was gone for about a year and a half,

22   and there was no one in his office, and I came in after

23   that.  I was there from '83 to '92.

24            And then you know Maya from -- I guess she has

25   come over before, and Mr. Swenson, he was a fixture here

1    for a long time.

2            So, anyway, go ahead and state your name so we

3    get that on the record.

4    A    My name is Norman Lyle Johnson.

5    Q    And where do you live?

6    A    I live in Blanding.

7    Q    How long have you lived in Blanding?

8    A    My entire life.

9    Q    Tell me a little bit about yourself.  Tell me

10   about your life.

11   A    Went to college.  Undergraduate degree in

12   accounting.  And --

13   Q    Where did you go to college?

14   A    Undergraduate is from Southern Utah State in

15   Cedar City.  And came back to Blanding to work.  Worked

16   for private companies, and then I worked for Utah Navajo

17   Development Council for about four years, and worked for

18   White Mesa Uranium Mill for a few more years.  And when it

19   closed I went back to the Utah Navajo Industries.  The

20   names will float out there.

21   Q    I know them.

22   A    And then I was hired by the City of Blanding to

23   be the city administrator.  I was there for nearly 12

24   years.  And then I ended up in the county, county clerk

25   auditor.  Came to the County in '99 and retired from there

1    this year.

2        Q    When did you work for UNDC?

3        A    It would have been, say '75, '79, somewhere in

4    that neighborhood.

5        Q    What did you do for them?

6        A    I was their office manager, business manager,

7    accountant.  I don't remember the exact title.

8        Q    When did you work for UNI?

9        A    It was -- I don't remember the exact years.  '83

10   to '85.  I was working for them when I went to City of

11   Blanding.

12       Q    What did you do when you were with UNI?

13       A    It was the same; business, accounting.

14       Q    I think we would have just barely overlapped

15   then, because I started Mexican Hat in '83.

16       A    I remember Herb.

17       Q    I didn't have all that much to do with UNI.  It

18   was sort of closed down in Mexican Hat by the time I got

19   there.

20       A    Yeah, we were winding that down.

21       Q    So, tell me about being the clerk auditor.  When

22   did you first take that job?

23       A    In 1999 I was appointed as a clerk auditor by the

24   lieutenant governor.  The clerk auditor that had been

25   elected in '98 and had started the first of '99 left and

1    vacated the position.

2         Q     Who was that?

3         A     Gail Northern.

4         Q     Oh, okay.

5         A     So, I was eventually appointed.  So, it was in

6    June of '99.

7         Q     And then you stood for election --

8         A     Stood for election the next three or four

9    elections.

10        Q     Has your family been in the county for a long

11   time?

12        A     Yes, all long term county.

13        Q     Are you Hole In The Rock folks?

14        A     My wife's family are.  Mine are more from the

15   New Mexico side and/or migrants in.

16        Q     Have they always lived in Blanding or --

17        A     Primarily Blanding.

18        Q     So, the folks from Mexico, they came in just

19   prior to World War I, as I recall, something like that?

20        A     Yes.  1900s, right in that neighborhood.

21        Q     That is quite a history.  But your wife is a Hole

22   In The Rock family?

23        A     My wife is a granddaughter of -- mainly talked

24   about Hole In The Rock Pierson (inaudible), her

25   granddaughter.

8

1    Q    I always loved that history when I was in Bluff.

2    I was always amazed by people like Jans Nielsen who went

3    across in a hand cart.  And I guess he had to get himself

4    amputated because he got --

5    A    Frostbite.

6    Q    -- frostbite, and then they went over to -- I

7    can't remember, it was Parawan or someplace else.

8    A    Over on the other side of the state.

9    Q    Right, then they came back over here.  It was

10   insane.

11   A    Most people just went where they were told.

12   Q    Exactly.  It was always kind of an amazing story.

13   So, anyway, you have a lot of family history here?

14   A    I do.  My entire history is basically here.  I

15   should say after I left the City of Blanding I went and

16   decided I had to see what I was good for, so I started

17   taking online courses and ended up with a master's degree

18   from Utah State University.

19   Q    What was your master's?

20   A    Human resource management.  It was one that

21   didn't require a thesis.

22   Q    It doesn't sound like you have done a lot of --

23   well, I guess being the administrator you must have had

24   some experience doing human resources stuff, right?

25   A    Yes, I had a lot.  But the mill, White Mesa mill,

1    that was part of my responsibility.

2        Q    Well, let's talk about some sort of general

3    stuff.  Have you ever had your deposition taken before?

4        A    Yes.

5        Q    When was that?

6        A    City of Blanding, a couple of different legal

7    actions.  And then I am pretty sure, I am getting kind of

8    foggy back there, but there was one with Utah Navajo

9    Development Council.

10       Q    Was that when you were working for them or --

11       A    I don't remember if it was while I was working

12   for them or after.  There has been a couple of actions

13   involving them.  I really don't remember exactly when I

14   may have been deposed.

15       Q    So, it is --

16       A    Or if it was an actual formal deposition or if it

17   was just discussion.  I have forgotten.

18       Q    So, it has been a few decades then, right?

19       A    Yes, it has been a decade or two.

20       Q    Did you do any preparation for this deposition?

21       A    Other than visiting with the attorney.

22       Q    So, you talked to Mr. Trentadue about --

23       A    Yes.

24       Q    I guess that was this morning, correct?

25       A    Yesterday afternoon and this morning.

```
 1      Q    Okay.  Did you talk to anyone else about it?

 2      A    (Inaudible response.)

 3           MR. TRENTADUE:  You have to say "yes" or

 4      "no," she can't spell --

 5           THE WITNESS:  No.  You can't spell a nod of

 6      the head?

 7      Q    (BY MR. BOOS:)  Just like take down shakes --

 8      A    No, not specifically to prepare for this event.

 9      Q    We have some questions for you of your job when

10      you were clerk auditor.  So, we need to go back in history

11      a little bit and talk about where you started with all

12      this.  You said you got appointed by the lieutenant

13      governor in 1999.

14      A    Correct.

15      Q    We understand you probably -- well, do you know

16      anything about the sort of election history in the county

17      before you got appointed?

18      A    General election history, yes.

19      Q    Do you know anything about the litigation that

20      the United States Department of Justice brought against

21      the County?

22      A    In the '80s, yes.

23      Q    What do you know about that?

24      A    Just what I was able to glean in the natural

25      process of running elections, and then as I came on with
```

1    the County I was subject to the rules that were set by the

2    consent decree from the election, and the decisions in the

3    late '80s.

4        Q    So, what do you know about that litigation?  What

5    have you heard?  What did you learn about it?

6        A    You have to be more specific.  I don't know --

7        Q    Do you know why the litigation was brought?

8        A    I believe it was discrimination.  I do not know

9    specifically why it was brought.

10       Q    What kind of discrimination have you heard was

11   going on back then?

12            MR. TRENTADUE:  Objection, foundation.

13            You can answer.

14            THE WITNESS:  They weren't getting people

15   registered and giving them the opportunity to vote.

16       Q    (BY MR. BOOS:)  By "people," do you mean Navajos

17   or Indians?

18       A    Native American population.

19       Q    So, it was your understanding, then, that the

20   litigation was about voter registration?

21       A    Voter registration, voter rights, opportunity to

22   vote.

23       Q    Okay.  You said that when you came into office

24   you had to do work that was the result of that litigation.

25   Can you tell me what kind of work you were doing?

1     A   The County was under -- I have forgotten the

2    word.  We had justice department people watching what we

3    were doing, quite often at our polling locations.  There

4    were items that came out of the legal action that they

5    wanted corrected.

6     Q   When you say "items," what do you mean?

7     A   There had been a list of names that had been

8    purged, taken off the voter roles.  That is about all I

9    know about it.  The list was several hundred individuals.

10   I don't know if they were all Native American or if there

11   were Anglos also.

12           (Mr. James Francom enters the room.)

13          MR. TRENTADUE:  James Francom.  He will be

14   sitting in as a representative for the County.

15          MR. BOOS:  Okay.

16     Q   (BY MR. BOOS:)  Are you familiar with the typical

17   Navajo names in the county?

18     A   Some of them.  Some of the typical Navajo names.

19   Some of them that are more common are not just typical

20   Navajo.

21     Q   You have to explain yourself on that one.

22     A   Jones.  Smith, Johnson.  There is a lot of those

23   who would be considered to be Native American and/or Anglo

24   that have the same names, but there are a lot that are

25   typical, too, just to the Native American.

1      Q     Did it seem to you that the list of names that

2    you saw on this purged list were mostly Indian names?

3      A     I do not remember.  I honestly don't.  This would

4    have been in '99 when I first saw the list.  I honestly

5    don't remember.

6      Q     Okay.  Let's talk about the -- do you know what

7    the decennial census is?  Have you heard of that term

8    before?

9      A     Not --

10               MR. TRENTADUE:  United States census.

11               THE WITNESS:  The census?  I know what the

12   census is.

13     Q     (BY MR. BOOS:)  Okay.  Do you know how often the

14   census takes place?

15     A     Every ten years.

16     Q     In 2000 there was a census that had been taken.

17     A     Right.

18     Q     Did you look at any of the data that came out of

19   that census?

20     A     Yes, we did.

21     Q     What did you do?

22     A     We took the census blocks the census used and --

23   to make sure these people were in the right precincts.

24     Q     What do you mean to make sure that the people

25   were in the right precincts?

1      A      The reservation is huge, scattered.  And our

2      precinct boundaries sometimes meander along the natural

3      geographic areas.  And we wanted to make sure that we had

4      the people from the census block that the census used in

5      the right county election district.

6      Q      So, what was your process?  What did you do in

7      order to make sure that they were?

8      A      One of my chief deputies took those census block

9      maps from the census bureau and went through, and we come

10     up and tried to make sure we knew where the populations

11     were.

12     Q      Who was your chief deputy back in 2000?

13     A      John Fellmeth.

14     Q      Tell me in a little more detail about what he did

15     to make sure that people were within the right --

16     A      We printed off the census blocks, the census

17     block that the census used.  And in each one of those

18     blocks they would have a number of how many people they

19     thought were in that census block.  And we tried to make

20     sure it matched up with the people we had registered in

21     those blocks.

22     Q      By "registered," you mean registered to vote?

23     A      Registered to vote.

24     Q      And what happened?  Did you determine everyone

25     was --

1      A    We were pretty dang close.

2      Q    Where did you have problems?

3      A    I am not remembering exactly where we had

4   problems.  A lot of them would have probably been right on

5   the borderlines of the census blocks in the reservation.

6   Some of the census blocks crossed over into different

7   precincts.  We had to try to determine which people

8   belonged to which precinct.

9      Q    How did you do that?

10      A    John would have to answer.  Mathematically.  I

11   mean, we -- I am not remembering exactly how we did it,

12   but I know we were very, very close with the total

13   population.

14      Q    Do you know whether he was going out and

15   determining whether --

16      A    Not out.  He didn't go out.

17      Q    Okay.

18      A    These were maps that we used, laid out.  May have

19   been on this table or may have been downstairs.

20      Q    Okay.  After you did that, did you talk to anyone

21   about reapportioning any of the election districts for the

22   county commission in this case?

23      A    No, we followed pretty much the guidelines and

24   found that we were relatively close in our population

25   numbers.

16

```
1        Q     What guidelines are you talking about?

2        A     The consent decree and the rulings from the

3   original lawsuit back in the '80s told us that we needed

4   to be within 5 percent of -- that original lawsuit caused

5   the County to form districts --

6        Q     Yes.  Election districts.

7        A     -- that would keep the population as equal as

8   possible in those three districts.

9        Q     Okay.  How did you determine you were within

10  5 percent?

11       A     Mathematically.  We knew what the population of

12  the county was.  Divide it by three and come up with a

13  number.  And we were very close.

14       Q     And the consent decree told you it had to be

15  within 5 percent?

16       A     I don't remember the consent decree.  But it was

17  somewhere in the legal process we needed to be in

18  5 percent.  That may be the federal guidelines, I am not

19  sure.

20       Q     Did you look at the school board election

21  districts in 2000?

22       A     Not very much.  They were also relatively close.

23  That original lawsuit also set up, I believe, five -- five

24  districts of schooling, but I never got involved a lot

25  with the school district.
```

1    Q    Why not?

2    A    No reason to.  I mean, the school district has

3    five, five board members, and they are divided up among

4    the county.  When the population was calculated it came

5    out relatively close.  We asked the school district if

6    they had any interest in changing.  As I recall, they

7    didn't.

8    Q    When you say "relatively close," do you mean it

9    was within the 5 percent number?

10    A    I don't remember.

11    Q    If you had determined -- this is back in 2000,

12    but if you had determined that the numbers -- that the

13    difference between the different election districts for

14    the school board were very high, like more than 5 percent,

15    what would you have done?

16            MR. TRENTADUE:  Objection, speculation.

17    Foundation.

18            THE WITNESS:  I don't know that.

19    Q    (BY MR. BOOS:)  You stated that the number that

20    you were looking at for being in compliance with the

21    consent decree was a not greater than 5 percent difference

22    between the election districts, right?

23    A    That is what I am remembering, and I don't

24    remember exactly where that 5 percent comes from.  It may

25    be out of the federal regulations.  I am not 100 percent

1    sure.

2         Q    It is also my understanding from what you have

3    said, that you would have looked at the population between

4    the five school board election districts, correct?

5         A    Would have looked at them.

6         Q    And you would have looked at them to see what

7    numerical differences there were between those

8    populations?

9         A    As I recall, yeah.  Yes.

10         Q    Is it your recollection that they were within

11    that 5 percent?

12         A    It is my recollection that they were relatively

13    close, and I do not recall any specific percentages.

14         Q    If in doing one of those calculations you find

15    that the percentage is much higher than 5 percent, do you

16    as the county clerk auditor have any duty to do anything?

17         A    I would say no.  Report it to the school and see

18    if they are interested in doing something.

19              The commission set the districts, set the

20    precincts.  But they would do it with advice and consent

21    of the school board, school district.

22         Q    Historically if the school board hasn't consented

23    the commission won't change anything?

24         A    I couldn't answer that.  It has not been changed

25    while I was here.

1    Q    Since 1999 to present the school board election

2    districts have never been changed?

3    A    Not to my knowledge, no, not while I was here.

4    Q    Did you look at the school board numbers after

5    the 2010 census?

6    A    Yes.  I mean, what I have just said.  We looked

7    at them to see how much population was in each of the five

8    voting -- each of the five school districts.

9    Q    After 2010 was it still within the 5 percent?

10   A    I don't remember percentage-wise.  It was

11   relatively close to where they had been.  The population

12   only changed 300 people.  So, your percentages get really

13   kind of squirrely.  I do not remember dealing with

14   percentages on those.

15   Q    What do you mean by the percentages get kind of

16   squirrely?

17   A    Well, you are dealing with 300 people out of

18   14,000.  You are not -- I am not quite -- probably a wrong

19   terminology.  I am not exactly sure what you are asking, I

20   guess.

21   Q    Well, I was just asking what you meant by the

22   population gets kind of squirrely?

23   A    A few people can change with -- change the voting

24   district, voting precinct.  I am getting my words mixed

25   up.

1    Q    And then what does that mean?

2    A    I don't know what that means.  It is not a large

3    number.

4    Q    Let me think about a larger number.  You are

5    aware, I would assume, you can tell me if you are not,

6    that the Spanish Valley area of the school district was

7    deannexed from the San Juan County schools?

8    A    Annexed is the wrong statement.

9    Q    Deannexed.

10    A    Yeah.  It was -- not annexed.  They had a

11    boundary change that year.

12    Q    They had a boundary change?

13    A    Boundary change.

14    Q    And what was the boundary change?

15    A    The boundary for Grand County School District

16    took in Spanish Valley.

17    Q    So, that population was added to the Grand County

18    schools?

19    A    To the Grand County schools.

20    Q    And it was taken --

21    A    The property wasn't annexed, it was just a

22    boundary change.

23    Q    But the population for school board election

24    districts, that population was taken out of the San Juan

25    County School's population?

1      A     That was after the -- after?  I can't remember.

2     I can't remember when it took place.  But, yes, that

3     population would have shifted to Grand County School

4     District.

5      Q     Do you know how many people were in that area?

6      A     Less than 200, as I recall.

7      Q     After that happened, did you look at the

8     population numbers at all and --

9      A     No, I did not.

10     Q     Okay.  And I take it that the school board didn't

11    ask you to look at the numbers?

12     A     They did not.

13     Q     Did they ask the county commission to do a

14    reapportionment after that?

15     A     No, not to my knowledge.

16     Q     I want you to take a look at Exhibit 1, which is

17    an e-mail from the State concerning local school board

18    apportionment dated June 12th, 2001.  Was the County on

19    notice after that that reapportionment of school districts

20    was required as a result of a decennial census in 2000?

21     A     Not to my knowledge.

22     Q     You never saw this e-mail?

23     A     I don't recall ever seeing this.  The only name I

24    even recognize on there is Gary Cameron.  He was the

25    superintendent of schools at the time I believe or at one

1    time.

2        Q    The exhibit, the e-mail, says that the state

3    would make Arc View and Arc GIS software available to the

4    county.  In 2001 did you have access to Arc GIS software?

5        A    I don't know.

6        Q    Do you recall whether you had access to any GIS

7    software in 2001?

8        A    Stays in my mind that we did, but I had -- like I

9    said, the chief deputy was the computer person.  He was

10   handling that.  I don't know.

11                MR. TRENTADUE:  Have we marked this one yet?

12                MR. BOOS:  That would be -- I need to --

13   that will be Plaintiff's Exhibit 1.

14                (Exhibit 1 marked for identification.)

15       Q    (BY MR. BOOS:)  Do you recall whether you had any

16   presentations from Rick Bailey in 2001 concerning school

17   board apportionment?

18       A    I don't recall anything from Rick.

19       Q    Do you recall by any chance a commission meeting

20   in November 2001 where Rick Bailey made a presentation?

21       A    I would have been in most of the commission

22   meetings, I assume.  But I don't recall a presentation.  I

23   assume you mean pertaining to the --

24                (Exhibit 2 marked for identification.)

25       Q    (BY MR. BOOS:)  This will be Plaintiff's Exhibit

1    No. 2.  You want to take a look at page 2 of 6, there is a

2    heading, "Administrative Assistant Rick Bailey's Report."

3         A    (Reviewing.)  Okay.

4         Q    And if you look at the first page as persons

5    present, this shows that you were present at that

6    meetings, correct?

7         A    I took the minutes.

8         Q    Okay.  You took the minutes and you created this

9    document?

10        A    Yes, I created the document.

11        Q    The document says several ideas for redistricting

12   commission districts and school districts were discussed.

13   Do you recall what was discussed?

14        A    No, I don't.

15        Q    Do you recall why it was decided to keep the

16   districts as they are?

17        A    I do not.

18        Q    Do you recall any part of a discussion?

19        A    The discussion that was more focused, as I

20   recall, about allowing this redistricting -- not

21   redistricting, but the changing the boundaries of the

22   school, and making sure that people understood it wasn't

23   an annexation of properties because of property taxes.

24   Then there was quite a discussion related to how the taxes

25   would work, you know.  The County would be assessing taxes

1    in San Juan County for the Grand County School District.

2              As I recall, it was more related to the political

3    process than it was to school board seats, per se, if they

4    knew that terminology.  I don't remember that.

5              MR. TRENTADUE:  I am confused, was this

6    about the Spanish Valley --

7              THE WITNESS:  Spanish Valley.

8         Q    (BY MR. BOOS:)  Did your office present any data

9    concerning how the annexation of Spanish Valley would

10   affect the population numbers of the school district?

11        A    Not that I recall.  No.  Not dealing with the

12   schools, we wouldn't have even had that information.  We

13   do a population, not with age brackets or anything.

14        Q    But you had population data at the time?

15        A    Must have.  I am not recalling exactly.

16        Q    Is that something that you think Mr. Fellmeth

17   would have had?

18        A    I don't know.  I don't remember.  Since

19   Mr. Bailey presented this it was on an administrative

20   level.  It was counties talking to counties, not staff, so

21   to speak.

22        Q    So, you wouldn't have given a presentation to the

23   commission on this issue?

24        A    No.  I don't recall ever having done that.

25        Q    Do you remember the gist of Mr. Bailey's

1    presentation?

2    A    Just what was written there.  They were talking

3    about the advantages and disadvantages of having that

4    boundary change for the school district.

5    Q    Do you recall what the advantages and

6    disadvantages were?

7    A    I don't, no.

8    Q    Do you recall why the commission voted to do no

9    reapportionment?

10    A    I do not recall.

11    Q    Let's move on to the 2002 election.  You had said

12    before that your understanding of the 1984 U.S. DOJ cases

13    was they had to do with voter purges, purging voter lists?

14    A    Yeah.  Part of it, yes.

15    Q    What were the other parts?

16    A    Just dealing with the -- there had not been

17    enough effort put in by the County to see that the folks

18    on the reservation had had an opportunity to register and

19    vote.

20    Q    From your point of view as clerk auditor, what

21    kind of impact did that case have on voting issues in the

22    county?

23    A    I came in that way after the fact.  So, I don't

24    have a history of the way it was prior to the legal

25    action.  I only knew what I was dealing with as I came in.

1    Q    Were you dealing with anything that was an

2    outcome of that change?

3    A    Just the fact that we had DOJ at polls, poll

4    watchers, that came to our polling locations.

5         The language, making sure that the ballots were

6    presented to the Native American in their language so that

7    they knew and understood what they were voting for.  It

8    didn't require us to translate the ballot, but we had to

9    have judges that were bilingual enough to present the

10   information to the voter if they asked.

11        And we were, of course, required to have a

12   bilingual judge at each poll location.  The County had to

13   hire a liaison who was Native American to work

14   specifically with the people.  And then that -- quite an

15   extensive list of voters that had been purged out of the

16   system, 2-, 300 voters, as I recall.  The County's claim

17   was that they were duplicates registrations.

18   Q    Is that something that you looked into?

19   A    I looked into it a little bit.  Eventually we

20   just put them back in the system.  Then over time they

21   were deactivated as the processes went through.

22   Q    You have to explain that.  What do you mean by

23   deactivate?

24   A    In an election system you can have active voters

25   and inactive voters.  An inactive voter is someone who has

1    not participated and/or whom you have got at least two

2    documents that say that they no longer exist at the

3    location they registered or have deceased or those types

4    of reasons.  And so you can inactivate them, otherwise

5    they are not an active voter in the county, but their

6    names are still on the rolls should they ever appear and

7    want to be -- they are still a registered voter, they are

8    just not an active registered voter.

9        Q    So, what I am understanding you to say is that in

10   those approximately 200 people that you added to the list

11   they were all inactivated later?

12       A    200 and some.  Over time I think most of them

13   probably they were.  It wasn't tracked.

14       Q    It wasn't tracked?

15       A    No.

16       Q    So, you don't have any records of what the names

17   were or when they were later inactivated?

18       A    No.  Not unless there is one of the original

19   lists around of the people that were taken out.  I don't

20   recall.

21       Q    As I understand it, the federal monitoring ended

22   in 1998, just about the time that you came into office; is

23   that right?

24       A    No, it continued through maybe 2002.  I am

25   thinking we had poll watchers in 2002.  Right shortly

1     after that I got mad.

2          Q     You got mad?

3          A     I got mad.

4          Q     Why?

5          A     I said," Tell me what we are doing wrong."

6          Q     About what?

7          A     With the elections.  "Why do we need to

8     continue?"

9          Q     What did they say?

10         A     They didn't.  They just went away.

11         Q     Okay.  Why do you think it wasn't necessary for

12    them to do monitoring?

13         A     We had done everything that we needed to do to

14    comply with federal and state voting requirements.

15         Q     After they went away, did you continue doing the

16    things --

17         A     Absolutely.

18         Q     So, you were still providing bilingual voter

19    assistance?

20         A     Yes.

21         Q     Has the election process changed at all since

22    they went away in 2002?

23         A     What do you mean?

24         Q     Are you running elections the same way now or

25    when you were last in office?

1      A     We ran them up through the last election they

2   were ran the same way.  Then the last election we went to

3   a by-mail election process.

4      Q     What changed with regard to how you were running

5   the elections with the by-mail process?

6      A     We did not have poll locations anymore.  That is

7   the main change.

8      Q     Were you providing bilingual voter assistance

9   anymore?

10     A     Yes.

11     Q     Where?

12     A     At the chapter houses on the reservation through

13  our liaison.  The liaison was still a full-time employee.

14     Q     So, on the day of the election he went to every

15  chapter house?

16     A     Not on the day of election, but in advance we

17  did.  We contacted by mail every registered voter.  We

18  made available phone numbers for them to call if they

19  needed assistance that couldn't be rendered by family

20  members.

21     Q     Do people typically have telephones on the

22  reservation?

23     A     I think nowadays a good share of them probably

24  do.

25     Q     Is that something --

1      A    Cell phones.

2      Q    Is that something you investigated?

3      A    Is that something what?

4      Q    Did you research that issue?

5      A    No.  No.

6      Q    So, that is -- your belief is that most people

7  have cell phones on the reservation?

8      A    My belief is most people have access,

9  telecommunication of some type, yes.

10     Q    That is not something you double-checked

11  yourself?

12     A    No.

13     Q    Tell me -- prior to doing the mail-in ballot

14  process, tell me what it was like to run an election on

15  the Navajo Reservation for you.

16     A    Not exactly sure what you mean "what it was

17  like."

18     Q    Well, what did you do?  What kind of problems did

19  you encounter?

20     A    Most of the problems we encountered on the

21  reservation was finding a polling location, central

22  location where we could hold the election.  We used

23  chapter houses.  We used some fire stations.  And then

24  having judges that we could depend on sometimes was a

25  problem.

1    Q    Why was it difficult to find locations?

2    A    There are not many down there that meet the

3    routine ADA and other qualifications to run the election.

4    Q    Did you have any problem making arrangements to

5    use chapter houses?

6    A    Not generally.  The nation, Navajo Nation, also

7    runs their election the same time we do.  So, sometimes

8    space was an issue.  But we worked through that.  They

9    were very cooperative.  We shared locations, particularly

10   Navajo Mountain and Aneth.  Bluff, we owned the facility,

11   the County did.

12   Q    Tell me a little bit more about the problems you

13   said you were experiencing with reliable translators.

14   A    Not reliable translators.  Election judges that

15   would commit to being there, come to the training and then

16   be at the polls.  Sometimes that was just an issue.  Same

17   as it is on or off the reservation.  It is not just a

18   reservation problem.  Finding reliable judges nowadays in

19   an election process is becoming an issue across the

20   nation.

21   Q    So, there wasn't anything -- so, except for

22   finding space, there wasn't anything especially difficult

23   about running an election on the reservation?

24   A    None other than time and distance to get the

25   equipment there, get it set up.  Time and distance is an

1    issue on the reservation.

2        Q    In what way?

3        A    It is just a long ways to handle equipment,

4    removing machines, electronic machines.  Getting them set

5    up, running, operating.  Getting the routine processes of

6    running an election.

7            Navajo Mountain is four-and-a-half hours from

8    here -- or it was.  Been awhile since I drove there now,

9    so probably got it by an hour.  If you have a problem, you

10   are a long ways away from your poll location.

11       Q    Did you ever experience any problems?

12       A    Yes, we did.

13       Q    Like what?

14       A    Just machine didn't operate or judges didn't show

15   up.

16       Q    What did you do then?

17       A    We usually had a back-up plan.  We either had a

18   back-up piece of equipment or we would head out there.

19   Literally.  Somebody would head for Navajo Mountain.

20       Q    And do the four-and-a-half hour drive?

21       A    That is correct.  And getting the results that

22   night was always interesting, waiting here until 1:00 in

23   the morning for somebody to drive in from out there and

24   bring the results.

25       Q    Let's talk about voter assistance.  As I

1    understand it, a lot of the people out at Navajo Mountain

2    are not primarily English speakers; is that right?

3         A    I wouldn't say that.  A good mix.

4         Q    A lot of people who only speak Navajo though?

5         A    Probably more there than other locations.

6         Q    What kind of voter assistance did you usually

7    need to provide people out at Navajo Mountain?

8         A    Their judges were trained to assist them.

9    Mr. Tapaha, our liaison, who would go out and meet with

10   senior citizens, he also works part time with the health

11   senior programs in San Juan County.  He knew a lot of

12   these people.

13        Q    Was the kind of assistance that you had to

14   provide at Navajo Mountain different than the assistance

15   you might have had to provide in, say, Blanding?

16        A    Oh, yeah.

17        Q    How so?

18        A    More personal.

19        Q    What do you mean?

20        A    Trying to make sure people understood the ballot

21   type of thing.

22        Q    Why did it have to be more personal?

23        A    Because English speaking -- the English speaking

24   population had access more to the printed material that

25   came from Salt Lake and other places, whereas we had to do

1    our best to interpret that information for those who did

2    not speak English.

3        Q    Thinking back on the kind of monitoring that the

4    United States was doing up through 2002, do you think that

5    was helpful in ensuring that Navajos got the kind of

6    assistance they needed to do voting?

7        A    Yes.  Yeah, I think it was positive.

8        Q    In what way?

9        A    Just that they are there, they are more

10   conscientious about satisfying them.  Our judges were more

11   conscientious.

12       Q    Since you --

13       A    If you have someone looking over your shoulder

14   you are a little more conscientious.

15       Q    Do you think that the system became less

16   conscientious in the assistance that was provided after

17   they left?

18       A    I do not believe that we did.  I think we stayed

19   right on the mark.

20       Q    Did folks get the same kind of assistance with

21   regard to the mail-in ballots as they did prior to that?

22       A    I think they did if they wanted the assistance.

23   They were all notified the same as any off reservation or

24   on reservation.

25       Q    If they had wanted the kind of personal

1    assistance that you used to give out at Navajo Mountain,

2    what would they have had to do?

3         A    Contact us.

4         Q    Contact you how?

5         A    Through the phones.  They were mailed,

6    individually mailed, a list of phone numbers, people to

7    contact.  We would have on occasion, I don't know how many

8    times, Mr. Tapaha would offer whatever personal assistance

9    we could.  We also relied a lot on families to help people

10   out.

11        Q    In what way?

12        A    The elderly.

13        Q    How did the family help out?

14        A    Well, I wasn't there.  Explaining the ballot,

15   explaining what was on the ballot, what offices were being

16   voted for.

17        Q    That is something that your office would have

18   taken care of in the past?

19        A    Yes.

20        Q    But after you went to mail-in ballots that was

21   something you expected the family to do?

22        A    Yes.

23        Q    If someone had wanted assistance from your office

24   of the kind that was provided prior to a mail-in ballot,

25   their option was to call?

1    A    Yes.  Contact us any way they wanted.

2    Q    Okay.  So, if you had had a Navajo speaker call

3   you on the phone just before the election, what would have

4   happened?

5    A    We would have sent Mr. Tapaha to them.

6    Q    You would have had him drive out to Navajo

7   Mountain?

8    A    I would have had him drive out there.  Probably

9   call them first and see what they needed.

10    Q    Were there any judges or any kind of assistance

11   through people other than Mr. Tapaha available?

12    A    No.

13    Q    So, he was the only assistance you provided?

14    A    He was the only one that spoke Navajo.  I do not

15   speak Navajo.  Other staff members did not.  He was the

16   one that we relied on to speak in their language.

17    Q    My understanding is that under the mail-in ballot

18   system you have one live polling place?

19    A    That is correct.

20    Q    And that was here in Monticello.

21    A    Here in Monticello.

22    Q    In this building, correct?

23    A    In this building, clerk's office downstairs.

24    Q    Were there any Navajo speakers here to provide

25   assistance to anyone who came in?

 1   A    Mr. Tapaha would have been here also if we needed

 2   him.

 3   Q    So, he had to be in a lot of different places?

 4   A    He had to be ready to move everywhere.

 5   Q    How did that work out?

 6   A    We didn't need him.

 7   Q    You had no inquiries?

 8   A    We did not have any inquiries here in this

 9   building.

10   Q    Typically prior --

11   A    Not in Navajo.  Had one in Spanish, but not in

12   Navajo.

13   Q    Typically prior to -- prior to going to a mail-in

14   ballot system, how many inquiries were you getting from

15   Navajo speakers at your live polling places?

16   A    I wasn't there, I don't know.

17   Q    You didn't collect any data on that?

18   A    We did not.  We just relied on our polling

19   judges.  We always had four polling judges.  Three judges

20   and one interpreter is what we called them.

21   Q    How many polling places did you have on the

22   reservation?

23   A    I want to say seven.  Navajo Valley, Mexican Hat,

24   Bluff -- six.

25   Q    So, you had six interpreters that you were

```
 1    employing prior to that?

 2         A    Yes.

 3         Q    Plus three judges?

 4         A    Three judges.

 5         Q    So, approximately 24 people --

 6         A    Yeah.

 7         Q    -- were providing voter assistance?

 8         A    Yes.

 9         Q    After you went to mail-in ballots, instead of

10    having 24 people providing voter assistance on the

11    reservation you had one?

12         A    On or around the reservation, yes.

13         Q    So, you went from 24 to one?

14         A    Correct.

15         Q    Prior to the mail-in ballots could an inactive

16    voter show up at a live polling place, like the one here

17    in this building, on election day and vote?

18         A    Yes.

19         Q    Did anyone do that?

20         A    If they provided the right information.

21         Q    What is the --

22         A    Show who they are, voter ID.

23         Q    Okay.

24         A    And those type of things that are now part of the

25    election process.
```

1   Q   If an inactive voter were voting by mail, how
2   could they vote?
3   A   They wouldn't have got a ballot.  They are not
4   voting by mail.  They would not have got a ballot.  Only
5   active voters got ballots.
6   Q   So, no inactive voters got ballots?
7   A   Not that we know of.
8   Q   Would they have gotten a voter ID in the mail?
9   A   No.  They are inactive voters.  They are
10  inactive.
11  Q   So, if an inactive voter had showed up here
12  wanting to vote, how would they have voted?
13  A   They would show us an ID.  We would have gone
14  into the system, activated them and produced a ballot for
15  them.
16  Q   Do you mean an ID like a driver's license?
17  A   Driver's license.  There is all kinds of IDs that
18  can be produced.  Lots of IDs that are recognized.
19  Q   What if you had someone out at Navajo Mountain --
20  I hate to pick on this, but --
21  A   That is all right.  It is a long ways away.
22  Q   It is a long ways away.  You have an elderly
23  non-English speaking voter with no phone, and they get a
24  ballot in the mail that is in English, and they don't
25  understand what is going on with it.  How would they

1    contact you?

2        A    They would have made contact with the County

3    people, I suppose.  They have the ballots for three weeks

4    prior to election.  So, they would have had opportunity to

5    make contact with folks.  There is a lot of people who

6    understand the election processes.

7        Q    Are any of them at Navajo Mountain?

8        A    They could have got information into us, yes.

9        Q    Are any of them out at Navajo Mountain?

10       A    Yes.

11       Q    Who?

12       A    People at the post office, people at the chapter

13   house.  These are people who have been our judges for

14   years.

15       Q    And were they your judges in 2014 during the --

16       A    No.  No.  But they are people who understand the

17   election processes.

18       Q    So, let me --

19       A    It didn't happen, so I don't know.

20       Q    So, let me make sure -- let me make sure I

21   understand this.  If a non-English speaking elderly person

22   with no phone out at Navajo Mountain got a ballot in

23   English and didn't understand it, the expectation from the

24   County would have been that they would have known to go

25   talk to someone who in the past had been one of your

1   election judges?

2       A    I am saying that they would have had that ballot

3   for a long enough time that had they been interested in

4   the election they would have been able to easily find

5   somebody who could have assisted them and directed them to

6   us.

7       Q    How would they know whether they are interested

8   in the election if they don't speak English?

9       A    I don't know.  I can't look into their minds.  I

10  don't know.

11      Q    How do you know that they had the ballots for

12  three weeks?

13      A    Didn't come back to us.

14      Q    Did you ever get any ballots that had been mailed

15  out in one year and they weren't returned to you until the

16  year following?

17      A    Not from the reservation that I remember.

18      Q    We'll get back to that.

19           Do you know anything about how the postal system

20  works on the reservation?

21      A    Like anywhere else, except sometimes they are

22  satellite post offices.

23      Q    The folks who live in the Utah part of Monument

24  Valley, where do they typically go to pick up their mail?

25      A    Utah part of Monument Valley?

1    Q    Uh-huh.

2    A    Monument Valley.

3    Q    There is a post office in Monument Valley?

4    A    Yes.

5    Q    Do you have any folks from the Utah part of

6  Monument Valley who have mailing addresses in Kayenta?

7    A    Could be. I don't recall exactly.

8    Q    What about people out at Navajo Mountain, where

9  do they go for their mail?

10    A    Tonalea, Arizona. However, that is the ZIP code,

11  but they do have a satellite office, a satellite post

12  office in the Navajo Mountain chapter house. So, they

13  must send it in bulk to Navajo Mountain and then put it in

14  the boxes there.

15    Q    Do you know how long typically it takes an

16  envelope to go from Monticello to Navajo Mountain?

17        MR. TRENTADUE: Objection, foundation.

18        THE WITNESS: I am making an assumption.

19  Four days. And that is changing.

20    Q    (BY MR. BOOS) How so?

21    A    The post office is changing their processes and

22  where our mail goes to.

23    Q    In what way?

24    A    Used to go to Provo, I think now it goes to

25  Grand Junction, Colorado. I don't have any idea what they

1    do with it.

2        Q    So, historically mail that left Monticello went

3    to Provo first?

4        A    Yeah.

5        Q    Do you know how it got to --

6        A    I do not.  It is the postal system.

7        Q    Let's talk about the 2003 election plan.  This is

8    Plaintiff's Exhibit 3.

9             (Exhibit 3 marked for identification.)

10       Q    (BY MR. BOOS:)  It is a letter from Bob Nagel,

11   the State of Colorado, dated April 30, 2003 to County

12   Clerk/Auditor.  Do you remember getting this letter?

13       A    I don't remember it just offhand.  I would have

14   passed it on to Mr. Fellmeth.

15       Q    There is a second letter in this exhibit from the

16   lieutenant governor.  Do you recall getting that letter?

17       A    I don't remember it offhand.  I responded to it,

18   obviously, but I don't specifically remember the letter.

19       Q    Having looked at it again, does it refresh your

20   recollection what was going on back then?

21       A    The State was doing something with their precinct

22   boundaries and whatnot.

23       Q    Were they asking you for updated information on

24   the county precinct boundaries?

25       A    Yes, we did change our precinct boundaries, so

44

     1    that was what I responded to.

     2         Q    Did the State offer you GIS assistance?

     3         A    I don't remember.

     4         Q    Take a look at the first letter from Mr. Nagel.

     5    Take a moment to look through it.

     6         A    (Reviewing.)  It is basically referring to the

     7    same information that is in the second letter.

     8         Q    Did they offer to help you put together this

     9    information?

    10         A    Yep, they did, but we didn't change our precinct

    11    boundaries.  They were asking for any changes.  We didn't

    12    change it.

    13         Q    Did you put together a San Juan County election

    14    plan in 2003?

    15         A    I don't know what you mean by "election plan."

    16         Q    I hand you  -- (turning to the reporter)

    17    Plaintiff's Exhibit 4 are we on?

    18                   THE REPORTER:  Yes.

    19              (Exhibit 4 marked for identification.)

    20         Q    (BY MR. BOOS:)  This is a commission meeting in

    21    September 2003.  Are these minutes that you also put

    22    together?

    23         A    Yes, those in attendance -- no, Deputy Clerk

    24    LaVee Scherrick would have put these minutes together.

    25         Q    Were you present at this meeting?

1       A    I was.

2       Q    Looking at the beginning of the second page,

3    there is a section marked "San Juan County Plan On

4    Election Reform."

5                 MR. TRENTADUE:  Where?  Oh, I see.

6                 THE WITNESS:  This must be when the federal

7    plan was put together.

8       Q    (BY MR. BOOS:)  Did you work on this plan?

9       A    I obviously did.

10      Q    Do you remember anything about it?

11      A    I don't.  I don't right now.  Without really

12   going back and researching and studying the document

13   itself, I don't know.

14      Q    Do you remember in 2003 when you put this plan

15   together, did you look at reapportioning either the county

16   commission election districts or the school board election

17   districts?

18      A    I don't know.

19      Q    Why not?

20      A    I don't --

21      Q    Was it discussed?

22      A    Not that I recall.

23      Q    Was any of the 2000 decennial census election

24   data shared with the commissioners when you discussed this

25   plan?

```
 1          A    I don't remember.

 2          Q    In 2005 do you recall whether the voter lists

 3   were purged?

 4          A    2005?

 5          Q    Yes.

 6          A    Purged?

 7          Q    Purged.

 8          A    What do you mean?

 9          Q    Do you know what a purge is?

10          A    I do know what a purge is.

11          Q    What is a purge?

12          A    Purge is taking people out of the system.

13          Q    Okay.

14          A    We did not take anyone out of the system.

15          Q    All right.  Between 2004 and 2006 there was a

16   25 percent drop in the number of voters on your list.  Do

17   you know why that would have been?

18          A    Probably inactivated.

19          Q    Inactivated, but not purged?

20          A    That is correct.

21          Q    So, explain to me --

22          A    Duplicate names, duplicate people.  If people

23   register, and they register one number different in their

24   box number or that type of thing, that may become -- you

25   can only have one person, one vote.  So, you have to --
```

1    you eliminate duplicate names, duplicate people.

2        Q    So, you took those names off the list?

3        A    No, inactivated them.  We did not take them off

4    the list, but we only count active voters.

5        Q    So, when the numbers show that there was a

6    significant drop in voters between 2004 and 2006, that is

7    just because the number that was inactive at that point

8    had increased dramatically?

9        A    I don't know.  Without looking at the data I do

10   not know why it changed.

11       Q    But you didn't take any of the names off the

12   list?

13       A    Not to purge from the list.

14       Q    Is there a process that you go through to change

15   someone from active to inactive?

16       A    Yeah, hit a button.

17       Q    You will have to explain that.

18       A    I mean, in the election system it classifies the

19   person.  You can change the classification from active to

20   inactive.

21       Q    And who does that?

22       A    Whoever is operating the computer system.  The

23   voting system I mean, not the computer system.  Either

24   myself or one of the deputies.  Any one of us could have

25   done it.

1     Q     And what would be the criteria that you were

2     using to decide whether --

3     A     If it was determined that that person was an

4     active voter.  And generally it is because they make

5     contact with us.

6     Q     And say that they are active?

7     A     They say that they did not receive a voter

8     registration card, they made contact with us, they have

9     moved back to the area.  Any number of ways.

10     Q     When you are moving someone from the active to

11     the inactive voter list, what criteria do you use to make

12     that decision?

13     A     Generally we get two pieces of mail or two pieces

14     of something back indicating that voter is no longer at

15     that residence or that address, or we receive information

16     from the family saying that person is deceased.

17     Q     Do you keep a record of those contacts or record

18     of the information?

19     A     I believe so.  I believe that information is

20     maintained.  I didn't personally operate the files very

21     often.

22     Q     Who did?

23     A     Chief deputies and deputy clerks.

24     Q     Is that the same process that you used in 2012 to

25     remove people from the active voter list?

1        A     Yes, as far as I know.

2        Q     Would it have been the same, chief deputy and

3    deputies that were doing this?

4        A     Primarily, yes.

5        Q     Who were they in 2012?

6        A     James Francom.  Mr. Francom was chief deputy

7    clerk.  And I am not sure who the other deputies were

8    then.  We went through several after that period of time.

9              The election rolls were in a very separate system

10   from all of our computer system.  It is called VISTA,

11   Voter Information System ran by the State of Utah.  Only

12   certain people have access to that.  I have access, but I

13   very seldom use it.

14       Q     And who are the other folks that have access?

15       A     Mr. Francom.  We usually had at least one other

16   deputy there, could be secretarial staff.

17       Q     And they would look at whether you had received

18   two pieces of mail back that had been addressed to the

19   last known address for the person?

20       A     That is correct.

21             Also, after an election the poll judges often

22   would make notes in our voter registration poll books;

23   this person is deceased or this person is the same as so

24   and so.  You know, a lot of things took place.

25       Q     What kind of work did your office do to check on

1    those notations to see if they were accurate?

2    A    What kind of work?

3    Q    What kind of investigation?  You get a notation

4    back from a poll worker that says so and so, John Begay is

5    the same as John Y. Begay.

6    A    We would look to see if there was comparative

7    information.

8    Q    Where?

9    A    Last four numbers of their Social Security

10   number, birthdates, that type of information.

11   Q    And you have that information?

12   A    We have some of it, yes.

13   Q    Do you have it for everyone?

14   A    Not everyone.  These rolls have been rolled

15   forward for years when we didn't require this type of

16   information.

17   Q    If you had an instance where a poll judge had

18   said John Begay is the same as John R. Begay, but you

19   couldn't find any of that information --

20   A    We wouldn't have changed anything.

21   Q    Okay.  I would like to move forward to the --

22            MR. TRENTADUE:  Good time to take a break?

23            MR. BOOS:  Sure.

24            MR. TRENTADUE:  We've been going for what?

25            MR. BOOS:  An hour or so.  An hour and ten

1    minutes.  Sure.

2              (Recess taken at 10:08 a.m. and back

3              in session at 10:15 a.m.)

4    Q    (BY MR. BOOS:)  I am trying to understand the

5    differences in some terminology that your office used.

6    Prior to 2004 you used the term "registered voters."  And

7    in the 2006 primary you used the term "eligible voters."

8    Then in nearly all other cases you used the term "active

9    voters."  We want to understand whether there is any

10   difference between those three terms.

11   A    I don't think there is any difference, really, in

12   the three terms.  Just various terminologies.

13   Q    But all those refer to active voters?

14   A    Active voters.  Voters who were actively

15   potential voters.  I say potential, voters who have the

16   right to come to the polls appropriately registered to

17   vote.

18   Q    You can have an inactive voter, though, who is

19   eligible, just as long as they --

20   A    As long as they come in and show ID and whatnot.

21        That came about because of federal laws.  They

22   started changing.  You know, you had to have voter ID.

23   You probably found that at your polls when you have gone.

24   Q    I am probably inactive.

25   A    Processes change depending on the laws.  So, the

52

1    terminology also changes the same way.

2        Q    So, there is active and inactive more in the

3    current terminology?

4        A    That is the terminology I currently use, yes.

5        Q    Okay.  I want to talk about the state of things

6    in the school board and commission election districts

7    after the 2010 decennial census.  Have you looked at that

8    data from 2010?

9        A    Probably did, but nothing that didn't change

10   much, I know that.  Our overall population didn't change

11   much.

12       Q    You understand there are three county commission

13   election districts, correct?

14       A    Yes.

15       Q    County commission -- based on the 2010 census,

16   the Native American population in Commission District 3

17   was over 90 percent.  Does that cause you any concern as a

18   clerk auditor or former clerk auditor?

19       A    No.

20       Q    Why not?

21       A    Just doesn't.  That district is primarily Native

22   American.  That is the way it was to be.

23       Q    How so?

24       A    The court's orders.  The previous lawsuit.

25       Q    You will have to explain that a little bit more.

1          A     The original lawsuit.  I call it the original.

2     It is the one back in the '80s --

3          Q     Uh-huh.

4          A     -- and made it so that one of the commission

5     districts was to be heavily weighted Native American.

6          Q     Was it okay for it to be as heavily weighted as

7     it is?

8          A     I couldn't answer that, I don't know.

9          Q     Is it your understanding of the original lawsuit

10    that there was to only be one heavily weighted Navajo

11    Native American district?

12         A     I don't know that.  There was to be one.

13         Q     But there was to be one?

14         A     There was one, that is the only thing I know.

15         Q     In looking at reapportionment issues, have you

16    ever thought that the fact that the Native American

17    population in that district was so high that that needed

18    to be addressed in some way?

19         A     No.  Didn't pay any attention to it.

20         Q     Why not?

21         A     Because it was set up by the court system back in

22    the '80s.

23         Q     What if you learned that it hadn't been set up by

24    the court system?

25         A     I couldn't imagine that, because I didn't learn

54

1    that.

2        Q    Okay.  What if I tell you right now that --

3        A    It wouldn't change my mind.  I don't know.  I

4    haven't seen it.

5        Q    So, you just never looked at those numbers?

6        A    No.  No reason to.

7        Q    I understand that you don't -- you haven't looked

8    at the apportionment of the school district election

9    district very much, but School District 4 and School

10   District 5 are respectively 98 percent and 95 percent

11   Native American.  Does that cause you any concern?

12       A    No.

13       Q    Why not?

14       A    Same reason.

15       Q    What is that?

16       A    The court orders, the process of that previous

17   lawsuit set those up.  I have no reason to change them.

18       Q    You had said that you understood that the

19   original lawsuit required you to keep what is known as the

20   deviation, the difference in population between the

21   different districts to within 5 percent?

22       A    That is what I am recalling.

23       Q    In following the 2010 census the deviation, the

24   overall deviation between the school board election

25   district was over 37 percent.  Did you feel at that time

55

1    that you had any duty to --

2        A    I am not recalling that.

3        Q    So, you didn't look at those numbers?

4        A    I have looked at them, but I am not remembering

5    anything about them.

6        Q    Would it have been your duty to bring them within

7    the 5 percent?

8        A    I don't know if it was within my duty or not.

9        Q    In 2011 did the Utah redistricting commission

10   offer you resources and assistance in doing redistricting?

11       A    I don't remember.

12       Q    So, you didn't take advantage of those?

13       A    No.

14       Q    You did not?

15       A    I did not take advantage of them.

16            MR. TRENTADUE:  His answer was he did not

17   remember.

18            THE WITNESS:  I don't remember the -- I

19   don't remember.

20       Q    (BY MR. BOOS:)  Were you present in November 2011

21   when the commission received a visit from the Navajo

22   Nation Human Rights Commission?

23       A    Probably.  I attended all the commission

24   meetings.

25       Q    Do you remember anything about that particular --

1       A    No, not -- probably need more information to what

2    their presentation was and it might ring a bell.

3       Q    The executive director of the Navajo Human Rights

4    Commission, Leonard Gorman, came and gave a presentation.

5    Do you remember that?

6       A    I remember him.

7       Q    What do you remember?

8       A    He made a presentation regarding redistricting of

9    the commission.  Had the boundaries drawn in a very

10   different way than what the county's current three

11   districts was.

12      Q    How different?

13      A    Very different.  He had split up the voting

14   population in and around Blanding primarily.

15      Q    And what was the result of how he drew the map?

16      A    The result?

17      Q    I mean, what kind of maps did he end up with as a

18   result of that?

19      A    I am not recalling exactly.  It was very

20   different, I remember that.

21      Q    Well, what did you think about what was being

22   proposed at the time?

23      A    I thought it was -- exactly what I thought.  I

24   didn't particularly like the idea.

25      Q    Why not?

57

1    A   Because I thought it messed with the process and

2    the systems, and he didn't follow county precinct lines.

3    Q   What do you mean when you say it messed with the

4    process?

5    A   The precincts are set.  They are geographic

6    areas, and he did not follow those geographic areas.  It

7    is very difficult to run an election except by those

8    geographic areas.

9         I looked at it as a person running an election,

10    the physical process of running an election versus a

11    political process.

12    Q   What do you mean by a political process of

13    running an election?

14    A   Who is elected versus how they are elected.

15    Q   When you say "who is elected," what do you mean?

16    A   The commissioners, where they represent or where

17    they are elected from.

18    Q   Did you see something about Mr. Gorman's

19    presentation that made you think that it had to do more

20    with who was elected?

21    A   I am not sure.  I don't know exactly what you are

22    asking.

23    Q   What else did Mr. Gorman say?

24    A   I don't remember.

25    Q   Did he offer you the assistance of the Navajo

```
 1    Nation in doing reapportioning?

 2        A    Yes, I remember that.

 3        Q    What did he say?

 4        A    I just remember he offered the assistance.

 5        Q    Did you take him up on that offer?

 6        A    I did not.

 7        Q    Did the county commission take him up --

 8        A    I don't think so.

 9        Q    Why not?

10        A    I don't know.

11        Q    Were you interested in getting the assistance

12   from the Navajo Nation?

13        A    No, I wasn't.

14        Q    Why not?

15        A    Didn't feel like we needed it.

16        Q    What was the outcome of that meeting?  Did you do

17   anything with regard to reapportionment following that

18   meeting?

19        A    I did not.

20        Q    Nothing?

21        A    Not that I recall the outcome.  I would have to

22   go back and research.

23             At one point in time the County changed a couple

24   of small precincts, yes.  But I don't know if that is

25   because of his visit or just because we were in the
```

1    process of getting it equalized again.  Is that what --

2        Q    Why don't you explain to me about being in the

3    process and getting them equalized again.

4        A    I am back to the numbers.  Trying to keep the

5    three commission districts with equal numbers, equal

6    population.

7        Q    And that was something you were doing before

8    Mr. Gorman came and visited?

9        A    Yeah, sure.

10       Q    Do you have any records concerning this?

11       A    Not that I know of.

12       Q    When did you start that process?

13       A    I don't remember.

14       Q    Was it in 2010?

15       A    I don't remember.  It is after we got the census

16   numbers.  Probably 2011.

17       Q    Tell me what you got by way of census numbers in

18   2011.

19       A    I don't remember exactly what we got.  It was the

20   total county population, and we were able to get the

21   population based on voting precincts.

22       Q    That is information that came to you from the

23   U.S. census in 2011?

24       A    That is what we were working on on the big maps,

25   to make sure we had the population in the right precinct.

1     Q     Was that information in electronic form?

2     A     I looked at a map.  I don't know.

3     Q     How did you get the information from --

4     A     Mr. Fellmeth got it for me.  I didn't get it, I

5     don't know.

6     Q     Okay.  Tell me about looking at the big maps.

7     What do you mean by that?  What was it you were doing?

8     A     I told you before, we had the census block

9     numbers, census block maps from the census bureau.  Big

10    maps as big as this table (indicating).  And we were

11    working the population trying to make sure we had the

12    right numbers that the census had in the right precinct,

13    county precinct.  See what the numbers were.

14    Q     Okay.  So, tell me about the adjustments that you

15    made to a couple little precincts you called them.

16    A     We had two little precincts out on the west --

17    east side of the county.  One was Ucolo and one was Cedar

18    Point.  A small number of people in each one of them.  We

19    shifted them from Commission District 2 to -- Commission

20    District 1 to Commission District 2 to equalize the

21    population in the three commission districts.  That was

22    the best way to shift it and maintain contiguous precincts

23    in any voting -- or commission district.

24    Q     So, are you saying that prior to doing that the

25    population wasn't equalized?

1    A    It just was shifted off a little bit.

2    Q    By how much, do you recall?

3    A    I don't remember.

4    Q    Enough that you thought that it was --

5    A    Enough that I thought we ought to get it back

6  within the 5 percent.

7    Q    That had nothing to do with Mr. Gorman coming and

8  telling you about that?

9    A    No.

10   Q    When did you actually do that work?

11   A    I can't remember.

12   Q    When you did that work, did you look at any of

13  the issues concerning the racial makeup of the population

14  in the district?

15   A    No.  Racial population has no association with

16  the voting process.  We don't have any data on race in the

17  voting system.

18   Q    So, the census data that you got didn't include

19  any of the population by race figures?

20   A    Not that I know of.

21   Q    Is that something Mr. Fellmeth would know?

22   A    I don't know.

23   Q    But you didn't look at any of that?

24   A    I did not.

25   Q    And you don't know whether you have it?

```
 1       A    I don't.

 2       Q    When you did -- looked at the maps in part of

 3  moving these little precincts in the Eastland, did you use

 4  blocks, census blocks?

 5       A    Not that I remember.

 6       Q    Do you know whether there were any split blocks

 7  in the plan that you came up with after 2011?

 8       A    Not sure what you mean by "split blocks."

 9       Q    Where the census block is split.

10       A    Where they cross our precinct boundaries?

11       Q    Well, that could be.  You need to tell me.

12       A    I don't understand your question.  Sorry.

13       Q    So, you don't know whether you had split blocks?

14       A    I guess not.

15       Q    Who would have done the work of actually drawing

16  the lines?

17       A    What lines?

18       Q    The lines where when you move the two little

19  districts from Eastland.

20       A    I did that.

21       Q    You did that.

22       A    In other words, they were precincts that I moved,

23  not lines.  They were precincts.

24       Q    So, you didn't look at anything else when you

25  redid that map, you just moved those two precincts and
```

1   that is it?

2        A    I moved those two precincts because the

3   population numbers within them would make them more equal

4   for voter representing districts.

5        Q    So, if you had split census blocks somewhere in

6   the plan, it would have just been retained, correct?

7        A    Still not sure what you are referring to by

8   split --

9        Q    You don't know what a split block is at all?

10        A    I do not know what split block is unless it is

11   related to -- divided over the county voting precincts.

12        Q    Is the overall calculation, the electronic stuff,

13   something that you didn't have a hand in at all?  When you

14   were doing these maps --

15        A    Okay.

16        Q    -- did you look at the numbers?  Did you use any

17   kind of computerized system personally?

18        A    I did not.

19        Q    Who would have done that?

20        A    Mr. Fellmeth.

21        Q    Did the county commission or the county attorney

22   or anyone give you any kind of guidelines or criteria or

23   other factors that you were to use in the redistricting?

24        A    No.

25        Q    So, the only thing you were looking at was moving

1    the two small --

2    A   I was trying to keep the commission districts of

3    the same population, but also keeping them contiguous and

4    protecting that third commission district, because I knew

5    it had to stay involved in the reservation.

6    Q   What do you mean by that?

7    A   Back to the original court issuance saying that

8    that third district needed to be a Native American

9    population district.

10    Q   So, what does that mean in terms of you moving

11    them?

12    A   Didn't mean anything.

13    Q   But it means you didn't want to touch that; is

14    that what you are saying?

15    A   I wasn't going to touch it.  And, also, I

16    wouldn't have done, because the population in those voting

17    precincts were too big.  It would have shifted something

18    out of balance.

19    Q   How so?

20    A   Too many people.  Too much population would have

21    been moved to keep it within the boundary of the -- the

22    5 percent boundary.  5 percent.  There were more people in

23    those voting precincts.  The numbers wouldn't crunch.

24    Q   Did you personally try crunching the numbers?

25    A   Yes, I did.  I did them.

1       Q       Did you use a computerized system in doing that?

2       A       No, I used a calculator.

3       Q       A calculator?

4       A       Yeah.

5       Q       That is sort of a computer.

6               Did you keep any worksheets or rough drafts of

7       the calculations you were doing?

8       A       I probably did.  I didn't personally keep them.

9       Q       Do you know where they are?

10      A       They would have been in the binders that we had

11      on the elections and on the census and stuff like that.  I

12      don't know.  They were made accessible to anybody that

13      wanted to look at them.  They were not -- they were a

14      public document.

15      Q       So, if we wanted to look at any of the -- talk to

16      someone about the electronic software that was used during

17      this process, if any, that would only be Mr. Fellmeth that

18      would know?

19      A       I believe so.

20      Q       Did you make use of any other assistance in doing

21      the redistricting or was it all an in-house thing here?

22      A       All in-house.

23      Q       So, you didn't use any multi-county agencies,

24      Utah Association of Counties, something like that?

25      A       No.

66

```
1      Q    Didn't contact the governor's office?
2      A    No.
3      Q    Or the lieutenant governor's office?
4      A    No, not in that matter.
5      Q    So, you did have the 2010 census data, correct?
6      A    Yes.
7           MR. TRENTADUE:  I am going to object to
8    that.  I don't know that he necessarily testified to
9    exactly what he has with the 2010 census data.
10     Q    (BY MR. BOOS:)  Okay.  Tell me.  What did you
11   have in the way of 2010 --
12     A    I don't remember.  We knew what the population of
13   San Juan County was.
14     Q    Well, how did you know that?
15     A    It is given to us.
16     Q    From who?
17     A    The census people, I guess.  I don't remember.
18   Seems like Mr. Bailey gave me the number and told me what
19   the total population was.
20     Q    And you apparently have the data for the
21   individual precincts?
22     A    Yes.  At some point, some place, yes.
23     Q    Is it possible that it came to you from someplace
24   other than the census?
25     A    Not that I know of.
```

1    Q    So, it is very likely that it came from the

2    census?

3    A    It is possible.  I don't know.  I don't remember.

4    Q    Okay.  Between 2012 and 2014 there was a

5    significant drop in the number of voters by approximately

6    17 percent.  Do you know why that might have been?

7    A    No.  I am wondering if it -- I am only wondering,

8    because I don't know without trying to go back and looking

9    at the way people voted and stuff.  I don't remember.

10        There was a very large push at one point in time

11   by the State of Utah to make sure everybody was reporting

12   our voting percentages the same, and making sure everybody

13   was voting -- reporting their voting percentages based on

14   active voters, not on total registered votes.  That is

15   where the active and inactive came into play.  That may

16   have been that period of time the way it is reported.  I

17   don't know.

18   Q    Let's talk about your decision in 2014 to change

19   to an all mail-in ballot system.  When did you make that

20   decision?

21   A    We started working on it a year or year and a

22   half before we did it.  We actually went through a test

23   process.  The City of Monticello was holding -- we call it

24   an off-year election, but it is a municipal election year.

25   And they were interested in trying it.  So we said, hey,

1    let us get involved with it, because we have been thinking

2    about it.  So, we ran the election in Monticello for them

3    to see how it worked, make sure we could answer questions.

4    And it went as we anticipated it would.  That was the year

5    prior.

6         Q    So, that would have been 2013?

7         A    Probably.  If I get my years correct, yes.

8         Q    Did you go to the county commission with those

9    results?

10        A    We did.  We told them -- I want to say January.

11   We told them what the results had been in Monticello.

12   Showed a highly significant increase in the voter

13   participation, doubled.  Explained to them what we had

14   done, how we had been involved, and basically we requested

15   their blessing.

16             I should say we requested their permission, but

17   the clerk runs the election, the commission doesn't.  So,

18   it was my choice.  It wasn't the commission's choice.  I

19   told them that is what I wanted to do.  Told them I felt

20   like it would probably save some money, but certainly

21   would be even, but that there would be some challenges.

22   We would work through those challenges.

23        Q    What kind of challenges did you identify at that

24   point?

25        A    Informational challenges was one of the big ones.

1    Making sure people understood what we were doing, the

2    process.  We spent a lot of money, a lot of time

3    advertising on the radio and stuff to make sure that the

4    people knew these things were happening.  We sent out an

5    advanced mailing to every registered voter.

6        Q    By "registered voter," now you are --

7        A    Registered voters.

8        Q    You mean active or inactive?

9        A    I can't remember if we sent them to the active

10   and inactive or just the active.  I don't remember.  I

11   know we sent out thousands.

12       Q    When you were going through the process of

13   deciding whether to go to a mail-in ballot, did you

14   involve anyone else in that analysis?

15       A    By anyone else, I mean, my staff, myself,

16   Mr. Tapaha.  We talked -- I talked with a lot of the other

17   county clerk auditors across the state whom had already

18   done this.  The input was -- there was a lot of input, a

19   lot of study done, but mostly it was on my part.

20       Q    When you say you contacted other clerk auditors,

21   were any of those clerk auditors in counties that had

22   reservations or reservation populations?

23       A    Probably, but I don't know.  It wasn't done on

24   a -- it was a voting process.

25       Q    What do you mean by that?

1    A    A voting process.  I mean, you are running an

2    election.  You don't look at race and stuff, you are

3    looking at voters.

4    Q    Well, would you agree that running an election in

5    Monticello for a city council is probably different than

6    running an election at Navajo Mountain?

7    A    Oh, yes.

8    Q    Okay.  Did you take that into consideration?

9    A    Oh, yes, definitely did.

10    Q    How?

11    A    By talking to Mr. Tapaha and having him talk

12    around to the senior programs and senior citizens and

13    asking what they thought about it.  In reporting back most

14    of the people liked it, liked the idea.  Thought it would

15    make it easier for them.

16         There are a couple other counties that have

17    Native American or reservations in and around their

18    counties, but they had already been doing by-mail voting

19    for some of those folks for years.  We have been doing it

20    for years here in San Juan County to the Ute reservation.

21    It has been by mail for years.

22    Q    To the Ute reservation, do you mean the community

23    at --

24    A    White Mesa.

25    Q    And what kind of results did you have with

1    mail-in --

2    A    Doubled the participation.  That is what --

3    Q    Do you have records on that?

4    A    I would have to dig them out.  I do not.  It was

5    such small numbers, 17 to 35.  You are not dealing with

6    large numbers, but a vote is a vote.

7           I think 11 counties that went by mail out of the

8    29.  Maybe 11, something like that.

9    Q    You said some of the clerk auditors had

10    reservations in their county.  Did you pick up any of the

11    data --

12    A    No.

13    Q    So, you don't --

14    A    Not that I recall.

15    Q    The mailing that you sent out to -- and I assume

16    this was to all -- only active voters, correct?

17    A    I can't remember if it was all active or

18    everybody was registered in the system.  I can't remember.

19    Q    The mailings that you sent out that explained the

20    new mail-in ballot election system, were those in English

21    only?

22    A    They were in English only, yes.

23    Q    How did you think that the system was going to

24    work on the reservation, the Navajo reservation?

25    A    We thought it would actually improve the voter

1    turnout, make it easier for those folks to vote.

2    Q   Why?

3    A   Because, again, the time and distance.  They

4    would have the ballot in hand, have the ballot at home and

5    talk to folks about it for several days, instead of just

6    going to the polls and that is the first time they saw the

7    ballot, the first time they -- it is not always the first

8    time that we presented them.  Posted ballots are out.

9    Q   So, prior to that, before you created the mail-in

10    ballot system, you provided no information --

11    A   No, no, no.  We always provided information.

12    Q   Prior to the election?

13    A   Yes.

14    Q   And so in prior elections before you had the

15    mail-in ballot people would have had a way of --

16    A   Those that wanted -- that attend the senior

17    programs, came to the chapter meetings.  There was

18    explanations offered, yes.

19    Q   So, it isn't quite right to say they would have

20    showed up at the polls on the day of election and they

21    would have seen it for the first time?

22    A   No, that is inaccurate.

23    Q   Okay.

24    A   But they would have had a longer time to have a

25    ballot in their hand to look at it.

73

1    Q    Typically when -- prior to the mail-in ballot

2    system, when did you send out information to these

3    communities about the election?

4    A    It would start about a month or so in advance.

5    Mr. Tapaha would -- we would sit down and make a schedule

6    so that we covered all the chapters, all the senior

7    centers and that type of thing.  A month or so in advance.

8    Q    So, they would have -- it sounds like they would

9    have had the same kind of information in either system

10   about --

11   A    If they would have gone to those locations where

12   the training was at.  How many of them went to those

13   trainings, I don't know.

14   Q    Take a look at Plaintiff's Exhibit 5.

15        (Exhibit 5 marked for identification.)

16   Q    (BY MR. BOOS:)  This is an e-mail string between

17   you and Bill Fuhrmann from June 2nd, 2014 to June 16th,

18   2014.  If you look at the second page, the end of the

19   paragraph, you make a statement, "We are so very excited.

20   It seemed to solve all ADA problems and in our case using

21   Interpreters at the Polls."  What do you mean by that?

22   A    Several of our polling locations on the

23   reservations we were using chapter houses.  These chapter

24   houses are not ADA compliant.  They are not in compliance

25   with the federal ADA guidelines.  And we didn't own them,

74

```
 1    we couldn't solve the problem.  We did what we could, but
 2    we couldn't solve the problem.  And by going by mail it
 3    eliminates the ADA question, because the people are able
 4    to solve that themselves.  They don't have to get a
 5    wheelchair over a ramp or something.
 6         Q    Had you had any ADA complaints about using
 7    chapter houses in the past?
 8         A    Yes.
 9         Q    Formal complaints?
10         A    Formal complaints.
11         Q    Do you have copies of them?
12         A    They would be downstairs somewhere.  There was a
13    polling location by polling location audit done by some
14    organization from the State of Utah about the state --
15    private.  Anyway, an ADA compliance organization.  And
16    they send us a polling location by polling location list
17    of our problems.
18         Q    Did you have any formal complaints by people
19    trying to --
20         A    No.
21         Q    -- vote?
22         A    No.  Not formal.
23         Q    So, the only thing you had was this audit saying,
24    what, the chapter houses were not in compliance?
25         A    Primarily it was the chapter locations.  There
```

1    were some others that had problems.  Primarily the chapter

2    houses.

3         Q    You also mentioned that interpreters had been a

4    problem that were solved by the mail-in ballot process.

5    What did you mean by that?

6         A    By that I meant that the -- the interpreters

7    wasn't the problem, but the problem of interpretation was

8    shifted to family members or trusted friends by folks who

9    didn't speak English as well or at all to help understand

10   the verbiage on the ballot, and accurately understand it

11   pertaining to their local understanding, their local

12   words.

13        Q    What do you mean by their "local words"?

14        A    There is many dialects on the Navajo Reservation.

15   A word may mean something on the western side that isn't

16   the same as the eastern side.  And so the local people

17   could respond in their own local -- the same as we in

18   San Juan County talk a whole lot different than those in

19   Oklahoma or those in Boston.  The same thing occurs on the

20   Navajo Reservation.

21        Q    So, are you saying that the folks at the Navajo

22   Mountain speak a dialect of Navajo than the folks in

23   Aneth?

24        A    I think they kind of do, but I don't know a lot

25   about it.  I don't speak Navajo.  Mr. Tapaha will be able

 1    to clear that up.

 2        Q    You have --

 3        A    We would teach our interpreters all the same way,

 4    but the way they use a word may be different than the way

 5    the person coming in would understand the word.

 6        Q    Did you ever have any issues come up like that?

 7        A    Not that I know of.  Not that I recall.

 8        Q    You sent out what are called voter ID cards prior

 9    to the mail-in ballot, right?

10        A    About a year in advance, as I recall.

11        Q    Do you remember exactly when you sent them out?

12        A    I don't.  I am wanting to say the fall.

13        Q    Do you think it was in September of 2013?

14        A    Could be, yeah, around that date.

15        Q    Were those sent out only in English?

16        A    Yes, they were all in English.

17        Q    Why?

18        A    Because that is the printed language.

19        Q    Were they sent to only active voters or

20    inactive --

21        A    I do not remember.

22        Q    How many were returned?

23        A    I don't remember exactly.  Several hundred

24    across the county.  I mean, percentages weren't any

25    different in one area over another.

1     Q     What do you mean?

2     A     2- or 300.  I mean, the number returned for

3    Blanding was not a whole lot different percentage-wise

4    than the number returned from the reservation.

5     Q     When the voter ID cards were returned, did your

6    office take any follow-up action on it?

7     A     Absolutely.  Every single card we tried to

8    identify and find out why it was returned to us.

9     Q     Did you keep a log of those actions?

10     A     I don't know.  I didn't personally do it.

11     Q     Who personally did it?

12     A     Mr. Francom and staff.

13     Q     If you weren't able to do any kind of a

14    verification following your getting those voter ID cards

15    back, at that point did you remove names from the list of

16    registered voters or active voters?

17     A     We may have inactivated them, but did not remove

18    them.

19     Q     So, you would have moved them from an active list

20    to an inactive?

21     A     Didn't remove them, we changed them to an

22    inactive status, because we couldn't prove that they were

23    still a valid voter in San Juan County.  But they are

24    still a registered voter.

25     Q     After you sent out the voter ID cards, as I

1    understand it the next step was to send out address

2    confirmation cards; is that right?

3         A    I believe that is what happened.

4         Q    When was that relative --

5         A    I don't know.  I don't remember.

6         Q    Tell me what the process was for sending out the

7    address confirmation card.

8         A    I don't know.  I didn't do it.

9         Q    Who was responsible for that?

10        A    Mr. Francom.

11        Q    Do you know whether those cards were only sent

12   out in English?

13        A    I am sure they were all in English.  We use --

14   yeah.  Most Navajos don't read Navajo.

15        Q    Based on?

16        A    My opinion.

17        Q    Okay.

18        A    Only my opinion.

19        Q    When were the voter information packets sent out?

20        A    By the State?

21        Q    By you.

22        A    I don't send out voter information packets.  The

23   State sends them out.

24        Q    Okay.  Do you know when they were sent out?

25        A    I don't exactly.

1    Q    Was that in 2013 or 2014?

2    A    2014, the election year.  Probably three to four

3    weeks in advance of the election is when the State sends

4    out the voter information packet.

5    Q    When those packets went out, was that the first

6    notice that voters got that you would only be using vote

7    by mail --

8    A    No, we sent out a mailing in advance of that.  We

9    send out an individual mailing.  I don't remember just

10   when, but several months before the election process,

11   telling them what was going to happen and how it was going

12   to happen and what they could expect.

13   Q    You don't know when that was sent out?

14   A    I don't remember.  I want to say March, but --

15   February or March.

16   Q    Do you know how many of those notices came back?

17   A    I do not.

18   Q    You didn't keep any record?

19   A    I didn't keep record.

20   Q    When you got those letters back concerning the

21   mail-in ballot process, did that lead to you taking any --

22   moving any names from the active voter list to the

23   inactive list?

24   A    I don't know.  It may have been one piece of

25   evidence.  Usually had to have two in order to change

1     their status.

2          Q     Was that a hard rule, that you had to have two

3     pieces of evidence?

4          A     I think that is federal.  There is federal

5     guidelines for that.

6          Q     But was that a hard rule for your office, that

7     you had to have two pieces of evidence?

8          A     For me personally it is.  That evidence may not

9     always be in writing.

10               I need to just look at a number.  I got my phone

11    buzzing at me.  Not important.  They can wait.

12         Q     On February 13th, 2014, did you publish a notice

13    about the general election in the Navajo Times?

14         A     Probably.

15         Q     Do you remember anything about --

16         A     Whatever I published in the Navajo Times, yes.

17         Q     Did the notice contain any information about

18    changing to a vote-by-mail system?

19         A     I don't remember without seeing the notice.  I

20    don't remember.  Lots of notices, lots of legal things

21    have to take place to run an election.  May have done it,

22    I don't remember.

23         Q     In May 28th, a San Juan Record article, you were

24    quoted as saying you had a large stack of voter

25    identification cards, letters returned to you, but you

1     were able to clear up the entire list.  How did you go

2     about doing that?

3          A     That is just what we've been talking about.

4     Those voter ID cards.  We went through them one by one and

5     attempted to find out what was -- why they were returned

6     to us.  In many cases Mr. Tapaha took them and physically

7     went and looked at them.

8          Q     What did he do when he looked at them?

9          A     I don't know what he did.  He was trying to

10    locate these people, identify who they were.

11                MR. TRENTADUE:  When you said physically

12    look at, what do you mean?

13                THE WITNESS:  Physically had the card in his

14    hand to look at it and find out who it is.  He knows most

15    of those people much like I know all the people in

16    Blanding pretty much to identify.

17         Q     (BY MR. BOOS:)  So, he wasn't basing it on

18    getting two pieces of documentary evidence?

19         A     No, he was not.

20         Q     He was just looking at --

21         A     He was trying to identify that particular card

22    and why it was returned to us.

23         Q     So, he might have looked at a card, held a card

24    in front of his face and said, "Oh, John R. Begay from

25    Aneth, he is dead"?

1       A     Could have been, I guess, I don't know.

2       Q     Did you keep a record of that process?

3       A     I don't know.

4       Q     Was there any record of how he made his --

5    Mr. Tapaha made his decision?

6       A     I don't know.  You will have to ask Mr. Francom,

7    I don't know.

8       Q     Let's talk about the primary of June 3rd, 2014.

9    Were all the ballots mailed to voters by June 3rd?

10      A     I believe so.  Unless they registered afterward.

11      Q     Did you have ballots that were returned prior to

12   the cut-off date of June 23rd?

13      A     Returned as in --

14      Q     Undeliverable.

15      A     Undeliverable, yes.

16      Q     What did you do with them?

17      A     Same process.  We looked at every individual

18   ballot and tried to find out why it was returned; have the

19   people moved, have they deceased.

20      Q     It is our understanding that ballots had to be

21   postmarked by June 23rd to be valid.

22      A     As I recall, those are the dates.  That is

23   correct.  I think they have to be postmarked the day

24   before the election.

25      Q     Why?

1      A      That is State law.

2      Q      What would you have done with a ballot that was

3   postmarked by that date but received after June 24th?

4      A      Help me understand your question.

5      Q      So, let's say you get a ballot back --

6      A      A live ballot.

7      Q      You get a ballot back on July 4th.

8      A      Okay.

9      Q      But it is postmarked June 23rd.

10     A      We would count it.

11     Q      You would count it?

12     A      Yeah.  Anything that comes in prior to the canvas

13   of the election, which is held two weeks later, would have

14   been counted.

15     Q      And what would you have done with a ballot that

16   was postmarked by June 23rd but received after the canvas?

17     A      It would have just ended up in the batch of stuff

18   to be boxed up on the election.  Can't go back and add it

19   in.  The election is over.  The canvas closes that

20   election.

21     Q      Do you know on the day of the election on

22   June 24th, did anyone show up at the formerly live polling

23   locations?

24     A      I don't know.  Not that I know of, but I don't

25   know.  We didn't have anybody there.

1    Q    Did any Navajo person come in and vote here at

2    this building in Monticello?

3    A    Not that I recall.  I am thinking we did have

4    some come in, but I am not -- just kind of ringing a bell

5    to me we did have some come in or brought their ballots

6    in, dropped them by as they were leaving town or whatever.

7    Q    Sounds like you don't have any distinct

8    recollection?

9    A    Yeah, not distinct recollection of specifics.

10   Q    Did you have any inactive voters show up on the

11   day of June 24th and --

12   A    No, not that I recall.

13   Q    There were some issues concerning the validity of

14   signatures on ballots.  Who made the determination of

15   whether signatures were valid or not?

16   A    Ultimately I did.

17   Q    In all cases?

18   A    Uh-huh.

19            MR. TRENTADUE:  You have to say "yes."  She

20   can't spell that either.

21            THE WITNESS:  Yes.

22   Q    (BY MR. BOOS:)  Why don't you explain the process

23   to me.

24   A    Most of it is a visual process.  We have in the

25   election system people's signatures when they registered

1    to vote, and we could compare that signature with the

2    signature on the voter ballot envelope.  And if there is

3    any similarity then you can tell it is a valid signature.

4    Any little part of it can make it a valid signature.

5            Also, age becomes a factor.  If the signature is

6    way different, but you can tell this person has got a

7    medical problem because of the way it is shaky, I would

8    always err on the side of the voter, always.

9    Q    If you had a question about the validity of a

10   signature, did you contact the voter?

11   A    We tried if it came in early enough that we even

12   had a chance to do that.  Because we had ballots coming in

13   for two weeks prior to the election.  We started running

14   and processing those ballots.

15   Q    Was there some date by which you cut off

16   contacting the voters about the signature?

17   A    No, just a day or so before we wouldn't have a

18   chance to contact.

19   Q    So, say if a ballot came in on June 23rd and you

20   had a question about a signature, you would not have

21   contacted the voter at that point?

22   A    We would have tried if it was reasonably

23   possible.

24   Q    Okay.  Did you contact any of the voters?

25   A    No, I don't think we had any.  And if we did not

86

1    have a signature on file, just second guessing, then we

2    would have assumed -- assume again, err on the side of the

3    voter that that was their signature.  And then we would

4    put it on file, which would help with the next election.

5        Q    The canvas was held on July 7th, 2014.

6        A    Two weeks, whatever that -- yeah.

7        Q    You reported to the commission that the number of

8    votes counted was 1,017.

9        A    Okay.

10       Q    Is that the same as the number of ballots that

11   were actually received by the County and eventually

12   validated?

13       A    As far as I know.  Without the numbers in front

14   of me, I don't --

15       Q    You don't have access to those numbers?

16       A    I don't have access to those numbers.

17       Q    Would you happen to know how many were cast but

18   not counted?

19       A    I do not.  But I am -- there is a number floating

20   around in my head, but I am thinking it was 35 or

21   something like that that were not counted for various

22   reasons.

23       Q    Do you know how many ballots were returned as

24   undeliverable?

25       A    I do not.

87

1      Q   If you received a ballot back as being

2  undeliverable, and you got it before June 23rd, did you do

3  anything to follow up on that?

4      A   The best we could.

5      Q   Which means what?

6      A   Which means Mr. Tapaha would take them

7  physically, try to relocate those people if he knew where

8  they were.  Because this election that we are referring

9  to, this primary, was all ran on the reservation.  It was

10  a school board election.

11      Q   Did you keep any records of what undeliverable

12  ballots he took?

13      A   I am sure there were.

14      Q   In the general election on August 7, 2014, did

15  you remove the names of any active voters from the active

16  voter list after that date?

17            MR. TRENTADUE:  "Remove"?

18      Q   (BY MR. BOOS:)  Move from active to inactive.

19      A   Not that I recall.  After the election is over,

20  it is over.

21      Q   For the October 1st, 2014 general election, there

22  was a notice that was placed on the county clerk's website

23  saying that there would be no early voting locations.

24  When was the decision made to cancel early voting?

25      A   There was never a decision to cancel early

1    voting.  There is no need for early voting if everybody

2    has their ballot in their hand.

3         Q    Okay.  So, basically the mail-in ballots

4    became --

5         A    The mail-in ballots automatically -- they would

6    start sending the ballots to us whenever they open them

7    and send them in.  There is always an early voting

8    location.  The clerk's office can always function as an

9    early voting location.  People would bring their ballot

10   here, sit down there and mark it.

11        Q    You had received an e-mail from Carr Printing

12   after the November general election saying that you had an

13   unusually high number of ballots with bad addresses.

14   Ordinarily it was about 1 or 2 percent, this time it was

15   8 percent.  Do you have any understanding of why you would

16   have had such an increase in the number of bad addresses

17   for the general election?

18        A    Yeah, but the post office changed their

19   procedures.

20        Q    How so?

21        A    They do something with their numbers.  I don't

22   know.  They have a process that they go through to

23   validate addresses or something.  I do not know the postal

24   system.  And even though it showed bad addresses, they are

25   still -- they got delivered when they got to the local

1    location.  I can't answer that.

2        Q    How many ballots were returned to you as

3    undeliverable in the general election?

4        A    I do not remember.

5        Q    If you got a ballot in the general election that

6    was returned as undeliverable, what did you do?

7        A    Same process.

8        Q    Same process?

9        A    Tried to individually find out why, send it back

10   out, get a new address, re-verify.

11       Q    And that is something that would have been handed

12   off to Mr. Tapaha to do?

13       A    Not always.  I mean, this general election was

14   county-wide.  So, I handled some, other staff handled

15   some.

16       Q    Who would have handled the ones on the Navajo

17   reservation?

18       A    Mr. Tapaha.

19       Q    So, on the date of the general election, or a

20   week or so prior to that, Mr. Tapaha would have been

21   running around being the only person providing voter

22   assistance and checking on the undeliverable ballots?

23       A    As much as possible, yes.

24       Q    Were you aware that some ballots were returned to

25   your office as undeliverable as late as February 28, 2015?

1    A    Rings a bell some of them would come back, post

2    office would send them back, yes.  Don't know if they were

3    from the reservation, I just remember that there were

4    some.

5    Q    Do you know who Sherry Swensen is?

6    A    Yes, county clerk in Salt Lake County.

7    Q    Did you ever talk to her about reapportionment

8    issues?

9    A    No.

10    Q    Did you ever talk to her about any other issues

11    concerning elections?

12    A    Just friendly conversation.  We talked about her

13    having to have Spanish ballots and stuff.  Just friendly

14    conversation.  Fellow clerk.

15         MR. BOOS:  Can we take a short break.  We

16    want to discuss whether there is anything else we want to

17    ask.

18         MR. TRENTADUE:  That is fine.

19         (Recess taken at 11:14 a.m. and

20         back in session at 11:26 a.m.)

21    Q    (BY MR. BOOS:)  Just a couple more questions.  Do

22    you happen to know where Rick Bailey is hanging out these

23    days?

24    A    He works in Moab.  He is their Grand County

25    Emergency Services Director, I believe.  Works out of the

1    sheriff's office up there.

2    Q   And Mr. Fellmeth, do you know where he is these

3    days?

4    A   He is here.  Still with the County.  I think he

5    is still a chief deputy auditor.

6             MR. BOOS:  That is it.  That is all we have.

7             MR. TRENTADUE:  I have a couple questions.

8                      EXAMINATION

9    BY MR. TRENTADUE:

10    Q   Mr. Johnson, you were asked a lot of questions

11    about the drop off in voter turnout between the 2012 and

12    2014 election.  Do you recall those questions?

13    A   Yes.

14    Q   Was 2012 a national election?

15    A   Yes.

16    Q   Was 2014 a -- wasn't a national election, was it?

17    A   No, it was local.

18    Q   In your experience is there typically a drop off

19    between national elections and local?

20    A   Huge.  Yeah, a very large percentage of change.

21    Q   Is it fair to say more people turn out for the

22    national elections?

23    A   Oh, yeah.  Presidential years are always big.

24    Q   And so the drop off would have been county-wide?

25    A   County-wide.

92

```
1        Q    Is it your understanding that -- we're talking
2   about District 3, and that is the one that is primarily --
3   there is a County Commission District 3 made up primarily
4   of members of the Navajo Nation?
5        A    Yes.
6        Q    And is it your understanding that was created by
7   a court order?
8        A    Yes.
9        Q    Was it your understanding that was also created
10  by an order of the federal government?
11       A    Yes.
12       Q    What is your understanding about your ability to
13  modify or change the boundaries of District 3 and
14  redistrict?
15       A    I was always under the impression I didn't have
16  any control over that.  It was set in concrete by the
17  lawsuit.
18       Q    And so when you did the redistricting in 2011,
19  you adjusted precincts in Districts 1 and 2 and didn't
20  touch District 3?
21       A    That is correct.
22       Q    You had gave some interesting testimony about the
23  federal government's monitoring of the county elections.
24       A    Yes.
25       Q    Did you ever receive any complaints from the
```

1     federal monitors?

2          A     No complaints.

3          Q     We talked a lot about vote-by-mail.  I take it --

4     let me ask you this:  Did you start the notification about

5     the vote-by-mail in advance of the election?

6          A     Yes.

7          Q     Well in advance?

8          A     Well in advance.  At least start talking about it

9     well over a year in advance.

10          Q     You mentioned radio ads.  Did you do any on

11    Navajo language stations?

12          A     Yes.  We -- in fact, we historically spend 1200

13    to $2,000 on Navajo interp- -- Navajo ads.  And prior to

14    this election we spent almost $12,000.

15          Q     And what was the purpose of the ads?

16          A     To educate the Native American in Native

17    American, in Navajo.  Mr. Tapaha prepared those ads.

18          Q     And they concerned going to voting by mail?

19          A     Going to voting by mail and how to proceed with

20    the voting.

21          Q     Prior to the voting by mail, was there any kind

22    of effort to register voters in District 3 of the Navajo

23    district?

24          A     Any time before an election we have registration

25    drives is what we call them in which we have -- make an

94

1    effort to register people to vote.  Mr. Tapaha primarily
2    would handle that on the reservation.  He would go from
3    location to location and set up -- call it a booth, but it
4    is his pickup.  He would set up a sign and indicate to
5    register here and try to get the people registered to
6    vote.  He would also attend any place where there was a
7    larger gathering; fairs, rodeos.  Any time there was a
8    larger gathering of people he would go and act as a
9    registration person.
10       Q    There was some testimony about Navajo elections,
11   the Nation's elections.  Are they held on the same date as
12   the county national elections?
13       A    Generally that is the case, yes.
14       Q    And these are the same polling booths?
15       A    Most of them share the same polling locations and
16   we share polling booths.
17       Q    Did you have any input from or contact with the
18   Navajo Election Administration about going to voting by
19   mail?
20       A    Not in writing.  Most of it was verbal.  But I
21   communicated with the Navajo Nation election's office on
22   several occasions.
23       Q    And can you give me the name of the person you
24   primarily contacted over there?
25       A    Edison Wauneka and -- his deputy's name just left

1    me.  Kimmeth Yazzie.

2        Q    Do you know Mr. Wauneka's title or position with

3    the Navajo Election Administration?

4        A    At the time I believe he was the department head.

5    He was the director of elections or Kimmeth Yazzie was an

6    outreach chief or something like that.

7        Q    Is it fair to say that you kept Mr. Wauneka

8    advised about what you were doing?

9        A    They were well -- kept them aware that what we

10   intended to do.  We attended meetings together and talked

11   with them on the phone.

12       Q    Did you get any feedback from Mr. Wauneka or the

13   Navajo Election Administration that they approved voting

14   by mail?

15       A    I don't know if they approved it, but they

16   liked -- seemed to me that they liked our concept and our

17   reasoning.  Seemed reasonable to them.  And they certainly

18   liked the results after the election.  They liked the

19   participation results we had.

20       Q    Mr. Wauneka told you that?

21       A    I can't remember if he directly told me that.  I

22   just don't remember.  I certainly left with the impression

23   that they were impressed with the results.

24       Q    And let's talk about the results.  Exhibit 5

25   indicates you had a 54 percent turnout in that primary

1     election with the vote-by-mail?

2         A     Yes.

3         Q     And that prior to that time it had been roughly

4     25 percent?

5         A     Yes, we doubled.  We doubled our turnout.  That

6     is historically what has occurred in vote-by-mail the

7     first time.  The participation, it increases.  It falls

8     off after a period of time because people get complacent

9     again.

10        Q     Let's talk a little bit about San Juan County.

11    The 2010 census was approximately, what, 14,475 voters?

12        A     Somewhere in that neighborhood.

13        Q     And the square miles of San Juan County?

14        A     Square miles, like 8100, 8,100-and-some-odd

15    square miles.

16        Q     Acreage?

17        A     Oh, goodness, got to be upwards of 6- to

18    7-million acres.

19        Q     And what percentage of the people in San Juan

20    County actually have a street address?

21        A     Only the people in Blanding, so I would say 3,000

22    out of the 14,000.  That is going to be -- not very good

23    at math.  Here I am an accountant.  20 percent, 25 percent

24    at the most have a street address.

25        Q     How do the other people receive their mail?

1      A    Post office box.

2      Q    I can't remember if I asked you this.  Do you

3   have an understanding as to whether or not the school

4   board election districts were also set by a consent

5   decree?

6      A    I was always under the impression they were set

7   by that consent decree.

8      Q    Or a consent decree?

9      A    Or a consent decree.

10      Q    And what is your understanding about your ability

11   to modify school board districts?

12      A    I don't believe I had the authority or the

13   ability to modify anything outside of that legal

14   determination.

15                  MR. TRENTADUE:  No further questions.

16                          FURTHER EXAMINATION

17   BY MR. BOOS:

18      Q    Let's go to the 2014 national election issue.

19   The question that I asked you before was whether there had

20   been not a drop in turnout, but a number of the active

21   voters between 2012 and 2014.  There is a difference

22   between turnout and active voters, correct?

23      A    Yes.

24      Q    What is the difference?

25      A    Turnout is the number of voting.  Active voters

1   is the number of people who could vote.

2       Q    So, is there any reason why you would connect the

3   drop in active voters to a national election?

4       A    The only reason I am thinking is that period of

5   time when the State wanted us to start reporting based on

6   active voters.  And I was wondering if that has a bearing

7   on that fact.

8       Q    Whether there was a national election or not

9   wouldn't have had any bearing?

10      A    Yeah, I don't know.

11      Q    You said you spent $12,000 on ads to KTNN, the

12  Navajo --

13      A    KTNN and there was one other.  There is two

14  Native American stations.  One out of Farmington, one out

15  of -- maybe they are both out of Farmington.  Maybe one

16  out of Window Rock.

17      Q    And KTNX is --

18      A    Window Rock.  And there is one out of Farmington,

19  too.  Yeah, I don't know the call numbers.

20      Q    Were those ads in Navajo or English?

21      A    Navajo.

22      Q    Did you keep copies of the ads?

23      A    Yes, we did.  I don't have them, but they are

24  available I am sure.

25      Q    Okay.  When did you start those ads?

99

```
 1          A    I don't remember.

 2          Q    Do you think you started them after June 2nd?

 3          A    No, no, before.  I have a feeling they started --

 4    we started different ads.  There were some back, I am

 5    thinking, in March, April.  The majority of them would

 6    have been about the same time as the ballots went out.

 7    But they would have started some before that.

 8          Q    Would you have invoices showing that you made --

 9          A    There would be invoices showing that.

10          Q    And the invoices would show that you started the

11    ads prior --

12          A    They would show when they were started, I am

13    sure, yeah.

14               MR. BOOS:  I don't have any other questions.

15    Thank you.

16               MR. TRENTADUE:  A couple more.

17                    FURTHER EXAMINATION

18    BY MR. TRENTADUE:

19          Q    There was some testimony about the voter

20    information packages, or packets you call them.  Who sends

21    those?

22          A    State of Utah.

23          Q    And what is in them?

24          A    Everything related to the candidates; voting

25    processes, procedures, explanation of any proposals or
```

1    propositions, who to contact to register to vote.

2        Q    Again, the State sends those?

3        A    The State sends those.  The lieutenant governor's

4    office sends those out.

5        Q    If a person doesn't vote for a number of

6    elections, is there a process where they are moved to

7    inactive status?

8        A    I believe the State system does that

9    automatically if they don't vote in two presidential

10   elections or two general elections, I don't know.  It is a

11   State system that we operate with.

12       Q    And the State does that?

13       A    The State does it automatically.

14                MR. BOOS:  No further questions.

15                We're done then.  Thank you.

16                THE REPORTER:  Would you like to ask the

17   witness whether he would like to read and sign the

18   deposition.

19                MR. BOOS:  Would you like to read and sign

20   the transcript of your deposition?

21                THE WITNESS:  I think it would be wise.

22                MR. TRENTADUE:  It would be wise.

23                MR. BOOS:  Always make sure they got to

24   right.

25                THE WITNESS:  I trust the court reporter.
                    (Deposition concluded at 11:30 a.m.)

1                     SIGNATURE OF WITNESS

2

3          I, **NORMAN JOHNSON**, hereby certify that I have

4    read the foregoing transcript of my deposition taken on

5    the 23rd day of June 2015, and that I have listed all

6    corrections thereto on the following page herein.  Except

7    for said corrections, it is a true and correct copy of my

8    testimony given on that day.

9

10                      _____

11                           **NORMAN JOHNSON**

12                      (  )  NO CORRECTIONS

13                      (  )  CORRECTIONS ATTACHED

14

15

16   STATE OF COLORADO      )
                            )  ss.
17   COUNTY OF              )

18

19          Subscribed and sworn to before me this _____

20   day of _____, _____.

21                      _____
                                   Notary Public
22

23   My commission expires:_____

24

25

```
1     PAGE      LINE    CORRECTION                              REASON

2     _____    _____  _____   _____

3     _____    _____  _____   _____

4     _____    _____  _____   _____

5     _____    _____  _____   _____

6     _____    _____  _____   _____

7     _____    _____  _____   _____

8     _____    _____  _____   _____

9     _____    _____  _____   _____

10    _____    _____  _____   _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    STATE OF COLORADO    )
                          )  ss.
2    COUNTY OF ARCHULETA )

3

4          I Beverly E. King, Certified Shorthand Reporter,

5    and Notary Public, DO HEREBY CERTIFY that I did administer

6    the oath to the witness herein prior to the taking of this

7    deposition; that I did thereafter report in stenographic

8    shorthand the questions and answers set forth herein, and

9    the foregoing is a true and correct transcription of the

10   proceedings had upon the taking of this deposition.

11         I FURTHER CERTIFY that I am neither employed by

12   nor related to any of the parties or attorneys in this

13   case, and that I have no interest whatsoever in the final

14   disposition of this case in any court.

15         I FURTHER CERTIFY that I have delivered the

16   Original Copy of this deposition to ANIMAS REPORTING

17   SERVICE, in ASCII format, for production, distribution,

18   and retention.

19         WITNESS MY HAND AND SEAL THIS 23rd day of

20   June, 2015.

21         _____
                   Beverly E. King, CSR
22

23

24

25   MY COMMISSION EXPIRES:  1/27/2016

# Exhibit 12

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 3                          * * *
 4   NAVAJO NATION HUMAN RIGHTS  )
     COMMISSION; PEGGY PHILLIPS; )
 5   MARK MARYBOY; WILFRED       )
     JONES; TERRY WHITEHAT;      )
 6   BETTY BILLIE FARLEY;        )   No. 2:16-cv-00154 JNP
     WILLIE SKOW; and MABEL      )
 7   SKOW,                       )
                Plaintiffs,      )
 8                               )
        vs.                      )
 9                               )
     SAN JUAN COUNTY; JOHN DAVID )
10   NIELSON, in his official    )
     capacity as San Juan County )
11   Clerk; and PHIL LYMAN,      )
     BRUCE ADAMS, and REBECCA    )
12   BENALLY, in their official  )
     capacities as San Juan      )
13   County Commissioners,       )
                                 )
14              Defendants.      )
15
16         30(b)(6) DEPOSITION OF SAN JUAN COUNTY
                     BY EDWARD TAPAHA
17
                 Friday, June 24, 2016
18                   10:00 a.m.
19      Taken at the San Juan Public Safety Building
                  297 S. Main Street
20              Monticello, Utah  84535
21
22
23           VERITEXT LEGAL SOLUTIONS
                MID-ATLANTIC REGION
24         1801 Market Street - Suite 1800
                Philadelphia, PA  19103
25
```

```
                                              Page 2
 1                    A P P E A R A N C E S
 2    For the Plaintiffs:
 3                    PATRICK CASTANEDA, ESQ.
                      DLA PIPER
 4                    One Liberty Place
                      1650 Market Street, Ste. 4900
 5                    Philadelphia, PA  19103
                      (215) 656-3378
 6                    patrick.castaneda@dlapiper.com
 7                    MAYA KANE, ESQ.
                      10 Town Square, #52
 8                    Durango, CO  81301
                      (970) 946-5419
 9                    mayakanelaw@gmail.com
10    For the Defendants:
11                    BRITTON R. BUTTERFIELD, ESQ.
                      SUITTER AXLAND, PLLC
12                    8 E. Broadway, Ste. 200
                      Salt Lake City, UT  84111
13                    (801) 532-7300
                      bbutterfield@sautah.com
14
      Also Present:   Lauren Benally
15                    Leonard Gorman
                      James Francom
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                    I N D E X
2    Witness
3    EDWARD TAPAHA
4    EXAMINATION  BY                            PAGE
5    Mr. Castaqeda...................................  5
     Ms. Kane...................................... 81
6    Mr. Castaqeda................................. 82
     Ms. Kane..................................... 101
7    Mr. Castaqeda................................ 104
     Mr. Butterfield............................. 131
8    Mr. Castaqeda............................... 136
     Ms. Kane................................... 140
9    Mr. Castaneda.............................. 141
10

                     E X H I B I T S
11

     EXHIBIT              DESCRIPTION             PAGE
12
     No. 1  30(b)(6) Deposition Notice            14
13
     No. 2  Audio recording                      33
14
     No. 3  Defendants' Counterclaim for Declaratory
15          and Other Relief                     40
16   No. 4  Deposition of Edward Tapaha          96
17   No. 5  Commission Work Meeting Notes,
            January 21, 2014                    101
18
     No. 6  Commission Work Meeting Notes,
19          October 20, 2014                    109
20   No. 7  San Juan County Commission Meeting,
            October 20, 2015                    110
21
     No. 8  San Juan County Commission Meeting,
22          February 16, 2016                   112
23   No. 9  Public Notice                       119
24   No. 10 Navajo Times article                126
25

1                    E X H I B I T S

2    EXHIBIT              DESCRIPTION              PAGE

3    No. 11  County Commissioners discuss mail-only

             ballots                             128

4

     No. 12  Diary/Calendar                      134

5

     No. 13  Public Notice                       142

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2                     EDWARD TAPAHA
 3   was called as a witness, having been first duly
 4   sworn, was examined and testified on his oath as
 5   follows:
 6                        --oOo--
 7            MR. CASTANEDA:  Good morning, Mr. Tapaha.
 8            THE WITNESS:  Good morning.
 9                       EXAMINATION
10   BY MR. CASTANEDA:
11        Q.   Could you state your name and address for
12   the record, please?
13        A.   Pardon me?
14        Q.   Would you say your name and address for
15   the record, please.
16        A.   Okay.  Edward Tapaha, Post Office Box 43,
17   Montezuma Creek, Utah 84534.
18        Q.   Mr. Tapaha, have you been deposed before?
19        A.   Yes.
20        Q.   Okay.  Have you been deposed as a
21   30(b)(6) designee before?
22        A.   Explain that to me.
23        Q.   Do you understand what a 30(b)(6)
24   designee is?
25        A.   No.
```

1        Q.   Okay.  We'll get to that in a second.

2             As far as being deposed, I'm just going

3    to refresh your recollection on how this goes.  I'll

4    be asking you a series of questions --

5        A.   Okay.

6        Q.   -- and you'll be answering those

7    questions to the best of your ability.  Do you

8    understand that?

9        A.   Yes.

10       Q.   Okay.  And you understand that you just

11   gave an oath to testify truthfully?

12       A.   Yes.

13       Q.   Okay.  And for purposes of our court

14   reporter who is helping us out here today, I'm going

15   to try and slow my pace down in asking my questions,

16   and I'll try to speak clearly; and I'll also ask that

17   you answer your questions slowly and verbally as well

18   because it's difficult for the court reporter to take

19   down nonverbal answers.

20            Do you understand?

21       A.   Yes.

22       Q.   Okay.  Great.  I'm going to try and get

23   my questions out clearly and concisely, and I would

24   just ask that you let me finish my question before

25   you start answering, and I will in turn allow you to

1   answer your questions to the best of my ability

2   without cutting you off.

3              Do you understand that?

4        A.   Yes.

5        Q.   Okay.  Is there any reason why you would

6   not be able to testify truthfully here today?

7        A.   No.

8        Q.   Are you on any medication --

9        A.   No.

10       Q.   -- whatsoever that might affect that?

11       A.   No.

12       Q.   So this is not a marathon.  I'm going to

13  be asking you a series of questions.  If you need a

14  break at any point in time, I'm going to rely on you

15  to let me know when you need a break.

16       A.   Okay.

17       Q.   Is that okay?

18       A.   Yes.

19       Q.   All right.  Great.

20              Can you give me just a little bit of

21  background of your current employment?

22       A.   I've been working for the county for the

23  last 24 years, close to 25 years.  I was hired back

24  in 1991.

25       Q.   Okay.  And what exactly is your title?

1          A.   I had voters outreach workers, and then

2     also I used to work with the county commissioner as a

3     liaison, but that changed in the last 10-15 years

4     ago, and I started working under the aging program,

5     county aging program.

6          Q.   Okay.  So let's clarify that a little bit

7     more, and let's work backwards.

8          A.   Okay.

9          Q.   So what's your current title now?

10         A.   Still voters outreach worker.

11         Q.   Okay.  And how long have you held that

12    title?

13         A.   I guess the last 24 years.

14         Q.   Okay.  And do you have any other titles

15    at this moment?

16         A.   And then I have county case manager

17    assistant, aging program.

18         Q.   Okay.  So you have two titles right now.

19         A.   Yes.

20         Q.   Okay.  Now, prior to -- and when did you

21    say that you even started?

22         A.   1991.

23         Q.   Okay.  Now, prior to these two positions,

24    what was your title before those?

25         A.   I was working in a different organization

1   as a nurse.

2        Q.   No.  I'm sorry.  Within your employment

3   with San Juan County.

4        A.   No.

5        Q.   No.  Okay.  So you've only had two

6   positions.

7        A.   Yes.

8        Q.   And you've had them the entire time, from

9   1991 until the present day.

10        A.   Yes.

11        Q.   Okay.  Thank you.  Now, what are your

12   roles and responsibilities for those positions?

13        A.   Outreach worker, I do the election

14   information, voter awareness, in the community, in

15   the southern part of San Juan County, and I attend

16   chapter meeting, do the registrations in different

17   places that I park and have people come in and do

18   registration.  If they have any questions on election

19   information, they can come over and ask those

20   questions.

21        Q.   Okay.  And then for your -- for your

22   other title?

23        A.   The other title under the case manager is

24   to work with the aging program, elderlies.  As case

25   manager assistant I do the interpreting, translation,

1   for them, for the case manager.  We visit the

2   elderly, and we have about 80 clients that we visit,

3   and I help out with the translation, interpreting

4   between the case manager and the client.

5           Q.   Okay.  Now, you mentioned before for the

6   voter outreach that you're in charge of the southern

7   part of the county; is that correct?

8           A.   I was assigned to the southern part as an

9   outreach worker.

10          Q.   Okay.  And who assigned you to the

11  southern part of the county?

12          A.   When I started my job back in 1991, it

13  was Gail Johnson.  She was the county clerk, and she

14  left that post -- I don't know -- maybe a couple

15  months, three months later, after I started, and then

16  Mrs. Gail Northern came in as county clerk, and she's

17  the one that directs those.

18          Q.   Okay.  And who was in charge of the

19  northern part of the county when you were assigned

20  the southern?

21          A.   The county clerk --

22          Q.   Okay.

23          A.   -- which, when I worked at that time, was

24  Gail Northern, and then the next position was Norman

25  Johnson.

1     Q.   Okay.  So you're in charge of the

2  southern part of the county now, and are you saying

3  that -- I'm sorry.  Are you saying Norman Johnson is

4  part of the northern county now?

5     A.   No, not Norman, just myself on the

6  southern part.

7     Q.   And who is in charge of the northern

8  part?

9     A.   John David Nielson.

10    Q.   Okay.

11    A.   He's the county -- new county clerk.

12    Q.   Okay.  For the second title, you

13  mentioned that you work on translations for, did you

14  say, the aging population?

15    A.   I work with the case manager.  They're

16  the one that visit the -- they're the one that visit

17  the elderly client, 65-year-old on up.

18    Q.   And so you handle translations for them.

19    A.   Yes.

20    Q.   And what -- what are you translating for

21  them?

22    A.   Healthcare, health information, social

23  status, and what the conditions are of the client.

24    Q.   And you're translating Navajo?

25    A.   Yes.

1        Q.   And what is your training in Navajo

2   translations?  Let me ask a better question.  Have

3   you taken any courses or training in translating

4   Navajo?

5        A.   No.

6             MR. BUTTERFIELD:  I'm going to object just

7   to the extent that it's outside the scope of the

8   30(b)(6) topics.  I understand you may be trying to

9   get some background, but to the extent that it's

10  outside the scope of the 30(b)(6) topics, I'm going to

11  object to this line of questioning.

12             Go ahead and answer his question.

13             THE WITNESS:  "No."

14        Q.   (BY MR. CASTANEDA)  You have no training.

15  So what is the basis, then, for your knowledge of the

16  Navajo language?

17        A.   I learned how to interpret when I was

18  young for my mother when she was in need of

19  healthcare.  I did the best I can to interpret for

20  her at a healthcare facility and provide the

21  information for her.

22             And I was also involved with the church

23  organization, and I did a lot of translation between

24  the ministers, churches and different ministers.  I

25  did a lot of interpreting and translating the

Page 13

1    information for them, and --

2           Q.   Okay.  And -- I'm sorry.

3           A.   And I did that for many years, and I

4    guess that's the learning process for me.

5           Q.   Okay.  And how would you describe the

6    proficiency of your knowledge of the Navajo language?

7           A.   Well.  Very well.

8           Q.   Okay.  And how about the proficiency of

9    your ability to translate from English into Navajo?

10          A.   Well.

11          Q.   And then vice versa, your proficiency of

12   your ability to translate from Navajo into English?

13          A.   I guess well too.  Good.

14          Q.   Is one better than the other?

15          A.   About the same.

16          Q.   About the same.  Would your answer be the

17   same with regard to verbal translations?

18          A.   Yes.

19          Q.   And also written translations?

20          A.   Yes.

21          Q.   And my understanding is that Navajo is

22   not a written language.  Is that correct?

23          A.   It's a written language.  If -- according

24   to what I know is that the Bible is written in

25   Navajo; so it's a written language.  So I learned how

Page 14

```
 1   to read that Navajo Bible and translate that
 2   information from Navajo to English and all that.
 3         Q.   Okay.  So is the Navajo Bible, then, your
 4   source for --
 5         A.   Yes.
 6         Q.   -- identifying words for translation?
 7         A.   Yes.
 8         Q.   Okay.  Are there any other sources that
 9   you use for translation?
10         A.   I read maybe newspaper that are written
11   in Navajo.  Navajo Time used to write story in
12   Navajo.  They have an article in Navajo language, and
13   I used to read that and learn some different words,
14   different version of various information that they
15   had.
16              MR. CASTANEDA:  Okay.
17              Mark this as Exhibit 1, please.  Thank
18   you.
19              (Exhibit 1 was marked.)
20         Q.   (BY MR. CASTANEDA)  Do you want to look
21   at it first?  It's the deposition notice.
22         A.   Okay.
23         Q.   Have you ever seen that document before?
24         A.   Yes.
25         Q.   Do you know what it is?
```

Page 15

```
 1          A.   It's a notice of taking deposition,
 2   San Juan County.
 3          Q.   Okay.  Can you tell me when you first saw
 4   that document?
 5               THE WITNESS:  Yesterday?
 6               MR. BUTTERFIELD:  You have to answer.
 7               MR. CASTANEDA:  You have to answer.
 8               THE WITNESS:  Yeah, yesterday.
 9          Q.   (BY MR. CASTANEDA)  Okay.  So you had not
10   seen it beforehand?
11          A.   Not yet.
12               MR. BUTTERFIELD:  Objection to the extent
13   it mischaracterizes testimony.
14          Q.   (BY MR. CASTANEDA)  Had you seen this
15   document before yesterday?
16          A.   I did, yes.
17          Q.   You saw this document before yesterday?
18          A.   Yesterday.  That's when I saw this
19   document.
20          Q.   Okay.  So the first and only time you saw
21   this document other than today was yesterday.
22          A.   This document, yes.
23          Q.   Okay.  Thank you.
24               Have you seen any other documents like
25   that?
```

1        A.    The deposition that I did in -- back last

2   year, and that's the one I received.

3        Q.    Okay.  For that deposition -- I'm sorry.

4   Strike that.

5              So before I asked you if you were aware

6   that you were here to testify on a 30(b)(6)

7   deposition, and you said you didn't know exactly what

8   that was; right?

9        A.    Yeah.  Yes.

10       Q.    Okay.  Looking at that document now, do

11  you have a better idea of what a 30(b)(6) deposition

12  is and why you're here today?

13       A.    30(b)(6) nobody really explained to me.

14       Q.    Okay.  So I'm going to ask you a series

15  of questions, and just answer them to the best of

16  your ability.  Do you understand that you have been

17  designated as a person most knowledgeable with

18  respect to certain items in that deposition notice?

19       A.    Yes.  Yes.

20       Q.    Okay.  And you understand that based on

21  your own reading of the document?

22       A.    Yes.

23       Q.    Okay.  Did anybody tell you which topics

24  you would be speaking to today?

25              MR. BUTTERFIELD:  Objection to the extent

1    it calls for attorney-client privilege.

2              MR. CASTANEDA:  You can answer.

3              MR. BUTTERFIELD:  If it's something that

4    we talked about, then you don't have to answer.

5              I'm going to instruct him not to

6    answer --

7              MR. CASTANEDA:  All right.  That's fine.

8              MR. BUTTERFIELD:  -- based on

9    attorney-client privilege.  That's something we're not

10   going to waive.

11             MR. CASTANEDA:  I understand.

12        Q.   (BY MR. CASTANEDA)  Do you understand

13   that San Juan's County counsel has identified you as

14   the designee for topics 1-g.?

15        A.   Yes.

16        Q.   Do you understand that San Juan's County

17   counsel has identified you as the designee for topics

18   2-a. and 2-b.?

19        A.   Yes.

20        Q.   Do you understand that San Juan County's

21   counsel has identified you as a designee for the

22   topic 3?

23        A.   Yes.

24        Q.   And do you understand that San Juan

25   County's counsel has identified you for the topic 4?

```
                                                          Page 18
 1          A.    Yes.
 2          Q.    And do you understand that San Juan
 3   County has identified you as a designee for topics
 4   5-a. and 5-b. as it relates to the southern part of
 5   the county?
 6                MR. BUTTERFIELD:  Want to go over 5-c. and
 7   d.?
 8          Q.    (BY MR. CASTANEDA)  And also --
 9                I'm sorry.  Thank you.
10                -- for topics 5-c. and d.?
11          A.    Yes.
12          Q.    Okay.  So are you the person most
13   knowledgeable with respect to each of the issues I've
14   just recited?
15          A.    Yes.
16          Q.    And do you understand that by being
17   designated you're speaking on behalf San Juan County
18   such that your answers --
19          A.    Yes.
20          Q.    -- are San Juan County's answers?
21          A.    Yes.
22                MR. BUTTERFIELD:  Just remember to let him
23   finish his question before you answer.
24                THE WITNESS:  Okay.
25          Q.    (BY MR. CASTANEDA)  That's fine.
```

Page 19

```
 1            And do you understand that by being
 2   designated, if you don't know an answer to a
 3   question, then effectively no one at San Juan County
 4   knows that answer?
 5        A.   Repeat that again, please.
 6        Q.   Do you understand that, if you don't know
 7   an answer to a question as a designee for San Juan
 8   County, then effectively San Juan County does not
 9   know the answer to that question?
10            MR. BUTTERFIELD:  Object to the extent it
11   calls for a legal conclusion.
12            Go ahead and answer.
13        A.   Yes.
14        Q.   Okay.  Do you understand that by being --
15   well, actually, strike that.
16            So you had said before that you just
17   received the topics for today's deposition yesterday;
18   right?
19        A.   Yes.
20        Q.   Okay.  So what did you do to prepare
21   yourself for each of those topics?
22        A.   Meet with the attorney.
23        Q.   Yourself.  Don't give me any
24   communications you had directly with your attorney,
25   but...
```

Page 20

1          A.   I studied.

2          Q.   You studied?

3          A.   Just the question.

4          Q.   What questions?

5          A.   The questions that's on the Schedule A on

6     page 1-f. and g.

7          Q.   Oh, you mean the topics.

8          A.   Yeah, the topic.

9          Q.   Okay.  So you said you studied 1-f and g.

10         A.   Mm-hmm.

11         Q.   You meant you just read the topics.

12         A.   Yes.

13              MR. BUTTERFIELD:  Objection to the extent

14    it mischaracterizes his testimony.

15         Q.   (BY MR. CASTANEDA)  Okay.  And did you --

16    and you -- so did you read the other topics that you

17    were designated for or just 1-g.?

18         A.   And the others.

19         Q.   Okay.  So apart from just reading the

20    topics as they are listed on that notice, did you do

21    any preparation for the deposition today in the last

22    24 hours?

23         A.   I took it home to study it and thought it

24    through.

25         Q.   Okay.  Did you -- did you meet with your

1    attorneys to discuss -- and don't tell me what you

2    discussed, but did you meet with your attorneys?

3           A.   Yes.

4           Q.   Okay.  How many times did you meet with

5    your attorneys to discuss these topics?

6           A.   Two time.

7           Q.   Can you tell me when those two times

8    were?

9           A.   Yesterday afternoon -- yesterday morning,

10   I mean, and this morning.

11          Q.   Okay.  Did you review any documents in

12   preparation for any of those topics?

13          A.   No.

14          Q.   Okay.  Had you talked with any colleagues

15   or co-workers in preparation for those topics?

16          A.   No.

17          Q.   Did you talk to anybody in preparation

18   for those topics?

19          A.   No.

20          Q.   Okay.  All right.  Let's -- I'm going to

21   jump around, and if you would just do me the favor of

22   looking at topic 4.  Just reread that to yourself and

23   look up at me when you have done so.

24               (Mr. Tapaha reviews document.)

25          A.   Okay.

Page 22

1          Q.    Okay.  And you understand that you have

2     been designated to speak on behalf of San Juan County

3     as it regards topic No. 4; is that correct?

4          A.    Yes.

5          Q.    Okay.  So the topic -- and I'll

6     paraphrase the topic -- concerns the county's plans

7     for educating the public about new polling places,

8     including the dates and frequency of those polling

9     places and any announcements regarding the same.  Do

10    you understand that?

11         A.    Yes.

12         Q.    Okay.  You mentioned before that you were

13    in charge of the southern part of the county for

14    voter outreach; correct?

15         A.    Yes.

16         Q.    Okay.  In so doing, in carrying out your

17    duties to do so, is it fair to say that you come

18    across people who are not proficient in the English

19    language?

20         A.    Yes.

21         Q.    Okay.  And in that respect do you then

22    use your Navajo translating abilities to assist in

23    your voter outreach for the southern part of the

24    county?

25         A.    Yes.

Page 23

1        Q.   Okay.  So is it fair to say, then, that
2   your voter outreach duties and your ability to
3   translate the Navajo language are necessary to assist
4   the county in educating the public about the new
5   polling places, including the dates and frequency of
6   any announcements made on local radio?
7        A.   Yes.
8        Q.   Okay.  So then you would agree with me,
9   then, that your ability to translate the Navajo
10  language is very important for the county in regards
11  to this topic; is that correct?
12       A.   Yes.
13       Q.   Okay.  So can you talk to me a little bit
14  generally, more specifically, about the county's
15  plans for educating the public about the new polling
16  places themselves?
17            MR. BUTTERFIELD:  Objection to the extent
18  there's not a question pending.
19            Go ahead and answer if you can.
20       Q.   (BY MR. CASTANEDA)  I'll re-ask the same
21  question.  Can you tell me a little bit more
22  specifically about the county's plans for educating
23  the public about the new polling places?
24       A.   Yes.
25       Q.   You can.  Okay.  Will you go ahead and do

1   so, please.

2           A.   I educate people by going to the chapter

3   meeting, attend chapter meeting.  Sometime chapter

4   meeting falls all in one day, and so just in

5   traveling between chapter meetings by far, great

6   traveling distance.  And when you ask to be on the

7   agenda, when you're attending one chapter meeting,

8   they usually put you on the agenda.  When they put

9   you on the agenda, they put you at last item in the

10  report, and then that's when you sit there.  And you

11  have other chapter meeting in place elsewhere, and --

12          Q.   How many chapter -- I'm sorry.  Sorry.

13  Go ahead.

14          A.   -- and you try to meet those chapter

15  meeting all in one day.  That's a heavy traveling.

16  It takes a while to get to one place, and I do my

17  best to do that and I've done that.

18               And they also did a radio announcement

19  from KNDN in Farmington, KTNN from Window Rock.  And

20  if I station here, park here along the road, and if

21  people come by, if I do a registration, I usually

22  tell them, "This is what's going to happen in the

23  coming election."

24          Q.   Okay.  So how many chapters are there?

25          A.   There's Aneth chapter, Red Mesa chapter,

Page 25

```
 1   Mexican Water, Oljato, Navajo Mountain.
 2          Q.   So five chapters altogether?
 3          A.   Yes.
 4          Q.   Okay.  And when did you attend these
 5   chapter meetings for the purpose of educating the
 6   public about the new polling places?
 7          A.   I know I attend, like, this June -- if I
 8   had a calendar, but the first part of June, the first
 9   weekend, Sunday.
10          Q.   Okay.  So only in June?
11          A.   Yes.  And then some in May.
12          Q.   Okay.  So then I'll just ask sort of a
13   general question.  Your attendance at the chapter
14   meetings -- and I understand you don't know the
15   specific dates.  I don't need those right now --
16          A.   Okay.
17          Q.   -- would be limited to May and June.
18          A.   I did some at the beginning of the year
19   because I had to do an announcement about the
20   candidacy following; so, like, January and February I
21   did that.
22          Q.   Okay.  So let me clarify my question.  My
23   question is about your attendance at chapter meetings
24   to educate the public about the new polling places.
25   Do you understand that?
```

1          A.    Yes.

2          Q.    Okay.  So at the beginning of the year

3    was the county -- was the county offering new polling

4    places, or were they still in the vote by mail phase?

5          A.    They were vote by mail, and then they

6    were discussing to open up the two poll -- the

7    polling place that will be there this year.

8          Q.    Okay.  So are you saying, then, that at

9    the beginning of the year when you visited chapter

10   meetings you were educating the public about new

11   polling places?

12         A.    At the beginning of the year in January

13   and February, I gave information saying that

14   eventually we will do by mail from the county, and

15   there is some still discussion referenced to the

16   polling place that will be open in the -- in the

17   coming months.

18         Q.    Okay.  Okay.

19               You also mentioned radio announcements.

20   Do you recall the dates of the radio announcements?

21         A.    I did three radio announcement the first

22   part of June, like on Monday, Wednesday, and Friday,

23   from KTNN and KNDN, and I did radio announcement for

24   this week Monday, Wednesday, and Friday, same

25   station.

1        Q.    So that sounds like six radio

2    announcements altogether?

3        A.    Yes.

4        Q.    Okay.  Have you done any other radio

5    announcements, other than those six, for the purpose

6    of educating the public about the new polling places.

7        A.    No.

8        Q.    Okay.  Coming back to the chapter

9    meetings, when you go to these chapter meetings, do

10   you record any notes or minutes of those meetings?

11       A.    No.  Just verbal.

12       Q.    Okay.  Does anybody at those chapter

13   meetings record notes?

14       A.    I don't know.  No, I don't know.

15       Q.    Okay.  So how do you recollect what

16   happens at those chapter meetings?

17       A.    I just attend chapter meeting when they

18   schedule chapter meeting.

19       Q.    Okay.  Do you bring any documents with

20   you such as an outline to help you tell each chapter

21   information about the new polling places?

22       A.    I guess I -- I memorize what I need to

23   say, and I use that technique and give the

24   information.

25       Q.    Okay.

 1          A.   I memorize all those process in my own

 2    mind and give that information, and I usually say,

 3    "Well, do you understand what I said?"  And if

 4    there's a question arise, then I answer that

 5    question.

 6          Q.   Okay.  And then do you review any

 7    documents to help you prepare for those meetings?

 8          A.   At home I do.

 9          Q.   Yeah.  What kind of documents do you

10    review to prepare?

11          A.   Like whatever document that was given to

12    me from the office, from the county clerk's office.

13          Q.   And who would be giving you documents

14    from the county clerk's office?

15          A.   John David Nielson.

16          Q.   Okay.  And what kind of documents are

17    they?

18          A.   Like the schedule of election, who the

19    candidates are, and at the beginning of the year, the

20    following for the candidacy, dates, and the ballot

21    information, and that's what I usually use.

22          Q.   Okay.  And what do you do with those

23    documents?  Are they at your house or --

24          A.   They're at home.

25          Q.   Okay.  Going back to the radio station

Page 29

1  announcements, do you give these radio station

2  announcements in English or Navajo?

3        A.   Navajo.

4        Q.   Navajo.  Okay.  Do you prepare any

5  documents to assist in your translation from English

6  to Navajo?

7        A.   No.

8        Q.   Okay.  So who comes up with the

9  information and content that you are disseminating

10  through the radio station announcement?

11       A.   Just working for the last 20 years with

12  the election, I just have a habit of doing this, This

13  is the most important information that I need to

14  share with the people, and based on that I share the

15  information on the radio just by thinking it through.

16       Q.   Okay.  But with regard to the specific

17  information about the new polling places, where does

18  that information come from --

19       A.   From the county --

20       Q.   -- before you translate it into Navajo

21  and then announce it over the radio?

22            MR. BUTTERFIELD:  Objection to extent it's

23  beyond the 30(b)(6) notice.

24            Go ahead and answer.

25       A.   From the county clerk, John David

Page 30

1   Nielson.

2          Q.   And then are you reviewing the same

3   documents that you review for the chapter meetings to

4   prepare the Navajo translation?

5          A.   Yes.

6          Q.   Okay.  Are there any publications that

7   San Juan County uses to educate the public about the

8   new polling places?

9          A.   Newspaper.

10         Q.   Which newspaper?

11         A.   San Juan Record.

12         Q.   Is that the only newspaper?

13         A.   I think that's the only -- that's the

14  only one I read.

15         Q.   Okay.  Are there any other publications

16  that San Juan County uses to educate the public about

17  the new polling places?

18         A.   From the news article that people write,

19  maybe Navajo Time, Gallop Independent.

20         Q.   But are those publications that the

21  county uses to disseminate that information?

22         A.   No.

23         Q.   Okay.  So with regard specifically to

24  publications that the county uses to educate the

25  public about these new polling places, in what form

1    does that information come across in the newspaper?

2              MR. BUTTERFIELD:  I'm going to object to

3    the extent that it's beyond the 30(b)(6) notice.

4    Topic 4 does not list newspapers as a topic that he

5    is prepared to testify about.

6              Go ahead and answer the question.

7         A.   The news clipping when the commission

8    meets on a weekly basis and when there's discussions

9    and put -- the information is put in the paper.

10        Q.   So is it put in the form of an article or

11   an advertisement?

12        A.   An advertisement, I believe it was, if

13   it's written in there.

14        Q.   Okay.  And do you know the dates of these

15   advertisements?

16        A.   No.

17             MR. BUTTERFIELD:  Again, objection to the

18   extent it's beyond the 30(b)(6) notice.

19             MR. CASTANEDA:  Maya, do you have any

20   questions?

21             MS. KANE:  (Shakes head.)

22        Q.   (BY MR. CASTANEDA)  Do you leave any

23   documents behind at the chapter meetings when you go

24   there?

25        A.   Registration form.

Page 32

1          Q.   Okay.  So let me back up.  I asked you

2     before if you brought any documents to the chapter

3     meeting, and you said no; so it sounds like there's a

4     miscommunication.  I'll ask you again.  When you go

5     to the chapter meetings to disseminate the

6     information about the new polling places, do you

7     bring anything with you?

8          A.   No.

9          Q.   Okay.

10         A.   When I go to the chapter meeting, I just

11    do my report, but at other times I go over there and

12    refill the registration form, at the chapter house.

13         Q.   So these are forms that the chapter has.

14         A.   Yes.

15         Q.   All right.  Thank you for clarifying

16    that.

17              Who has the copies of the recordings of

18    the advertisements for the new polling places?

19         A.   County clerk.

20         Q.   Okay.

21              We've talked at length about the

22    translations that you use to educate the public on

23    behalf of the county.  Does anybody review your

24    translations before you disseminate them?

25         A.   No.  Well, my wife.  She -- I ask her

1   questions, if I said this right, and she will give me

2   "Maybe you should say it this way."

3        Q.   And has she been trained in translating?

4        A.   No.

5        Q.   Okay.  So can you just briefly describe

6   the basis for her knowledge of the Navajo language,

7   then?

8        A.   She is also good at Navajo Bible reading,

9   and she understands it pretty well.  She has some

10  brief knowledge of writing, not to the extent that

11  where she would write a full page, just a small word

12  in.

13       Q.   Okay.  I just have a few more questions

14  on this topic, and we're going to play a recording

15  for you.

16       A.   Mm-hmm.

17            MR. CASTANEDA:  And can we mark that

18  recording as Exhibit 2?  And I want you to listen to

19  the recording, and once it's over I'll ask you some

20  questions.

21            MR. BUTTERFIELD:  I'm going to object to

22  the extent -- to the extent this is beyond the

23  30(b)(6) notice.

24            Go ahead, Maya.

25            (Playing recording.)

Page 34

1        Q.    (BY MR. CASTANEDA)   Okay.   Were you able

2   to hear that recording clearly?

3        A.    Yes.

4        Q.    Okay.   Whose voice is on that recording?

5        A.    Me.

6        Q.    When did you make this recording?

7        A.    I can't remember the date, but it's in

8   June.

9        Q.    Okay.   If I wanted to find out the exact

10   date, how would I do that?

11        A.    You'd probably have to talk to the county

12   clerk.

13        Q.    Okay.

14        A.    The county clerk and the IT person, John

15   Fellmeth.

16        Q.    Okay.   What is -- what is -- what did you

17   make the recording for?

18        A.    To give information on the Democrat party

19   ticket.

20        Q.    To whom?

21        A.    Namely, two individual who are running as

22   a United States Senate.

23        Q.    Who asked you to make the recording?

24        A.    The county clerk.

25        Q.    Okay.   So where is this recording

Page 35

1   located?

2          A.   At the office, at the county clerk's

3   office.

4          Q.   Okay.  And I'll represent to you that we

5   played that from --

6               Is that the San Juan County website?

7               MS. KANE:   Yeah.

8          Q.   (BY MR. CASTANEDA)  Do you know if that

9   recording is anywhere other than the website for

10  public consumption?  I'm sorry.  Let me ask the

11  question again.

12              Is that recording located anywhere else

13  for public consumption other than the county website?

14         A.   Probably on the county website, and there

15  may be a different message on the radio station.

16         Q.   Okay.  And that was going to be my next

17  question.  Is this recording similar to the radio

18  station announcements that you've been making for the

19  new polling locations?

20         A.   Yes.

21         Q.   Okay.  And then would you agree with me

22  that -- well, let me ask you who -- who asked you to

23  make the radio station announcements?

24         A.   The county clerk.

25         Q.   Okay.  And let me back up for a second.

1    I asked you before about the documents that you

2    reviewed to prepare for the chapter meetings and also

3    documents you reviewed to prepare yourself to make

4    the radio station announcements.  Who would know

5    where those documents are other than yourself?

6           A.    The county clerk give me the information,

7    and he should have that.

8           Q.    Okay.  So all those documents, then, they

9    were given to you by the county clerk, or you pulled

10   them yourself?

11          A.    He gave them to me.

12          Q.    Okay.  So in the process of preparing

13   yourself for the radio station announcements and the

14   chapter meetings, all of the information is given to

15   you by the county clerk; is that correct?

16          A.    Yes.

17          Q.    Okay.  So we played the Democratic ballot

18   for you; is that correct?

19          A.    Yes.

20          Q.    Okay.  And generally what was the -- you

21   probably can't do it off the cuff, but can you just

22   sort of describe what you said in that ballot?  And

23   we can play it again if you need to hear it.

24          A.    I mentioned the Democrat party ticket.

25          Q.    Okay.

1       A.   And those -- there's two candidates for

2   the United States Senate, two individual that are

3   running for the United States Senate, and their name

4   are Misty K. Snow and Jonathan Swinton, and whichever

5   candidate you want to vote for, it's your choice.

6       Q.   Okay.  We're going to play the second

7   part to be fair to Democrats and Republicans alike.

8           MR. BUTTERFIELD:  Is this going to be

9   still Exhibit 2?

10          MR. CASTANEDA:  Yes.

11          MR. BUTTERFIELD:  Okay.

12          (Playing audio.)

13      Q.   (BY MR. CASTANEDA)  Okay.  So do you

14  agree with me that the Republican ballot is longer

15  than the Democrat ballot recording?

16      A.   Yes.

17      Q.   Can you tell me why?

18      A.   Because it has two different position on

19  the ballot.

20      Q.   Okay.  And are there -- is there

21  information including -- included in these recordings

22  regarding local races?

23      A.   No.

24      Q.   Why is that?

25      A.   We don't have any local races that

```
 1   affects the southern part.
 2         Q.   Okay.  These recordings, were they given
 3   to any of the radio stations to play?
 4         A.   Yes.
 5         Q.   Which radio stations were the recordings
 6   given to?
 7         A.   KNDN, KTNN.
 8         Q.   Did you say KTNN?
 9         A.   Mm-hmm.
10         Q.   Okay.
11              MR. BUTTERFIELD:  Is that a yes?
12         Q.   (BY MR. CASTANEDA)  Did you -- did you
13   say KTNN?
14         A.   Yes, KTNN.
15              MR. CASTANEDA:  Thank you, Counsel.
16         Q.   (BY MR. CASTANEDA)  Okay.  I think that's
17   it for topic 4.  Do you need a break?
18         A.   No.
19         Q.   Okay.  It's actually a good segue into
20   topic 3.  Can you take a second and look at topic 3?
21   And after you're done reading it just look up so I
22   know you've read it.
23              (Mr. Tapaha reviews document.)
24         A.   Okay.
25         Q.   So topic 3 concerns the county's plans to
```

Page 39

1    provide Navajo-language ballots in audio form at all

2    four polling locations, including making the audio

3    Navajo ballot available on the website and a

4    telephone number that Navajo voters can call for

5    Navajo-language assistance; right?

6          A.   Yes.

7          Q.   Okay.  Who is going to be making the

8    Navajo-language ballots in audio form?

9          A.   Myself.

10         Q.   Okay.  And who at the county asked you to

11   do that?

12         A.   The county clerk.

13         Q.   Okay.  Have you prepared those audio

14   ballots yet?

15         A.   We prepared one small audio for the

16   primary election.

17         Q.   Okay.  And when you say "small audio,"

18   what do you -- what do you mean by that?

19         A.   Just a brief information about the

20   upcoming election and the candidate.

21         Q.   Okay.  But is that an actual ballot, or

22   is it just in information only?

23         A.   Information.

24         Q.   Okay.  So is there not going to be an

25   audio -- a Navajo-language audio ballot at these

Page 40

1    polling locations?

2          A.   I think audio at the polling location

3    depends on our interpreter or whoever that will

4    assist us at the polling place verbally.

5          Q.   I'm sorry.  So are you saying, then -- do

6    you understand that, when I'm asking the questions

7    regarding ballots in audio form, I'm talking about a

8    recorded ballot in the Navajo language?

9          A.   No.

10              MR. CASTANEDA:  Okay.  So I'll try to ask

11   that line of questioning again, then.  Actually, let

12   me back up.

13              Make this Exhibit 3, please.

14              (Exhibit 3 was marked.)

15              Counsel, do you want to review it?

16              MR. BUTTERFIELD:  I'm okay.  Thank you.

17         Q.   (BY MR. CASTANEDA)  Would you please take

18   a look at paragraph 50.

19         A.   On page what?

20         Q.   On page 8.

21              (Mr. Tapaha reviews document.)

22         A.   Okay.  Yes.

23         Q.   Okay.  I'll read it into the record.

24   "For the 2016 and future elections -- election

25   cycles" -- excuse me.  Strike that.

Page 41

1             "For the 2016 and future election cycles,

2      the County is already committed to provide

3      Navajo-language ballots in audio form at all four

4      polling locations, including making the audio and

5      Navajo ballot available at a link on the County's

6      website, and provide a telephone number that Navajo

7      voters can call for Navajo-language assistance."

8             I want to focus in on the language

9      regarding, quote, "Navajo-language ballots in audio

10     form at all four polling locations," close quote.  Do

11     you understand what is meant by the term "ballots" in

12     that sentence?

13          A.   Yes.

14          Q.   And a ballot is something that a voter

15     would use to make his selection of candidate and then

16     submit to the county; is that correct?

17          A.   Yes.

18          Q.   Okay.  So a ballot essentially represents

19     the voter's vote; is that correct?

20          A.   Yes.

21          Q.   Okay.  So I asked you before who was

22     going to make the Navajo-language ballots in audio

23     form, and you said that was yourself; correct?

24          A.   Yes.

25          Q.   Okay.  And then when I asked you more

Page 42

```
 1    questions about the ballot, you told me that it was
 2    more of an informational recording and not a ballot;
 3    is that correct?
 4           A.   Yes.
 5           Q.   Okay.  So I'm going to ask my original
 6    question, which is who is going to make the
 7    Navajo-language ballots in audio form at each of
 8    these four polling locations?
 9           A.   Me.
10           Q.   Have you made the Navajo-language ballots
11    in audio form yet?
12           A.   No.
13           Q.   Okay.  When are you going to make the
14    Navajo-language ballots in audio form for these four
15    polling lotions?
16           A.   In this primary election, which will
17    happen next week.  I will pursue doing the general
18    election, which is November 8th, and I'll -- I'm
19    probably going to take the initiative to explain the
20    ballot more in depth, what it will be.  And when --
21    when the state provided the information on the format
22    of the ballot, I will translate that into Navajo and
23    put it in audio form with a phone number.
24           Q.   And when will that be?
25           A.   Probably August.
```

Page 43

1      Q.   Okay.  So let's talk about the -- the

2   primary is this coming Tuesday; right?

3      A.   Yeah.

4      Q.   So is there not going to be an audio

5   ballot for the Tuesday primary at these four polling

6   locations?

7      A.   I guess my thought would be that the poll

8   workers, that we designate to be, eventually will

9   provide the information on the -- the ballot, because

10  it's just like Democrat is only one ticket, and on

11  Republican only two ticket, meaning the United States

12  House of Representative and then the state governor's

13  position.

14     Q.   Okay.  So then you're talking about poll

15  workers providing Navajo-language assistance --

16     A.   Yes.

17     Q.   -- at the polls; correct?

18     A.   Yes.

19     Q.   But you're not talking about --

20     A.   Not the audio.

21     Q.   You're not talking about a ballot in

22  Navajo language; correct?

23     A.   By explaining the ballot, the interpreter

24  probably provide the information.

25     Q.   I understand that, but my question is

Page 44

 1    very focused on whether or not there is going to be a
 2    Navajo-language ballot in audio form at the four
 3    polling locations.
 4           A.   I guess I'm looking at it as saying --
 5    looking at it as two format, in Navajo with the
 6    ballot and then another form of audio.
 7           Q.   Okay.  I understand how you're looking at
 8    it, but I'm asking you on behalf of the county to
 9    explain the county's writing in the county's document
10    that they submitted to the court, and in that
11    document it says:  "The County is already committed
12    to provide Navajo-language ballots in audio form at
13    all four polling locations."  And you, on behalf of
14    the county, are telling me that as of right now for
15    Tuesday's primary there is no Navajo-language ballot
16    in audio form that will be available in all four
17    locations; is that correct?
18                MR. BUTTERFIELD:  Objection to the extent
19    it mischaracterizes prior testimony.
20                Go ahead.
21           A.   No.
22           Q.   That's not correct?
23           A.   I mean yes.
24           Q.   Okay.  We're going to have to --
25           A.   I guess I could say I'll do the best I

Page 45

1   can in translating within the next four days to have

2   an audio.

3          Q.   Okay.  I'm sure the voters will

4   appreciate that, but, I mean, I have to clean up the

5   line of questioning a little bit, if you will excuse

6   me.

7          A.   Yeah.

8          Q.   So as of right now nobody -- has anyone

9   asked you to create a Navajo-language ballot in audio

10  form for all four polling locations?

11         A.   No.

12         Q.   Okay.  So is it fair to say, then, that

13  you have not created a Navajo-language ballot in

14  audio form for all four polling locations?

15         A.   No.

16         Q.   Are you aware of anyone who has started

17  the process of creating a Navajo-language ballot in

18  audio form in all four polling locations?

19         A.   No.

20         Q.   Okay.  So then are you saying -- well,

21  let me just back up and ask you a more fundamental

22  question.  Prior to preparing for this deposition,

23  had you ever seen Exhibit 3?

24         A.   No.

25         Q.   Did anyone talk to you about any plans to

Page 46

1    provide any Navajo-language ballot in audio form at
2    these four polling locations?
3          A.   No.
4          Q.   Okay.  So is today the first time you've
5    heard that the county planned on creating a
6    Navajo-language ballot in audio form for all four
7    polling locations?
8          A.   According to this document.
9          Q.   Is that a yes or a no?
10         A.   Yes.
11         Q.   Okay.  Have you ever heard anyone say
12   that they planned on putting a Navajo ballot
13   recording on the county's website for the primary on
14   Tuesday?
15         A.   The county clerk.
16         Q.   When did he say that?
17         A.   I can't remember the dates.  It's in this
18   month.
19         Q.   Okay.  So if I had more questions about
20   the county's plan to provide Navajo-language ballots
21   in audio form at all four poll locations, would I
22   have to talk to the county clerk?
23         A.   Yes.
24         Q.   Is there anyone else I would have to talk
25   to?

Page 47

1          A.    County clerk and James Francom.

2          Q.    So it is fair to say, then, that you are

3     not the most knowledgeable person about topic 3?

4          A.    Repeat that again, please.

5          Q.    I'll ask a better question.  Are you the

6     most knowledgeable person about the issues described

7     in topic 3?

8          A.    Yes.

9          Q.    You are?

10          A.    (Nods head.)

11          Q.    You are the most knowledgeable person

12     about the issues described in topic 3, but you don't

13     have answers to my questions in topic 3?

14              MR. BUTTERFIELD:  Objection.  Asked and

15     answered.

16          Q.    (BY MR. CASTANEDA)  Is that correct?

17              MR. BUTTERFIELD:  Go ahead and answer.

18          A.    Yes.

19          Q.    Do you see the conflict in your answer?

20          A.    Yeah.

21              MR. BUTTERFIELD:  Objection.

22          Q.    (BY MR. CASTANEDA)  Okay.  So I'm going

23     to ask you again.  Are you the most knowledgeable

24     person about the issues described in topic 3?

25              MR. BUTTERFIELD:  Objection.  Asked and

Page 48

1   answered.

2           A.   No.

3           Q.   Okay.  Who are the most knowledgeable

4   people about the issues in topic 3?

5           A.   The county clerk.

6           Q.   And anyone else?

7           A.   County attorney and deputy county clerk.

8           Q.   Okay.  Thank you.  So topic 3 also

9   discusses a telephone number that Navajo voters can

10  call for Navajo-language assistance; right?

11          A.   Yes.

12          Q.   Okay.  Can you give me any more

13  information about whether that telephone number is

14  going to be manned by a person Monday through Friday

15  during normal business hours?

16          A.   The county clerk, the deputy clerk.

17          Q.   What about them?

18          A.   They're at that number if they have

19  somebody call them to talk to them.

20          Q.   I should have asked you a fundamental

21  question.  Do you know anything about this telephone

22  number that Navajo voters can call for

23  Navajo-language assistance?

24          A.   Yes.

25          Q.   What do you know about it?

Page 49

```
 1          A.    Any person that needs to find out about
 2     the election information or voting information can
 3     call the county -- the county clerk's office number.
 4          Q.    Do you know that number offhand?
 5          A.    1 (435) 587-3223, Extension 2,
 6     Extension 1.
 7          Q.    Okay.  And are there people on the other
 8     end of that line that speak Navajo and are able to
 9     translate and interpret --
10          A.    No.
11          Q.    -- the Navajo language?
12          Okay.  So I'm going to re-ask the
13     question again, because the county's document and
14     statement says that it already had plans to, quote,
15     "provide a telephone number that Navajo voters can
16     call for Navajo-language assistance," end quote.
17          My question is do you know anything about
18     that specific telephone number for Navajo voters that
19     they can call for Navajo-language assistance?
20          A.    Yes.
21          Q.    What do you know about it?
22          A.    To provide that number, and any
23     individual that wants to know about the election can
24     call that number.
25          Q.    And what is that phone number?
```

Page 50

1           A.    1 (435) 587-3223.

2           Q.    So that's the same number you gave me

3     before?

4           A.    Yes.

5           Q.    Okay.  But you said that there is not

6     someone on other end of that phone that can interpret

7     Navajo; right?

8           A.    No.

9           Q.    Okay.  So, then, can you tell me how --

10    how that -- how that's going to work?

11          A.    When that voter or that person calls the

12    county clerk's number and whoever answer that phone

13    will also call me on my cell phone.

14          Q.    Okay.  Are you the only Navajo

15    interpreter that will be available for voters?

16          A.    During the working days, yes.

17          Q.    Okay.  So other than a voter seeking

18    Navajo-language assistance calling the county clerk

19    and then being forwarded to your cell phone, are

20    there any other processes for that voter to obtain

21    Navajo-language assistance for the primary?

22          A.    Just by the phone call, whoever answer

23    that phone.

24          Q.    So then the answer to my question is no?

25          A.    No.

Page 51

```
 1          Q.   All right.  Let me clear up the record.
 2   I'm sorry.  Other than the county clerk forwarding a
 3   call to you for Navajo-language assistance, are there
 4   any other processes for a Navajo -- for a voter to
 5   obtain Navajo-language assistance?
 6          A.   They can call me also.
 7          Q.   Okay.  So a voter seeking Navajo-language
 8   assistance can either call the county --
 9          A.   Mm-hmm.
10          Q.   -- who will then call you --
11          A.   Yes.
12          Q.   -- or call you directly.
13          A.   Yes.
14          Q.   Okay.  Now, with regard to the polling
15   locations, are there going to be any interpreters at
16   the -- there?
17          A.   Yes.
18          Q.   Who are the interpreters?
19          A.   Montezuma Creek, I'll probably do that
20   myself.  And over in Monument Valley or Oljato will
21   be --
22          Q.   I'm sorry.  Can you spell those names?
23          A.   Oljato.
24          Q.   Yeah?
25          A.   O-l-j-a-t-o.  That will be Edith Tahy.
```

Page 52

1    Navajo Mountain will be Marieta Steven.

2         Q.   Is that it?

3         A.   That's it.

4         Q.   Will there be any Navajo interpreters in

5    Monticello?

6         A.   No.

7         Q.   So if a voter seeking Navajo-language

8    assistance is going to vote in Monticello, how will

9    they obtain Navajo-language assistance?

10        A.   From the county clerk's office.

11   Eventually they'll call me, and when they call me,

12   I'll talk to the voters and assist them over the

13   phone.

14        Q.   Each of the interpreters you named, do

15   you know how they were trained?  I'm sorry.  Strike

16   that.  Let me ask you a better question.

17             Were the interpreters that you named

18   trained to provide Navajo-language assistance at

19   these polling locations?

20        A.   They were our previous poll workers in

21   the last few years that we hold the election.

22        Q.   Do you know if they received any

23   training --

24        A.   Yes.

25        Q.   -- to assist with their abilities?

1          A.   Yes.

2          Q.   You do know that?

3          A.   Yes.

4          Q.   Okay.  Can you tell me what the training

5    was?

6          A.    Training is that to explain the position

7    that is on the ballot and who they are, and also

8    trained what to say for the Utah State House of

9    Representative, the U.S. Senate, governor's position

10   translation.

11         Q.   Who trained them?

12         A.   I do.

13         Q.   You trained them?

14         A.   I did.

15         Q.   Okay.  When did you train them?

16         A.    I guess depending on their train of

17   thoughts from previous training that I did with them,

18   and I talk to them briefly as I communicate with them

19   that we will use them as poll workers.

20         Q.   So when was the first time you ever

21   trained them for Navajo-language assistance?

22         A.    All these years that I work as training

23   the election process; so that's like 2014, 2012,

24   2010.  I did have a brief discussion as I went and

25   find them, saying that "We would like to utilize you

Page 54

1    as our poll workers."

2         Q.    How did you find them?

3         A.    I went to their home.

4         Q.    Why did you go to their home?

5         A.    According to my other work, I know one of

6    them works as a provider for aging program; so I

7    communicate with her.  The other person that is a

8    senior center cook, and I talk to her and visit her

9    and see if she could do -- help us out with the

10   election, and I briefly went over what needs to be

11   done.

12        Q.    So do you know anything about the basis

13   for their understanding of the Navajo language?

14        A.    Since they were/are previous poll workers

15   as interpreter in translating and assisting us with

16   the election in the previous years.

17        Q.    Yeah.  But how do they become proficient

18   enough to provide Navajo-language assistance in the

19   first place?

20        A.    I guess by training them and helping

21   them, and I don't know whether they have any

22   education background in Navajo language or not.  That

23   I don't know.  But I provide training.

24        Q.    Before you provided them training for the

25   first time, did you know whether or not they even

Page 55

1    knew the Navajo language?

2         A.   Yes.

3         Q.   And how did you know that?

4         A.   Talked to them in Navajo.

5         Q.   Okay.  Otherwise you don't know anything

6    about how they learned the Navajo language?

7         A.   No.

8              MR. CASTANEDA:  Okay.

9              All right.  We just went for an hour.

10   Let's just take a quick five-minute break.

11             We can go off the record.

12             (Recess.)

13        Q.   (BY MR. CASTANEDA)  So still with topic

14   3, a couple fundamental questions about the

15   translations that you discussed, namely, the radio

16   translations.  How do you transmit your translation

17   to the radio stations?

18        A.   By email.

19        Q.   Okay.  I guess I should ask more

20   fundamentally.  How do you record the translation?

21        A.   Record it in a computer recording at the

22   office.

23        Q.   Okay.  And do you know what kind of file

24   that is?

25        A.   I...

Page 56

1          Q.    That's fine if you don't.

2          A.    No.

3          Q.    Okay.  And then you email it from the

4     work computer to the radio station?

5          A.    Yes.  The person that does that with me

6     by the name of John Fellmeth is the IT person.

7          Q.    Okay.

8          A.    He helps me do the recording.  He

9     transmit all the information.

10         Q.    Do you have a work email?

11         A.    No.

12         Q.    Do you have your own email?

13         A.    Yes.

14         Q.    So do you use your personal email for

15    your work?

16         A.    Occasionally.

17         Q.    Okay.  And you also mentioned that for

18    voters seeking Navajo-language assistance they may

19    call you directly?

20         A.    Yes.

21         Q.    Okay.  So do you have a cell phone?

22         A.    Yes.

23         Q.    And they would be calling you on that

24    cell phone?

25         A.    Yes.

1          Q.   Okay.  Is that cell phone paid for by the

2     county or --

3          A.   Yes.

4          Q.   -- by yourself?

5          A.   County.

6          Q.   Okay.  Do you have a personal cell phone?

7          A.   No.

8          Q.   The only cell phone that you have is paid

9     for by the county; is that correct?

10         A.   Yes.

11         Q.   Do you do any translations on your cell

12    phone?

13         A.   Yes.

14         Q.   And do you do those on the recording

15    function of your cell phone?

16         A.   No.

17         Q.   Okay.  So any translations that you do on

18    the cell phone, that would be on a phone call?

19         A.   Yes.

20         Q.   Okay.  Do you ever call into the radio

21    station to provide a live translation?

22         A.   No.

23         Q.   Okay.  Does the county have to pay the

24    radio stations to run the translations?

25         A.   Yes.

Page 58

1       Q.   Do you know how much?

2       A.   Expensive.

3       Q.   Have you ever --

4       A.   Last I heard is like 6,000.

5       Q.   Who did you hear that from?

6       A.   From KTNN and KNDN.

7       Q.   Do you know if the radio station provides

8 an invoice to the county?

9       A.   Yes.

10       Q.   Have you ever seen that invoice?

11       A.   No.

12       Q.   Who would see those invoices?

13       A.   The county clerk would.

14       Q.   Okay.  Does anybody verify that the radio

15 station actually runs the radio announcement?

16       A.   I try to listen to the station, and

17 occasionally I do listen to the station and hear

18 myself.

19       Q.   But nobody at the county -- has anybody

20 at the county been told to make sure that the radio

21 station runs the announcement, to your knowledge?

22       A.   The county clerk and the IT person should

23 have that information.

24       Q.   Okay.

25       So when somebody calls the county to

Page 59

1   obtain Navajo-language assistance and the county then

2   forwards that call to you, is there any record

3   created of that voter's request for Navajo-language

4   assistance?

5        A.   No.

6        Q.   What about when somebody calls you

7   directly for Navajo-language assistance?  Do you

8   create any record of that other than the phone call

9   being on your cell phone?

10        A.   Just on the phone.  I have no recording.

11        Q.   Do you take any notes for any

12   communications that you have with voters seeking

13   Navajo-language assistance?

14        A.   When they call me, I usually call them

15   back right away and ask them, and they talk to me.

16        Q.   Okay.  So you don't make any writings?

17        A.   No.

18        Q.   You mentioned training before, and we

19   discussed a little bit of that training.  Can you

20   describe a little bit more clearly what training for

21   providing Navajo-language assistance at these polling

22   location entails?

23        A.   Explaining the ballot format that we will

24   provide to the voters and what time the poll will be

25   open at the polling place, and assisting the voters

Page 60

1    if they need help and provide the information --

2    ballot information to them, translate the

3    information.

4           Q.   Okay.  So then this -- so then does the

5    training merely include discussions with each of

6    these interpreters?

7           A.   Yes.

8           Q.   And is it a one-time training?

9           A.   Yes.

10          Q.   Okay.  Do they ever have any questions

11   for you?

12          A.   I usually tell them, "If you have any

13   questions, do so," or they can call me.

14          Q.   Okay.  Do they call you with questions?

15          A.   Occasionally.

16          Q.   Take a look again at Exhibit 3, paragraph

17   51.  Let me know when you've had a chance to read

18   that.

19               (Mr. Tapaha reviews document.)

20          A.   Okay.

21          Q.   So paragraph 51 obviously comes after

22   paragraph 50, and in paragraph 50 the county has

23   asserted that it will provide Navajo-language ballots

24   in audio form at all four polling locations; right?

25          A.   Yes.

Page 61

1          Q.   But as we've discussed, no one has asked
2     you to do that to date; correct?
3          A.   We briefly discussed the information, but
4     I usually take everything upon myself to provide
5     information.
6          Q.   I'm sorry.  I don't understand your
7     answer.
8          A.   I usually -- well, I usually take upon
9     myself to explain the election information at the
10    chapters in Navajo language and the vote by mail
11    process and explain the ballots, what it consists of.
12         Q.   Okay.  Let me clarify that.  My next
13    series of questions concerns specifically the
14    Navajo-language ballots in audio form at all four
15    polling locations.  Do you understand that?
16         A.   Yes.
17         Q.   Okay.  And you previously testified here
18    today under oath that as of today no one has asked
19    you to create the Navajo-language ballots in audio
20    form at all four poll locations; correct?
21         A.   Yes.
22         Q.   Okay.  So then my next question concerns
23    specifically paragraph 51, in which the county
24    writes:  "In addition to the forgoing measures, which
25    were adopted and/or approved prior to Counterclaim

Page 62

1    Defendants commencement of the Underlying Action,
2    Edward Tapaha, the county's Navajo Liaison and
3    Election Coordinator, will attend pre-election
4    meetings of all Utah Navajo Nation Chapters to
5    explain, in the Navajo language, the vote-by-mail
6    process, including the ballots."
7                Did I read that correctly?
8         A.   Yes.
9         Q.   Okay.  I want to focus on the first half
10   of the sentence, which talks about the county having
11   already adopted and/or approved the forgoing
12   measures.  Do you see that?
13        A.   Yes.
14        Q.   You understand that paragraph 51 comes
15   after paragraph 50, which discusses Navajo-language
16   ballots in audio form at all four polling locations;
17   right?
18        A.   Yes.
19        Q.   So then you understand paragraph 51 to
20   mean that the county had already adopted and/or
21   approved the provision of Navajo-language ballots in
22   audio form at all four polling locations; right?
23        A.   Yes.
24        Q.   Okay.  So sitting here today, based on
25   your testimony, do you agree with paragraph 51?

Page 63

1          A.   Yes.

2          Q.   How do you agree with paragraph 51 as it

3    relates to the provision of Navajo-language ballots

4    in audio form at all four polling locations?

5          A.   That election information should be in a

6    process of recording and audio at the chapter or at

7    the polling place.

8          Q.   I'm going to try asking the questions a

9    different way, then.  Paragraph 50 concerns the

10   provision of Navajo-language ballots in audio form at

11   all four polling locations; right?

12         A.   Yes.

13         Q.   Okay.  You told me here today that the

14   county has not as of today asked you or anyone else

15   to create Navajo-language ballots in audio format at

16   all four polling locations; correct?  It's a yes or

17   no question.

18         A.   Yes.

19         Q.   Okay.  So with that said, then isn't it

20   true that paragraph 51 is not correct as it relates

21   to the provision of Navajo-language ballots in audio

22   form at all four -- at all four polling locations?

23         A.   Yeah.  Yes.

24         Q.   Okay.  So to sum it up, then, as of today

25   the county has not adopted or approved the provision

Page 64

1    of Navajo-language ballots in audio form at all

2    four -- at all four polling locations?

3            A.   Repeat the question, please.

4            Q.   I will, actually.  Has the county adopted

5    and/or approved the provision of Navajo-language

6    ballots in all four -- excuse me.

7                 Has the county adopted or approved the

8    provision of Navajo-language ballots in audio form at

9    all four -- at all four polling locations?

10                MR. BUTTERFIELD:  I'm going to object,

11   first off, to the extent that it's beyond the scope of

12   the topics.

13                Go ahead and answer.

14           A.   Yes.

15           Q.   You're saying that the county has

16   approved the provision of all four polling locations

17   having Navajo-language ballots in audio form?

18           A.   No.

19           Q.   Okay.  So let's clean it up again.

20           A.   Okay.

21           Q.   I'm going to ask you as clearly as I

22   possibly can.  And also note for the record that

23   topic 3 concerns the provision of Navajo-language

24   ballots in audio form at all four polling locations.

25                My question is has the county adopted

Page 65

1    and/or approved the provision of Navajo-language

2    ballots in audio form at all four polling locations?

3          A.   I guess I could say, yes, we have the

4    recording, and according to your exhibit, that can be

5    recorded and played at the polling site with the

6    website -- with the website on the computer.

7          Q.   You're talking about Exhibit 2 that we

8    discussed before?

9          A.   The recording.

10         Q.   Okay.  That's not what my question is

11   about.  Okay?  And I think everyone in this room

12   knows exactly what my question is about; so I'm going

13   to ask you again.

14              MR. BUTTERFIELD:  Objection.

15   Argumentative.

16         Q.   (BY MR. CASTANEDA)  My question is has

17   the county adopted and/or approved the provision of

18   Navajo-language ballots in audio form at all four

19   polling locations?

20         A.   Yes.

21         Q.   When did they approve that?

22         A.   The date I don't know.  Probably when the

23   document was being prepared.

24         Q.   What document?

25         A.   The document I have before me.

Page 66

1          Q.    How do you know that it was approved?

2          A.    If it's signed by...

3          Q.    Do you have any personal knowledge of the

4     approval?

5          A.    No.

6          Q.    So why are you saying today that the

7     county has adopted or approved the provision of

8     Navajo-language ballots in audio form at all four

9     polling locations?

10         A.    I guess just by reading the document.

11         Q.    So other than reading Exhibit 3 and the

12    statement herein, you don't know whether the county

13    has approved or adopted the provision of

14    Navajo-language ballots in audio form at all four

15    polling locations?

16         A.    No.

17         Q.    So are you the person most knowledgeable

18    about topic 3, then?

19              MR. BUTTERFIELD:  Objection.  Asked and

20    answered.

21              Go ahead and answer.

22         A.    Am I the most knowledgeable person

23    according to 3?  I should say yes.

24         Q.    Okay.  You understand that topic -- let

25    me back up.  You understand that you testified that

Page 67

1    you took an oath to testify truthfully here today?

2          A.   Yes.

3          Q.   Okay.  Looking at topic 3, you understand

4    that topic 3 concerns the county's plans to provide

5    Navajo-language ballots in audio form at all four

6    polling locations?

7          A.   Yes.

8          Q.   Okay.  Do you recall testifying earlier

9    today that as of this date no one has asked you to

10   create a Navajo-language ballot in audio form at all

11   four polling locations?

12         A.   Can you repeat that again, please,

13   slowly?

14         Q.   As of today has anyone asked you to

15   prepare a Navajo-language ballot in audio form for

16   all four polling locations?

17         A.   Yes.

18         Q.   Okay.  When did this -- who asked you?

19         A.   The county clerk.

20         Q.   When?

21         A.   I can't remember the date.  Sometime in

22   June.

23         Q.   In what context did the county clerk ask

24   you?

25         A.   To give information on the ballot about

1    the candidates' position.

2         Q.   Okay.  But there's a difference between a

3    ballot in audio form versus providing information;

4    correct?

5         A.   Yes.

6         Q.   Okay.  You testified earlier that you put

7    information in audio form regarding the election;

8    correct?

9         A.   Yes.

10        Q.   But when I asked you before -- and we can

11   have the court reporter pull up the language -- when

12   I asked you whether anyone had asked you to create a

13   Navajo-language ballot in audio form for each of the

14   four polling locations, you said that no one had;

15   right?

16        A.   Yes.

17        Q.   Okay.  So I'm going to go through the

18   same questions again.

19             MR. BUTTERFIELD:  I will object to asked

20   and answered.

21        Q.   (BY MR. CASTANEDA)  You recall

22   testifying -- you recall taking an oath to testify

23   truthfully here today; correct?

24        A.   Yes.

25        Q.   Okay.  You looked at topic 3; correct?

Page 69

1          A.    Yes.

2          Q.    And you agreed that you were designated

3     by the county as a person most knowledgeable to

4     discuss topic 3; is that correct?

5          A.    Yes.

6          Q.    And you see that topic 3 concerns plans

7     to provide Navajo-language ballots in audio form at

8     all four polling locations; correct?

9          A.    Yes.

10         Q.    Okay.  And you testified earlier today

11    that no one had asked you to create a Navajo-language

12    ballot in audio form for each of the four polling

13    locations; correct?

14         A.    Repeat the question again, please.

15         Q.    You testified earlier today that no one

16    had asked you to create a Navajo-language ballot in

17    audio form for each of the four polling locations;

18    correct?

19         A.    No.

20         Q.    That's not correct?

21         A.    That's not correct.

22         Q.    So who asked you to provide a Navajo

23    ballot in audio form for each of the four locations?

24         A.    The county clerk.

25         Q.    When?

Page 70

1            MR. BUTTERFIELD:  Asked and answered.

2    We've gone over this three times now.

3            MR. CASTANEDA:  Okay.  Can we go off the

4    record?

5            (Recess.)

6            MR. CASTANEDA:  Back on.  Thank you.

7        Q.   (BY MR. CASTANEDA)  So, Mr. Tapaha, I

8    asked you before -- you recall, of course, that you

9    took an oath to testify truthfully here today;

10   correct?

11       A.   Yes.

12       Q.   Okay.  Earlier we played -- we played an

13   exhibit for you, Exhibit 2, and those were recordings

14   from the county website.  Do you recall that?

15       A.   Yes.

16       Q.   Okay.  I'll play them both for you again

17   right now.

18            (Playing audio recording.)

19            Now, that recording you created; correct?

20       A.   Yes.

21       Q.   And it's in the Navajo language; right?

22       A.   Yes.

23       Q.   And that recording is -- that recording

24   provides information about the Democratic race;

25   correct?

Page 71

```
 1          A.   Yes.
 2          Q.   Okay.  I'm going to play the second
 3     recording for you, which is -- well, I'll just play
 4     it for you and then ask you questions.
 5               (Playing audio recording.)
 6               Okay.  And that was you on that
 7     recording, right, Mr. Tapaha?
 8          A.   Yes.
 9          Q.   And you are translating the Republican
10     race --
11          A.   Yes.
12          Q.   -- into Navajo; right?
13          A.   Yes.
14          Q.   Okay.  And who actually put that on the
15     website?
16          A.   Yes.
17          Q.   Who actually put that on the website?
18          A.   The county clerk and the IT person.
19          Q.   Okay.  And they put that on the website
20     for general informational purposes; correct?
21          A.   Yes.
22          Q.   Okay.  So do you understand the
23     difference between the informational recordings that
24     you created versus a Navajo-language ballot in audio
25     form?
```

Page 72

1          A.   Yes.

2          Q.   Okay.  And so you understand that the

3  Navajo-language ballot in audio form -- actually,

4  strike that.

5               You recall -- do you recall testifying

6  earlier today that no one had asked you to create a

7  Navajo-language ballot in audio form?

8               MR. BUTTERFIELD:  Objection to the extent

9  it mischaracterizes the question.  Asked and answered.

10              MR. CASTANEDA:  Strike that.

11         Q.   (BY MR. CASTANEDA)  I'll ask you again.

12  Has anyone asked you to create a Navajo-language

13  ballot in audio form?

14         A.   Yes.

15         Q.   Who asked you to do that?

16         A.   The county clerk.

17         Q.   When?

18         A.   Sometime in June.  I can't remember the

19  date.

20         Q.   So, Mr. Tapaha, are you changing your

21  testimony from earlier today regarding --

22         A.   I was confused about the question

23  previously.

24         Q.   What were you confused about?

25         A.   Understanding what it really meant.

Page 73

```
 1        Q.    Okay.  So have you created the Navajo

 2   ballot yet?

 3        A.    Yes, I created it.

 4        Q.    Where is it?

 5        A.    It's in the audio with the clerk.

 6        Q.    The clerk has the audio ballot right now?

 7        A.    Yes.

 8              MR. BUTTERFIELD:  Can we take a break?

 9              MR. CASTANEDA:  No.

10              MR. BUTTERFIELD:  There's not a question

11   pending.  I can take a break.

12              Come in here.

13              We'll be just a second.

14              (Off the record.)

15              MR. CASTANEDA:  All right.  We can go back

16   on.

17        Q.    (BY MR. CASTANEDA)  Mr. Tapaha, I'm going

18   to ask you again.  Do you recall testifying earlier

19   today that no one had asked you to create a

20   Navajo-language ballot in audio form?

21        A.    Can you repeat it again?

22        Q.    Do you recall testifying earlier today

23   that no one had asked you to create a Navajo-

24   ballot in audio form?

25        A.    Yes.
```

1        Q.    Okay.  Are you changing your answer to
2    that question now?
3        A.    Okay.
4        Q.    What was that?  Are you changing your
5    answer to that question now?
6        A.    Yes.
7        Q.    So now you're saying that someone has
8    asked you to create a Navajo-language ballot --
9        A.    Yes.
10       Q.    -- in audio form?
11       A.    Yes.
12       Q.    Okay.  Why did you change your answer?
13       A.    I misunderstand -- misunderstood the
14   question previously.
15       Q.    What about the question did you not
16   understand?
17       A.    I misunderstand the question being asked,
18   which were adopted and approved in paragraph 51.  I
19   misunderstood.
20       Q.    I asked you the question about your --
21   about whether you were asked to create a
22   Navajo-language ballot about an hour before I asked
23   you the question about paragraph 51; so can you
24   explain to me how that could possibly have changed
25   your answer to a question I asked previously?

Page 75

1          A.   By approaching with my attorney and

2     asking more --

3               MR. BUTTERFIELD:  Just don't say anything

4     that we've talked about, but you can answer the

5     question.

6          Q.   (BY MR. CASTANEDA)  So your attorney gave

7     you the answer?

8          A.   No.  I -- I was asked to translate the

9     ballot into an audio to be available to voters, and

10    that was recorded and -- and it's on the website as

11    you played in the exhibit.

12         Q.   So you're saying that the audio ballot is

13    Exhibit 2?

14         A.   Yes, Exhibit 2, Democrat and Republican

15    ballot.

16         Q.   So that audio ballot is going to be at

17    each of the four polling locations?

18         A.   Yes.

19         Q.   Okay.  And who told you to do that?

20         A.   The county clerk.

21         Q.   And when did he tell you to do that?

22         A.   Sometime in June.  I can't remember the

23    date.

24         Q.   Where did -- where did he tell you to do

25    that?

Page 76

1          A.   At the office, the county clerk's office.

2          Q.   Okay.  And was this -- did you have a

3    meeting with him?

4          A.   Yes.

5          Q.   Okay.  So you're saying, then, that

6    Exhibit 2 is going to be the audio ballot.

7          A.   Yes.

8          Q.   Okay.  How is that going to be -- let me

9    back up.  So you had a conversation with the clerk.

10   Do you remember what time of day it was?

11         A.   Before noon.

12         Q.   Okay.  And do you have any idea whether

13   it was -- was it earlier in the week or later in the

14   week?

15         A.   I believe it was Thursday or -- midweek.

16         Q.   Was it yesterday?

17         A.   No.

18         Q.   Okay.  Was it last week?

19         A.   About two weeks ago.

20         Q.   About two weeks ago.  Okay.  Was anybody

21   else there for that conversation?

22         A.   The clerk and the deputy clerk.

23         Q.   Who is the deputy clerk?

24         A.   James Francom.

25         Q.   Okay.  And where did this meeting take

Page 77

1    place?

2          A.    At the county clerk's office.

3          Q.    Where in the county clerk's office?

4          A.    In his office, Monticello, county clerk's

5    office.

6          Q.    His actual physical office.

7          A.    Yes.

8          Q.    Okay.  So inside his office?

9          A.    Yes.

10         Q.    Was the door shut or open?

11         A.    It was open.

12         Q.    It was open.  Was anybody else in --

13         A.    No.

14         Q.    Is there a waiting room?

15         A.    No.

16         Q.    Did anybody make any writings regarding

17   this?

18         A.    I don't know.

19         Q.    You don't know.

20               Are there any policies or procedures

21   governing how decisions are made with respect to

22   election issues?

23         A.    I don't know.

24               MR. BUTTERFIELD:  Object to the extent

25   it's beyond the 30(b)(6) notice.

Page 78

1          Q.    (BY MR. CASTANEDA)  You don't know?

2          A.    I don't know.

3          Q.    Have you ever reviewed any policies or

4     procedures of the county concerning election issues?

5               MR. BUTTERFIELD:  Objection to the extent

6     it's beyond the 30(b)(6) notice.

7          A.    No.

8          Q.    Have you ever reviewed any policies or

9     procedures regarding any business of the county?

10               MR. BUTTERFIELD:  Objection to the extent

11     it's beyond the 30(b)(6) notice.

12          A.    No.

13          Q.    Okay.  So you -- so tell me exactly how

14     the issue came up regarding creation of the audio

15     ballot.

16          A.    When I was interpreting the radio

17     announcement and the radio announcement information

18     and the county clerk asked me to record additional

19     for the audio, and I just told him that we could use

20     the radio announcement that we did, but I had to go

21     through and review it and make sure it sounds a lot

22     better than the radio announcement; so the recording

23     that we did is the one that would be recorded in the

24     audio.

25          Q.    Okay.  So this Exhibit 2, I just want to

Page 79

1    go back to it.  That is going to be the audio ballot

2    at the polling locations; correct?

3         A.   Yes.

4         Q.   Okay.  And can you tell me the process

5    for creating each of those recordings?

6         A.   It's recorded in the computer format.  I

7    don't know much about computer system and recording.

8    It's recorded in that format, and it will be -- the

9    staff will be there with the -- at the polling site

10   will have that computer in place, and with that

11   computer they can play that audio for anybody that

12   wants to listen to it.

13        Q.   So there's going to be one computer at

14   each polling place.

15        A.   Yes.

16        Q.   Okay.  And each voter will have to go to

17   the computer, play both ballots, and then go and cast

18   their vote?

19             MR. BUTTERFIELD:  Objection to the extent

20   it mischaracterizes.

21        Q.   (BY MR. CASTANEDA)  Is that correct?

22        A.   Yes.

23        Q.   Okay.  Let's talk more about how you

24   actually -- and I don't mean technologically

25   speaking.  What information did you review before you

Page 80

1   translated -- before you created the Navajo-language

2   recordings which are Exhibit 2?

3           A.   I reviewed our -- I had the ballot in my

4   hand that the county clerk shared with me, and out of

5   that ballot information I translate that information

6   to the audio.

7           Q.   Okay.  And what was your exact process

8   for -- for doing that in terms of looking at the

9   ballot and then putting the information into the

10  recording?

11          A.   I -- I studied the ballot format and

12  studied -- went from both ballots, for the Democrat

13  and also for the Republican, and translated the

14  information.

15          Q.   Okay.  And does the translation proceed

16  in the same order as the ballot --

17          A.   Yes.

18          Q.   -- proceeds.

19               Okay.  So it's top to bottom, left to

20  right?

21          A.   Yes.

22          Q.   Okay.  And did anyone check your

23  translation?

24          A.   No.

25               MR. CASTANEDA:  Any more questions on

```
 1   that?
 2              MS. KANE:  (Shakes head.)
 3              MR. CASTANEDA:  No.  Okay.
 4              Go ahead, Maya.
 5              My Counsel has a question.
 6         Q.   (BY MS. KANE)  So the audio recording
 7   that's on the county website is word for word what's
 8   on the ballot?
 9         A.   Yes.
10         Q.   Does the ballot say "Hello"?
11         A.   Yeah.  Navajo.
12         Q.   The ballot says "Hello" in Navajo?
13         A.   It says "Ya'at'eeh."
14         Q.   Are there any other interpretations?
15         A.   Just the ballot information.
16         Q.   Does the English language version of the
17   ballot say "Hello" at the top?
18         A.   Repeat the question, please.
19         Q.   Does the ballot -- the English language
20   version of the ballot that you have say "Hello" at
21   the top?
22         A.   No.
23         Q.   Does it say "Mule Party"?
24         A.   Huh?
25         Q.   Does it say "Mule Party"?
```

Page 82

1          A.    No.

2          Q.    Are there any other words that you might

3    have added?

4          A.    No.

5          MS. KANE:   Okay.

6          Q.    (BY MR. CASTANEDA)   As far as the English

7    language ballot is concerned, were you looking at a

8    final version of the English language ballot?

9          A.    Would you please repeat the question.

10         Q.    Well, I'll back up.  To refresh your

11   recollection, you said that in creating the

12   recordings on the website you looked at the English

13   language ballot --

14         A.    Yes.

15         Q.    -- is that correct?  You then translated

16   the English language ballot into the recording; is

17   that right?

18         A.    Yes.

19         Q.    So the English language ballot you were

20   looking at, where is that, first of all?

21         A.    In the office, county clerk.

22         Q.    Is it your copy?

23         A.    I have a draft copy.

24         Q.    Okay.  So is it -- so it's not a final

25   copy of the ballot?

Page 83

1          A.    I believe, yes, it was the final copy.

2          Q.    Okay.  So you had this two weeks ago?

3          A.    Yes.

4          Q.    Do you know when all the ballots were

5    printed?

6          A.    I don't know.

7                MR. BUTTERFIELD:  Objection to the extent

8    it's beyond the 30(b)(6) notice.

9          Q.    (BY MR. CASTANEDA)  Who prints the

10   ballots for you?

11               MR. BUTTERFIELD:  Object to the extent

12   it's beyond the 30(b)(6) notice.

13         A.    I don't know.

14         Q.    Who would have information about the

15   printing of the ballots?

16         A.    The county clerk.

17               MR. CASTANEDA:  Okay.  Do you guys have

18   anything else on this?

19               MS. KANE:  I'll probably mispronounce

20   this, but the word "Hunushlay" (phonetic)?

21               MR. GORMAN:  Hun'ush'le (phonetic).

22               MR. BUTTERFIELD:  I'm going to object to

23   anyone else talking.

24               MS. KANE:  All right.  I don't have

25   anything else.

Page 84

1          MR. CASTANEDA:  That's fine.

2          Q.   (BY MR. CASTANEDA)  When -- when are

3  the -- when were the ballots -- the ballots mailed

4  out?

5          MR. BUTTERFIELD:  Objection to the extent

6  it's beyond the 30(b)(6) notice.

7          A.   I don't know.

8          Q.   You don't know.  Who would know?

9          A.   The county clerk.

10          Q.   Okay.

11          So you mentioned before that you -- part

12  of your voter outreach duties include providing

13  information to Navajo speakers; correct?

14          A.   Yes.

15          Q.   Okay.  Did you ever discuss with the

16  Navajo speakers when the ballots would be mailed out?

17          A.   No.

18          Q.   Were they curious at all about when these

19  ballots may have been mailed to them?

20          A.   Yes.

21          Q.   So they asked you?

22          A.   They asked me, yes.

23          Q.   And what did you tell them?

24          A.   I told them sometime after this month or

25  the first of the month.

Page 85

1          Q.    After the first of this month?

2          A.    Yeah.  Yes.

3          Q.    Okay.  Who would know when those ballots

4    were mailed out?

5          A.    The county clerk.

6          Q.    Anybody else?

7          A.    Deputy clerk, James Francom.

8          Q.    Okay.  You may have answered this before,

9    but how many Navajo interpreters are there going to

10   be at each location?

11         A.    Three.

12         Q.    Three interpreters at each location or --

13         A.    Yes.

14         Q.    -- three total?

15         A.    Three at each location.

16         Q.    Okay.

17         A.    Or one at each location.

18               MR. BUTTERFIELD:  I think you may want to

19   ask that again.  I think the ships got crossed there.

20               MR. CASTANEDA:  Yeah.

21         Q.   (BY MR. CASTANEDA)  So let's take a look

22   at topic 2.  Can you read that and look up when

23   you're finished, please?

24               (Mr. Tapaha reviews document.)

25         A.    Okay.

 1          Q.   So topic 2 concerns the county's claim

 2     that for the 2016 and future election cycles

 3     Navajo-language assistance will be available at all

 4     four polling places; right?

 5          A.   Yes.

 6          Q.   Including the number of Navajo

 7     interpreters at each location and what the county has

 8     done and plans to do to recruit and train

 9     interpreters; right?

10          A.   Yes.

11               MR. BUTTERFIELD:  I'm just going to object

12     to this line of questioning in that it's already been

13     asked and answered.

14               MR. CASTANEDA:  Okay.

15          Q.   (BY MR. CASTANEDA)  So there are four

16     polling -- there are four polling locations; correct?

17          A.   Yes.

18          Q.   And they are Montezuma Creek, Oljato, and

19     Navajo Mountain and Monticello?

20          A.   Yes.

21          Q.   Okay.  How many interpreters will be at

22     Monticello?

23               MR. BUTTERFIELD:  Asked and answered.

24               You can go ahead and answer.

25          A.   One.

Page 87

1          Q.   Who is that going to be?

2          A.   I don't know.

3          Q.   Okay.  How many interpreters are going to

4     be at Montezuma Creek?

5          A.   One or two.  It will be myself.

6          Q.   So you're going to be at Montezuma Creek?

7          A.   Yes.

8          Q.   Okay.  And who decided that you were

9     going to be at Montezuma Creek?

10          A.   The county clerk.

11          Q.   Okay.  How many interpreters are going to

12     be at Oljato?

13          A.   One.

14          Q.   Okay.  And do you know who that is?

15          MR. BUTTERFIELD:  Objection.  Asked and

16     answered.

17          Answer.  Go ahead.

18          A.   Edith Tahy.

19          Q.   Okay.  And how many interpreters are

20     going to be at Navajo Mountain?

21          A.   One.

22          MR. BUTTERFIELD:  Asked and answered.

23          Q.   (BY MR. CASTANEDA)  And who is that going

24     to be?

25          A.   Marieta Steven.

1    Q.   Okay.  But as of today you don't know who

2  is going to be the interpreter at Monticello?

3    A.   No.

4    Q.   You mentioned just now that there might

5  be two interpreters at Montezuma Creek; right?

6    A.   Yes.

7    Q.   Do you know who that other person might

8  be?

9    A.   One person that I'm still trying to

10  contact by the name of Ruth Johnson.

11    Q.   Okay.  Why do you need two people in

12  Montezuma Creek?

13    A.   We may have a bigger load over there.

14    Q.   Okay.

15    A.   At the same time, if I'm needed elsewhere

16  for some assistance, they will call me to go to,

17  let's say, Oljato.

18    Q.   Okay.  Where are you in the process of

19  finding an interpreter for Monticello?

20    A.   Probably talk to the county clerk and get

21  the -- look for someone that I know of or find

22  someone on the southern part and have them come up

23  here to Monticello.

24    Q.   Have you talked to the county clerk about

25  this already?

Page 89

1         A.   Not yet, no.

2         Q.   Okay.  Can a Navajo voter vote in person

3    in Monticello at any time during this month?

4         A.   Yes.

5         Q.   When was the first day they were allowed

6    to vote in person in Monticello?

7              MR. BUTTERFIELD:  Objection to the extent

8    it's beyond the 30(b)(6) notice.

9              Go ahead and answer.

10        A.   I don't know the answer.

11        Q.   Who would know that answer?

12        A.   The county clerk.

13        Q.   Okay.  And for each of the interpreters

14   at Mont -- well, at Montezuma, Oljato, and Navajo

15   Mountain, the training that they received entailed

16   the discussions that you had with them; correct?

17        A.   Yes.

18        Q.   Which we just talked about earlier; is

19   that right?

20        A.   Yes.

21        Q.   Okay.  Do you have any backup Navajo

22   interpreters in case one or any of these other

23   interpreters cannot show?

24        A.   No.

25        Q.   So when there were polling locations --

Page 90

1    there are four now.  When there were polling
2    locations before 2014, how many polling locations
3    were there?
4          A.    Seven.
5          Q.    Okay.  And how many interpreters were at
6    each polling location then?
7          A.    Three.
8          Q.    Why three for each polling location?
9          A.    I guess they all help each other and
10   interchange, not just one individual will provide
11   interpreting, as to where all three individual assist
12   each other.
13         Q.    Are the interpreters different people
14   than the poll workers?
15         A.    No.
16         Q.    Okay.
17         A.    Poll worker and interpreter are the same
18   person, people that we use.
19         Q.    Do the election judges ever act as
20   interpreters?
21         A.    Yes.
22         Q.    Okay.  And so prior to 2014 were you the
23   person that also trained the interpreters?
24         A.    Yes.
25         Q.    Okay.  And was the training similar to

1   the training as it is now, where you have a

2   discussion with them?

3        A.   Yes.

4        Q.   Okay.  So you had discussions with

5   election judges?

6        A.   Yes.

7        Q.   About translating?

8        A.   Yes.

9        Q.   Okay.  So is there a difference between a

10  poll worker and an election judge, or are they all

11  the same?

12       A.   They're all the same.

13       Q.   They're all the same.  Okay.  So one

14  person could be a Navajo-language interpreter, a poll

15  worker, and an election judge at the same time;

16  right?

17       A.   Yes.

18       Q.   So you need to be bilingual to be an

19  interpreter; right?

20       A.   Yes.

21       Q.   Do you need to be bilingual to be a poll

22  manager?

23       A.   Yes.

24       Q.   Do you need to be bilingual to be an

25  election judge?

Page 92

1      A.   Yes.

2      Q.   And how did you recruit these

3   interpreters, poll workers, and election judges?

4      A.   I know them from previously that I worked

5   with in the election, and we've been using the same

6   workers, poll workers, and at the end of the election

7   I usually ask them, "Would you like to work for us in

8   the next election?"  And they're willing to do it; so

9   I do our recruitment based on that, the list that we

10  have in the office.

11     Q.   Okay.  So is it fair to say, then, that

12  the recruitment of the Navajo interpreters is done

13  somewhat informally?

14     A.   Yes.

15     Q.   Okay.  And it's done mostly through

16  people that you know in the community and have

17  interacted with?

18     A.   Yes.

19     Q.   Have you ever asked someone to be an

20  interpreter and they said no?

21     A.   Yes.

22     Q.   Why did they say no?

23     A.   Work related.

24     Q.   Okay.  So a work conflict, then?

25     A.   Yes.

Page 93

1        Q.   Okay.  And other than just people you
2    interact with, do you -- have you tried to -- well,
3    strike that.
4             In recruiting Navajo interpreters, did
5    you ever put out information on your website seeking
6    Navajo interpreters?
7        A.   No.
8        Q.   Did the county -- did the county ever put
9    information on their website?  You're speaking on
10   behalf of the county, so let mr just clarify that.
11       A.   No.
12       Q.   No.  Okay.  Did the county ever put an
13   advertisement in any of the news publications seeking
14   Navajo interpreters?
15       A.   No.
16       Q.   What about do any radio announcements
17   seeking Navajo interpreters?
18       A.   No.
19       Q.   Okay.  So as of right now you -- the
20   county has hired three interpreters; correct?
21       A.   Yes.
22       Q.   The other two interpreters, who do they
23   work for outside of the county?
24             MR. BUTTERFIELD:  Objection.  Foundation.
25       Q.   (BY MR. CASTANEDA)  Sorry.  Who do they

1   work for other than the county?

2              MR. BUTTERFIELD:  And I objected to

3   foundation.

4          Q.   (BY MR. CASTANEDA)  Let me back up.  The

5   other interpreters, do you know if they have any

6   other jobs?

7          A.   Part time.

8          Q.   Okay.  So what's the process for hiring

9   an interpreter?

10         A.   I approach them and I know them and I

11  work with them.  We worked with them previously, from

12  the previous election, and they always say they're

13  willing to do it and they make arrangements with

14  their -- who they work for.

15         Q.   Is it a paid position?

16         A.   Yes.

17         Q.   And how are they paid?

18         A.   I don't know.  Ask the county clerks.

19         Q.   Okay.  Do you know if they sign any

20  papers to --

21         A.   Just the time sheet.

22         Q.   Time sheet.  Okay.  Do you know if they

23  sign a W-2, provide any of that information?

24         A.   I don't know.

25         Q.   And who would have that information?

Page 95

1          A.    The county clerk.

2          Q.    Okay.

3          A.    Well -- yeah, the county clerk would.

4          Q.    Okay.  And other than speaking Navajo to

5    some degree, are there any qualifications to become

6    an interpreter?

7          A.    Be people orient.

8          Q.    Okay.  And who determines whether or not

9    their qualifications are sufficient to be an

10   interpreter?

11         A.    I probably do.

12         Q.    Okay.  Do you have to get approval from

13   anyone to hire someone as an interpreter?

14         A.    No.

15         Q.    Okay.  So essentially you decide someone

16   is capable of being an interpreter, and after you

17   make that decision who do you talk to within the

18   county to obtain approval for hiring that person?

19         A.    The county clerk.

20         Q.    Okay.  And has he ever said no --

21         A.    No.

22         Q.    -- to an interpreter?

23         A.    (Shakes head.)

24         Q.    Okay.  What other qualifications to be a

25   poll worker?  Are they the same?

1          A.   The same, yes.

2          Q.   And what about an election judge?

3          A.   Same.

4          Q.   Okay.

5               And more fundamentally, you were not

6    trained by the county when you were hired in Navajo

7    translation; right?

8          A.   No.

9          Q.   Okay.  Do you remember testifying in a

10   prior deposition that your Navajo is not that good

11   even after all these years?

12               MR. BUTTERFIELD:  Objection to the extent

13   it's beyond the 30(b)(6) notice.

14         A.   Yes, I did.  Yes.

15         Q.   You do remember testifying to that

16   effect?

17         A.   I don't remember.

18               MR. CASTANEDA:  Okay.

19               That's Exhibit 4, please.

20               (Exhibit 4 was marked.)

21         Q.   (BY MR. CASTANEDA)  Okay.  I'm handing

22   you Exhibit 4, which is a copy of your prior

23   deposition transcript.  I have put it on page 23 for

24   you, but feel free to, you know, rifle through it if

25   you need to make sure it is what it is.

Page 97

```
 1            I'd like to direct your attention to
 2   page 23, lines 12 to 13, that general area.
 3            MR. BUTTERFIELD:  Objection to the extent
 4   this is beyond the 30(b)(6) notice.
 5            Q.   (BY MR. CASTANEDA)  Well, let me back up
 6   for a second just to clarify here.  I mean, as
 7   designated, one of the topics concerns your plans for
 8   educating -- concerns the county's plans for
 9   educating the public about new polling places; right?
10            A.   Yes.
11            Q.   And part of your voter outreach position
12   includes conversing with the Navajo community; is
13   that correct?
14            A.   Yes.
15            Q.   And you agreed with me before that being
16   able to converse in Navajo is essential to your
17   ability to converse with the Navajo community;
18   correct?
19            A.   Yes.
20            Q.   Okay.  So now coming back to this
21   exhibit, do you see where it says "My Navajo is not
22   that good, even after all these years"?
23            A.   Yes.
24            Q.   Okay.  And let me ask you a question now.
25   Has your Navajo improved since then, or is it about
```

1    the same?

2            A.   About the same.

3            Q.   Okay.  Thank you.

4            And you also mentioned before that the

5    county never trained you on how to translate

6    documents into Navajo; right?

7            A.   Yes.

8            Q.   Okay.  So in the same vein -- well, I'll

9    just ask you.  Have you ever been trained in how to

10   translate election documents into Navajo?

11           A.   No.

12           Q.   Okay.

13           MR. BUTTERFIELD:  Can we take just a break

14   real quick?  I want to talk --

15           MR. CASTANEDA:  We can go off the record.

16           (Conversation off the record.)

17           MR. CASTANEDA:  All right.  We can go back

18   on.

19           Q.   (BY MR. CASTANEDA)  So it's fair to say,

20   then, that you -- you oversee -- you're in charge of,

21   rather, each of these Navajo interpreters for the

22   polling locations; right?

23           A.   Yes.

24           Q.   So how do you oversee their performance

25   to make sure that they are doing a good job if you're

1   not there in person and the election is one day only?

2          A.    From previous, when the election were

3   held, I usually go from place to place, from each

4   polling place, and I stay there for about 30 minutes

5   and listen to them doing the interpreting and

6   translating.  And during my training I usually

7   encourage them to explain to me what I said, and they

8   will respond accordingly.

9          Q.    Okay.  But you agree that there is really

10  no formal training or process for their provision of

11  Navajo-language assistance; right?

12         A.    No.  No.

13         Q.    You don't agree with me, or you do agree

14  with me?

15         A.    I do agree.

16         Q.    Does that concern you at all?

17         A.    Yes.

18         Q.    Why does it concern you?

19         A.    Maybe miswording, miswording some

20  information.

21         Q.    Have you ever raised those concerns to

22  anyone in the county?

23         A.    I did talk to the county clerk, and I

24  also talked to the polling official.

25         Q.    When did you do that?

1          A.    From previous election.

2          Q.    Okay.  What were their responses?

3          A.    And they said, "Well, I'll change that

4    information or that wording."

5          Q.    So after the fact.

6          A.    Yes, after the fact.

7          Q.    Okay.  But there's been no discussion

8    on -- well, has there been any discussion about

9    creating a more formal process of training?

10         A.    No.

11         Q.    Okay.  Would you like to see a more

12   formal process of training?

13         A.    It could be done.

14         Q.    I understand that it could be done, but

15   I'm asking --

16         A.    Yes.

17         Q.    -- if you would like to see a more formal

18   process of training.

19         A.    Yes.

20         Q.    Okay.  Have you ever asked for a more

21   formal process of training?

22         A.    No.

23         Q.    Why not?

24         A.    I guess I just took it upon myself to say

25   that I provide that training and continue to do so,

 1    and also meeting with the poll workers as I go about

 2    visiting them and still trying to reemphasize with

 3    them.

 4         Q.   Okay.  Do you think the informal process

 5    of training Navajo interpreters is sufficient right

 6    now?

 7         A.   Yes.

 8              MR. CASTANEDA:  Okay.

 9              Lets take a look at the next exhibit,

10    Exhibit 5.

11              (Exhibit 5 was marked.)

12              MR. BUTTERFIELD:  Just leave them there,

13    and don't take any of the exhibits with you.  The

14    court reporter will chase you down.

15              MR. CASTANEDA:  Maya is going to ask you a

16    quick question before we look at this exhibit.

17         Q.   (BY MS. KANE)  Mr. Tapaha, in your

18    opinion, is it sufficient to have three polling

19    locations on the Navajo reservation?

20         A.   Yes.

21         Q.   In your opinion, is it sufficient to have

22    only one interpreter at each location?

23         A.   Yes.

24         Q.   Do you think you can reach everyone who

25    needs voter assistance with this system?

```
 1        A.   Yes.

 2        Q.   In the past when you had 21 interpreters

 3   total at each election, as you earlier talked about,

 4   were you able to reach every voter who needed

 5   assistance?

 6        A.   Some.

 7        Q.   But not all?

 8        A.   The one that needs it, we provided the

 9   information to them.

10        Q.   But not everyone?

11        A.   Not everyone.

12        Q.   And what if someone needs language

13   assistance but not able to reach you on election day

14   for assistance an interpreter is going to do?

15        A.   They can come to the poll --

16             MR. BUTTERFIELD:  Objection.  Foundation.

17             THE WITNESS:  They can come to the poll

18   and request for assistance.

19        Q.   (BY MS. KANE)  In the past if there was

20   an issue with voting on election day related to

21   language assistance, what -- what occurred?

22             MR. BUTTERFIELD:  Objection to beyond the

23   scope of the 30(B)(6).

24             MS. KANE:  I think that's part of the --

25             MR. CASTANEDA:  He can answer.
```

1           MR. BUTTERFIELD:  Go ahead.  Answer.

2           THE WITNESS:  Repeat the question, please.

3       Q.   (BY MS. KANE)  In the past if there was

4   problem on election day with language assistance or

5   otherwise, how were -- how were those issues

6   resolved?

7           MR. BUTTERFIELD:  Same objection.

8       A.   At the polling place they can request to

9   be assisted with the ballots translation, and people

10  that does the translation can provide that assistance

11  for them.

12      Q.   Have you ever had an instance where an

13  interpreter or translator was not able to help a

14  voter?

15      A.   Not that I know of.

16      Q.   Did you have any other kinds of

17  language-related assistance issues?

18      A.   No.

19      Q.   How about signing -- signing a name on a

20  ballot?

21      A.   Repeat that question.

22      Q.   Were there ever issues with an individual

23  being unable to sign their name on a ballot?

24          MR. BUTTERFIELD:  Objection.  Beyond the

25  30(b)(6) notice.

1          A.    Signing their name on the ballot?  If the

2    person is being sent the ballots at home by mail, I

3    assume that the family has the responsibility to

4    assist whoever that needs it at home, and I value

5    that because I emphasize that family needs to be

6    involved in all the decision making in reference to

7    voting at home, to discuss candidates and issues that

8    affects them so they can assist each other.

9          Q.    And you think family members are capable

10   of this level of translation?

11         A.    I don't know.

12               MS. KANE:  Okay.  Anything else on that?

13         Q.    (BY MR. CASTANEDA)  How is the younger

14   generation's Navajo, to your knowledge?

15               MR. BUTTERFIELD:  Objection.  Beyond the

16   scope of the 30(b)(6) and foundation.

17               MR. CASTANEDA:  You can answer.

18               MR. BUTTERFIELD:  You can answer.

19               THE WITNESS:  Repeat that question for me,

20   please.

21         Q.    (BY MR. CASTANEDA)  Do you have an

22   opinion on the younger generation and their ability

23   to speak Navajo?

24               MR. BUTTERFIELD:  Same objections.

25         A.    Maybe a small number of them will speak

Page 105

1    minimum Navajo language, and I feel that, if they

2    have the family members could value themself to

3    assist each other, they could encourage the younger

4    generation to become involved in interpreting the

5    information, and also from the parents themselves to

6    ask for the assistance from the young generation as

7    much as possible.

8         Q.   But overall you'd agree with me that

9    their Navajo is not that great?

10             MR. BUTTERFIELD:  Objection.  Foundation

11   and beyond the 30(b)(6) notice.

12        A.   There may be a limit.

13        Q.   Do you ever hear of the -- do you ever

14   hear of the Voting Rights Act?

15        A.   Yes.

16        Q.   Do you ever discuss it with your

17   co-workers?

18        A.   No.

19        Q.   So has there been any discussion -- well,

20   I guess based on your answer is it fair to say, then,

21   that you haven't been a part of any discussion

22   regarding the county's obligations under the Voting

23   Rights Act?  Is that fair to say?

24        A.   Yes.

25        Q.   Okay.  So let's actually get to

1    Exhibit 5, which I placed in front of you maybe

2    10 minutes ago now.  What is this document?

3         A.   It's a commission work meeting agenda as

4    of January 21st, 2014.

5         Q.   Okay.  And just to clarify, it's not an

6    agenda so much as it's a meeting notes; right?

7         A.   Yes.

8         Q.   All right.  And I see your name under

9    "Others Present."  Do you see it?

10        A.   Yes.

11        Q.   Were you at this meeting?

12        A.   Yes.

13        Q.   Now, this document includes four people

14   who are, quote/unquote, "Present" and then a list of

15   people who are referred to as "Others Present";

16   right?

17        A.   Yes.

18        Q.   Okay.  Are there more people -- were

19   there -- were other people there other than the

20   people listed under "Present" and "Others Present"?

21        A.   I don't recall.

22        Q.   Okay.  Typically -- well, let me ask you

23   a question.  How many of these meetings have you been

24   to before?

25        A.   I can't recall.

1          Q.   Is it a standing meeting?

2          A.   Yes.

3          Q.   How often does this meeting occur?

4          A.   On a -- on a weekly basis.

5          Q.   Is it the same day a week?

6          A.   Yes.

7          Q.   What day is that?

8          A.   Usually Monday.

9          Q.   Okay.

10              I want to focus on part C., subpart c.,

11  so capital C., little c., and I'll read it into the

12  record.  "Reviewed and discussed the decision to have

13  the County go to an all by mail voting system for

14  2014.  Information was presented by Norman, Edward

15  Tapaha and James Francom.  Monty Wells expressed a

16  descending opinion.  As the decision rests with the

17  county clerk, advertising and information on the

18  process will begin immediately."

19              What information did you provide

20  regarding this subtopic?

21          A.   I was just present at that meeting.

22  Norman, the county clerk, did all the information,

23  provided it.

24          Q.   Okay.  Did Mr. Francom provide any

25  information, or was he just present also?

Page 108

1          A.    He was present also.

2          Q.    What kind of information did Mr. Norman

3     provide?

4          A.    That the county -- that we go to by mail

5     voting process for 2014.

6          Q.    Okay.  Was there -- did he -- did he --

7     was there like any documents from that meeting, or

8     did he just present this orally?

9          A.    I can't recall.

10          Q.    Okay.  Do you see where it says "Monty

11     Wells discussed a descending opinion"?

12          A.    Yes.

13          Q.    Does that mean Monty Wells opposed the

14     decision to go to an all by mail voting system for

15     2014?

16          A.    I don't know.

17          Q.    Do you remember Monty Wells?

18          A.    I know the name.

19          Q.    Do you remember him speaking at this

20     meeting?

21          A.    Yes.

22          Q.    Do you remember what he said?

23          A.    I can't recall.  I don't remember.

24          Q.    Okay.

25                I'm going to show you a few more meeting

Page 109

1   notes.

2             Okay.  Exhibit 6.

3             (Exhibit 6 was marked.)

4        Q.   (BY MR. CASTANEDA)  Just to clarify,

5   Exhibit 5 was for January 21st, 2014.  I'm now

6   showing you Exhibit 6, which is Commission Work

7   Meeting Notes for October 20th, 2014.  I'll just

8   represent to you right now I don't see your name in

9   these notes.

10            Do you recall attending this meeting?

11       A.   No.

12       Q.   Okay.  Do you know that you did not

13  attend this meeting?

14       A.   No.

15       Q.   You don't know.

16       A.   I don't.

17       Q.   You did not attending this meeting?

18       A.   I did not attending this meeting.

19       Q.   Okay.  Nevertheless, if we look at

20  part A., it says "R Lloyd Nielson, resident of

21  Blanding, expressed his opposition to and feelings

22  about the vote by mail election procedures.  Norman

23  Johnson stated that the county clerk's office would

24  be open on election day to allow anyone who wished to

25  vote in person."

Page 110

1           Do you see that?

2      A.   Yes.

3      Q.   Okay.  Do you know who Mr. Nielson is?

4      A.   I don't know.

5      Q.   Okay.  Had you heard any opposition to

6  the vote by mail election procedures beforehand?

7           MR. BUTTERFIELD:  Objection.  Beyond the

8  30(b)(6) notice.

9      A.   No.

10     Q.   No.  No one complained to you about the

11 vote by mail election procedures?

12          MR. BUTTERFIELD:  Objection.

13          THE WITNESS:  No.

14          MR. BUTTERFIELD:  Same.

15          THE WITNESS:  No.

16     Q.   (BY MR. CASTANEDA)  Nobody ever came to

17 you and said they were unhappy with the vote by mail

18 election procedures?

19          MR. BUTTERFIELD:  Asked and answered.

20 Beyond the 30(b)(6) notice.

21          THE WITNESS:  No.

22          MR. CASTANEDA:  Okay.

23          Okay.  We're going to make this

24 Exhibit 7.

25          (Exhibit 7 was marked.)

Page 111

1        Q.    (BY MR. CASTANEDA)  So I just handed you
2   San Juan County Meeting -- San Juan County Commission
3   Meeting, Hideout Golf Course, October 20th, 2015.
4   They look somewhat similar to the prior notes we
5   reviewed.  Again, I'll just tell you that I don't see
6   your name in this document.

7             Did you attend this meeting?

8        A.    No.

9        Q.    Please look at the last page right beside
10  where it says "Commissioner Benally."

11       A.    Mm-hmm.

12       Q.    It says:  "attended chapter meetings.
13  She mentioned that a resolution to oppose the mail-in
14  ballot process was passed at the Red Mesa chapter
15  meeting.  She also attended a meeting in Ouray,"
16  which is O-u-r-a-y.

17       A.    You-ray (phonetic).

18       Q.    Ouray.  Thank you.  And it says:  "Will
19  attend and NDOT meeting in Window Rock this week."

20             Had you ever heard about a resolution to
21  oppose the mail-in ballot process passed at the Red
22  Mesa chapter meeting?

23             MR. BUTTERFIELD:  Objection.  Beyond the
24  scope of the 30(b)(6) notice.

25       A.    I did not attend that meeting.

Page 112

1       Q.   Okay.  But have you ever heard about any

2  resolution to a oppose the mail-in ballot process?

3            MR. BUTTERFIELD:  Same objection.

4       A.   I heard.

5       Q.   What did you hear?

6            MR. BUTTERFIELD:  Same objection.

7       A.   By just someone.

8       Q.   And what specifically did you hear?

9       A.   I just heard that there was a resolution

10  passed that the chapter was opposing the by mail

11  voting.

12       Q.   Okay.  So what you heard concerned Red

13  Mesa chapter specifically; right?

14       A.   Mm-hmm.

15       Q.   Have you heard about any other

16  resolutions to oppose the mail-in ballot process from

17  other chapters?

18            MR. BUTTERFIELD:  Objection.  Beyond the

19  30(b)(6) notice.

20       A.   No.

21            MR. CASTANEDA:  Okay.

22            Let's look at Exhibit 8.

23            (Exhibit 8 was marked.)

24       Q.   (BY MR. CASTANEDA)  And this looks like

25  another set of notes from the San Juan County

Page 113

1  Commission meeting, right, dated February 16, 2016?

2  Is that correct?

3          A.   Yes.

4          Q.   Okay.  Did you attend this meeting?

5          A.   No.

6          Q.   Look on the second page, please, right

7  beside "Commissioner Benally" again.  It says:

8  "attended most of the chapter meetings, but will be

9  gone to NACO this week so she will be able to attend

10  the Oljato meeting on the 21st.  At the meeting there

11  will be a presentation on proposed gravel pit sites.

12  She talked about some concerns at the chapter

13  meetings regarding the transfer of utility power from

14  Utah Power to NTUA.  Also discussed at the chapter

15  meetings was the desire to go back to polling

16  locations for the voting.  She also talked about

17  developing literacy for kids."

18          Have you ever heard anyone talk about the

19  desire to go back to polling locations for the

20  voting?

21          MR. BUTTERFIELD:  Objection.  Beyond the

22  30(b)(6) notice.

23          You can answer, Ed.

24          A.   Yes, just by word of mouth.

25          Q.   Okay.  And what were you hearing?

1        A.    That some of the chapters were opposing

2   to the process.

3        Q.    And who would you hear it from?

4        A.    Just a community member.

5        Q.    Anyone you --

6        A.    I don't know.  I don't know their name.

7              MR. CASTANEDA:  You don't know.  Okay.

8              Do you guys have anything else?

9              We're going to take five and make sure

10  that we're...

11             MR. BUTTERFIELD:  Okay.

12             (Recess.)

13             MR. CASTANEDA:  Back on.

14        Q.   (BY MR. CASTANEDA)  So you mentioned

15  before that you attend chapter meetings?

16        A.    Yes.

17        Q.    How often do you attend them?

18        A.    I try to attend them on a monthly basis,

19  but sometimes it's a conflict.

20        Q.    Okay.  And these are chapter meetings for

21  each of the five chapters; is that correct?

22        A.    Yes.

23        Q.    Okay.  And how often do those chapters

24  have the meetings, whether or not you can attend?

25        A.    On a monthly basis.

1          Q.    Okay.

2          A.    Once a month.

3          Q.    And then you said you try to attend

4    unless there's a conflict.  Do they sometimes -- do

5    chapters have meetings on the same day sometimes?

6          A.    Yes.

7          Q.    Okay.  And how do you get to those

8    chapter meetings?

9          A.    Driving.

10         Q.    Okay.  And is that -- is that part of

11   your duties within your job description of voter

12   outreach?

13         A.    Yes.

14         Q.    Do you submit any forms for reimbursement

15   for the mileage on your vehicle --

16         A.    No.

17         Q.    -- or gas to the county?

18         A.    No.

19         Q.    That's nice of you.

20               When you go to these chapter meetings, do

21   you bring a notebook with you?

22         A.    Yes.

23         Q.    And what do you put in that notebook?

24         A.    Just kind of highlight what I would be

25   saying.

Page 116

1        Q.   Okay.  So you do that before you go to
2   the meeting or after the meeting?
3        A.   During the meeting.
4        Q.   Okay.  But as far as you know, that's --
5   that's the only written recording of those meetings?
6        A.   Yes.
7        Q.   Which is to say that nobody else at the
8   chapter meetings write anything down?
9        A.   I don't know.
10            MR. BUTTERFIELD:  Objection.  Foundation.
11       Q.   (BY MR. CASTANEDA)  You don't know if
12  they do or not?
13       A.   I don't know.
14       Q.   Okay.  Do you have that notebook with you
15  here today?
16       A.   No.
17       Q.   Where is it?
18       A.   At home.
19            MR. CASTANEDA:  Okay.  We're going to
20  request copies of that notebook, and I believe you
21  provided that notebook beforehand.
22       A.   Yes.
23       Q.   You have?
24       A.   Yes.
25       Q.   Okay.  So we'll be requesting the updated

1   copies of that.

2           MR. CASTANEDA:  Do we have the prior

3   notebook?

4           MS. KANE:  Mm-hmm.

5           MR. CASTANEDA:  We do.  Okay.

6       Q.  (BY MR. CASTANEDA)  You mentioned that,

7   when we were talking about prior to 2014, when there

8   were three interpreters at each of the seven polling

9   locations, that you would go from each location and

10  spend about a half an hour at each --

11      A.  Yes.

12      Q.  -- roughly; is that correct?

13      A.  Yes.

14      Q.  So now we're sitting here in 2016, are

15  you going to do the same thing?

16          MR. BUTTERFIELD:  Objection.  It's beyond

17  the 30(b)(6).

18          You can go ahead and answer.

19      A.  Yes.

20      Q.  So when you do that, who is going to be

21  covering Montezuma?

22      A.  The other interpreter that we will get.

23      Q.  Okay.  But you don't have that

24  interpreter yet; right?

25      A.  Not yet.

1         Q.   Okay.  For Oljato -- am I saying that
2    correctly?
3              MS. KANE:  Ol-jay-toe (phonetic).
4              MR. CASTANEDA:  Ojato.  Thank you.
5         Q.   (BY MR. CASTANEDA)  My understanding --
6    well, how is the cell phone service out there?
7         A.   Bad.
8         Q.   Bad.  Okay.  So if somebody has
9    questions, how can they get in touch with you or the
10   county other than driving to a place where there is
11   cell service?
12        A.   One of the staff from here, the clerk's
13   office, will be there, and the interpreter will be
14   there.
15        Q.   Okay.
16        A.   That person, whoever has that question,
17   can ask the staff from the county clerk's office, and
18   they'll have the information.
19        Q.   Okay.
20             Let's take a look at topic 5.  Just give
21   that a look, and let me know when you're ready.
22             (Mr. Tapaha reviews document.)
23        A.   Okay.
24        Q.   Okay.  So I understand that you are going
25   to be speaking with respect to topic 5, subparts a.

1    and b., as it relates to the southern part of the

2    county.  Is that correct?

3           A.   Yes.

4           Q.   Okay.  How many polling locations were

5    there in 2012?

6           A.   Seven.

7                MR. CASTANEDA:  Okay.

8                Exhibit 9.

9                (Exhibit 9 was marked.)

10          Q.   (BY MR. CASTANEDA)  Have you ever seen

11   this document before?

12          A.   Yes.

13          Q.   Okay.  So this is a Public Notice, and

14   this shows 20 polling locations; right?

15          A.   Yes.

16          Q.   Okay.  So can you explain to me why your

17   answer to my prior question was 7 instead of 20?

18          A.   My thought was that, as you're speaking

19   for the -- I'm speaking for the southern part.

20          Q.   Okay.

21          A.   That's why I have seven.

22          Q.   Okay.  So what are the seven polling

23   locations in the southern part?

24          A.   No. 1, Bluff, which even though it's off

25   the reservation.

Page 120

1          Q.    Okay.

2          A.    No. 2, Montezuma Creek.

3          Q.    Okay.

4          A.    No. 3, Aneth.

5          Q.    Mm-hmm.

6          A.    No. 12, Mexican Hat.

7          Q.    Okay.

8          A.    No. 13, Oljato; No. 14, Navajo Mountain;

9   No. 16, Red Mesa.

10         Q.    Okay.  Thank you for clarifying that.

11               How were those locations selected back

12   then?

13         A.    It was like that before I got on board as

14   a worker.

15         Q.    So before 1991?

16         A.    Yes.

17         Q.    Okay.  Now, the new locations of which

18   you have been designated to talk about educating the

19   public on, how were those four locations selected?

20         A.    Discussion.  I believe the discussion was

21   made between the county clerk and the deputy clerk,

22   and they informed me about the three location for the

23   southern.

24         Q.    Did they tell you why they went from

25   seven locations in 2012 to four locations now?

Page 121

1          A.    The reason why was that it's a by mail

2     voting.

3          Q.    Okay.  So the thought, then, is that

4     because there is also mail-in-vote voting that not as

5     many in-person locations are needed; is that right?

6          A.    Could be.

7          Q.    Okay.  Who would have -- well, how was

8     that decision made?  Were there any writings or

9     documents created for that decision?

10         A.    The county clerk office has that

11    information.

12         Q.    Okay.  So you sitting here today, you

13    don't know that.

14         A.    The decision was made by the county

15    clerk.

16         Q.    Okay.  So if I want to find out more

17    information about that decision-making process, I

18    have to talk to the county clerk?

19         A.    Yes.

20               MR. BUTTERFIELD:  Objection to the extent

21    this is beyond the scope of his designation.

22         Q.    (BY MR. CASTANEDA)  Is there anybody else

23    I could talk to about that?

24         A.    County clerk, deputy clerk.

25         Q.    Okay.

Page 122

1          There has been a suggestion in -- or a

2     statement rather, if you go back to Exhibit 3.  It

3     should be page 8, paragraph 48.  It says:  "For the

4     2016 and future election cycles, every resident of

5     San Juan County will be within a one-hour drive of a

6     polling location."

7               Do you see that?

8          A.   Yes.

9          Q.   Do you know how that determination was

10    made?

11               MR. BUTTERFIELD:  Objection.  Beyond the

12    scope of 30(b)(6).

13          A.   That was probably the decision that was

14    made by the county clerk.

15          Q.   So you don't know how this one-hour drive

16    was arrived at?

17          A.   I don't know.

18               MR. CASTANEDA:  Okay.

19               Do you guys have anything else?  I have a

20    few wrap-up questions for him.

21               MS. KANE:  Was he consulted?

22          Q.   (BY MR. CASTANEDA)  Were you consulted at

23    all about selection of the new four polling locations

24    for this election?

25          A.   Yes.

Page 123

1          Q.    Who were you -- who consulted with you?

2          A.    The county clerk.

3          Q.    Okay.  And what specifically did he ask

4     you about these locations?

5          A.    He just mentioned that we will open the

6     four polling place, but mostly he mentioned the three

7     location on the southern part.

8          Q.    So he had already decided where the

9     locations would be before he talked to you?

10         A.    No, I don't -- I didn't decide on them.

11    The county clerk did.

12         Q.    He decided.

13         A.    He decided.

14         Q.    Okay.  So he didn't really ask your

15    opinion on where those locations should be.  He told

16    you.  Right?

17              MR. BUTTERFIELD:  Objection.

18    Mischaracterizes the testimony.

19         A.    He told me.

20         Q.    Well, I'll ask you whether or not I

21    mischaracterized your testimony.  Did he -- did he

22    tell you, or did he ask you?

23         A.    He told me.

24         Q.    Okay.  Did you have any response to him

25    about those four places?

Page 124

1        A.   Yes.

2        Q.   And what was your response?

3        A.   I -- I just mentioned that I hope that's

4   a good location that we can deal with.  Within the

5   vicinity of the other location of the precinct it

6   was, there would be more of a -- I guess the reason

7   why is that post office and clinic -- or let's say in

8   Montezuma Creek there's a post office and a clinic

9   there; so people can go there.

10       Q.   So do you have concerns about the four

11  polling locations?

12       A.   No.

13       Q.   You think that they're sufficient?

14       A.   They're sufficient, yes.

15       Q.   Okay.

16            All right.  So zeroing more specifically

17  on the decision that was made sometime this year to

18  introduce the four polling locations, do you know

19  when that decision was made?

20       A.   I don't know.

21       Q.   And who would know when the decision was

22  made?

23       A.   The county clerk.

24       Q.   Okay.  Has the county publicized any

25  record of that decision?

1            MR. BUTTERFIELD:  Objection.  This is

2    beyond the scope of his 30(b)(6) designation.

3            Q.   (BY MR. CASTANEDA)  I'm sorry.  Let me

4    back up.  When did the county clerk tell you about

5    the new four polling locations?

6            MR. BUTTERFIELD:  Objection.  Beyond the

7    scope of the 30(b)(6) designation.

8            A.   I can't recall.

9            Q.   Was it this month?

10           A.   No.

11           Q.   Was it last month?

12           A.   About a month -- a couple months ago, but

13   I'm not sure of the date.

14           Q.   You're not sure?

15           A.   No.

16           Q.   Anyway, it was just an oral conversation?

17           A.   Yes.

18           Q.   Did he write this down at all?

19           A.   I don't know.

20           MR. BUTTERFIELD:  Objection.  Foundation.

21           Q.   (BY MR. CASTANEDA)  Do you communicate

22   with the county clerk via email at all?

23           A.   No.

24           Q.   Do you send him text messages?

25           A.   I call him.

Page 126

1          Q.    Okay.  How often do you call him?

2          A.    Once a week.

3          Q.    And what do you typically discuss on your

4     phone calls with him?

5          A.    I just ask him to see if any new

6     information is readily available of what's happening.

7               MR. CASTANEDA:  This is Exhibit 10.

8               (Exhibit 10 was marked.)

9          Q.    (BY MR. CASTANEDA)  Do you read the

10    Navajo Times?

11         A.    Once in a while.

12         Q.    Okay.  Do you remember this article?

13         A.    No.

14         Q.    You've never seen this article before?

15         A.    No.

16         Q.    Okay.  Does this refresh your

17    recollection at all about when you were told about

18    the new polling places?

19         A.    Could you repeat that question, please?

20         Q.    Does this refresh your recollection at

21    all about when the county clerk told you about the

22    new four polling places?

23         A.    I can't recall.

24         Q.    So it does not refresh your recollection?

25         A.    No.

1          Q.   Okay.

2               When a decision is made to change how the

3     county operates, how is that decision usually

4     captured?

5               MR. BUTTERFIELD:  Objection.  Beyond the

6     scope of his 30(b)(6) designation.

7          A.   By verbal information.

8          Q.   By verbal what?

9          A.   Verbal information.

10         Q.   So it's not written down anywhere?

11         A.   No.

12         Q.   So how do you check when decisions are

13    made?  Just memory?

14         A.   Just memory.

15              MR. BUTTERFIELD:  Objection.  Beyond the

16    scope of --

17         Q.   (BY MR. CASTANEDA)  Just memory?

18         A.   I usually ask the county clerk.  Like I

19    said, I call on a weekly basis.

20         Q.   Okay.  Do you know if he writes anything

21    down with respect to the decision that he makes?

22              MR. BUTTERFIELD:  Objection.

23              Let me get my objection in before you

24    answer and before I get cut off.

25              Objection.  Foundation.  Beyond the scope

Page 128

1   of his 30(b)(6) designation.

2            THE WITNESS:  I don't know.

3            MR. CASTANEDA:  Okay.  Let's mark this

4   Exhibit 11, please.

5            (Exhibit 11 was marked.)

6        Q.   (BY MR. CASTANEDA)  Do you read the

7   San Juan Record?

8        A.   Once in a while.

9        Q.   Okay.  Take a look at this article, and

10  then let me know whether or not you've seen it.

11           (Mr. Tapaha reviews document.)

12       A.   I don't recall.

13       Q.   Take a look at the first paragraph where

14  it says:  "Rebecca Benally reported at the February

15  16 meeting of the San Juan County Commission that

16  most of the Navajo chapters in the county favor

17  polling places and voter booths on election day

18  rather than mail-in ballots."

19           Do you see that?

20       A.   Yes.

21       Q.   Were you at that meeting?

22       A.   No.

23       Q.   Okay.  Stepping apart -- stepping away

24  from that meeting, do you agree with that statement,

25  that most of the Navajo chapters in the county favor

Page 129

1    polling places?

2              MR. BUTTERFIELD:  Objection.  Beyond the

3    scope of his designation and foundation.

4              Go ahead and answer.

5         A.   I don't know.

6         Q.   You don't know if you agree with it?

7         A.   I agree with it.

8         Q.   So you do agree with that statement.

9         A.   Yes.

10        Q.   Okay.

11             Look at the third paragraph where it

12   says:  "Benally said elections are an item on an

13   upcoming Utah Navajo Commission agenda.  A UNC

14   decision represents all seven chapters because the

15   chapter presidents each have a vote on the

16   commission."

17             Do you see that?

18        A.   Yes.

19        Q.   Do you attend the UNC meetings?

20             MR. BUTTERFIELD:  Objection.  Beyond the

21   scope of his designation.

22        A.   No.

23        Q.   Okay.

24             Look at the fourth paragraph where it

25   says:  "Bruce Adams said Mark Thomas, the State

Page 130

```
1    Director of Elections, said the state recommendation
2    is that the county go away from the mail-in ballot."
3              Do you see that?
4         A.   Yes.
5         Q.   And do you see where it says:  "Adams
6    added that the decision is up to the commissioners"?
7         A.   Yes.
8         Q.   Do you see where it says:  "County Clerk
9    John David Nielson said he had not received any
10   written recommendations"?
11        A.   Yes.
12        Q.   Okay.  Have you ever seen the state
13   recommendation?
14        A.   No.
15             MR. BUTTERFIELD:  Objection.  Beyond the
16   scope of his designation.
17             MR. CASTANEDA:  Okay.
18             THE WITNESS:  No.
19        Q.   (BY MR. CASTANEDA)  Are you aware of any
20   written recommendations regarding the mail-in ballot
21   procedure?
22        A.   No.
23             MR. BUTTERFIELD:  Beyond the scope.
24        Q.   (BY MR. CASTANEDA)  Who would have more
25   information on that?
```

Page 131

```
 1          A.    The county clerk.

 2                MR. CASTANEDA:  I think that's it.  Thank

 3    you for your time.

 4                MR. BUTTERFIELD:  Ed, I'm going to ask you

 5    a couple questions, just some follow-up and clarifying

 6    questions.

 7                           EXAMINATION

 8    BY MR. BUTTERFIELD:

 9          Q.    Earlier you testified that you have the

10    ability to translate from Navajo to English and

11    English to Navajo and that you do those well; is that

12    correct?

13          A.    Yes.

14          Q.    And that's your testimony?

15          A.    Yes.

16          Q.    If we will look at Exhibit 4, this is

17    your deposition from one year ago today, June 24th,

18    2015, and this was a deposition, I believe, taken by

19    Mr. Steven Boos, and if you will go to page 23.

20    Counsel asked you about this and read a statement he

21    attributed to you wherein it was discussed -- wherein

22    there's a statement that says:  "My Navajo is not

23    that good."

24                And let me -- if you can read from

25    Exhibit 4, line 10, you will see an "A," and I will
```

1   represent for the record that that means that's an

2   answer to a question, and when there is a "Q," that

3   means that there is a question, and that's the

4   question.

5              Starting with line 9, will you read the

6   answer.

7        A.   "What I was going to say is I will

8   explain it to you in Navajo, you translate that."

9        Q.   Who said that?

10       A.   I did.

11       Q.   And then will you read the question that

12  follows that.

13       A.   "Sorry.

14             "My Navajo is not that good, even after

15  all these years.  Mr. Swenson might be better.  I

16  don't know."

17             Well, what can you tell me about it in

18  English?  I am sorry."

19       Q.   So is it your understanding that that

20  actually is a question from Mr. Boos, not a statement

21  by you?

22       A.   Yes.

23       Q.   And then what -- and then read line 16.

24       A.   "Huh?"

25       Q.   That's a question from you, and then read

Page 133

1    the question again starting with Line 17.

2         A.    "What can you tell me about the Navajo

3    district in English?  What did you understand or what

4    do you understand it was supposed to be about?"

5         Q.    So it's your testimony that you did not

6    say that your Navajo is not that the good?

7         A.    No.

8         Q.    Even though that was represented to you

9    today by counsel?

10        A.    Yes.

11        Q.    Thank you.

12              Earlier there was some discussion about

13   radio announcements, and there was a discussion with

14   respect to how many radio stations -- or how many

15   announcements there were, and you mentioned there

16   were six announcements; correct?

17        A.    Yes.

18        Q.    And those six announcements were played

19   on how many radio stations?

20        A.    Two radio station.

21        Q.    Was there a third one that you had

22   mentioned, a third radio station as well?

23        A.    No.

24        Q.    Just two radio stations?

25        A.    Just the two.

1       Q.   So it was 12 announcements, six on one

2    station and six on the other?  Is that my

3    understanding?

4       A.   Six radio -- let me put it this way:  Two

5    radio announcement from KTNN and KNDN within one

6    week; so that's two, four, six.

7       Q.   Okay.

8       A.   And then same thing the other month, two,

9    four, six; so there's 12 radio announcement on both

10   station.

11      Q.   Okay.  Do you know if your cell phone

12   number is on the county website --

13      A.   Yes.

14      Q.   -- for -- and what's it there for?

15      A.   For information, and if any voter wants

16   to call me, they can call me.

17      Q.   So anyone can go onto the website and

18   find your cell phone number and give you a call

19   anytime?

20      A.   Yes.

21           MR. BUTTERFIELD:  Can we mark this?

22           (Exhibit 12 was marked.)

23      Q.   (BY MR. BUTTERFIELD)  You've just been

24   handed what's been marked as Exhibit 12, and I'll

25   note for the record there is also an Exhibit 8

Page 135

1  sticker on here, which is -- I'll represent is

2  Exhibit 8 from your previous deposition from a year

3  ago.  Do you recognize this document?

4           A.   Yes.

5           Q.   What is it?

6           A.   It's my daily diary that I carry with me.

7  Most of the information that I jot down are client

8  that we visit with my other job and clients that we

9  visit, and also in it I usually document in it that I

10  attend this meeting, give this information.  Mostly

11  in that document it says election information that

12  consists of any information that I gave out today.

13           Q.   Okay.  Thank you.

14                Do you know how long your phone number

15  has been on the website?

16           A.   Ever since I got a cell phone.

17           Q.   So when did you get your cell phone?

18           A.   Back in 1991.

19           Q.   So your cell phone -- I mean, maybe the

20  county didn't have a website in '91, but it's --

21           A.   Yes.

22           Q.   -- been on the website for a number of

23  years?

24           A.   Yes.

25           Q.   You were asked about the polling

Page 136

1    locations and about your conversations with the
2    county clerk and any input that you may have had.
3    Did you -- did you provide any input on polling
4    locations to the county clerk?
5              A.   Yes.
6              Q.   You did?
7              A.   Yes.
8              Q.   And what information did you provide?
9              A.   The information is that the location is
10   what we've been using all these years.
11             Q.   Okay.
12             A.   And voters should be able to know where
13   the location is.
14                  MR. BUTTERFIELD:  Okay.
15                  That's all I have on follow-up.
16                  MR. CASTANEDA:  Unfortunately, we have a
17   new exhibit, so I have a couple follow-up questions.
18   I apologize.
19                       EXAMINATION
20   BY MR. CASTANEDA:
21             Q.   If you could go to -- this is Exhibit...
22                  MR. BUTTERFIELD:  12.
23                  MR. CASTANEDA:  12.  Thank you.
24             Q.   (BY MR. CASTANEDA)  -- your entry from
25   the week of June 23rd to the 29th.  There are no page

```
 1   numbers; so take your time in finding that.
 2           A.   Okay.
 3           Q.   And I'm looking specifically at
 4   June 24th, Tuesday.
 5           A.   Yes.
 6           Q.   And what's the significance of that date?
 7           A.   It's the primary election result.
 8           Q.   Okay.  And do you see where it says
 9   "Primary election"?
10           A.   Yes.
11           Q.   Okay.  And then underneath that it looks
12   like there's a star or an X?
13           A.   Mm-hmm.
14           Q.   Can you tell me what that says there?
15           A.   That's just an entry that I usually use.
16           Q.   Well, what does it say, the handwriting
17   underneath "Primary election"?
18           A.   I can't read my own writing.
19           Q.   Is the second word --
20           A.   It says "poll."
21           Q.   Is the second word "ballots"?
22           A.   Yes, second word "ballots," at Montezuma
23   Creek and Bluff.
24           Q.   Okay.  So what's the first word?
25           A.   I think that's "poll."
```

Page 138

```
 1          Q.   Is it "pick"?

 2          A.   Yeah, "pick."

 3          Q.   So it says:  "Pick ballots at MC/Bluff"?

 4          A.   Mm-hmm.

 5          Q.   And "MC" is Montezuma Creek?

 6          A.   Yeah.

 7          Q.   Do you recall what that entry summarizes

 8   exactly?

 9          A.   I can't recall.

10          Q.   Are you -- are you driving ballots from

11   Montezuma County and Bluff to -- I'm sorry --

12   Montezuma Creek and Bluff to Monticello?

13          A.   Previously, yes.

14          Q.   Does -- okay.  So does "Pick ballots at

15   MC/Bluff" -- do you have any idea what that means

16   sitting here today?

17          A.   No, I don't.

18          Q.   And then what about beneath that?  We see

19   "Rebecca Benally and Roger at city," and then numbers

20   beside them.  What are those for?

21          A.   That's the vote that they had, that they

22   received.

23          Q.   Okay.  Why are there three numbers there?

24          A.   The other part is just a number that I

25   had.  I can't recall on that one.  I think that was
```

Page 139

1    the result or the -- I can't recall.

2         Q.   Do you know what each of -- so you don't

3    know what either of those numbers stand for?

4         A.   Rebecca Benally, 541?

5         Q.   Mm-hmm.

6         A.   That's the vote that she got.

7         Q.   Okay.

8         A.   And then Roger Atcitty, that's the vote

9    that he got.

10        Q.   So you just don't know what 1879 stands

11   for, right?

12        A.   No.

13        Q.   And I see beside there in the margin it

14   says 8:30, 6:30, or maybe it says 8:00 and 6:30.

15        A.   That's my time.

16        Q.   That's your time?

17        A.   Yeah.

18        Q.   So that's the time you worked that day?

19        A.   Yes.

20        Q.   Okay.  Were you frequently driving

21   ballots up to Monticello during that time period?

22        A.   Yes.

23        Q.   So you were going to each of these

24   locations and then driving to Monticello and then

25   back?

1      A.    Just pick them up all and bring them --
2   bring them in.
3      Q.    You did that in one -- one trip --
4      A.    Yes.
5      Q.    -- or several trips?
6      A.    One trip.
7      Q.    Okay.  Do you know at what time in the
8   day you did that?
9      A.    I don't know.  I can't recall.
10     Q.    (BY MS. KANE)  Why?
11     A.    Huh?
12     Q.    Why?
13     A.    If there was some that are -- well, I
14  guess let me retract that statement.  I think what
15  I'm saying there is -- oh, I can't really recall.
16     Q.    But you did testify that you have driven
17  ballots up from locations on the Navajo reservation
18  to Monticello?
19     A.    Yes.
20     Q.    And what would be the reason for you to
21  do that?
22     A.    Bring it into the clerks.
23     Q.    And why would you do that for somebody
24  else?
25            MR. BUTTERFIELD:  Objection.  That's

Page 141

1    mischaracterizing the testimony or lack of foundation.

2             MS. KANE:  I'm just trying to understand.

3    He says he driving ballots up.  I just want to

4    understand the reason.

5             Q.   (BY MS. KANE)  Why would you have

6    occasion to drive a ballot up?

7             A.   Bring them in.

8             Q.   (BY MR. CASTANEDA)  To be counted?

9             A.   To -- if there's a leftover ballot that

10   we got and pack them and bring them in.

11            Q.   So these are ballots that were not cast?

12            A.   Not used.

13            Q.   So these are blank ballots.

14            A.   Blank ballots.

15            MS. KANE:  So you have never brought up a

16   filled out ballot.

17            THE WITNESS:  Yeah.

18            Q.   (BY MR. CASTANEDA)  Is that correct?

19            A.   Yes.

20            Q.   Okay.  Now, please find the week of

21   November 3rd to the 9th.

22            A.   Okay.

23            Q.   Specifically November 4th, Tuesday.  Do

24   you see where it says "election"?

25            A.   Yeah.  Yes.

Page 142

1        Q.   And then in the margin it says "7:00 to
2   12:00"?
3        A.   Yes.
4        Q.   Are those the hours that you worked on
5   the election that day?
6        A.   Yes.
7        Q.   Okay.  And I see that there's no notes
8   there beneath "election."  Is that correct?
9        A.   Yes.
10        Q.   Do you recall which -- which polling
11   locations you traveled to that day?
12             MR. BUTTERFIELD:  Objection.  Foundation.
13   Or lack of foundation with regard to --
14        Q.   (BY MR. CASTANEDA)  Did you travel to any
15   polling location on that day?
16        A.   No.
17        Q.   What did you do that day for the
18   election?
19        A.   I was here at the office.
20        Q.   So you were here in Monticello --
21        A.   Yes.
22        Q.   -- the entire day?  Okay.
23             One final document, Exhibit 13.
24             (Exhibit 13 was marked.)
25             So that document is a Public Notice

Page 143

1    concerning the June 2014 election; right?

2         A.   Yes.

3         Q.   And that document notifies the public

4    about the switch to mail-in only voting; right?

5         A.   Yes.

6         Q.   Okay.  Do you recall seeing that notice?

7         A.   Yes.

8         Q.   When did you see it?

9         A.   Prior to the election.

10        Q.   Excuse me?

11        A.   In the paper and Mr. Johnson shared it

12   with me.

13        Q.   So that notice was issued in March of

14   2014; right?

15        A.   Yes.

16        Q.   And what's the specific date on that

17   notice?

18        A.   It's March 27, 2014.

19        Q.   So you're saying that the first time you

20   saw it is a few days after it was -- a few days after

21   March 27, 2014?

22        A.   Yes.

23        Q.   Okay.  Has there been a Public Notice

24   issued for the changes relating to this June 2016

25   election?

Page 144

1        A.   I can't recall.

2        Q.   Has anybody talked to you about a Public

3   Notice for those changes?

4        A.   I don't remember.

5        Q.   Okay.  Have you ever heard anyone talk

6   about issuing a Public Notice for the changes in

7   those -- in the June 2016 election?

8        A.   I don't remember.

9        Q.   Okay.  Who would know whether or not a

10   Public Notice was issued about the changes for the

11   June 16 election?

12       A.   The county clerk would.

13       Q.   Okay.  Anybody else?

14       A.   Maybe the commissioner.

15       Q.   Do you have any idea how many Navajo

16   voters have access to the Internet?

17            MR. BUTTERFIELD:  Objection.  Beyond the

18   scope of his 30(b)(6) designation.  Foundation.

19            You can answer if you can.

20       A.   I don't know.

21       Q.   Okay.  Do you know whether a non-English

22   speaking Navajo voter can distinguish your cell phone

23   number from an office number on the Internet?

24            MR. BUTTERFIELD:  Objection.  Lack of

25   foundation.  Beyond the scope of his 30(b)(6)

Page 145

1  designation.

2          A.   I don't know.  But I did get a call from

3  one saying, "Is this Mr. Tapaha?"  I guess one of the

4  family member got the number for them.

5          Q.   Do you know any non-English speaking

6  Navajo voters that have a computer?

7              MR. BUTTERFIELD:  Objection.  Beyond the

8  scope of his 30(b)(6) designation.  Foundation.

9              THE WITNESS:  No.

10             MR. CASTANEDA:  That's it for me.

11             MR. BUTTERFIELD:  All right.

12             (Concluded at 1:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 146

```
 1                        CERTIFICATE
 2     STATE OF UTAH          )
                              )
 3     COUNTY OF UTAH         )
 4              THIS IS TO CERTIFY that the deposition of
       EDWARD TAPAHA was taken before me, Jerry R. Martin, a
 5     Registered Professional in and for the state of Utah;
 6              That the said witness was by me, before
       examination, duly sworn to testify the truth, the
 7     whole truth, and nothing but the truth in said cause;
 8              That the testimony of said witness was by
       me reported in stenotype, and therefore caused to be
 9     transcribed into typewriting, and that a full, true,
       and correct transcription of said testimony so taken
10     and transcribed is set forth in the foregoing pages,
       numbered 5 to 145, inclusive, and said witness
11     deposed and said as in the foregoing annexed
       deposition;
12
                I further certify that I am not of kin or
13     otherwise associated with any of the parties to said
       cause of action, and that I am not interested in the
14     event thereof.  WITNESS MY HAND AT OREM, UTAH, THIS
       28TH DAY OF JUNE 2016.
15
16
17     _____
       JERRY MARTIN, RPR
18
19
20
21
22
23
24
25
```

Page 147

1     Navajo Nation Human Rights v. San Juan County

2                  Edward Tapaha

3           INSTRUCTIONS TO THE WITNESS

4           Please read your deposition over

5     carefully and make any necessary corrections.

6     You should state the reason in the

7     appropriate space on the errata sheet for any

8     corrections that are made.

9           After doing so, please sign the errata

10    sheet and date it.

11          You are signing same subject to the

12    changes you have noted on the errata sheet,

13    which will be attached to your deposition.

14          It is imperative that you return the

15    original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24

25    2333188

Page 148

1      Navajo Nation Human Rights v. San Juan County

2                      Edward Tapaha

3                      E R R A T A

4                      - - - - -

5      PAGE   LINE    CHANGE

6      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

7      Reason:_____

8      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

9      Reason:_____

10     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11     Reason:_____

12     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13     Reason:_____

14     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15     Reason:_____

16     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17     Reason:_____

18     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19     Reason:_____

20     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

21     Reason:_____

22     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23     Reason:_____

24     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

25     2333188

Page 149

1    Navajo Nation Human Rights v. San Juan County

2                    Edward Tapaha

3              ACKNOWLEDGMENT OF DEPONENT

4                 I, _____, do

5    hereby certify that I have read the foregoing

6    pages and that the same is a correct

7    transcription of the answers given by

8    me to the questions therein propounded,

9    except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____          _____

14   DATE                    SIGNATURE

15

16   Subscribed and sworn to before me this

17   _____  day of _____, 20___.

18

19   My commission expires: _____

20   _____

21   Notary Public

22

23

24

25   2333188

# Exhibit 13

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
3                          * * *
4   NAVAJO NATION HUMAN RIGHTS  )
    COMMISSION; PEGGY PHILLIPS; )
5   MARK MARYBOY; WILFRED       )
    JONES; TERRY WHITEHAT;      )
6   BETTY BILLIE FARLEY;        )   No. 2:16-cv-00154 JNP
    WILLIE SKOW; and MABEL      )
7   SKOW,                       )
              Plaintiffs,       )
8                               )
        vs.                     )
9                               )
    SAN JUAN COUNTY; JOHN DAVID )
10  NIELSON, in his official    )
    capacity as San Juan County )
11  Clerk; and PHIL LYMAN,      )
    BRUCE ADAMS, and REBECCA    )
12  BENALLY, in their official  )
    capacities as San Juan      )
13  County Commissioners,       )
                                )
14            Defendants.       )
15
16        30(b)(6) DEPOSITION OF SAN JUAN COUNTY
                   BY JAMES FRANCOM
17
18             Friday, June 24, 2016
19                   1:55 p.m.
       Taken at the San Juan Public Safety Building
20               297 S. Main Street
               Monticello, Utah  84535
21
22
23            VERITEXT LEGAL SOLUTIONS
                 MID-ATLANTIC REGION
24          1801 Market Street - Suite 1800
               Philadelphia, PA  19103
25
```

Page 2

```
 1                    A P P E A R A N C E S
 2   For the Plaintiffs:
 3                    PATRICK CASTANEDA, ESQ.
                      DLA PIPER
 4                    One Liberty Place
                      1650 Market Street, Ste. 4900
 5                    Philadelphia, PA  19103
                      (215) 656-3378
 6                    patrick.castaneda@dlapiper.com
 7                    MAYA KANE, ESQ.
                      10 Town Square, #52
 8                    Durango, CO  81301
                      (970) 946-5419
 9                    mayakanelaw@gmail.com
10   For the Defendants:
11                    BRITTON R. BUTTERFIELD, ESQ.
                      SUITTER AXLAND, PLLC
12                    8 E. Broadway, Ste. 200
                      Salt Lake City, UT  84111
13                    (801) 532-7300
                      bbutterfield@sautah.com
14
     Also Present:    Edward Tapaha
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                        I N D E X
2   Witness
3   JAMES FRANCOM
4   EXAMINATION  BY                              PAGE
5   Mr. Castaqeda.................................  4
    Ms. Kane.....................................  46
6   Mr. Castaqeda................................  49
    Ms. Kane.....................................  52
7   Mr. Castaqeda................................  54
    Ms. Kane.....................................  55
8   Mr. Castaqeda................................  57
9
10

                        E X H I B I T S
11
    EXHIBIT              DESCRIPTION              PAGE
12
    No. 1  30(b)(6) Deposition Notice             8
13
    No. 5  Commission Work Meeting Notes,
14         January 21, 2014                       17
15  No. 6  Commission Work Meeting Notes,
           October 20, 2014                       43
16
    No. 9  Public Notice                          13
17
    No. 10 Navajo Times article                   50
18
    No. 11 County Commissioners discuss mail-only
19         ballots                                44
20  No. 13 Public Notice                          32
21  (All exhibits were marked in Edward Tapaha's
    deposition.)
22
23
24
25

```
                                            Page 4
 1                P R O C E E D I N G S

 2                    JAMES FRANCOM

 3   was called as a witness, having been first duly

 4   sworn, was examined and testified on his oath as

 5   follows:

 6                       --oOo--

 7                     EXAMINATION

 8   BY MR. CASTANEDA:

 9        Q.    Can you please state your name for the

10   record?

11        A.    James Francom.

12        Q.    And your address?

13        A.    383 North 600 West, Blanding, Utah.

14        Q.    And you've been deposed before; correct?

15        A.    Yes.

16        Q.    Okay.  So I'll just go through a couple

17   of ground rules just to refresh your recollection.

18   I'm going to ask you a series of questions, and

19   you're going to answer them to the best of your

20   ability under oath.

21             Do you understand?

22        A.    Yes.

23        Q.    Okay.  And we're going to try and speak

24   slowly and verbally.  I have to work on that myself.

25             Do you understand?
```

Page 5

1          A.   Yes.

2          Q.   And please try and let me finish my

3    questions before you start answering, and in turn I

4    will try to let you finish your answers before I

5    start asking more questions to keep the record clear.

6               Do you understand?

7          A.   Yes.

8          Q.   Okay.  Is there any reason why you might

9    not be able to tell the truth today?

10         A.   No.

11         Q.   Are you on any medication that might

12   affect your ability to tell the truth?

13         A.   No.

14         Q.   Okay.  And then as far as breaks are

15   concerned, please do let me know if you need a break

16   for any reason, and we'll go ahead and do that.

17   Sound good?

18         A.   Yes.

19         Q.   Okay.  Let's talk about your current

20   employment.  Can you tell me your current title?

21         A.   Yes.  Chief deputy clerk.

22         Q.   And how long have you held that position?

23         A.   Over six years.  I think I started

24   December 2010.

25         Q.   Okay.  And what position did you have

Page 6

1   before that?

2          A.   Where did I work before?

3          Q.   Yes.

4          A.   I worked at a couple different places.  I

5   worked at Eagle Air Med.

6          Q.   Okay.  So not for the county?

7          A.   Not for the county.

8          Q.   Okay.  All right.  You can just list

9   those.

10          A.   No other positions with the county.

11          Q.   And with respect to your county position,

12   can you describe your roles and responsibilities?

13          A.   Yes.  I -- I handle the accounts payable,

14   the payroll, and also help with the elections.

15          Q.   Okay.  When you say "help with the

16   elections," what does that mean?

17          A.   Whatever duties are assigned from the

18   clerk, help with the -- with the ballot preparation,

19   advising, you know, helping information with the --

20   providing information for the elections.

21          Q.   Okay.  So does the clerk essentially give

22   you instruction with regard to all of your duties

23   encompassed by your employment?

24          A.   I have a job description that also shows

25   what my duties are.

Page 7

1          Q.   But the clerk is your primary boss;
2     right?
3          A.   Yes.
4          Q.   Do you report to anybody other than the
5     clerk?
6          A.   No.
7          Q.   Okay.  Are there any policies and
8     procedures -- or procedures that govern the scope of
9     your responsibilities from the county?
10         A.   Yes.
11         Q.   Is it like a manual?
12         A.   Yeah, there's a policy manual that
13    explains our job duties.
14         Q.   Do you know if that policy manual covers
15    anything with respect to elections?
16         A.   No.  The election law is -- is mostly
17    based from the state of Utah, from what I understand.
18         Q.   Okay.  So are there any county documents
19    concerning your responsibilities with respect to
20    elections --
21              MR. BUTTERFIELD:  Objection.
22         Q.   -- that you're aware of?
23              MR. BUTTERFIELD:  Objection just to the
24    extent it's beyond the 30(b)(6) notice.
25         A.   Not that I'm aware of.

1          Q.    Okay.  I'm going to hand you Exhibit 1.
2      Have you ever seen that before?
3          A.    Yes.
4          Q.    When did you see it?
5          A.    I think it was yesterday.
6          Q.    Okay.  Had you seen any version of that
7      before yesterday?
8          A.    No.
9          Q.    Okay.  Can you tell me the context in
10     which you saw that?
11         A.    The context in which I saw it?  What do
12     you mean?  Can you rephrase the question?
13         Q.    How did you come to see this notice?
14         A.    It was emailed to me.
15         Q.    Okay.  By whom?
16         A.    I think it was the attorneys.
17         Q.    Okay.  And was it yesterday morning?
18         A.    I -- I don't recall.
19         Q.    Okay.  Did you discuss the notice with
20     them at all?  And don't tell me what was discussed.
21     Just tell me whether or not you discussed the notice.
22         A.    Yes.
23         Q.    Okay.  How long did you discuss it?
24         A.    I don't recall.  I think it was maybe an
25     hour or two.

Page 9

1          Q.   Okay.  Have you read that document fully?

2          A.   Yes.

3          Q.   Okay.  And I assume that you read it

4     yesterday.

5          A.   Yes.

6          Q.   Okay.  So do you understand that the

7     county's counsel has designated you as a person most

8     knowledgeable with respect to topics 1-a. through f.

9     and topic 5-a. through b. concerning the northern

10    part of the county?

11         A.   Yes.

12         Q.   Okay.  So you understand that being

13    designated as such means that from the county's

14    perspective you are the most knowledgeable person

15    with respect to each of those issues I just recited?

16         A.   I should be, yes.

17         Q.   Okay.  Do you feel like you are?

18         A.   I feel like I have them -- yes, I feel

19    like that I have the most information about it.  I

20    might not -- I might have to research different items

21    on it.

22         Q.   Okay.  So do you understand that by being

23    designated by the county you are speaking on behalf

24    of the county such that your answers are the county's

25    answers?

1          A.    Yes.

2          Q.    Okay.  And do you understand inversely

3     that if you don't know an answer to a question that

4     means effectively no one at the county knows that

5     answer?

6                MR. BUTTERFIELD:  Objection.  Beyond the

7     scope of the notice and calls for a legal conclusion.

8                Go ahead an answer.

9          A.    I -- I don't necessarily agree with that

10    because the -- the question may -- as far as the --

11    their topics, but specific questions, someone else

12    may have more information about it.

13         Q.    Okay.  What did you do to prepare

14    yourself to provide testimony on these topics?

15         A.    I reviewed the documents that were given

16    to me.

17         Q.    What documents were given to you?

18         A.    I reviewed letters that were sent, the

19    correspondence between the Navajo Nation and the

20    county.

21         Q.    Okay.  And where are those correspondence

22    right now?

23         A.    Email.

24         Q.    Okay.  Are they in your email?

25         A.    Yes.

1      Q.   Okay.  Do you have a work email address?

2      A.   Yes.

3      Q.   Okay.  And what is it?

4      A.   Jfrancom@sanjuancounty.org.

5      Q.   Excuse me.  Do you have a personal email

6  address?

7      A.   Yes.

8      Q.   Do you ever use that personal email for

9  county-related duties --

10     A.   No.

11     Q.   -- or activities?

12     A.   No.

13     Q.   Do you have a cell phone?

14     A.   Yes.

15     Q.   Is it a county-issued cell phone?

16     A.   No.

17     Q.   Okay.

18     A.   It's -- it's also used for the county,

19  though.

20     Q.   Okay.  Does the county provide you any

21  reimbursement for usage of that cell phone?

22     A.   Yes.

23     Q.   Okay.  Do you have a county laptop?

24     A.   Yes.

25     Q.   Okay.  And other than the correspondence

1    between the Navajo Nation and the county, did you

2    review any other documents to prepare yourself for

3    the topics we're going to discuss today?

4            A.    Yes.   I also reviewed the testimony --

5    let's see.   The declaration from John David Nielson.

6            Q.    Okay.   That was filed in this case?

7            A.    Yes.

8            Q.    Okay.   Did you talk with any co-workers

9    in preparation for your testimony here today?

10           A.    Yes.

11           Q.    With whom did you speak?

12           A.    The clerk and the county attorney.

13           Q.    And what did you discuss with the clerk?

14           A.    Dates.

15           Q.    Dates of what exactly?

16           A.    Trying to recall dates as far as when

17   decisions and things were discussed.

18           Q.    Okay.   And you met with him yesterday?

19           A.    Yes.

20           Q.    Okay.   Around what time?

21           A.    I think it was in the afternoon.

22           Q.    Okay.

23           A.    Early afternoon.

24           Q.    Okay.   Let's look at topic 5.   Can you

25   just take a moment to look at topic 5?

1          (Mr. Francom reviews document.)

2          And topic 5 concerns how the county

3    conducted elections prior to the switch to mail in

4    only in 2014, including the number and location of

5    polling places and the number of poll workers at each

6    polling place.

7          And my understanding from counsel is that

8    you are going to speak on these topics with regard to

9    the northern part of the county.  Is that your

10   understanding as well?

11         A.   Yes.

12         Q.   Okay.  And this was discussed earlier,

13   but who is in charge of the southern part of the

14   county for the same topics?

15         A.   The clerk is responsible for all of them,

16   but Ed Tapaha is also responsible for the southern

17   part.

18         Q.   Okay.  So let's take a look at Exhibit

19   No. 9.

20         A.   Okay.

21         Q.   Have you seen that document before?

22         A.   Yes.

23         Q.   Okay.  And just to summarize that

24   document, that lists the polling locations for all of

25   San Juan County as of the date November -- or for the

1    November 6, 2012, election; correct?

2         A.   Yes.

3         Q.   Okay.  How many of those locations are

4    included in the northern district, or the northern

5    part of the county rather?

6         A.   How many polling locations?

7         Q.   Yes.

8         A.   There's two physical polling locations.

9    The others are all by mail.

10        Q.   Okay.

11        A.   Absentee.

12        Q.   In 2012?

13        A.   Yes.

14        Q.   Okay.  So where it says "voting by

15   absentee ballot" --

16        A.   Yes, that was --

17        Q.   -- can you just describe that?

18             MR. BUTTERFIELD:  Let him finish his

19   question just so we get a clear record.

20        Q.   (BY MR. CASTANEDA)  Can you just describe

21   for the record what exactly that means?

22        A.   Yes.  Voting by absentee ballot means

23   that they are voting all by mail.

24        Q.   Okay.  And for those particular

25   locations, how were they selected?  Are those towns?

Page 15

1           MR. BUTTERFIELD:  Objection.

2      Q.   (BY MR. CASTANEDA)  Municipal districts?

3           MR. BUTTERFIELD:  Objection to the extent

4  this is beyond the 30(b)(6) notice that he's noticed

5  to testify about.

6      A.   They're unincorporated areas that the

7  only -- there's actually only two incorporated areas,

8  Blanding and Monticello, and they're small

9  population; so these other areas are a population

10  area, but they're small -- I don't know what you

11  would call them.

12      Q.   Okay.  So how were those -- I understand

13  it's voting by absentee ballot, but how were those

14  specific locations chosen for, you know, the 2012

15  election?

16      A.   As far as the decision on that, that was

17  before my time.  I started in 2010, and these were

18  designated like that a long time ago.

19      Q.   Okay.  Do you know who would have been

20  involved in -- in deciding?

21      A.   I would guess it was Norman, but it may

22  have been before his time as well.

23      Q.   Okay.  Understood.

24           Still in 2012, do you have any idea how

25  many poll workers were at those locations?  I guess

Page 16

1    there's only two, but...

2         A.   Yeah.   I think there were at least three

3    at each location.

4         Q.   Okay.  And why do you think there was at

5    least three?

6         A.   I think there were three workers at each

7    location.  I think I remember who they were at least

8    for Monticello.

9         Q.   Okay.  Who were they?

10        A.   Sally Jack and Carol Van Steeter, and I

11   don't recall the third.

12        Q.   So are you saying that Monticello is in

13   the north?

14        A.   Yes.

15        Q.   Okay.  Thanks for clarifying that.  And

16   the other one was Blanding?

17        A.   Yes.

18        Q.   So at that point in time was there any

19   discussion with regard to the other areas in the

20   north regarding the voting by absentee ballot

21   regarding whether or not they were in favor or

22   opposed it?  Do you recall?

23        A.   No.  As far as I recall, they've always

24   been by ballot.

25        Q.   Got it.  And was that the case before you

Page 17

1    arrived in 2010?

2          A.   Yes.

3          Q.   All right.  Let's take a look at

4    Exhibit -- I'm handing you Exhibit 5 Commission Work

5    Meeting Notes for January 21st, 2014.  Do you see

6    your name there --

7          A.   Yeah.

8          Q.   -- besides "Others Present"?

9          A.   Yes.

10         Q.   Do you recall attending that meeting?

11         A.   Yes.

12         Q.   Okay.  Let's took a look at Section C.-c.

13   can you just review that entry there?  Do you see

14   where it says:  "Reviewed and discussed the decision

15   to have the County go to an all by mail voting system

16   for 2014.  Information was presented by Norman,

17   Edward Tapaha, and James Francom.  Monty Wells

18   expressed a descending opinion.  As the decision

19   rests with the county clerk, advertising and

20   information on the process will begin immediately."

21              MR. BUTTERFIELD:  Objection to the extent

22   that this is beyond the scope of the 30(b)(6)

23   designation.

24         Q.   (BY MR. CASTANEDA)  Do you see that?

25         A.   Yes.

Page 18

1          Q.   Okay.  What information did you provide

2    at that meeting?

3               MR. BUTTERFIELD:  Same objection.

4          A.   I don't recall.  I think it was I was

5    there more to answer questions.

6          Q.   Do you recall any of the questions that

7    were asked?

8          A.   I don't.

9          Q.   Was there any writing created other than

10   these meeting notes?

11         A.   Not any writing that I took.

12         Q.   Are you aware of any other writing --

13         A.   No.

14         Q.   -- from anyone else that was there?

15         A.   No.

16         Q.   Typically who drafts these meeting notes?

17              MR. BUTTERFIELD:  Objection.  Beyond the

18   scope of his designation.

19         A.   It varies.  It -- sometimes it's Norman.

20   Sometimes it's the deputy clerk.

21         Q.   Okay.  And you just don't remember who

22   drafted these?

23         A.   No.

24         Q.   Do you remember Monty Wells expressing a

25   descending opinion?

Page 19

```
 1          A.   Yes.
 2               MR. BUTTERFIELD:  Objection.  Same
 3    objection.
 4          Q.   (BY MR. CASTANEDA)  What was Monty Wells'
 5    position on the matter?
 6          A.   His concern was over the privacy of the
 7    ballots.
 8          Q.   Is that it?
 9          A.   That's all I recall.
10          Q.   Okay.  Do you remember more specifically
11    what he said about the privacy of the ballots?
12          A.   He was concerned that -- that people
13    processing the ballots would be able to see how the
14    person voted, and we -- we expressed to him he was
15    welcome to monitor the process and view it.
16          Q.   Did he eventually go and monitor the
17    process?
18          A.   He did not.
19          Q.   Okay.  Well, tell me about that process.
20    How is that process conducted?  Well, let me clarify.
21    How was the process conducted in 2014 for by mail
22    voting?
23               MR. BUTTERFIELD:  Objection.  Beyond the
24    scope of his designation.
25          A.   We have several people that -- let's see.
```

Page 20

1    We have staff that take the envelope.  They scan a

2    bar code, and that pulls up the signature.  They can

3    review the signature and see if it matches the

4    signature from a previous registration.  Once it's

5    verified that that is the voter, then the ballots are

6    opened and separated and processed, and different

7    individuals handle different parts of the process.

8         Q.    And where is this conducted?

9         A.    In our office.

10        Q.    Okay.  And who actually conducts that

11   process?

12             MR. BUTTERFIELD:  Objection.  Beyond the

13   scope of the designation.

14        A.    Who conducts that process?

15        Q.    Mm-hmm.

16        A.    We had poll workers -- at that time we

17   had similar poll workers that worked in the 2010

18   election.

19        Q.    I see.  So those poll workers work at the

20   poll, and then all come to the county office to

21   conduct that process?

22             MR. BUTTERFIELD:  Objection.  Misstates

23   prior testimony.

24        Q.    (BY MR. CASTANEDA)  You can answer.

25        A.    The process is done over a period of

1    time.  It's not just election day.

2         Q.   Right.  What I'm saying is the poll

3    workers, they're working at the poll on election day;

4    right?

5         A.   The poll --

6         Q.   The poll workers, they're working at the

7    poll on election day; right?

8         A.   It -- the ballots were all by mail.

9         Q.   Right.  But there were two locations;

10   right?  There were two in-person -- there were two

11   in-person voting locations?

12        A.   Sorry.  I might be confused.  Are we

13   talking about all by mail election or --

14        Q.   I'm talking the two counties that had

15   poll workers.

16             MS. KANE:  2012.

17        Q.   (BY MR. CASTANEDA)  2012.  Sorry.

18        A.   You're talking the 2012 election?

19        Q.   Yeah.

20        A.   Sorry.  That process is different.

21        Q.   Okay.

22        A.   That's not the process that I've spoken

23   about.

24        Q.   I'm sorry if I misled you.  Let me back

25   up and clear it up.  So for the 2012 election, right,

Page 22

1    in the north part of the county, there were two

2    in-person voting areas; right?

3           A.    Yes.

4           Q.    And then the remaining, I guess, 11 areas

5    were conducted by absentee ballot; right?

6           A.    Yes.

7           Q.    Okay.  So were you saying that the poll

8    workers for the two locations were also the people

9    that were counting the mail-in ballots in 2012?

10          A.    No.  In 2014 we used --

11          Q.    I see the confusion.  Okay.

12          A.    -- we used the --

13          Q.    Okay.  All right.

14          A.    -- the same poll workers.

15          Q.    So let's come to 2014, and sorry if I

16   confused you.  What is the process for -- so who -- I

17   think this is where we got confused.  I asked you who

18   reviews the ballots and pulls them up at the county,

19   and you said the poll workers.

20          A.    Yes.

21          Q.    So those are not really people that are

22   working at a poll.  Those are poll workers that are

23   just at the county counting mail-in ballots; right?

24          A.    Yes.

25          Q.    Okay.  Thank you.  And how many of those

1    are at the county office in 2014 to count mail-in

2    ballots?

3         A.    How many -- sorry.

4         Q.    Poll workers.

5         A.    How many pole workers do we have?

6         Q.    Yeah, to count the ballots.

7         A.    It was over a different period of time.

8    We had -- at one point, I mean, we would have like

9    three workers at a time on different days; so it

10   wouldn't be the same people for each day.

11        Q.    I see.  And you said this is over a

12   period of time.  How long does it take to review --

13   how long did it take to review all of the mail-in

14   ballots and then ultimately publish a result?

15             MR. BUTTERFIELD:  Objection.  Beyond the

16   scope of the designation.

17        A.    Between the time that they were mailed

18   out and election day.

19        Q.    Well, once you got them.  Sorry.  Once

20   the mail-in ballots came in, how long did it take for

21   the poll workers to review those ballots and then

22   input the information and then publish the result?

23             MR. BUTTERFIELD:  Same objection.

24        A.    We -- we established different days that

25   the poll workers would come, and so that the public

1    was welcome to come and review the process on those

2    specific days.

3         Q.   And the results were published by each

4    day?

5         A.   No.  We didn't have results until

6    election day.  The ballots were actually fed in the

7    machine.  The machine doesn't give us any results

8    until we -- until we process it.

9         Q.   So the results are -- okay.  I think

10   we're getting confused here.

11        A.   The only thing that we have is a count of

12   how many ballots we processed.

13        Q.   Okay.  But that's not done the day of the

14   election; right?  That's done over a few -- a few

15   days?

16        A.   The count or the election results?

17        Q.   The count.

18        A.   The count.  Yes, the count is done over

19   several days.

20        Q.   Okay.  That's what I was trying to get

21   at.  All right.

22             So this -- the distinction between the

23   northern part and the southern part of the county,

24   that existed in 2012, right, for the 2012 election?

25        A.   What do you mean by "distinction"?

Page 25

1      Q.   Well, the county was broken up into two
2  parts, the northern part and southern part; right?
3      A.   Not necessarily.
4      Q.   So you've been designated to testify
5  about topic 5 with regard to the northern part of the
6  county; right?
7      A.   Uh-huh.  Yes.
8      Q.   That's the destination that I'm making
9  here.
10     A.   Okay.
11     Q.   And I showed you Exhibit 9, and there
12  were 13 of those areas that you said were in the
13  northern part of the county; right?
14     A.   Yes.
15     Q.   Okay.  And all but two of them were
16  conducted via voting by absentee ballot; right?
17     A.   Yes.
18     Q.   Okay.  So that was in 2012.  In 2014 were
19  the areas split up the same way, such that you had
20  the same 13 areas in the northern part of the county?
21  You had oversight of those same areas?
22     A.   I don't understand the question.
23     Q.   Okay.  Take a look at topic 5.
24     A.   Okay.
25     Q.   And topic 5 is asking for how San Juan

1   County conducted elections prior to 2014; right?

2          A.   Right.

3          Q.   And you've been designated to speak with

4   respect to the northern part of the county; right?

5          A.   Yes.

6          Q.   Okay.  So we looked at Exhibit 9 and

7   established the 13 areas that are in the northern

8   part of that county; right?

9          A.   Yes.

10          Q.   Can you name those 13 areas?

11          A.   I can read them off.

12          Q.   Please.  Please do so.

13          A.   Let's see.  Cedar Point, Ucolo, LaSal,

14   Spanish Valley, North Monticello, South Monticello,

15   Northwest Blanding, Southwest Blanding, Southeast

16   Blanding, Northeast Blanding, Central Monticello, and

17   I skipped Halls Crossing.

18          Q.   Okay.  So let's fast forward now to the

19   2014 elections.  Are those same areas -- were they

20   within your oversight such as they were in 2012?

21          A.   The oversight is we oversee all of it.

22   We oversee all of the county.  We have responsibility

23   over all the county.

24          Q.   Okay.  But you specifically have

25   responsibility for the northern part; right?

1      A.   I -- I have more knowledge about the

2  northern part.

3      Q.   Okay.  All right.  So I guess that's what

4  I'm -- what I'm not understanding.  So do those same

5  areas -- are they a part of the -- were they a part

6  of the 2014 areas from which the election ballots

7  were made -- were sent?  I'm sorry.  The mail-in

8  ballots were sent?

9      A.   Can you repeat the question?

10      Q.   So we're looking at Exhibit 9 right now

11  in 2012, and there are a number of polling places,

12  or, I guess, are these considered precincts?

13      A.   Yes, precincts.

14      Q.   Okay.  I think that will help clear

15  everything up.  So there are 20 total precincts here.

16  You had just read off the precincts that were in the

17  northern part of the county.  In 2014 were these the

18  same precincts that applied, or were there different

19  precincts created for the 2014 mail-in election?

20      A.   They're the same precincts.

21      Q.   Okay.  And then I'll ask you now, with

22  regard to the upcoming 2016 election, are those the

23  same precincts?

24      A.   They're -- no.  They're similar

25  precincts, but we had to redistrict.

 1          Q.   Okay.  All right.  I think that helps
 2    clear some things up a little bit.
 3               With respect to the county and how they
 4    look at each of these precincts, are you saying that
 5    there is really no official delegation of
 6    responsibility to you regarding the northern
 7    precincts?
 8          A.   No.  I --
 9          Q.   So you're responsible for all of the
10    precincts.
11          A.   Correct.
12          Q.   Okay.  And is it fair to say, then, that
13    Mr. Tapaha is responsible for all the precincts as
14    well?
15               MR. BUTTERFIELD:  Objection.  This is
16    beyond the scope of the designation.
17          A.   His responsibility is as the Navajo
18    liaison, and so he would be responsible for helping
19    with the Navajo people.
20          Q.   Okay.  And those just happen to be in the
21    southern part of the county.
22          A.   Correct.
23          Q.   I see.  Okay.  So do you as part of your
24    responsibilities do any voter outreach to any of
25    these precincts?

Page 29

1          A.   We have in the past.

2          Q.   Okay.  Do you -- have you done that --

3     did you do that in 2014?

4          A.   I don't recall.

5          Q.   Okay.  Are you -- have you or are you

6     doing it for this upcoming election?

7          A.   We will be going out to the polling

8     locations this election.

9          Q.   Okay.  And you specifically or your

10    delegates?

11         A.   Yes.  I will be in Navajo Mountain on

12    Tuesday.

13              MR. BUTTERFIELD:  Can we go off the record

14    for just one second?

15              MR. CASTANEDA:  Yeah.

16              (Conversation off the record.)

17              MR. CASTANEDA:  Let's go back on.

18         Q.   (BY MR. CASTANEDA)  All right.  So just

19    to clarify, then, is there an official distinction

20    within the county regarding election duties between

21    the northern part of the county and the southern part

22    of the county?

23         A.   No.

24         Q.   Okay.  So then your election-related

25    duties include the entire county; right?

Page 30

```
 1        A.    Yes.
 2        Q.    And that would also include the southern
 3   part, which is primarily Navajo; correct?
 4        A.    Correct.
 5        Q.    Do you do any voter outreach in the
 6   southern part?
 7        A.    Yes.
 8        Q.    What kind of voter outreach do you do in
 9   the southern part?
10        A.    We have in the past.  We've -- when Ed
11   has gone and done trainings at the different
12   locations, the clerk has also gone and tried to do a
13   registration drive to get people registered.
14        Q.    Okay.  And when you say "Ed," you mean
15   Mr. Tapaha?
16        A.    Yes.
17        Q.    Okay.  So Mr. Tapaha is the person who
18   does the voter outreach in the southern part of the
19   county primarily; right?
20        A.    Yes.
21        Q.    Now, with regard to election procedures,
22   given the prevalence of Navajo in the southern part
23   of the community, can you talk about any differences
24   with how elections are conducted in the northern part
25   of the county?
```

1          MR. BUTTERFIELD:  Objection based on the

2   fact that this is outside the scope of the 30(b)(6)

3   designation.

4          Go ahead and answer.

5      A.   Any differences between how it's handled

6   in the north?

7      Q.   Yeah.

8      A.   I think we try to give more services to

9   that Navajo Nation.

10     Q.   And what kind of services would those

11  entail?

12         MR. BUTTERFIELD:  Same objection.

13     A.   Having polling locations throughout the

14  reservation and having someone designated to go and

15  do outreach and do registration drives.  We don't

16  have any of that in the other areas.

17         MR. CASTANEDA:  Do you have anything else

18  in topic 5.

19         MS. KANE:  Just about polling location

20  sites.

21         MR. CASTANEDA:  Okay.  Do you want to ask

22  him that?

23         MS. KANE:  Sure.

24     Q.   (BY MS. KANE)  Well, I think Mr. Tapaha

25  testified that he was not responsible for determining

Page 32

1   the location of the three additional proposed polling

2   locations for this election.

3                    MR. CASTANEDA:  Wait.  For 20...

4                    MS. KANE:  For 2016.

5                    MR. CASTANEDA:  Yeah, we're not there yet.

6                    MS. KANE:  Oh, I'm sorry.  We're not

7   there.

8                    MR. CASTANEDA:  Topic 5 is 2014.

9                    MS. KANE:  Strike that.

10                   MR. CASTANEDA:  Do you have anything else

11  about topic 5?

12                   MS. KANE:  No.  I'm just tired.

13                   MR. CASTANEDA:  All right.  So topic 5, I

14  believe, is done.

15                   Take a look at topic 1.

16                   MS. KANE:  Sorry about that.

17                   MR. CASTANEDA:  No problem.

18                   THE WITNESS:  Okay.

19       Q.   (BY MR. CASTANEDA)  And that concerns --

20  well, actually, before we get there, this is still

21  related to 2014.  Let's take a look at Exhibit

22  No. 13.  Have you ever seen that document before?

23       A.   I don't know that I've read all the way

24  through it.  I think I've -- I think I saw it in the

25  newspaper.

Page 33

```
 1        Q.   Okay.  And what do you understand that to
 2   be?
 3        A.   The public notice explaining the -- the
 4   polling locations for this election.  Let's see.  No.
 5   I'm sorry.  This is for 2014.
 6        Q.   Okay.  So that's -- that's the public
 7   notice, and I'll paraphrase it.  That's the public
 8   notice from March 27th, 2014, regarding the change
 9   from in-person voting to mail-in only voting for the
10   June 2014 primary; right?
11        A.   Yes.
12             MR. BUTTERFIELD:  Objection.  Beyond the
13   scope of the designation.
14        Q.   (BY MR. CASTANEDA)  And do you know when
15   the decision was made to change from in-person voting
16   to mail in only for the June 2014?
17        A.   No, I do not.
18             MR. BUTTERFIELD:  Objection.  Beyond the
19   scope of the designation.
20        Q.   (BY MR. CASTANEDA)  Do you know who made
21   that decision?
22        A.   Yes.  It was Norman.
23        Q.   Okay.  And what's Norman's full name?
24        A.   Norman Johnson, the clerk.
25        Q.   Okay.  And his title, he's the clerk.
```

1   Okay.

2           MR. BUTTERFIELD:  Can I clarify?  Former

3   clerk.

4           MR. CASTANEDA:  Thank you.

5           MR. BUTTERFIELD:  I'm not testifying, but

6   you may want to clear that up.

7           MR. CASTANEDA:  Yeah.

8       Q.  (BY MR. CASTANEDA)  And he is the former

9   clerk; is that correct?

10      A.  Yes.

11      Q.  Other than a public notice, how would the

12  decision have been documented within the county?

13          MR. BUTTERFIELD:  Objection.  Vague.

14  Beyond the scope of the designation.

15      A.  The commission minutes.

16      Q.  Which commission minutes?

17      A.  I'm not -- I'm not sure.

18      Q.  Okay.  At least none of the minutes that

19  I showed you today so far; right?

20      A.  (Shakes head.)

21      Q.  Okay.  Who has all those commission

22  minutes?

23          MR. BUTTERFIELD:  Objection.  Beyond the

24  scope of the designation.

25      A.  The clerk's office.

1      Q.   Okay.  Anyone in particular at the
2   clerk's office?
3      A.   They're -- they're on the website as
4   well.
5      Q.   Okay.  Okay.  So are you saying, then,
6   that the decision to move to mail-in only ballots for
7   the June 2014 election would have been made at the
8   monthly commission meeting?
9           MR. BUTTERFIELD:  Objection.  Beyond the
10   scope of the designation.
11      A.   No.  I must have misunderstood the
12   question.  I thought you were just asking about
13   documentation about a decision.
14      Q.   That's fair.  So let me back it up, then.
15   When would a decision like that be made?
16           MR. BUTTERFIELD:  Objection.  Beyond the
17   scope of designation.
18      A.   What do you mean by "when"?
19      Q.   Okay.  Let me back up.  The decision to
20   move to mail-in only ballots for the June 2014
21   primary, do you know when that decision was made?
22           MR. BUTTERFIELD:  Objection.  Beyond the
23   scope of the designation.
24      A.   No, I don't.
25      Q.   Okay.  Do you know how a decision like

Page 36

1   that would be made within the county?

2          A.   Yes.   After discussion and research.

3          Q.   Okay.   And would that -- would that

4   discussion -- would that occur at a monthly

5   commission meeting or some other meeting?

6               MR. BUTTERFIELD:  Objection.  Beyond the

7   scope of the designation.

8          A.   No, it wouldn't even necessarily be in a

9   meeting.   It would just be research.

10         Q.   Okay.   So ultimately who makes that

11  decision?

12              MR. BUTTERFIELD:  Beyond the scope.

13         A.   The county clerk.

14         Q.   Okay.   And do you recall having any

15  conversations with him about the decision to move to

16  mail-in only ballots in June -- for the June 2014

17  primary before the date of the Public Notice in

18  Exhibit 13?

19              MR. BUTTERFIELD:  Objection.  Beyond the

20  scope of the designation.

21         A.   Yes.

22         Q.   Okay.   And do you recall the dates of

23  those discussions you had with the clerk?

24              MR. BUTTERFIELD:  Objection.  Beyond the

25  scope.

Page 37

```
 1        A.   No.
 2        Q.   Okay.  So the only person who would
 3   really know when the decision was made would be the
 4   county clerk; is that right?
 5             MR. BUTTERFIELD:  Objection.  Beyond the
 6   scope.
 7        A.   There may be documentation we could
 8   research, but I'm not aware of it.
 9        Q.   Okay.  And do you know if that public
10   notice was posted on the website in 2014?
11             MR. BUTTERFIELD:  Objection.  Beyond the
12   scope.
13        A.   No, I don't know.
14        Q.   Okay.
15             MS. KANE:  You're talking about that?
16             MR. CASTANEDA:  Yeah.
17             MS. KANE:  Okay.
18        Q.   (BY MR. CASTANEDA)  Did anybody consult
19   you with respect to the decision to move from
20   in-person voting to mail-in only ballots for the
21   June 2014 election?
22             MR. BUTTERFIELD:  Objection.  Beyond the
23   scope.
24        A.   Yes.
25        Q.   Who?
```

Page 38

1          A.    The county clerk.

2          Q.    And what was your position on that

3   decision?

4                MR. BUTTERFIELD:  Objection.  Beyond the

5   scope.

6          A.    I was in favor of it.

7          Q.    Okay.  Why were you in favor of it?

8                MR. BUTTERFIELD:  Can I make a running

9   objection with respect --

10               MR. CASTANEDA:  Sure.

11               MR. BUTTERFIELD:  -- to the election of

12  June 2014?

13               MR. CASTANEDA:  Sure.

14               MR. BUTTERFIELD:  Okay.

15               THE WITNESS:  I -- I thought it would be

16  the most -- it's very difficult to communicate with --

17  to get information to people on the reservation with

18  all their limitations, and the most effective way that

19  I'm aware of is by mail.

20               MR. CASTANEDA:  Okay.

21               THE WITNESS:  And we've -- my assumption

22  is that we'd be able to reach more voters and have a

23  better turnout if we did that by mail.

24         Q.    (BY MR. CASTANEDA)  Okay.  So how did you

25  educate people particularly in the southern part of

1   the county, the Navajo voters, about the switch to

2   mail only ballot voting for the June 2014 election?

3              MR. BUTTERFIELD:  Same objection.

4         A.   I know -- I know we sent out a notice.

5   We sent a flier to all mailboxes throughout the

6   county explaining the switch.

7         Q.   Okay.  Did you receive any questions or

8   concerns about the switch to mail-in only voting for

9   the June 2014 election?

10        A.   Yes.

11        Q.   What were the concerns?

12        A.   A lot of the concerns were just change

13  and privacy of ballots and that they enjoyed the

14  social part of the polling locations.

15        Q.   Did you have any issues with ballots

16  being returned as -- you know, for -- for address

17  issues or not being picked up by the intended

18  recipients?

19             MR. BUTTERFIELD:  Beyond the scope.

20        A.   Yes.

21        Q.   And what were the issues with that more

22  specifically?

23             MR. BUTTERFIELD:  Beyond the scope.

24        A.   Similar to any mailings that we get out,

25  that any mailings that are sent, people move, they

Page 40

1    don't change their addresses.  Usually the last thing

2    that people think of is to change their address with

3    elections.

4         Q.   And how did the county try and fix the

5    situations -- or fix instances where ballots were

6    returned?

7              MR. BUTTERFIELD:  Objection.  Beyond the

8    scope.

9              All of these questions -- there's nothing

10   that you asked in the last ten minutes that has been

11   within the 30(b)(6) topic.

12             MR. CASTANEDA:  I mean, the topics concern

13   the 2014 election.

14             MR. BUTTERFIELD:  Where?  What topic?

15             MR. CASTANEDA:  Topic 5.

16             MR. BUTTERFIELD:  Topic 5 does not concern

17   the 2014.  It says how San Juan County conducted

18   elections prior to the 2014 election.

19             MR. CASTANEDA:  Okay.  And then topic 1

20   concerns the decision.

21             MR. BUTTERFIELD:  To switch from what they

22   did in 2014 --

23             MR. CASTANEDA:  Right.

24             MR. BUTTERFIELD:  -- to now.

25             MR. CASTANEDA:  So we have to talk about

1   what was done in 2014, no?

2                MR. BUTTERFIELD:  Well, it --

3                MR. CASTANEDA:  The objection is noted,

4   and that's fine.

5                MR. BUTTERFIELD:  Sure.  But, I mean, you

6   can continue to ask the questions.  So...

7                MR. CASTANEDA:  Yeah.  I mean, if they

8   don't come in, then we can talk about re-noticing

9   another deposition or finding somebody who can answer,

10  actually, some of the questions, but we don't have to

11  talk about that today.

12               Q.   (BY MR. CASTANEDA)  Where was I?

13               Yeah.  So how did the county go about

14  fixing issues with the mail -- the mailings for the

15  2014 election?

16               MR. BUTTERFIELD:  Same objection.

17               A.   A lot of times there will be a sticker

18  that shows for a forwarding address, and we would

19  follow up with those addresses.  And one of the

20  processes is also to send out a confirmation card

21  that would go to the -- the ballot doesn't get

22  forwarded, but the confirmation notice would be

23  forwarded to a new address.

24               Q.   Okay.  And who is in charge of actually

25  doing that?

Page 42

```
1              MR. BUTTERFIELD:  Same objection.
2        A.   Myself and the deputy clerk.
3        Q.   Okay.  And then do you actually drive out
4   to the addresses or near addresses, or is that all
5   done within the office?
6              MR. BUTTERFIELD:  Same objection.
7        A.   The addresses are actually P.O. boxes.
8   We wouldn't be able to find hardly any addresses by
9   driving to them.
10       Q.   Okay.  So in the process of trying to fix
11  those -- those situations, do you actually talk with
12  the people that you were trying to reach?
13             MR. BUTTERFIELD:  Same objection.
14       A.   One of the difficulties is that they put
15  very little information on the registration form, and
16  so we usually don't have a phone number or any other
17  means to contact them other than the by mail.
18       Q.   Okay.  So the only -- the only way you
19  know whether or not you fixed that situation is
20  whether or not they end up responding through the
21  second mailing?
22             MR. BUTTERFIELD:  Same objection.
23       Q.   (BY MR. CASTANEDA)  Or let me ask a
24  better question.  How do you end up -- how do you
25  know whether or not you found the intended recipient
```

1  if you don't actually talk with them in person?

2          MR. BUTTERFIELD:  Beyond the scope.

3      A.   The only thing that we're changing is the

4  mailing address.

5      Q.   Okay.  So if you change the mailing

6  address.  So that's really -- I guess that's what I'm

7  getting at is, the only thing you really do in that

8  scenario is to try a different mailing address;

9  right?

10     A.   Correct.

11     Q.   Okay.  And then if you get a "Return to

12 sender," then that's basically the end of the

13 inquiry?

14         MR. BUTTERFIELD:  Same objection.

15     A.   Yes.

16     Q.   Okay.  Thank you.

17         All right.  So moving on to topic 1 for

18 the 2016 decision, was there -- well, let me back up.

19         Let's look at Exhibit 6, which is the

20 commission meeting notes for October 2014.  Did you

21 attend that meeting?

22     A.   No, it doesn't -- it doesn't appear so.

23     Q.   Okay.  Take a look at just A. where it

24 talks about "...a resident of Blanding expressing his

25 opposition to and feelings about the vote by mail

1    election procedures."  I understand you weren't at

2    the meeting.  What concerns have you heard about the

3    vote by mail election procedures?

4              MR. BUTTERFIELD:  Objection.  Beyond the

5    scope.

6         A.   Similar to what was answered before,

7    privacy of the ballots and -- and just -- just the

8    change in the process.

9         Q.   Okay.  Now, actually moving to 2016 --

10   and sorry for going back a couple times on you

11   there -- let's take a look at Exhibit 11.  So that's

12   a San Juan Record article; right?

13        A.   Yes.

14        Q.   Okay.  Have you ever seen that article

15   before?

16        A.   Yes.

17        Q.   Okay.  So this article talks about a

18   February 16 meeting of the San Juan County Commission

19   and most of the Navajo chapters favoring polling

20   places instead of voter booths -- I mean -- sorry --

21   favoring polling places with booths -- booths instead

22   of mail-in ballots; right?

23        A.   Yes.

24        Q.   Okay.  Were you at that meeting

25   February 16th, 2016?

1          A.    No, I don't think so.

2          Q.    Okay.  Were you at the Utah Navajo

3    Commission meeting that's discussed in the third

4    paragraph?

5          A.    No.

6          Q.    And are you aware of any -- have you seen

7    the state recommendation to go away from the mail-in

8    ballot that's referenced in the fourth paragraph?

9          A.    No.

10          Q.    Okay.  Do you know if that recommendation

11   was made in writing to the county or not?

12          A.    I don't know.

13          Q.    Okay.  Who would know that?

14          A.    It looks like Bruce Adams.

15          Q.    Okay.  So as of February 16th, 2016, had

16   the county decided to move from the mail-in only

17   ballots to a mail-in -- to a mail-in ballot and

18   polling locations?

19               MR. BUTTERFIELD:  Objection to the extent

20   it mischaracterizes the prior elections.

21               Go ahead.

22          A.    Can you repeat the question?

23          Q.    Yeah, let me try and ask a better

24   question.  Yeah, I guess ultimately what I'm getting

25   at here is when was the decision made to add polling

Page 46

1   locations for the 2016 June election?

2         A.   It was discussed back in October, but the

3   decision was actually made in either late February or

4   early -- sorry -- late January or early February.

5         Q.   And how would the decision have been

6   made?  Was it -- was it during a commission meeting?

7         A.   No.  The clerk would have made that

8   decision after discussing it with -- with other

9   people.

10        Q.   Okay.  In making that decision, is there

11  an internal process for, I guess, making that

12  decision official?

13        A.   No.

14        Q.   Okay.  So the decision is just made in

15  the clerk's head, and when he communicates to someone

16  that he has made that decision, that's when the

17  decision is made for the county?

18              MR. BUTTERFIELD:  Objection.

19  Mischaracterizes prior testimony.

20              MR. CASTANEDA:  Go ahead and answer.

21              THE WITNESS:  That's what I understand.

22              MR. CASTANEDA:  Okay.

23              MS. KANE:  Could I jump in?

24              MR. CASTANEDA:  Yeah.  Go ahead, yeah.

25        Q.   (BY MS. KANE)  You said it was discussed

Page 47

1    back in 20 -- in October of this past year?

2             A.   (Nods head.)

3             Q.   Who discussed it then?

4             A.   Myself and the county attorney and --

5             MR. CASTANEDA:   That's October 2015?

6             THE WITNESS:   -- the county clerk.

7             Yes.

8             Q.   (BY MS. KANE)   You discussed what

9    exactly?  Well, I don't know if that falls within the

10   privilege.

11            MR. CASTANEDA:   So in October --

12            MR. BUTTERFIELD:   Don't discuss anything

13   that you talked with Kendall about, but with respect

14   to what you and -- and John David or even with the DOJ

15   or whatever -- whoever it is you talked to, you can --

16   you can --

17            THE WITNESS:   Explain that?

18            MR. BUTTERFIELD:   -- explain that.

19            THE WITNESS:   So after meeting with the

20   Department of Justice, we -- we met and discussed

21   different options as far as, you know, how can we

22   better serve the Navajo population.  We discussed the,

23   you know, polling locations, possible locations.

24            Q.   (BY MS. KANE)   You discussed possibly

25   reopening certain polling locations at that time?

Page 48

```
 1         A.   Yes.

 2         Q.   Were any decisions made?

 3         A.   No.

 4         Q.   And you said that -- when was the

 5    decision actually made?

 6              MR. BUTTERFIELD:  Asked and answered.

 7         Q.   (BY MS. KANE)  Sorry.  You said it was

 8    made in late January or early February?

 9         A.   (Nods head.)

10         Q.   And how do you know that?

11         A.   It's also from testimony from John David

12    Nielson in the declaration.

13         Q.   Okay.  But you were not a part of that

14    decision-making process?

15         A.   I was a part of the decision-making

16    process, but it was ultimately his decision.

17         Q.   Can you explain that process?

18         A.   Just counseling with -- with people,

19    just -- what part of the process?

20         Q.   Well, did you engage in discussions with

21    him?  Was there anything written at that time?

22         A.   No, nothing was written.

23         Q.   So there's nothing to memorialize that

24    decision in any way other than just internal

25    discussions within the office?
```

Page 49

1          A.   As far as I know, yes.

2          Q.   And when would that decision had been

3    made public?

4          A.   Could I refer to the...

5               MR. CASTANEDA:  Please.

6               THE WITNESS:  Let's see.  It says in his

7    testimony that he sent a press release to the San Juan

8    Record and Navajo Times on March 9th, 2016.

9          Q.   (BY MS. KANE)  So to your knowledge,

10   before that time there was no public notice or

11   anything?

12         A.   Let's see.  I think there may have been

13   an email.  No, I'm not aware of anything.

14              MR. CASTANEDA:  Okay.  I think that this

15   is the confusion here, is we have Exhibit 11 --

16              MS. KANE:  Can we chat for just a second?

17              MR. CASTANEDA:  Yeah.  Let's take five.

18              (Recess.)

19              MR. CASTANEDA:  We can go back on.

20         Q.   (BY MR. CASTANEDA)  So after the decision

21   was made to introduce physical polling locations for

22   the 2016 election, did the county provide any public

23   notice similar to Exhibit 13?

24         A.   I will have to look.  I don't know.

25         Q.   So do you know when the first time the

1  county put any information about the physical polling

2  places on its website?

3       A.   No.

4       Q.   Do you know who would know that?

5            MS. KANE:  Is it there now?

6            MR. BUTTERFIELD:  I don't know.

7       Q.   (BY MR. CASTANEDA)  You don't know if

8  it's there now?

9       A.   I don't know if it is there.

10      Q.   Okay.  Who would know that?

11      A.   I guess anyone can look at the website.

12      Q.   Okay.  We'll do that later.

13           Before you had mentioned that, I think it

14  was, the clerk had sent the Navajo Times information

15  about the physical polling locations on March 9th,

16  2016.  Is that right?

17      A.   Yes.

18      Q.   Okay.  I'm going to show you Exhibit 10.

19  That's the Navajo Times article regarding the

20  reversal of the policy on mail-in ballots.  Is that

21  the Navajo Times article that you mentioned?

22      A.   I -- I haven't seen this article before.

23      Q.   Okay.  So that article is dated March 10,

24  2016; right?

25      A.   Yes.

1          MR. CASTANEDA:  Do you have any more

2    questions about that exhibit?

3          MS. KANE:  Not that one.

4          MR. CASTANEDA:  Okay.  All right.

5      Q.   (BY MR. CASTANEDA)  So in that exhibit it

6    references -- I think it's four polling locations.

7    Is that correct?

8      A.   Yes.

9      Q.   Okay.  And can you read those locations

10   into the record?

11     A.   Monticello, Montezuma Creek, Oljato, and

12   Navajo Mountain.

13     Q.   Okay.  Do you know how -- well, what is

14   the -- do you know the reasoning for selecting those

15   four specific places for the polling locations?

16     A.   Yes.

17     Q.   What is the reasoning?

18     A.   Time and distance.

19     Q.   Okay.  And who -- who made the decision

20   about the time and distance with regard to each of

21   those four polling locations?

22     A.   I discussed that with the clerk.  We

23   looked at the populations and used Google Maps to

24   look at how long it would take to travel from each of

25   those locations and what would be the -- what would

1   make the most sense as far as setting up those
2   locations.
3              MR. CASTANEDA:  Okay.
4              Maya, do you have any more question on
5   that?
6        Q.   (BY MS. KANE)  When you say what would
7   make the most sense as far as setting up those
8   locations, what do you mean?
9        A.   Being able to staff and have the
10   resources at each of those locations.  We were going
11   to set them up as vote centers, which is a lot
12   different than polling -- polling places.
13        Q.   Can you explain that?
14        A.   That means that anyone can vote from
15   anywhere at those -- at those locations; so if
16   somebody showed up from Oljato to Mexican Hat, they
17   would still be able to vote there.
18        Q.   But you decided not to set them up as
19   voting centers?
20        A.   No.  They are voting centers.
21        Q.   You decided -- okay.  So you can vote no
22   matter where you live in the county in person on
23   election day?
24        A.   Yes.
25        Q.   Did you formally consult anyone from the

Page 53

1  Navajo Nation, or informally, in locating these three

2  additional physical polling locations?

3       A.   No.  We discussed with Ed.  We had

4  originally talked about having two locations -- two

5  locations on the reservation, and Ed advised us that

6  it would be good to have the third location in Navajo

7  Mountain.

8       Q.   Did you receive any other feedback?

9       A.   No.

10       Q.   In your mind, are these three locations

11  sufficient?

12       A.   Yes.  In fact, I -- I expect that we'll

13  have a very low turnout at the locations.

14       Q.   Why do you expect that?

15       A.   Because everyone has already received a

16  ballot by mail and --

17       Q.   How do you know that?

18       A.   We send all the voters a ballot by mail.

19       Q.   And how long does it take for ballots to

20  reach those locations?

21            MR. BUTTERFIELD:  Objection.  Beyond the

22  scope.

23            MS. KANE:  I think this has to --

24            Well, go ahead.

25            THE WITNESS:  I'm not sure.  It's

1    different for different locations depending on the

2    post office.

3         Q.   (BY MS. KANE)  But it's your assumption

4    that by election day everyone will have received a

5    ballot, and that's the reason that you have lower

6    turnout on that day, is more people will be voting by

7    mail?

8         A.   Yes.

9         Q.   (BY MR. CASTANEDA)  Do you know the dates

10   and hours that the polling places will be open?

11        A.   Yes.  It's from 7:00 to 8:00 p.m., set by

12   the state.

13        Q.   And on the Tuesday, on election day;

14   right?

15        A.   Yes.

16        Q.   Okay.  Do you know when the mail-in

17   ballots were sent out?

18        A.   I don't recall the exact date, but it was

19   according to the requirements from the state.

20        Q.   Okay.  And do you know if the locations

21   and hours for each of these polling locations are on

22   the San Juan County website?

23             MR. BUTTERFIELD:  Objection.  Asked and

24   answered.

25        Q.   (BY MR. CASTANEDA)  You can answer.

1          A.    I'm not sure.

2          Q.    Okay.  Do you know if the county has

3    publicized the locations, date, and hours for each of

4    those polling locations any other way?

5          A.    I haven't looked at the public notices,

6    no.

7                MS. KANE:  Who is in charge of those

8    public notices?

9                MR. BUTTERFIELD:  Objection.  Beyond the

10   scope.

11               THE WITNESS:  The county clerk.

12         Q.    (BY MR. CASTANEDA)  So is the county

13   clerk the right person to talk to about the notices

14   regarding the hours and locations being publicized to

15   the community?

16         A.    Yes.

17               MR. CASTANEDA:  Okay.

18               Do you have anything else?

19         Q.    (BY MS. KANE)  In making your decision

20   about going to four polling locations, did you

21   consider any issues with the postal system that may

22   have occurred in the past elections?

23               MR. BUTTERFIELD:  Objection.  Withdraw

24   that objection.

25               (The reporter asks for clarification.)

1           MR. CASTANEDA:  Can you ask the question

2    again?

3           Q.   (BY MS. KANE)  In making the decision to

4    reopen or to locate three additional physical polling

5    locations in 2016, did you consider any past issues

6    with the postal system in the county at all?

7           A.   Yes.  I felt the previous election

8    actually went really well.

9           Q.   In what respect?

10          A.   Our voter turnout was much better than it

11   had been in other elections.

12          Q.   Were there any other indication that's it

13   went well?  Are you basing that simply on voter

14   turnout?

15          A.   As far as statistics, and also we did

16   receive feedback from quite a few voters that they

17   like the process.

18          Q.   Were there any issues or complaints

19   associated with the postal service that led -- that

20   were considered in the decision to reopen these

21   polling location?

22          A.   Can you say that again?

23          Q.   Were there any issues or complaints

24   associated with the postal system that you're aware

25   that have were factored into the decision to reopen

Page 57

```
 1    polling locations?

 2          A.   It was all taken into consideration.

 3          Q.   (BY MR. CASTANEDA)  You mentioned before

 4    that part your duties include accounts payable;

 5    right?

 6          A.   Yes.

 7          Q.   So do you see invoices related for any of

 8    the county's expenditures with regard to election

 9    procedures?

10          A.   Yes.

11               MR. BUTTERFIELD:  Objection.  Beyond the

12    scope.

13          Q.   (BY MR. CASTANEDA)  So that would include

14    invoices for the cost of publicizing information

15    regarding this upcoming election?

16               MR. BUTTERFIELD:  Beyond the scope.

17          A.   Yes.

18          Q.   Okay.  That would include invoices

19    regarding any radio announcements as well?

20               MR. BUTTERFIELD:  Beyond the scope.

21          A.   Yes.

22          Q.   As well as the hiring of poll workers,

23    election judges, or interpreters to assist with the

24    elections?

25               MR. BUTTERFIELD:  Beyond the scope.
```

1              THE WITNESS:  Yes.

2              MR. CASTANEDA:  Okay.  Let's take a five

3    and see if we can figure if there's anything else.

4              (Recess.)

5              MR. CASTANEDA:  We can go back on the

6    record briefly.

7              We have no further questions.

8              MR. BUTTERFIELD:  Okay.  I don't have any

9    questions.

10              We'll read and sign the depositions.

11              MR. CASTANEDA:  Can I get a rough

12   transcript when you get a chance?  I think at least

13   for me the rough as soon as reasonably possible is

14   great and then everything else.  I like the minis.

15              MR. BUTTERFIELD:  You can just send me a

16   mini and a regular and then a disk.  I don't know that

17   I need a disk.  I want a hard copy of a regular and

18   then an electronic copy of a regular and mini.

19              (Concluded at 3:15 p.m.)

20

21

22

23

24

25

Page 59

```
1                        CERTIFICATE
2    STATE OF UTAH          )
                            )
3    COUNTY OF UTAH         )
4            THIS IS TO CERTIFY that the deposition of
     JAMES FRANCOM was taken before me, Jerry R. Martin, a
5    Registered Professional in and for the state of Utah;
6            That the said witness was by me, before
     examination, duly sworn to testify the truth, the
7    whole truth, and nothing but the truth in said cause;
8            That the testimony of said witness was by
     me reported in stenotype, and therefore caused to be
9    transcribed into typewriting, and that a full, true,
     and correct transcription of said testimony so taken
10   and transcribed is set forth in the foregoing pages,
     numbered 4 to 58, inclusive, and said witness deposed
11   and said as in the foregoing annexed deposition;
12           I further certify that I am not of kin or
     otherwise associated with any of the parties to said
13   cause of action, and that I am not interested in the
     event thereof.  WITNESS MY HAND AT OREM, UTAH, THIS
14   28TH DAY OF JUNE 2016.
15
16

             _____
17           JERRY MARTIN, RPR
18
19
20
21
22
23
24
25
```

Page 60

1     Navajo Nation Human Rights v. San Juan County
2                    James Francom
3            INSTRUCTIONS TO THE WITNESS
4          Please read your deposition over
5     carefully and make any necessary corrections.
6     You should state the reason in the
7     appropriate space on the errata sheet for any
8     corrections that are made.
9            After doing so, please sign the errata
10    sheet and date it.
11           You are signing same subject to the
12    changes you have noted on the errata sheet,
13    which will be attached to your deposition.
14           It is imperative that you return the
15    original errata sheet to the deposing
16    attorney within thirty (30) days of receipt
17    of the deposition transcript by you.  If you
18    fail to do so, the deposition transcript may
19    be deemed to be accurate and may be used in
20    court.
21
22
23
24
25    2333188

```
                                                Page 61
 1      Navajo Nation Human Rights v. San Juan County

 2                    James Francom

 3                  E R R A T A

 4                    - - - - -

 5      PAGE    LINE    CHANGE

 6      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 7      Reason:_____

 8      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

 9      Reason:_____

10      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11      Reason:_____

12      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13      Reason:_____

14      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15      Reason:_____

16      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17      Reason:_____

18      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19      Reason:_____

20      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

21      Reason:_____

22      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23      Reason:_____

24      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

25      2333188
```

Page 62

1    Navajo Nation Human Rights v. San Juan County

2                    James Francom

3            ACKNOWLEDGMENT OF DEPONENT

4            I, _____, do

5    hereby certify that I have read the foregoing

6    pages and that the same is a correct

7    transcription of the answers given by

8    me to the questions therein propounded,

9    except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____          _____

14   DATE                      SIGNATURE

15

16   Subscribed and sworn to before me this

17   _____  day of _____, 20__.

18

19   My commission expires: _____

20   _____

21   Notary Public

22

23

24

25   2333188

# EXHIBIT 14



Already checked your inbox?     Then why not try to save?     Get A Quote.



GEICO

**NAVAJO TIMES**

DINÉ BI NAALTSOOS
Wednesday, June 8, 2016

ADVERTISE WITH US

EXHIBIT #10
WIT: Tapaha
DATE: 6-14-16
ALPINE COURT REPORTING

| A&E ▾ | BUSINESS | EDUCATION | NEWS ▾ | OPINION ▾ | POLITICS ▾ | SPORTS ▾ | CLASSIFIEDS | ADVERTISE! |

# SJC reverses policy on mail-in ballots

👤 by Cindy Yurth , 🕘 March 10, 2016      f   y   in   g+

**CHINLE**

Voters in San Juan County, Utah, will be able to vote either by mail or in person in the next county commission election, County Clerk John David Nielson confirmed Wednesday.

He added the change has nothing to do with a lawsuit filed last month by the Navajo Nation Human Rights Commission.

"We had taken some time to figure things out as far as what would be the best way to do things," Nielson said.

Everyone will get a ballot in the mail, Nielson explained, but it will be their choice whether to mail it in or take it to one of four polling places: Monticello, Montezuma Creek, Oljato or Navajo Mountain.

If they lose their ballot, one will be provided at the polling place, Nielson said.

The Navajo Nation Human Rights Commission on Feb. 25 sued the county over its closure of rural polling places in favor of mail-in ballots.

In 2014, the county closed all polling places except the county offices in Monticello, Utah, sending out thousands of mail-in ballots instead.

The HRC says the mail-in ballots deprive many Navajos — including those who don't speak English, those who don't drive and those who only sporadically pick up their mail — of exercising their right to vote.

*To read the full article, subscribe here now or pick up your copy of the Navajo Times at your nearest newsstand!*



$99+ Super Cheap Flights ✈ Find Deals!

GoLastMinute.com

Share:

✉ 🖨 f in y G+ P

**Related**



HRC challenges San Juan County on mail-in ballots
In "News"

**SJC: ballot lawsuit is political conspiracy**
A lawsuit brought by the Navajo Nation Human Rights Commission against San Juan County (Utah) over the use of mail-in ballots is a "sham" designed to return control of the
In "Politics"



Navajo Utah Commission joins fight against redistrict plans in San Juan County
In "Education"

🏷 CATEGORIES: POLITICS      🏷 TAGS: NAVAJO NATION HUMAN RIGHTS COMMISSION



KeyBank ☝🔒

The expertise to provide stability. The power to build legacies.

Learn more ›

©2016 KeyCorp. Member FDIC 150503-190505 15-0477

FROM THE WIRES     TRENDING

**News from Indian Country, via The Associated Press**

Man pleads not guilty to abducting, killing t

NY authorities say UPS knowingly shipped cigarettes

Man pleads not guilty to abducting, killing t

Critics highlight violence, response times in

Federal officials: 2 tribes 'exhausted' recogi

Man pleads guilty to murder on Spirit Lake

Program helping abuse victims could end a dry

Man unearths prehistoric weapons while p

Tribe leader to FBI: Crime is 'literally killing

Suspect in Navajo girl's deadly abduction to court

Rehearsal for mega-quake, tsunami starts i

North Dakota voters to cast ballots in presi caucuses

Alaska legislators face housing crunch as se continues

Fort Yates man pleads guilty to distributing methamphetamine

Woman accused of cutting man's throat aft ride

Hillary secures crucial delegates on eve of t vote

# EXHIBIT 15

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : : : : : : : : | **DECLARATION OF KENDALL G. LAWS** |
| Plaintiffs, | : : | |
| v. | : : | Case No. 2:16-cv-00154 JNP |
| SAN JUAN COUNTY; JOHN DAVID NIELSON, in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, | : : : : : : | Judge Jill N. Parrish

Magistrate Judge Brooke C. Wells |
| Defendants. | : : | |

| | |
|---|---|
| SAN JUAN COUNTY; JOHN DAVID NIELSON; PHIL LYMAN, BRUCE ADAMS; and REBECCA BENALLY | : : : : |
| Counterclaim Plaintiffs, | : : |
| v. | : : |
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : : : : : : |
| Counterclaim Defendants. | : : |

Pursuant to 28 U.S.C. §1746, **KENDALL G. LAWS** submits this

*Declaration*:

1.      I am an adult citizen and resident of San Juan County, Utah.

2.      The purpose of this *Declaration* is to present evidence and information to the Court in this lawsuit. The statements in this *Declaration* are true and correct.

3.      The statements are also based upon my personal knowledge. Furthermore, if I were present in Court and testifying, I would testify to the facts exactly as set forth in this *Declaration*.

4.      I am the San Juan County Attorney.  I have held that Office since January 1, 2015.

5.      In early October of 2015, I received a telephone call from Victor Williamson of the United States Department of Justice ("DOJ").   Mr. Williamson stated that he was with the DOJ's Voting Rights Section.

6.      Mr. Williamson informed me that the DOJ had received a complaint from the Navajo Human Rights Commission about San Juan County's vote-by-mail procedures, and that he wanted to come to San Juan County and meet with County Officials regarding the vote-by-mail procedures that the County had implemented for the 2014 election cycle.

7.      On October 29, 2015, myself, John David Nielson, James Francom, Ed Tapaha, and Norman Johnson met with Mr. Williamson and two other DOJ representatives to review the County's 2014 election procedures.

8.      John David Nielson is the County Clerk-Auditor, James Francom is the Deputy Clerk/Auditor, Ed Tapaha is the County's liaison with the Navajo Nation, and Norman Johnson is the former Clerk-Auditor.

9.      It was my understanding that  Mr. Williamson had earlier met with members of the Navajo Human Rights Commission on the subject of the County's vote-by-mail procedures.

10.      From my conversation with Mr. Williamson and one other DOJ

representatives with him, I came to understand that the DOJ did not consider the County's vote-by-mail system as implemented for the 2014 elections (and the 2015 municipal elections) to be contrary to law or otherwise failed to meet the County's obligation to provide bilingual voting assistance to Navajo voters.

11.   Mr. Williamson, however, did inform me that the DOJ would continue watching the way in which the mail-in-voting system affected County residents and particularly its Navajo citizens.

12.   As a consequence, San Juan County began to consider making changes to improve the vote-by-mail system by adding three in-person polling locations on the Navajo Reservation as well as language assistance to Navajo voters.

13.   The final decision as to the locations of the three additional polling places was made on or before February 16, 2016.

14.   I next heard from Mr. Williamson when he called me shortly before the June 28, 2016 county-wide primary election.  During that conversation, Mr. Williamson informed me that, again at the request of the Navajo Human Rights Commission, the DOJ had been asked to review the changes that the County had made to its vote-by-mail procedures.

15.     Thereafter, Mr. Williamson and several investigators from the DOJ came to San Juan County to review the new vote-by-mail procedures.  I along with John David Nielson and Kelly Pehrson, San Juan County's Chief Administrative Officer, met with Mr. Williamson and the DOJ investigators on Monday, June 27, 2016, the day before the primary election.

16.     During that meeting, we explained to Mr. Williamson the DOJ investigators the procedures that were being used for that primary, including 3 new on-reservation polling locations and language assistance.  We also explained to Mr. Williamson and the DOJ investigators that the County was constantly working to improve its vote-by-mail procedures based upon what it had learned from each election, and would continued to do so.

17.     Mr. Williamson and the DOJ investigators said that they were comfortable with that approach, and  also made it clear to me that if they determined that any changes in the vote-by-mail procedures were in violation of the law, they would let me know.

18.     To date, I have not heard any criticism of the County's vote-by-mail procedures from Mr. Williamson or anyone else within the DOJ.

19.     Highway 191 is the only north-south road in San Juan County.

5

20.    From  Spanish Valley, Utah on San Juan County's northern border to Monument Valley, Utah on the County's southern border is a distance of approximately 183 miles.

21.    On Highway 191, in good weather  it takes approximately 3 hours and 26 minutes to drive from Spanish Valley, Utah to Monument valley, Utah.

22.    Pursuant to 28 U.S.C. §1746  I, KENDALL G. LAWS, hereby declare under the penalty of perjury that the information stated above is true and correct to the best of my knowledge.

EXECUTED in Monticello, Utah this 26th day of August, 2016.

Kendall G. Laws

*T:\7000\7788\J\LAWS DECLARATION.wpd*

## CERTIFICATION

I, Jesse C. Trentadue, hereby certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

Dated this 26th day August, 2016.

/s/ jesse c. trentadue

6

# EXHIBIT 16

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : : : : : : | **DECLARATION OF JAMES FRANCOM** |
| Plaintiffs, | : : | |
| v. | : : | Case No. 2:16-cv-00154 JNP |
| SAN JUAN COUNTY; JOHN DAVID NIELSON, in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, | : : : : : : | Judge Jill N. Parrish  Magistrate Judge Brooke C. Wells |
| Defendants. | : : | |

SAN JUAN COUNTY; JOHN DAVID           :
NIELSON; PHIL LYMAN, BRUCE            :
ADAMS; and REBECCA BENALLY            :
                                      :
      Counterclaim Plaintiffs,     :
                                      :
v.                                    :
                                      :
NAVAJO NATION HUMAN RIGHTS            :
COMMISSION; PEGGY PHILLIPS; MARK      :
MARYBOY; WILFRED JONES; TERRY         :
WHITEHAT; BETTY BILLIE FARLEY;        :
WILLIE SKOW; and MABEL SKOW,          :
                                      :
      Counterclaim Defendants.     :
                                      :

      Pursuant to 28 U.S.C. §1746, **JAMES FRANCOM** submits this

*Declaration*:

      1.      I am an adult citizen and resident of San Juan County, Utah.

      2.      The purpose of this *Declaration* is to present evidence and

information to the Court in this lawsuit.  The statements in this *Declaration* are

true and correct.

      3.      The statements are also based upon my personal knowledge.

Furthermore, if I were present in Court and testifying, I would testify to the facts

exactly as set forth in this *Declaration*.

      4.      I am the chief deputy San Juan County Clerk.  I have held that Office

since December, 2010.

5.     During my employment with the San Juan County Clerk's office, I have been substantially involved with the administration of elections in San Juan County and am familiar with the procedures and processes used in connection with those elections, including efforts of San Juan County to reach out and assist Navajo residents of the County with respect to voting.

6.     To assist Navajo voters, the County has employed Mr. Edward Tapaha full-time as its Navajo liaison.  As such, Mr. Tapaha spends approximately 50% of his time on fostering the right to vote among Navajo voters.  Mr. Tapaha, who is Navajo and fluent in Navajo, does this by attending on-reservation Navajo Chapter meetings to explain election procedures, including the use of mail-in-ballots, and to describe for Navajo voters the ballots and candidates for each election.

7.     Mr. Tapaha's duties likewise include registering Navajos to vote, and there is even an election "hotline" so to speak where Mr. Tapaha is available 24 hours a day by telephone to answer questions from members of the Navajo Nation about voting and voting procedures.

8.     Mr. Tapaha also assists the County in the hiring and training of Navajo language interpreters who are present at polling locations to assist those

Navajo voters who are not proficient in speaking or reading the English language.

9.     During the time that I have worked in the San Juan County Clerk's Office, there have been no similar efforts to educate and/or to assist non-Navajo voters in the County.

10.     Pursuant to 28 U.S.C. §1746  I, JAMES FRANCOM, hereby declare under the penalty of perjury that the information stated above is true and correct to the best of my knowledge.

EXECUTED in Monticello, Utah this 30th day of August, 2016.

_____
James Francom

*T:\7000\7788\1\DECLARATION_JAMES FRANCOM.wpd*

4

**CERTIFICATION**

I, Jesse C. Trentadue, hereby certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

Dated this 30th day of August, 2016.

/s/ jesse c. trentadue