Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: jesse32@sautah.com
E-Mail: chuefner@sautah.com
E-Mail: bbutterfield@sautah.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

|  |  |
|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | Case No. 2:16-cv-00154 JNP |
| v. | Judge Jill N. Parrish |
| SAN JUAN COUNTY; JOHN DAVID NIELSON, in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, | Magistrate Judge Brooke C. Wells |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

---

| | |
|---|---|
| SAN JUAN COUNTY; JOHN DAVID NIELSON; PHIL LYMAN, BRUCE ADAMS; and REBECCA BENALLY | : |
| | : |
| | : |
| | : |
| Counterclaim Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, | : |
| | : |
| Counterclaim Defendants. | : |
| | : |

Plaintiffs have moved for a preliminary injunction. That *Motion*[1] is 33 pages in length and allegedly supported by five *Declarations* which, with attached exhibits, total almost 700 pages.[2] The essence of Plaintiffs' claim is that Defendants have failed to comply with the requirements of Section 2 (equal access to voting),[3] and Section 203 (language assistance)[4] of the Voting Rights Act. Defendants hereby submit this *Memorandum* in opposition.

## **INTRODUCTION**

If one were to pick a word to define the allegations in *Plaintiffs' Complaint* and in the *Motion* at bar, it would be: "gamesmanship." Gamesmanship both as to the claims being

---

[1] Dkt. 94.

[2] *See* Dkt. 94-1 through 94-6.

[3] Codified at 52 U.S.C. §10301.

[4] Codified at 52 U.S.C. §10503.

2

asserted and the so-called "evidence" presented in support of those claims.[5]  For example, in their *Complaint* Plaintiffs allege that San Juan County's decision to use mail-in-ballots in the 2014 general election unreasonably hindered the ability of Navajo citizens to participate effectively in the political process on equal terms with white voters, and that "unless enjoined by this Court, these practices will continue to do so in the 2016 election cycle and beyond."[6]  Plaintiffs' *Complaint*, however, does not address the voting procedures actually used in the county-wide June 28, 2016 primary, which will also be used in the November 8, 2016 general elections.

For instance, prior to the 2016 county-wide primary election, the County's Navajo liaison, Edward Tapaha, a member of the Navajo Nation, repeatedly visited Navajo Chapter Houses to explain the vote-by mail procedure.  He made these visits in January and/or February of 2016 to explain the vote-by-mail procedures and again in June of 2016 to explain the ballot.  Plaintiffs contend, without any evidence, that Mr. Tapaha is not fluent in Navajo and not a full-time County employee.[7]

Prior to the 2016 county-wide primary election, the County also issued press releases announcing the polling locations for in-person voting, which were published in *The San Juan Record* and *The Navajo Times* on March 9, 2016.  Plaintiffs acknowledge that this was done, but

---

[5]  Whereas the facts advanced by Plaintiffs are not supported by the record, Defendants have filed herewith a "book marked"  Appendix of Exhibits.  Dkt. 108.  Unless otherwise indicated, Defendants reference to evidence will be to the depositions, declarations and other documents contained in that Appendix.

[6]  *Complaint,* Dkt 2, ¶ 2.

[7]  *Motion for Preliminary Injunction*, Dkt. 94, pp. 16-17.

insist that "Defendants have not issued any written statement to the general public to inform San Juan County citizens about the County's plans for the 2016 general election"[8] which was, at the time of the filing of their *Motion for Preliminary Injunction*, still almost three months away. Moreover, San Juan County is already committed to using the same procedures in the November general election as it did in the June primary election, and the notion that the County will not provide pre-election public information as to this fall's general election is nonsense.

During the 2016 county-wide primary election, San Juan County had four polling locations for in person voting, three of which were on the Navajo Reservation and within a 15-mile mean travel distance to the nearest polling location for Navajo voters as compared to 20 miles for non-Indian voters.   Yet, Plaintiffs represent to the Court that "Navajo citizens have to travel, on average, 103.57 minutes to vote in Monticello (the only location for in-person voting) as compared with an average travel time of just 34.66 minutes for white voters,"[9] which is clearly not true.

During the 2016 county-wide primary election, San Juan County had an audio on its county website and at each polling location on election day identifying the candidates, their political affiliation and the offices for which they were seeking to be elected.  Plaintiffs contend that this was inadequate because there was no reference to the voter registration form or the candidates filing information.[10]  But there were interpreters at each of the four polling locations

---

[8]  *Id.* at pp. 10-11.

[9]  *Id.* at p. 9.

[10]  *Id*. at p. 11.

to assist Navajo voters in understanding this material.

During the 2016 county-wide primary election, there were Navajo interpreters at each of the polling locations to assist those voters who were not proficient in reading English with help in voting, registering, etc.  Again, Plaintiffs contend that this was inadequate because these Navajo interpreters were not "certified," or not trained.  While it is true that these individuals were not "certified," they were experienced election interpreters who had been trained in prior election cycles and, more importantly, they were members of the Navajo Nation and fluent in both English and Navajo.

Similarly, if one were to pick a word to define the injunctive relief that Plaintiffs are seeking with the *Motion* at bar, it would be: "outrageous."  For example, there are approximately 9,500 people of voting age in San Juan County of whom one-half are Navajo.  These 9,500 voters live in an area that is approximately twice the size of the State of Connecticut, and only 25% of them have a street address.  The other 75% live in remote parts of the County and use a Post Office Box for their address.  There is only one highway that runs north to south in San Juan County, and it takes almost 4 hours to drive from the northern border of San Juan County to the southern border.

There are four polling locations in San Juan County for in person voting, and three of them are located on the Navajo Reservation.  Consequently, as previously noted, the mean distance that a Navajo voter has to travel to vote in person is 25% less than that of a non-Navajo voter.  Navajo interpreters are present at all four polling locations on election day to assist anyone who is not proficient in reading the English language.  San Juan County has a full-time

employee whose duties are to go to the Navajo Reservation to register voters, explain the voting procedures, ballots, offices up for election and the candidates.  And not only has the Department of Justice and Navajo Election Administration tacitly approved the County's vote-by-mail procedures, but the use of mail-in ballots has significantly increased the turn out among Navajo voters.  Furthermore, similar assistance is not provided by the County to non-Navajo voters.

Yet, despite all of these things, by way of this *Motion for Preliminary Injunction* Plaintiffs seek: (1) to reopen all polling locations as well as numerous satellite offices on the Navajo Reservation for early voting;[11] (2) to employ full-time bilingual coordinators;[12] (3) to have ballots and other election materials printed in Navajo even though Navajo, by Plaintiffs' own admission, is not a written language; (4) to provide the Navajo Chapter Houses with audio equipment, apparently including computers, on which members can listen to audio ballots in Navajo; (5) to create a Navajo glossary of election terms;[13] and (6) to provide Plaintiffs' counsel with a detailed report of election results.[14]  What Plaintiffs are asking for is not the same opportunity to participate in the election process as that enjoyed by all voters.  To the contrary, Plaintiffs are asking for much more, which is neither required nor permitted under the Voting

---

[11]  Rather than satellite offices for early voting, Plaintiffs and other County voters have mail-in-ballots.

[12]  The County already has a full-time bilingual coordinator, Mr. Edward Tapaha.

[13]  An election glossary already exists. *See Glossary*, Appendix Exhibit 10.  What Plaintiffs are apparently asking is for the County to prepare a new glossary without any showing that the current one is defective or inadequate.

[14]  *See Proposed Injunction Order*, Dkt. 94-8.

Rights Act.

## **SUMMARY OF ARGUMENT**

Plaintiffs originally brought this action to do away with vote-by-mail procedures used in 2014, but now they seek much more by their *Motion*.  It is important to note that Plaintiffs' *Complaint* and their *Motion for Preliminary Injunction* must be analyzed under both Sections 203 and 2 of the Voting Rights Act.  In their *Complaint*, Plaintiffs attack the vote-by-mail procedures used by the County for the 2014 election cycle alleging that "in 2014, San Juan County closed all polling places and switched to a mail-only voting system.  The only way for a voter either to vote in person on Election Day or to vote by absentee ballot was, and currently is, to go to the County Clerk's office in Monticello."[15]  But none of the allegations in Plaintiffs' *Complaint* are true or even relevant since they are focused upon the 2014 procedures and not those currently in use by the County.  For the County's alleged violations of the Voting Rights Act, Plaintiffs are asking the Court to order Defendants: (1) to reopen polling sites equally accessible to Navajo voters as to non-Indian voters, and (2) to provide language assistance to Navajo voters.[16]

### A.      **Section 203**

Section 203 sets forth the language assistance requirements of the Voting Rights Act, and it is recodified at 52 U.S.C. §10503.  The thrust of Plaintiffs' Section 203 claim is that "Navajo is

---

[15] *Complaint*, Dkt. 2, p. 10.  Plaintiffs choose to ignore the fact that the County's mail-in-ballot is an absentee ballot.  *Francom Deposition*, Appendix Exhibit 13, p. 14.

[16] *Id.* at p. 21, ¶¶ 1-4.

a traditionally unwritten language. . . [and] the mail-only system as implemented by San Juan County fails to provide adequate oral assistance to limited English-proficient Native American voters, and therefore violates the Voting Rights Act."[17]  Significantly, however, Plaintiffs have not cited a single case holding that private action exists under the bilingual election requirements of §10503, and there is a reason for them not having done so.  Section 10503 does not create a private right of action.  But even if it did, Defendants have complied with that law, especially when both the Department of Justice and Navajo Election Administration have given their tacit approval to the County's vote-by-mail election procedures.

    **B.**    <u>**Section 2**</u>:

The Voting Rights Act protects the rights of individual voters, not the rights of groups.[18] Section 2 of the Voting Rights Act prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in a language minority group.  Section 2 is not an affirmative action plan; it requires equal opportunity, not unequal opportunity.[19]  The ultimate goal of Section 2 is "equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."[20]  With respect to Section 2, Plaintiffs essentially claim that this law has been violated because "[t]he closure of polling places within or accessible to the

---

[17]  *Complaint,* ¶ 6, Dkt. 2.

[18]  *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 437 (2006).

[19]  See 52 U.S.C. §10301("That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population").

[20]  *Johnson v. De Grandy*, 512 U.S. 997, 1014 fn. 11 (1994).

Navajo Nation Reservation together with the adoption of mail-only voting unreasonably hindered the ability of Navajo citizens . . . to participate effectively in the political process on equal terms with white voters."[21]  In the instant case, the focus of the Court's analysis should be on whether, based on the totality of circumstances, the County's vote-by-mail procedures as currently implemented result in Navajo voters having "less opportunity" to participate in the political process or to elect representatives of their choice,[22] and they have not.  But in fact, vote-by-mail has significantly increased voter participation or turn-out among Navajo voters.

While the United States Supreme Court has repeatedly stated that "voting is of the most fundamental significance under our constitutional structure." [23]  The Court has also recognized that "[i]t does not follow . . . that the right to vote in any manner . . . [is] absolute."[24] "Election law will invariably impose some burden upon individual voters,"[25] but this does not mean that

---

[21]  *Complaint*, Dkt. ¶ 2.

[22]  52 U.S.C. § 10301(b) ("A violation of [Section 2] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [Section 2] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). *See also, e.g., Turner v. State of Arkansas,* 784 F .Supp. 553, 573 (E.D. Ark. 1991).

[23]  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

[24]  *Id.*

[25]  *Id.*

the law violates Section 2.  For example, the "Constitution does not require *any* opportunities for early voting and as many as thirteen states offer just one day for voting: Election Day."[26] Consequently, not offering early voting or reducing the number of days offered for early voting does not violate Section 2, even if some voters would have preferred to vote earlier.[27]  Simply stated, "[t]he Equal Protection Clause . . . cannot be reasonably understood as demanding recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public."[28]  Nevertheless, that is at the heart of Plaintiffs' claims in this lawsuit: Their alleged personal preference for voting in-person.

## THE STANDARD PLAINTIFFS MUST MEET FOR THE INJUNCTIVE RELIEF THAT THEY ARE SEEKING

As noted above, Plaintiffs' *Complaint* challenges the procedures used in the 2014 election cycle.  However, the County modified those procedures for the 2016 election cycle, but Plaintiffs never attempted to verify that fact before bringing this lawsuit.  Even more significantly, with their *Motion for Preliminary Injunction,* Plaintiffs are not seeking to maintain the *status quo* between the parties to this litigation, which is the purpose of a preliminary injunction.  Instead, they are seeking a mandatory injunction requiring the County to assume and incur significant additional burdens, and ones that are beyond the scope of their *Complaint*.

---

[26] *Ohio Democratic Party v. Husted*, No. 16-3561, 2016 WL 4437605 at *1 (6th Cir. Aug. 23, 2016).

[27] *See id.*

[28] *Id.* at *7.

Normally, in order to obtain a preliminary injunction, Plaintiffs must establish: (1) that they will suffer irreparable injury unless the injunction issues; (2) that the threatened injury outweighs whatever damage the proposed injunction may cause the County; (3) that the injunction, if issued, will not be adverse to the public interest; and (4) that there is a substantial likelihood Plaintiffs will prevail on the merits.[29]  And even in normal circumstances, the Tenth Circuit has cautioned that because "a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal,"[30] and "granted only in cases where the necessity for it is clearly established."[31] An ordinary preliminary injunction is already an extraordinary remedy, and what Plaintiffs seek exceeds that benchmark, subjecting their injunction request to a heightened standard.

Even if Plaintiffs had asked for a preliminary injunction granting them only the relief requested in their *Complaint*, which is not the case, they could not obtain that relief without an exceptional showing.  This is so because what Plaintiffs would be seeking is a mandatory injunction requiring Defendants to provide them with the relief that they have sued to obtain without benefit of trial that likewise changes rather than maintains the *status quo*.

The Tenth Circuit has identified three types of preliminary injunctions that are

---

[29]  *Schrier v. University of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005).

[30]  *Id.* (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).

[31]  *United States ex. rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989).

"disfavored."[32]  These are (1) those that alter the *status quo*; (2) mandatory preliminary injunctions that require the enjoined party to take affirmative acts rather that not acting; and (3) preliminary injunctions that afford the movant all the relief that he or she could recover at the conclusion of a trial on the merits.[33]  Since these three type of injunctions are disfavored, each "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. . . [A] party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."[34]  Furthermore, the burden on Plaintiffs is much greater in this instance because the injunction that they seek is much, much broader than that requested in their *Complaint*.

Whereas the *Complaint* essentially asks the Court to do away with mail-in-ballots, Plaintiffs are now asking the Court to order Defendants: (1) to reopen all polling locations as well as numerous satellite offices on the Navajo Reservation for early voting;[35] (2) to employ full-time bilingual coordinators; (3) to have ballots and other election materials printed in Navajo even though Navajo, by Plaintiffs' own admission, is not a written language; (4) to provide the Navajo Chapter Houses with audio equipment, apparently including computers, on which

---

[32] *Schrier*, 427 F.3d at 1259.

[33] *Id.* at 1258.

[34] *Id.* at 1259 (citation and internal quotation marks omitted).

[35] Rather than satellite offices for early voting or absentee voting, Plaintiffs and other County voters have mail-in-ballots. *See Francom Deposition*, Appendix Exhibit 13, p. 14 ("Voting by absentee ballot means that they are voting all by mail").

members can listen to audio ballots in Navajo; (5) to create a Navajo election glossary; and (6) to provide Plaintiffs' counsel with a detailed report of election results.[36]

Clearly then, the injunction that Plaintiffs are seeking with their *Motion* is one that falls within all three of the types of injunctions that are disfavored by the Tenth Circuit so as to be subject to the stricter standard. It does not preserve the *status quo*; it is mandatory rather than prohibitory; and it not only gives Plaintiffs the relief that they are seeking in their *Complaint*, but it also gives them much more. More importantly, because Plaintiffs are seeking injunctive relief beyond the four corners of their *Complaint*, the Court does not have the requisite jurisdiction to issue that injunction because, "when the movant seeks intermediate relief beyond the claims in the complaint, the court is powerless to enter a preliminary injunction."[37]

A district court does not have jurisdiction to issue a preliminary injunction when the moving party has "present[ed] issues which [were] entirely different from those which [had been] alleged in his original complaint."[38] "Even when a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion."[39] A court "will not award a preliminary injunction on grounds not raised in the complaint, as there is, by virtue of the

---

[36] *See Proposed Injunction Order*, Dkt. 94-8.

[37]  *Schwartz v. United States Dep't of Justice,* 2007 WL 2916465, at *3 (D.N.J. Oct. 4, 2007).

[38] *Stewart v. United States Immigration & Naturalization Serv.,* 762 F.2d 193, 198–99 (2nd Cir.1985).

[39]  *Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002).

absence of the issue from the complaint, no likelihood of success on the merits."[40]

Finally, there is the matter of security, which Plaintiffs have failed to address. Nor can Defendants do so without knowing the scope of any injunctive relief the Court might order. Thus, if the Court proposes to enter a preliminary injunction, Defendants request an evidentiary hearing to set the amount of the security and/or bond that Plaintiffs are required to post pursuant to *Federal Rule of Civil Procedure* 65(c).

## EVIDENCE

It is well settled that only admissible evidence can be considered by the Court in ruling on *Motions*.[41] Towards this end, a court may not consider either hearsay evidence or unsworn documents submitted either in support of or in opposition to a party's *Motion*.[42] The *Declaration* or *Affidavit* submitted in support of or in opposition to a *Motion* must be based upon the witness's personal knowledge,[43] set out facts that would be admissible in evidence, and show that

---

[40] *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 233 n.10 (M.D. Pa. 2001); *see also Lee v. Lindsay,* 2007 WL 1120562, at *1 (M.D. Pa. Apr.13, 2007) ("[I]t is well established that a court may not grant a preliminary injunction when the issues raised in the motion for a preliminary injunction are entirely different from those raised in the complaint." (citing *Stewart v. United States Immigration and Naturalization Service,* 762 F.2d 193, 198–199 (2d Cir.1985))).

[41] *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

[42] *Martin v. John W. Stone Oil Distributor, Inc*., 819 F.2d 547, 549 (5th Cir. 1987); *See Rogers v. Ford Motor Co.*, 952 F. Supp. 606, 610 (N.D. Ill. 1997).

[43] *See Bright v. Ashcroft*, 259 F. Supp. 2d 494 (E.D. La. 2003)(Statements not based upon affiant's personal knowledge should be stricken).

the affiant or declarant is competent to testify on the matters.[44]  A declarant or affiant also cannot

state legal opinions/conclusions in his or her *Declaration* or *Affidavit*.[45]  Similarly, a *Declaration*

or *Affidavit* that makes conclusory factual assertions and/or is based upon speculation is likewise

deficient and not to be considered by the Court.[46]  And, even if the *Declaration* or *Affidavit* is not

hearsay, is not improper speculation, and is otherwise free of conclusory statements, including

legal opinions, it still must be relevant in order to be considered by the Court.[47]

<u>**REBUTTAL TO PLAINTIFFS' STATEMENT OF FACTS**</u>

In their *Motion*, Plaintiffs have a section titled "*Statement of Facts*."  However, what

Plaintiffs contend are the facts entitling them to the injunctive relief that they are seeking are

scattered throughout their *Memorandum* and almost 700 pages of attachments.  More

importantly, these so-called facts are not supported by the record submitted by Plaintiffs.

Defendants, therefore, have culled from Plaintiffs' *Memorandum* what they believe to be the

material facts.  These facts are set forth below with each "purported" fact followed by

Defendants' response:

1.      Navajo is historically an unwritten language.[48]

---

[44] *Federal Rule of Civil Procedure* 56(b)(4).

[45] *See Fedler v. Oliverio,* 934 F. Supp. 1032, 1047 (N.D. Ind. 1996).

[46] *See e.g. Falls Riverway Realty, Inc. v. Niagra Falls,* 754 F.2d 49 (2nd Cir. 1985); *Koclanakis v. Merrimack Mutual Fire Insurance Co.,* 899 F.2d 673, 675 (7th Cir. 1990); *First Pacific Networks, Inc. v. Atlantic Mut. Ins. Co.*, 891 F. Supp. 510, 514 (N.D. Cal. 1995).

[47] *See McKeithen v. S.S. Frosta*, 430 F. Supp. 899, 905-906 (E.D. La. 1977).

[48] *Memorandum*, p. 2.

**Defendants' Response**:  Undisputed.  Furthermore, the younger Navajo are becoming increasingly less fluent and unable to speak Navajo.[49]

2.      A large proportion of the Navajo Indians residing in San Juan County are unable to speak, write or read the English language.[50]

**Defendants' Response**: Disputed.  There is no evidence of that fact.  Moreover, as "evidence" Plaintiffs refer to paragraph 6 of the Gorman Declaration,[51] in which he states that: "Navajo is an historically unwritten language.  In recent decades, there have been efforts made to develop a written form of the language, but not all Navajo people and read the language."[52] Gorman says nothing about the ability of Navajo voters to read, speak and/or write English.

3.      During the 2012 election cycle prior to the implementation of vote-by-mail in 2014, the average travel time for Navajo residents to get to a polling location was 13.94 minutes.[53]

**Defendants' Response**: Undisputed, but irrelevant.  Under the current election procedures with three polling locations within the Navajo Reservation Plaintiffs time and distance expert, Gerald Webster, states that Navajo voters live within 15.24 miles of a polling location compared to non-Indian voters who must travel 20.39 miles to a polling location to vote

---

[49] *First Tapaha Deposition*, Appendix Exhibit 9, pp. 37-38.

[50] *Memorandum*, p. 2.

[51] Dkt. 94-1.

[52] *Id.* at ¶ 6.

[53] *Memorandum*, p. 3.

in-person.[54]

4.      The fact that many Navajo live in rural areas of San Juan County complicates mail delivery and means that they are less likely to receive their mail, including ballots.[55]

**Defendants' Response:**  Disputed.  Plaintiffs also submit no evidence to support this conclusory statement.  Nor could they given the fact that San Juan County is so rural that only about 25% of its residents have a street address; whereas the remainder list a Post Office Box as their address.[56]  Moreover, because the population of San Juan County is almost equally divided between Indian and non-Indian, it can be fairly said that to the extent mail delivery to rural areas is problematic, then both Indians and non-Indians are equally effected.

5.      Because of the historical discrimination against Navajo in San Juan County, Navajo voters are reluctant to travel to Monticello, Utah, which has a majority population of non-Indians, to vote in person.[57]

**Defendants' Response**: Disputed.  There is no evidence of this fact.  As "evidence," Plaintiffs refer to paragraphs 2 and 3 of the Whitehat Declaration.[58]  But all Whitehat says is: "That from my home, it takes me approximately five hours to drive to Monticello one way. [and

---

[54] Dkt. 94-2, p. 51.

[55] *Memorandum*, p. 3.

[56] *Norman Johnson Deposition*, Appendix Exhibit 11, pp. 96-97.

[57] *Memorandum*, p. 3.

[58] Dkt. 94-3.

that] There is a history of discrimination against Navajo people in San Juan County."[59]
Furthermore, during the 2016 primary, Whitehat voted in-person in Navajo Mountain where he
lives.[60]

      6.      Prior to the 2016 county-wide primary election, the San Juan County Clerk had
press releases published in the Navajo Times and San Juan Record announcing the four polling
locations for in-person voting, but the County has not sent out any similar press releases for the
November 2016 general election,[61] which procedures included public announcements regarding
polls, voting hours, etc.

      **Defendants' Response**: Undisputed but irrelevant.  The election is still two months
away.  Besides the San Juan County Clerk-Auditor, John David Nielson, has said that the County
intends to use the same procedures in the 2016 general elections as it used in the 2016 primary
election.[62]  Furthermore, Plaintiffs ignore the work of Ed Tapaha, the County's full-time liaison
with the Navajo Nation.

      Mr. Tapaha is a member of the Navajo Nation and has lived his entire life at Red Mesa,
Utah, which is on the Navajo Reservation.[63]  He attended San Juan County High School and has

---

[59] *Id.* at ¶¶ 2-3.

[60] *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 16.

[61] *Memorandum*, pp. 4-5.

[62] *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 15.

[63] *First Tapaha Deposition*, Appendix Exhibit 9, p.4.

a college degree.  He is also a licensed practical nurse.[64]  He was specifically hired by the County in 1991 to work on matters involving the Navajo Nation, especially elections.  Depending upon whether it is an election year, between 50% and 60% of Mr. Tapaha's time is devoted to election activities,[65] such as visiting Chapter Houses to register voters, discussing the vote-by-mail procedures, explaining the ballots in upcoming elections, and providing language assistance, including selecting and training translators to be present on election day at each polling location in order to assist Navajo voters.[66]  Mr. Tapaha is able to provide this language assistance because he is fluent in both Navajo and English with considerable experience as a translator.[67]

      7.     During the 2016 primary election, San Juan County did not provide Navajo voters with a translation of the ballot, voter registration forms or candidate filing information.  Instead, the County's website listed in Navajo the offices up for election, the names of the candidates for those offices and their political party affiliation.[68]

    **Defendants' Response**: Disputed.  Mr. Tapaha testified about his election education–voter registration work with Navajo voters leading up to the 2016 county-wide primary election in June of 2016.[69]  In addition, Plaintiffs cite to paragraph 14 of the Gorman Declaration as

---

   [64] *Id.* at pp. 5-6.

   [65] *Id.* at pp. 55-60.

   [66] *See id*. at pp.8-9, and  49-84.

   [67] *Second Tapaha Deposition*, Appendix Exhibit 12, pp 12-13, 22-23, 36-37, and 72-73. .

   [68] *Memorandum*, p. 5.

   [69] *Second Tapaha Deposition*, Appendix Exhibit 12, pp. 9, 24-25.

"evidence" of this fact but, as usual, that Declaration is markedly different than what Gorman knows to be the truth.  Gorman, for example, contends that there was no translation of the ballot available for voters during the 2016 primary election, which is not true.  At every polling location there were trained translators, fluent in Navajo, available to assist those who needed help.  These translators were selected and trained by Mr. Tapaha,[70] and they were experienced having been poll workers or translators in many previous elections.[71]

8.      Because Navajo voters live in rural areas, White voters receive their mail-in ballots more expeditiously than do Navajo voters.[72]

**Defendants' Response**: Disputed.  This fact is also not supported by any evidence. Plaintiffs' "evidence" consists of paragraph 17 of the Gorman Declaration and paragraph 4 of the Whitehat Declaration.  But paragraph 17 of the Gorman Declaration about slow mail delivery to Navajo residents of the County is based on his unknown staff member's conversations with an unknown postmaster, which is triple hearsay.  In similar fashion, paragraph 4 of the Whitehat Declaration merely states that he received his 2016 primary ballot about two weeks after it had been mailed, which is consistent with the allegations of the *Complaint* wherein Whitehat states that he works in Arizona and, "as a result he only gets his mail approximately every two weeks."[73]

---

[70]  *Id.* at pp. 51 -55, and 91-92.

[71]  *Id.* at pp. 12-13.

[72]  *Memorandum*, p. 5.

[73]  *Complaint*, ¶ 17, Dkt. 2.

9.      San Juan County has identified the procedures that it will use for the 2016 election cycle (*e.g.*, language assistance, press releases, and four polling locations) but has not identified the procedures for future elections.[74]

**Defendants' Response**: Undisputed.  But irrelevant.  Furthermore, the County works to improve its election procedures by analyzing the results of each election to see if there are things that need to be done to improve.[75]  As a result, the procedures may change depending upon County's experience with the 2016 election cycle.

10.      San Juan County's Navajo liaison official, Edward Tapaha, visited Navajo Chapter meetings prior to the 2016 county-wide primary to explain the vote-by-mail and other election procedures, but the County has not indicated whether he will make similar election - informational visits to Chapter meeting for the 2016 general election.[76]

**Defendants' Response**:  Disputed. The County is on record as to the election procedures that will be used in the 2016 general election.[77]

11.      The County's 30(b)(6) designees, Mr. Tapaha and Mr. Francom, did not know whether a public notice had been issued prior to the 2016 county-wide primary informing voters of the addition of three new polling locations for in-person voting. [78]

---

[74] *Memorandum*, p. 6.

[75] *Laws Declaration*, Appendix Exhibit 15, ¶ 16.

[76] *Memorandum*, p. 6.

[77] *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 15.

[78] *Memorandum*, p. 5.

**Defendants' Response**: Disputed.  Both Mr. Tapaha,[79] and Mr. Francom said that the County Clerk-Auditor issues such notices.[80]  That public notice was issued.[81]

12.     The Navajo translators are not required to have any relevant qualifications and lack formal training.[82]

**Defendants' Response**: Disputed.  They are required to be fluent in Navajo and English. And while they were not trained with respect to the 2016 county-wide primary, that was because of their training and experience in previous elections.[83]  In addition, Mr. Tapaha visited the polling locations in previous election years to observe the performance of the translators who he felt were able to do the job.[84]  Also, for over 30 years the Department of Justice ("DOJ") has monitored the County's election procedures for compliance with the Voting Rights Act, including that law's language assistance requirements, and the DOJ has tacitly approved them, including its vote-by-mail procedures.[85]  Similarly, in developing the 2014 vote-by-mail procedures the County worked with and received the tacit approval of the Navajo Election

---

[79] *Second Tapaha Deposition*, Appendix Exhibit 12, p. 144.

[80] *Francom Deposition*, Appendix Exhibit 13, p. 55.

[81] *See First Nielson Declaration*, Appendix Exhibit 1, ¶21.  *See also Navajo Times Article*, Appendix Exhibit 14.

[82] *Memorandum*, p.11.

[83] *See* response to paragraph 7 above.

[84] *Second Tapaha Deposition*, Appendix Exhibit 12, pp. 98-101.

[85] *See, infra.,* Section D of Statement of Additional Facts.

Administration.[86]

13.      Plaintiffs insist that the County needs a glossary of election terms to be used by translators.

**Defendants' Response**: That glossary already exists.[87]

14.      Plaintiffs also contend that voting in San Juan County is polarized, meaning that Navajo voters vote for Navajo candidates and that non-Indians vote for non-Indian candidates. Navajo voters within San Juan County prefer Democratic candidates over Republican candidates.[88]

**Defendants' Response**: Disputed and irrelevant.  It is likewise not true because the Navajo vote along party lines.  In fact, political party affiliation among Navajo voters in San Juan County is so strong that they will vote for a non-American-Indian Democratic candidate rather than an Navajo Republican candidate,[89] which is a fact that is well documented by the testimony of Gail Johnson.

---

[86]  *First Tapaha Deposition*, Appendix Exhibit 9, pp. 94-95.

[87]  *See Glossary,* Appendix Exhibit 10.  More importantly, Mr. Tapaha helped prepare the *Glossary* and did so to make sure that translators at the polling locations were correctly describing the offices up for election and the ballot.  *See First Tapaha Deposition*, Appendix Exhibit 9, pp. 87-89.and election

[88]  *See Third Johnson Declaration*, Appendix Exhibit 5,  ¶ 7; *Gail Johnson Deposition*, Appendix Exhibit 6, pp. 58 -60.

[89]  *Gail Johnson Deposition*, Appendix Exhibit 6, pp. 58 -60; Exhibit 15 to *Gail Johnson Deposition*, Appendix Exhibit 7.

Gail Johnson was the San Juan County Clerk-Auditor from 1983 until the early 1990s.[90]

As such, Ms. Johnson was in charge of elections.[91]  Ms. Johnson gave the following testimony

during her deposition about the lack of cohesiveness among Indian voters within San Juan

County:

> Q.   Now, this is interesting.  This Exhibit 15.  You wrote this.  This is talking about the results of which election was it?
>
> A.   I believe in the 70's.
>
> Q.   Oh, '72, '76 and 1980.  Did I understand this correctly - - it was interesting reading, I had never thought about this before.  This says 'It appears as though in these elections Navajo voters would vote for a non-Navajo Democrat before they would a Republican Navajo candidate.'
>
> A.   That is the conclusion it looked like to me.
>
> Q.   They voted party lines?
>
> A.   Uh-huh.
>
> Q.   You have to say 'yes.'
>
> A.   Yes.
>
> Q.   **So, in many of these cases you focus clearly on a non-Navajo takes the votes in these predominantly voting areas from a Navajo candidate who happens to be the Navajo candidate that is Republican?**
>
> A.   **Right.**
>
> Q.   **Was that your experience throughout your time as the clerk in the elections you oversaw?**

---

[90] *Gail Johnson Deposition*, Appendix Exhibit 6, p. 11.

[91] *Id.*

A.      **Yes. Yes.**

Q.      They go predominantly – party line is Democrat?

A.      Party line is Democrat.[92]

More importantly, Ms. Johnson prepared a report for the County Commissioners addressing the DOJ's contention that voting within the County was polarized along racial lines.[93]  In that report, Ms. Johnson documented the results from the general elections of 1972, 1974, 1976 and 1980.[94]  In election after election, Ms. Johnson showed in her report that non-Navajo Democratic candidates prevailed over Navajo Republican candidates.

15.     Plaintiffs insist that in *Navajo Nation v. San Juan County*,[95] this Court recently found that San Juan County intentionally discriminated against Navajo voters by failing to redraw County Commission election Districts in accordance with Voting Rights Act.[96]

**Defendants' Response**: Disputed and irrelevant. The Commission Districts at issue in that case were drawn pursuant to a 1984 *Consent Decree* entered into between San Juan County and the DOJ, which required that one of the three County Commission Districts have a majority of Navajo voters so as to guarantee that at least one San Juan County Commissioner would

---

[92]  *Id.* p. 59 (emphasis added).

[93]  *See* Exhibit 15 to *Gail Johnson Deposition*, Appendix Exhibit 7.

[94]  *Id.*

[95]  2016 WL 697120 (D. Utah Feb. 19, 2016).

[96]  *Memorandum*, p. 19.

always be a member of the Navajo Nation.[97]  Further, Plaintiffs do not allege in their *Complaint* that San Juan County's vote-by-mail procedures are racially motivated.

15.     In his *Declaration*, Leonard Gorman states that: "It is my understanding that, during the 2014 election, ballots were mailed on October 10, 2014.  This gave voters only three weeks to receive ballots, complete them, obtain language assistance if necessary, and return the ballots."[98]

**Defendants' Response**: Objection.[99] This is not based upon Gorman's personal knowledge, and it is irrelevant since the issues in this case concern the 2016 election cycle, which Plaintiffs seem determined to ignore.

16.     In paragraphs 12, 13 and 17 of his Declaration, Gorman purports to state facts based upon his conversations with his unidentified staff members about the staff members' conversations with other unidentified parties, such as: His staff members being told by unknown voters that language assistance was not available at unspecified polling locations, or that an unidentified postmaster said that at one week prior to the June 28, 2016 primary election he or she had not received any ballots to deliver to Navajo voters .

**Defendants' Response**: Objection.  Hearsay upon hearsay and not based upon his personal knowledge.

---

[97]  *See United States v. San Juan County*, District of Utah Case No. 2:83CV1286.

[98]  Dkt. 94-1, ¶ 8.

[99]  The *Local Rules* provide the procedure for challenging evidence submitted in support of a *Motion*.  Pursuant to *DUCivR* 7-1(b)(1)(B), evidentiary objections must included in the *Memorandum* submitted in opposition to the *Motion*.

17.     In paragraph 18, Gorman states that: "because of discrimination and the difficulty of making the trip, many Navajo residents of San Juan County are hesitant to travel to Monticello to vote."

**Defendants' Response**: Objection.  Lack of foundation, speculation and conclusory.  It is likewise irrelevant since there were four polling locations for in-person voting during the 2016 county-wide primary and there will be four polling locations for in-person voting in the 2016 fall general election.  More importantly, there is no allegation in the *Complaint* that the County's use of the vote-by-mail procedure is an act of intentional discrimination against Navajo voters.

In fact, the *Complaint*'s reference to discrimination in the context to the vote-by-mail procedures appears in paragraph 7, which states:

> Under the mail-only election system, the only location to vote in person in the entire County (whether in person on Election Day or submitting an absentee ballot in person) is in the County seat of Monticello. In order to reach Monticello, Navajo residents of San Juan County are required to travel, on average, more than twice as far to vote in person in comparison to white residents of San Juan County.  The significantly greater average distance required for Navajo residents in San Juan County to reach the county seat of Monticello, in the context of socioeconomic factors including disparate rare of poverty and access to reliable public and private transportation, together with the **history of racial discrimination** and hostility toward Native Americans, place a severe burden upon Navajo residents to vote in person; this burden falls substantially less heavily on white residents of San Juan County.[100]

Nowhere in the *Complaint* do Plaintiffs allege that vote-by-mail was the result of discriminatory animus towards Native Americans voters in general or Navajo voters in particular.  Nor could

---

[100]  *Complaint*, ¶ 7, Dkt. 2.(emphasis added).

such a claim be made since mail-in-ballots had significantly increased the turn out among Navajo voters,[101] and both the Department of Justice and Navajo Election Administration have tacitly approved the County's procedures for the 2014 election cycle (before the implementation of additional procedures to assist Navajo participation).

18.    In his *Declaration*, Terry Whitehat states that: "There is a history of discrimination against Navajo people in San Juan County."[102]

**Defendants' Response**: Objection.  Lack of foundation, not based upon personal knowledge and conclusory.  It is likewise irrelevant.

19.    In his *Declaration*, Whitehat also states that: "From my home [in Navajo Mountain] it takes me five hours to drive to Monticello one way."[103]

**Defendants' Response**: Objection.  Irrelevant.  There is a polling location at Navajo Mountain for in-person voting, and that is where Whitehat voted during the 2016 county-wide primary.

20.    In his *Declaration*, Dan McCool purports to give a history of discrimination against Native Americans in San Juan County.[104]  He does so by reviewing various newspaper articles and other publications.

---

[101]  It is likewise noteworthy that, with the apparent exception of San Juan County, the ACLU universally champions vote-by-mail.  *See*: https://www.aclu.org/letter/aclu-letter-support-universal-right-vote-mail-act-senate-rules-hearing

[102]  Dkt. 94-3, ¶ 3.

[103]  Dkt. 94-3, ¶ 3.

[104]  Dkt. 94-5.

**Defendants' Response**: Objection.  Irrelevant.  The issues before the Court in this case relate to voting procedures and the alleged need for language assistance, and not discrimination. McCool's opinions are likewise speculative insofar as they are based upon hearsay rather than evidence such as the fact that for decades the DOJ has monitored San Juan County's election procedures for compliance with the Voting Rights Act and not found them wanting.

21.     In his *Declaration*, Richard Engstrom purports to give opinions on whether or not voting in San Juan County is racially polarized.[105]  That is, do registered voters vote along racial or political party lines?  He concludes that they do.

22.     **Defendants' Response**: Objection.  Irrelevant.  Polarized voting is an issue in redistricting cases;[106] whereas the issues before the Court in this case relate to voting procedures and the alleged need for language assistance, not discrimination.  Engstrom's opinions are likewise speculative insofar as they are not based upon the evidence, which is that rather than bloc voting along racial lines Navajo voters in San Juan County prefer Democratic candidates over Republican candidates.

## STATEMENT OF ADDITIONAL FACTS

The facts that are dispositive of the *Motion for Preliminary Injunction* have been separately marshaled into the following categories: (1) San Juan County's demographics; (2)

---

[105]  Dkt. 94-6.

[106]  *See Sanchez v. State of Colorado*, 97 F.3d 1303 (10th Cir. 1996).  In addition, the "Senate Factors"by which an alleged violation of §2 of the Voting Rights Act is analyzed may or may not be applicable depending upon the kind of rule, practice or procedure that is being challenged.  *Id.* at p. 1310.

the County's compliance with the Voting Rights Act; (3) Plaintiffs lack of injury; and (4) the Department of Justice's approval of the County's vote-by-mail procedures.

### A.   Unique Characteristics of San Juan County:

The demographic make-up of San Juan County and its geography present many challenges to the conduct of elections, as the following facts demonstrate:

1.      According to the 2010 Census, the County's population was 14,746 people.[107] The 2010 Census also put the County's voting-age population (18 years old and over) at  9,729 or 65% of the total population.[108]

2.      The voting-age population is almost equally split between Indian and non-Indian voters.  Depending upon how "Indian" is defined for the purpose of analyzing Census data, Indians comprise between 49.40% and 50.23% of the County's voting-age population.[109]

3.      San Juan County is also immense.   It is one of the largest counties in the United States at approximately 8,103 square miles in size.[110]

4.      Highway 191 is the only road in San Juan County that traverses the County from its northern boundary to its southern boundary.  From Spanish Valley, Utah on San Juan County's northern border to Monument Valley, Utah on the County's southern border is a distance of approximately 183 miles and, in good weather, it takes approximately 3 hours and

---

[107]   *Brace Dec*., Appendix Exhibit 8, ¶ 10.

[108]   *Id.* at ¶ 36.

[109]   *Id.*

[110]   *Id.*

26 minutes to drive from Spanish Valley to Monument Valley.[111]

5.　　　Vast regions of the County are uninhabited and, according to Norman Johnson, the former San Juan County Clerk-Auditor, only about 25% of the County's registered voters have a physical address.　The remainder use only a post office box for their address.[112]

**B.　　Compliance with the Voting Rights Act**:

Plaintiffs claim that the County's voting procedures make voting locations more accessible to non-Indian voters than to Navajo voters and/or otherwise deny them language assistance, which is clearly not so when one views the procedures that the County used for the June 28, 2016 county-wide primary election and will use for the upcoming November 8, 2016 general election:

1.　　　For the 2016 county-wide primary election, which was held on Tuesday, June 28, 2016, there were three polling places open on election day, in addition to the County Clerk's office in Monticello, to accommodate those voters who wish to cast their ballot in person.[113]

2.　　　The locations of the three additional polling locations, all of which were located on the Navajo Reservation, are as follows:

> Navajo Mountain Chapter House
> Navajo Route 16, mile marker 36.15
> Navajo Mountain, Utah

---

[111] *Laws Declaration*, Appendix Exhibit 15, ¶¶ 20-22.

[112] *Norman Johnson Deposition*, Appendix Exhibit 11, pp, 96-97; *Brace Declaration*, Appendix Exhibit 8, ¶ 16.

[113] *First Nielson Declaration*, Appendix Exhibit 1, ¶ 8.

       Oljato Senior Center
       County Road 422, 15 miles north of
       Gouldings' Store Oljato, Utah

       Montezuma Creek Fire Station
       15 South Texaco Road
       Montezuma Creek, Utah 84543[114]

3.      These three locations were selected so as to ensure that no voter in the County is more than a one-hour drive away from an in-person voting location,[115] and that fact is confirmed by the Declaration of Plaintiffs' "time and travel" expert, Gerald R. Webster.

4.      Buried deep within Webster's 53-page report is his assessment of the Navajo and non-Indian travel times with respect to the four polling locations used in the recent 2016 county-wide primary election.[116]

5.      Webster says that Navajo voters had a mean travel distance to the nearest poll in order to vote in-person of only 15.24 miles while the mean distance to the nearest polling location for non-Indians voters was 20.39 miles.[117]  Thus, even Plaintiffs' expert says that Navajo voters have less distance to travel in order to vote in-person than do non-Indian voters.

6.      Also buried deep within Webster's 53-page report is his assessment of the mean travel distances to the nearest post office for Navajo voters and non-Indian voters who opt to vote by mail.

---

[114] *Id.* at ¶ 9.

[115] *Id.* at ¶ 10.

[116] Dkt. 94-2, p. 51.

[117] *Id.*

7.      Webster says that Navajo voters live within 14.27 miles of the nearest post office whereas the distance for non-Indian voters is 4.30 miles.[118]  The County has no control over where Navajo voters choose to live or where the federal government locates Post Offices.  But even if Navajo voters on average have to travel 10 miles further than non-Navajo voters to receive and return their mail-in ballots, that does not violate the Voting Rights Act, especially given the one-month window for voting by mail and the fact that Navajo voters surely must go to the Post Office more than once a month to obtain their mail.

8.      For the 2016 county-wide primary election, a San Juan County election official able to provide Navajo-language voting assistance was available at each of the four  polling locations.[119]

9.      Those persons providing language assistance during the  2016 county-wide primary election were Ella Greyeyes and Maryetta Stevens at the Navajo Mountain polling location; Ed Tapaha at the Montezuma Creek polling location; Edyth Tahe at the Oljato polling location; and Fermina Keith at the Monticello polling location.[120]

10.      In addition, for the 2016 county-wide primary election San Juan County had a link on the elections page of its website by which voters could access a Navajo-language audio translation of the ballot itself, and that audio was also available at each of the four in-person

---

[118]  *Id.*

[119]  *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 11.

[120]  *Id.* at ¶ 12.

voting locations.[121]

11.    The Count's website likewise identifies Ed Tapaha as the County's Navajo Liaison/Elections Coordinator and gives his telephone number and extension.[122]

12.    Furthermore, as in prior election years, before the 2016 county-wide primary election San Juan County had Edward Tapaha attend meetings of each of the Navajo Chapters to explain in the Navajo language the voting system and answer any questions about the election process.[123]

13.    The foregoing procedures, which were in place for the 2016 county-wide primary election, will be used in the upcoming 2016 general election,[124] and they are fully compliant with the requirements of the Voting Rights Act.

14.    The language assistance, as well as the overall voting information-registration assistance, including three on-reservation polling locations, that San Juan County provides to Navajo voters is not available to non-Indian voters.[125]

C.    **Plaintiffs Have Suffered No Injury, Much Less An Irreparable Injury**:

It is also noteworthy that while Plaintiffs supposedly challenge the County's vote-by-mail procedures, their voting record in the recent 2016 county-wide primary does not support that

---

[121]  *Id.* at ¶ 13.

[122]  *Id.*

[123]  *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 14.

[124]  *Id.*

[125]  *Francom Declaration*, Appendix Exhibit 16, ¶ ¶ 5-6.

challenge.

1.      Plaintiff Peggy Phillips alleges that she is not comfortable voting in English; that she needs assistance for a translator to vote; and that she did not receive her ballot in the mail for 2014 election and was, therefore, unable to vote.[126]

2.      The records maintained by the San Juan County Clerk's Office show that Plaintiff Peggy Phillips acted as an election official, including serving as a Navajo-language interpreter, in prior elections, most recently in connection with the 2012 elections, which contradicts the allegations of the *Complaint* in this lawsuit that she needs assistance from a translator.[127]

3.      Furthermore, the election records maintained by the San Juan County Clerk's Office also show that, contrary to the allegations of the *Complaint* in this lawsuit, Peggy Phillips did vote by mail in the 2014 election, as well as in the 2015 municipal elections.[128]

4.      More importantly, the election records maintained by the San Juan Clerk-Auditor's Office show that in the June 28, 2016 county-wide primary election Peggy Phillips attempted to vote twice, once in person at the Oljato polling location, and again by mail-in-ballot.[129]

5.      Plaintiff Terry Whitehat alleges that he prefers to vote in person.[130]  But, the

---

[126]  *Complaint*, ¶ 14, Dkt. 2.

[127] *First Nielson Declaration*, Appendix Exhibit 1, ¶ 23.

[128] *Id.* at ¶ 24.

[129] *Second Nielson Declaration*, Appendix Exhibit 3, ¶ 10.

[130]  *Complaint*, ¶17, Dkt. 2.

election records maintained by the San Juan County Clerk's Office also show that, in 2012, Plaintiff Terry Whitehat, filed an affidavit requesting an absentee ballot and expressing a preference to vote by absentee ballot in all future elections, and did in fact vote by absentee ballot in the 2012 election.[131]

6.     Plaintiff Terry Whitehat also filed a *Declaration* in support of the *Motion for Preliminary Injunction*.[132]  In that *Declaration*, Terry Whitehat indicates that he resides in Navajo Mountain, Utah, and that to vote in person he has to drive five hours to the polling location in Monticello, Utah.[133]

7.     More importantly, the election records maintained by the San Juan Clerk-Auditor's Office show that in the 2016 county-wide primary election Terry Whitehat voted in person at the polling location in Navajo Mountain, Utah where he lives,[134] and did not drive to Monticello, Utah, to vote in person as set forth in his Declaration.

8.     In his *Declaration*, Terry Whitehat also states that he did not receive his 2016 mail-in primary ballot until June 13, 2016, which he contends was almost two weeks after it was mailed.[135]  But in the *Complaint*, Terry Whitehat alleges that he works in Arizona and, "as a result he only gets his mail approximately every two weeks."[136]

---

[131]  *First Nielson Declaration*, Appendix Exhibit 1, ¶ 25.

[132]  Dkt. 94-3.

[133]  *Id.*

[134]  *Second Nielson Declaration*, Appendix Exhibit 3,  ¶ 11.

[135]  Dkt. 94-3.

[136]  *Complaint*, ¶ 17, Dkt. 2.

9.      Plaintiff Wilfred Jones alleges that he lives in Red Mesa, Utah, and that he prefers to vote in person but has to travel over two hours to do so in Monticello, Utah.[137]  But, the election records maintained by the San Juan Clerk-Auditor's Office show that in the  2016 county-wide primary election Wilfred Jones did not vote even though there was a polling location in nearby Montezuma Creek, Utah.[138]

10.      Plaintiff Mark Maryboy alleges that he lives in Montezuma Creek, Utah, and that he prefers to vote in person but has to travel approximately two hours to do so in Monticello, Utah.[139]  But, the election records maintained by the San Juan Clerk-Auditor's Office show that in the June 28, 2016 county-wide primary election Mark Maryboy voted in person at the polling location in Montezuma Creek, Utah.[140]

11.      Plaintiff Betty Farley alleges that she lives in Red Mesa, Utah, and that she prefers to vote in person but has to travel over four hours round trip to do so in Monticello, Utah.[141]  But, the election records maintained by the San Juan Clerk-Auditor's Office show that in the 2016 county-wide primary election Betty Farley did not vote even though there was a polling location in nearby Montezuma Creek, Utah.[142]

12.      Plaintiffs Willie Skow and Mabel Skow allege that they live in Mexican Water,

---

[137]  *Id*. at ¶ 16.

[138]  *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 16.

[139]   *Complaint*, ¶ 15, Dkt. 2.

[140]  *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 16.

[141]  *Complaint*, ¶ 18, Dkt. 2.

[142]  *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 16.

Utah, and that they prefer to vote in person but that to do so requires them to travel over two hours round trip to Monticello, Utah.[143]  But, the election records maintained by the San Juan Clerk-Auditor's Office show that in the 2016 county-wide primary election Willie Skow and Mabel Skow chose to vote by mail, and not in person at the polling location in nearby Montezuma Creek, Utah.[144]

13.     The individual Plaintiffs have suffered no injury because they either voted or chose not to vote.  Plaintiff Navajo Human Rights Commission cannot vote, which means that it has no injury much less a personal injury.  Moreover, the Commission cannot sue to enforce the rights of others.[145]

14.     The election records maintained by the San Juan County Clerk's Office show that the 2014 election in which vote-by-mail was implemented resulted in a substantial increase in voter turn out as a result of allowing voters the option of voting by mail, especially among Navajo voters.[146]

15.     In fact, during the 2014 election the number of Navajo voting more than doubled compared to previous elections without the vote-by-mail option.[147]

16.     The election records maintained by the San Juan County Clerk's Office, for

---

[143]  *Complaint*, ¶ ¶19 and 20, Dkt. 2.

[144]  *Third Nielson Declaration*, Appendix Exhibit 4, ¶ 16.

[145]  *See Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990).

[146]  *First Nielson Declaration,* Appendix Exhibit 1, ¶ 29.

[147]  *Id.* at ¶ 30.

example, show that during the 2014 election voter participation in precincts with a heavy concentration of Navajo voters went from 25% during the 2012 election using only in-person voting at polls to almost 54% with vote-by-mail in 2014.[148]

17.     This significant increase in voter participation occurred despite the fact that the 2014 election was not a national election which tends to produce a higher number of voters.[149]

18.     The increased voter participation among Navajo voters is undoubtedly attributable in part to the fact that the mail-in-ballot process allows voters who work away from their homes on the Navajo Reservation, or who are away at college or in the military, to participate in elections without having to appear at a polling place or make advance application for an absentee ballot.[150]

19.     The increased voter participation among Navajo voters was also undoubtedly attributable to the fact that the mail-in-ballot process allows elderly voters who have no means of transportation to a polling location to vote from their homes by use of the mail-in-ballot.[151]

20.      There are benefits to a vote-by-mail system over an in-person voting system, including, among others: (a) providing voters the opportunity to consider their election decisions over a longer period of time; (b) accommodating the needs of voters who regularly work outside of the immediate area of their residence, are at school or in the military, without their having to

---

[148]  *Id.* at ¶ 31.

[149]  *Id.* at ¶ 32.

[150]  *Id.* at ¶ 33.

[151]  *Id.* at ¶ 34.

apply personally for an absentee ballot which may be particularly of benefit to a significant number of Navajo voters who work away from their homes due to the limited availability of jobs in San Juan County; (c) allowing voters to make their ballot decisions away from candidates campaign efforts in close proximity to polling places; and (d) allowing limited-English proficiency voters to seek assistance from family members or other trusted acquaintances if they so choose rather than having to rely on interpreters provided by the County.[152]

   **D.      DOJ Tacit Approval of County Election Procedures**:

   For over 30 years, the DOJ has monitored the County's election procedures for compliance with the Voting Rights Act.  More particularly, the DOJ did so at the request of the Navajo Nation, including the Navajo Human Rights Commission.  The DOJ tacitly found those procedures to be compliant with the Voting Rights Act, including the language assistance requirements of 52 U.S.C. §10503 as the following facts clearly show.

   1.      In 1983, the DOJ sued San Juan County to enforce the requirements of §10503.[153] That suit resulted in *Consent Decree* whereby DOJ representatives were present during an election cycle to monitor the County's Navajo voter's language assistance program.

   2.      That monitoring continued until 2002.[154]  According to Norman Johnson, who was the County Clerk-Auditor during most of this monitoring period, the DOJ did not require the County to translate ballots into the Navajo language, "but we had to have judges that were

---

   [152]  *Id.* at ¶ 35.

   [153]  *See Complaint*, Dkt. 1, *United States v. San Juan County*, District of Utah Case No. 2:83CV1287; *Norman Johnson Deposition*, Appendix Exhibit 11, pp. 26-29.

   [154]  *See id. Order*, Dkt.17; *Norman Johnson Deposition*, Appendix Exhibit 11, p. 27.

bilingual enough to present the [ballot] information to the voter if they asked.[155]  Throughout the period of this monitoring for compliance with the language assistance requirements of §10503, the DOJ never informed the County that it had violated that law.[156]

3.      In early October of 2015, San Juan County Attorney, Kendall G. Laws, received a telephone call from Victor Williamson of the United States Department of Justice.  Mr. Williamson informed Mr. Laws that he was with the DOJ's Voting Rights Section.[157]

4.      At the request of and on the behalf of the Navajo Human Rights Commission, Mr. Williamson wanted to come to San Juan County and meet with County Officials regarding the vote-by-mail procedures that the County had implemented for the 2014 election cycle.[158]

5.      On October 29, 2015, Mr. Laws, John David Nielson, James Francom, Ed Tapaha and Norman Johnson met with Mr. Williamson and his DOJ staff to review the County's 2014 election procedures.[159]

6.      John David Nielson is the County Clerk-Auditor, James Francom is the Deputy Clerk-Auditor, Ed Tapaha is the County's liaison with the Navajo Nation, and Norman Johnson is the former Clerk-Auditor.[160]

---

[155] *Norman Johnson Deposition*, Appendix Exhibit 11, p. 26.

[156] *See id.* at pp.27-28.

[157] *Laws Declaration*, Appendix Exhibit 15, ¶ 5.

[158] See id. at ¶6; *First Nielson Declaration*, Appendix Exhibit 1, ¶ 17; *DOJ Flyer*, Appendix Exhibit 2.

[159] *Laws Declaration*, Appendix Exhibit 15, ¶ 7; *First Nielson Declaration*, Appendix Exhibit 1, ¶ 16.

[160] *Laws Declaration*, Appendix Exhibit 15, ¶ 8.

7.     During that meeting, Mr. Laws learned from Mr. Williamson that he and his staff had earlier met with members of the Navajo Human Rights Commission.[161]

8.     From his conversation with Mr. Williamson and his staff following that meeting with the County officials, both Mr. Laws and Mr. Nielson came to understand that the DOJ did not consider the County's vote-by-mail system as implemented for the 2014 elections (and the 2015 municipal elections) to be contrary to law or otherwise failed to meet the County's obligation to provide bilingual voting assistance to Navajo voters.[162]

9.     Mr. Williamson, however, did inform Mr. Laws that the DOJ would continue watching the way in which the mail-in-voting system affected County residents and particularly its Navajo citizens.[163]

10.     As a consequence of that meeting, San Juan County began to consider making changes to improve the vote-by-mail system to better serve Navajo voters by adding three in-person polling locations on the Navajo Reservation as well as language assistance to Navajo voters.[164]

11.     The final decision as to the locations of the three additional polling places was made on or before February 16, 2016.[165]

---

[161]  *Id.* at ¶ 9.

[162] *Id.* at ¶ 10;  *First Nielson Declaration*, Appendix Exhibit 1, ¶¶ 16 and 18.

[163] *Laws Declaration*, Appendix Exhibit 15, ¶ 11.

[164] *Id.* at ¶ 12.

[165]  *Id.* at ¶ 13.

12.     Mr. Laws next heard from Mr. Williams when he called Mr. Laws shortly before the June 28, 2016 county-wide primary election.  During that conversation, Mr. Williamson told Mr. Laws that, again at the request of and on behalf of the Navajo Human Rights Commission, the DOJ had been asked to review the changes that the County had made to its 2014 vote-by-mail procedures.[166]

13.     Thereafter, several investigators from the DOJ came to San Juan County to review the new vote-by-mail procedures.  Mr. Laws along with John David Nielson and Kelly Pehrson, San Juan County's Chief Administrative Officer, met with the DOJ investigators on Monday, June 27, 2016, the day before the primary election.[167]

14.     During that meeting, Mr. Laws and the other County representatives explained to the DOJ investigators the procedures that were being used for that primary, including three new on-reservation polling locations and the language assistance that was to be provided at those locations.[168]

15.     Mr. Laws and the other County officials also explained to the DOJ investigators that the County was constantly working to improve its vote-by-mail procedures based upon what it had learned from each election, and would continued to do so.[169]

16.     The DOJ investigators said that they were comfortable with that approach, and

---

[166] *Id.* at ¶ 4.

[167] *Id.* at ¶ 15.

[168] *Id.* at ¶ 16.

[169] *Id.* at ¶ 16.

also made it clear to Mr. Laws that if they determined that any changes in the vote-by-mail procedures were in violation of the law, they would let the County know.[170]

17.     To date, the County has not received any notification from the DOJ that its vote-by-mail election procedures do not fully comply with the Voting Rights Act.[171]

**ARGUMENT: PLAINTIFFS CANNOT MEET THE
REQUIREMENTS FOR A PRELIMINARY INJUNCTION**

To obtain the injunction that they seek, Plaintiffs are required to show: (1) a substantial likelihood of success on the merits; (2) irreparable harm unless an injunction is issued; (3) that the threatened injury to Plaintiffs outweighs any potential harm to San Juan County; and (4) that the injunction, if issued, would not adversely effect the public interest.[172]  Plaintiffs, however, cannot satisfy any of these requirements.  Furthermore, because the injunctive relief they seek is mandatory rather than prohibitory in nature, alters rather than maintains the *status quo*, and/or otherwise affords Plaintiffs all of the relief would potentially receive following a trial on the merits, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."[173]  Plaintiffs must therefore "make a strong showing both with regard to the likelihood of success on the merits and with

---

[170] *Id.* at ¶ 17.

[171] *Id.* at ¶ 18.

[172] *Prairie Band of Potawatomi Nation v. Wagon*, 476 F. 3d 818, 822 (10th Cir. 2007).

[173] *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).

regard to the balance of harms."[174] Furthermore, the Court is without the jurisdiction grant this

*Motion for Preliminary Injunction* because the injunctive relief sought by Plaintiffs exceeds the

claims set forth in their *Complaint* and/or is not otherwise based on the grounds set forth in that

pleading.[175]

### A.   Substantial Likelihood of Success on the Merits

Plaintiffs have the burden of establishing a substantial likelihood of success on the merits

of their claims.[176] The Court must then determine "whether the Plaintiffs have met their burden

of proof and shown that their right to relief . . . [is] clear and unequivocal."[177]  Furthermore, a

court "will not award a preliminary injunction on grounds not raised in the complaint, as there is,

by virtue of the absence of the issue from the complaint, no likelihood of success on the

merits."[178]  Because Plaintiffs' *Motion* exceeds their *Complaint*, they cannot succeed on the

merits.  But even if the Court considers the merits, Plaintiffs have not met their burden under

Section 203 and Section 2 and have no likelihood of prevailing, much less a substantial

---

[174] *Id.* at 976.

[175]  *See Stewart*, 762 F.2d at 198-99; *Adair*, 193 F. Supp.  2d at 200; *First Health Grp. Corp.*, 155 F.Supp. 2d at 233 fn. 10.

[176] *See Nova Health Systems v. Edmondson*, 460 F.3d 1295, 1299, 1302 (10th Cir. 2006).

[177] *Aid for Women v. Foulston*, 441 F.3d 1101, 1117 (10th Cir. 2006) (alteration in original) (citation and internal quotation marks omitted).

[178]  *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 233 n.10 (M.D. Pa. 2001); *see also Lee v. Lindsay,* 2007 WL 1120562, at *1 (M.D. Pa. Apr.13, 2007) ("[I]t is well established that a court may not grant a preliminary injunction when the issues raised in the motion for a preliminary injunction are entirely different from those raised in the complaint." (citing *Stewart v. United States Immigration and Naturalization Service,* 762 F.2d 193, 198–199 (2d Cir.1985))).

likelihood of prevailing, on the merits.

      **(I)**    <u>**Section 203**</u>

      Plaintiffs cannot succeed on the merits because they have no standing to bring a Section

203 claim.[179]  Section 203 does not create a private right of action.  Rather, it is enforceable only

by the Attorney General pursuant to Section 204, codified at 52 U.S.C. § 10504, which  reads as

follows:

> Whenever the Attorney General has reason to believe that a State or political
> subdivision (a) has enacted or is seeking to administer any test or device as a
> prerequisite to voting in violation of the prohibition contained in section 10501 of
> this title, or (b) undertakes to deny the right to vote in any election in violation of
> section 10502 or **10503** of this title, he may institute for the United States, or in
> the name of the United States, an action in a district court of the United States, in
> accordance with sections 1391 through 1393 of Title 28, for a restraining order, a
> preliminary or permanent injunction, or such other order as he deems appropriate.
> An action under this subsection shall be heard and determined by a court of three
> judges in accordance with the provisions of section 2284 of Title 28 and any
> appeal shall be to the Supreme Court.[180]

Furthermore, the Code of Federal Regulations establishes that "the Attorney General will

measure compliance" under Section 203.[181]  The only Court to have apparently considered this

issue concluded, based upon the clear language of Section 204, that the bilingual election

---

[179]  *See Dekom v. New York*, 2013 WL 3095010 *8 (E.D.N.Y. 2013), *aff'd*, 583 Fed.
Appx. 15, 17 (2d Cir. 2014)(Holding  that the bilingual election requirements of Section 203 are
enforceable **only** by the Attorney General).

[180]  52 U.S.C.§ 10504. (Emphasis added).

[181]  *See* 28 CFR § 55.2. *See also* 28 CFR § 55.20 (stating that the "Attorney General will
consider whether a jurisdiction has given sufficient attention . . . to the needs of members of
language minority groups whose languages are unwritten).

requirements of Section 203 are enforceable **only** by the Attorney General.[182]  Moreover, that

decision is consistent with the case law defining when a statute creates a private right of action.

Courts "are not authorized to create a cause of action, 'no matter how desirable that might

be as a policy matter or how compatible with the statute.'"[183]  "Like substantive federal law itself,

private rights of action to enforce federal law must be created by Congress."[184] When considering

if a statute creates a private right of action, courts determine "whether Congress expressly or by

implication, intended to create a private cause of action."[185] "Where Congress has expressly

provided for enforcement of a statute by a particular means, [courts] are hesitant to look beyond

that means because '[t]he express provision of one method of enforcing a substantive rule

suggests that Congress intended to preclude others.'"[186] "Absent Congressional intent to create

both a right and a remedy in favor of a plaintiff, a cause of action does not exist."[187]

Even if this Court decides to reach Plaintiffs' Section 203 claim on the merits, there is not

a substantial likelihood that Plaintiffs' claim will succeed.  San Juan County's current voting

procedures satisfy Section 203's minority language requirement.  Section 203 states that

---

[182]  *See Dekom v. New York*, 2013 WL 3095010 *8 (E.D.N.Y. 2013), *aff'd*, 583 Fed.
Appx. 15, 17 (2d Cir. 2014).

[183]  *Cuba Soil & Water Conservation Dist. v. Lewis*, 527 F.3d 1061, 1064 (10th Cir. 2008)
(quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).

[184]  *Sandoval*, 532 U.S. at 286 (2001).

[185]  *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1267 (10th Cir. 2004).

[186]  *Cuba Soil & Water*, 527 F.3d at 1064 (quoting *Sandoval*, 532 U.S. at 290).

[187]  *Id.* (citing *Sandoval*, 532 U.S. at 286).

"[w]henever any State or political subdivision . . . provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the election process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language."  Because Navajo "is historically unwritten, the [County] is only required to furnish oral instructions, assistance, or other information relating to registration and voting."[188]

San Juan County has provided oral instructions, assistance, and other information relating to registration and voting in the Navajo language.  In addition to assistance at the polling locations, the County has included a Navajo reading of the ballots on its website, and sent Edward Tapaha, the County's Navajo Liaison and Elections Coordinator, to speak to the Navajo community.  These resources will be available for the November 2016 general election and for future elections, and they have already been repeatedly scrutinized by the DOJ and tacitly approved.

**(ii)** <u>**Section 2**</u>:

Plaintiffs likewise cannot succeed on their Section 2 claims.  Section 2 of the Voting Rights Act prohibits voting practices or procedures that discriminate against individual voters on the basis of race, color, or membership in a language minority group.[189]  Section 2 is not an affirmative action plan; it requires equal opportunity for all voters, not an unequal opportunity for

---

[188] 52 U.S.C.§ 10503.

[189] *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 437 (2006).

some voters.[190]  The ultimate goal of Section 2 is "equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."[191]  With respect to Section 2, Plaintiffs essentially claim that this law has been violated because "[t]he closure of the polling places within or accessible to the Navajo Nation Reservation together with the adoption of mail-only voting unreasonably hindered the ability of Navajo citizens . . . to participate effectively in the political process on equal terms with white voters."[192] Here, the focus of the Court's analysis should be on whether, based on the totality of the circumstances, the County's vote-by-mail procedures as currently implemented result in Navajo voters having "less opportunity" to participate in the political process.[193]

The United States Supreme Court has repeatedly stated that "voting is of the most fundamental significance under our constitutional structure."[194] The Court has further recognized,

---

[190] See 52 U.S.C. § 10301 ("That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.")

[191] *Johnson v. DeGrandy*, 512 U.S. 997, 1014 n.11 (1994).

[192] *Complaint*, Dkt. 2.

[193] *See* 52 U.S.C. § 10301(b) ("A violation of [Section 2] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [Section 2] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). *See also, e.g., Turner v. State of Arkansas,* 784 F .Supp. 553, 573 (E.D. Ark. 1991).

[194] *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979)).

however, that "[i]t does not follow . . . that the right to vote in any manner . . . [is] absolute."[195]

"Election law will invariably impose some burden upon individual voters,"[196] but this burden does not mean that the election law violates Section 2.  Furthermore, the "Equal Protection Clause . . . simply cannot be reasonably understood as demanding recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public."[197]

Section 2 "encompasses two types of claims: a 'vote-dilution' claim, which alleges that a districting practice denies minorities an equal opportunity 'to elect representatives of their choice,' and a 'vote-denial' claim, which alleges the denial of opportunity to 'participate in the political process.'"[198] Plaintiffs claim that their right to vote has been denied or abridged by the County's vote-by-mail procedures.  Courts have analyzed a vote-denial claim with a two-step test.[199]  The first element of a Section 2 vote-denial claim "requires proof that the challenged standard or practice causally contributes to the alleged discriminatory impact by affording protected group members less opportunity to participate in the political process."[200] Only after

---

[195] *Id.*

[196] *Id.*

[197] *Ohio Democratic Party v. Husted*, No. 16-3561, 2016 WL 4437605, at *7 (6th Cir. Aug. 23, 2016).

[198] *Id.*

[199]  *See id.* at *13.

[200] *Id.* ("The first step essentially reiterates Section 2's textual requirement that a voting standard or practice, to be actionable, must result in an adverse disparate impact on protected class members' opportunity to participate in the political process. But this formulation cannot be construed as suggesting that the existence of a disparate impact, in and of itself, is sufficient to

this first element is met should the Court analyze the "Senate Factors," as discussed in *Thornburg v. Gingles*.  In this second step, the Court analyzes whether "a disparate impact in the opportunity to vote is show to result not only from operation of the law, but from the interaction of the law *and* social and historical conditions that have produced discrimination."[201]

Plaintiffs cannot meet the first step of the two-part test.  They have alleged no facts that the vote-by-mail process or the County's voting process as a whole afforded them less opportunity to participate in the political process.  Each of the Plaintiffs voted in the 2014 election.  Furthermore, more Navajo voters participated in the 2014 election.  Without proof of a discriminatory impact, Plaintiffs cannot invoke the "Senate Factors."  But even if they could, they cannot successfully argue that the County's voting procedures "interacts with social and historical conditions . . . causing racial inequality in the opportunity to vote." *Id.*  The County has established three new polling locations, all on the Navajo Nation Reservation.  The County implemented vote-by-mail, which allows both Navajo and white voters to vote from home. The County has established language assistance, both in-person and online.  And the County has sent Edward Tapaha to speak with Navajo voters about the election process.

### B.    Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, actual and not

---

establish the sort of injury that is cognizable and remediable under Section 2. We know this is true because 'a showing of disproportionate racial impact alone does not establish a per se violation" of Section 2.'").

[201] *Id.*

theoretical."[202] "A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury."[203] "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the United States Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[204] A plaintiff must show "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages" to satisfy the irreparable harm requirement for a preliminary injunction.[205] "The irreparable-harm prong's overarching inquiry compares (I) what would happen if the preliminary injunction were not granted; with (ii) what would happen if the preliminary injunction were granted; and then (iii) asks whether the difference between (I) and (ii) is irreparable."[206]

Plaintiffs allege that they "will suffer immediate and serious harm if Defendants do not open a sufficient number of polling places and Defendants do not comply with minority language requirements of the Voting Rights Act."[207] They argue that "denial of the right to participate in an election is by its nature an irreparable injury."[208] Plaintiffs have not and cannot show that a

---

[202] *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

[203] *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practices and Procedures* § 2948.1, p. 155).

[204] *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

[205] *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

[206] *Logan v. Public Employees Retirement Assoc.*, 2016 WL 807973 (D. N.M. Jan. 11, 2016) (citation and internal quotation marks omitted).

[207] Dkt 94, p. 2.

[208] *Id.* at 23.

significant risk of harm will come from the County's voting procedures because Plaintiffs have not been and will not be harmed.  Plaintiffs have not been denied the right to participate in the voting process–in fact, the County has increased outreach to and opportunities for Navajo voters.  The County has provided four polling places–three on the Navajo Nation Reservation–in addition to early voting in Monticello and vote-by-mail for all voters.  The County has also provided language assistance for Navajo voters, including in-person outreach and telephonic assistance by Edward Tapaha and translators fluent in Navajo at polling locations.  Furthermore, the individual Plaintiffs suffered no harm in the 2014, 2015 or 2016 elections–each voted or at their own choice did not vote, and while they may have preferred to vote in person, there is no constitutional right to do so.

### C.   **Balance of Harm**

"To be entitled to a preliminary injunction, the movant has the burden of showing that the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction."[209]  The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[210]

Plaintiffs have not and will not suffer any injury if the Court does not grant the injunction.  Plaintiffs will be able to vote, whether by mail or at one of three polling locations on the Navajo Nation Reservation.  They will have the necessary language assistance, in the form of online audio support, translators at the polls, and Mr. Tapaha's outreach.  If the injunction is granted,

---

[209] *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (citation and internal quotation marks omitted).

[210] *Winter*, 555 U.S. 7 at 24.

however, the injury to the County will be significant in terms of costs and the administrative

burdens.  The County has already expended and will continue to expend substantial resources to

facilitating Navajo voters—providing support where there is no support for non-Indian voters.  If

the injunction is granted, the County will be required to expend more resources to open

additional polling places, open satellite locations for early in-person voting, hire additional

coordinators and translators, and translate additional materials.  Some of Plaintiffs' injunctive

requests would require the County to duplicate work and costs already completed, including

providing pre-election publicity in Navajo, employing bilingual coordinators (the County already

has Mr. Tapaha), and providing another Navajo glossary of election terms.  Of particular interest

to this case is the request for early satellite voting locations.  The County essentially provided

this to all voters when it instituted vote by mail, allowing all voters to vote early and return their

vote via mail.  All of this has already been done by the County, for Navajo voters.  Accordingly,

the harm to the County in terms of cost and administrative burden will far outweigh the non-

existent harm to the Plaintiffs, who will continue to be able to exercise their right to vote as they

did in the 2014 election.

     **D.**    **Public Interest**

     The fourth factor the Court must consider when determining whether the extraordinary

measure of a preliminary injunction should be granted is whether the injunction is adverse to the

public interest.[211]  "In exercising their sound discretion, courts of equity should pay particular

---

[211] *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 983 (10th
Cir. 2004) (en banc).

regard for the public consequences in employing the extraordinary remedy of injunction."[212]  Not withstanding Plaintiffs' conclusory assertions to the contrary, the public interest will be adversely affected by the injunctive relief sought in this case.  San Juan County's vote-by-mail procedures have afforded the voting public, especially the County's Navajo voters, more options and opportunities to vote.  In the 2014 election cycle, the County saw an increase in Navajo and other voter participation.  Furthermore, the County has allocated significant resources to facilitating Navajo voters; to ask the County to allocate additional resources would take those resources away from other programs that benefit all citizens of San Juan County.

## **CONCLUSION**

For the reasons stated, Defendants respectfully ask the Court to deny Plaintiffs' *Motion for Preliminary Injunction*.  However, if the Court is inclined to grant that *Motion*, Defendants respectfully request the Court to set an evidentiary hearing to determine the amount of security that Plaintiffs should be required to post as a precondition for that injunction.

DATED this 31st day of August, 2016.

SUITTER AXLAND, PLLC
 /s/ jesse c. trentadue
Jesse C. Trentadue
Carl F. Huefner
Britton R. Butterfield
*Attorneys for Defendants*

---

[212] *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2016, I electronically filed the foregoing document with the U.S. District Court for the District of Utah.  Notice will automatically be electronically mailed to the following individual(s) who are registered with the U.S. District Court CM/ECF System:

| | |
|---|---|
| John Mejia (Bar No. 13965) <br> Leah Farrell (Bar No. 13696) <br> American Civil Liberties Union of Utah <br> 355 North 300 West <br> Salt Lake City, UT 84103 <br> T: (801) 521-9862 <br> jmejia@acluutah.org <br> lfarrell@acluutah.org <br> *Attorneys for Plaintiffs* | Ezra D. Rosenberg* <br> M. Eileen O'Connor* <br> Arusha Gordon* <br> Lawyers' Committee for Civil Rights Under Law <br> 1401 New York Ave., Suite 400 <br> Washington, D.C. 20005 <br> T: (202) 662-8600 <br> erosenberg@lawyerscommittee.org <br> eoconnor@lawyerscommitee.org <br> agordon@lawyerscommittee.org <br> *Attorneys for Plaintiffs* |
| M. Laughlin McDonald* <br> American Civil Liberties Union Foundation <br> 2700 International Tower <br> 229 Peachtree Street, NE <br> Atlanta, GA 30303 <br> T: (404) 500-1235 <br> lmcdonald@aclu.org <br> *Attorneys for Plaintiffs* | Maya Kane* <br> 10 Town Square, #52 <br> Durango, Colorado 81301 <br> T: (970) 946-5419 <br> mayakanelaw@gmail.com <br> *Attorneys for Plaintiffs* |
| William A. Rudnick* <br> DLA Piper LLP (US) <br> 203 North LaSalle Street, Suite 1900 <br> Chicago, IL 60601 <br> T: (312) 368-4000 <br> william.rudnick@dlapiper.com <br> *Attorneys for Plaintiffs* | Raymond M. Williams* <br> DLA Piper LLP (US) <br> One Liberty Place <br> 1650 Market Street, Suite 4900 <br> Philadelphia, PA 19103 <br> T: (215) 656-3300 <br> raymond.williams@dlapiper.com <br> *Attorneys for Plaintiffs* |

| Patrick Castaneda<br>DLA Piper, LLC<br>One Liberty Place<br>1650 Market Street, Suite 4900<br>Philadelphia, PA 19103-7300<br>Telephone: 215-656-3378<br>patrick.castaneda@dlapiper.com | |

/s/ jesse c. trentadue

*T:\7000\7788\I\OPPOSITION TO MOTION FOR PRELIMINARY INJUCTION.wpd*