IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

NAVAJO NATION HUMAN RIGHTS
COMMISSION; PEGGY PHILLIPS; MARK
MARYBOY; WILFRED JONES; TERRY
WHITEHAT; BETTY BILLIE FARLEY;
WILLIE SKOW; and MABEL SKOW,

                                    Case No. 2:16-cv-00154 JNP

                          Plaintiffs,

v.

SAN JUAN COUNTY; JOHN DAVID
NIELSON, in his official capacity as San Juan
County Clerk; and PHIL LYMAN, BRUCE
ADAMS, and REBECCA BENALLY, in their
official capacities as San Juan County
Commissioners,

                            Defendants.

**PLAINTIFFS' REPLY IN
SUPPORT OF THEIR MOTION
FOR PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   STATEMENT OF FACTS ............................................................................... 2

    A.    Defendants' Rebuttal to Plaintiffs' Statement of Facts ............................. 2

    B.    Defendants' Statement of Additional Facts ............................................. 19

        1.    Unique Characteristics of San Juan County ............................... 19

        2.    Compliance with the Voting Rights Act ..................................... 20

        3.    Plaintiffs' Irreparable Injury ...................................................... 22

        4.    DOJ "Tacit Approval" of County Election Procedures ............. 24

III.  ARGUMENT .................................................................................................. 25

    A.    Substantial Likelihood of Success on the Merits .................................... 27

        1.    Plaintiffs are Likely to Succeed on the Merits on Their Section 203 (Language Assistance) Claim ......................................... 28

        2.    Plaintiffs are Likely to Succeed on the Merits on Their Section 2 (Equal Opportunities) Claim .......................................... 30

    B.    Irreparable Harm ..................................................................................... 31

    C.    Balance of Harm ...................................................................................... 36

    D.    Public Interest .......................................................................................... 37

IV.  CONCLUSION ............................................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Blackwelder Furniture Co. v. Seilig Mfg. Co.*,
    550 F.2d 189 (4th Cir. 1977) .................................................................................39

*Bone Shirt v. Hazeltine*,
    336 F. Supp. 2d 976 (D.S.D. 2004) .............................................................12, 19

*Briscoe v. Bell*,
    432 U.S. 404 (1977)..........................................................................................38

*Brooks v. Gant*,
    2012 WL 4482984 (D.S.D. Sept. 27, 2012)....................................................19

*Brown v. Dean*,
    555 F. Supp. 502 (D.R.I. 1982).......................................................................22

*Chinese for Affirmative Action v. Leguennec*,
    580 F.2d 1006 (9th Cir. 1978) .........................................................................28

*City News & Novelty, Inc. v. City of Waukesha*,
    531 U.S. 278 (2001) ........................................................................................34

*Continental Oil Co. v. Frontier Ref. Co.*,
    338 F.2d 780 (10th Cir.1964) ..........................................................................27

*Conway School Dist. v. Wilhoit*,
    854 F. Supp. 1430 (E.D. Ark. 1994) ...............................................................29

*Cook v. Luckett*,
    575 F. Supp. 479 (S.D. Miss. 1983).........................................................31, 38

*De Beers Consol. Mines v. U.S.*,
    325 U.S. 212 (1945)........................................................................................27

*Dekom v. New York*,
    2013 WL 3095010 (E.D.N.Y. June 18, 2013), *aff'd*, 583 F. App'x 15 (2d Cir. 2014) ..........28

*Dillard v. Crenshaw Cnty.*,
    640 F. Supp. 1347 (M.D. Ala. 1986) ........................................................31, 36

*Elrod v. Burns*,
    427 U.S. 347 (1976)........................................................................................31

*Fish v. Kobach*,
    2016 WL 2866195 (D. Kan. May 17, 2016)....................................................32

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) (en banc), *aff'd on other grounds*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013) ...............................................................19

*Harman v. Forssenius*,
  380 U.S. 528 (1965)..........................................................................................................31

*Harris v. Graddick*,
  593 F. Supp. 128 (M.D. Ala. 1984) ..................................................................26, 31, 38

*Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*,
  503 F. App'x 616 (10th Cir. 2012)................................................................... passim

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003).......................................................................... passim

*Johnson v. Halifax Cnty., N.C.*,
  594 F. Supp. 161 (E.D.N.C. 1984)......................................................................36, 38

*Kikumura v. Hurley*,
  242 F.3d 950 (10th Cir. 2001) ...........................................................................32

*Miss. State Chapter, Operation PUSH, Inc. v. Mabus*,
  932 F.2d 400 (5th Cir. 1991) .........................................................................19, 22

*N.C. State Conf. of the NAACP v. McCrory, et al.*,
  2016 WL 4053033 (4th Cir. July 29, 2016)....................................................30

*NAACP v. State of N.Y.*,
  413 U.S. 345 (1973)..........................................................................................37

*Navajo Nation v. San Juan Cnty.*,
  2016 WL 697120 (D. Utah Feb. 19, 2016) .....................................12, 13, 22, 38

*Nick v. City of Bethel*,
  No. 3:07-CV-0098, ECF No. 327, Order (D. Alaska July 30, 2008) .................26,  28, 33, 34

*Oberstar v. F.D.I.C.*,
  987 F.2d 494 (8th Cir. 1993) ............................................................................25

*Padilla v. Lever*,
  463 F.3d 1046 (9th Cir. 2006) ..........................................................................28

*Reynolds v. Sims*,
  377 U.S. 533 (1964)......................................................................................31, 32

*Roberts v. Wamser*,
  883 F.2d 617 (8th Cir. 1989) ............................................................................29

*Sanchez v. State of Colo.*,
    97 F.3d 1303 (10th Cir. 1996) .............................................................12, 13, 16, 20

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966).......................................................................................37

*Spirit Lake Tribe v. Benson Cnty., N.D.*,
    2010 WL 4226614 (D.N.D. Oct. 21, 2010) ...............................................22, 34, 36

*State of Or. By & Through Div. of State Lands v. Bureau of Land Mgmt.*,
    876 F.2d 1419 (9th Cir. 1989) ........................................................................25

*Taylor v. Louisiana*,
    419 U.S. 522 (1975)........................................................................................36

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)................................................................................... passim

*U.S. v. Berks Cty., Pa.*,
    250 F. Supp. 2d 525 (E.D. Pa. 2003) ................................................................36

*U.S. v. Metropolitan Dade Cnty, Fla.*,
    815 F. Supp. 1475 (S.D. Fla. 1993) ..................................................................26

*Unified Sch. Dist. No. 259, Sedgwick Cty., Kan. v. Disability Rights Ctr. of Kansas*,
    491 F.3d 1143 (10th Cir. 2007) .......................................................................34

*Veasey v. Abbott*,
    2016 WL 3923868 (5th Cir. July 20, 2016) ........................................................31

*Watson v. Comm'rs of Harrison Cnty.*,
    616 F.2d 105 (5th Cir. 1980) ...........................................................................38

*Wesberry v. Sanders*,
    376 U.S. 1 (1964)...........................................................................................31

**STATUTES**

52 U.S.C. § 10302(a) ...........................................................................................28

52 U.S.C. § 10308(d) ...........................................................................................25

52 U.S.C. § 10310*l*(e) ...........................................................................................29

52 U.S.C. § 10503................................................................................................26, 40

52 U.S.C. § 105054 ..............................................................................................28

52 U.S.C.A. § 10301(a) ........................................................................................18, 31

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act
   Reauthorization and Amendments Act of 2006, Public Law 109-246, 120 Stat. 577,
   Section 2(b)(3) ..........................................................................................................38

Pub. L. No. 94-73, § 402, 89 Stat. 400 ..................................................................................29

Pub. L. No. 109-246, § 6, 120 Stat. 577 (2006).....................................................................29

Section 14(e) of the Voting Rights Act..................................................................................29

Section 2 of the Voting Rights Act ................................................................................. passim

Section 203 of the Voting Rights Act .............................................................................. passim

Section 204 of the Voting Rights Act ....................................................................................28

Section 3 of the Voting Rights Act .................................................................................28, 29

Section II.(b)(iii) of the Voting Rights Act...................................................................20, 30, 39

## OTHER AUTHORITIES

28 C.F.R. § 55.2(b) .......................................................................................................21, 36

2009-2013 American Community Survey 5-Year Estimates, B19001C ................................39, 35

2009-2013 American Community Survey 5-Year Estimates, S1701 ...........................................35

H.R. Rep. No. 439, 89th Cong., 1st Sess. 11 (1965) ...............................................................37

Michael J. Lichenstein, *Settling the Law in the Circuits: Presenting Hearsay Evidence in
   a Preliminary Injunction Hearing*, 29 Am. J. of Trial Advocacy 415, 423-25 (2005)..............4

S. Rep. No. 417, 97th Cong., 2d Sess. 5 (1982), reprinted in 1982 USCCAN 182.......................37

S. Rep. No. 94-295 at 39-40 (1975), as reprinted in 1975 U.S.C.C.A.N. 806..............................29

U.S. Const. Amend. XIV ...............................................................................................28, 33, 36

U.S. Const. Amend. XV....................................................................................................28, 31

## I.        INTRODUCTION

Defendants' argument in opposing a preliminary injunction misses the point. Plaintiffs have shown San Juan County's largely mail-only voting system violates the Constitution and the Voting Rights Act because that system creates unequal voting opportunities for Navajo and white voters, and because it fails to provide proper language assistance to Navajo speakers. They have requested a preliminary injunction that remedies these violations in a thorough and meaningful way, which largely mirrors efforts Defendants had already been making in response to a 1983 consent decree with the U.S. Department of Justice ("DOJ") before unilaterally moving to mail-only voting in 2014. Declaration of John Mejia (Mejia Decl.), attached hereto as Ex. A, Ex. 1; Plaintiffs' Motion for Preliminary Injunction and Memorandum in Support of Motion (Pls.' MPI) Ex. E, Declaration of Dr. Dan McCool (McCool Decl.), attaching Expert Witness Report by Dr. Daniel McCool (McCool Expert Report) at 162-73 (discussing the DOJ agreements with San Juan County). Plaintiffs have shown how all the legal factors are met in support of their requested relief.

Rather than even attempting to refute these simple and true propositions, Defendants ask the Court to ignore the mail-only voting procedures it had in place since 2014, and instead focus on their most recent practices, which were put in place after the Complaint was filed, and on their promised procedures in the future (which, by their own admission, are subject to change). However, as Plaintiffs show below, a preliminary injunction is necessary as the County failed to (1) translate *all* election materials into Navajo and provide effective translation assistance, as required under the language assistance provision of the Voting Rights Act; (2) provide in-person early vote opportunities anywhere except in the predominantly white town of Monticello, and (3) keep its promises concerning its administration of the June 2016 primary, therefore

1

demonstrating a court order is necessary to ensure compliance with federal civil rights law for the general election.

Plaintiffs have met all four factors necessary for a preliminary injunction. First, Plaintiffs have shown mail-only voting violates their statutory and constitutional rights, and Defendants have not even attempted to make a legal argument otherwise. They are therefore substantially likely to prevail. Second, impairments of constitutional rights, of which voting is a very prominent one, is irreparable injury. Third, Defendants are not harmed in being ordered to protect the voting rights of the Plaintiffs. Finally, there is no adverse public impact in protecting voting rights.

## II.      STATEMENT OF FACTS

### A.      Defendants' Rebuttal to Plaintiffs' Statement of Facts

Defendants' rebuttal to Plaintiffs' statement of facts fails to provide substantive responses, and instead largely focuses on irrelevant objections and mischaracterizations. Defendants' failure to dispute key facts, including the fact Monticello was the only place for in-person early voting and the fact not all election materials were translated into Navajo, is also indicative. Below, Plaintiffs address Defendants' responses to the facts most material to the decision before the Court.

<u>Fact 2</u>

<u>Fact asserted by Plaintiffs, as presented by Defendants</u>: "A large proportion of the Navajo Indians residing in San Juan County are unable to speak, write or read the English language." Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (Opp. Br.) at 16.

<u>Defendants' Response</u>:

> Disputed.  There is no evidence of that fact.  Moreover, as "evidence" Plaintiffs refer to paragraph 6 of the Gorman Declaration, in which he states that:  "Navajo is an historically unwritten language.  In recent decades, there have been efforts

made to develop a written form of the language, but not all Navajo people and [sic] read the language."  Gorman says nothing about the ability of Navajo voters to read, speak and/or write English.

*Id.*

Plaintiffs' Reply: Defendants' views on the proportion of Navajo English speakers are irrelevant: San Juan County is covered for Navajo under the language assistance section of the Voting Rights Act (Section 203), which is triggered when a certain proportion of the minority population, measured by the Census, is found not to be fluent in English. Pls.' MPI at 7, n.3; Mejia Decl. Ex. 2.

**Fact 4**

Fact asserted by Plaintiffs, as presented by Defendants: "The fact that many Navajo live in rural areas of San Juan County complicates mail delivery and means that they are less likely to receive their mail, including ballots." Opp. Br. at 17.

Defendants' Response:

> Disputed.  Plaintiffs also submit no evidence to support this conclusory statement. Nor could they given the fact that San Juan County is so rural that only about 25% of its residents have a street address; whereas the remainder list a Post Office Box as their address.  Moreover, because the population of San Juan County is almost equally divided between Indian and non-Indian, it can be fairly said that to the extent mail delivery to rural areas is problematic, then both Indians and non-Indians are equally effected.

*Id*.

Plaintiffs' Reply: Plaintiffs provide evidence regarding complications to mail delivery in San Juan both in Professor McCool's expert report (McCool Expert Report at 189-91) (describing how for "more remote Navajo precincts" "many voters face long drives over dirt roads to get the mail" and may have to drive "as much as 30 or 40 miles" to pick up mail) and in Mr. Gorman's Declaration. Second Declaration of Leonard Gorman, executed September 16, 2016 (Second Gorman Decl.), attached hereto as Ex. B, ¶ 6-7; Pls.' MPI Ex. A, Declaration of Leonard

Gorman (Gorman Decl.) ¶ 17. In any event, Defendants do not dispute Plaintiffs' asserted fact regarding the problems with delivery of mail to Navajo voters in rural parts of the County, and, even had they done so, there is a relaxed standard of evidence for motions for preliminary injunction. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003); *Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*, 503 F. App'x 616, 621 (10th Cir. 2012).[1] Instead, Defendants rely on the County Clerk to opine that 75 percent of County residents use Post Office Boxes, even though they fail to establish how or why he would be able to assert this fact. They proffer no facts about the Navajo and white proportions of those asserted 25 percent of voters with street addresses, but instead simply conclude it is "fair" to say any burdens based on Post Office Box use is equally felt between the two groups. Plaintiffs assert, and Defendants deny based merely on assumption, Navajo voters are less likely to receive ballots given mailing problems.

Further, as Defendants' own staff testified, there are not a "sufficient number of post office boxes for everyone" in some majority Navajo precincts. Opp. Br. Ex. 9 at 41:13-21. Some majority-Navajo precincts, such as Navajo Mountain, do not have a post office at all, while other post offices aren't "always open." McCool Expert Report at 190. In a confusing twist, some residents may have to rely on post office boxes located in other states to vote in a Utah or county elections. Defs. Opp. Br. Ex. 9 at 41:13-21; McCool Expert Report at 189-90.

**Fact 5**

---

[1] In the section of their opposition brief entitled "Evidence," Defendants fail to cite *any* Tenth Circuit case law on the evidentiary standard for motions for preliminary injunction. Defendants fail to appreciate that there is a circuit split on this issue. *See* Michael J. Lichenstein, *Settling the Law in the Circuits: Presenting Hearsay Evidence in a Preliminary Injunction Hearing*, 29 Am. J. of Trial Advocacy 415, 423-25 (2005).

Fact asserted by Plaintiffs, as presented by Defendants: "Because of the historical discrimination against Navajo in San Juan County, Navajo voters are reluctant to travel to Monticello, Utah, which has a majority population of non- Indians, to vote in person." Opp. Br. at 17.

Defendants' Response:

> Disputed. There is no evidence of this fact.  As "evidence," Plaintiffs refer to paragraphs 2 and 3 of the Whitehat Declaration.  But all Whitehat says is: "That from my home, it takes me approximately five hours to drive to Monticello one way.  [and that] There is a history of discrimination against Navajo people in San Juan County."  Furthermore, during the 2016 primary, Whitehat voted in-person in Navajo Mountain where he lives.

*Id*.

Plaintiffs' Reply: It is appropriate for the Court to consider the facts in Mr. Whitehat's declaration, even over Defendants' objection, given the relaxed standard applicable to this motion. *See Heideman*, 348 F.3d at 1188-89; *Heartland Animal Clinic,* 503 F. App'x at 621.  In his Second Declaration, Mr. Whitehat explains he feels like a target in Monticello and therefore avoids going there if possible by, for example, getting gas in another County so he won't have to stop for gas in Monticello. Second Declaration of Plaintiff Terry Whitehat, executed on September 15, 2016 (Second Whitehat Decl.), attached hereto as Ex. C, ¶ 4. In any event, the evidence for this proposition is not only in Mr. Whitehat's declaration, but it is also in the declaration of Mr. Gorman, as well as in the lengthy history of discrimination found in Professor McCool's report. *See* McCool Decl. ¶ 3; McCool Expert Report at 9-59.

## **Fact 6**

Fact asserted by Plaintiffs, as presented by Defendants: "Prior to the 2016 county-wide primary election, the San Juan County Clerk had press releases published in the Navajo Times and San Juan Record announcing the four polling locations for in-person voting, but the County has not sent out any similar press releases for the November 2016 general election." Opp. Br. at 18.

Defendants' Response:

> Undisputed but irrelevant.  The election is still two months away.  Besides the San Juan County Clerk-Auditor, John David Nielson, has said that the County intends to use the same procedures in the 2016 general elections as it used in the 2016 primary election.  Furthermore, Plaintiffs ignore the work of Ed Tapaha, the County's full-time liaison with the Navajo Nation ... He was specifically hired by the County in 1991 to work on matters involving the Navajo Nation, especially elections.  Depending upon whether it is an election year, between 50% and 60% of Mr. Tapaha's time is devoted to election activities, such as visiting Chapter Houses to register voters, discussing the vote-by-mail procedures, explaining the ballots in upcoming elections, and providing language assistance, including selecting and training translators to be present on election day at each polling location in order to assist Navajo voters.  Mr. Tapaha is able to provide this language assistance because he is fluent in both Navajo and English with considerable experience as a translator.

*Id.* at 18-19.

Plaintiffs' Reply: Defendants contradict themselves. On the one hand, they claim the County is committed (albeit with no written documentation or other memorialization) to keeping four polling places open for the general election (see their response to facts number 6 and 9) while, on the other hand, they acknowledge "procedures may change" for future elections. *Id.* at 21. The fact "procedures may change" when the threat of litigation is gone is one of the reasons Plaintiffs need a preliminary injunction. The County has proven it is unwilling to comply fully with its obligations under the Voting Rights Act in the absence of monitoring. The County failed to respond to Plaintiffs' pre-litigation attempts to obtain more information about election procedures in advance of 2016 elections, made a public announcement about its plans to open the three polling locations on the Navajo reservation only after Plaintiffs' lawsuit was filed, and has provided information regarding its election procedures only after each step of the litigation. Such whack-a-mole responses by the County do not provide Plaintiffs with an accurate and reliable understanding of how the 2016 General Election will be conducted, or whether the County will comply fully with the Voting Rights Act.

Furthermore, Mr. Tapaha's visits to Chapter Houses to "register voters, discussing the vote-by-mail procedures, explaining the ballots in upcoming elections, and providing language assistance" are far from sufficient. For instance, Defendants' Responses to Plaintiffs' First Set of Interrogatories show Mr. Tapaha only visited three chapter houses in 2016, even though there are five Navajo chapters in San Juan County. Mejia Decrl. Ex. 3 at 12-13; Opp. Br. Ex. 12 at 24:24-25:3.

Finally, Defendants' assertion that Mr. Tapaha "is fluent in both Navajo and English with considerable experience as a translator" (Opp. Br. at 19) is undermined by Mr. Tapaha's own testimony. *See* Opp. Br. Ex. 12 at 96:9-14 (Mr. Tapaha agreeing he had previously testified his "Navajo is not that good even after all these years"); Opp. Br. Ex. 9 at 36:17-19 (Mr. Tapaha testifying that "I have to think real hard how to translate words. And I had to have help from other folks how to translate."); Opp. Br. Ex. 9 at 38:16-24 (Mr. Tapaha explaining he needed help from other Navajo speakers who "spoke extremely fluent Navajo" in order to translate election documents into Navajo). Despite Mr. Tapaha never having held a job in elections before, the County gave Mr. Tapaha no training. Opp. Br. Ex. 12 at 98:9-12 (Mr. Tapaha testifying he has never "been trained in how to translate election documents into Navajo.").

**<u>Fact 7</u>**

<u>Fact asserted by Plaintiffs, as presented by Defendants</u>: "During the 2016 primary election, San Juan County did not provide Navajo voters with a translation of the ballot, voter registration forms or candidate filing information.  Instead, the County's website listed in Navajo the offices up for election, the names of the candidates for those offices and their political party affiliation." Opp. Br. at 19.

<u>Defendants' Response</u>:

> Disputed.  Mr. Tapaha testified about his election education–voter registration work with Navajo voters leading up to the 2016 county-wide primary election in June of 2016.  In addition, Plaintiffs cite to paragraph 14 of the Gorman Declaration as "evidence" of this fact but, as usual, that Declaration is markedly different than what Gorman knows to be the truth. Gorman, for example, contends that there was no translation of the ballot available for voters during the 2016 primary election, which is not true.  At every polling location there were trained translators, fluent in Navajo, available to assist those who needed help.  These translators were selected and trained by Mr. Tapaha, and they were experienced having been poll workers or translators in many previous elections.

*Id*. at 19-20.

<u>Plaintiffs' Reply</u>: Defendants fail to address the fact the Navajo-language recording regarding the primary election ballots on the website was not a complete translation of the ballot itself, but rather just a listing of the offices up for election for each party and the names of the candidates running for those offices. Pls.' MPI at 5. Furthermore, Defendants refuse to acknowledge part of their asserted plans in their Answer and other filings was "for the 2016 and future election cycles, the County is already committed to providing Navajo language ballots *in audio form* at the four polling locations within San Juan County and on the County's website." Defendants' Answer to Complaint for Declaratory and Injunctive Relief (Defs.' Answer) at 3-4 (emphasis added). Defendants have now changed course, depending instead on translators at polling places who were "available to assist those who needed help." Opp. Br. at 20. This tendency to announce one plan about voting (in court pleadings no less), then follow another is exactly why a preliminary injunction spelling out the County's obligations is needed.

Finally, Defendants' claim the translators were "experienced," having been "translators in many previous elections," is misleading: of the five translators hired for the 2016 primary, only two (Marietta Stevens and Edward Tapaha) appear to have actually served as translators in an election since 2012. Mejia Decl. Ex. 3, Defs.' Responses to Pls.' RFPs, 7-9.

**<u>Fact 8</u>**

Fact asserted by Plaintiffs, as presented by Defendants: "Because Navajo voters live in rural areas, White voters receive their mail-in ballots more expeditiously than do Navajo voters." Opp. Br. at 20.

Defendants' Response:

> Disputed.  This fact is also not supported by any evidence. Plaintiffs' "evidence" consists of paragraph 17 of the Gorman Declaration and paragraph 4 of the Whitehat Declaration.  But paragraph 17 of the Gorman Declaration about slow mail delivery to Navajo residents of the County is based on his unknown staff member's conversations with an unknown postmaster, which is triple hearsay.  In similar fashion, paragraph 4 of the Whitehat Declaration merely states that he received his 2016 primary ballot about two weeks after it had been mailed, which is consistent with the allegations of the *Complaint* wherein Whitehat states that he works in Arizona and, "as a result he only gets his mail approximately every two weeks."

*Id*. at 20.

Plaintiffs' Reply: It is appropriate for the Court to consider these facts, even over Defendants' objection, given the relaxed standard applicable to this motion. *See Heideman*, 348 F.3d at 1188-89; *Heartland Animal Clinic,* 503 F. App'x at 621. Furthermore, Plaintiffs provide evidence regarding complications to mail delivery to Navajo residents of San Juan both in Professor McCool's expert report, *see* McCool Expert Report at 189-91) (describing how for "more remote Navajo precincts" "many voters face long drives over dirt roads to get the mail" and may have to drive "as much as 30 or 40 miles" to pick up mail), and in Mr. Gorman's Declaration. Second Gorman Decl. ¶ 6-7; Pls.' MPI Ex. A, Gorman Decl. ¶ 17.

## **Fact 12**

Fact asserted by Plaintiffs, as presented by Defendants: "The Navajo translators are not required to have any relevant qualifications and lack formal training."  Opp. Br. at 22.

Defendants' Response:

> Disputed.  They are required to be fluent in Navajo and English.  And while they were not trained with respect to the 2016 county-wide primary, that was because of their training and experience in previous elections.  In addition, Mr. Tapaha visited the polling locations in previous election years to observe the performance of the translators who he felt were able to do the job.  Also, for over 30 years the Department of Justice ("DOJ") has monitored the County's election procedures for compliance with the Voting Rights Act, including that law's language assistance requirements, and the DOJ has tacitly approved them, including its vote-by-mail procedures.  Similarly, in developing the 2014 vote-by-mail procedures the County worked with and received the tacit approval of the Navajo Election Administration.

*Id.* at 22-23.

Plaintiffs' Reply: Given the County's changes to its election system (going from an in-person vote system in 2012, to mail only in 2014, to reopening four polling locations in the June 2016 primary), as well as recent changes to the County's district lines, the risk of voter confusion was significant and the decision not to train poll workers because they had been trained in unspecified "previous elections," raises questions regarding the County's ability to effectively administer an election. Defendants further fail to address testimony, cited in Plaintiffs' brief, regarding how the lack of a formal training program has created problems:

> Q.  (Plaintiff counsel) [Y]ou agree that there is really no formal training or process for their provision of Navajo language assistance; right? …
> A.  (Mr. Tapaha, the Navajo liaison for the County Clerk's office) I do agree.
> Q.  Does that concern you at all?
> A.  Yes.
> Q.  Why does it concern you?
> A.  Maybe miswording, miswording some information.

Pls.' MPI, Declaration of Maya Kane, Esq. (Kane Decl.) Ex. 1, Part 2 at 98:8-18.

## Fact 13

Fact asserted by Plaintiffs, as presented by Defendants: "Plaintiffs insist that the County needs a glossary of election terms to be used by translators." Opp. Br. at 23.

Defendants' Response: "That glossary already exists." *Id.*

Plaintiffs' Reply: The glossary Defendants include as an exhibit to their response, Opp. Br. Ex.

10, is from 1993 and does not appear to have been updated. For instance, the glossary fails to

include terms such as "website," even though San Juan provides election information on its

website and the State of Utah provides voter registration and address change services online. The

glossary also has not been distributed residents of San Juan who may be struggling to translate

their ballots. *See* Opp. Br. Ex. 9 at 99:18-100:20.

## Fact 14

Fact asserted by Plaintiffs, as presented by Defendants: "Plaintiffs also contend that voting in

San Juan County is polarized, meaning that Navajo voters vote for Navajo candidates and that

non-Indians vote for non-Indian candidates." Opp. Br. at 23.

Defendants' Response:

> Disputed and irrelevant.  It is likewise not true because the Navajo vote along
> party lines.  In fact, political party affiliation among Navajo voters in San Juan
> County is so strong that they will vote for a non-American-Indian Democratic
> candidate rather than an [sic] Navajo Republican candidate, which is a fact that is
> well documented by the testimony of Gail Johnson.  Gail Johnson was the San
> Juan County Clerk-Auditor from 1983 until the early 1990s.  As such, Ms.
> Johnson was in charge of elections… Ms. Johnson prepared a report for the
> County Commissioners addressing the DOJ's contention that voting within the
> County was polarized along racial lines.  In that report, Ms. Johnson documented
> the results from the general elections of 1972, 1974, 1976 and 1980.  In election
> after election, Ms. Johnson showed in her report that non- Navajo Democratic
> candidates prevailed over Navajo Republican candidates.

*Id.* at 23-25.

Plaintiffs' Reply: Defendants fail to provide any expert evidence to rebut Plaintiffs' expert report

on racially polarized voting in San Juan County, one of the "Senate Factors" courts may consider

in Section 2 cases. Instead, the Defendants rely on the opinions of former County Clerk Gail

Johnson, who is not an expert in this field and did not perform any objective analysis of racially

polarized voting. In doing so, Defendants improperly insert causation into the discussion, despite

the fact the second and third *Thornburg v. Gingles*, 478 U.S. 30 (1986), preconditions only require "proof of the correlation between the race of the voter and the defeat of the minority's preferred candidate." *Sanchez v. State of Colo.*, 97 F.3d 1303, 1313 (10th Cir. 1996) (district court committed reversible error in rejecting plaintiffs' evidence of racial bloc voting using same statistical method approved in *Gingles*). The relevant inquiry focuses on "*how* voters vote, not *why* voters voted that way." *Id.* (emphasis in original). Evidence of political cohesion "cannot be rebutted by evidence that the divergent voting patterns may be explained by causes other than race." *Gingles*, 478 U.S. at 32-33 (J. O'Connor concurring) ("Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting, and defendants may not rebut that case with evidence of causation or intent." *Id.* at 32 (J. Brennan concurring)); *see also Bone Shirt v. Hazeltine* 336 F. Supp. 2d 976, 1009 (D.S.D. 2004) ("[T]he court will not accept defendants' argument that limits Indian preference to Democrats."). Defendants' statements regarding racially polarized voting must be disregarded entirely.

**Fact 15**

Fact asserted by Plaintiffs, as presented by Defendants: "Plaintiffs insist that in *Navajo Nation v. San Juan County*, this Court recently found that San Juan County intentionally discriminated against Navajo voters by failing to redraw County Commission election Districts in accordance with Voting Rights Act." Opp. Br. at 25.

Defendants' Response:

> Disputed and irrelevant. The Commission Districts at issue in that case were drawn pursuant to a 1984 *Consent Decree* entered into between San Juan County and the DOJ, which required that one of the three County Commission Districts have a majority of Navajo voters so as to guarantee that at least one San Juan County Commissioner would always be a member of the Navajo Nation. Further, Plaintiffs do not allege in their *Complaint* that San Juan County's vote-by-mail procedures are racially motivated.

*Id.* at 25-26.

Plaintiffs' Reply: Regardless of the post-hoc explanations the County gives for its redistricting decisions, this Court found San Juan County intentionally discriminated against Native American voters when it "failed to attend to minimal redistricting obligations for over twenty-five years and incorrectly treated [a] racially-based [election district] as a permanent fixture of its politics." *Navajo Nation v. San Juan Cnty.*, 2016 WL 697120 (D. Utah Feb. 19, 2016) (finding the Navajo Nation successfully established San Juan County's "redistricting decisions predominated by racial classifications violate the Equal Protection Clause."). Defendants' argument that "Plaintiffs do not allege in their Complaint that San Juan County's vote-by-mail procedures are racially motivated" is irrelevant, given Plaintiffs have not brought an intentional discrimination case, but rather a case challenging discriminatory results. A violation of Section 2 does not require discriminatory intent. *Gingles*, 478 U.S. at 35 ("Congress substantially revised § 2 [in 1982] to make clear a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test[.]'"). Plaintiffs discuss this Court's multiple findings of San Juan County's discrimination against the Navajo people in the context of the totality of the circumstances and "Senate Factor 1," which looks at the history of official discrimination against a minority group. *Sanchez,* 97 F.3d at 1310 n.11.

**Fact 15** [sic] (Defendants' response includes two facts numbered as 15).

Fact asserted by Plaintiffs, as presented by Defendants: "In his *Declaration*, Leonard Gorman states that: 'It is my understanding that, during the 2014 election, ballots were mailed on October 10, 2014. This gave voters only three weeks to receive ballots, complete them, obtain language assistance if necessary, and return the ballots.'" Opp. Br. at 26.

<u>Defendants' Response</u>: "Objection.  This is not based upon Gorman's personal knowledge, and it is irrelevant since the issues in this case concern the 2016 election cycle, which Plaintiffs seem determined to ignore." *Id.*

<u>Plaintiffs' Reply</u>: It is appropriate for the Court to consider these facts, even over Defendants' objection, given the relaxed standard applicable to this motion. *See Heideman*, 348 F.3d at 1188-89; *Heartland Animal Clinic*, 503 F. App'x at 621. Defendants also ignore the fact Mr. Gorman attaches, as an exhibit to his declaration, a newspaper article dated August 13, 2014 stating ballots were sent out on October 10 for the 2014 election. Defendants also ignore testimony from their own staff acknowledging voters would only have two to three weeks to receive their ballots and complete them. Opp. Br. Ex. 9 at 94:11-13 (Edward Tapaha, Navajo liaison for the San Juan County Clerk's office, testifying "you will receive a ballot two or three weeks ahead of time, mostly two weeks ahead of time"). Finally, Defendants accuse Plaintiffs of being "determined to ignore" "issues in this case concern[ing] the 2016 election cycle," yet Defendants themselves ignore the fact Plaintiffs have multiple sections in their brief devoted to the electoral system used during the 2016 primary elections. *See*, *e.g.*, Pls.' MPI at 4-6 (discussing the June 2016 primary elections and the 2016 general election plans of the County); *id.* at 15-18 (discussion of electoral system implemented in the June primary elections).

**<u>Fact 16</u>**

<u>Fact asserted by Plaintiffs, as presented by Defendants</u>:

> In paragraphs 12, 13 and 17 of his Declaration, Gorman purports to state facts based upon his conversations with his unidentified staff members about the staff members' conversations with other unidentified parties, such as: His staff members being told by unknown voters that language assistance was not available at unspecified polling locations, or that an unidentified postmaster said that at one week prior to the June 28, 2016 primary election he or she had not received any ballots to deliver to Navajo voters.

Opp. Br. at 26.

Defendants' Response: "Objection. Hearsay upon hearsay and not based upon his

personal knowledge." *Id.*

Plaintiffs' Reply: It is appropriate for the Court to consider these facts, even over Defendants'

objection, given the relaxed standard applicable to this motion. *See Heideman*, 348 F.3d at 1188-

89; *Heartland Animal Clinic*, 503 F. App'x at 621. Moreover, Defendants do not dispute these

facts or offer any contrary evidence.

**Fact 17**

Fact asserted by Plaintiffs, as presented by Defendants: "In paragraph 18, Gorman states that:

'because of discrimination and the difficulty of making the trip, many Navajo residents of San

Juan County are hesitant to travel to Monticello to vote.'" Opp. Br. at 27.

Defendants' Response:

> Objection.  Lack of foundation, speculation and conclusory.  It is likewise
> irrelevant since there were four polling locations for in-person voting during the
> 2016 county-wide primary and there will be four polling locations for in-person
> voting in the 2016 fall general election.  More importantly, there is no allegation
> in the *Complaint* that the County's use of the vote-by-mail procedure is an act of
> intentional discrimination against Navajo voters…Nowhere in the *Complaint* do
> Plaintiffs allege that vote-by-mail was the result of discriminatory animus towards
> Native Americans voters in general or Navajo voters in particular.  Nor could
> such a claim be made since mail-in-ballots had significantly increased the turn out
> among Navajo voters, and both the Department of Justice and Navajo Election
> Administration have tacitly approved the County's procedures for the 2014
> election cycle (before the implementation of additional procedures to assist
> Navajo participation).

*Id.* at 27-28.

Plaintiffs' Reply: It is appropriate for the Court to consider Mr. Gorman's declaration, even over

Defendants' objection, given the relaxed standard applicable to this motion. *See Heideman*, 348

F.3d at 1188-89; *Heartland Animal Clinic,* 503 F. App'x at 621. Moreover, Mr. Gorman's views

15

on discrimination and the challenges of traveling to Monticello are founded on his experiences as Executive Director of the Navajo Nation Human Rights Commission. Furthermore, as discussed above, Plaintiffs have not brought an intentional discrimination case, but rather a case challenging discriminatory results. A violation of Section 2 does not require discriminatory intent. *Gingles*, 478 U.S. at 35. Plaintiffs discuss San Juan County's discrimination against the Navajo people in the context of the totality of the circumstances and "Senate Factor 1," which looks at the history of official discrimination against a minority group. *Sanchez*, 97 F.3d at 1310 n.11. Defendants' arguments regarding the "tacit approval" by the U.S. Department of Justice are discussed below.

**Fact 18**

Fact asserted by Plaintiffs, as presented by Defendants: "In his *Declaration*, Terry Whitehat states that: 'There is a history of discrimination against Navajo people in San Juan County.'" Opp. Br. at 28.

Defendants' Response: "Objection.  Lack of foundation, not based upon personal knowledge and conclusory.  It is likewise irrelevant." *Id.*

Plaintiffs' Reply: It is appropriate for the Court to consider Mr. Whitehat's stated experience, even over Defendants' objection, given the relaxed standard applicable to this motion. *See Heideman*, 348 F.3d at 1188-89; *Heartland Animal Clinic*, 503 F. App'x at 621. Moreover, Mr. Whitehat's assertion is based on his personal experience. Second Whitehat Decl. ¶ 3. The history of discrimination is relevant as it is one of the factors courts may consider in assessing the "totality of the circumstances" in a Section 2 equal opportunities voting rights case. *Sanchez*, 97 F. 3d at 1310 n.11.

**Fact 19**

16

Fact asserted by Plaintiffs, as presented by Defendants: "In his *Declaration*, Whitehat also states that: 'From my home [in Navajo Mountain] it takes me five hours to drive to Monticello one way.'" Opp. Br. at 28.

Defendants' Response: "Objection.  Irrelevant.  There is a polling location at Navajo Mountain for in-person voting, and that is where Whitehat voted during the 2016 county-wide primary." *Id*.

Plaintiffs' Reply: The time required for Mr. Whitehat to travel to Monticello is relevant as Monticello is currently the only location in the County offering early in-person voting, where voters can trouble shoot, re-register and get in-person assistance during the 14 days of early voting. Pls.' MPI, Kane Decl. Ex. 2 at 16:22-24 (The Office Manager for San Juan County explaining "[t]he advantage of having a polling location in our office is that we were able to resolve any of those [voting related] issues in our office."). Mr. Whitehat prefers to vote in person, yet he only has one day (Election Day) to do that, as the nearest site open for the fourteen days of early voting is in predominantly white Monticello and requires a nine hour round trip. Because Mr. Whitehat may be in Salt Lake City on Election Day, due to a possible kidney operation, he will be denied the opportunity available to voters in Monticello to vote early in person. Moreover, this fact is also relevant as the County only committed to opening the in-person polling location in Navajo Mountain *after* Plaintiffs' Complaint was filed, and there is no assurance the County will not revert back to mail-only voting without a preliminary injunction in place.

**Fact 20**

Fact asserted by Plaintiffs, as presented by Defendants: "In his *Declaration*, Dan McCool

purports to give a history of discrimination against Native Americans in San Juan County.  He

does so by reviewing various newspaper articles and other publications." Opp. Br. at 28.

Defendants' Response:

> Objection.  Irrelevant.  The issues before the Court in this case relate to voting
> procedures and the alleged need for language assistance, and not discrimination.
> McCool's opinions are likewise speculative insofar as they are based upon
> hearsay rather than evidence such as the fact that for decades the DOJ has
> monitored San Juan County's election procedures for compliance with the Voting
> Rights Act and not found them wanting.

*Id.* at 29.

Plaintiffs' Reply: Given that Plaintiffs have brought claims under Section 2 of the Voting Rights

Act, which is intended to help root out discrimination in the election process,[2] Defendants err in

arguing "the issues before the Court" are not related to discrimination. Professor McCool's

opinions are related to several of the Senate Factors relevant to the totality of the circumstances

in proving a Section 2 violation. In addition, as he explains in detail, the methods Professor

McCool relied on in drafting his report are well established in his field. McCool Expert Report at

6-9.

**Fact 21**

Fact asserted by Plaintiffs, as presented by Defendants: "In his *Declaration*, Richard Engstrom

purports to give opinions on whether or not voting in San Juan County is racially polarized.  That

is, do registered voters vote along racial or political party lines?  He concludes that they do."

Opp. Br. at 29.

Defendants' Response:

---

[2] The Voting Rights Act, 52 U.S.C.A. § 10301(a), prohibits a political subdivision from imposing or applying any voting practice or procedure "in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group]."

Objection.  Irrelevant.  Polarized voting is an issue in redistricting cases; whereas the issues before the Court in this case relate to voting procedures and the alleged need for language assistance, not discrimination. Engstrom's opinions are likewise speculative insofar as they are not based upon the evidence, which is that rather than bloc voting along racial lines Navajo voters in San Juan County prefer Democratic candidates over Republican candidates.

*Id*.

Plaintiffs' Reply: While polarized voting is a precondition to be proven in redistricting cases, *Gingles*, 478 U.S. at 50-51, it is also one of the Senate Factors to be considered within the totality of the circumstances in ballot access cases. *Miss. State Chapter, Operation PUSH, Inc. v. Mabus* ("*Operation PUSH I*"), 932 F.2d 400, 405 (5th Cir. 1991); *Gonzalez v. Arizona*, 677 F.3d 383, 405–06 (9th Cir. 2012) (en banc) (considering the Senate factors in evaluating a Section 2 challenge to Arizona's voter ID law), *aff'd on other grounds*, *Arizona v. Inter Tribal Council of Ariz.*, *Inc.*, 133 S. Ct. 2247 (2013); *Brooks v. Gant*, 2012 WL 4482984, at *6 (D.S.D. Sept. 27, 2012). Furthermore, as mentioned above, "Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting, and defendants may not rebut that case with evidence of causation or intent." *Gingles*, 478 U.S. at 32-33 (J. O'Connor concurring); *see also Bone Shirt* 336 F. Supp. 2d at 1009 ("[T]he court will not accept defendants' argument that limits Indian preference to Democrats.").

### B.    Defendants' Statement of Additional Facts

Defendants assert additional "facts" relating to (1) unique characteristics of San Juan County, (2) compliance with the Voting Rights Act, (3) Plaintiffs' injury, and (4) DOJ's alleged "tacit approval" of County election procedures.

### 1.    Unique Characteristics of San Juan County

Plaintiffs do not dispute Defendants' additional facts concerning the geographic and demographic characteristics of San Juan County. However, Defendants' assertion that "only

19

about 25% of the County's registered voters have a physical address" and the "remainder use only a post office box for their address" is misleading and inaccurate. Opp. Br. at 31. As Defendants' own staff testified, in some majority Navajo precincts there are not a "sufficient number of post office boxes for everyone." Opp. Br. Ex. 9 at 41:13-21. Furthermore, some majority-Navajo precincts, such as Navajo Mountain, do not have a post office at all, while other post offices aren't "always open." McCool Expert Report at 190. As mentioned above, some residents may have to rely on post office boxes located in other states, to vote in a Utah or county elections. Opp. Br. Ex. 9 at 41:13-21. Finally, as discussed in Section II(b)(iii), Defendants arguments regarding turnout for the 2014 general election are misleading.

2.    Compliance with the Voting Rights Act

Defendants restate the same facts alleged in previous pleadings concerning the three new polling places established for the June 2016 primary. Defendants also make a number of new assertions which are unsupported, many of which constitute legal argument and demonstrate their lack of understanding concerning the County's obligations under the Voting Rights Act. For instance, in paragraph 7 of this section of their brief, Defendants argue because the "County has no control over where Navajo voters choose to live or where the federal government locates Post Offices," the County cannot be responsible for the fact Navajo residents of San Juan may need to travel further to retrieve their mail-in ballot. Opp. Br. at 33. This misses the point: under the Voting Rights Act, the County is responsible for providing equal voting opportunities within the totality of the circumstances. *Sanchez*, 97 F.3d at 1329. The County cannot create a voting system which would be equal, but for the various social, economic, geographic and other factors comprising the totality of the circumstances in which it is implemented. Furthermore, Defendants assert – with absolutely no support – "Navajo voters surely must go to the Post Office more than once a month to obtain their mail." Opp. Br. at 33.  Aside from being argumentative, Defendants

point to no specific evidence in making this assumption. Moreover, it illustrates Defendants

fundamental misunderstanding of Navajo culture and tradition, especially given that Plaintiffs'

expert has documented many Navajo residents "hardly ever go to the post office." McCool

Expert Report at 190-91.

Defendants also ignore the fact the County reduced the number of translators on Election

Day from 21 pre-2014, Opp. Br. Ex. 9 at 81:3-7, to five during the primary election in 2016. Def.

Opp. Br. 33. In addition, while they claimed in multiple filings the County would "make

extensive use of paid Navajo-language announcements on two Navajo language radio stations

(KNDN and KTTN) to explain in the Navajo language the vote-by-mail process and ballot,"

Defendants ignore the fact these announcements never happened. Defs.' Answer at 5. In their

responses to Plaintiffs' interrogatories, Defendants acknowledge:

> [i]n the course of preparing its responses to these Interrogatories, San Juan
> County discovered that, due to a communication problem within the Clerk's
> office, the request to run the Navajo-language public service announcement
> relating to the 2016 primary election, which was recorded by Mr. Edward Tapaha,
> was never sent to the radio stations.

Mejia Decl. Ex. 3 at 11. Such failure to comply with the promises made in their Answer and

Counterclaims – whether intentional or due to simple oversight – is exactly the reason a

preliminary injunction is necessary to ensure that Navajo residents are "effectively informed"

about voting, in keeping with the language assistance requirements of the Voting Rights Act. 28

C.F.R. § 55.2(b). Similarly, Defendants claim that "the County also issued press releases

announcing the polling locations for in-person voting which were published in *The San Juan

Record* and *Navajo Times* on March 9, 2016,*"* yet they have failed to produce these articles or

any other published announcements regarding the details for the 2016 elections in response to

discovery requests. Opp. Br. at 3. Furthermore, emails Defendants did produce indicate the

reporter at the San Juan Record was unable to open the press release, and rather than publishing

the announcement simply "included the information in other articles about the election" – a shortcoming which the County Clerk did not remedy. Mejia Decl. Ex. 5. Again, such failure to "effectively inform" residents about voting procedures is why a preliminary injunction is necessary. This is especially so given the County's former Clerk has acknowledged "[i]f you have someone looking your shoulder you are a little more conscientious…." Opp. Br. Ex. 11, Deposition of Norman Johnson, at 34:3-14 (describing the impact of federal monitoring agreed to in the 1983 consent decree with DOJ).

Finally, Defendants again demonstrate their confusion regarding their obligations under the Voting Rights Act in arguing comparable language assistance provided to Navajo voters "is not available to non-Indian voters." Opp. Br. at 34. Federal law requires San Juan County to provide this assistance to Navajo voters because it is covered for *Navajo*, not English, under language assistance section (Section 203) of the Voting Rights Act. Mejia Decl. Ex. 2 at 6.

### 3.   Plaintiffs' Irreparable Injury

Defendants next purport to analyze each Plaintiff's circumstances individually, arguing because Plaintiffs were able to cast a ballot in previous elections despite the switch to mail only voting, Plaintiffs have not suffered an injury. Not only are these arguments inappropriate in this "statement of additional facts," but Defendants again miss the point: it is irrelevant whether Plaintiffs were able to cast their ballot or not,[3] what matters is *they did not have the same*

---

[3] As Plaintiffs explain in their Motion for Preliminary Injunction,

> Section 2 does not require a showing that voters cannot register or vote under any circumstance. *See*, *e.g.*, *Miss. State Chapter of Operation PUSH, Inc. v. Mabus ("Operation PUSH I"),* 932 F.2d 400 (5th Cir. 1991) (restriction on voter registration violated Section 2 even though the challenged law did not absolutely bar any citizen from registering to vote, and notwithstanding it was possible, with a sufficient expenditure of effort, for citizens to overcome the obstacles to registration imposed by the restriction); *Spirit Lake Tribe v. Benson Cnty., N.D.*, 2010 WL 4226614, at *1-2 (D.N.D. Oct. 21, 2010) (granting a preliminary injunction based on a Section 2 claim enjoining the county from closing polling places on the Reservation even though mail-in balloting was available); *Brown v. Dean*, 555 F. Supp. 502, 504-06 (D.R.I. 1982) (enjoining relocation of a polling place where plaintiffs allege such change would make it "considerably more difficult" – but not impossible – for black voters to vote, due in part to the limitations of public

*opportunities as white voters to do so*. Many Navajo voters do not receive mail on a regular basis, and may have their mail delivery delayed due to the rural nature of the County or because they need to wait to have a family member translate it, meaning they have fewer days to receive, review and return their mail-in ballot.  Pls.' MPI Ex. A, Gorman Decl., ¶ 17; Second Gorman Decl. ¶ 6-7. Furthermore, the average travel time for Navajo voters to vote in-person and get assistance at the County Clerk's office during the fourteen-day early voting period is more than double that of the average white voter.  Pls.' MPI Ex. B, Declaration of Dr. Gerald R. Webster (Webster Decl.) Ex. 1. This means the average white voter – but not the average Navajo voter – can more readily obtain in-person assistance if they have questions about their ballot, registration problems, or need any other help in the voting process. For instance, voters in Monticello,[4] who have been inactivated for some reason and therefore would not receive a ballot in the mail in advance of the election, can easily go to the County Clerk's office, re-register, and vote during the fourteen days of early voting. Opp. Br. Ex. 9, Deposition of Edward Tapaha, at 82:11-83:12. Such assistance is largely unavailable to Navajo who live further from Monticello.[5]

      While the real issue here is the fact white voters have voting opportunities unavailable to Navajo voters, Plaintiffs also dispute Defendants' assertions regarding the individual Plaintiffs'

---

transportation and lack of access to private vehicles). Rather, Section 2 involves a comparative standard: whether political processes "are not equally open to participation" by minority voters because those voters are given "less opportunity" than white voters to participate in elections and elect their representatives of choice.
Pls.' MPI at 18-19.

[4] Monticello is 84 percent white. Complaint ¶ 27.

[5] Defendants assert that "[r]ather than satellite offices for early voting or absentee voting, Plaintiffs and other County voters have mail-in-ballots." Opp. Br. at 6 n.11, 12 n.35. However, as explained in Plaintiffs' Motion for Preliminary Injunction, Defendants are obligated, under Utah law, to provide 14 days of in-person early voting. Furthermore, Defendants have acknowledged numerous times (1) that such an opportunity is available in the majority-white County seat of Monticello and (2) that such in-person early voting provides serious benefits. *See* Opp. Br. Ex. 11 at 88:7-10 ("There is always an early voting location.  The clerk's office can always function as an early voting location. People would bring their ballot here, sit down there and mark it."); *id.* Ex. 9 at 82:11-83:12 (describing how, voters who have been inactivated for some reason, can go to the County Clerk's office in Monticello, reregister, and vote, during the fourteen days of early voting); Kane Decl. Ex 2 at 16:22-24 (the Office Manager for the County Clerk's Office explaining that "[t]he advantage of having a polling location in our office is that we were able to resolve any of those [voting related] issues in our office.").

voting histories. Defendants argue because Plaintiff Phillips acted as an election official, she therefore must be comfortable voting in English. This assumption, however, is both inappropriate and ungrounded: a person can help with elections and still be uncomfortable voting in a second language, especially given the complex wording of many ballot measures. Furthermore, it is unclear why Defendants think it is relevant and exculpatory that Plaintiff Phillips and other Plaintiffs voted by mail in the 2014 elections and 2015 municipal elections, given those elections were conducted entirely by mail (with the exception of the voting site at the County Clerk's office in Monticello).

Defendants also argue because voter participation "increased" and "more than doubled" between the 2012 election (which had in-person voting in most precincts) and the 2014 election (which was conducted entirely by mail), there is no injury to Navajo voters.  Defendants' assertion is contradicted by the record. Not surprisingly, Defendants do not cite any specific data to substantiate their claim, because there is none. Defendants do not provide expert analysis of turnout data in San Juan County to support the causal relationship they assert. In fact, even a cursory analysis of turnout data demonstrates Defendant's contention is patently false. According to election results published by San Juan County, between 2010 and 2014 (both non-presidential year elections), turnout did not "double" and in fact decreased among many predominantly Navajo precincts. Mejia Decl. Ex. 4. By contrast, turnout increased during this same time period among many predominantly white precincts that did not previously have vote-by-mail. *Id.*

            4.      DOJ "Tacit Approval" of County Election Procedures

Defendants contend because the DOJ has been monitoring (to some degree) the County's election procedures, including the recent vote-by-mail implemented during the June 2016 primary election, and because the DOJ has notified the County of no violation of law, the DOJ has "tacitly" approved the vote-by-mail procedure and, therefore, it must be lawful. *See* Opp. Br.

at 40-44. Defendants' argument is illogical. Simply because the DOJ has not formally intervened in the run-up to the November 2016 election does not mean the proposed voting procedures are lawful. Defendants have not cited any statute or decisional law that would preclude a finding of unlawfulness concerning an election merely because an investigative body failed to intervene (or impliedly created an understanding as to legality) before any actual votes were taken. What is more, even if the DOJ's actions could be interpreted as conferring "tacit" agreement that the proposed vote-by-mail procedures are completely legal, this Court is not bound by the agency's conclusions. *Cf. Oberstar v. F.D.I.C.*, 987 F.2d 494, 500-03 (8th Cir. 1993) (rejecting and reversing FDIC's determination that individual violated federal banking laws); *State of Or. By & Through Div. of State Lands v. Bureau of Land Mgmt.*, 876 F.2d 1419, 1425-32 (9th Cir. 1989) (rejecting conclusions of the Interior Board of Land Appeals regarding apportionment of federal land under U.S. law).

## III.  ARGUMENT

Plaintiffs have established mail-only voting violates their constitutional right to vote and the statutory protections protecting that right. They have sought a preliminary injunction seeking full protection of their voting rights in the time it takes the Court to make a final ruling on the issue. To obtain a preliminary injunction, a movant must establish the following: (1) the movant will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits. *Heideman*, 348 F.3d at 1188.

Initially, contrary to Defendants' arguments otherwise, Plaintiffs are authorized by statute to seek preliminary relief for Voting Rights Act violations. *See* 52 U.S.C. § 10308(d). Using the same standard employed by the Tenth Circuit, courts have granted preliminary relief for Voting

Rights Act violations very similar to the relief Plaintiffs seek here. *See*, *e.g.*, *Harris v. Graddick*, 593 F. Supp. 128, 132-136 (M.D. Ala. 1984) (granting preliminary injunction in Section 2 case); *U.S. v. Metropolitan Dade Cnty, Fla.*, 815 F. Supp. 1475, 1478 (S.D. Fla. 1993) (granting preliminary injunction in Section 203 case); *Nick v. City of Bethel*, No. 3:07-CV-0098, ECF No. 327, Order (same).

In their section regarding the standard Plaintiffs must meet for injunctive relief, Defendants make two main arguments. First, they contend "the injunction Plaintiffs are seeking with their *Motion* is one that falls within all three of the types of injunctions that are disfavored by the Tenth Circuit" and is therefore "subject" to a "stricter standard." Opp. Br. at 13. Even if Plaintiffs were seeking any of the types of injunctions disfavored by the Tenth Circuit, Plaintiffs satisfy this "stricter standard," as shown below.

Second, Defendants argue "Plaintiffs are seeking injunctive relief beyond the four corners of their *Complaint*" and the Court therefore does not have jurisdiction to issue a preliminary injunction. In making this argument, however, Defendants mischaracterize the relief sought and describe it as simply "ask[ing] the Court to do away with mail-in ballots." Opp. Br. at 12-13. At no point have Plaintiffs ever sought to do away with a mail-in balloting option in San Juan County, and Defendants' assertion otherwise is based on a self-servingly flawed misreading of the Complaint the Court should reject. In reality, the relief sought in the Complaint includes, among other things, the "reopen[ing] [of] polling sites equally accessible to Navajo voters as to white voters and (2) fully comply[ing] with their obligations under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503." Complaint at 21. The relief Plaintiffs seek in their motion for preliminary injunction specifies the steps necessary to make "polling sites equally accessible" and for bringing the County into full compliance with the Voting Rights Act.

The Supreme Court has recognized such relief is appropriate. *De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."). None of the cases relied upon by Defendants support their opposition to Plaintiffs' motion for a preliminary injunction. As discussed below, all four requirements for the issuance of a preliminary injunction are met both for Plaintiffs' Section 203 (language assistance) claim and Section 2 (equal opportunity) claim.[6]

### A.    Substantial Likelihood of Success on the Merits

As explained further below, Plaintiffs have shown mail-only voting in San Juan County violates the Constitution and the Voting Rights Act. Defendants' arguments otherwise are all unavailing, as are their misleading attempts to try to focus the Court's attention to their recent and promised procedures, which are not at issue in the Complaint. Accordingly, Plaintiffs meet whatever standard for likelihood of success on the merits the Court decides applies for their motion, whether it is heightened (as argued by Defendants), substantial (in a normal case), or relaxed, the standard Plaintiffs believe should apply. *See Heideman*, 348 F.3d at 1189 (holding "when the three 'harm' factors tip decidedly in a movant's favor, the 'probability of success requirement' is somewhat relaxed"); *see also Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781-82 (10th Cir.1964) (same).

---

[6] Defendants also contend that "Plaintiffs never attempted to verify . . . before bringing this lawsuit" that the County modified the procedures used in the 2014 election for the 2016 election cycle. Opp Br. at 10. To the contrary, as Plaintiffs provide in their Complaint ¶ 16, on September 14, 2015, the Lawyers' Committee for Civil Rights Under Law and the ACLU (counsel for Plaintiffs) sent a letter to the County Clerk's office in support of the Navajo Nation's request to repeal the mail-only system and reinstate polling places. *See* Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion to Expedite Discovery (Pls.' Reply to Defs.' Opp. to Pls' Mot. to Expedite Discovery) Ex. B at 2-4. The County Clerk responded on October 1, 2015, stating that he would not be reopening polling places and that he needed to give the issue more "time and consideration." *See* Complaint ¶ 63. Thus, Plaintiffs did in fact attempt to verify before bringing this lawsuit whether the County intended to modify the procedures used in the 2014 election for the 2016 election cycle, and were informed that no decision had been reached.

1.      Plaintiffs are Likely to Succeed on the Merits on Their Section 203
        (Language Assistance) Claim

Defendants claim "Section 203 does not create a private right of action.  Rather, it is

enforceable only by the Attorney General pursuant to Section 204, codified at 52 U.S.C. §

105054." Opp. Brief at 46.[7] In support, Defendants cite *Dekom v. New York*, 2013 WL 3095010

*8 (E.D.N.Y. June 18, 2013), *aff'd,* 583 F. App'x 15 (2d Cir. 2014), for the proposition that

"[t]he only Court to have apparently considered this issue concluded, based upon the clear

language of Section 204, that the bilingual election requirements of Section 203 are enforceable

**only** by the Attorney General." Opp. Br. at 46-47 (emphasis in original).

Defendants misrepresent *Dekom*. That case held only "the three-judge panel requirement

under § 1973aa-2 [Section 204] was inapplicable," but it did not question whether Section 203

created a private right of action. *Dekom*, 583 F. App'x at 17. Other courts have also exercised

jurisdiction over claims brought by private plaintiffs to enforce Section 203, without any

question being raised as to whether there was a private right of action under Section 203.  *See*,

*e.g.*, *Padilla v. Lever*, 463 F.3d 1046, 1048 (9th Cir. 2006); *Chinese for Affirmative Action v.

Leguennec*, 580 F.2d 1006, 1008 (9th Cir. 1978);  *Nick*, No. 3:07-CV-0098, ECF No. 327, Order.

Moreover, Defendants do not cite a single case in which a court has held there was no private

right of action to enforce Section 203, because there are none.

The Voting Rights Act, read as a whole in the context of its legislative history, can be

read only as creating a private right of action under Section 203. In the 1975 amendments to the

Voting Rights Act, Congress amended Section 3 of the Act to make it explicit that "an aggrieved

person," like the Attorney General, could institute "a proceeding *under any statute* to enforce the

voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a) (emphasis

---

[7] Section 203 imposes "bilingual election requirements" upon covered jurisdictions, such as San Juan County.

28

added). In the Judiciary Committee Report accompanying that amendment, the Senate

specifically noted it was intended "to afford to private parties *the same remedies* which Section 3

now affords only to the Attorney General." S. Rep. No. 94-295 at 39-40 (1975), as reprinted in

1975 U.S.C.C.A.N. 806 (emphasis added). The "dual enforcement mechanism" depended

heavily on "private attorneys general" to supplement the Attorney General's efforts to secure

compliance with the Act.[8] *Id.*; *see also Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989)

(finding the 1975 addition of "aggrieved persons" to Section 3 of the Voting Right Act was

intended to broadly confer standing to voters seeking to enforce the Act's provisions); *Conway*

*School Dist. v. Wilhoit*, 854 F. Supp. 1430, 1432-33 (E.D. Ark. 1994) (same). It is apparent

Congress intended to create a broad private right of action to enforce Section 203, even if the

right to a three judge court was limited to actions brought by the Attorney General.

Defendants also contend "there is not a substantial likelihood that Plaintiffs' [Section

203] claim will succeed." Opp. Br. at 47. To the contrary, the evidence shows Plaintiffs are

likely to succeed on their Section 203 claim. As detailed in Plaintiffs' motion for preliminary

injunction, San Juan County failed to provide the public with election information in Navajo and

failed to provide effective Navajo language translation. Pls.' MPI at 10-11. Furthermore,

Defendants do not dispute the fact that, while San Juan provided the voter registration form and

public notices regarding the mail-only process in English, these same materials were not

provided in Navajo, contrary to the County's obligations under the language assistance provision

(Section 203) of the Voting Rights Act. *See* Gorman Decl. ¶ 14, Ex. 8 (screenshot of San Juan's

election website, http://www.sanjuancounty.org/elections_voting.htm, showing voting forms in

---

[8] Congress also strengthened the private attorneys general provisions in the 1975 and 2006 amendments by adding and amending Section 14(e) of the Voting Rights Act, which authorizes private litigants who prevail in cases to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments to recover "a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses." *See* Pub. L. No. 94-73, § 402, 89 Stat. 400, at 403; Pub. L. No. 109-246, § 6, 120 Stat. 577, at 581 (2006) (codified as amended at 52 U.S.C. § 10310*l*(e)).

English, but not Navajo). Finally, while the County provided general information about the races on the primary ballot, the County failed to provide a comprehensive translation of that ballot. Gorman Decl. ¶ 14.

>    2.    Plaintiffs are Likely to Succeed on the Merits on Their Section 2 (Equal Opportunities) Claim

In responding to Plaintiffs' Section 2 claims, Defendants argue Plaintiffs "have alleged no facts" that the "County's voting process as a whole afforded them less opportunity to participate in the political process," because "[e]ach of the Plaintiffs voted in the 2014 election," and because "more Navajo voters participated in the 2014 election." Opp. Br. at 51. As detailed in Section II, Defendants ignore key facts showing Defendants' practices create unequal voting opportunities (*e.g.*, Defendants fail to address differences in mail delivery in the County or the fact the average white voter, but not the average Navajo voter, has access to in-person voting and assistance at the County Clerk's office for the 14 days of statutory mandated early voting). In focusing on the fact "each of the Plaintiffs voted in the 2014 election," Defendants also fail to appreciate that establishing a violation of Section 2 does not require a showing that individual voters are barred from registering to vote or voting. *See supra* n. 3.

Similarly, Defendants' focus on turnout in the 2014 election is irrelevant and misleading:[9] regardless of general trends in turnout during a single election two years ago, Plaintiffs and other Navajo voters were denied – and continue to be denied – the same voting opportunities as white voters. The Supreme Court has recently instructed that, "courts should not place much evidentiary weight on any one election." *N.C. State Conf. of the NAACP v. McCrory, et al.*, 2016 WL 4053033, at \*16 (4th Cir. July 29, 2016) (citing *Gingles*, 478 U.S. at 74-77 (noting the results of multiple elections are more probative than the result of a single election,

---

[9] *See* Section II.(b)(iii).

particularly one held during pending litigation)). Evidence of decreased turnout "is not required

to prove a Section 2 claim of vote denial or abridgement":

> [a]n election law may keep some voters from going to the polls, but
> in the same election, turnout by different voters might increase for
> some other reason. . . More fundamentally, no authority supports
> requiring a showing of lower turnout, since abridgement of the right
> to vote is prohibited along with denial.

*Veasey v. Abbott*, 2016 WL 3923868, at 24 (5th Cir. July 20, 2016) (citing U.S. Const. amend.

XV; 52 U.S.C. § 10301(a)). Accordingly, Defendants' argument that a direct negative impact on

turnout is required is unsound.

### B.   Irreparable Harm

The right to vote is one of the most fundamental rights in our system of government.

*Reynolds v. Sims*, 377 U.S. 533, 554 (1964); *Harman v. Forssenius*, 380 U.S. 528, 537 (1965);

*Elrod v. Burns*, 427 U.S. 347, 373 (1976). The right to vote is entitled to special constitutional

protection because:

> The right to vote freely for the candidate of one's choice is of the essence of a
> democratic society, and any restrictions on that right strike at the heart of
> representative government. . . . [T]he right to exercise the franchise in a free and
> unimpaired manner is preservative of other basic civil rights.

*Reynolds*, 377 U.S. at 555, 562; *accord*, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("[o]ther

rights, even the most basic, are illusory if the right to vote is undermined"). Because of the

preferred place it occupies in our constitutional scheme, "any illegal impediment to the right to

vote, as guaranteed by the U.S. Constitution or statute, would by its nature be an irreparable

injury." *Harris*, 593 F. Supp. at 135; *accord*, *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347,

1363 (M.D. Ala. 1986) ("denial of the right to vote" constitutes irreparable injury); *Cook v.

Luckett*, 575 F. Supp. 479, 484 (S.D. Miss. 1983) ("perpetuating voter dilution" constitutes

"irreparable injury"); *see also Elrod*, 427 U.S. at 373 (the loss of constitutionally protected

freedoms "for even minimal periods of time, constitutes irreparable injury"). The Supreme Court

has consistently held "'all qualified voters have a constitutionally protected right to vote, and to

have their votes counted.'" *Fish v. Kobach*, 2016 WL 2866195, at *26 (D. Kan. May 17, 2016)

(quoting *Reynolds*, 377 U.S. at 554). "When an alleged constitutional right is involved, most

courts hold that no further showing of irreparable injury is necessary." *Id.* (quoting *Kikumura v.*

*Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)).

   Defendants argue because "Plaintiffs have not been denied the right to participate in the

voting process" and because the "County has provided four polling places," therefore "Plaintiffs

have not been and will not be harmed." Opp. Br. at 53. Defendants mischaracterize the injury at

issue. Plaintiffs' injury is not related to whether the individual Plaintiffs were or were not able to

cast a ballot; rather, Plaintiffs' injury concerns the fact they were denied equal opportunities to

cast that ballot (e.g., they did not have the opportunity to vote in person, with the possibility of

assistance, during the 14 days of early voting). Furthermore, Plaintiffs have been and continue to

be denied the language assistance they are entitled to under Section 203 of the Voting Rights

Act, which requires San Juan to "provide[ ] registration or voting notices forms, instructions,

assistance, or other materials or information relating to the electoral process, including ballots"

in Navajo, if it provides those forms in English. In other words, under Section 203, any and

every voting material provided in English must also be provided in Navajo. While the County

provided some information in Navajo concerning the races on the primary ballot on the County's

website, they failed to provide a full translation of the ballot on the website or at polling places,

as promised. Gorman Decl. ¶ 14; Defs.' Answer ¶ 21. Finally, the County failed to translate voter

registration forms, candidate filing information, election information guides, or other materials

provided in English in violation of their obligations under Section 203 – a fact Defendants do not dispute.

Plaintiffs acknowledge, after the lawsuit was filed, Defendants first announced they had taken initial steps to bring the County into compliance with the Voting Rights Act and Fourteenth Amendment by, for example, opening the three additional polling sites for the June primary. In a similar case language assistance voting rights case, the District of Alaska granted a preliminary injunction (including many of the same types of relief), despite the fact the Defendants in that case had taken steps to improve their language assistance efforts:

> After considering this evidence and the parties' arguments at the July 8, 2008 hearing, the Court also rejects the State Defendants' contention that injunctive relief should be denied because the State is in the midst of revamping its MLAP [minority language assistance program]. The evidence shows that State officials became aware of potential problems with their language-assistance program in the spring of 2006, after the Native American Rights Fund issued a report describing the State's alleged failure to comply with the VRA's minority language provisions. Yet the State's efforts to overhaul the language assistance program did not begin in earnest until after this litigation began…Therefore, while the State contends that an injunction is unnecessary, the court disagrees in light of the fact that: 1) the State has been covered by Sections 203 and 4(f)4 for many years now; 2) the State lacks adequate records to document past efforts to provide language assistance to Alaska Native voters; and 3) the revisions to the State's MLAP, which are designed to bring it into compliance, are relatively new and untested. For all these reasons, the Court concludes that injunctive relief is both appropriate and necessary. The Court acknowledges that the State has undertaken significant efforts to improve its language assistance program. But by the State's own admission, the overhaul remains a work in progress… Until these measures and others are fully in place, the evidence of past shortcomings justifies the issuance of injunctive relief to ensure that Yup'ik speaking voters have the means to fully participate in the upcoming State-run elections.

*Nick*, No. 3:07-CV-0098, ECF No. 327, Order at 8-9. Similarly, San Juan County's efforts remain a "work in progress." *Id.* The County's efforts to notify residents of election changes fell short, *see supra* Section II(b)(ii) (discussing Defendants' admission that, despite being promised, radio announcements regarding the 2016 primary were never made); the

translation of the June primary ballot on the website was incomplete, *see* Gorman Decl. ¶ 14; they failed to provide audio translations of the ballot at polling places, as promised, *see supra* response to Fact 7; the County's translators were not trained, *id.*; and, the County failed to offer fourteen days of in-person early voting anywhere but in the predominantly white town of Monticello. Like the defendants in the Alaska case, Defendants' actions here are "new and untested." *Nick*, No. 3:07-CV-0098, ECF No. 327, Order at 8-9. "Evidence of [the County's past shortcomings justif[y] the issuance of injunctive relief to ensure that [Navajo] [ ] voters have the means to fully participate in the upcoming [ ] elections." *Id.*

Moreover, other than including an unverified statement in the declaration of the County Clerk, the County has yet to provide any proof the decision to reopen polling places was made *before* the Complaint was filed.[10] The Tenth Circuit has held, in such cases, "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Unified Sch. Dist. No. 259, Sedgwick Cty., Kan. v. Disability Rights Ctr. of Kansas*, 491 F.3d 1143, 1149 (10th Cir. 2007) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)). Without a preliminary injunction, the County would be free to reverse even those initial steps it has taken to meet its obligations under the Voting Rights Act, causing plaintiffs irreparable harm.

A denial of Plaintiffs' Motion for Preliminary Injunction will impact Plaintiffs and other Navajo residents in an immediate and direct manner. "There is no process for ordering 're-votes'… "Once an election is over, it is over and it is little consolation to say that the problem will be remedied in the next election." *Spirit Lake Tribe v. Benson Cnty., N.D.*, 2010 WL

---

[10] All the available evidence – including county minutes and news articles – indicate that the decision was made after the Complaint was filed. *See* Pls.' Reply to Defs.' Opp. to Pls.' Mot. to Expedite Discovery Ex. A, ECF 69-1 (news article indicating that no decision had been made as of the February 16, 2016 county commission meeting, contrary to Defendant Nielson's assertion in his declaration (¶ 20)).

4226614, at *5 (D.N.D. Oct. 21, 2010). The Navajo Human Rights Commission staff will continue to have to travel to San Juan and expend resources to provide notice of the County's changes and clear up confusion. Second Gorman Decl. ¶ 8. Navajo residents like Plaintiff Whitehat, who may be traveling on Election Day, will be denied the opportunity to vote early in person if the County fails to create satellite early vote offices on the Navajo Reservation with the same 14 days of early voting available in majority-white Monticello. Second Whitehat Decl. ¶ 5-6. (explaining he prefers to vote in person, but may be traveling on Election Day). Similarly, if the Skows, Ms. Farley, Ms. Phillips or other Navajo who do not fully understand English are not provided with complete, accurate translations in the 2016 general election, their right to vote will be harmed.  Even if they receive their ballots, despite the poor mail delivery system, and the fact many Navajo do not pick up their mail on a regular basis, they may not understand what the ballot is and might accidentally throw it away. McCool Expert Report at 189-91 (quoting Navajo residents of San Juan explaining "people out there they hardly ever go to the post office" and some Navajo didn't vote in 2014 because "they didn't know what was on the paper [ballot]."). But there are further barriers: even if these Navajo residents get their ballot, and even if Plaintiffs and other Navajo residents are able to get money for gas and access to a car[11] to travel for, on average, an hour to one of the three polling places the County claims it will have open on the Navajo Reservation[12] to get translation assistance voting (a trip white voters fluent in English do not have to make), Plaintiffs and other Navajo residents still will not receive a complete and accurate translation of the ballot, as the County has failed to train its translators, provide

---

[11] While only 11.2 percent of whites in the County live below the poverty level, 42.3% of American Indians live below the poverty line. 2009-2013 American Community Survey 5-Year Estimates, S1701. Nearly a third of American Indian households in the county live off an income of less than $10,000.  *Id*. at B19001C.  Less than one percent of white households in San Juan have no vehicle, while one in ten American Indian households are without a vehicle. 2006-2010 American Community Survey Selected Population Tables, DP04.
[12] In 2012, the County had at least nine polling places on the Reservation. Gorman Decl. ¶ 15.

translators with scripts, or provide audio translations of election materials at polling sites. Webster Decl. ¶ 3, Ex. 1; *see also supra* response to Fact 7. Plaintiffs will lose their ability to vote, with clarity and with the "effective" assistance they are entitled to under federal law, for the next President of the United States or any other office on the ballot. 28 C.F.R. § 55.2(b). It is "little consolation" that, at a later date in a different election, Defendants may be ordered to fully comply with their obligations under federal civil rights laws to provide equal opportunities to vote. *Spirit Lake Tribe*, 2010 WL 4226614, at *5.

Plaintiffs, for the reasons set out above and in their memorandum in support of their motion for preliminary injunction, will suffer irreparable injury if Defendants fail to provide effective language assistance in upcoming and future elections under Sections 203 and 2 of the Voting Rights Act and the Fourteenth Amendment.

## C.     Balance of Harm

The threatened injury to Plaintiffs outweighs any harm an injunction might cause Defendants. The only burden to Defendants were the injunction to issue amounts to the administrative steps they would have to take to conduct upcoming and future elections in compliance with Sections 203 and 2 of the Voting Rights Act and the Fourteenth Amendment. But as the Supreme Court has held: "administrative convenience" cannot justify a state practice that impinges upon a fundamental right. *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975); *accord*, *Dillard*, 640 F. Supp. at 1363 (stating "the administrative burden" on county defendants "cannot begin to compare with the further subjection of the counties' black citizens to denial of their right to full and equal participation"). Administrative costs in similar cases have been found to be "outweighed by the fundamental right at issue." *U.S. v. Berks Cty., Pa.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) (Section 2 case granting Hispanic plaintiffs a preliminary injunction); *see also Johnson v. Halifax Cnty., N.C.*, 594 F. Supp. 161, 171 (E.D.N.C. 1984); *Taylor*, 419 U.S. at 535.

Furthermore, while Defendants argue they are concerned about duplicating work allegedly "already completed" – such as providing "pre-election publicity in Navajo" – this argument holds no weight as these types of activities need to occur in every election cycle, and Plaintiffs are simply trying to ensure that occurs, as Defendants' promises regarding election procedures fell short in the primary election.[13] Similarly, while Plaintiffs applaud Defendants for producing the Navajo-English glossary of election terms, the glossary was created over 26 years ago, has not updated to reflect recent changes (e.g., to reflect terms related to online voting resources and the fact Utah voters can now register to vote online), and has not been distributed. Opp. Br. Ex. 9 at 99:18-100:20.

### D.    Public Interest

The Voting Rights Act is a Congressional directive for the immediate removal of all barriers to equal political participation by racial and language minorities. When it adopted the remedial provisions of the Act in 1965, Congress cited the "insidious and pervasive evil" of discrimination in voting and acted "to shift the advantage of time and inertia from the perpetrators of the evil to its victims." *South Carolina v. Katzenbach*, 383 U.S. 301, 309, 328 (1966). In the legislative history of the 1965 Act, as well as the 1970, 1975, 1982, and 2006 extensions, Congress repeatedly expressed its intent "that voting restraints on account of race or color should be removed as quickly as possible in order to 'open the door to the exercise of constitutional rights conferred almost a century ago.'" *NAACP v. State of N.Y.*, 413 U.S. 345, 354 (1973) (quoting H.R. Rep. No. 439, 89th Cong., 1st Sess. 11 (1965)). *See also* S. Rep. No. 417, 97th Cong., 2d Sess. 5 (1982), reprinted in 1982 USCCAN 182 ("[o]verall, Congress hoped

---

[13] As mentioned above, despite being promised, the County failed to make radio announcements regarding the 2016 primary; the translation of the June primary ballot on the website was incomplete, *see* Gorman Decl. ¶ 14; Defendants failed to provide audio translations of the ballot at polling places, as promised; the County's translators were not trained, *supra* Fact 7; and, the County failed to offer fourteen days of in-person early voting anywhere but in the predominantly white town of Monticello.

by passage of the Voting Rights Act to create a set of mechanisms for dealing with continuing voting discrimination, not step by step, but comprehensively and finally"); Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Public Law 109-246, 120 Stat. 577, Section 2(b)(3) ("[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965"). As the Court held in *Briscoe v. Bell*, 432 U.S. 404, 410 (1977), the Voting Rights Act "implements Congress' intention to eradicate the blight of voting discrimination with all possible speed."

Given the clear and unambiguous intent of Congress that the door to minority political participation be opened as quickly as possible, an injunction requiring Defendants to comply with Section 203 and Section 2 of the Voting Rights Act is in the public interest. *See Harris*, 593 F. Supp. at 135 ("…when section 2 is violated the public as a whole suffers irreparable injury"); *Johnson*, 594 F. Supp. at 171 (the "public interest" is served by enjoining discriminatory election procedures).

The public also has a broad interest in the integrity of elected government which is compromised by a system that fails to weigh the votes of all citizens equally. *See Cook*, 575 F. Supp. at 485 ("[t]he public interest must be concerned with the integrity of our representative form of government"); *Navajo Nation*, 2016 WL 697120, at *15 (finding San Juan County's failure to correct racially discriminatory redistricting lines "offends basic democratic principles"). Subjecting the Plaintiffs and other Navajo voters and residents of San Juan County to officials elected under an "inequitable" system would be adverse to the public interest. *Watson v. Comm'rs of Harrison Cnty.*, 616 F.2d 105, 107 (5th Cir. 1980).

38

The Fourth Circuit has held the presence of a federal statute that prohibits the alleged acts of a defendant and supplies the gravamen of a complaint "aligns" the moving party provisionally "on the side of the public interest and constitutes added weight in favor of precautionary relief." *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 197 (4th Cir. 1977). Plaintiffs here, through Section 203 and Section 2, are aligned with the public interest and an injunction against behavior that would violate the statutes would promote that interest.

Defendants argue vote-by-mail procedures "have afforded the voting public, especially the County's Navajo voters, more options and opportunities to vote" and "[i]n the 2014 election cycle, the County saw an increase in Navajo and other voter participation." Opp. Br. at 55. However, while Defendants' electoral system may have created additional voting opportunities for San Juan residents in the sense that all active registered voters are now supposed to receive a ballot in the mail, these opportunities are not equally available to both white and Navajo voters when considered within the totality of the circumstances. Navajo voters are more likely to be poor and illiterate than white voters, making it more difficult for them to take advantage of the mail-voting opportunities. *See* Pls.' MPI at 21 (citing 2009-2013 American Community Survey 5-Year Estimates, B19001C). Furthermore, the average white voter, but not the average Navajo voter, has access to fourteen days of in-person early voting and assistance in the County Clerk's office in Monticello. In addition, as described above, the impact of the mail-only system on voter turnout is much more complicated than Defendants make out. *See supra* Section II(b)(iii); *see also* McCool Expert Report at 188-90.

## IV.   CONCLUSION

For the reasons set forth in their Motion for Preliminary Injunction and Memorandum in Support as well as above, Plaintiffs respectfully request the Court order Defendants to (1) reopen

polling sites equally accessible to Navajo voters as to white voters; (2) create at least three

satellite offices on the Navajo Reservation to allow early in-person voting; and (3) fully comply

with their obligations under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503, to provide

full translation, interpretation, and assistance services to Navajo speaking voters, to govern the

November 2016 general election and other elections until further order of this Court.

RESPECTFULLY SUBMITTED,

/s/ John Mejia_____
John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
American Civil Liberties Union of Utah
355 North 300 West
Salt Lake City, UT 84103
T: (801) 521-9862
jmejia@acluutah.org
lfarrell@acluutah.org

M. Laughlin McDonald*
American Civil Liberties Union Foundation
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 500-1235
lmcdonald@aclu.org

Ezra D. Rosenberg*
Arusha Gordon*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., Suite 400
Washington, D.C. 20005
T: (202) 662-8600
erosenberg@lawyerscommittee.org
agordon@lawyerscommittee.org

Maya Kane*
10 Town Square, #52
Durango, Colorado  81301
T: (970) 946-5419
mayakanelaw@gmail.com

Raymond M. Williams*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
T: (215) 656-3300
raymond.williams@dlapiper.com

*Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of September, 2016, I electronically filed the

foregoing document with the U.S. District Court for the District of Utah. Notice will

automatically be electronically mailed to the following individual(s) who are registered with the

U.S. District Court CM/ECF System:

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUTTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-7300

*Attorneys for Defendants*

/s/ John Mejia
