IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW, <br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br> SAN JUAN COUNTY; JOHN DAVID NELSON; in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners, <br><br><div align="center">Defendants.</div> | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Case No. 2:16-cv-00154-JNP-BCW <br><br> District Judge Jill N. Parrish |

Before the court is a Motion for Preliminary Injunction filed by Plaintiffs Navajo Human Rights Commission, Peggy Phillips, Mark Maryboy, Wilfred Jones, Terry Whitehat, Betty Billie Farley, Willie Skow, and Mabel Skow against Defendants San Juan County, John David Nelson, Phil Lyman, Bruce Adams, and Rebecca Benally. Plaintiffs allege that San Juan County's voting procedures violate the Voting Rights Act. Plaintiffs now bring this Motion, requesting that the court require the County to implement new voting procedures before the November 2016 general election.

## BACKGROUND

San Juan County is a sparsely populated and geographically vast political subdivision of the State of Utah, occupying the state's southeastern corner. The County's southern boundaries

encompass a large section of the federally established Navajo Reservation. As a result, approximately half of the County's residents are members of the Navajo Nation, a federally recognized Indian tribe. Most of the County's Navajo residents live within the boundaries of the Reservation. Much of the rest of the County's residents are centralized in the northern half of the County. This geographic segregation has often resulted in significant political tension between Navajo and white residents, which has played out in numerous cases before this court. *See, e.g.*, *Navajo Nation v. San Juan Cty.*, 162 F. Supp. 3d 1162 (D. Utah 2016) (addressing voting rights and election districts in San Juan County).

This motion for preliminary injunction comes before the court in the context of a lawsuit initiated by the Navajo Human Rights Commission and several named plaintiffs[1] who allege that the voting procedures in place in San Juan County violate the Voting Rights Act. The voting procedures at issue here span several years of elections. Prior to 2014, the County conducted elections through nine polling places open on Election Day. Each polling place provided some form of language assistance to Navajo-speaking voters. In 2014, the County transitioned to a predominantly mail-in voting system, leaving a single physical polling location operating at the County Clerk's office in Monticello, Utah. Ballots were distributed to voters through available mailing addresses approximately one month prior to Election Day. This system was in place for the 2014 election cycle.

During 2014 and early in 2015, the Navajo Nation and the Navajo Human Rights Commission officially opposed the mail-in system, asserting that the closure of polling locations

---

[1] All of the named plaintiffs are members of the Navajo Nation, residents of San Juan County, and registered voters. They are Peggy Phillips of Oljato, Mark Maryboy of Montezuma Creek, Wilfred Jones of Red Mesa, Terry Whitehat of Navajo Mountain, Betty Billie Farley of Red Mesa, and Willie Skow and Mabel Skow, who are residents of Mexican Water.

and switch to mailed ballots burdened rural Navajo voters. The County acknowledged the

opposition, but indicated that it would continue to utilize the mail-in system for upcoming

elections. Sometime thereafter, the Commission contacted the United States Department of

Justice's Voting Rights Section (the "DOJ"), requesting an evaluation of the County's mail-in

voting system.[2] In October of 2015, a DOJ representative met with both Commission and County

officials and inspected the voting procedures then in place. Evidently, the DOJ did not come to

any definitive conclusions regarding the mail-in voting system or the Commission's concerns.

After some unfruitful back-and-forth between the County and various civil-liberties

organizations opposed to the mail-in ballot system, the Commission filed the Complaint

underlying this Motion on February 25, 2016, alleging that the mail-in ballot system violated the

Voting Rights Act and the Fourteenth Amendment to the United States Constitution. (Docket No.

2). Shortly thereafter, Defendants filed their Answer, which asserted that the County was making

significant changes to its election procedures in anticipation of the June 2016 primary elections.[3]

(Docket No. 41at 3–4). For the June 2016 elections, the County maintained the predominantly

mail-in voting system, but also opened three physical polling locations on the Navajo

Reservation and provided language assistance to voters through Navajo-speaking translators on

Election Day. On August 3, 2016, Plaintiffs filed this Motion for Preliminary Injunction,

asserting that whether the County employed the 2014 mail-in voting system or the June 2016

procedures, the elections to be held in November 2016 would violate Sections 2 and 203 of the

---

[2] As part of a 1984 consent decree, the DOJ monitored San Juan County's elections until 2002. (Docket No. 2 at 17); Def. Res. Br. at 40.

[3] There is significant disagreement between Plaintiffs and Defendants regarding the timing of the County's decision to add polling places and otherwise update the election procedures used in 2014 and 2015. Plaintiffs contend that the County did not decide to change the procedures until after this lawsuit was filed, while the County asserts that officials made the decision sometime in late 2015. Since the resolution of this factual dispute is ultimately irrelevant to this Motion, the court takes no position on the issue.

Voting Rights Act. Defendants filed a Memorandum in Opposition to the Motion on August 31, 2016. Plaintiffs filed a reply on September 19, 2016. Oral argument was held on September 21, 2016. The court has jurisdiction over this matter under 28 U.S.C. §§ 1333, 1343(a)(4), and 52 U.S.C. § 10308(f).

## STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. Fed. R. Civ. P. 65(a)(1). Before a preliminary injunction may be issued, the requesting party must demonstrate

> (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the [requesting party] if the preliminary injunction is denied; (3) the threatened injury to the [requesting party] outweighs the injury to the other party under the the preliminary injunction; and (4) the injunction is not adverse to the public interest.

*Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). Moreover, "[i]t is the movant's burden to establish that each of these factors tips in his or her favor." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Indeed, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (Murphy, J., concurring in part and dissenting in part) (internal quotations omitted) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865 (1997)); *Kikumura*, 242 F.3d at 955 (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)) ("Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." (internal quotations omitted)).

In applying Rule 65, the Tenth Circuit has recognized both (1) a "relaxed" standard and (2) a "heightened" standard. Where a movant establishes that the factors dealing with irreparable injury, the balancing of potential harms, and the potential harm to public interest "tip *decidedly* in its favor, the 'probability of success requirement' is somewhat relaxed." *Heideman*, 348 F.3d at 1189 (internal quotations omitted) (emphasis in original). But, where a movant requests an injunction that falls into any one of three "disfavored" categories, the request must satisfy a "heightened" burden. *O Centro Espirita*, 389 F.3d at 975 (per curiam). This heightened burden applies to any of the following categories:

> (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) a preliminary injunction that affords the movant all the relief that it could recover at the conclusion of a full trial on the merits.

*Id.* These "disfavored" forms of preliminary injunction are deserving of heightened scrutiny because they cut against the traditional purpose of interim relief, which "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830 (1981); *O Centro Espirita*, 389 F.3d at 975–76 (per curiam) ("[B]ecause a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction . . . must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard.").  Moreover, injunctions that alter the status quo are "far more likely to impose untoward costs on the non-moving party." *Id.* at 980 n.2 (Murphy, J., concurring in part and dissenting in part). Thus, when evaluating pleas for injunctive relief, a district court "must recognize that any preliminary injunction fitting within one of the disfavored categories must be

more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* at 975 (per curiam). Additionally, where a movant requests injunctive relief that falls into any of the disfavored categories, the "relaxed" standard outlined above is wholly inapplicable. *Id.* at 976.

Plaintiffs and Defendants differ as to the standard to be applied to this request for preliminary injunction. Plaintiffs assert that the relaxed standard outlined above should be applied, while Defendants argue that the Plaintiffs' request for relief falls under all three "disfavored" categories and should therefore be subject to heightened scrutiny. The court agrees with Defendants.

The injunctive relief sought by Plaintiffs clearly falls under each of the categories of disfavored injunctions recognized by the Tenth Circuit. For example, Plaintiffs' request that the court require the Defendants to (1) open polling places that have been closed since at least 2014, (2) open three new satellite administrative offices on the Navajo Reservation to conduct early in-person voting, (3) provide equipment to play audio-recorded Navajo translations of election materials at polling places, (4) report to this court on procedures used and progress made, and, finally, (5) provide Plaintiffs with election data for review for an unspecified period. Pl. Op. Br. at 1-2. Many of these requests alter the status quo by requiring Defendants to utilize procedures that have not previously been put into practice. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260–61 (10th Cir. 2005) (explaining that an injunction alters the status quo if it requires a change from the "last peaceable uncontested status existing between the parties before the dispute developed"). The requested relief would also require Defendants to act, rather than simply prohibiting their conduct, and require the court to monitor their subsequent conduct. *See id.* at 1261 ("We characterize an injunction as mandatory if the requested relief affirmatively

requires the nonmovant to act in a particular way, and as a result places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." (internal quotations and alterations omitted)). Lastly, the relief requested by Plaintiffs constitutes essentially "all the relief that [they] could recover at the conclusion of a full trial on the merits[,]" *see O Centro Espirita*, 389 F.3d at 975, because it would force Defendants to undertake all of the measures that Plaintiffs have requested in this suit. Plaintiffs make no effort to counter these conclusions, but instead argue that they have made a sufficient showing on the merits regardless of the standard applied. Thus, this court will evaluate Plaintiffs' request for a preliminary injunction under a heightened standard, and even "more closely scrutinize[] [their claims] to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.*

Additionally, the court is mindful that this plea for injunctive relief is directed at an impending election process. The Supreme Court has indicated that "[i]n awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *See Reynolds v. Sims*, 377 U.S. 533, 585, 84 S.Ct. 1362 (1964). Moreover, "a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." *Id.*; *see also U.S. v. Metro. Dade Cty., Fla.*, 815 F. Supp. 1475, 1478–79 (S.D. Fla. 1993) (applying these principles in a Section 203 claim for injunctive relief dealing with an impending election). Accordingly, the court's discussion of Plaintiffs' plea for injunctive relief will necessarily be informed by equitable consideration of the extremely close proximity of the November general elections.

## **DISCUSSION**

With the heightened standard in mind, the court now turns to the merits of Plaintiffs'
claim for injunctive relief. Plaintiffs assert that the implementation of either (1) the mail-in
voting procedures first used by the County in 2014 (the "2014 procedures") or (2) the in-person
voting procedures used by the County in June 2016 (the "June 2016 procedures") will violate
their rights under the Voting Rights Act. When separated into its component parts, Plaintiffs'
claim alleges four separate violations of the Voting Rights Act, and they assert that each justifies
injunctive relief. First, they argue that the 2014 mail-in voting system may be implemented again
for the November 2016 elections, and that such a system would violate Section 2 of the Voting
Rights Act. Second, Plaintiffs argue that even if their Section 2 concerns are resolved, the mail-in
voting system will nonetheless violate Section 203 of the Voting Rights Act if re-implemented.
Third, Plaintiffs argue that even if the 2014 mail-in voting system is not implemented and the
County chooses to again implement the procedures used in the June 2016 primaries, those
procedures will violate Section 2. Finally, Plaintiff argues that even if their Section 2 concerns
are resolved under the June 2016 procedures, the procedures will still violate Section 203.
Plaintiffs make an extensive request for injunctive relief to address these claimed violations. The
court will now evaluate their plea for injunctive relief by addressing the implementation of the
2014 procedures and the June 2016 procedures in turn.

## I.     THE 2014 PROCEDURES

First, the court will address together the violations of Sections 2 and 203 that Plaintiffs
allege will occur if the 2014 mail-in voting system (the "2014 procedures") is reinstituted.
Plaintiffs allege that the County's shift to a mail-in voting system with only one in-person polling

place violated the rights of Navajo voters by impermissibly diminishing their access to in-person

voting at now-closed satellite polling places and by failing to provide required translation of

mail-in ballots for Navajo-speaking voters. Defendants counter that the 2014 procedures

substantially increased voter turnout in far-flung rural districts, including among the Navajo

population. While both sides present compelling arguments for and against, the merits of such a

system are, in the end, immaterial to this Motion for injunctive relief.

The Tenth Circuit has observed that the injuries prevented by a preliminary injunction

"must be certain, great, *actual and not theoretical*." *Heideman v. South Salt Lake City*, 348 F.3d

1182, 1189 (10th Cir. 2003) (internal quotations omitted) (emphasis added) (quoting *Wis. Gas

Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). More specifically,

> [i]njunctive relief will not be granted against something merely feared as liable to
> occur at some indefinite time . . . ; the party seeking injunctive relief must show
> that the injury complained of is of such *imminence* that there is a clear and present
> need for equitable relief to prevent irreparable harm.

*Wis. Gas Co.*, 758 F.2d at 674 (internal quotations, citations, and brackets omitted) (emphasis in

original). Thus, in order to justify injunctive relief, the requesting party must demonstrate not

only that the harm alleged will be irreparable, but that it will occur "*unless* the injunction issues."

*See Heideman*, 348 F.3d at 1188 (emphasis added) (quoting *Resolution Trust Corp. v. Cruce*, 972

F.2d 1195, 1198 (10th Cir. 1992); *Pinson v. Pacheco*, 397 Fed. App'x 488, 491–92 (10th Cir.

2010) (unpublished) (discussing the imminence requirement underlying the irreparable harm

analysis).

Here, even assuming that the implementation of 2014 procedures would harm Plaintiffs'

rights, Plaintiffs have failed to establish that such harm is imminent or even likely to occur. The

2014 procedures were not used in the June 2016 primary elections because the County had

drawn up and implemented new procedures, as discussed above. Thus, Plaintiffs' claims for

injunctive relief relating to the 2014 procedures hinge on the possibility that the County will

reverse course and reinstitute the 2014 procedures again in November 2016 or in some election

beyond that date. *See* Pl. Op. Br. at 6. In evaluating this argument, the court is mindful that

> [b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. The movant must provide proof that the harm has occurred in the past *and is likely to occur again*, or proof indicating that the harm is certain to occur in the near future.

*Wis. Gas Co.*, 758 F.2d at 674 (emphasis both added and in original). Here, even

assuming the Plaintiffs were harmed in 2014, they have failed to demonstrate that the

County is likely to harm them in this election cycle or in future cycles by reinstituting the

2014 procedures. The County has submitted the declaration of the County Clerk

containing his assurance that the June 2016 procedures, and not the 2014 procedures, will

be used in November 2016. (*See* Docket No. 109, Ex. 1 at 4–5). While the Clerk does not

address election cycles beyond November 2016, Plaintiffs have provided no evidence

indicating that the 2014 procedures will ever be implemented again. While such an

occurrence is perhaps within the realm of possibility, this court may not issue an

injunction "against something merely feared as liable to occur at some indefinite time."

*See Wis. Gas Co.*, 758 F.2d at 674; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 129

S.Ct. 365 (2008) ("Issuing a preliminary injunction based only on a possibility of

irreparable harm is inconsistent with our characterization of injunctive relief as an

extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief."); *Heideman*, 348 F.3d at 1189 ("To constitute irreparable harm, an

injury must be . . . actual and not theoretical." (internal quotations omitted)). Thus,

Plaintiffs have failed to carry their initial burden of demonstrating the imminence of irreparable injury resulting from future use of the 2014 procedures. The court therefore rejects Plaintiffs' plea for injunctive relief on that basis.

## II.      THE JUNE 2016 PROCEDURES

Plaintiffs next allege that the procedures used by the County in the June 2016 primary were inadequate under Sections 2 and 203 of the Voting Rights Act, and implementation of the same procedures in November 2016 will again violate their voting rights. Unlike Plaintiffs' claims for injunctive relief based on the 2014 procedures, the claims regarding the June 2016 procedures meet the "imminence" requirement discussed above because the County has unequivocally stated that it will employ the June 2016 procedures again in November 2016. (*See* Docket No. 109, Ex. 1 at 4–5). As a result, there is potential for "certain, great, actual and not theoretical" harm if the June 2016 procedures did in fact violate Plaintiffs' voting rights. *See Heideman*, 348 F.3d at 1189 (internal quotations omitted). If, however, the June 2016 procedures did not violate Plaintiffs' voting rights, they have failed to establish that irreparable harm will result from the re-implementation of the procedures in November 2016. Thus, in order to demonstrate that they are entitled to injunctive relief, Plaintiffs must demonstrate that the June 2016 procedures violated the Voting Rights Act. Plaintiffs assert that the June 2016 procedures violated their rights under both Section 2 and Section 203 of the Voting Rights Act. The court will now address these alleged violations in turn.

### A.  EQUAL OPPORTUNITY UNDER SECTION 2

First, Plaintiffs claim that the June 2016 procedures violated Section 2 of the Voting Rights Act. Section 2 prohibits affected jurisdictions from imposing or applying a "voting

qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial

or abridgement of the right of any citizen of the United States to vote on account of race or

color." 52 U.S.C. § 10301(a). A plaintiff claiming a violation of Section 2 need not demonstrate

that the affected jurisdiction acted with discriminatory intent. *See Sanchez v. State of Colo.*, 97

F.3d 1303, 1309 (10th Cir. 1996); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir.

2002) ("Section 2, unlike other federal legislation that prohibits racial discrimination, does not

require proof of discriminatory intent.")  Instead, a violation of Section 2 is established on a

showing of discriminatory effect alone:

> A violation of . . . [Section 2] is established if, based on the totality of the
> circumstances, it is shown that the political processes leading to nomination or
> election in the State or political subdivision are not equally open to participation
> by members of a [protected] class . . . in that its members have less opportunity
> than other members of the electorate to participate in the political process and to
> elect representatives of their choice.

*See* 52 U.S.C. § 10301(b); *Sanchez*, 97 F.3d at 1309. Section 2 has been interpreted to proscribe

both "vote dilution" and "vote denial." *Ohio Democratic Party v. Husted*, —F.3d—, 2016 WL

4437605 at *12 (6th Cir. 2016). "Vote-dilution" claims typically arise in the context of election

district gerrymandering, *see, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752 (1986);

*Baca v. Berry*, 806 F.3d 1262 (10th Cir. 2015), which may deny minority populations the right to

"elect representatives of their choice," *see* 52 U.S.C. § 10301(b). By contrast, a "vote-denial"

claim alleges that a "voting qualification or prerequisite to voting or standard, practice, or

procedures . . . deni[es] or abridge[s] the right" of minorities "to participate in the political

process." *See id.* § 10301(a)–(b).

Three decades ago, in *Gingles*, the Supreme Court established a detailed test for

evaluation of vote-dilution claims under Section 2, which can involve analysis of the so-called

"Senate Factors" in order to determine whether electoral "devices result in unequal access to the electoral process." *See* 478 U.S. at 43–46. Thus, much of "vote-dilution jurisprudence is well-developed," but "numerous courts and commentators have noted that applying Section 2's 'results test' [based in *Gingles*] to vote-denial claims is challenging, and a clear standard for its application has not been conclusively established." *Ohio Democratic Party*, 2016 WL 4437605 at *12. Still, several circuits have employed a two-part test to establish whether a voting procedure constitutes a denial or abridgement of voting rights under Section 2. *See Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014) (unpublished); *Veasey v. Abbott*, 830 F.3d 216, 244–45 (5th Cir. 2016); *League of Women Voters v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014). The Fourth, Fifth, and Sixth Circuits articulate the test as follows:

> First, 'the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' Second, that burden 'must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.'

*League of Women Voters*, 769 F.3d at 240 (internal citations and quotations omitted) (quoting *Ohio State Conference*, 768 F.3d at 553); *see also Veasey*, 830 F.3d at 244–45.

"The first step essentially reiterates Section 2's textual requirement that a voting standard or practice, to be actionable, must result in an adverse disparate impact on protected class members' opportunity to participate in the political process." *Ohio Democratic Party*, 2016 WL 4437605 at *13. Once a disparate impact is established, the second step asks whether the voting standard or practice, "albeit not designed or maintained for a discriminatory purpose," nonetheless effectually denies or abridges the right to vote "as it interacts with social and

historical conditions." *Id.* (emphasis omitted). "In assessing both elements, courts should

consider 'the totality of the circumstances.'" *Ohio State Conference*, 768 F.3d at 554 (quoting 52

U.S.C. § 10301(b), formerly 42 U.S.C. § 1973(b)); *see also Gingles*, 478 U.S. at 79 ("This

determination is peculiarly dependent upon the facts of each case, and requires an intensely local

appraisal of the design and impact of the contested electoral mechanisms." (internal quotations

and citation omitted)).

The Supreme Court describes the basic inquiry as follows:

As both amended [Section] 2 and its legislative history make clear, in evaluating
[whether a violation has occurred], the trial court is to consider the totality of the
circumstances and to determine, based upon a searching practical evaluation of the
past and present reality, whether the political process is equally open to minority
voters.

*Gingles*, 478 U.S. at 79 (internal citations and quotations omitted) (discussing the standard of

inquiry under Section 2 in vote-dilution cases). In sum, "[t]he essence of a [Section] 2 claim is

that a certain electoral law, practice, or structure interacts with social and historical conditions to

cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their

preferred representatives." *Id.* at 47.

Plaintiffs argue that, under the totality of the circumstances, the political process in San

Juan County is not equally open to Navajo voters. Specifically, they argue that while the four

polling places open in June 2016

equalize travel distance to vote in person for Navajo and white residents, the three
polling locations in majority-Navajo precincts will be open *only* on Election Day.
The polling place in the majority-white precinct [the county seat], on the other
hand, will be open not just on Election Day, but also for fourteen days of in-
person voting prior to Election Day.

Pl. Op. Br. at 15 (emphasis added and internal citation omitted). Plaintiffs argue that the

restriction of in-person early voting to the County Clerk's office in Monticello means that Navajo

14

voters—who live on average much further from Monticello and have statistically less access to transportation than white voters—will have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[4] *See* 52 U.S.C. § 10301(b).

After a "searching practical evaluation" of the situation in San Juan County, *see Gingles*, 478 U.S. at 79, the court acknowledges the evidence supporting Plaintiffs' argument. The Navajo people, as a whole, are subject to some of the most severe and debilitating impoverishment in the nation. (Docket No. 94, Ex. E, Expert Witness Rep. at 66–69). Indeed, during the period 2009–2010, the unemployment rate within the Navajo nation was more than five times the national average, *see id.*, and at least 10.5% of Navajo households in San Juan County—as compared with 0.8% of white households—do not have access to an automobile, (Docket No. 94-2 at 52). These "social and historical conditions" may place a cognizable disparate burden on the average Navajo voter, who must travel three times further than her white counterpart to participate in early voting. *See id.* at 51. In short, Plaintiffs may be able to establish at trial that the County's decision to locate early voting only in Monticello provides Navajo voters with materially "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *See* 52 U.S.C. § 10301(b).

---

[4] Insofar as Plaintiffs argue that the location of the four polling places on Election Day disparately burdens Navajo voters, they have failed to establish a cognizable disparate impact as Section 2 requires. *See Ohio Democratic Party*, 2016 WL 4437605 at *13–*15 (rejecting a claim that a reduction in early voting violated Section 2 where the plaintiffs failed to demonstrate a disparate impact resulting from the reduction). According to Plaintiffs' own expert report, the average  Navajo voter is *closer* than the average white voter to the four polling places open on Election Day. (Docket No. 94-2 at 51). While Plaintiffs have indicated that socioeconomic barriers affect Navajo voters, they have not demonstrated that those barriers are such that Navajos voters are disadvantaged as compared to white voters despite being closer to available polling locations. Moreover, Plaintiffs' cure for this alleged disparity is to reopen polling locations available in 2012, but submitted statistical evidence indicates that the 2012 polling procedures would place the average Navajo voter only 8.14 miles closer to a polling station.  *Id.*

Plaintiffs also appear to argue that the mail-in voting option maintained in addition to the four polling stations in June 2016 was not equally open to Navajo voters. While this could be true due to socioeconomic and geographic barriers, Plaintiffs do not offer any solution to the alleged problem. Even if the court were to grant all of the injunctive relief that Plaintiffs seek, the alleged imbalance in access to the mail-in voting option would remain.

But the court need not definitively decide whether Plaintiffs have made a substantial showing of success on the merits at this time because even assuming the existence of a Section 2 violation, Plaintiffs "must make a strong showing *both* with regard to the likelihood of success on the merits and with regard to the balance of the harms" under the heightened standard for disfavored preliminary injunctions. *O Centro Espirita*, 389 F.3d at 976 (emphasis added). Here, the court concludes that the balance of harms weighs decisively against Plaintiffs' claim for preliminary injunctive relief.

At the outset, the court notes that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362 (1964). Accordingly, where a court finds a voting procedure or practice impinges on voters' rights, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *See id.* at 585. Nevertheless, because electoral processes are complex and the whole electorate of a political subdivision may be affected by the issuance of an injunction directed at voting procedures, "our law recognizes that election cases are different from ordinary injunction cases." *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (citing *Reynolds*, 377 U.S. at 585). Thus, the court is mindful that "[i]n awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Reynolds*, 377 U.S. at 585.

With these "general equitable principles" in mind, the court believes that requiring the institution of extensive early-voting procedures would "make unreasonable or embarrassing

demands" on the County. *See id.* Though Plaintiffs rightly point to cases where mere expense or

administrative convenience was insufficient to outweigh a burden on voters' rights, *see*, *e.g.*,

*Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986), the court is not concerned

here with mere expense or administrative convenience—the court is concerned with logistical

impossibility. At this late date, the court is not convinced that it would be possible for Defendants

to implement procedures that would actually cure any inequity in early voting. The County is

required by state law to provide in-person early voting for a fourteen-day period prior to the date

of the election. *See* Utah Code § 20A-3-601(2)–(3). In order to properly equalize any disparity in

early voting between white and Navajo voters, the County would be required to find and secure

at least three locations on the Reservation that can be open to voters every weekday during the

fourteen-day early voting period, staff those locations with trained full-time poll workers and

registrars, *and* provide some form of effective language assistance and translation for Navajo

voters to cover each weekday for the fourteen-day period. Moreover, the County would have to

provide effective notice of the availability of these satellite early-voting options in enough time

for voters to become aware of and actually take advantage of the new opportunities. Any less

than this could constitute a violation of the Voting Rights Act and would subject the County to

contempt proceedings in the days prior to the election, potentially disrupting administration of

the election. At the time of this opinion, the general election is less than four weeks away and

early voting must begin in less than two weeks.[5] The court considers this timeframe to be a

---

[5] Plaintiffs cite the court to the recent decision in *Sanchez v. Cegavske*, Case No. 3:16-cv-523-MMD-WGC (D. Nev. October 7, 2016) (slip opinion), where the District Court of Nevada held that two counties had violated Section 2 by placing their early-voting locations at significant distances from Native American voters and ordered the counties to open new early-voting locations on the reservation. While the opinion is helpful in elucidating certain of Plaintiffs' claims, it is not binding on this court and is readily distinguishable. Most importantly, the injunction issued in that case only required each county to open a single early-voting location within the Reservation and there was no indication that the counties would be required to provide additional language assistance to early voters. Here, San Juan County would be required to locate and provide three separate polling sites for approximately two weeks with full-time language assistance. The court therefore finds the balance of harms in that case distinguishable.

practically insurmountable obstacle to the institution of any new early-voting procedures in San Juan County. The issuance of an injunction at this stage would only set the County up to fail. Even if the court had been able to issue a decision in this matter directly following oral arguments, the County would not have been able to properly correct these issues in time for the start of early voting.

Moreover, the opening of new early-voting locations is by far the most extensive form of injunctive relief that Plaintiffs have requested, and it is clear that Plaintiffs have been aware of potential disparities in early-voting opportunities since at least June of this year, *see* Pl. Reply Br. at 2 (indicating that "Monticello was the only place for in-person early voting" in June 2016), and perhaps as early as the filing of their Complaint in February of this year, *see* Complaint ¶ 7 (alleging disparate opportunities for Election Day voting and submission of in-person absentee ballots to the County Clerk's office prior to Election Day). Despite this knowledge of their claim, Plaintiffs did not file their motion for preliminary injunctive relief until August. And, unlike the other forms of injunctive relief requested here, Plaintiffs did not need discovery to flesh out their arguments regarding early-voting disparity because the restriction of early voting to Monticello appears to have been a practice in the County since at least 2012. (*See* Docket No. 94-1 at 7). The court considers Plaintiffs' delay to weigh against issuance of an injunction altering early-voting practices. *See, e.g.*, *McNeil v. Springfield Park Dist.*, 656 F. Supp. 1200, 1202–04 (C.D. Ill. 1987) (denying a motion for injunction, in part, because of delay before filing of the motion). For the foregoing reasons, the court concludes that the issuance of an injunction requiring San Juan County to quadruple their early-voting options at this late stage would be imprudent and ultimately ineffective, even when weighed against the potential burden on Plaintiffs' voting

rights. Accordingly, the court rejects any claim for injunctive relief seeking the addition of early-voting locations prior to the November election.

B.  LANGUAGE ASSISTANCE  UNDER SECTION 203

Next, Plaintiffs allege that the June 2016 procedures employed by the County violated Section 203 of the Voting Rights Act. They further allege that the repeated use of such procedures in November 2016 will cause irreparable harm to their voting rights by denying "effective language assistance to Navajo voters in San Juan County." *See* Pl. Op. Br. at 7. Defendants counter that an injunction is inappropriate because Section 203 does not create any private right of action. Thus, before proceeding to the merits of Plaintiffs' plea for injunctive relief based on a violation of Section 203, the court must address Defendants' statutory argument.

1.  PRIVATE RIGHT OF ACTION UNDER SECTION 203

Defendants argue that Plaintiffs cannot succeed on the merits because there is no private right of action under Section 203. Defendants rely on the language of the enforcement provision in Section 204, which states:

> Whenever the *Attorney General* has reason to believe that a State or political subdivision (a) has enacted or is seeking to administer any test or device as a prerequisite to voting in violation of the prohibition contained in [Section 201] of this title, or (b) undertakes to deny the right to vote in any election in violation of [Section 202] or [Section 203] of this title, he may institute for the United States, or in the name of the United States, an action in a district court of the United States . . . .

52 U.S.C. § 10504 (emphasis added). Defendants also point to the Code of Federal Regulations, which charges the *Attorney General* with measuring compliance with Section 203 and

"consider[ing] whether a jurisdiction has given sufficient attention . . . to the needs of members of language minority groups whose languages are unwritten." 28 C.F.R. §§ 55.2, 55.20.

Plaintiffs respond by pointing to cases in which courts have exercised jurisdiction over claims brought by private plaintiffs to enforce Section 203. But those cases do not explicitly consider whether there is a private right of action under Section 203, suggesting that the issue was simply not raised in those cases. Plaintiffs also argue that when the Voting Rights Act is read as a whole in the context of its legislative history, it is clear Section 203 does give rise to a private right of action. In 1975, Congress amended Section 3 of the Voting Rights Act to make clear that "an aggrieved person," like the Attorney General, could institute "a proceeding *under any statute* to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a) (emphasis added). The Judiciary Committee Report accompanying the 1975 amendment noted the amendment was intended "to afford to private parties the same remedies which Section 3 now affords only to the Attorney General." S. Rep. No. 94-295 at 39–40 (1975). Plaintiffs also point to 1975 and 2006 amendments to Section 14(e) of the Voting Rights Act, which now authorizes recovery of litigation expenses by private litigants who prevail in cases to enforce the voting guarantees of the Fourteenth or Fifteenth Amendments. 52 U.S.C. § 10310 ("In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, *other than the United States*, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." (emphasis added)). Plaintiffs contend that these other provisions show that Congress has intended to foster a broad private right of action to enforce *any* part of the Voting Rights Act, including Section 203.

No other court has directly addressed whether there is an implied private right of action under Section 203. But Defendants rely on *Dekom v. New York*, No. 12–CV–1318 (JS)(ARL), 2013 WL 3095010 (E.D.N.Y. June 18, 2013) (unpublished), arguing that it did consider the issue and that it concluded that Section 203 is only enforceable by the Attorney General. Plaintiffs respond that the *Dekom* court's holding was narrow—limited only to the issue of whether the three-judge panel requirement of Section 204 was applicable to a case brought by private individuals.

In *Dekom*, private plaintiffs brought suit against the State of New York and various state and county officials alleging, among other things, violations of the Voting Rights Act. *Id.* at *1. Among their voting rights claims, plaintiffs alleged that the defendants failed to provide copies of a "designating petition" in Spanish in violation of Section 203. *Id.* at *17. Plaintiffs requested that the court refer the action to a three-judge panel pursuant to Section 204. *Id.* at *8. The court denied that request because "Section [204], by its express terms, only permits suits by the Attorney General," and was therefore "inapplicable to the present case." *Id.* Despite stating that Section 204 only "permits" suits by the Attorney General, the court went on to rule on the merits of the plaintiffs' Section 203 claim, concluding that because the designating petitions were not "provided by" the defendants, the claim should be dismissed. *Id.* at *17–*18.

The court agrees with Plaintiffs that *Dekom* stands only for the proposition that the three-judge-panel provision of Section 204 is not applicable to private actions. Indeed, *Dekom* did not consider whether Section 203 was enforceable by private parties, or whether Section 204 precluded an implied private right of action under Section 203. Although the court in *Dekom* stated that Section 204 only "permits" suits by the Attorney General, that statement is inconsistent with what the court actually did, which was to rule on the merits of the Section 203

claims. In context, its statement that Section 204 "permit[ted]" only suits by the Attorney General must be read to suggest that the three-judge panel provision of section 204 applies only to suits brought by the Attorney General—not that enforcement of Section 203 is limited to suits by the Attorney General.

The Plaintiffs in this case—like the plaintiffs in *Dekom*—requested a referral to a three-judge panel, but that request was denied. The court explained that a three-judge panel is only required when the Attorney General brings an action under Section 204. "As is clear from the complaint, this case is not brought by the Attorney General and it is not brought under Section [204]. Rather it is brought under Section [203]." Docket 89, 22:7–10. In denying the request for referral to a three-judge panel, the court made clear to the parties "the ruling . . . with respect to the three-judge panel should not be interpreted by [the parties] as a ruling with respect to whether or not there's an implied private right of action" under Section 203. *Id.* at 22:17–20. That is the question now before the court.

Whether there is an implied right of action under Section 203 depends in large part on whether the existence of an explicit provision authorizing the Attorney General to enforce Section 203 forecloses a private right of action. Although it appears that no court has analyzed whether there is an implied private right of action under Section 203, courts have considered the broader question of whether the existence of an explicit provision authorizing the Attorney General to enforce a specific section of the Voting Rights Act forecloses a private right of action to enforce that same section. *See McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) (holding that the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action). *Contra Schwier v. Cox*, 340 F.3d 1284, 1294–96 (11th Cir. 2003) (holding that neither the existence of a "provision for

enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in [a Voting Rights Act section] require the conclusion that Congress did not intend such a right to exist").

*McKay* and *Schwier* both examined whether there is an implied private right of action under Section 1971 of the Voting Rights Act. Section 1971 contains an enforcement provision similar to Section 204 that specifically authorizes the Attorney General to bring actions enforcing that particular Voting Rights Act section with no mention of any private right of action or provision giving standing to "aggrieved person[s]." *See* 52 U.S.C. § 10101(c) ("Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b), the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief. . . .").

In *McKay*, the Sixth Circuit examined whether there was an implied private right of action, and held that "Section 1971 is enforceable by the Attorney General, not by private citizens." *McKay*, 226 F.3d at 756 (internal citations omitted). In *Schwier*, the Eleventh Circuit reached the opposite result after considering the *McKay* court's reasoning:

> In *McKay*, the Sixth Circuit relied entirely on *Willing v. Lake Orion Community Schools Board of Trustees*, 924 F.Supp. 815, 820 (E.D.Mich.1996), which in turn relied entirely on *Good v. Roy*, 459 F.Supp. 403, 405–06 (D.Kan.1978). Thus, the extent of the analysis relied on by the Sixth Circuit is the following from *Good*: "Furthermore, subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons . . . . [T]he unambiguous language of Section 1971 will not permit us to imply a private right of action." 459 F.Supp. at 405–406.

*Schwier*, 340 F.3d at 1294. The Eleventh Circuit was persuaded that the Sixth Circuit's reasoning in *McKay* was incorrect, concluding that the Supreme Court's interpretation of other Voting

Rights Act provisions in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) and *Allen v. State Board of Elections*, 393 U.S. 544 (1969), as well as the legislative history indicating "an intense focus on protecting the right to vote," compelled the holding "that neither § 1971's provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in § 1971 require the conclusion that Congress did not intend such a right to exist." *Id.* at 1295–96. "Thus, [the Eleventh Circuit held] that the district court erred by finding that Congress's provision for enforcement by the Attorney General in § 1971(c) precluded continued enforcement of § 1971 by a private right of action under § 1983." *Id.* at 1296.[6]

As the Eleventh Circuit noted in *Schwier*, the Supreme Court has read an implied private right of action into other sections of the Voting Rights Act that contain language empowering the Attorney General to bring suit. First, in *Allen*, the Court analyzed the provision of the Voting Rights Act requiring judicial scrutiny of alterations of voting qualifications or procedures, 52 U.S.C. § 10304,[7] and reasoned that the goals of the statute were much more likely to be reached if private citizens were not "required to depend solely on litigation instituted at the discretion of

---

[6] It is worth noting that the Sixth Circuit recently addressed whether there is an implied private right of action under Section 201 of the Voting Rights Act. That Section is also enforceable by the Attorney General under Section 204. In *Ne. Ohio Coal. for the Homeless v. Husted*, —F.3d—, 2016 WL 4761326 (6th Cir. Sept. 13, 2016), the plaintiffs alleged that requiring voters to fill out absentee and provisional ballot forms with their birth date and address was a requirement to "comply with [a] test or device" in violation of Section 201 of the Voting Rights Act. 2016 WL 3166251 at *54. The defendant argued that there was no private right of action under Section 201, pointing to Section 204's language authorizing the Attorney General to institute an action for violation of Section 201. *Id.* The Sixth Circuit acknowledged the circuit split between the Sixth and Eleventh circuits and held that, because it was bound by its prior decision in *McKay*, the private plaintiffs could not bring an action for a violation of Section 201. 2016 WL 4761326, at *11.

[7] "*Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made." 52 U.S.C. § 10304(a).

the Attorney General." 393 U.S. at 556. Thus, the *Allen* Court found that the possibility of enforcement by the Attorney General did not preclude enforcement by private citizens. *Id.* at 556–57. Then in *Morse*, the Court analyzed the provision of Voting Rights Act prohibiting the use of a poll tax, 52 U.S.C. § 10306,[8] and held that a private right of action had not been foreclosed even though the enforcement scheme of the Voting Rights provision at issue gave the Attorney General the right to sue for violations. *Morse*, 517 U.S. at 193 (plurality opinion). *See also id.* at 240 (Breyer, J., concurring) (agreeing with plurality opinion that a private right of action lies under § 10306). The holdings in *Allen* and *Morse* are contrary to the reasoning relied on by the Sixth Circuit that "unambiguous language" giving the Attorney General the power to enforce provisions of the Voting Rights Act "will not permit us to imply a private right of action." Indeed, the Supreme Court twice has implied such a right in the face of Attorney General enforcement provisions.

With these authorities in mind, the court concludes that there is an implied private right of action under Section 203. The court is persuaded—along with the Eleventh Circuit—by the Supreme Court's holdings in both *Morse* and *Allen* that provisions similar to Section 204 giving the Attorney General the explicit right to bring suit under certain sections of the Voting Rights Act do not foreclose a private right of action to enforce those same sections. Further, the court agrees that when the Voting Rights Act is read as a whole and in the context of its legislative history, it shows that Congress intended to expand the rights under the Voting Rights Act, not to restrict them. The court is especially persuaded that the 1975 amendment to Section 3 of the Voting Rights Act adding the right of "an aggrieved person" to institute "a proceeding *under any*

---

[8] "[T]he Attorney General is authorized and directed to institute forthwith in the name of the United States such actions, including actions against States or political subdivisions, for declaratory judgment or injunctive relief against the enforcement of any requirement of the payment of a poll tax as a precondition to voting, or substitute therefor . . . ." 52 U.S.C. § 10306(b).

*statute* to enforce the voting guarantees of the fourteenth or fifteenth amendment" indicates congressional intent to allow for private suits to enforce the provisions of the Voting Rights Act. *See* 52 U.S.C. § 10302(a) (emphasis added). In short, the court concludes that when Section 203 is read in the broader context of the Voting Rights Act, and in conjunction with the Supreme Court's decisions in *Morse* and *Allen*, it must be read to imply a private right of action

### 2.   ALLEGED VIOLATIONS OF SECTION 203 IN JUNE 2016

Having established that Section 203 provides a private right of action, the court now turns to Plaintiffs' allegation that the County violated the provisions of that section in June 2016. Plaintiffs argue that the June 2016 procedures employed by the County were ineffective under Section 203 because of alleged deficiencies in the assistance provided to Navajo-speaking voters at the polls. Plaintiffs also argue that the June 2016 procedures were ineffective because the County failed to properly inform voters of the opportunities that were provided for language assistance at the polls. As explained below, the court finds that Plaintiffs have failed to demonstrate that the June 2016 procedures were ineffective.

Section 203 of the Voting Rights Act seeks to "enable members of applicable language minority groups to participate effectively in the electoral process." 28 C.F.R. § 55.2(b); *see also U.S. v. Sandoval Cty., N.M.*, 797 F. Supp. 2d 1249, 1250 (D.N.M. 2011) ("In enacting [Section] 203 of the Voting Rights Act (VRA), . . . Congress intended that language minority populations have substantive access to the ballot." (internal quotations omitted)). In evaluating national voting practices, Congress determined that,

> through the use of various practices and procedures, citizens of language
> minorities have been effectively excluded from participation in the electoral
> process. Among other factors, the denial of the right to vote of such minority
> group citizens is ordinarily directly related to the unequal educational

> opportunities afforded them resulting in high illiteracy and low voting
> participation.

52 U.S.C. § 10503(a). Accordingly, Section 203 prohibits discriminatory voting practices related

to English literacy and requires that voting materials provided in English also be provided in the

languages of relevant minority language populations. *See id.* § 10503(a), (c).

> The applicable requirements of Section 203 are as follows:

> Whenever any State or political subdivision subject to the prohibition . . . of this
> section provides any registration or voting notices, forms, instructions, assistance,
> or other materials or information relating to the electoral process, including
> ballots, it shall provide them in the language of the applicable minority group as
> well as in the English language: *Provided,* That where the language of the
> applicable minority group is oral or unwritten or in the case of Alaskan natives
> and American Indians, if the predominant language is historically unwritten, the
> State or political subdivision is only required to furnish oral instructions,
> assistance, or other information relating to registration and voting.

*Id.* § 10503(c). The plain language of this section provides two separate standards, one to be

applied to written minority languages and one to be applied to oral minority languages. The first

standard requires *all* written voting materials to be provided "in the language of the applicable

minority group as well as the English language." *See id.* However, in the context of minority

languages that are "oral or unwritten or in the case of Alaskan natives and American Indians, . . .

historically unwritten, the State or political subdivision is *only* required to furnish oral

instructions, assistance, or other information relating to registration and voting." *Id.* (emphasis

added); *see also United States v. McKinley Cty., N.M.*, 941 F. Supp. 1062, 1066–67 (D.N.M.

1996) (applying the standard to the Navajo and Zuni languages). Thus, where the relevant

minority language is unwritten or historically unwritten, the State or subdivision is not required

to provide *all* materials orally in the minority language, as it would if the language were written.

Instead, the State or subdivision must provide only "oral instructions, assistance, or other information relating to registration and voting." *See id.*

Defendants do not dispute that they are subject to the requirements of Section 203. Thus, in their administration of local elections, Defendants are required by Section 203 to provide "oral instructions, assistance, or other information relating to registration and voting." *See id.* This requirement extends to both pre-election publicity efforts and direct assistance provided to voters at the polls. *See* 28 C.F.R. § 55.20(a). Defendants' compliance with these requirements is measured by an "effectiveness" standard, *see id.* § 55.20(c), which requires that a jurisdiction "take[] all reasonable steps to ensure minority language voters have received information and assistance allowing them to participate effectively in voting-connected activities." *McKinley Cty.*, 941 F. Supp. at 1067 (internal quotations omitted); 28 C.F.R. § 55.2(b) (interpreting § 10503(c) and outlining the following requirements: "(1) That material and assistance should be provided in a way designed to allow members of applicable language minority groups to be effectively informed of and participate effectively in voting-connected activities; and (2) That an affected jurisdiction should take all reasonable steps to achieve that goal"). Nevertheless, "[t]he determination of what is required for compliance with . . . [S]ection 203(c) is the responsibility of the affected jurisdiction" and the "guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction." *Id.* § 55.2(c); *see also id.* § 55.14(c). Indeed, a great deal of discretion is granted to jurisdictions seeking to implement the requirements of Section 203(c), *see id.* § 55.2(c), and only where the jurisdiction falls below the effectiveness standard will the Attorney General take action. *See Sandoval Cty.*, 797 F. Supp. 2d at 1253–54 (explaining that the reasonable effectiveness standard under Section 203 "does not demand perfection, but only" something akin to "substantial compliance"). While the Attorney General's interpretations

of the Act are not binding on this court, *see Montero v. Meyer*, 861 F.2d 603, 608–09 & 609 n.3 (10th Cir. 1988) (noting that the Attorney General's interpretations of the minority language provisions are "suggestive and not directory"), the reasonable effectiveness standard is consistent with the central purposes of Section 203 and therefore instructive in evaluating the County's compliance, *see id.* (explaining that an administrative interpretation must be consistent with statutory purposes if it is to be accorded deference).

As noted above, Plaintiffs allege deficiencies in the assistance provided to Navajo-speaking voters at the polls in June 2016 primary and the publicity regarding language assistance and polling locations in the lead-up to the primary. First, Plaintiffs argue that the County's pre-election publicity and outreach to Navajo voters was inadequate because the County failed to provide complete translations of all election materials on their website or at polling locations. Moreover, Plaintiffs assert that the County failed to air promised public service announcements explaining election procedures in Navajo and that the County's publication of public service announcements in local newspapers was inadequate. Next, Plaintiffs argue that the County's language assistance procedures were inadequate under Section 203 because the County failed to provide any recorded audio translations to voters at the various polling places as previously promised, the County failed to provide scripts in the Navajo language to aid poll workers in assisting voters, and, most importantly, the poll workers providing language assistance were not properly trained.

As an initial matter, neither the Voting Rights Act nor the applicable regulations specifically required the County to provide full translations of all election materials, air public service announcements, or publish notices in local newspapers. Nor was the County specifically required to provide scripts, recorded audio translations, or even formal training to translators

working the polls. Instead, the County was "only required to furnish oral instructions, assistance, or other information relating to registration and voting." 52 U.S.C. § 10503(c). The statute does not explicitly require any of the specific measures identified by Plaintiffs. Moreover, as noted above, the statute and the regulations give affected jurisdictions significant discretion regarding the form and extent of both publicity and language assistance: "The determination of what is required for compliance with . . . [S]ection 203(c) is the responsibility of the affected jurisdiction." *See* 28 C.F.R. §§ 55.2(c), 55.14(c). The discretion afforded to the County under the Act is bounded only by the requirement that it take all "reasonable steps" to provide "effective[]" pre-election publicity and language assistance to voters. *See id.* § 55.2(b); *Montero*, 861 F.2d at 608–09 & 609 n.4 (explaining that affected jurisdictions are afforded deference in their decisions regarding the implementation of the language assistance provisions of the Act).

Determination of whether the County complied with Section 203 during the June 2016 primaries turns not on whether it provided specific types of publicity or language assistance, but whether the County took "all reasonable steps" to "allow[] [Navajo voters] to be effectively informed of and participate effectively in voting-connected activities." *See* 28 C.F.R. § 55.2(b)(1), (2). Thus, this court need not determine whether the County should have employed the methods requested by Plaintiffs or even the methods that the County promised but failed to implement; the court need only evaluate whether *the methods actually employed* by the County in June 2016 were effective. The court is therefore presented with two questions regarding the County's compliance with Section 203 during the June 2016 elections: (1) Whether the County's pre-election publicity efforts in 2016 were effective in informing Navajo voters of "voting-connected activities" related to the June 2016 primaries; and (2) Whether the language assistance provided to Navajo voters by the County during the June 2016 primary election was effective. If

the County's efforts in either regard were ineffective, then Plaintiffs' rights under Section 203 were likely violated, and re-implementation of the same procedures in November 2016 could constitute imminent irreparable harm. However, as explained below, the court finds that Plaintiffs have failed to demonstrate that the County's efforts were ineffective.

As described above, sometime prior to the June 2016 primaries, San Juan County decided to alter its current voting procedures. Ahead of the primaries, the County employed several different methods to inform Navajo voters of election procedures. First, the County provided an audio recording on its website, in the Navajo language, that listed the offices in contention and the candidates for each office, as well as their party affiliations. Next, the County's Navajo liaison, Edward Tapaha, visited various tribal chapter houses around the County to explain the new voting procedures. Mr. Tapaha also worked to register individual Navajos to vote and explained the nature of election procedures. Further, the County published an announcement of the new procedures in the Navajo Times, and provided the San Juan Record with information about the new polling locations, which was published in an article on the election. Additionally, the County recorded several public service announcements in Navajo but, due to a miscommunication, failed to actually deliver them to local radio stations for broadcast.

The County also implemented procedures to assist Navajo-speaking voters at the polls. Mr. Tapaha, the County's Navajo liaison, recruits interpreters from various locations around the County to assist Navajo-speaking voters at the polls. (Docket No. 94-4 at 97–98, 129–30). Mr. Tapaha also provides basic training and oversight for these interpreters, although he concedes that any training and oversight is informal. *Id.* During the June 2016 primary election, each of the four polling places open for voting was staffed by at least one of these interpreters to provide language assistance to voters. (Docket No. 109, Ex. No. 4, ¶ 11–12). Mr. Tapaha himself was

31

stationed at Montezuma Creek, while Ella Greyeyes and Maryetta Stevens were stationed at Navajo Mountain, Edythe Tahe was stationed at Oljato, and Fermina Keith assisted voters at the Monticello polling location. *Id.* ¶ 12. Many, if not all, of the interpreters had served as poll workers in previous elections.[9]

Plaintiffs argue that these procedures violated Section 203. First, Plaintiffs argue that the pre-election publicity provided by the County was inadequate under Section 203. More specifically, they argue that Mr. Tapaha failed to visit two of the tribal chapter houses before the June 2016 election and that public service announcements recorded in Navajo describing election procedures were never aired due to a miscommunication. Next, Plaintiffs allege that the language assistance procedures were ineffective because the poll workers were not provided with uniform scripts in Navajo and were only informally trained prior to the June 2016 election.[10] Pl. Op. Br. at 10–11.

---

[9] At least Mr. Tapaha, Marietta Stevens, and Edythe Tahe served as poll workers in elections prior to June 2016. (*See* Docket No. 94-4 at 95–96). It is likely, although unproven, that the other interpreters listed above have previously served as poll workers, since Mr. Tapaha typically utilizes interpreters who have already worked in previous elections:

> [Counsel:] And how did you recruit these interpreters, poll workers, and election judges?

> [Mr. Tapaha:] I know them from previously [sic] that I worked with in the election, and we've been using the same workers, poll workers, and at the end of the election I usually ask them, "Would you like to work for us in the next election?" And they're willing to do it; so I do our recruitment based on that, the list that we have in the office.

*Id.* at 129. Plaintiffs claim that only two of the poll workers for June 2016 had actually worked in previous elections, but their basis for that claim is a list of interpreters that covers only the 2016, 2014, and 2012 elections. *See* Pl. Reply Br. at 8; (Docket No. 112-1 at 43–45). The list does not include any information on elections prior to 2012, and therefore sheds little light on whether or not the named individuals have in fact previously served as interpreters.

[10] Plaintiffs also argue that the County violated Section 203 because it failed to provide *all* voting-related materials in the Navajo language. Pl. Op. Br. at 10; Pl. Reply Br. at 32. For example, they argue that the recorded explanation of offices and candidates was not adequate because it failed to explain the ballot itself to voters. *Id.* However, as Plaintiffs' counsel candidly admitted at oral argument, affected jurisdictions that provide election information and assistance in a "historically unwritten" language need not provide translations of *all* elections materials, as discussed above. *See* 52 U.S.C. § 10503(c). Instead, the affected jurisdiction need "only . . . furnish oral instructions, assistance, or other information relating to registration and voting." *See id.* Thus, the County was not required to provide a pre-recorded translation of the ballot in full or to provide any other elections materials in a pre-recorded format. Instead, under the statutory

As discussed above, the provision of "oral instructions, assistance, and other information relating to registration and voting" under Section 203 is measured by an "effectiveness" standard. *See* 28 C.F.R. § 55.20(a) ("Announcements, publicity, and assistance should be given in oral form to the extent needed to enable members of the applicable language minority group to participate effectively in the electoral process."). In evaluating the effectiveness of a jurisdiction's efforts to publicize election information, the Attorney General "will consider whether public notices and announcements of electoral activities are handled in a manner that provides members of the applicable language minority group an effective opportunity to be informed about electoral activities." *Id.* § 55.18(b). Further, "[t]he Attorney General will consider whether a covered jurisdiction has taken appropriate steps to publicize the availability of materials and assistance in the minority language." *Id.* § 55.18(e). A covered jurisdiction "*may*" fulfill their publicity obligations under Section 203 by "display of appropriate notices, in the minority language, at voter registration offices, polling places, etc., the making of announcements over minority language radio or television stations, the publication of notices in minority language newspapers, and direct contact with language minority group organizations." *Id.* (emphasis added). Similarly, in evaluating the effectiveness of a jurisdiction's efforts to provide language assistance to voters through "helpers" or interpreters, the Attorney General considers factors such as "the number of a precinct's registered voters who are members of the applicable language minority group, the number of such persons who are not proficient in

---

scheme, the "oral instructions [and] assistance" provided at the polls, if effective, would be sufficient to fulfill the County's Section 203 obligations. *See id.*; 28 C.F.R. § 55.20(a) ("Announcements, publicity, and assistance should be given in oral form to the extent needed to enable members of the applicable language minority group to participate *effectively* in the electoral process." (emphasis added)).

English, and the ability of a voter to be assisted by a person of his or her own choice." *See* 28 C.F.R. § 55.20(c).

While the guidelines listed above are helpful for affected jurisdictions in assisting minority language populations, they are not entirely binding on the jurisdiction if the methods actually employed by the jurisdictions are effective. *See* 28 C.F.R. § 55.2(b) (describing the effectiveness standard); *id.* § 55.2(c) ("These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction."). Thus, "[c]ompliance with the requirements of . . . [S]ection 203(c) *is best measured by results*." *Id.* § 55.16 (emphasis added). And therein lies the major failing of Plaintiffs' arguments on this point: they have failed to demonstrate any adverse results from the June 2016 procedures. In other words, Plaintiffs have failed to show that the June 2016 procedures had any specific detrimental effect on the ability of Navajo voters "to be effectively informed of and participate effectively in voting-connected activities." *See id.* § 55.2(b)(1). They have not demonstrated or even alleged that any Navajo-speakers were unaware of the polling locations or the availability of language assistance. They have not demonstrated that the interpreters' performance on election night was in fact deficient or that the number of bilingual poll workers was in fact insufficient to assist Navajo-speaking voters.

Plaintiffs have failed to come forward with any evidence that the procedures used by the County in the June 2016 election were ineffective. Rather, Plaintiffs argue that the court should draw an inference of ineffectiveness from the nature of the procedures themselves. For example, Plaintiffs insist the court may draw an inference of ineffectiveness from the lack of scripts, pre-recorded audio translations of voting materials, and formal training or oversight of the five translators who assisted voters at the polls. Plaintiffs argue that these omissions made any translation provided to voters "inconsistent and inaccurate" and therefore "inadequate and

ineffective." Pl. Op. Br. at 10. The court disagrees. While the provision of scripts, pre-recorded audio translations, and more uniform training of poll workers may have made the language assistance as a whole *more* consistent or *more* accurate, Plaintiffs have failed to provide any evidence that the language assistance actually provided in June 2016 was so inconsistent or inaccurate as to be ineffective. This is not to say that the court believes the language assistance provided by the County's hired interpreters in June 2016 was flawless. But even assuming there were inconsistencies or inaccuracies in the language assistance provided to voters, Section 203 does not require that language assistance be free from inaccuracy or inconsistency in order to be effective.[11] *See McKinley Cty.*, 941 F. Supp. at 1068. The same holds true for the County's publicity efforts, which were perhaps less than ideal. But other than bare allegations of missteps, Plaintiffs have made no showing of actual ineffectiveness in the County's efforts.[12] Thus, on

---

[11] For example, in *McKinley Cty.*, the court rejected a challenge to the language assistance procedures provided by McKinley County to Navajo and Zuni-speaking voters based on inaccurate and inconsistent translation by poll workers. 941 F. Supp. at 1068. It was demonstrated through "documentation, sworn and unsworn, . . . [that] poll workers at certain polling places . . . failed to adequately translate the ballot contents for Navajo and Zuni language voters." *Id.* Nevertheless, the court rejected the claim that the "County's failure to adequately train ballot translators effectively denie[d] Navajo and Zuni language voters equal access at the polls." *See id.* The court observed,

> Differences in culture and vocabulary make translating English into Navajo or Zuni a complex and difficult task. For instance, no word exists in the Navajo or Zuni languages for Republican or Democrat. Much is necessarily left to the translators' discretion. The court does not dispute on this record that irregularities and inconsistencies in translation remain. But if the court considered every inconsistency or irregularity in ballot translation a violation of the [Voting Rights Act], federal court intervention into and oversight of McKinley County's election process might never end. Congress in enacting [Section] 203(c) of the [Voting Rights Act] 'did not authorize federal courts to be state election monitors.'

*Id.* (internal emphasis omitted) (quoting *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980)). Thus, the fact that interpreters may inaccurately or inconsistently translate election materials for language minority groups does not necessarily indicate a violation of Section 203. Instead, the sheer amount or crucial nature of inaccuracies and inconsistencies must be such that the language assistance is rendered ineffective. *See Sandoval Cty.*, 797 F. Supp. 2d at 1253 (explaining that the "effectiveness" standard "does not demand perfection but only . . . 'substantial compliance' with [Section] 203" and therefore "accounts for the fact that the occasional irregularity or inconsistency in oral translation may occur").

[12] Moreover, the court is not convinced that all of the missteps alleged were as severe as Plaintiffs suggest. For instance, Plaintiffs allege that Mr. Tapaha only visited three of the five chapter houses to publicize the new election procedures prior to the June 2016 primary. But they base this assertion on an interrogatory response that appears to

these facts, the court finds that the publicity efforts and language assistance provided by the County in June 2016 did not violate Section 203 or Plaintiffs' rights under that section.

Because Plaintiffs have failed to demonstrate that their Section 203 rights were violated by the June 2016 procedures, they have failed to demonstrate that their rights will be violated by the use of those same procedures again in November 2016. Thus, Plaintiffs have failed to demonstrate an essential prerequisite for issuance of a preliminary injunction—a likelihood of success on the merits. By the same token, they have also failed to demonstrate that irreparable harm will befall them in November 2016. They have not "provide[d] proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674. As described above, Plaintiffs' claims are subject to a heightened standard because they request a disfavored injunction calling for an extraordinary remedy. They have failed to meet this standard.  Accordingly, the court rejects any claim for injunctive relief under Section 203.

## <u>CONCLUSION</u>

Based on the foregoing, the court concludes that Plaintiffs' motion for preliminary injunction should be **DENIED.** It is so ordered.

Signed October 14, 2016.

BY THE COURT

Jill N. Parrish
United States District Court Judge

---

be incomplete and subject to change, (Docket No. 112-1 at 48–49), and Mr. Tapaha indicated in deposition testimony that he had visited all of the chapter houses prior to the primary, *see* Pl. Op. Br. at 6; (Docket No. 94-4 at 72–75).