**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

NAVAJO NATION HUMAN RIGHTS
COMMISSION; PEGGY PHILLIPS; MARK
MARYBOY; WILFRED JONES; TERRY
WHITEHAT; BETTY BILLIE FARLEY;
WILLIE SKOW; and MABEL SKOW,

                                Plaintiffs,

v.

SAN JUAN COUNTY;  JOHN DAVID
NIELSON, in his official capacity as San Juan
County Clerk; and PHIL LYMAN, BRUCE
ADAMS, and REBECCA BENALLY, in their
official capacities as San Juan County
Commissioners,

                                Defendants.

Case No. 2:16-cv-000154 JNP

ORAL ARGUMENT REQUESTED

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO LIABILITY ON ALL OF PLAINTIFFS' CLAIMS**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................... 2

III.    ARGUMENT ....................................................................................................... 4

    1.      Defendants' Actions Have a Discriminatory Result and Violate Section 2
        of the Voting Rights Act .............................................................................. 4

        A.      Statement of Elements and Undisputed Material Facts Regarding
            Section 2 of the Voting Rights Act ......................................................... 4

            a.      Elements of a Claim Under Section 2 of the Voting Rights
                Act ................................................................................................ 4

            b.      Relevant Undisputed Facts Bearing on Section 2 Claim .............. 6

        B.      Argument ............................................................................................. 11

            a.      The Vote-By-Mail System Used in the 2014 Elections
                Disproportionately Benefited White Residents While
                Burdening Navajo Residents in San Juan County ....................... 11

            b.      Providing In-person Early Voting in Monticello Only
                Disproportionately Benefits White Residents While
                Burdening Navajo Residents of San Juan County ...................... 13

            c.      Vote By Mail Disproportionately Benefits White Residents
                and Burdens Navajo Residents of San Juan County .................... 15

            d.      Social and Historical Conditions Further Exacerbate
                Unequal Opportunities to Vote Early In-Person When
                Considered Within the Totality of the Circumstances ................ 15

                i.       Senate Factor 1:  History of Official Discrimination
                    Affecting the Right of Minorities to Participate in
                    the Democratic Process .................................................... 17

                ii.      Senate Factor Two:  Racially Polarized Voting .............. 18

                 iii.     Senate Factor Three:  Use of Unusually Large
                     Election Districts or Other Voting Practices
                     Enhancing Opportunity for Discrimination .................... 18

                 iv.      Senate Factor Five:  Effects of Discrimination on
                     Socioeconomic Status ...................................................... 18

                 v.       Senate Factor Six:  Use of Racial Appeals in
                     Political Campaigns ......................................................... 19

                 vi.      Senate Factor Seven:  Extent to Which Minorities
                     Have Been Elected to Public Office ................................ 19

    2.      Defendants Have Not Provided Effective Language Assistance in
        Violation of Section 203 Claim of the Voting Rights Act ................................... 20

## TABLE OF CONTENTS
(continued)

Page

A.     Statement of Elements and Undisputed Material Facts Regarding Section 203 of the Voting Rights Act ...................................................... 20

      a.     Elements of a Claim Under Section 203 of the Voting Rights Act ................................................................................... 20

      b.     Relevant Undisputed Facts Bearing on Section 203 Claim ........ 21

B.     Argument ...................................................................................... 26

      a.     The County Did Not Take All Reasonable Steps to Allow Navajo Language Voters to Be Effectively Informed and to Effectively Participate in Voting-Connected Activities ............. 26

3.     Defendants' Actions Violate the Fundamental Right to Vote Protected by the First and Fourteenth Amendments ................................................. 30

A.     Statement of Elements and Undisputed Material Facts Regarding Fundamental Right to Vote Claim ................................................ 31

      a.     Elements of a Fundamental Right to Vote Claim Under the First and Fourteenth Amendments ............................................ 31

      b.     Relevant Undisputed Facts Bearing on Fundamental Right to Vote Claim Under the First and Fourteenth Amendments ...... 31

B.     Argument ...................................................................................... 33

      a.     Character and Magnitude of Burden on the Right to Vote ......... 33

         i.     Residents Who Are Able to Only Vote by Mail Face a Severe Burden to Their Right to Vote ................. 33

            1.     Undeliverable Addresses and Undeliverable Mail ...................................................................... 34

            2.     Difficulties Accessing Post Offices ..................... 34

            3.     Delays in Delivery and Postmarking Mail ........... 35

         i.     The County's Election Practices Mean Residents Voting In Person Face a Severe Burden to Their Right to Vote .................................................................. 36

      b.     The County Has Asserted No Interest Which Would Justify the Burden Imposed on the Fundamental Right to Vote .............. 36

IV.     CONCLUSION ......................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)............................................................................2

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
133 S. Ct. 2247 (2013)........................................................................16

*Bear v. Cnty. of Jackson,*
No. 5:14-CV-5059-KES, 2015 WL 1969760 ..........................................5

*Bone Shirt v. Hazeltine,*
461 F.3d 1011 (8th Cir. 2006) ...........................................................5

*Burdick v. Takushi,*
504 U.S. 428 (1992)......................................................................31, 33

*Chao v. Hall Holding Co.*,
285 F.3d 415 (6th Cir. 2002) .............................................................2

*City of Herriman v. Bell*,
590 F.3d 1176 (10th Cir. 2010) .........................................................33

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008)......................................................................36, 37

*Gonzalez v. Arizona,*
677 F.3d 383 (9th Cir. 2012) (en banc) .............................................16

*Imperial v. Castruita,*
418 F. Supp. 2d 1174 (C.D. Cal. 2006) ..............................................28

*League of Women Voters of Ohio v. Brunner,*
548 F.3d 463 (6th Cir. 2008) ............................................................36

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,*
475 U.S. 574 (1986)............................................................................2

*Navajo Nation Human Rights Comm'n v. San Juan Cnty.,*
No. 2:16-cv-00154-JNP-BCW, 2016 WL 6068125 (D. Utah Oct. 14, 2016)................. passim

*Navajo Nation v. San Juan Cnty.*,
150 F. Supp. 3d 1253 (D. Utah 2015)........................................ passim

*Navajo Nation v. San Juan Cnty.*,
   162 F. Supp. 3d 1162 (D. Utah 2016)..................................................................18

*Nick v. City of Bethel*,
   No. 3:07-CV-0098, 2010 WL 4225563 (D. Alaska July 30, 2008)........................27

*Padilla v. Lever*,
   463 F.3d 1046 (9th Cir. 2006) .......................................................................28, 29

*Reynolds v. Sims,*
   377 U.S. 533 (1964)................................................................................................33

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)......................................................................................16, 18, 20

*Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rights Ctr. of Kan.*,
   491 F.3d 1143 (10th Cir. 2007) .............................................................................13

*United States v. Berks Cnty., Pa.*,
   250 F. Supp. 2d 525 (E.D. Pa. 2003) ....................................................................28

*United States v. Sandoval Cnty.*,
   797 F. Supp. 2d 1249 (D.N.M. 2011) ...................................................................26

*Ury v. Santee,*
   303 F. Supp. 119. (N.D. Ill. 1969) ........................................................................36

*Yanito v. Barber*,
   348 F. Supp. 587 (D. Utah 1972)...........................................................................17

## STATUTES

52 U.S.C. § 10301....................................................................................................4

Utah Code § 20A-3-601(1)-(2) ...............................................................................7

Utah Code § 20A-3-601(2)–(3) ...............................................................................7

Utah Code § 20A-3-601(3) ......................................................................................7

Utah Election Code § 20A-3-603 ...........................................................................7

Utah Election Code § 20A-3-603(1)........................................................................7

## OTHER AUTHORITIES

28 C.F.R. § 55.2 .....................................................................................................23

28 C.F.R. § 55.2(b) .................................................................................................21

81 Fed. Reg. 87,532 (Dec. 5, 2016) ...............................................................2, 21

Fed. R. Civ. P. 56 ...........................................................................................1

Fed. R. Civ. P. 56(e) .......................................................................................2

Janai S. Nelson, *The Causal Context of Disparate Vote Denial*, 54 B.C. L. Rev. 579, 596 (2013) .....................................................................................................16

Navajo Reservation. U.S. Census Bureau, *San Juan County, Utah - Profile of General Population and Housing Characteristics* (2010) ...............................................2

Paul Tiao, *Non-Citizen Suffrage: An Argument Based on the Voting Rights Act and Related Law*, 25 Colum. Hum. Rts. L. Rev. 171, 194 (1993) .................................28

S. Rept. 97-417 (1982), Reprinted in 1982 U.S.C.C.A.N. ....................................5, 6

U.S. Census Bureau, *San Juan County, Utah – Profile of General Population and Housing Characteristics* (2010) ......................................................................2

D. Utah Civ. R. 56-1 .......................................................................................1

Pursuant to Fed. R. Civ. P. 56 and D. Utah Civ. R. 56-1, Plaintiffs Navajo Nation Human Rights Commission ("NNHRC"), Peggy Phillips, Mark Maryboy, Wilfred Jones, Terry Whitehat, Betty Billie Farley, Willie Skow and Mabel Skow ("Plaintiffs") respectfully move this Court for partial summary judgment. This motion is supported by the memorandum below and appendix. Plaintiffs respectfully request oral argument.

## I.      INTRODUCTION

Plaintiffs are entitled to summary judgment on their claims because the undisputed facts support the legal conclusion that San Juan County is not providing equal opportunities to vote for all voters, is not providing effective language assistance to non-English proficient voters, and has not fulfilled its duty to ensure voters' fundamental right to vote.

The overarching undisputed facts are:

1. The County does not provide equal access to early voting opportunities, as Navajo citizens must travel, on average, *over three times farther* round-trip, than white citizens to take advantage of in-person early voting opportunities or to get voting assistance.

2. The County has failed to take all reasonable actions to effectively inform Navajo language voters about election-related activities and to allow them to effectively participate in election-related activities.

3. The County's election practices place undue burdens on voters in remote areas of the County.

These and other facts support Plaintiffs' claims that the County violated Sections 2 and 203 of the Voting Rights Act, and the Equal Protection and Due Process clauses of the Constitution. Defendants have offered no expert opinions and did not depose the Plaintiffs' experts or otherwise challenge those experts. There is thus nothing in the record to rebut the

evidence provided by Plaintiffs' experts. Fed. R. Civ. P. 56(e); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 261 (1986) ("The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts.  It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment.").  Summary judgment should be entered accordingly.

## II.    STATEMENT OF FACTS

San Juan County is located in the southeastern corner of Utah and contains a substantial portion of the Navajo Reservation.  U.S. Census Bureau, *San Juan County, Utah - Profile of General Population and Housing Characteristics* (2010).  The Navajo population of San Juan County constitutes 50.4 % of the total county population.  *Id.*  Navajo is historically an unwritten language, and a large proportion of the Navajo Indians residing in San Juan County are unable to speak, write, or read the English language.  Declaration of Leonard Gorman ("NNHRC Decl.") ¶ 6, ECF No. 94-1; 81 Fed. Reg. 87,532 (Dec. 5, 2016).

In 2014, San Juan County officials decided to close all polling places, except the County clerk's office in Monticello.  NNHRC Decl. ¶ 5, ECF No. 94-1.  During the 2014 primary and general elections, the only possible location to vote in person was in Monticello, which is approximately 84% white.  U.S. Census Bureau, *San Juan County, Utah – Profile of General Population and Housing Characteristics* (2010); NNHRC Decl. ¶¶ 4-5, ECF No. 94-1. Likewise, the only location to vote in person before Election Day in the 2016 elections was in Monticello.  Deposition of John David Nielson ("Nielson Dep."), attached hereto as Ex. A, 124:18-125:4.  Navajo voters who wished to vote in-person either during the early voting period or on Election Day in 2014, or during the early voting period in 2016, had to travel, on average,

103.57 minutes to vote in Monticello (the only location for in-person voting) as compared with an average travel time of just 34.66 minutes for white voters.  Declaration of Dr. Gerald R. Webster ("Webster Decl.") Ex. 1, ECF No. 94-2.  Furthermore, the fact that many Navajo citizens live in rural areas of the County complicates mail delivery and thus, they are less likely to receive their mail, including their ballots.

In September 2015, NNHRC and the Lawyers' Committee for Civil Rights Under Law, in partnership with the American Civil Liberties Union, sent letters to the County opposing closure of polling sites.  NNHRC Decl. ¶ 10, ECF No. 94-1  In his September 17, 2015 response to this letter, the County Clerk stated the County would not reconsider opening any polling places for the upcoming elections, and did not commit to doing so for any future elections.  *Id.*  On February 25, 2016, having received no written commitment from the County to reopen polling places, Plaintiffs filed their Complaint.  ECF No. 2.

On March 31, 2016, Defendants filed their Answer to the Complaint and a Counterclaim for Declaratory and Other Relief.  Answer, ECF No. 41; Countercl., ECF No. 40.  In the Answer and Amended Counterclaim, Defendants claimed in-person voting polls would be available on Election Day at four locations within San Juan County for future elections: Monticello, Montezuma Creek, Oljato, and Navajo Mountain.  Answer ¶ 7, ECF No. 41; Am. Countercl. ¶ 39, ECF No. 74.  In their filings, Defendants also claimed they would provide Navajo-language assistance services to voters and they would publicize the three additional  polling places.  Answer ¶ 7, ECF No. 41; Am. Countercl. ¶¶ 41-43, ECF No. 74.  Though the County has claimed that the decision to open additional polling locations was made prior to Plaintiffs filing their Complaint, it is undisputed that the County failed to publicize the reopening of polling

locations until the County issued a press release on March 9, 2016.  Am. Countercl. ¶¶ 50, 51, ECF No. 74.

While the County provided some language assistance and in-person voting opportunities to Navajo voters in the 2016 elections, the County has still not fully complied with their obligations under the Voting Rights Act or the Fourteenth Amendment.  Language assistance remains ineffective and in-person early voting opportunities remain more easily accessible for white, but not Navajo, residents.  In addition, numerous problems plagued the implementation of the 2016 elections, unduly burdening residents' fundamental right to vote.

### III.    ARGUMENT

### 1.    Defendants' Actions Have a Discriminatory Result and Violate Section 2 of the Voting Rights Act

A.    Statement of Elements and Undisputed Material Facts Regarding Section 2 of the Voting Rights Act.

a.    Elements of a Claim Under Section 2 of the Voting Rights Act

A violation of Section 2 is established if:

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) [of this section] in that its members have *less opportunity than other members of the electorate to participate in the political process* and to elect representatives of their choice.

52 U.S.C. § 10301.  As this Court has noted, the Fourth, Fifth, and Sixth Circuits have outlined a two part standard for applying the Section 2 "results test" in vote-denial cases:

> The first step essentially reiterates Section 2's textual requirement that a voting standard or practice, to be actionable, must result in an adverse disparate impact on protected class members' opportunity to participate in the political process.  Once a disparate impact is established, the second step asks whether the voting standard or practice, albeit not designed or maintained for a discriminatory purpose, nonetheless effectually denies or abridges the right to vote as it interacts with social and historical conditions.

*Navajo Nation Human Rights Comm'n v. San Juan Cnty., No.* 2:16-cv-00154-JNP-BCW, 2016 WL 6068125, at *6 (D. Utah Oct. 14, 2016) (internal quotations and citation omitted). "[T]he essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Id.* (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986)); *Bone Shirt v. Hazeltine* ("*Bone Shirt II*"), 461 F.3d 1011, 1017-18 (8th Cir. 2006); *see also Bear v. Cnty. of Jackson,* No. 5:14-CV-5059-KES, 2015 WL 1969760, at *4-5 (D.S.D. May 1, 2015) (Plaintiffs need to "show their legally protected right to *equal access to the electoral process* was infringed") (emphasis added).

A court's analysis in the second step of this process – assessing how the practice interacts with social and historical conditions (or within the "totality of the circumstances") - generally focuses on the factors that the Senate Judiciary Committee identified in its report related to the 1982 amendment to Section 2.  S. Rept. 97-417 (1982), Reprinted in 1982 U.S.C.C.A.N.  These factors include:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
> (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
> (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> (6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 206-07.[1]

      b.  <u>Relevant Undisputed Facts Bearing on Section 2 Claim</u>

1. In 2014, San Juan County officials closed all polling places, except the County clerk's office in Monticello, and implemented a vote-by-mail election system.  NNHRC Decl. ¶ 5, ECF No. 94-1

2. In September, 2015 NNHRC and the Lawyers' Committee for Civil Rights Under Law, in partnership with the American Civil Liberties Union, sent letters opposing the mail-only plan and closure of polling sites to San Juan County.  NNHRC Decl. ¶ 10, ECF No. 94-1.

3. In his September 17, 2015 response to this letter, the County Clerk stated the County would not reconsider opening any polling places for the upcoming elections.  *Id.*

4. On February 25, 2016, having received no written commitment from the County to reopen polling places, Plaintiffs filed their Complaint and served Defendants on March 1, 2016. ECF No. 2 and ECF Nos. 26-30.

5. The County first publically communicated its decision in a press release to reopen three of the polling places on the Navajo Reservation on March 9, 2016, only after the Complaint was filed.  Am. Countercl.  ¶¶ 50, 51, ECF No. 74. Although the County has claimed that the decision to open additional polling locations was made prior to Plaintiffs filing their Complaint, the County has provided no evidence, beyond a declaration, to support that claim. Declaration of John David Nielson Re: General Election ("Nielson Decl."), attached hereto as Ex. B  ¶14.

---

[1] Two other factors are also probative in the totality-of-the-circumstances test: "a significant lack of response from elected officials to the needs of the minority group," and whether "the policy underlying the jurisdiction's [action was] tenuous."  S. Rept. 97-417 (1982), Reprinted in 1982 U.S.C.C.A.N.

6.  The Clerk-Auditor testified that he could make decisions regarding changes in election administration without approval of the County Commission.  Nielson Dep. 41:1-42:14.

7.  Utah state law requires counties to provide in-person early voting for a fourteen-day period prior to the date of the election.  *See* Utah Code § 20A-3-601(2)–(3).

8.  Utah Election Code provides that "[a]n individual who is registered to vote may vote before the election date" and that the "voting period shall [ ] begin on the date that is 14 days before the date of the election."  Utah Code § 20A-3-601(1)-(2).  Voting is conducted for a "minimum of four days during each week" for local special elections and primary and general municipal elections; for all other elections, voters can cast their ballots early any weekday.  Utah Code § 20A-3-601(3).

9.  Utah Election Code § 20A-3-603 further requires election officers to "designate one *or more* polling places for early voting."  Utah Election Code § 20A-3-603(1) (emphasis added).

10. San Juan County provided early in-person voting only at the county clerk's office in Monticello.  Nielson Dep. 124:18-25, 125:1-4; NNHRC Decl. Ex. 1, ECF No. 94-1 (Public Notice indicating that "[r]egistered voters of San Juan County Utah can cast an Early Vote ballot in the clerks [sic] office weekdays from 8:00 A.M. to 5:00 P.M.").

11. In addition to having additional days to cast a ballot in-person, the location of in-person voting in Monticello provides a number of additional benefits including the ability to request a ballot or help troubleshooting a problem.  Nielson Dep. 66:1-11; Declaration of Maya Kane, Esq. ("Kane Decl.") Ex. 2, at 16:22-24, ECF No. 94-4.

12. The Office Manager for San Juan County has explained "the advantage of having a polling location in our office is that we were able to resolve any of those [voting related] issues in our office."  Kane Decl. Ex. 2, at 16:22-24, ECF No. 94-4.

13. Navajo citizens in San Juan County must travel, on average, *three times the distance* and *three times the time* that white citizens must travel to reach the Monticello location to vote early in-person, or to get assistance.  Webster Decl. Ex. 1, at  51, ECF 94-2; Nielson Dep. 66:1-11; Kane Decl. Ex. 2, at 16:22-24, ECF No. 94-4.

14. This means that Navajo citizens must travel, on average, *over two hours longer* round-trip, and 94 miles farther round-trip than white citizens to take advantage of in-person early vote opportunities or to get assistance.  *Id.*

15. This past general election, Mr. Whitehat, who has a preference for voting in-person, had just a small window during which he could vote, because his father had an operation in Flagstaff, Arizona scheduled on Election Day[2] and because the only satellite office offering in-person early voting is approximately five hours away in Monticello.  Second Affidavit of Terry Whitehat ("Whitehat Second Aff."), attached hereto as Ex. C.,  ¶¶ 5-7; Declaration of Plaintiff Terry Whitehat ("Whitehat Decl.") ¶ 2, ECF No. 94-3.

16. In order to travel in the remote parts of the County, a person must often use dirt tracks and unpaved roads that may be impassible in inclement weather, especially for the general election in the fall.  *See* Brief Expert Witness Report by Daniel McCool ("McCool Second Report"), attached hereto as Ex. D, at 6; *see also* Transcript of the Edward Tapaha Deposition from Redistricting case ("Tapaha 2015 Dep.") 41:6-8, App. to Defs. Opp. to Mot. for Prelim. Inj., ECF No. 107.

17. Almost 54% of the County's registered voters do not have a street address and many residents therefore rely on post office boxes to receive their mail.  *Navajo Nation v. San Juan*

---

[2] Discovery formally closed on October 1, 2016, but Plaintiffs made a timely motion to keep discovery open to collect facts relating to the 2016 primary and general elections.  That motion is currently pending.  Plaintiffs note that many of the facts in support of this motion were obtained during the 2016 elections in San Juan County, and will note them accordingly.

*Cty.*, 150 F. Supp. 3d 1253 (D. Utah 2015), at ECF No. 309, dated February 11, 2016 at p. 15.

18. There is a shortage of post office boxes in Oljato and Monument Valley, meaning some residents without a home mailing address are also unable to get a post office box in San Juan County. *See* Tapaha 2015 Dep. 42:1-7, ECF No. 107.

19. Some residents in the remote areas of San Juan County may have to drive 30 or 40 miles – and cross state lines – just to get their mail.  *See* McCool Second Report at 6;  Declaration of Dr. Dan McCool ("McCool Decl."), attaching Expert Witness Report by Dr. Daniel McCool ("McCool First Report") at 189, ECF No. 94-5.

20. Navajo residents live, on average, more than twice as far from the nearest post office than white voters.  Webster Decl. Ex. 1, at 52, ECF No. 94-2.

21. Many residents do not regularly get their mail.  McCool First Report at 191, ECF 94-5 (quoting resident explaining that "the people out there they hardly ever go to the post office, they hardly get their mail").

22. The history of official voting discrimination against the Navajo in Utah is extensive and severe.  McCool First Report, ECF 94-5.

23. Elections since 2000 have been racially polarized in San Juan County, with Native American voters supporting Native American candidates and non-Native American voters largely supporting only non-Native American candidates.  *See* Declaration of Richard L. Engstrom ("Engstrom Decl."), Expert Witness Report of Richard L. Engstrom, Ph.D. ("Engstrom Expert Report"), at 7, 11, ECF No. 94-6.

24. The unemployment rate among Navajo residents is five times greater than the national average. *Navajo Nation Human Rights Comm'n*, 2016 WL 6068125, at \*7 (order denying

preliminary injunction).

25. While only 11.2% of whites in the County live below the poverty level, 42.3% of American Indians in the County live below the poverty line and nearly one-third of American Indian households in San Juan County live off an annual income of less than $10,000.  Webster Decl. Ex. 1, ECF No. 94-2.

26. Less than 1% of white households in San Juan County have no vehicle, while 1 in 10 American Indian households in the County are without a vehicle.  *Id.*

27. Because of a history of discrimination and the difficulties of making the trip, many Navajo residents of San Juan County are hesitant to travel to Monticello to vote.  NNHRC Decl. ¶ 18, ECF No. 94-1; Whitehat Second Declaration ("Whitehat Second Decl.") ¶ 3-4, ECF No. 112-3.

28. For instance, Mr. Whitehat feels like he is a target whenever he goes to Monticello and will avoid going there, if possible.  If he is driving, he will fill his gas elsewhere to avoid stopping in Monticello.  Whitehat Second Decl. ¶ 4, ECF No. 112-3.

29. Multiple political campaigns in San Juan have been characterized by racial appeals.  McCool First Report at 129-132, ECF No. 94-5.

30. In a 1990 election, for instance, a flyer was distributed advising residents that "Utah Navajos are 60% of all the people in San Juan County, so if they all vote, they can always control the county."  McCool First Report at 129, ECF No. 94-5.

31. In 2012, supporters of Bruce Adams, one of the current county commissioners, ran an advertisement warning voters that his Navajo opponent (Willie Grayeyes) was "campaigning on promises that if he is elected he will use San Juan County money for projects on the reservation…" *Id.*

32. Navajo residents have never been elected to a majority of seats in the county commission or school board.  McCool First Report at 82-94, ECF No. 94-5; Engstrom  Expert Report at ¶¶ 14-18, ECF No. 94-6.

33. Navajo candidates have consistently lost to white candidates: for instance, in 1990, Navajo candidates ran for five of six countywide seats and lost in each race.  Engstrom  Expert Report at ¶¶ 19-36, ECF 94-6.

34. No Navajo candidate has ever won a countywide election and, before the U.S. Department of Justice filed suit against San Juan County, no Navajo resident had been elected to County office.  McCool First Report at 82-94, ECF 94-5; Engstrom Expert Report at ¶¶ 14-18, ECF No. 94-6.

B.  Argument

Providing early voting only in Monticello (as was the case in the 2016 elections) or having a vote-by-mail system in which Monticello is the only location for either in-person early voting or Election Day voting (as was the case in the 2014 elections) disproportionately burdens Navajo citizens in San Juan County because they must travel, on average, three times farther as others to take advantage of these opportunities.  The 2014 vote-by-mail system and the early voting plan currently in place effectively deny Plaintiffs and other Navajo voters the vote when considered within the totality of the circumstances.

a.  The Vote-By-Mail System Used in the 2014 Elections Disproportionately Benefited White Residents While Burdening Navajo Residents in San Juan County

In 2014, San Juan County implemented a vote-by-mail system and provided in-person voting only in Monticello on Election Day and for early voting days.  NNHRC Decl. ¶ 5, ECF No. 94-1.  Navajo residents were disproportionately burdened by the location of the single in-person voting site being located in Monticello.  As mentioned above, on average, Navajo

11

residents in San Juan County had to travel two hours longer, about *three times the distance* and *three times the time* that white citizens must travel to reach the Monticello location to vote in person in the 2014 elections.  Webster Decl. Ex. 1, at 51, ECF No. 94-2; Nielson Dep. 66:1-11.

Although the County made some changes to its election practices after the filing of the Complaint, including reopening three polling places on the Navajo Reservation, there is nothing stopping the County from closing those polling places in future elections.  In fact, the Clerk-Auditor testified that he could make decisions of this nature without approval of the County Commission.  Nielson Dep. 42:12-14.  Moreover, it appears from the undisputed record that, although the Clerk-Auditor testified that these types of decisions would be reflected in the minutes of County Commissioner meetings, in fact, the crucial change in 2016 election procedures is nowhere to be found there.  Nielson Dep. 42:4-11, 15-22.

The County has claimed that the decision to open additional polling locations was made prior to Plaintiffs filing their Complaint, but the County has provided no evidence, beyond a declaration, to support that claim.[3]  Furthermore, the County's first communication about the decision – a press release issued on March 9, 2016 - was only made *after* the Complaint was filed.  Am. Counterl. ¶¶ 50, 51, ECF No. 74.

Under these undisputed facts of (1) unilateral decision-making in the hands of the Clerk-Auditor, and (2) no official documentation of such decisions, the threat of sudden, unpublicized reversal of the quickly and surreptitiously implemented 2016 procedures is real.  The Tenth Circuit has held, in such cases, "a party should not be able to evade judicial review, or to defeat a

---

[3] While Mr. Nielson claims he made the decision to reopen polling places before the Complaint was filed, ECF No. 2 ¶ 14, Defendants have provided no evidence that that decision was communicated in any way to his staff, the County commissioners or *any other person* until after the Complaint was filed. In other words, Mr. Nielson was apparently spurred to action to implement or communicate his decision about reopening polling places only after the Complaint was filed.

judgment, by temporarily altering questionable behavior." *Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1149 (10th Cir. 2007) (quoting *City News & Novelty, Inc. v. City of Waukesha,* 531 U.S. 278, 284 n.1 (2001)).  Without this Court's declaration that the 2014 vote-by-mail procedures violated Section 2 of the Voting Rights Act, the County would be free to reverse the changes it made after the Complaint was filed.

### b. Providing In-person Early Voting in Monticello Only Disproportionately Benefits White Residents While Burdening Navajo Residents of San Juan County

Despite the speedy and surreptitious opening of additional polling places following the filing of the Complaint, the 2016 system retains a significant feature of the 2014 system that disproportionately and unlawfully discriminates against Navajo voters.  Specifically, as was the case in 2014, white residents of San Juan County have easier access to in-person early voting opportunities than do Navajo residents because early in-person voting is limited to Monticello. Monticello is the only physical location in the County to vote early in-person during the statutory period.  Nielson Dep. 124:18-125:4.  The recently reopened polling places are open only on the day of the primary or general election.  The availability of early voting in Monticello provides a number of additional benefits, including the ability to request a ballot (if, for instance, the ballot was lost in the mail) or receive troubleshooting help if a problem arises.  Nielson Dep. 66:1-11; Kane Decl. Ex. 2, at 16:22-24, ECF No. 94-4.  As the Office Manager for San Juan County has explained, "the advantage of having a polling location in our office is that we were able to resolve any of those [voting related] issues in our office."  Kane Decl. Ex. 2, at 16:22-24, ECF No. 94-4,.

It is undisputed that, at present, these opportunities are more readily available to white residents than to Navajo residents because, as discussed above, American Indian citizens must travel a significantly greater distance and amount of time to vote in Monticello.  Again, Navajo

citizens in San Juan County must travel, on average, *three times the distance* and *three times the time* that white citizens must travel to reach the Monticello location to vote early in-person, or to get assistance.  Webster Decl. Ex. 1, ECF No. 94-2; Nielson Dep. 66:1-11; Kane Decl. Ex. 2, at 16:22-24, ECF No. 94-4).  This means that Navajo citizens must travel, on average, *over two hours longer* round-trip, and 94 miles farther round-trip than white citizens to take advantage of in-person early vote opportunities or to get assistance.  *Id.*  This greater distance is further complicated by the depressed socioeconomic status of the Navajo and because Navajo residents are lower income and less likely to have access to a vehicle.  Furthermore, many Navajo residents live in areas with only dirt tracks and unpaved roads that may be impassible in inclement weather, especially for the general election in the fall.  McCool Second Report at 6; McCool First Report at 189, ECF No. 94-5.

By providing in-person early voting only in Monticello, but not in the majority Navajo portion of the County, the County has created a system which essentially provides for nearly a month of in-person voting for white residents, who are more likely to live closer to Monticello, but only a single day of in-person voting for Navajo residents.  Webster Decl. Ex. 1, at 51, ECF No. 94-2.  This is a serious concern for Navajo residents who may have to travel on Election Day for health or employment reasons.  For instance, this past general election, Mr. Whitehat, who has a preference for voting in-person, had just a small window during which he could vote, because his father had an operation in Flagstaff, Arizona scheduled on Election Day[4] and because the only satellite office offering in-person early voting is approximately five hours away in Monticello.  Whitehat Second Aff. ¶¶ 5-7; Whitehat Decl. ¶ 2, ECF No. 94-3.  If there had been a satellite office offering in-person early voting in the majority-Navajo parts of the County,

---

[4] See supra note 2.

Mr. Whitehat would have been able to take advantage of that to vote early in-person and get to Flagstaff with plenty of time to help his father prepare for his operation on Election Day.

      c.   <u>Vote By Mail Disproportionately Benefits White Residents and Burdens Navajo Residents of San Juan County</u>

Navajo voters, who are forced to vote by mail because they cannot make it to one of the four polling places, are still disproportionately burdened as compared with whites.  Navajo residents live, on average, more than twice as far from the nearest post office than white voters. Webster Decl. Ex. 1, at 52, ECF No. 94-2.  Navajo residents in more remote areas may have to drive up to 40 miles – and cross state lines – to retrieve their mail.  McCool First Report at 189, ECF 94-5.  To make matters worse, this travel may involve using dirt tracks and unpaved roads that may be impassible in inclement weather, especially for the general election in the fall.  *See id;* McCool Second Report at 6.  As a result, many residents do not regularly get their mail.  McCool First Report at 191, ECF 94-5 (quoting resident explaining that "the people out there they hardly ever go to the post office, they hardly get their mail").  Furthermore, because of the rural nature of the County, more than half of the residents rely on post office boxes to receive their mail, *Navajo Nation*, 150 F. Supp. 3d 1253 (D. Utah 2015) at ECF No. 309, at 15, yet some Navajo residents are unable to obtain a post office box in San Juan County, as there is a shortage of post office boxes in some majority-Navajo precincts.  *See* Tapaha 2015 Dep. 42:1-7, ECF No. 107 (noting a shortage of post office boxes in Oljato and Monument Valley).  Given the socioeconomic disparities in San Juan County, these factors make it disproportionately more difficult for Navajo voters to cast their ballot by mail than white voters.

      d.   <u>Social and Historical Conditions Further Exacerbate Unequal Opportunities to Vote Early In-Person When Considered Within the Totality of the Circumstances</u>

The 2014 vote-by-mail practice and the current practice of providing early in-person voting only in Monticello abridge Navajo residents' right to vote, especially in consideration of

the broader social and historical context, or the "totality of the circumstances."  A court's analysis of the "totality of the circumstances" generally focuses on the factors that the Senate Judiciary Committee identified in its report related to the 1982 amendment to Section 2.  S. Rept. 97-417 (1982).  The evaluation of these factors is "dependent upon the facts of each case, and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms."  *Thornburg*, 478 U.S. at 79 (internal citations omitted).

The Senate Factors used to analyze the "totality of the circumstances" that are particularly pertinent to the type of Section 2 claim at issue here include any history of official discrimination touching on the right of minority citizens to register, to vote, or otherwise to participate in the democratic process (the first Senate Factor), and the extent to which socioeconomic disparities hinder minority citizens' ability to participate effectively in the political process (the fifth Senate Factor).  *See Gonzalez v. Arizona*, 677 F.3d 383, 405-06 (9th Cir. 2012) (en banc), *aff'd on other grounds*; *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013); *see also* Janai S. Nelson, *The Causal Context of Disparate Vote Denial*, 54 B.C. L. Rev. 579, 596 (2013) ("Indeed, in *Gingles*, the Supreme Court underscored the importance of the fifth [Senate] factor, stating that the 'essence of a § 2 claim is that a certain electoral law, practice, or structure *interacts with social and historical conditions* to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'").  While it is not necessary to prove every Senate factor, due to the broader implications of providing unequal access to American Indian voters, additional relevant Senate factors are discussed below.  *See Thornburg*, 478 U.S. at 45 (noting that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other").

      i.   <u>Senate Factor 1:  History of Official Discrimination Affecting the Right of Minorities to Participate in the Democratic Process</u>

The first Senate Factor, a history of official voting discrimination, weighs heavily in favor of the Plaintiffs.  As discussed in Dr. Dan McCool's expert report, ECF No. 94-5, the history of official voting discrimination against Native Americans in Utah is extensive and severe.  This Court has recognized San Juan County's discrimination against Navajo voters in a number of cases.  In *Yanito v. Barber*, 348 F. Supp. 587 (D. Utah 1972), this Court held that a San Juan County Clerk had unlawfully discriminated against Native Americans running for office in violation of the plaintiffs' constitutional rights.  The Court found a long history of intentional discrimination against Native Americans by the federal government and state of Utah..  Similarly, in 1984 this Court found "'the process leading to the selection of County Commissioners in San Juan County' had failed to 'comply fully' with Section 2 of the Voting Rights Act."  *Navajo Nation I*, 2015 WL 1137587, at *1 (quoting *United States v. San Juan Cnty.,* No. C-83-1286W (D. Utah, April 4, 1984)).  Most recently, this Court found San Juan County intentionally discriminated against its Navajo residents in failing to redraw county election districts in *Navajo Nation v. San Juan County*, and the County's "school board districts violated the one-person, one vote rule" of the Equal Protection Clause.  *Navajo Nation*, 150 F. Supp. 3d at 1253.  Because of this history of discrimination and the difficulties of making the trip, many Navajo residents of San Juan County are hesitant to travel to Monticello to vote.  NNHRC Decl. ¶ 18, ECF 94-1; Whitehat Second Decl. ¶¶ 3-4, ECF 112-3.  For instance, Mr. Whitehat feels like he is a target whenever he goes to Monticello and will avoid the area.  If he is driving, he will fill his gas elsewhere to avoid stopping in Monticello.  Whitehat Second Decl. ¶ 4, ECF 112-3.

ii.   Senate Factor Two:  Racially Polarized Voting

Elections in San Juan County are racially polarized, with Native American voters supporting Native American candidates and non-Native American voters largely supporting only non-Native American candidates.  *See* Engstrom Expert Report at 7, 11, ECF 94-6 ("Native American voters were always cohesive in their support for Native American candidates, and non-Native American voters invariably vetoed that choice when elections were held in a context in which a majority of the VAP [voting age population] was not Native American.").

iii.   Senate Factor Three:  Use of Unusually Large Election Districts or Other Voting Practices Enhancing Opportunity for Discrimination

As discussed above, this Court has recognized San Juan's intentional use of voting districts which discriminate against Navajo residents.  *Navajo Nation v. San Juan Cnty.*, (*"Navajo Nation II"*), 162 F. Supp. 3d 1162, 1175  (D. Utah 2016) ("San Juan County expressly admits that District Three was intentionally created by the Commission to have a heavy concentration of American Indians.") (internal quotations omitted); *id*. at 1168 (School Board election districts were maintained for over 20 years although they never complied with the constitutional one-person, one-vote requirement.).

iv.   Senate Factor Five:  Effects of Discrimination on Socioeconomic Status

It is well recognized that "political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."  *Thornburg*, 478 U.S. at 69.  As this Court noted, socioeconomic disparities may "place a cognizable disparate burden on the average Navajo voter, who must travel three times further than her white counterpart to participate" in early and Election Day in-person voting.  *Navajo Nation Human Rights Comm'n*, 2016 WL 6068125, at *7 (order denying preliminary injunction). As discussed in Dr. Webster's Expert

Report, the unemployment rate among Navajos is five times greater than the national average.

Webster Dec. Ex. 1, ECF No. 94-2.  While only 11.2% of whites in the County live below the

poverty level, 42.3% of American Indians live below the poverty line and nearly one-third of

American Indian households in San Juan County live off an annual income of less than $10,000.

*Id.*  For Navajo voters, the trip to Monticello is further complicated by the significant distance,

poor road conditions of the County, the lack of reliable public transportation for Navajo residents

to travel to Monticello, and most Navajo households do not have access to an automobile.  *Id*.

The difficulty of traveling to Monticello makes in-person early voting and in-person voting

assistance effectively out of reach for many Navajo voters.

> v.  <u>Senate Factor Six:  Use of Racial Appeals in Political Campaigns</u>

Multiple political campaigns in San Juan County have been characterized by racial

appeals.  In a 1990 election, for instance, a flyer was distributed advising residents that "Utah

Navajos are 60% of all the people in San Juan County, so if they all vote, they can always

control the county."  McCool First Report at 129, ECF 94-5.  Just four years ago, in 2012,

supporters of Bruce Adams, one of the current county commissioners, ran an advertisement

warning voters that his Navajo opponent (Willie Grayeyes) was "campaigning on promises that

if he is elected he will use San Juan County money for projects on the reservation…" *Id.*

> vi.  <u>Senate Factor Seven:  Extent to Which Minorities Have Been Elected to Public Office</u>

Navajo candidates have had limited success with being elected to office.  Navajo

residents have never been elected to a majority of seats in the county commission or school

board.  McCool First Report at 82-94, ECF 94-5; Engstrom Expert Report at ¶¶ 14-18, ECF 94-

6.  Navajo candidates have consistently lost to white candidates: for instance, in 1990 American

Indian candidates ran for five of six countywide seats and lost in each race.  Engstrom Expert

Report at ¶¶ 19-36, ECF 94-6.  No Navajo resident has ever won a countywide election and, before the U.S. Department of Justice (DOJ) filed suit against the County, no Navajo resident had been elected to County office.  McCool First Report at 82-94, ECF 94-5; Engstrom Expert Report at ¶¶ 14-18, ECF 94-6.  After the DOJ lawsuits, and the creation of single-member districts, a Navajo resident has been elected to the third district every election.  However, while Navajo candidates have had limited success in recent years, such success does not weaken Plaintiffs' argument under factor seven, when considered within the totality of the circumstances. *See Thornburg*, 478 U.S. at 76 (noting "sporadic" success by minority candidates cannot be used to defend a discriminatory voting system). It is undisputed from the totality of the circumstances that opportunities for in-person voting and in-person voting assistance are closer and more readily available to white but not Navajo residents of San Juan.  Defendants have not disputed these facts and therefore summary judgment is appropriate.

**2.** **Defendants Have Not Provided Effective Language Assistance in Violation of Section 203 Claim of the Voting Rights Act**

    A. Statement of Elements and Undisputed Material Facts Regarding Section 203 of the Voting Rights Act.

        a. Elements of a Claim Under Section 203 of the Voting Rights Act

Under Section 203, covered jurisdictions are required to provide "oral instructions, assistance or other information relating to registration and voting" in the minority language in "both pre-election publicity efforts and direct assistance provided to voters at the polls." *Navajo Nation Human Rights Comm'n*, 2016 WL 6068125, at *13 (citing 28 C.F.R. § 55.20(a)) (internal quotations omitted). "Defendants' compliance with these requirements is measured by an 'effectiveness' standard, *id.* § 55.20(c), which requires that a jurisdiction 'take[ ] all reasonable steps to ensure minority language voters have received information and assistance allowing them to participate effectively in voting-connected activities." *Navajo Nation Human Rights*, 2016

WL 6068125, at *13 (citing *United States v. McKinley Cnty., N.M.*, 941 F. Supp. 1062, 1067 (D.N.M. 1996)); *see also*  28 C.F.R. § 55.2(b) (outlining the following requirements: "(1) That materials and assistance should be provided in a way designed to allow members of applicable language minority groups to be effectively informed of and participate effectively in voting-connected activities; and (2) That an affected jurisdiction should take all reasonable steps to achieve that goal.").

      b.  Relevant Undisputed Facts Bearing on Section 203 Claim

In addition to the undisputed facts asserted above, Plaintiffs assert the following facts bearing on their claim under Section 203.

1. San Juan County is a covered jurisdiction under Section 203 of the VRA for the Navajo language. 81 Fed. Reg. 87,532 (Dec. 5, 2016).

2. Contrary to promises made in their Answer and other filings, no working audio translations of the ballot were available at polling places in the general election for the voters or the poll workers.[5] Affidavit of Wilfred Jones ("Jones Aff."), attached hereto as Ex. E,. ¶ 22; Affidavit of Terva Begay ("Begay Aff") , attached hereto as Ex. F, ¶ 14; Affidavit of Marietta Stevens ("Stevens Aff."), attached hereto as Ex. G, ¶ 8; Affidavit of Nelson Yellowman ("Yellowman Aff.") , attached hereto as Ex. H,. ¶ 13; Affidavit of Jenny Crank ("Crank Aff."), attached hereto as Ex. I,  ¶¶ 11, 12.

3. In their Answer and other filings, the County promised to provide radio announcements on Navajo language radio stations regarding the election for the 2016 election cycle.  Answer ¶ 7, ECF No. 41.

4. The County failed to provide radio announcements regarding voting procedures on Navajo

---

[5] See supra note 2.

language radio stations in advance of the 2016 primary.  Defs.' Resp. to Pls.' First Set of
Interrogs., attached hereto as Ex. J, Resp. No. 7.

5.  The Defendants have stated that the failure to provide radio announcements regarding the
primary election was due to a "communication" problem within the San Juan County Clerk's
office.  Defs.' Resp. to Pls.' First Set of Interrogs., No. 7.

6.  Plaintiff Betty Billie Farley regularly listens to KNDN, a Navajo language radio station,
during the 12:30- 1 p.m. newscast, and did not hear any information about the 2016 general
election.[6]  Affidavit of Betty Billie Farley ("Farley Affidavit"), attached hereto as Ex. K, ¶ 8.

7.  Leroy Teeasytoh, a Navajo resident of San Juan County, heard the radio announcement on
KNDN prior to the general election, but did not think the information was clear.[7] Affidavit of
Leroy Teeasytoh ("Teeasytoh Aff."), attached hereto as Ex. L, ¶ 5.

8.  There are places in the Navajo portion of San Juan County where static can interfere with the
radio signal.  Tapaha 2015 Dep. 11:2-9, ECF No. 107.

9.  Mr. Teeasytoh believes that there is a need for more information to be distributed about the
election systems, particularly because of the changes.[8] Teeasytoh Aff. ¶ 6.

10. Mr. Tapaha testified that he visits Chapter Houses as part of the County's pre-election
publicity efforts.  Kane Decl. Ex. 1, Part 2, at 8:11-16, 22:21-23:16, ECF No. 94-4; Defs.
Resp. to Pls.' First Set of Interrogs., No. 8.

11. Ms. Bonnie B. Charley, a Navajo elder who does not speak, read, or write English attended a
chapter house meeting when Mr. Tapaha visited but, because Mr. Tapaha often spoke in

---

[6] See supra note 2.
[7] See supra note 2.
[8] See supra note 2.

English, Ms. Charley could not understand most of what he was saying.[9]  Affidavit of Bonnie

B. Charley ("B. Charley Aff."), attached hereto as Ex. M, ¶¶ 3-4, 8.

12. After listening to Mr. Tapaha at the chapter house meeting, Ms. Charley and her son both

believed that, if they wanted to vote in the general election, they would have to vote by mail,

even though they would have preferred to vote in person.[10]  B. Charley Aff. ¶¶ 7, 9; Affidavit

of Jimmy Charley, Jr. ("J. Charley Aff.") , attached hereto as Ex. N, ¶¶ 7, 9.

13. Some Navajo residents of San Juan County who require language assistance mistook their

mail-in ballot for junk mail and failed to vote.[11]  Crank Aff. ¶ 4.  McCool First Report at 190,

ECF 94-5.

14. A state or political subdivision covered by Section 203 of the Voting Rights Act is

responsible for providing the appropriate language assistance and "furnish[ing] oral

instructions, assistance, or other information relating to registration and voting," in the case

of unwritten languages.  28 C.F.R. § 55.2; Order of Oct. 14, 2016 ("Order"), ECF No. 129, at

27.

15. In 2014, when the County moved to a vote-by-mail system, Mr. Johnson, the former County

Clerk, acknowledged that the County "relied a lot on families to help people out" by

"[e]xplaining the ballot, explaining what was on the ballot, what offices were being voted

for."  Defs.' App. of Exhibits, Ex. 11 (Deposition of Norma Johnson), ECF No. 107 at 35:4-

22.

16. Mr. Johnson, the former County Clerk, acknowledged that these tasks were "something [his]

office would have taken care of in the past," but that "after [the County] went to mail in

---

[9] See supra note 2.
[10] See supra note 2.
[11] See supra note 2.

*ballots that was something you expected the family to do." Id.*

17. Ed Tapaha, the Navajo liaison for the County Clerk's office, has stated that young Navajos, who are more likely to speak English and less likely to speak Navajo, would have difficulty translating election materials. *Navajo Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253 (D. Utah 2015) at ECF No. 309, dated February 11, 2016 at p.16; Tapaha 2015 Dep. 20:12-17, ECF No. 107.

18. Tapaha has also explained that translating election materials is quite challenging, and that he has consulted with Navajo translators in Arizona and New Mexico in an effort to improve the accuracy of his translations. Tapaha Dep. 2015 36:3-37:21, ECF No. 107.

19. Mr. Jimmy Charley, a member of the Navajo Nation and resident of San Juan County, attempted to translate the 2016 general election ballot for his mother who does not speak English, but struggled to explain some of the provisions on the ballot.[12]  J. Charley Aff. ¶ 4.

20. The County's own audio translation of the 2016 general election ballot posted on their website is not correctly translated, and confuses the terms "Judicial Retention," "constitutional amendments" and "for or against," affecting the accuracy of the message. Declaration of Joanna Manygoats ("Manygoats Decl."), Opinion of Joanna Manygoats ("Manygoats Report"), attached hereto as Ex. O, at 2-3.

21. At least one Navajo voter who required language assistance to vote was uncomfortable asking for and getting the assistance she needed, as the only interpreter was preoccupied.[13] See Crank Aff. ¶¶ 6-10.

22. Mr. Tapaha provides translation services for the County, but his translations are not reviewed by a trained translator or anyone employed by the County.  Kane Decl. Ex. 1, Part 2, at

---

[12] See supra note 2.
[13] See supra note 2.

31:22-32:1-13, ECF No. 94-4.

23. Translators are recruited informally by Mr. Tapaha and translators are not required to have any relevant qualifications.  Kane Decl. Ex. 1, Part 2, at 91:10-17, ECF No. 94-4.

24. Mr. Tapaha has expressed concerns that the lack of formal training for translators means there is a risk translators "misword[ ]" when they try to translate the ballot.  *Id.* at 98:8-19.

25. Mr. Tapaha did not provide training to poll workers working in the predominantly Navajo precincts for the 2016 primary election.  Defs.' Resp. to Pls.' First Set of Interrogs., Resp. No. 5.

26. Mr. Tapaha likewise did not provide training to poll workers working in the predominantly Navajo precincts for the 2016 general election.[14] Stevens Aff. ¶ 5; Begay Aff. ¶ 8.

27. Plaintiffs Mabel and Willie Skow do not speak English and requested language assistance when they voted in person during the 2016 general election.[15]  Affidavit of Mabel Skow ("M. Skow Aff."), attached hereto as Ex. P, ¶¶ 5, 12; Affidavit of Willie Skow ("Skow Aff."), attached hereto as Ex. Q, ¶¶ 5, 10.

28. The language assistance the Skows received did not help them understand what was on the ballot.[16]  M. Skow Aff. ¶ 14; W. Skow Aff. ¶ 10.

29. Because Mr. Skow did not understand the ballot, he did not cast votes for most of the positions on the ballot for the 2016 general election.[17]  W. Skow Aff. ¶ 11.

30. Plaintiff Wilfred Jones requested language assistance when he went to vote in the 2016 general election as Navajo is his first language.[18] Jones Aff. ¶¶ 5, 14.

---

[14] See supra note 2.
[15] See supra note 2.
[16] See supra note 2.
[17] See supra note 2.
[18] See supra note 2.

31. The interpreter at the Montezuma Creek polling place who assisted Mr. Jones did not interpret the entire ballot for him, could not explain to Mr. Jones which were the County and which were the State elections and propositions on the ballot, and told Mr. Jones to "turn in [his] ballot as is" if he did not "know about a particular portion of the ballot."[19]  Jones Aff. ¶¶ 17-20.

32. Because the interpreter could not answer Mr. Jones' questions or provide a full translation, Mr. Jones did not vote for the propositions on the ballot and did not vote for officials because he could not identify which race was for a County or State position.[20] Jones Aff.¶¶ 20, 21.

33. Plaintiffs' Navajo language expert identified various deficiencies in the County's posted sample ballot translation and the County's general election information found on their website.  These problems varied from relatively small, like a confusing translation of the word "computer," to entirely problematic, like not being able to understand the general election translation.  Manygoats Report at 1-3.

B.  <u>Argument</u>

    a.  <u>The County Did Not Take All Reasonable Steps to Allow Navajo Language Voters to Be Effectively Informed and to Effectively Participate in Voting-Connected Activities</u>

A jurisdiction covered by Section 203 of the Voting Rights Act for an unwritten language should take "all reasonable steps" to provide effective language assistance.  Order at 28 (citing 28 C.F.R. § 55.2(b)).  Though covered jurisdictions have leeway in judging for themselves what is effective, there still must be "substantial compliance with Section 203."  *United States v. Sandoval Cnty.*, 797 F. Supp. 2d 1249, 1253 (D.N.M. 2011).  The key word in the governing regulation is "all": simply taking some measures is not necessarily enough.  *See, e.g., id.* (County

---

[19] See supra note 2.
[20] See supra note 2.

failed to meet "all reasonable steps" standard even though it had provided language assistance training for some poll workers and hired a language coordinator); *Nick v. City of Bethel*, No. 3:07-CV-0098, 2010 WL 4225563 (D. Alaska July 30, 2008) (County failed to provide public service announcements or track whether 'public service announcements were translated, failed to ensure fluency of poll workers and accuracy and comprehensiveness of translations, and failed to require mandatory training of poll workers).

Here, the County failed to take "all reasonable steps" to (1) effectively inform voters and (2) to allow them to "participate effectively in voting-connected activities." *Navajo Nation Human Rights*, 2016 WL 6068125, at *13. The County's attempts to inform Navajo residents about the 2016 election process in the lead up to both the primary and general elections were decidedly insufficient. Defendants have admitted that no radio ads concerning the primary elections were played on Navajo language radio stations. Defs. Resp. to Pls.' First Set of Interrogs., No. 7. Moreover, the ads played in advance of the general election were confusing to the Navajo public,[21] as were the public meetings held on the issue. Teeasytoh Aff. ¶ 5, Manygoats Report at 2. For example, attendees to meetings held at various chapters by the County ostensibly to provide information about the elections left confused and mistakenly believed they *had* to vote by mail in the general election, rather than understanding that they had the option to vote at one of the four polling places *or* by mail.[22] J. Charley Aff. ¶ 9; B. Charley Aff. ¶¶ 7, 9. In addition, attendees to the chapter meetings reported that Mr. Tapaha, the County's translator, was not able to translate all of the ballot propositions into Navajo during the meeting, J. Charley Aff. ¶ 8, and that he frequently spoke in English, even though there were

---

[21] See supra note 2.
[22] See supra note 2.

elders present who spoke only Navajo.[23]  B. Charley Aff. ¶¶ 3-4, 8-9.  And, while the County posted various recordings pertaining to the election on the San Juan County website, these translations had serious deficiencies.  Manygoats Report at 1-3.

In addition to failing to effectively *inform* Navajo residents about the election process, Defendants also failed to provide the assistance necessary to allow Plaintiffs and other residents to effectively *participate* in the voting process.  For voting participation to be effective, it must be "informed or meaningful."  *Padilla v. Lever*, 463 F.3d 1046, 1054 (9th Cir. 2006) (Reinhardt, J., concurring); *see also* Paul Tiao, *Non-Citizen Suffrage: An Argument Based on the Voting Rights Act and Related Law*, 25 Colum. Hum. Rts. L. Rev. 171, 194 (1993) ("The rationale behind the decision to provide multilingual voting assistance is the same as the reasoning that required help for illiterate voters: meaningful assistance to allow the voter to cast an effective ballot is implicit in the granting of the franchise.").

Participation "in the electoral process in some bare sense" is not enough.  *Padilla*, 463 F.3d at 1054.  Thus, plaintiffs who cast a ballot without fully understanding the ballot firsthand because they cannot read the materials have been prevented from effectively participating in the election.  *Cf. Imperial v. Castruita*, 418 F. Supp. 2d 1174, 1182 (C.D. Cal. 2006) (holding that plaintiff had shown a high probability of irreparable harm where recall petition was not translated because she was not afforded all the information upon which she could make an informed decision); *United States v. Berks Cnty., Pa.*, 250 F. Supp. 2d 525, 530 (E.D. Pa. 2003) (holding that plaintiff had shown a high probability of irreparable harm in Section 2 case where a Spanish-speaking voter "was unable to read the English-language ballot, and simply pushed all

---

[23] See supra note 2.

kinds of buttons on the machine, and in the end was not sure who she voted for" (internal quotation marks and alteration omitted)).

As a result of the County's failure to provide training or a glossary of terms to its poll workers, poll workers were unable to provide "meaningful" assistance such that limited-English voters were effectively informed and could effectively participate in the election. *Padilla,* 463 F.3d at 1054 (Reinhardt, J., concurring).  None of the named Plaintiffs who asked for language assistance felt that the assisting poll worker helped them to fully understand their ballots.[24]  M. Skow Aff. ¶¶ 12-14; W. Skow Aff. ¶¶ 7-11, Jones Aff. ¶¶ 17-21.  This meant that some Navajo speaking voters were uncomfortable voting a full ballot and were therefore effectively disenfranchised.[25]  Jones Aff.¶¶ 20, 21; W. Skow Aff. ¶¶ 10-11 ("I didn't cast votes for most of the positions because I didn't understand the ballot").

It is unsurprising that poll workers struggled to translate the ballot, as Defendants' own staff acknowledge that translating from English to Navajo can be difficult, especially when there are propositions with complicated legal language on the ballot.  Tapaha Dep. 2015 36:3-37:21, ECF No. 107.  Yet, even though translating ballots from English to Navajo is challenging, the County has failed to properly train its poll workers.[26] Defs.' Resp. to Pls.' First Set of Interrogs., Resp. No. 5; Stevens Aff. ¶ 5.  Furthermore, the handbook for translation Mr. Tapaha has stated he relies on as a glossary for election-related translations that is over 20 years old and does not contain most of the terms found in the 2016 ballot used by San Juan County voters.  Defs.' Opp. to Pls.' Mot. for Prelim. Inj., ECF No. 108, Ex. 10.  It does not appear that the glossary has been distributed to anyone else providing language assistance.  Tapaha Dep. 2015 99:18-100:20, ECF

---

[24] See supra note 2.
[25] See supra note 2.
[26] See supra note 2.

No. 107.  As a result of the County's failure to train its poll workers or provide them with an updated glossary, or make an audio version of the ballot available at polling places, it is unsurprising that some poll workers simply told voters asking for assistance to skip portions of the ballot they did not understand.[27] Jones Aff.¶¶ 16-22.  Such haphazard and incomplete language assistance effectively disenfranchised limited English-speaking voters.

While Plaintiffs recognize that the effectiveness standard "'does not demand perfection but only . . . 'substantial compliance' with [Section] 203,'" the undisputed facts paint a picture of the County's chronic deviation from its Section 203 obligations: the County failed to train its poll workers and interpreters or provide audio versions of the ballot at polling places, Defs. Opp. to Pls. Mot. for Prelim. Inj., ECF No. 108, at 22; Stevens Aff. ¶ 5; Begay Aff. ¶ 8, the County failed to follow through to ensure public service announcements regarding election changes were aired, Defs.' Resp. to Pls.' First Set of Interrogs, Resp. No. 7; and the County relied on a glossary of election terms that was over 20 years old, Defs.' Opp. to Pls.' Mot. for Prelim. Inj., ECF No. 108, Ex. 10.  Taken together these and other undisputed facts paint a picture of the County's failure to meet the substantial compliance requirement

**3.  Defendants' Actions Violate the Fundamental Right to Vote Protected by the First and Fourteenth Amendments**

Plaintiffs are entitled to summary judgment on their fundamental right to vote claim because there is no genuine dispute of material facts that San Juan County's election system violates the First and Fourteenth Amendments.  San Juan's electoral practices impose unjustified severe burdens on residents' right to vote.  As such, Plaintiffs are entitled to summary judgment as a matter of law.

---

[27] See supra note 2.

A. <u>Statement of Elements and Undisputed Material Facts Regarding Fundamental Right to Vote Claim</u>

    a. <u>Elements of a Fundamental Right to Vote Claim Under the First and Fourteenth Amendments</u>

In considering a claim under the First and Fourteenth Amendments, the Court "must weigh 'the character and magnitude of the asserted injury'" against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

    b. <u>Relevant Undisputed Facts Bearing on Fundamental Right to Vote Claim Under the First and Fourteenth Amendments</u>

In addition to the undisputed facts asserted above, Plaintiffs assert the following facts bearing on their fundamental right to vote claim under the First and Fourteenth Amendments.

1. 'Many mail-in ballots are returned due to a high percentage of undeliverable addresses in the County. Kane Decl. Ex. 3, ECF No. 94-4 (email from mail processor noting that 8% of San Juan addresses are undeliverable.)

2. Mail delivery to remote parts of the County is frequently delayed, such that it may take almost two weeks to receive one's ballot. The County, however, assumes it only takes four days for ballots to reach residents. Whitehat Second Decl. ¶ 7, ECF No. 112-3 (noting a delay of almost two weeks from the date the County sent out ballots to the date Whitehat received his ballot); *cf.* Kane Decl. Ex. 4 (County Commission notes dated October 6, 2014, in which the Clerk informs commissioners ballots for the 2014 general election would be mailed out on October 10 and received four days later on October 14).

3. Some voters never received their ballot in the mail for the 2016 election, *see* Jones Aff. ¶ 3,

and many people received their ballots after the election was over.  McCool First Report at 190, ECF 94-5.

4. Some mail routes through San Juan County have multiple stops, meaning it may take several days for a ballot from a remote part of the County to reach the point in the mail system where it is actually postmarked.  McCool Second Report at 5-6.

5. Some of the ballots the County rejected from the 2016 primary had postmarks from Phoenix, Arizona, and Albuquerque, New Mexico.  *Id.*

6. On November 8, 2016, the Oljato Senior Center ran out of paper ballots by 10:00 AM.[28] Teeasytoh Aff. ¶ 8.

7. On November 8, 2016, voters experienced long lines at the Oljato Senior Center.[29]  J. Charley Aff. ¶ 12; Teeasytoh Aff. ¶ 10.

8. On November 8, 2016, ballots were inadequately translated to Navajo by some poll workers, leaving some voters confused.[30]  M. Skow Aff. ¶ 14; W. Skow Aff. ¶ 10; Jones Aff. ¶¶ 17-22; Crank Aff. ¶ 11.

9. Voters who wished to vote in the November 8, 2016 election faced, on average, an hour roundtrip to a polling place in 2016.  Webster Decl. Ex. 1, at 51, ECF No. 94-2

10. The County has asserted several reasons for relying on a predominately mail-only voting system: (1) increasing voter turnout, (2) ensuring that non-ADA compliant chapter houses are not used as polling places, and (3) giving voters more time to vote and obtain Navajo language assistance from family and friends.  Defs.' App. Exhibits, Ex. 11 (Deposition of Norma Johnson), at 67:18-69:24, 73:1-75:20, ECF No. 107.

---

[28] See supra note 2.
[29] See supra note 2.
[30] See supra note 2.

B. <u>Argument</u>

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick,* 504 U.S. at 433 (citation and internal quotation marks omitted). Indeed, the "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964); *accord, City of Herriman v. Bell*, 590 F.3d 1176, 1184 (10th Cir. 2010) ("The right to vote is fundamental under the Constitution."); *Navajo Nation v. San Juan County*, 150 F. Supp. 3d 1253, 1262 (D. Utah 2015) ("The right to vote is fundamental."). Given the fundamental nature of the right to vote, a jurisdiction may not place significant burdens on voters' fundamental right to vote without a sufficiently weighty justification for such burden. *See Burdick,* 504 U.S. at 434 (citing *Anderson,* 460 U.S. at 789).

a. <u>Character and Magnitude of Burden on the Right to Vote</u>

In applying the *Anderson/Burdick* balancing test to San Juan County's electoral practices, the Court must first consider the "character and magnitude" of the burden placed on residents' right to vote. Regardless of whether a voter chooses to vote by mail or in-person, the County's practices place a severe burden on residents' right to vote.

       i.   Residents Who Are Able to Only Vote by Mail Face a Severe Burden to Their Right to Vote

The County's reduction of polling places and practice of relying primarily on a vote-by-mail election system are complicated by a number of factors, including the fact that many residents are unable to get their mail on a regular basis, there is a high percentage of bad addresses in the County causing many ballots to be returned as undeliverable, and there are frequent delays in mail service.

### 1.   Undeliverable Addresses and Undeliverable Mail

Vote-by-mail is complicated because many mail-in ballots are returned as undeliverable. An October 7, 2014 email with the mail service company hired by the County to help send out ballots, highlights the problem of undeliverable addresses:

> David, I have processed the addresses for San Juan County ballots.  I am concerned with the number of bad addresses that were detected during processing.   On average when I process a list, the percentage of bad addresses is around 1-2%.   With the list for San Juan County, the percentage is 8% (nearly 500 addresses).

Kane Decl. Ex. 3, ECF No. 94-4.  The next email in the chain appears to be from a supervisor, David Baker, at the mail service company.  Mr. Baker forwards the email regarding the percentage of undeliverable addresses to the former San Juan County Clerk, Norman Johnson, and notes "many if not most of the bad addresses will be returned" and asks how to proceed; Mr. Johnson's response is to "go ahead and proceed."  *Id*.  Unsurprisingly, Professor McCool explained that he found many ballots were returned because of inadequate addresses in San Juan County.  McCool First Report at 183-84, ECF 94-5.

### 2.   Difficulties Accessing Post Offices

As discussed above, because of the rural nature of the County, almost 54% of the County's registered voters do not have a street address.  *Navajo Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253 (D. Utah 2015) at ECF No. 309, dated February 11, 2016, at 15.  Many residents must therefore rely on post office boxes to receive their mail.  Yet, some residents without home delivery are also unable to obtain a post office box in San Juan County, as there is a shortage of post office boxes in some precincts.  *See* Tapaha 2015 Dep. 42:1-7, ECF No. 107 (noting a shortage of post office boxes in Oljato and Monument Valley).  If a resident does have a post office box, the distance to the post office to retrieve one's ballot may still be considerable.  *See* McCool Second Report at 6.  People in more remote areas may have to drive up to 40 miles -

across state lines - to retrieve their mail.  McCool First Report at 189, ECF 94-5.  And again, to make matters worse, this travel may involve using dirt tracks and unpaved roads that may be impassible in inclement weather, especially for the general election in the fall.  *See id.*; *see also* Tapaha 2015 Dep. 36:3-37:21, ECF No. 107.  As a result, some residents do not regularly get their mail.  McCool First Report at 191, ECF No. 94-5 (quoting resident explaining that "the people out there they hardly ever go to the post office, they hardly get their mail.").

### 3.  Delays in Delivery and Postmarking Mail

Problems with the postal service mean that residents in remote parts of the County may have fewer days to vote than other residents.  Mail to remote parts of the County is frequently delayed, such that it may take almost two weeks to receive one's ballot.  Whitehat Decl. ¶ 4; *cf.* Kane Decl. Ex. 4, ECF No. 94-4 (County Commission notes dated October 6, 2014, in which the Clerk informs commissioners ballots for the 2014 general election would be mailed out on October 10 and received four days later on October 14).  Some voters may never receive their ballot, *see* Affidavit of Wilfred Jones ¶ 3, or may receive it after the election is over.  McCool First Report at 190, ECF No. 94-5 ("A lot of people got their ballots after the election was over.").

Furthermore, some mail routes through San Juan County have multiple stops, meaning it may take several days for a ballot from a remote part of the County to reach the point in the mail system where it is actually postmarked.  McCool Second Report at 5-6.  For instance, some of the ballots the County rejected from the 2016 primary had postmarks from Phoenix, Arizona, and Albuquerque, New Mexico.  *Id.*  This means that the deadline for mailing a ballot from a remote part of the County is, in effect, earlier than the deadline for mailing a ballot from other parts of the County.  McCool Second Report at 5-6.

i.   The County's Election Practices Mean Residents Voting In Person Face a
Severe Burden to Their Right to Vote

Even though rural residents may take advantage of early voting if they travel to

Monticello to vote early in person, or to one of the four polling places in the County for Election

Day voting, this does not relieve the significant burdens imposed on residents' right to vote.

Courts have found that obstacles that voters encounter on Election Day – such as long lines,

insufficient poll place staffing, inadequate voting facilities, an insufficient number of voting

machines, and inadequate poll worker training – can amount to a violation of their fundamental

right to vote.  *See Ury v. Santee,* 303 F. Supp. 119, 124-125. (N.D. Ill. 1969); *see also League of*

*Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008).  These are the same

problems that plagued the San Juan County polling places on November 8, 2016.  Voters

experienced long lines at the Oljato Senior Center.  J. Charley Aff. ¶ 12; Teeasytoh Aff. ¶ 10.

Poll workers and interpreters were not trained. Defs. Opp to Pls. Mot. for Prelim. Inj., ECF 108,

at 22; Stevens Aff. ¶ 5; Begay Aff. ¶ 8. Ballots were inadequately translated by poll workers,

leaving some voters confused.  M. Skow Aff. ¶ 14; W. Skow Aff. ¶ 10; Jones Aff. ¶¶ 17-22;

Crank Aff. ¶ 11.  Furthermore, one polling place ran out of paper ballots by 10:00 AM on

Election Day.  Leroy Teeasytoh Aff. ¶ 8.  Where, as here, defendants fail "to provide adequate

voting facilities, plaintiffs and those similarly situated [are] hindered, delayed and effectively

deprived of their rights secured by the Constitution of the United States to vote."  *Ury v. Santee*,

303 F. Supp. 119, 126 (N.D. Ill. 1969).

b.   The County Has Asserted No Interest Which Would Justify the Burden Imposed
on the Fundamental Right to Vote.

In balancing the interests of the parties, the court must consider whether the burdens

imposed upon voters is justified by "relevant and legitimate state interests sufficiently weighty to

justify the limitation."  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008); *see*

*also Anderson*, 460 U.S. at 789.  Here, the County has asserted several reasons for relying on a predominately mail-only voting system: (1) increasing voter turnout, (2) ensuring that non-ADA compliant chapter houses are not used as polling places, and (3) giving voters more time to vote and obtain Navajo language assistance from family and friends.  Defs.' Appendix of Exhibits, Ex. 11 (Deposition of Norma Johnson), at 67:18-69:24, 73:1-75:20, ECF No. 107.  However, Defendants' asserted interests are not "relevant and legitimate state interests sufficiently weighty to justify the limitation" placed on voters, *Crawford*, 553 U.S. at 191; *see also Anderson*, 460 U.S. at 789, and the County's stated interests can be met by a system that allows for mail-in voting while also providing additional in-person voting opportunities that are equally accessible for both voters in remote parts of the County and other voters.  The County's particular interests, therefore, do not outweigh the substantial burdens placed on residents by the new system.

Therefore, in light of the fundamental nature of the right to vote, and the special protections given to voting rights, the undisputed facts establish that San Juan County's election system impermissibly burdens Plaintiffs' right to vote in clear violation of the First and Fourteenth Amendments.  Accordingly, Plaintiffs' claim that Defendants' practices violated their constitutional right to vote should be granted as a matter of law.

## IV.    CONCLUSION

The evidence demonstrates that San Juan County has not provided equal opportunities to vote for all voters as required by Section 2 of the Voting Rights Act, has not provided effective language assistance to non-English proficient voters as mandated by Section 203 of the Voting Rights Act, and has not fulfilled its duty to ensure voters' fundamental right to vote under the First and Fourteenth Amendments. Accordingly, Plaintiffs respectfully request this Court to render summary judgment as to liability on all of Plaintiffs' claims.

RESPECTFULLY SUBMITTED,


/s/ John Mejia
John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
American Civil Liberties Union of Utah
355 North 300 West
Salt Lake City, UT 84103
T: (801) 521-9862
jmejia@acluutah.org
lfarrell@acluutah.org

M. Laughlin McDonald*
American Civil Liberties Union Foundation
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 500-1235
lmcdonald@aclu.org

Ezra D. Rosenberg*
Arusha Gordon*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., Suite 400
Washington, D.C. 20005
T: (202) 662-8600
erosenberg@lawyerscommittee.org
agordon@lawyerscommittee.org

Maya Kane*
10 Town Square, #52
Durango, Colorado 81301
T: (970) 946-5419
mayakanelaw@gmail.com

Raymond M. Williams*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
T: (215) 656-3300
raymond.williams@dlapiper.com

*Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of February, 2017, I electronically filed the

foregoing document with the U.S. District Court for the District of Utah. Notice will

automatically be electronically mailed to the following individual(s) who are registered with the

U.S. District Court CM/ECF System:

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-7300


*Attorneys for Defendants*

_____/s/ John Mejia_____