**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

NAVAJO NATION HUMAN RIGHTS
COMMISSION; PEGGY PHILLIPS; MARK
MARYBOY; WILFRED JONES; TERRY
WHITEHAT; BETTY BILLIE FARLEY;
WILLIE SKOW; and MABEL SKOW,

                Plaintiffs,

       v.

SAN JUAN COUNTY;  JOHN DAVID
NIELSON, in his official capacity as San Juan
County Clerk; and PHIL LYMAN, BRUCE
ADAMS, and REBECCA BENALLY, in their
official capacities as San Juan County
Commissioners,

              Defendants.

Case No. 2:16–cv–000154 JNP

ORAL ARGUMENT REQUESTED

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................. 1

II.    BACKGROUND ............................................................................. 2

III.   RESPONSE TO STATEMENT OF ELEMENTS AND FACTS .................................... 3

    A.     Response to Elements ........................................................... 3

    B.     Response to Undisputed Facts ..................................................... 4

        1.     Unique Characteristics of San Juan County ............................... 4

        2.     2016 Primary Election Compliance with the Voting Rights Act .............. 5

        3.     2016 General and Future Election Compliance with the VRA and Equal Protection ................................................. 26

        4.     DOJ Tacit Approval of County Election Procedures ......................... 32

IV.    PLAINTIFFS' ADDITIONAL STATEMENT OF ELEMENTS AND FACTS ........... 37

V.     ARGUMENT .............................................................................. 44

    A.     Defendants' Motion for Summary Judgment on Plaintiffs' Section 2 Claim Should Be Denied ............................................................... 44

        1.     The 2014 Election Plan is Still at Issue ................................. 44

        2.     The 2016 Election Plan Violates Section 2 of the VRA ..................... 45

    B.     Defendants are Not Entitled to Summary Judgment on Section 203 .................. 47

    C.     Defendants are Not Entitled to Summary Judgment on Plaintiffs' Equal Protection Claim ............................................................... 51

    D.     Plaintiffs Are Entitled to Injunctive Relief ....................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Burdick v. Takushi*,
   504 U.S. 428 (1992)............................................................................................4, 51

*Citizen Ctr. v. Gessler*,
   770 F.3d 900 (10th Cir. 2014) ...............................................................................57

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)...............................................................................................55

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944)...............................................................................................56

*League of Women Voters of Ohio v. Brunner*,
   548 F.3d 463 (6th Cir. 2008) .................................................................................55

*Mitchell v. Hertzke*,
   254 F.2d 183 (10th Cir. 1956) ...............................................................................57

*Navajo Nation v. San Juan Cnty.*,
   150 F. Supp. 3d 1253 (D. Utah 2015).................................................40, 43, 47, 53

*Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*,
   508 F. Supp. 2d 972 (D. Utah 2007)......................................................................57

*Swift & Co. v. United States*,
   276 U.S. 311 (1928)...............................................................................................57

*U.S. v. W.T. Grant Co.*,
   345 U.S. 629 (1953).....................................................................................56, 57, 58

*Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rights Ctr. of Kan.*,
   491 F.3d 1143 (10th Cir. 2007) .......................................................................45, 56

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981)...............................................................................................50

*Ury v. Santee*,
   303 F. Supp. 119 (N.D. Ill. 1969) .........................................................................55

*Voile Mfg. Corp. v. Dandurand*,
   551 F. Supp. 2d 1301 (D. Utah 2008)....................................................................55

## TABLE OF AUTHORITIES
### (continued)

Page(s)

STATUTES

2 V.R.A., 52 U.S.C. § 10301 ..................................................................................3

203 V.R.A., 52 U.S.C. § 10503(c) ..........................................................................3

1 N.N.C. § 2(O) .....................................................................................................32

2 N.N.C. §§ 871-77 ...........................................................................................8, 32

U.C. § 20A-1-203 .................................................................................................32

U.C. § 20A-1-204 .................................................................................................32

U.C. § 20A-3-601(1)-(2) ..................................................................................37, 46

U.C. § 20A-3-601(3) ........................................................................................37, 46

U. C. § 20A-3-603 ................................................................................................38

U. C. § 20A-3-603(1) ...........................................................................................38

OTHER AUTHORITIES

28 C.F.R. § 55.2 ...................................................................................................40

28 C.F.R. § 55.20(c) ............................................................................................47

81 Fed. Reg. 87, 532 (Dec. 5, 2016) ...................................................................39

*Ballot Errors Force Reprint, New Ballots to be Mailed Today,*
    San Juan Record (Oct. 27, 2016) ...................................................................17

Commission Work Meeting, Audio Recording (Feb. 16, 2016),
    http://www.sanjuancounty.org/archives/Commission%20Audio/20160216%20commi
    ssion%20mtg.MP3 ..............................................................................................9

Fed. R. Civ. P. 56 ..................................................................................................1

Fed. R. Evid. 602 .................................................................................................22

Fed. R. Evid. 701 .................................................................................................22

U.R.C.P. 56-1 ....................................................................................................1, 3

Pursuant to Fed. R. Civ. P. 56 and D. Utah Civ. R. 56-1, Plaintiffs Navajo Nation Human Rights Commission ("NNHRC"), Peggy Phillips, Mark Maryboy, Wilfred Jones, Terry Whitehat, Betty Billie Farley, Willie Skow and Mabel Skow ("Plaintiffs") respectfully submit this Opposition to Defendants' Motion for Summary Judgment. This Opposition is supported by the memorandum below and attached exhibits. Plaintiffs respectfully request oral argument.

## I.    INTRODUCTION

Defendants' Motion for Partial Summary Judgment as to Plaintiffs' claims is based wholly on two equally untenable theories: (1) that the only issue before this Court is the legality of Defendants' 2016 election plan—and not all of it at that; and (2) that Defendants' naked assertion that the County is in compliance with Section 203 of the Voting Rights Act ("VRA") is determinative of that claim. These theories underlie Defendants' entire defense to all of the VRA claims, the constitutional claim, and Plaintiffs' request for injunctive relief. The theories are based on a fundamental misunderstanding of both Plaintiffs' claims and the governing law.

First, although Defendants have purported to change some—but not all—of its challenged election plan for the 2016 elections, they did not change a key element, the limitation of early voting to a single polling place in Monticello, which violates Section 2 of the VRA because it continues to have a discriminatory impact on Navajo voters because of the undisputed disproportionate travel burden on them when compared to white voters. Nowhere in their motion do Defendants address this issue.

Similarly, Defendants fail to address Plaintiffs' claim that a system relying largely on mail-in-voting unnecessarily burdens rural voters compared to other voters, in violation of the Fourteenth Amendment.

Third, the facts adduced in discovery demonstrate that the decision to create three new polling places for in-person voting on Election Day was made under mysterious circumstances,

completely undocumented, and can be changed with the same surreptitiousness by the County Clerk/Auditor unilaterally. Under these circumstances, the originally challenged plan is clearly susceptible to repetition, but incapable of review, unless relief is granted in this case. Nowhere in their motion do Defendants address this issue.

Finally, although Defendants describe in summary fashion the acts they have taken to attempt to comply with the language assistance requirements of Section 203 of the Voting Rights Act, nowhere do they indicate why and how these acts meet the effectiveness standard which Section 203 mandates. Instead, they ask this Court to accept their say-so that this "clearly" meets the Act. However, Plaintiffs have offered ample proof that the language assistance is woefully below the standard of effectiveness. None of these facts are controverted in Defendants' motion.

For these reasons, as more fully explained below, Plaintiffs respectfully request that this Court deny Defendants' Motion for Partial Summary Judgment.

## II.    BACKGROUND

Plaintiffs have provided a detailed background in their Motion for Partial Summary Judgment, filed on February 24, 2017. *See* ECF No. 144 at 2–4.

Defendants open their memorandum in support of summary judgment by baselessly claiming that Plaintiffs have fabricated their claims under the Voting Rights Act and the Constitution. As their sole example, Defendants point to the deposition transcript of Terry Whitehat and claim that Plaintiffs' counsel "intended to mislead the Court" by representing that Mr. Whitehat had to drive to Monticello to vote in the 2016 primary election. However, nowhere in their briefs do Plaintiffs state or imply that Mr. Whitehat had to drive to Monticello to vote in person on *election day*. Rather, in context, it is clear that Plaintiffs relied on Mr. Whitehat's Declaration to show that Mr. Whitehat was burdened by the lack of *early voting* outside of Monticello. Throughout this case, Defendants' tactic has been to try to steer focus away from the

problems with their voting procedures and to invented controversies. The Court should resist this bait.

## III.     RESPONSE TO STATEMENT OF ELEMENTS AND FACTS

### A.     <u>Response to Elements</u>

Defendants failed to comply with D. Utah L.R. 56-1(b)(2), which requires a motion for summary judgment to include a Statement of Elements that contains: "(A) Each legal element required to prevail on the motion;" and "(B) Citation to legal authority supporting each stated element (without argument)."  Instead of including this information in their motion for summary judgment, Defendants state instead that "to prevail on their VRA *Claims*, Plaintiffs must show that San Juan Clerk/Auditor's *current* election procedures deny Navajo voters the ability to participate in elections on equal terms with non-Navajo voters, or that the San Juan Clerk/Auditor has failed to provide adequate Navajo-language assistance to voters with limited English proficiency."  Defs.' Mot. Summ. J. at 10, ECF No. 141.

Plaintiffs agree that Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 is violated when racial or language minorities "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  However, Plaintiffs believe the mail-in system in effect *at the time the complaint was filed*, as well as the current election procedures, violate Section 2 and are subject to review by this Court. Plaintiffs agree that Section 203 of the Voting Rights Act, 52 U.S.C. § 10503(c), requires San Juan County to furnish Navajo language oral instructions, assistance, or other information relating to registration and voting. Plaintiffs believe the mail-in system in effect *at the time the complaint was filed*, as well as the current election procedures, violate Section 203 and are subject to review by this Court.

Defendants further state that "to prevail on their *Fourteenth Amendment Claims*, Plaintiffs must show that San Juan Clerk/Auditor's current procedures were adopted either with an intention to discriminate against Navajo voters, or that, as implemented by the Clerk/Auditor, the ability of Navajo residents to exercise their right to vote is unreasonably hindered as compared to non-Navajo residents." Defs.' Mot. Summ. J. at 10. Again, Plaintiffs agree with Defendants' overall description of what is necessary for a Fourteenth Amendment claim, but note that Defendants have inserted language regarding "current procedures" without citing to any legal authority. Given the fundamental nature of the right to vote, the election procedures place significant burdens on Navajo voters' fundamental right to vote without a sufficiently weighty justification for such burdens. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Plaintiffs believe the mail-in system in effect *at the time the complaint was filed*, as well as the current election procedures, violate the Fourteenth Amendment and are subject to review by this Court.

B.    **Response to Undisputed Facts**

1.    Unique Characteristics of San Juan County

**DEFS.' 1.** According to the 2010 Census, the County's population was 14,746 people. The 2010 Census also put the County's voting-age population (18 years old and over) at 9,729 or 65% of the population.

**PLS.' RESPONSE TO DEFS.' 1.** Undisputed as to Census numbers. Disputed that the citation given by Defendants discusses the County's voting-age population.

**DEFS.' 2.** The voting-age population is almost equally split between Indian and non-Indian voters. Depending upon how "Indian" is defined for the purpose of analyzing Census data, Indians comprise between 49.40% and 50.23% of the County's voting-age population.

**PLS.' RESPONSE TO DEFS.' 2.** Undisputed**.**

**DEFS.' 3.** San Juan County is also immense. It is one of the largest counties in the United States at approximately 8,103 square miles in size.

**PLS.' RESPONSE TO DEFS.' 3.** Undisputed.

**DEFS.' 4.** Highway 191 is the only road in San Juan County that traverses the County from its northern boundary to its southern boundary. From Spanish Valley, Utah on San Juan County's northern border to Monument Valley, Utah on the County's southern border is a distance of approximately 183 miles and, in good weather, takes approximately 3 hours and 26 minutes to drive from Spanish Valley to Monument Valley.

**PLS.' RESPONSE TO DEFS.' 4.** Undisputed.

**DEFS.' 5.** Vast regions of the County are uninhabited and, according to Norman Johnson, the former San Juan County Clerk / Auditor, only about 25% of the County's registered voters have a physical address. The remainder, both Indian and non-Indians alike, live in rural parts of the County and use a post office box for their address.

**PLS.' RESPONSE TO DEFS.' 5.** Undisputed.

2.    2016 Primary Election Compliance with the Voting Rights Act

**DEFS.' 1.** Pursuant to Utah statute, the San Juan Clerk/Auditor implemented a vote-by-mail election process for the 2014 election cycle, for which ballots were sent by mail to all registered voters with instructions for completing the ballots and returning them by mail.

**PLS.' RESPONSE TO DEFS.' 1.** Plaintiffs' object to this compound statement. Undisputed as regarding the implementation of a vote-by-mail election process for the 2014 election cycle. Disputed that "*ballots* were sent by mail to all registered voters" (emphasis added). Defendants cite to Norman Johnson's deposition to support this assertion but, when read in context, it is clear that during his deposition Mr. Johnson was referring to a pre-election mailing sent to voters, not to the actual ballots. *See* Deposition of Norman Johnson ("Johnson Dep."), June 23, 2015, ECF

No. 107, Ex. 11 at 67–69, 71, and 79, attached as **Ex. A**. Furthermore, Mr. Johnson could not confirm whether the County's pre-election mailing discussed at the pages cited by Defendants to support their assertion was to "active and inactive [registered voters] or just the active." *Id*. at 69:4–11.

DEFS.' 2. In addition to the obvious reduction in election administration costs associated with the Clerk/Auditor having to establish and staff polling locations on election day, the purposes for the adoption of the vote-by-mail process also included: (1) encouraging greater voter participation in elections by making voting more convenient for all voters; (2) solving the problem of many of the on-Reservation polling places being in Navajo Chapter Houses that were not ADA compliant; and (3) reducing the problem that Navajo dialects caused in providing language assistance because, depending where one lived on the Navajo Reservation, people speak a different Navajo dialect whereas with vote-by-mail those persons not proficient in English have time to consult with family members or trusted friends who speak the same dialect to help them interpret the ballots.

PLS.' RESPONSE TO DEFS.' 2. Disputed. Plaintiffs object to this compound statement. Undisputed that the former County Clerk asserted the above reasons for his decision to adopt the mail-only system, but disputed as to whether these reasons are valid. Defendants present no evidence for their assertion that there is an "obvious reduction in election administration costs" by switching to a mail only system. Rather, Mr. Johnson testified that the switch to a mail only system would "probably save some money, but certainly would be even." Ex. A, Johnson Dep. 68:19–21. In addition, Defendants' assertion regarding voter participation is not supported: the results of the 2014 general election indicate that turnout decreased from 2010 among many predominantly Navajo precincts, including Mexican Hat, Oljato, Navajo Mountain and Red

Mesa. Declaration of John Mejia ("Mejia First Decl."), ECF No. 112, Ex. 4, attached as **Ex. B**; *see also* Declaration of Dr. Dan McCool ("McCool Decl."), ECF No. 94-5, attaching Expert Witness Report by Dr. Daniel McCool ("First McCool Report") at 188–189 (discussing turnout between 2014 and 2010), attached as **Ex. C**. It further bears noting that a jurisdiction cannot close all polling places to avoid liability under one federal law, while adopting a system which violates their responsibilities under another federal law (e.g., avoiding responsibilities under the ADA by switching to a mail-only system for a jurisdiction that is covered by Section 203 of the Voting Rights Act for a largely unwritten language). Furthermore, Defendants have produced no evidence regarding any problems that purportedly different "Navajo dialects caused in providing language assistance." Even if they had done so, they have pointed to no evidence or precedent that suggests that their decision to assume that voters might rely on unnamed friends and family was an effective method of providing language assistance services in that situation. Finally, Mr. Nielson has testified that he has never heard from voters or residents that they prefer assistance from family members rather than from interpreters provided by the County. Deposition of John David Nielson ("Nielson Dep."), September 26, 2016, 87:24–88:3, attached as **Ex. D**.

DEFS.' 3. For the 2014 elections, the only polling location open on election day was at the San Juan County Clerk/Auditor's office at the county seat in Monticello. Declaration of John David Nielson ("Nielson Decl."), ECF No. 109, Ex. 1 ¶ 6, attached as **Ex. E**.

PLS.' RESPONSE TO DEFS.' 3. Undisputed.

DEFS.' 4. In developing the 2014 vote-by-mail procedures, the former County Clerk Auditor, Norman Johnson, worked with and received the tacit approval of the Navajo Election Administration.

**PLS.' RESPONSE TO DEFS.' 4.** Disputed. This assertion lacks evidentiary foundation and is immaterial to the legal claims made by Plaintiffs. The Navajo Election Administration did not provide tacit approval for the system. Mr. Johnson's deposition transcript simply describes a conversation with a single individual from the Administration, Mr. Edison Wauneka, who told Mr. Johnson that he "liked" "by-mail voting." Deposition of Edward Tapaha, June 24, 2015 ("Tapaha 2015 Dep.")  94:23–95:20, attached as **Ex. F**. Furthermore, given that the Navajo Election Administration's mission concerns *Navajo Nation* elections, not state or local elections, the approval of the Administration is irrelevant. Navajo Nation Code, 2 N.N.C. §§ 871–77, attached as **Ex. G**. Moreover, the Navajo Board of Election Supervisors passed a resolution in May 2014 opposing all-mail voting in San Juan County. ECF 94-1, Ex. 4.

**DEFS.' 5.** Following the 2014 election cycle, as a result of comments from voters about the new vote-by-mail process, the County Clerk/Auditor determined in early 2016 before this suit was filed, that for the 2016 election cycle three additional polling locations all on the Navajo Reservation, would be open on election day for both the June 28, 2016 primary and the November 8, 2016 general elections, each of which would be staffed with at least one poll worker who could provide Navajo-language assistance to voters needing such assistance.

**PLS.' RESPONSE TO DEFS.' 5.** Disputed. The Defendants' assertion that the decision to move away from vote-by-mail only *before* this lawsuit was filed is not supported by undisputed facts. Instead, they point only to Mr. Nielson's self-serving statement that "by late January or early February," the "County had already made the decision" to reopen less than half of the closed polling places. Ex. E, Nielson Decl. ¶ 14. Contemporaneous documents call this assertion into question. First, a news article describing the February 16, 2016, County Commission meeting—just nine days before the Complaint was filed—and the audio recording of that

meeting indicates that the decision had not been made at that time. *See* Declaration of John Mejia ("Mejia Second Decl."), attached as **Ex. H**; *County Commissioners discuss mail-only ballots*, San Juan Record, Feb. 24, 2016, attached as **Ex. I**. One would expect that if the County had decided on the issue late January or early February, the County Commissioners would have been aware of that decision. Instead, during that meeting, the Commissioners discussed the decision as to whether to retain the mail-only system as still being open. *Id*. The minutes and news report from that meeting show that Mr. Nielson was present at that meeting, and that he discussed the decision with the Commissioners, noting that he had not received any written recommendations regarding the mail-only system from the State Director of Elections. *Id*. Had the decision actually been made in late January or early February, Mr. Nielson or any other County decision makers could have clarified or stated that decision for the record, rather than continuing to discuss the decision as still open. Commission Work Meeting, Audio Recording, Feb. 16, 2016, available here:

http://www.sanjuancounty.org/archives/Commission%20Audio/20160216%20commission%20mtg.MP3 (discussion of mail in ballots at minute 37), attached as **Ex. L**. None did.

Moreover, Nielson did not make a public announcement regarding the decision to reopen some of the closed polling places until about March 9, 2016, after this lawsuit was filed. *See* Ex. E, Nielson Decl. ¶ 21. Mr. Nielson testified that he recalls that the idea to prepare a press release notifying the public was one the County Attorney suggested at about the time he was served with the Complaint in this action. Ex. D, Nielson Dep. 73–74. Had the County actually decided to reopen polling places in January 2016, there is no good reason why that decision was not discussed at the next public meeting or publicly announced until March 2016. Indeed, Defendants have provided no documentation that that decision was communicated in any way by

Nielson to his staff, the County commissioners or *any other person* until after the Complaint was filed. In fact, a March 8, 2016 article published in the *San Juan Record*, over a week after the Complaint was filed, notes that "[t]he San Juan County Commission and County Clerk John David Nielson have yet to announce how they will handle the ballots for the 2016 election." *See* Ex. H, Mejia Second Decl. and *Election season will include several changes*, San Juan Record dated March 8, 2016, attached as **Ex. J**. All of these facts give Plaintiffs ample reason to dispute the purported timing of the County's decision to reopen some polling places.

DEFS.' 6. In January and February 2016, and again in June 2016, prior to the county-wide primary election, the County's Navajo liaison, Ed Tapaha, again repeatedly visited Navajo Chapter Houses to explain the vote-by-mail procedures; whereas Plaintiffs' *Complaint* was filed on February 25, 2016 (ECF No. 2 ("Comp.")), but San Juan County Defendants were not served until March 1, 2016 (ECF Nos. 26–30).

PLS.' RESPONSE TO DEFS.' 6. Plaintiffs object to this compound statement. Plaintiffs do not dispute that Mr. Tapaha visited some of the chapter houses to explain vote-by-mail procedures. However, Mr. Tapaha did not discuss in-person voting opportunities, especially given that some of those visits occurred *before* the decision to reopen polling places was made. Deposition of Edward Tapaha, June 24, 2016 ("Tapaha 2016 Dep.") 25:2–26:17, attached as **Ex. II**. Undisputed that all the Defendants were served on March 1, 2016.

DEFS.' 7. The San Juan Clerk/Auditor issued press releases announcing the new polling locations for in-person voting, which were published in the *San Juan Record* and the *Navajo Times* on March 9, 2016. Those press releases, however, had been prepared by the San Juan County Attorney approximately a week earlier.

**PLS.' RESPONSE TO DEFS.' 7.** Plaintiffs object to this compound statement. Plaintiffs do not dispute that the *Navajo Times* and the *San Juan Record* ran articles regarding changes to the County's voting procedures after the Complaint was filed and after publicity regarding the Complaint in these same news outlets. *See* **Ex. J** (a *San Juan Record* article from March 8, 2016 discussing the mail-only system and noting that "the San Juan County Commission and County Clerk John David Nielson have yet to announce how they will handle the ballots for the 2016 election.") Disputed that the *Navajo Times* article Defendants' cite to was published on March 9, 2016 (it has a date of March 10). Defendants do not provide, and Plaintiffs could not identify, any articles in the San Juan Record regarding this issue from March 9, 2016, although, as mentioned above, there is an article in that publication from March 8, 2016 noting that the County had not yet made a decision regarding mail-only voting. Ex. J. Disputed that the press release had been prepared by the San Juan County Attorney a week earlier as there is no evidence of this, beyond Nielson's Declaration and Nielson did not prepare the press release and has not asserted any foundation for how he knows when the County Attorney prepared the press release. Defendants have produced no documents to support this assertion and their response to Plaintiffs' discovery requests on this topic do not indicate that any communication between the County Attorney and the County Clerk concerning the press release occurred before (or after) the Complaint was filed. *See* Ex. H, Mejia Second Decl.; *see also* Defs.' Resps. to Pls.' First Set of Interrogs. and Reqs. for Produc. ("Defs. Resps. to Pls. First Set of Interrogs."), Resp. No. 17, attached as **Ex. K**.

**DEFS.' 8.** During the 2016 primary election, the San Juan Clerk/Auditor had four polling locations for in-person voting, three of which were on the Navajo Reservation and within an

average 15-mile travel distance to the nearest polling location for Navajo voters as compared to an average of 20 miles for non-Indian voters.

**PLS.' RESPONSE TO DEFS.' 8.** Undisputed. However, while travel to in-person polling places open on Election Day may be more or less equal, this ignores the disparate road conditions in the County. *See* Ex. C, First McCool Report at 201–06 (discussing poor road conditions in the southern, largely Navajo part of the County as compared with the northern, largely white part of the County).

**DEFS.' 9.** During the 2016 primary, the San Juan Clerk/Auditor had a Navajo-language audio recording on its county website, as well as at each polling location on election day, identifying the candidates, their political affiliation and the offices for which they were seeking to be elected.

**PLS.' RESPONSE TO DEFS.' 9.** Disputed. Plaintiffs object to this statement because it lacks evidentiary foundation. Defendants cite to Mr. Nielson's Declaration for this assertion, yet Nielson does not speak Navajo and is therefore not competent to testify on what is or is not translated in the recording. Ex. D, Nielson Dep. 68:25–69:1. Defendants provided no expert witness concerning language or translation.

**DEFS.' 10.** During the 2016 primary election there were experienced Navajo interpreters, trained by Mr. Edward Tapaha, at each of the polling locations to assist those voters who were not proficient in reading English with help in voting, registering, etc.

**PLS.' RESPONSE TO DEFS.' 10.** Disputed. Plaintiffs object to this statement because it is vague and lacks evidentiary foundation. The term "experienced Navajo interpreters" implies that the individuals hired by the County for language assistance had some sort of formal training specific to providing an effective interpretation between English language ballots and Navajo.

The record contains no evidence that any of these individuals received such training for the 2016 primary, and in fact, Mr. Tapaha himself has not received any formal interpretation training. Ex. II, Tapaha 2016 Dep. 12:1-5. Translators are recruited informally by Mr. Tapaha and translators are not required to have any relevant qualifications. Declaration of Maya Kane ("Kane Decl.") at Ex. 1, Part 2 91:10-17, ECF  No. 94-4, attached here as **Ex. N**.

The "training" Tapaha describes at the pages cited by Defendants is nothing more than a "brief" conversation, that could have happened years before:

Q:  … Can you tell me what the training was?
A. Training is that to explain the position that is on the ballot and who they are, and also trained what to say for the Utah State House of Representative, the U.S. Senate, governor's position translation.
Q. Who trained them?
A. I do.
Q. You trained them?
A. I did.
Q. Okay. When did you train them?
A. I guess depending on their train of thoughts from previous training that I did with them, and I talk to them briefly as I communicate with them that we will use them as poll workers.

Ex. II, Tapaha 2016 Dep. 52:14–54:1. As can be seen from the above, Mr. Tapaha acknowledges that his training of interpreters is not specific to any ballot or election cycle, and is very brief in nature, and that once he selects an individual, he simply tells them they will work again without providing additional training. *See also* Ex. K, Defs.' Resp. to Pls.' First Set of Interrogs., Resp. No. 5 (describing how Mr. Tapaha did not provide training to poll workers working in the predominantly Navajo precincts for the 2016 primary election). Thus, in contrast to an implication that the County's interpreters are well trained, the evidence shows that Mr. Tapaha provides a translation for certain offices once, and then does not again train at all, much less for any accepted translations for terms on specific ballots.

As Mr. Tapaha himself has acknowledged, in his capacity as the Defendants' 30(b)(6) most knowledgeable person for election procedures in the southern portion of San Juan County, he worries that his failure to train those providing language assistance may lead to ineffective translations, a concern he shared with other County officials:

> Q. … But you agree that there is really no formal training or process for their provision of
> Navajo-language assistance; right?
> A. No. No.
> Q. You don't agree with me, or you do agree with me?
> A. I do agree.
> Q. Does that concern you at all?
> A. Yes.
> Q. Why does it concern you?
> A. Maybe miswording, miswording some information.
> Q. Have you ever raised those concerns to anyone in the county?
> A. I did talk to the county clerk, and I also talked to the polling official.

Ex. II, Tapaha 2016 Dep. at 99:9-24.

**Defs.' 11.** Navajo is historically an unwritten language, although efforts have been made in recent decades to develop a written form of the language, which not all Navajo can read the written form of the language.

**PLS.' RESPONSE TO DEFS.' 11.** Undisputed.

**Defs.' 12.** Younger Navajo are becoming increasingly less fluent and unable to speak Navajo.

**PLS.' RESPONSE TO DEFS.' 12.** Undisputed, although Plaintiffs object because this statement is immaterial to their Section 203 claim. Furthermore, Mr. Tapaha is not an expert on this issue.

**Defs.' 13.** For the 2016 county-wide primary election, which was held on Tuesday, June 28, 2016, there were three polling places open on election day, in addition to the County

Clerk/Auditor's office in Monticello, to accommodate those voters who wish to cast their ballot in person.

**PLS.' RESPONSE TO DEFS.' 13.** Undisputed. Plaintiffs object to the "those voters" because it is vague.

**Defs.' 14.** The locations of the three additional polling locations, all of which were located on the Navajo Reservation, are as follows:

> Navajo Mountain Chapter House
> Navajo Route 16, mile marker 36.15
> Navajo Mountain, Utah
>
> Oljato Senior Center
> County Road 422, 15 miles north of
> Gouldings' Store Oljato, Utah
>
> Montezuma Creek Fire Station
> 15 South Texaco Road
> Montezuma Creek, Utah

**PLS.' RESPONSE TO DEFS.' 14.** Undisputed.

**Defs.' 15.** These three locations were selected so as to ensure that no voter in the County is more than a one-hour drive away from an in-person voting location, and that fact is confirmed by the *Declaration* of Plaintiffs' "time and travel" expert, Gerald R. Webster.

**PLS.' RESPONSE TO DEFS.' 15.** Disputed. Defendants cite to Mr. Nielson's Declaration for the assertion that the "three locations were selected so as to ensure that no voter in the county is more than a one-hour drive away from an in-person voting location," yet have not produced any evidence supporting how Mr. Nielson purportedly made this calculation. It turns out he did not do so. In fact, in his deposition, Nielson testified that no one did an "analysis on how long it would take to get to [the] polling locations." Ex. D, Nielson Dep. 115:17–20. As no one in the County did an analysis on how long it would take to get to the polling locations, Mr. Nielson has no credible grounds to make the assertion that this was the reason for his decision as to where to

locate polling places. *See* Declaration of Dr. Gerald R. Webster in Resp. to Defs.' Mot. for Summ. J., March 16, 2017, at 1–3, attached as **Ex. O**. Finally, Plaintiffs' expert found that the *average voter's* drive time to one of the four polling places is an hour, not that "no voter in the County is more than a one-hour drive away from an in-person voting location" as Defendants claim. Plaintiffs have submitted ample evidence that many voters on the Navajo portion of San Juan County face various difficulties in traveling by car to polling places, making even seemingly short increases in distance to polling places disproportionately significant to them.

**DEFS.' 16.** Buried deep within Webster's 53-page report is his assessment of the Navajo and non-Indian travel times with respect to the four polling locations used in the recent 2016 county-wide primary election.

**PLS.' RESPONSE TO DEFS.' 16.** Disputed that Plaintiffs' expert "buried" any data in his report.

**DEFS.' 17.** Webster says that Navajo voters had a mean travel distance to the nearest poll in order to vote in-person of only 15.24 miles while the mean distance to the nearest polling location for non-Indians voters was 20.39 miles. Thus, even Plaintiffs' expert says that Navajo voters have less distance to travel in order to vote in person than do non-Indian voters.

**PLS.' RESPONSE TO DEFS.' 17.** Undisputed as to voting in-person on Election Day. Disputed that Navajo voters "have less distance to travel" pertaining to early in-person voting, which is available in Monticello only. *See, e.g.*, Second Declararntion of Plaintiff Terry Whitehat Decl. ("Whitehat Second Declarartion") ¶ 2, ECF No. 112-3, attached as **Ex. P** (describing five-hour drive to Monticello from Navajo Mountain for early in-person voting in 2016 general election). Furthermore, while travel distance to in-person polling places open on Election Day may be nearly equal, this ignores the disparate road conditions in the County. *See* Ex. C, First

McCool Report at 201–06 (discussing poor road conditions in the southern, largely Navajo part of the County as compared with the northern, largely white part of the County).[1]

DEFS.' 18. Also buried deep within Webster's 53-page report is his assessment of the mean travel distances to the nearest post office for Navajo voters and non-Indian voters who opt to vote by mail.

PLS.' RESPONSE TO DEFS.' 18. Disputed that Plaintiffs' expert "buried" any data in his report.

DEFS.' 19. Webster says that Navajo voters live within 14.27 miles of the nearest post office whereas the distance for non-Indian voters is 4.30 miles. Neither the County nor the Clerk/Auditor have any control over where Navajo voters choose to live or where the federal government locates Post Offices. But even if Navajo voters on average have to travel 10 miles farther than non-Navajo voters to receive and return their mail-in ballots, that does not violate the VRA, especially given the one-month window for voting by mail and the fact that undoubtedly most Navajo voters go to the Post Office more than once a month to get their mail.

PLS.' RESPONSE TO DEFS.' 19. Plaintiffs object to this paragraph because it is a compound statement, contains legal argument and mixed statements of law and fact, and is speculative. Undisputed as to Prof. Webster's findings concerning travel distance to the nearest post office and the fact that neither the County nor the Clerk have control over where Navajo voters choose to live or where post offices are located. Disputed that "even if Navajo voters on average have to travel 10 miles farther than non-Navajo votes to receive and return their mail-in

---

[1] As McCool notes in his report, at a hearing before the U. S. Commission on Civil Rights, tribal chairman Peter McDonald raised this issue: 'To be sure, the Voting Rights Act provides that the Navajo may not be disenfranchised by any government, but to the Navajo stranded on a muddy road 25 or 30 miles from the nearest polling place, of what value is this right?"

ballots that does not violate the VRA, especially given the one-month window for voting by mail and the fact that undoubtedly most Navajo voters go to the Post Office more than once a month to get their mail." First, Defendants attempt to include argument as an undisputed fact. Second, Defendants provide no support for their assertion that there is a "one-month window for voting by mail." This lack of evidence is likely due to the fact that evidence shows residents do not actually have a one-month window for voting. *See Ballot errors force reprint, new ballots to be mailed today*, San Juan Record (Oct. 27, 2016) (reporting that due to multiple clerical errors on ballots, which the County initially planned to mail on October 11 but actually mailed on October 18, the County was reprinting certain ballots and mailing the corrected ballots on October 27, 2016 – just over a week before the general election), attached as **Ex. M**; Ex. P, Whitehat Second Decl. ¶ 7 (noting a delay of almost two weeks from the date the County sent out primary ballots to the date Whitehat received his ballot); *cf.* Ex. N, Kane Decl. at Ex. 4 (County Commission notes dated October 6, 2014, in which the Clerk informs commissioners that, for the 2014 general election on November 4, ballots would be mailed out on October 10 and received four days later on October 14). Third, Defendants fail to cite to any evidence to support their bald assertion that "undoubtedly most Navajo voters go to the Post Office more than once a month to get their mail." Plaintiffs, on the other hand, show that many residents do not regularly get their mail. Ex. C, First McCool Report at 189 ("Remote voters also faced problems in getting their mail-in ballots in a timely manner") and 191 (quoting resident explaining that "the people out there they hardly ever go to the post office, they hardly get their mail."); Declaration of Plaintiff Betty B. Farley ("Farley Decl.")   ("I only check my mail every two to four weeks. The Post Office is about 17 miles from my home and because I do not have a car, I have trouble getting my mail.") ¶ 7, attached as **Ex. Q**. In fact, Mr. Nielson, the County Clerk testified that he had no

idea how often most residents go into the post office to pick up their mail. Ex. D, Nielson Dep. 91:18–21. Mr. Nielson also testified that he has heard of mail getting delayed, has had at least one complaint where a voter did not receive their ballot in time to vote (Ex. D, Nielson Dep. 91:24–95:10), and some ballots arrived at the County Clerk's office too late to be counted. Ex. D, Nielson Dep. 93:16–19.

**DEFS.' 20.** For the 2016 county-wide primary election, a San Juan County election official able to provide Navajo-language voting assistance was available at each of the four polling locations.

**PLS.' RESPONSE TO DEFS.' 20.** Disputed. The statement "able to provide Navajo language assistance" is vague and constitutes legal argument insofar as it is meant to convince this Court that this is equivalent to effective language assistance. Furthermore, Mr. Nielson has testified that he did not know whether Mr. Tapaha trained translators and poll workers at majority Navajo precincts for the primary, so it is unclear what Nielson is basing his assertion that these officials were "able to provide Navajo-language voting assistance" on. Ex. D, Nielson Dep. 121:12–15. Moreover, there is no evidence that the interpreters hired by Tapaha for the primary election could be characterized as "election officials." Also, see Plaintiffs' response to Fact No. 10 concerning the undisputed evidence regarding the Defendants' language assistance "training" for poll workers.

**DEFS.' 21.** Those persons providing language assistance during the 2016 county-wide primary election were Ella Greyeyes and Maryetta Stevens at the Navajo Mountain polling location; Ed Tapaha at the Montezuma Creek polling location; Edyth Tahe at the Oljato polling location; and Fermina Keith at the Monticello polling location.

PLS.' RESPONSE TO DEFS.' 21. Undisputed that these individuals were hired by the County for the primary election. Disputed that any assistance offered was effective given that there was no training provided to any of these individuals regarding how to effectively translate the specific ballots at issue. Ex. II, Tapaha 2016 Dep. 52:14–54:1.

DEFS.' 22. In addition, for the 2016 county-wide primary election, the San Juan Clerk/Auditor had a link on the election page of its website by which voters could access a Navajo-language audio translation of the ballot itself, and that audio was also available at each of the four in-person voting locations.

PLS.' RESPONSE TO DEFS.' 22. Plaintiffs object as this is a compound statement. Undisputed that San Juan County provided an audio recording with some information about the 2016 primary election on their website, but the recording was never checked or reviewed for accuracy or completeness. Ex. II, Tapaha 2016 Dep. 80:22–24; Ex. K, Defs.' Resp. to Pls.' First Set of Interrogs., Resp. No. 6.  As a result, the information was confusing and inadequate to communicate essential information to the public. Declaration of Leonard Gorman Executive Director, Navajo Nation Human Rights Commission ("NNHRC") Decl. ¶ 14, ECF No. 94-1, attached as **Ex. R**.  Further, it is disputed that the audio translation was a translation of "the ballot itself" (rather than just general information) or that the audio was available at each of the four in-person voting locations. Letter to County Clerk from Executive Director of NNHRC, dated Sept. 4, 2015, ECF No. 94-1 at 13–14, attached as **Ex. S**. Defendants provide no evidentiary foundation for these assertions beyond Mr. Nielson's declaration and Mr. Nielson does not speak Navajo. Ex. D, Nielson Dep. 68:25–69:1. Plaintiffs assert that instead of completely translating the ballot, the recording posted on the County website for the primary

election was simply a recitation of the offices up for election during the primary election and who was running for them for each party. Ex. R, NNHRC Decl. ¶ 14.

**DEFS.' 23.** The County's website likewise identifies Ed Tapaha as the County's Navajo Liaison/Elections Coordinator and gives his telephone number and extension. *Id.*, Ex. 8.

**PLS.' RESPONSE TO DEFS.' 23.** Undisputed.

**DEFS.' 24.** Furthermore, as in prior election years, before the 2016 county-wide primary election the San Juan Clerk/Auditor had Edward Tapaha attend meetings of each of the Navajo Chapters to explain in the Navajo language the voting system and answer any questions about the election process.

**PLS.' RESPONSE TO DEFS.' 24.** Disputed. Defendants cite to Mr. Nielson's Declaration to support this assertion, yet Mr. Nielson testified that he did not know whether Mr. Tapaha visited each of the chapter houses, Ex. D, Nielson Dep. 129:14–18, that he has no "records of the number of visits [Mr. Tapaha] [has] made to chapter houses", and that he never asked Mr. Tapaha if he had attended meetings at each Navajo Chapter house located in the County. Ex. D, Nielson Dep. 80:21–81:6. Plaintiffs also dispute that Tapaha attended meetings at "each of the Navajo Chapters" as there is no documentation of this "fact." It is not clear from the section of his deposition cited by Defendants in asserting Fact number 6, whether Tapaha got to every chapter house or just some of them. *See* Response to Fact 6 (discussing Ex. F, Tapaha 2016 Dep. 25:2–26:17).

**DEFS.' 25.** The foregoing procedures, which were in place for the 2016 county-wide primary election, are fully compliant with the requirements of the VRA.

**PLS.' RESPONSE TO DEFS.' 25.** Disputed. Defendants are attempting to include argument as fact. This statement is also vague and lacks evidentiary support.

**DEFS.' 26.** The language assistance, as well as the overall voting information-registration assistance, including three on-reservation polling locations, that the San Juan Clerk/Auditor provides to Navajo voters is not available to non-Indian voters.

**PLS.' RESPONSE TO DEFS.' 26.** Disputed and irrelevant. On language assistance, until recently, when the Ute language became covered for San Juan County, Navajo was the only language for which the County was required by federal law to provide assistance. Moreover, Mr. Francom did not state in his Declaration that the polling locations located on the Navajo reservation were not available to non-Indians, or that non-Indians did not have "overall voting information-registration assistance" available to them.

**DEFS.' 27.** The election records maintained by the San Juan County Clerk/Auditor's Office show that the 2014 election in which vote-by-mail was implemented resulted in a substantial increase in voter turn out as a result of allowing voters the option of voting by mail, especially among Navajo voters. Ex. E, Nielson Decl. ¶ 29.

**PLS.' RESPONSE TO DEFS.' 27.** Disputed. This statement is conclusory opinion, vague, and lacks evidentiary support, and Mr. Nielson is not competent to offer this opinion. Defendants have not supported Mr. Nielson's statement with any "election records" showing a "substantial increase in voter turn out." Determining what factors influenced voter turnout in any given election, and comparing voter turnout in different elections, require complex expert analyses. Mr. Nielson does not have personal knowledge of the reasons for any changes in turnout, especially as he was not County Clerk in 2014. Nor does Nielson have the necessary technical knowledge to determine the reason for the alleged "substantial increase in voter turn out." Therefore, this "fact" is not admissible under Federal Rules of Evidence 602 and 701. Mr. Nielson has not produced these results or attached them for the Plaintiffs and Court to verify.

In addition, this statement is vague as it is not clear whether Mr. Nielson is discussing the primary or general election results from 2014 and what the 2014 election results are being compared with. The results of the previous two mid-term general elections, 2010 and 2014 general elections, posted to the San Juan County website (and included in the record at ECF No. 114, Ex. 4), indicate that turnout actually decreased significantly between 2010 and 2014 in many predominantly Navajo precincts, including Oljato, Navajo Mountain and Red Mesa. Ex. B., Mejia First Decl., Ex. 4; *see also* Ex. C, First McCool Report at 188–89 (discussing turnout between 2014 and 2010).

**DEFS.' 28.** In fact, during the 2014 primary election the number of Navajo voting more than doubled compared to previous elections without the vote-by-mail option.

**PLS.' RESPONSE TO DEFS.' 28.** Disputed. See Pls.' Response to Defs.' 27.

**DEFS.' 29.** The election records maintained by the San Juan County Clerk/Auditor's Office, for example, show that during the 2014 primary election voter participation in precincts with a heavy concentration of Navajo voters went from 25% during the 2012 election using only in-person voting at polls to almost 54% with vote-by-mail in 2014.

**PLS.' RESPONSE TO DEFS.' 29.** Disputed. See Pls.' Response to Defs.' 27.

**DEFS.' 30.** This significant increase in voter participation occurred despite the fact that the 2014 primary election was not a national election which tends to produce a higher number of voters.

**PLS.' RESPONSE TO DEFS.' 30.** Disputed. See Pls.' Response to Defs.' 27.

**DEFS.' 31.** The increased voter participation among Navajo voters was undoubtedly attributable in part to the fact that the mail-in-ballot process allows voters who work away from their homes on the Navajo Reservation, or who are away at college or in the military, to

participate in elections without having to appear at a polling place or apply in advance for an absentee ballot.

**PLS.' RESPONSE TO DEFS.' 31.** Disputed. *See* Pls.' Response to Defs.' 27. This compound statement is conclusory opinion and lacks evidentiary support. Mr. Nielson has no personal knowledge on which to make this assertion. He is not an expert on the causal effects of what drives voter participation, nor is he an expert on the history or socio-economic status of Navajo or where they work and go to school.

**DEFS.' 32.** The increased voter participation among Navajo voters was also undoubtedly attributable to the fact that the mail-in-ballot process allows elderly voters who have no means of transportation to a polling location to vote from their homes by use of the mail-in-ballot. *Id.* ¶ 34.

**PLS.' RESPONSE TO DEFS.' 32.** Disputed. This compound statement is conclusory opinion and lacks evidentiary support. *See* Pls.' Response to Defs.' 31. This is speculation. Defendants have not provided evidence of any Navajo elders actually being impacted in the way asserted. Furthermore, Defendants have not provided expert evidence regarding turn out results or the reasons why participation my fluctuate.

**DEFS.' 33.** There are benefits to a vote-by-mail system over an in-person voting system, including, among others: (a) providing voters the opportunity to consider their election decisions over a longer period of time; (b) accommodating the needs of voters who regularly work outside of the immediate area of their residence, are at school or in the military, without their having to apply personally for an absentee ballot which may be particularly of benefit to a significant number of Navajo voters who work away from their homes due to the limited availability of jobs in San Juan County; (c) allowing voters to make their ballot decisions away from candidates' campaign efforts in close proximity to polling places; and (d) allowing limited-English

proficiency voters to seek assistance from family members or other trusted acquaintances whom they choose rather than relying on interpreters provided by the Clerk/Auditor.

**PLS.' RESPONSE TO DEFS.' 33.** Disputed. This compound statement is conclusory opinion, speculative, and lacks foundation and evidentiary support. *See* Pls.' Responses to Defs.' 31 and 32. Disputed that these "benefits" to a vote-by-mail system are benefits "over" an in-person voting system. In addition to Mr. Nielson having no personal knowledge concerning these assertions, Defendants have provided no expert or other evidence regarding the number of Navajo voters who work away from their homes "due to the limited availability of jobs in San Juan County." In addition, Defendants have no evidence that "candidates' campaign efforts in close proximity to polling places" were illegal or put undue pressure on voters. Ex. D, Nielson Dep. 86:18–87:3. Indeed, Mr. Nielson testified that he had been told that some Navajo voters *prefer* to vote in person because there is frequently food at polling places because of "campaign efforts." Ex. D, Nielson Dep. 87:4–23. Finally, Mr. Nielson has no basis for his assertion that one of the benefits of a vote-by-mail system includes "allowing limited-English proficiency voters to seek assistance from family members… rather than relying on interpreters provided by the Clerk/Auditor" and testified that he had never heard from any voters expressing a preference for translations done by family members rather than official interpreters. Ex. D, Nielson Dep. 86:24–87:3 ("Q. And have you ever heard from voters or residents that they prefer assistance from family members rather than from interpreters provided by the county? A. I have not heard that.").

**DEFS.' 34.** The large turnout of Navajo voters for the 2014 primary election resulted in the election of Rebecca Benally over Kenneth Maryboy and Manuel Morgan for the office of County Commissioner from District Three.

PLS.' RESPONSE TO DEFS.' 34. Disputed. This statement is speculative, a conclusory opinion and lacks evidentiary support. First, Mr. Nielson's Declaration does not support this assertion as it simply states that "election records . . . show that Commissioner Benally defeated both Kenneth Maryboy and Manual Morgan" and does not address the reasons for Commissioner Benally's victory, including whether there was a large turnout. Second, even if it did, Nielson lacks personal knowledge or the expertise to testify as to whether her election was due to changes in turnout or something else.

DEFS.' 35. Prior to vote-by-mail, Plaintiff Mark Maryboy, his brother Kenneth Maryboy and Manual Morgan had always held the Commission seat from District Three.

PLS.' RESPONSE TO DEFS.' 35. This statement is immaterial and without evidentiary foundation. Further, it inappropriately implies a causal relationship between election procedures and particular candidates for office. Commissioner Benally was elected in 2014, the same year the County switched to a vote-by-mail system. *See* Memo in Opp'n Mot. to Dismiss at 23, ECF No. 99; Defs.' Ans. at 3, ECF No. 41. Disputed that prior to 2014 Plaintiff Mark Maryboy, his brother, and Manual Morgan "had always held the Commission seat from District Three." The current district seats were created in 1984 due to a consent decree with the Ex. B, Mejia First Decl., U.S. Department of Justice Consent Decree. Only one person at a time may hold a Commission seat from District 3.

3.      2016 General and Future Election Compliance with the VRA and Equal Protection

DEFS.' 1. With respect to the November 8, 2016 general election, an advertisement was placed in the two local papers, the *San Juan Record* and the *Navajo Times*, and ran once a week for one month prior to the general election.

**PLS.' RESPONSE TO DEFS.' 1.** Plaintiffs' Response: Disputed. This statement lacks evidentiary foundation. Defendants have not provided the ads or any evidence to support their assertion that the ads "ran once a week for one month prior to the general election," and thus do not have any foundation on which to base Mr. Nielson's assertion or any way to verify Mr. Nielson's assertion.

**DEFS.' 2.** That ad provided election information to voters, such as: date of the general election; what to do if the voter does not receive a ballot in the mail; the location of polls for in-person voting and hours of operation on election day; the ability to register to vote on election day; the availability of interpreters at each polling location; and where voters could go to listen to this same information and a description of the ballot in the Navajo language.

**PLS.' RESPONSE TO DEFS.' 2**: Disputed. *See* Pls.' Response to Defs.' 1. This statement lacks evidentiary foundation. Defendants have not supplemented their discovery, and have not produced the ads from the general election. Furthermore, a Navajo resident of the County has testified that the information in the ads "wasn't clear" and that "[t]here is a need for more information to be distributed about the election systems." [2] Affidavit of Leroy Teeasytoh ("Teeasytoh Aff.") ¶¶ 5–6, ECF No. 144-12, attached as **Ex. T**. Plaintiffs' language expert also testified that she was not able to understand the recording of election information posted on the County website and that it confused the terms "Judicial Retention," "constitutional amendments" and "for or against," affecting the accuracy of the message. Joanna Austin-Manygoats Report with Opinion, ECF No. 144-15, Ex. 1 ("Manygoats Report') at 2-3, attached as **Ex. U**. ("[T]he

---

[2] Plaintiffs note that some of the facts in support of this response pertain specifically to what happened in the November 2016 election and therefore could not have been obtained before discovery closed on October 7, 2016. Plaintiffs would not object to allowing Defendants additional discovery regarding any of these facts.

recording does not include the address for the clerk's office, where voters are supposed to return their ballots. The services available at the polling locations (in person voting, interpreters to assist voters to further understand the ballot, and County agents to register new voters) are also not included in the recording.")

DEFS.' 3. That same ad was also translated into Navajo, including a description of the ballot, and was aired twice a week on the two local Navajo language radio stations, *KTNN* and *KNDN*, for a month prior to the general election.

PLS.' RESPONSE TO DEFS.' 3. Disputed. This statement lacks evidentiary foundation. Defendants have not supplemented their discovery, and have not produced the ads. Moreover, several Plaintiffs are regular listeners to these stations and did not hear the ad. Second Affidavit of Betty Billie Farley ¶ 8, ECF No. 144-11 (describing how Plaintiff Betty Billie Farley, who regularly listens to KNDN, a Navajo language radio station, during the 12:30 to 1:00 p.m. newscast, did not hear any information about the 2016 general election), attached as **Ex. V**. In addition, some information in ads placed by the county "wasn't clear" to Navajo voters.[3] Ex. T, Teeasytoh Aff. ¶ 5. Plaintiffs' language expert also testified that she was not able to understand the recording of election information posted on the County website. Ex. U, Manygoats Report at 2. ("The recording does not communicate clearly how voters receiving mail-in ballots can receive assistance or vote in person despite receiving the ballot. The translation does not accurately describe the mail-in voting process... Although I am a professional translator, and have been translating for 28 years, I had trouble understanding this recording.")

---

[3] *See supra* note 2.

**DEFS.' 4.** Furthermore, the Clerk/Auditor established a toll-free telephone number containing the same election information and a description of the ballot, all in the Navajo language, that voters could call: 1-888-693-6209.

**PLS.' RESPONSE TO DEFS.' 4.** Undisputed that a toll-free number was set up. However, Plaintiffs note that Defendants have admitted that phone service in the County is not uniformly available or reliable. Ex. D, Nielson Dep. 89:7–13.

**DEFS.' 5.** The County's website likewise contained the same election information and description of the ballot in the Navajo language.

**PLS.' RESPONSE TO DEFS.' 5.** Disputed as to "description of the ballot" which is conclusory opinion and lacks evidentiary foundation. Mr. Nielson does not speak Navajo and cannot determine based on personal knowledge what information in Navajo is posted on the website. Ex. D, Nielson Dep. 68:25–69:1. As Plaintiffs' undisputed expert noted, the recording was "long, muddled, and confusing." Ex. U, Manygoats Report at 2.

**DEFS.' 6.** An audio description of the ballot in the Navajo language was delivered to each of the Navajo Chapter Houses prior to the general election.

**PLS.' RESPONSE TO DEFS.' 6.** Undisputed that audio descriptions may have been delivered, although it is unclear whether Mr. Nielson is able to assert this because he personally delivered these audio descriptions. Furthermore, although these audio descriptions may have been "delivered to each" chapter house, no working audio translations of the ballot were available at polling places (including the Navajo Mountain polling place which was at the chapter house) in the general election for the voters or the poll workers, contrary to the promises

made in Defendants' Answer and other filings.[4] Affidavit of Wilford Jones ("Jones Aff.") ¶ 22, ECF No. 144-5, attached as **Ex. W**; Affidavit of Terva Begay ("Begay Aff.") ¶ 14, ECF No. 144-6, attached as **Ex. X**; Affidavit of Marietta Stevens ("Stevens Aff.")  ¶ 8, ECF No. 144-7, attached as **Ex. Y**; Affidavit of Nelson Yellowman ¶ 13, ECF No. 144-8, attached as **Ex. Z**; Affidavit of Jenny Crank ("Crank Aff.") ¶¶ 11–12, ECF No. 144-9, attached as **Ex. AA**. Finally, even if these audio ballots were delivered, the translation of the ballot available on the County's website was "long, muddled, and confusing" such that Plaintiffs' language expert concludes that she does not believe "a 60 year old Navajo, a Non-English speaker would be able to understand the[] recording[]."

DEFS.' 7. As noted in the ad, San Juan County's Election Liaison, Mr. Ed Tapaha, visited Chapter Houses and Senior Centers prior to the general election to answer questions, register voters and explain voting procedures.

PLS.' RESPONSE TO DEFS.' 7. Undisputed that Mr. Tapaha may have visited some of the chapter houses. Disputed that information conveyed was complete or conveyed in an effective manner. Attendees of these chapter meetings with Mr. Tapaha reported that they left the meeting confused about the election voting options and procedures.[5] Affidavit of Jimmy Charley, Jr. ("J. Charley Aff.") ¶ 9, ECF No. 144-14, attached as **Ex. BB**; Affidavit of Bonnie B. Charley Aff. ("B. Charley Aff.") ¶ 7, ECF No. 144-13, attached as **Ex. CC**. This is unsurprising given that Mr. Tapaha struggled to translate the ballot propositions into Navajo during his chapter house visits and frequently spoke in English, even though there were Navajo elders there who do not speak English. Ex. BB, J. Charley Aff. ¶ 8; Ex. CC, B. Charley Aff. ¶ 8.

---

[4] *See supra* note 2.
[5] *See supra* note 2.

**DEFS.' 8.** For the November 8, 2016 general election, there were, in addition to the County Clerk/Auditor's office in Monticello, the same three additional polling places use [sic] in the June primary election open on election day to accommodate those voters who wished to cast their ballot in person.

**PLS.' RESPONSE TO DEFS.' 8.** Undisputed.

**DEFS.' 9.** The locations of the three additional on-reservation polling locations were:

Navajo Mountain Chapter House
Navajo Route 16, mile marker 36.15
Navajo Mountain, Utah

Oljato Senior Center
County Road 422, 15 miles north of Gouldings' Store
Oljato, Utah

Montezuma Creek Fire Station
15 South Texaco Road
Montezuma Creek, Utah

Pls.' Response to Defs.' 9. Undisputed.

**DEFS.' 10.** As previously explained, these three locations were selected so as to ensure that no voter in the County was more than a one-hour drive away from an in-person voting location.

**PLS.' RESPONSE TO DEFS.' 10.** *See* Pls.' Response to Defs.' 15 in Section II above.

**DEFS.' 11.** On November 8, 2016, the date of the general election, there were election officials able to provide Navajo-language voting assistance available at each of the polling locations.

**PLS.' RESPONSE TO DEFS.' 11.** Disputed. Lack of foundation. This statement is conclusory opinion. Mr. Nielson was not at all polling locations and does not speak Navajo. Ex. D, Nielson Dep. 68:25–69:1. He therefore has no basis for making assertions regarding the

abilities of election officials to provide Navajo language assistance. *See also* Pls.' Response to Fact 10 of previous section regarding quality of language assistance.

DEFS.' **12.** On November 8, 2016, the date of the general election, there were election officials present at each of the polling locations to register voters, and to accept mail-in-ballots from those persons who, for whatever reasons, wished to hand-deliver their ballot.

PLS.' RESPONSE TO DEFS.' **12.** Undisputed.

DEFS.' **13.** It is the Clerk/Auditor's intention to employ the same basic election procedures described herein above (*i.e.*, radio ads, newspaper ads, audiotapes, three polling locations within the Navajo Reservation for in-person voting, interpreters, etc.) for future county-wide elections.

PLS.' RESPONSE TO DEFS.' **13.** Disputed. This statement is vague and speculative. Plaintiffs cannot speak to the Clerk's subjective thoughts or intentions and note that the Clerk's "intentions" could change at any moment, especially given that he has asserted that he can make changes to the County's election procedures without approval of the County Commission. Ex. D, Nielson Dep. 41:1–42:14.

DEFS.' **14.** The Clerk/Auditor, however, is constantly working to improve the vote-by-mail procedures based upon what he learns from each election, and will continue to do so.

PLS.' RESPONSE TO DEFS.' **14.** Disputed as immaterial.

DEFS.' **15.** Consequently, two changes in election procedures for future elections that the Clerk/Auditor is presently considering are: (a) asking the Navajo Election Administration to review and comment upon the Clerk/Auditor's Navajo language election audiotapes prior to their distribution, and (b) for those years when the Navajo Nation's election day falls on the same day as a federal, state or other county-wide election, to attempt to work out an arrangement with the

Navajo Election Administration whereby the County and Navajo Nation use the same poll locations in Navajo Mountain, Oljato and Montezuma Creek.

PLS.' RESPONSE TO DEFS.' 15. Disputed. This statement is speculative.

DEFS.' 16. Of course, these changes in election procedures that the Clerk/Auditor is currently considering will require the agreement and cooperation of the Navajo Election Administration.

PLS.' RESPONSE TO DEFS.' 16. Disputed. The Navajo Nation Election Administration does not have authority over County elections. The Navajo Election Administration's mission pertains to the administration of elections of the Navajo Nation, not state or federal elections and so it is unclear whether these requests fall within the Navajo Election Administration's purview. Navajo Nation Code, 1 N.N.C. § 2(O) and 2 N.N.C. § 873 (B)(2).

DEFS.' 17. The next county-wide election will perhaps take place in the June 2018, and that will be the primary election. If there is not a primary election, then the next county-wide election will be in November of 2018.

PLS.' RESPONSE TO DEFS.' 17. Disputed. While Plaintiffs acknowledge that currently the next *scheduled* election is in 2018, a state or local special election could be called before then pursuant to Utah Code 20A-1-203 and 20A-1-204. This is a very real possibility for San Juan County, given that one of the proposed remedies that could be considered by Judge Shelby in the redistricting case against San Juan County is a special election which would occur in June 2018 (for the primary) and November 2018 (for the general).

DEFS.' 18. Meanwhile the County's Navajo liaison, Mr. Ed. Tapaha, will be retiring in August of 2017. However, it is both the County's and Clerk/Auditor's intention to continue that position.

PLS.' RESPONSE TO DEFS.' 18. This statement lacks evidentiary foundation and is speculative and immaterial. Undisputed that Mr. Tapaha has said he will retire. Plaintiffs cannot speak to the Clerk's subjective thoughts or considerations and the only public statement he has made about these intentions is in the context of trying to win summary judgment.

          4.    <u>DOJ Tacit Approval of County Election Procedures</u>

DEFS.' 1. In 1983, the DOJ sued San Juan County to enforce the requirements of § 10503. That suit resulted in a *Consent Decree* whereby DOJ representatives were present during an election cycle to monitor the Clerk / Auditor's Navajo voter's language assistance program.

PLS.' RESPONSE TO DEFS.' 1. Undisputed.

DEFS.' 2. That monitoring continued until 2002. According to Norman Johnson, who was the County Clerk / Auditor during most of this monitoring period, the DOJ did not require the Clerk / Auditor to translate ballots into the Navajo language, "but we had to have judges that were bilingual enough to present the [ballot] information to the voter if they asked." Throughout the period of this monitoring for compliance with the language assistance requirements of § 10503, the DOJ never informed San Juan County that it had violated that law.

PLS.' RESPONSE TO DEFS.' 2. Undisputed, but immaterial.

DEFS.' 3. In early October of 2015, San Juan County Attorney, Kendall G. Laws, received a telephone call from Victor Williamson of the United States Department of Justice. Mr. Williamson informed Mr. Laws that he was with the DOJ's Voting Rights Section.

PLS.' RESPONSE TO DEFS.' 3. Undisputed, but immaterial.

DEFS.' 4. At the request of and on the behalf of the Navajo Human Rights Commission, Mr. Williamson wanted to come to San Juan County and meet with County Officials regarding the vote-by-mail procedures that the Clerk / Auditor had implemented for the 2014 election cycle.

PLS.' RESPONSE TO DEFS.' 4. Undisputed, but immaterial.

DEFS.' 5. On October 29, 2015, Mr. Laws, John David Nielson, James Francom, Ed Tapaha, and Norman Johnson met with Mr. Williamson and his DOJ staff to review the Clerk / Auditor's 2014 election procedures.

PLS.' RESPONSE TO DEFS.' 5. Undisputed, but immaterial.

DEFS.' 6. John David Nielson is the County Clerk / Auditor, James Francom is the Deputy Clerk / Auditor, Ed Tapaha is the county's liaison with the Navajo Nation, and Norman Johnson is the former Clerk / Auditor.

PLS.' RESPONSE TO DEFS.' 6. Undisputed.

DEFS.' 7. During that meeting, Mr. Laws learned from Mr. Williamson that he and his staff had earlier met with members of the Navajo Human Rights Commission.

PLS.' RESPONSE TO DEFS.' 7. Undisputed.

DEFS.' 8. From his conversation with Mr. Williamson and his staff following that meeting with the County officials, both Mr. Laws and Mr. Nielson came to understand that the DOJ did not consider the Clerk / Auditor's vote-by-mail system as implemented for the 2014 elections (and the 2015 municipal elections) to be contrary to law or otherwise failed to meet the Clerk / Auditor's obligation to provide bilingual voting assistance to Navajo voters.

PLS.' RESPONSE TO DEFS.' 8. Disputed as immaterial and inadmissible hearsay.

DEFS.' 9. Mr. Williamson, however, did inform Mr. Laws that the DOJ would continue watching the way in which the mail-in-voting system affected County residents and particularly its Navajo citizens.

PLS.' RESPONSE TO DEFS.' 9. Disputed as immaterial and inadmissible hearsay.

**DEFS.' 10.** As a consequence of that meeting, the San Juan Clerk / Auditor began to consider making changes to improve the vote-by-mail system to better serve Navajo voters by adding three in-person polling locations on the Navajo Reservation as well as language assistance to Navajo voters.

**PLS.' RESPONSE TO DEFS. 10.** Disputed as immaterial. There is no documentary evidence that former San Juan Clerk/Auditor Mr. Nielson decided to reopen three polling locations until the County issued a press release on March 9, 2016. Am. Countercl. ¶¶ 50–51, ECF No. 74. Defendants have provided no admissible evidence that Mr. Nielson's decision was communicated in any way to his staff, the County commissioners, or any other person until after the Complaint was filed.

**DEFS.' 11.** The final decision as to the locations of the three additional polling places was made on or before February 16, 2016.

**PLS.' RESPONSE TO DEFS.' 11.** Disputed. The County's first public communication about its decision to reopen three polling locations was a press release issued on March 9, 2016. *Id*. Defendants have not produced any documentation of the decision having been made earlier than that. *See* Pls.' Responses to Defs.' 5 and 7 under their discussion of the primary election.

**DEFS.' 12.** Mr. Laws next heard from Mr. Williams[on] when he called Mr. Laws shortly before the June 28, 2016 county-wide primary election. During that conversation, Mr. Williamson told Mr. Laws that, again at the request of and on behalf of the Navajo Human Rights Commission, the DOJ had been asked to review the changes that the Clerk / Auditor had made to its 2014 vote-by-mail procedures.

**PLS.' RESPONSE TO DEFS.' 12.** Disputed as immaterial and inadmissible hearsay.

**DEFS.' 13.** Thereafter, several investigators from the DOJ came to San Juan County to review the new vote-by-mail procedures. Mr. Laws along with John David Nielson and Kelly Pehrson, San Juan County's Chief Administrative Officer, met with the DOJ investigators on Monday, June 27, 2016, the day before the primary election.

**PLS.' RESPONSE TO DEFS.' 13.** Disputed as immaterial and inadmissible hearsay.

**DEFS.' 14.** During that meeting, Mr. Laws and the other County representatives explained to the DOJ investigators the procedures that were being used for that primary, including three new on-reservation polling locations and the language assistance that was to be provided at those locations.

**PLS.' RESPONSE TO DEFS.' 14.** Disputed as immaterial and inadmissible hearsay.

**DEFS.' 15.** Mr. Laws and the other County officials also explained to the DOJ investigators that the County was constantly working to improve its vote-by-mail procedures based upon what it had learned from each election, and would continue[] to do so.

**PLS.' RESPONSE TO DEFS.' 15.** Disputed as immaterial and inadmissible hearsay.

**DEFS.' 16.** The DOJ investigators said that they were comfortable with that approach, and also made it clear to Mr. Laws that if they determined that any changes in the vote-by-mail procedures were in violation of the law, they would let the County know.

**PLS.' RESPONSE TO DEFS.' 16.** Disputed as immaterial and inadmissible hearsay.

**DEFS.' 17.** The County has not received any notification from the DOJ that its vote-by-mail election procedures do not fully comply with the VRA.

**PLS.' RESPONSE TO DEFS.' 17.** Disputed as inadmissible, and inadmissible hearsay (to extent Defendants are claiming that DOJ's alleged silence means something).

**DEFS.' 18.** On election day, November 8, 2016, Mr. Williamson and members of his staff were present at the Navajo Mountain, Oljato and Montezuma Creek polling locations to observe the Clerk / Auditor's voting procedures during the general election.

**PLS.' RESPONSE TO DEFS.' 18.** Disputed as immaterial and lacking evidentiary support.

**DEFS.' 19.** As was the case with respect to the DOJ's October 2015 visit to San Juan County to review the 2014 election procedures and the DOJ's monitoring of the 2016 primary election, neither Mr. Williamson, nor any of the DOJ election-day observers, has notified the County, either on the day of the election or subsequent thereto, that the Clerk / Auditor's elections procedures, including the provision of language assistance to Navajo voters, did not comply with the requirements of the VRA and/or the Equal Protection Clause.

**PLS.' RESPONSE TO DEFS.' 19.** Disputed as immaterial and inadmissible hearsay.

## IV.    PLAINTIFFS' ADDITIONAL STATEMENT OF ELEMENTS AND FACTS

*Additional Material Facts Relating to Plaintiffs' Section 2 Equal Opportunities Claim*

**PLS.' 1.** In 2014, San Juan County officials closed all polling places, except the County Clerk's office in Monticello, and implemented a vote-by-mail election system. Ex. R, NNHRC Decl. ¶¶ 4-5.

**PLS.' 2.** In September, 2015 NNHRC and the Lawyers' Committee for Civil Rights Under Law, in partnership with the American Civil Liberties Union, sent letters opposing the mail-only plan and closure of polling sites to San Juan County. Ex. R, NNHRC Decl. ¶ 10.

**PLS.' 3.** In his September 17, 2015 response to this letter, the County Clerk stated the County would not reconsider opening any polling places for the upcoming elections. *Id.*

**PLS.' 4.** On February 25, 2016, having received no written commitment from the County to reopen polling places, Plaintiffs filed their Complaint. ECF No. 2 and ECF Nos. 26–30.

PLS.' **5.** The Clerk-Auditor testified that he could make decisions regarding changes in election administration without approval of the County Commission. Ex. D, Nielson Dep. 41:1–42:14.

PLS.' **6.** Utah Election Code provides that "[a]n individual who is registered to vote may vote before the election date" and that the "voting period shall [ ] begin on the date that is 14 days before the date of the election."  Utah Code § 20A-3-601(1)-(2). Voting is conducted for a "minimum of four days during each week" for local special elections and primary and general municipal elections; for all other elections, voters can cast their ballots early any weekday. Utah Code § 20A-3-601(3).

PLS.' **7.** Utah Election Code § 20A-3-603 further requires election officers to "designate one *or more* polling places for early voting." Utah Election Code § 20A-3-603(1) (emphasis added).

PLS.' **8.** San Juan County provides early in-person voting only in the county clerk's office in Monticello. Ex. R, NNHRC Decl., Ex. 1 (Public Notice indicating that "[r]egistered voters of San Juan County Utah can cast an Early Vote ballot in the clerks [sic] office weekdays from 8:00 a.m. to 5:00 p.m.").

PLS.' **9.** In addition to having extra days to cast a ballot in-person, the location of in-person voting in Monticello provides a number of other benefits including the ability to request a ballot or help troubleshooting a problem. Ex. D, Nielson Dep. 66:1–11; Ex. N, Kane Decl. Ex. 2, at 16:22–24.

PLS.' **10.** The Office Manager for San Juan County has explained "the advantage of having a polling location in our office is that we were able to resolve any of those [voting related] issues in our office." Ex. N, Kane Decl. Ex. 2, at 16:22–24.

**PLS.' 11.** Navajo citizens in San Juan County must travel, on average, *three times the distance* and *three times the time* that white citizens must travel to reach the Monticello location to vote early in-person, or to get assistance. Declaration of Dr. Gerald R. Webster ("Webster First Decl.") Ex. 1 at 1, ECF No. 94-2, at 51, attached as **Ex. DD**; Ex. D, Nielson Dep. 66:1–11; Ex. N, Kane Decl. Ex. 2, at 16:22–24.

**PLS.' 12.** This means that Navajo citizens must travel, on average, *over two hours longer* round-trip, and 94 miles farther round-trip than white citizens to take advantage of in-person early vote opportunities or to get assistance. *Id.*

**PLS.' 13.** This past general election, Mr. Whitehat, who has a preference for voting in-person, had just a small window during which he could vote, because his father had an operation in Flagstaff, Arizona scheduled on Election Day and because the only satellite office offering in-person early voting is approximately five hours away in Monticello. Affidavit of Terry Whitehat ("Whitehat Aff.") ¶¶ 5–7, ECF No. 144-3, attached as **Ex. EE**; Ex. P, Whitehat Second Decl. ¶ 2.

*Additional Material Facts Relating to Plaintiffs Section 203 Language Assistance Claim*

**PLS.' 14.** San Juan County is a covered jurisdiction under Section 203 of the VRA for the Navajo language. 81 Fed. Reg. 87,532 (Dec. 5, 2016).

**PLS.' 15.** In their Answer and other filings, the County promised to provide radio announcements on Navajo language radio stations regarding the election for the 2016 election cycle. Ans. ¶ 7.

**PLS.' 16.** The County failed to provide radio announcements regarding voting procedures on Navajo language radio stations in advance of the 2016 primary. Ex. K, Defs. Resps. to Pls. First Interrogs., Resp. No. 7.

**PLS.' 17.** The Defendants have stated that the failure to provide radio announcements regarding the primary election was due to a "communication" problem within the San Juan County Clerk's office. *Id*.

**PLS.' 18.** Some Navajo residents of San Juan County who do not speak or read English did not recognize their ballot (Ex. Q, Farley Decl. ¶ 9), or mistook their mail-in ballot for junk mail and failed to vote.[6] Ex. AA, Crank Decl. ¶ 4.

**PLS.' 19.** A state or political subdivision covered by Section 203 of the Voting Rights Act is responsible for providing the appropriate language assistance and "furnish[ing] oral instructions, assistance, or other information relating to registration and voting," in the case of unwritten languages. 28 C.F.R. § 55.2; Order of Oct. 14, 2016 ("Order"), ECF No. 129 at 27.

**PLS.' 20.** In 2014, when the County moved to a vote-by-mail system, Mr. Johnson, the former County Clerk, acknowledged that the County "relied a lot on families to help people out" by "[e]xplaining the ballot, explaining what was on the ballot, what offices were being voted for." Ex. A, Johnson Dep. at 35.

**PLS.' 21.** Mr. Johnson, the former County Clerk, acknowledged that these tasks were "something [his] office would have taken care of in the past," but that "after [the County] went to mail in ballots that was something you expected the family to do." *Id.*

**PLS.' 22.** Ed Tapaha, the Navajo liaison for the County Clerk's office, has stated that young Navajos, who are more likely to speak English and less likely to speak Navajo, would have difficulty translating election materials. *Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253 (D. Utah 2015) at ECF No. 309, dated February 11, 2016 at 16.

**PLS.' 23.** Tapaha has also explained that translating election materials is quite

---

[6] *See supra* note 2.

challenging. Ex. F, Tapaha 2015 Dep. at 36–37.

**PLS.' 24.** Mr. Jimmy Charley, a member of the Navajo Nation and resident of San Juan County, attempted to translate the 2016 general election ballot for his mother who does not speak English, but struggled to explain some of the provisions on the ballot.[7] Ex. BB, J. Charley Decl. ¶ 4.

**PLS.' 25.** At least one Navajo voter who required language assistance to vote was uncomfortable asking for and getting the assistance she needed, as the only interpreter was preoccupied.[8] *See* Ex. AA, Crank Decl. ¶¶ 6–10.

**PLS.' 26.** Mr. Tapaha provides translation services for the County, but his translations are not reviewed by a trained translator or anyone employed by the County. Ex. N, Kane Decl. at Ex. 1, Part 2, at 31:22–32:1–13.

**PLS.' 27.** Plaintiffs Mabel and Willie Skow do not speak English and requested language assistance when they voted in person during the 2016 general election. Affidavit of Mabel Skow ("M. Skow Aff.") ¶¶ 5, 12, ECF No. 144-16, attached as **Ex. FF**; Affidavit of Willie Skow ("W. Skow Aff.") ¶ 10, ECF No. 144-17, attached as **Ex. GG**.

**PLS.' 28.** The language assistance the Skows received did not help them understand what was on the ballot. *Id.* ¶ 13.

**PLS.' 29.** Because Mr. Skow did not understand the ballot, he did not cast votes for most of the positions on the ballot for the 2016 general election. Ex. GG, W. Skow Aff. ¶ 11.

**PLS.' 30.** Plaintiff Wilfred Jones requested language assistance when he went to vote in the 2016 general election as Navajo is his first language. Ex. W, Jones Aff. ¶¶ **4**-5, 14.

---

[7] *See supra* note 2.
[8] *See supra* note 2.

**PLS.' 31.** The interpreter at the Montezuma Creek polling place who assisted Mr. Jones did not interpret the entire ballot for him, could not explain to Mr. Jones which were the County and which were the State elections and propositions on the ballot, and told Mr. Jones to "turn in [his] ballot as is" if he did not "know about a particular portion of the ballot." Ex. W, Jones Decl. 17–20.

**PLS.' 32.** Because the interpreter could not answer Mr. Jones' questions or provide a full translation, Mr. Jones did not vote for the propositions on the ballot and did not vote for officials because he could not identify which race was for a County or State position. Ex. W, Jones Decl. 20–21.

**PLS.' 33.** Plaintiffs' Navajo language expert identified various deficiencies in the County's posted sample ballot translation and the County's general election information found on their website. These problems varied from relatively small, like a confusing translation of the word "computer," to entirely problematic, like not being able to understand the general election translation. Ex. U, Manygoats Report at 1–3.

*Facts Relating to Plaintiffs' Claim Under the Equal Protection Clause*

**PLS.' 34.** Many residents of San Juan County are unable to get their mail on a regular basis. Ex. C, First McCool Report at 191 (quoting resident explaining that "the people out there they hardly ever go to the post office, they hardly get their mail.") and at 189 ("Remote voters also faced problems in getting their mail-in ballots in a timely manner."); *see also* Farley Decl. ¶ 7 ("I only check my mail every two to four weeks. The Post Office is about 17 miles from my home and because I do not have a car, I have trouble getting my mail.").

PLS.' 35. Many mail-in ballots are returned due to a high percentage of undeliverable addresses in the County. Ex. N, Kane Decl. Ex. 3 (email from mail processor noting that 8% of San Juan addresses are undeliverable).

PLS.' 36. In order to travel in the remote parts of the County, a person must often use dirt tracks and unpaved roads that may be impassible in inclement weather, especially for the general election in the fall. *See* Brief Expert Witness Report by Daniel McCool ("Second McCool Report"), attached as **Ex. HH** at 6; *see also* Ex. F, Tapaha 2015 Dep. 41.

PLS.' 37. Some voters never received their ballot in the mail for the 2016 election, *see* Ex. W, Jones Aff. ¶ 3, and other people have received their ballots after an election was over. Ex. C, First McCool Report at 190.

PLS.' 38. Some mail routes through San Juan County have multiple stops, meaning it may take several days for a ballot from a remote part of the County to reach the point in the mail system where it is actually postmarked. Ex HH, Second McCool Report at 5–6.

PLS.' 39. Some of the ballots the County rejected from the 2016 primary had postmarks from Phoenix, Arizona, and Albuquerque, New Mexico. *Id.*

PLS.' 40. On November 8, 2016, the Oljato Senior Center ran out of paper ballots by 10:00 AM.[9] Ex. T, Teeasytoh Aff. ¶ 8.

PLS.' 41. On November 8, 2016, voters experienced long lines at the Oljato Senior Center.[10] Ex. BB, J. Charley Aff. ¶ 12; Ex. T, Teeasytoh Aff. ¶ 10.

---

[9] *See supra* note 2.
[10] *See supra* note 2.

PLS.' 42. Almost 54% of the County's registered voters do not have a street address and many residents therefore rely on post office boxes to receive their mail. *Navajo Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253 (D. Utah 2015), at ECF No. 309, at 15.

PLS.' 43. There is a shortage of post office boxes in Oljato and Monument Valley, meaning some residents without a home mailing address are also unable to get a post office box in San Juan County. *See* Ex. F, Tapaha 2015 Dep. 42:1–7.

PLS.' 44. Some residents in the remote areas of San Juan County may have to drive 30 or 40 miles – and cross state lines – just to get their mail. *See* Brief Expert Witness Report by Daniel McCool ("Second McCool Report") at 6, attached as Ex. HH at 6;  Ex. C, First McCool Report at 189.

PLS.' 45. Navajo residents live, on average, more than twice as far from the nearest post office than white voters. Ex. DD, Webster First Decl. Ex. 1 at 1 (ECF No. 94-2 at 51).

## V.    ARGUMENT

### A.    Defendants' Motion for Summary Judgment on Plaintiffs' Section 2 Claim Should Be Denied[11]

Stripped of its rhetoric (*e.g.,* "Section 2 is not an affirmative action plan," Defs.' Mot. Summ. J. at 30), Defendants' motion for summary judgment rests entirely on a single faulty premise, and one which Defendants ask this Court to accept as true based solely on their say-so. Defendants' premise is that the only issue before this Court pertaining to Plaintiffs' Section 2 claim is Defendants' 2016 election plan. That premise is false because the legality of Defendants' 2014 election plan, which is capable of repetition, is still before this Court. Further, Defendants' conclusory, self-serving assertion that the 2016 election plan is "clearly" not

---

[11] Plaintiffs incorporate by reference their Section 2 argument from their cross-filed Motion for Summary Judgment. (ECF No. 144 at 11-20.)

violative of Section 2 fails to address the discriminatory impact of the limitation of in-person early voting to the single polling place in Monticello and of the mail-only voting practice in general on Navajo voters. For these reasons, Defendants' motion for summary judgment on Plaintiffs' Section 2 claim should be denied.

1.     The 2014 Election Plan is Still at Issue

Without explaining why, or providing a scintilla of case support, Defendants proceed on the assumption that only the 2016 election plan is subject to court review. The deficiencies of the 2014 plan are pled in the Complaint. (*See* Compl. ¶¶ 2, 26–41, 75–83; *see also* Mot. Summ. J., ECF No. 144.). However, there are ample facts in the record to support the proposition that the replacement of the 2014 plan by the 2016 plan is a temporary move, intended to derail this litigation. First, there is the mysterious, undocumented, sudden appearance of the 2016 election plan within days after the filing of this suit. *See* Pls.' 1–5. Indeed, despite the Clerk-Auditor's testimony that these types of decisions would be reflected in the minutes of County Commissioner meetings, the crucial change in 2016 election procedures was <u>not</u> in the minutes. Ex. D, Nielson Dep. 42:4–11, 15–22. Second, there is Mr. Nielson's testimony that, as Clerk-Auditor, he could make decisions of this nature without approval of the County Commission. Pls.' 6; Ex. D, Nielson Dep. 42:12–14. Under these undisputed facts of (1) unilateral decision-making in the hands of the Clerk-Auditor, and (2) no official documentation of such decisions, the threat of sudden, unpublicized reversal of the quickly and surreptitiously implemented 2016 procedures is real. The Tenth Circuit has held, in such cases, "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1149 (10th Cir. 2007) (quoting *City News & Novelty, Inc. v. City of Waukesha,* 531 U.S. 278, 284 n.1 (2001)). Without this Court's declaration that the 2014 vote-by-mail procedures violated Section

2 of the VRA, the County would be free to reverse the changes it made after the Complaint was filed.

> 2.      The 2016 Election Plan Violates Section 2 of the VRA.

Even were Plaintiffs' Section 2 claim limited to the 2016 plan, Defendants would still not be entitled to summary judgment, because they fail to address, let alone rebut the undisputed facts, that that plan's limitation of early voting to Monticello discriminates against Navajo residents and the reduction in polling places has a discriminatory result.

After the Complaint was filed, Defendants expanded the number of polling places on *election day*, but failed to provide access to any of three polling sites located on the Navajo Reservation during any early voting days.[12] Indeed, the only polling place open to residents of San Juan County ahead of the election was in Monticello. Ex. D, Nielson Dep. 124:18–25, 125:1–4; Ex. R, NNHRC Decl. Ex. 1 (Public Notice indicating that "[r]egistered voters of San Juan County Utah can cast an Early Vote ballot in the clerks [sic] office weekdays from 8:00 a.m. to 5:00 p.m."). Navajo citizens in San Juan County must travel, on average, *three times the distance* and *three times the time* that white citizens must travel to reach the Monticello location to vote early in-person. Ex. DD, Webster First Decl. Ex. 1 at 1 (ECF No. 94-2 at 51); *see also* Ex. D, Nielson Dep. 66:1–11; Ex. N, Kane Decl. at Ex. 2, 16:22–24. This means that Navajo citizens must travel, on average, *over two hours longer* round-trip, and 94 miles farther round-trip than white citizens to take advantage of in-person early vote opportunities or to get assistance. *Id.*

---

[12] Utah Election Code provides that "[a]n individual who is registered to vote may vote before the election date" and that the "voting period shall [ ] begin on the date that is 14 days before the date of the election." Utah Code § 20A-3-601(1)-(2). Voting is conducted for a "minimum of four days during each week" for local special elections and primary and general municipal elections; for all other elections, voters can cast their ballots early any weekday. Utah Code § 20A-3-601(3).

Further, Navajo voters, who may be forced to vote by mail because they cannot make it to one of the four polling places, are still disproportionately burdened as compared with whites. Navajo residents live, on average, more than twice as far from the nearest post office than white voters. Ex. DD, Webster Decl. Ex. 1 at 1 (ECF No. 94-2 at 51). Navajo residents in more remote areas may have to drive up to 40 miles—and cross state lines—to retrieve their mail. Ex. C, First McCool Report at 189. To make matters worse, this travel may involve using dirt tracks and unpaved roads that may be impassible in inclement weather, especially for the general election in the fall. *See id;* Ex. HH, Second McCool Report at 6. As a result, many residents do not regularly get their mail. Ex. C, First McCool Report at 191 (quoting resident explaining that "the people out there they hardly ever go to the post office, they hardly get their mail"); Farley Decl. ¶ 7 ("I only check my mail every two to four weeks. The Post Office is about 17 miles from my home and because I do not have a car, I have trouble getting my mail."). Furthermore, because of the rural nature of the County, more than half of the residents rely on post office boxes to receive their mail, *Navajo Nation*, 150 F. Supp. 3d 1253 (D. Utah 2015) at ECF No. 309 at 15, yet some Navajo residents are unable to obtain a post office box in San Juan County, as there is a shortage of post office boxes in some majority-Navajo precincts. *See* Ex. F, Tapaha 2015 Dep. 42:1–7 (noting a shortage of post office boxes in Oljato and Monument Valley). Given the socioeconomic disparities in San Juan County, these factors make it disproportionately more difficult for Navajo voters to cast their ballot by mail than white voters.

Ignoring these material facts—including those dispositive of a legal element, as discussed in Plaintiffs' Motion for Summary Judgment—does not make them go away.

## B.   Defendants are Not Entitled to Summary Judgment on Section 203

Defendants' motion for summary judgment as to Plaintiffs' Section 203 claim reduces to the following propositions: (1) they purport to have rendered language assistance, (2) the

Department of Justice supposedly had no problem with it, and (3) this Court denied Plaintiffs' preliminary injunction motion on that claim. These defenses are inadequate. First, simply going through the motions of providing language assistance is not the standard of compliance with Section 203: the effectiveness of those efforts is key. 28 C.F.R. § 55.20(c). Second, the inadmissible hearsay of the Department of Justice's alleged representations or implications from its alleged silence are, even if admissible, legally irrelevant. Finally, rulings on preliminary injunction motions are *ipso facto* "preliminary," and Plaintiffs have provided—in their own summary judgment motion on this claim—precisely the evidence this Court found, preliminarily, lacking.[13]

To summarize the undisputed facts, Plaintiffs have shown that the County's pre-election publicity efforts in 2016 were ineffective. Defendants, by their own admission, played no radio ads in advance of the 2016 primary elections. *See* Fact 4. With regard to general election ads in 2016, they were not effective either. For example, Plaintiff Betty Billie Farley regularly listens to Navajo language radio and did not hear any ad prior to the 2016 general elections. *Id.*; Fact 6. Even those voters who heard the 2016 general election ad were likely to be confused, as an expert pointed to many specific problems with the ad, in addition to being generally difficult to understand. Ex. U, Manygoats Report at 2; *see also* Fact 7 (Navajo voter unable to understand 2016 general election information ad.)  Likewise, Mr. Tapaha's visits to the Chapter Houses were not effective in communicating information to at least some voters in advance of the 2016 elections. See, Facts 11–12. (Navajo voters confused by Mr. Tapaha's explanation of election-related information at Chapter House meeting.)

---

[13] *See* Pls. ' Mot. Summ. J. , Section III(2).

Moreover, the Defendants' in-person voting assistance at polling places in the 2016 elections was not effective. Three named Plaintiffs who voted in person in the 2016 general elections state that the language assistance the County attempted to provide was not effective in helping them properly understand their ballots. *See* Facts 27–32; Ex. FF, M. Skow Aff. ¶¶ 5, 12, Ex. GG, W. Skow Aff. ¶ 10. As a result, these plaintiffs were unable to cast their votes for certain positions on the ballot. Ex. GG, W. Skow Aff. ¶ 11; Ex. W, Jones Decl. 20–21.

These failures were not a few one-off failures of the kind that Courts are allowed to overlook in considering Section 203 claims. Rather, this ineffectiveness is a result of the many failures by Defendants. First, and important, Defendants have not established Mr. Tapaha's ability to translate election-related English into Navajo effectively. Instead, the evidence points to Mr. Tapaha's translations as being ineffective. For example, an expert Navajo translator listening to Mr. Tapaha's recorded translation of the 2016 general election sample ballot found the translation ineffective. Ex. U, Manygoats Report at 2–3. In particular, Ms. Manygoats opined that Mr. Tapaha's translation was "muddled" and "confusing" for various reasons, and that the translation added, omitted, and changed information from the original English. *Id.* Given the "confusing" recorded translation and Mr. Tapaha's difficulties translating the ballot propositions into Navajo during his chapter house visits, it is a reasonable inference that the in-person translation services Mr. Tapaha provided were similarly flawed. Ex. BB, J. Charley Aff. ¶ 8; Ex. CC, B. Charley Aff. ¶ 8.

Likewise, the Defendants did not provide any ballot-specific translation training to any of their language assistance workers in 2016. *See id.*, Facts 25–26. Moreover, the one-time "training" that the County provided to such workers, at an unspecified previous time, is, by the County's own admission, cursory, informal, and nothing more than a "brief" conversation. Ex.

II, Tapaha 2016 Dep. 52:14–54:1. As a result, the interpreters for the 2016 elections were not trained to effectively translate technical and complex terms in any particular ballots by Mr. Tapaha, leaving them to decide for themselves how to translate such terms. Ex. Y, Stevens Aff. ¶¶ 5-6; Ex. X, Begay Aff. ¶ 8. This lack of uniformity and training precludes a reasonable fact-finder from concluding that the election day translation services the Defendants provided were effective.

While Defendants have stated an intention to maintain Mr. Tapaha's position filled once Mr. Tapaha retires in August 2017, they have not committed to taking any measures to make sure that the person they hire will be effective in leading their language assistance efforts. For example, Defendants have not stated that they intend to hire a candidate who has any formal training or experience translating election-related English into Navajo. They have not committed to ensuring that the liaison will train individuals hired to provide language assistance any potential polling places in ballot-specific terms. They have not committed to any method of ensuring that radio ads, Chapter House presentations, and audio ballots are effective and understandable to Navajo voters. And so on. Because the Defendants only have a vague intention to fill a liaison position without any plans to fix the problems of the 2016 elections, they are not entitled to a ruling that they are filling their Section 203 responsibilities, much less that they will do so in the future without Court intervention.[14]

Defendants' reliance on inadmissible statements (or silence) by DOJ is legally irrelevant. Defendants have provided no law to support the proposition that the Department of Justice's

---

[14] While, for the reasons set forth in their motion for summary judgment,  Plaintiffs submit that all of these facts are undisputed, and allow the Court to draw the legal conclusion that Defendants violated Section 203 of the VRA, at a minimum, they raise disputed issues of fact that preclude a grant of summary judgment in Defendants' favor.

failure to allege a violation of the Voting Rights Act has any bearing on the merits of a claim brought by private plaintiffs. As this Court has held, the VRA grants private plaintiffs the right to bring an action under Section 203. Ruling on Prelim. Inj. at 26, ECF No. 129. Nowhere does it provide that the claim is good only insofar as the Department of Justice agrees.

Finally, a ruling that a plaintiff has failed to show a probability of success on the merits at the preliminary injunction stage has absolutely no relevance to the ultimate success on the merits of the plaintiff's claim. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (holding that "[a] party . . . is not required to prove his case in full at a preliminary-injunction hearing" and that "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits") (internal citations omitted). Moreover, at the preliminary judgment stage, the Court indicated that Plaintiffs had not submitted evidence that the Defendants' efforts were ineffective. Plaintiffs have now, however, submitted evidence going directly to the ineffectiveness of the Defendant's language assistance efforts in 2016. This evidence is thoroughly discussed in Plaintiffs' motion, and specifically discussed above. *See* ECF 144 at 21–26.

## C.   Defendants are Not Entitled to Summary Judgment on Plaintiffs' Equal Protection Claim

Defendants' argument with respect to Plaintiffs' Equal Protection claim is not supported by either the law or the evidence in this case. The law is clear – given the fundamental nature of the right to vote, Defendants may not place significant burdens on voters' right to vote without a sufficiently weighty justification for such burden. *See Burdick v. Takushi,* 504 U.S. 428, 434 (1992)(quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983)). Here, the evidence demonstrates that Defendants' election practices unduly burdens voters' right to vote in violation of the Equal Protection Clause.

As an initial matter, contrary to Defendants' contentions, Plaintiffs' Equal Protection claim is not premised on the assertion that San Juan County's voting procedures "discriminate[] against Navajo residents."  Opposition at 36. Rather, as demonstrated by Plaintiffs' cross motion for summary judgment, Plaintiffs are contending – and have established with competent evidence – that Defendants' electoral practices unduly burdens San Juan County residents' right to vote, particularly its rural residents. As such, Defendants' arguments purportedly rebutting any racial bias in their electoral practice are wholly inapposite to the Plaintiffs' Equal Protection claim and therefore do not warrant a response.

With respect to Defendants' arguments pertaining to the effect of its election practices on rural residents as a whole, Defendants have not presented any facts supporting their assertion that their electoral practices do not unduly burden rural residents' right to vote. Instead, Defendants simply state that Plaintiffs' claim fails without any citation to evidence. Conclusory statements, however, cannot carry Defendants' burden on summary judgment, especially in light of the weighty evidence presented by Plaintiffs establishing both the character and magnitude of the severe burden placed on rural votes by Defendants' electoral practices. Indeed, the evidence demonstrates that the County's reduction of polling places and practice of primarily relying on a vote-by-mail election system severely burden voters' right to vote due to complications caused by (1) undeliverable address and undeliverable mail, (2) difficulties accessing post offices, and (3) delays in delivery and postmarking mail.

First, the undisputed facts show that many mail-in ballots were returned as undeliverable. For example, emails produced during discovery in the current redistricting case against San Juan highlight the problem of undeliverable addresses. An October 7, 2014 email, presumably from an employee, Mark, at the mail service company hired by the County to help send out ballots, reads:

> David, I have processed the addresses for San Juan County ballots. I am concerned with the number of bad addresses that were detected during processing. On average when I process a list, the percentage of bad addresses is around 1–2%. With the list for San Juan County, the percentage is 8% (nearly 500 addresses).

Ex. N, Kane Decl. at Ex. 3. The next email in the chain appears to be from a supervisor, David Baker, at the mail service company. Mr. Baker forwards Mark's email regarding the percentage of bad addresses to the former San Juan County Clerk, Norman Johnson, and notes "many if not most of the bad addresses will be returned" and asks how to proceed; Mr. Johnson's response is to "go ahead and proceed." *Id*. Additionally, Plaintiffs' expert, Professor McCool, explained he found many Navajo ballots were returned because of inadequate addresses in San Juan. Ex. C, First McCool Report at 183–84.

  Second, multiple sources of evidence demonstrate the difficulties that rural residents face when accessing post offices. As mentioned above, almost 54% of the County's registered voters do not have a street address. *Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253 (D. Utah 2015) at ECF No. 309, dated February 11, 2016 at p. 15. Many residents therefore rely on post office boxes to receive their mail. Some residents, however, are unable to get a post office box in San Juan County because there are not enough post office boxes for all residents in some precincts. *See* Ex. F, Tapaha 2015 Dep. 42:1–7 (noting a shortage of post office boxes in Oljato and Monument Valley). Further, even if a resident does have a post office box, the distance to the post office to retrieve one's ballot may still be considerable. *See* Ex. C, First McCool Report at 6. Again, people in more remote areas may have to drive as much as 30 or 40 miles to get their mail, which may involve using dirt tracks and unpaved roads that may be impassible in inclement weather. Ex. C, First McCool Report at 189; *see also* Ex. F, Tapaha 2015 Dep. 41. As a result, many residents do not regularly get their mail. Ex. C, First McCool Report at 191

(quoting resident explaining that "the people out there they hardly ever go to the post office, they hardly get their mail.") and at 189 ("Remote voters also faced problems in getting their mail-in ballots in a timely manner.").

Finally, the evidence establishes that problems with the postal service also mean that residents in remote parts of the County may have less time to vote than other residents. Mail to remote parts of the County is frequently delayed, sometimes by weeks. Ex. P, Whitehat Second Decl. ¶ 7 (noting a delay of almost two weeks from the date the County sent out ballots to the date Whitehat received his ballot); *cf.* Ex. N, Kane Decl. at Ex. 4 (County Commission notes dated October 6, 2014, in which the Clerk informs commissioners ballots for the 2014 general election would be mailed out on October 10th and received four days later on October 14th). These delays are worrisome even in the best circumstances, but can be especially troubling in instances, like during the November election, when the County mails ballots later than initially scheduled. *See* Ex. M (reporting that due to multiple clerical errors on ballots, the County was reprinting certain ballots and mailing the corrected ballots on October 27, 2016 – just over a week before the general election). In light of these issues, some voters may never receive their ballot or may receive it after the election is over. *See* Ex. W, Jones Aff. ¶ 3; Ex. C, First McCool Report at 190 ("a lot of people got their ballots after the election was over.")  Furthermore, because some mail routes through San Juan County have multiple stops, it can take several days for a ballot from these areas to reach the point in the mail system where it is actually postmarked. Ex. HH, Second McCool Report at 5–6. As a result, the deadline for mailing a ballot from a remote part of the County is, in effect, earlier than the deadline for mailing a ballot from other parts of the County. Ex. HH, Second McCool Report at 5–6.

Importantly, that rural residents may vote in person at one of the four polling places in the County does not relieve the burden placed on their right to vote. In fact, evidence demonstrate that the obstacles faced at these polling places also present undue burdens on voters' right to vote. Specifically, the undisputed facts establish that during the November 8, 2016 election, voters experienced long lines at the Oljato Senior Center.[15] Ex. BB, J. Charley Aff., ¶ 12; Ex. T, Teeasytoh Aff. ¶ 10. Poll workers and interpreters were not trained.[16] Defs. Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 108 at 22; Ex. Y, Stevens Aff. ¶ 5; Ex. X, Begay Aff. ¶ 8. Ballots were inadequately translated by some poll workers, leaving some voters confused. Ex. FF, M. Skow Aff. ¶ 14; Ex. GG, W. Skow Aff. ¶ 10; Ex. W, Jones Aff. ¶¶ 17–22; Ex. AA, Crank Aff. ¶ 11. One polling place ran out of paper ballots by 10:00 AM on Election Day.[17] Ex. T, Teeasytoh Aff. ¶ 8. Courts have found that these same types of obstacles can amount to a violation of voters' fundamental right to vote. *See Ury v. Santee,* 303 F. Supp. 119, 124–126. (N.D. Ill. 1969) (noting that by failing "to provide adequate voting facilities, plaintiffs and those similarly situated were hindered, delayed and effectively deprived of their rights secured by the Constitution of the United States to vote"); *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008).

Accordingly, the undisputed facts establish that, contrary to Defendants' unsupported contentions, San Juan County's election system impermissibly burdens Plaintiffs' right to vote in clear violation of the Fourteenth Amendment. The Court, therefore, should deny Defendants' motion for summary judgment on Plaintiffs' equal protection claim, and should grant Plaintiffs' cross motion for summary judgment as a matter of law.

---

[15] *See supra* note 2.
[16] *See supra* note 2.
[17] *See supra* note 2.

D.     **Plaintiffs Are Entitled to Injunctive Relief**

In order to be entitled to permanent injunctive relief, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardship between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). *Accord, Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1303–04 (D. Utah 2008). Defendants contend Plaintiffs are not entitle to injunctive relief "either because of their lack of an irreparable injury or mootness."  ECF No. 141 at 40. They do not contend that Plaintiffs failed to meet the other three requirements for permanent injunctive relief, *i.e.*, that (2) remedies available at law are inadequate to compensate for the injury, (3) the balance of hardship between the plaintiff and defendant indicate that a remedy in equity is warranted, and (4) the public interest would not be disserved by a permanent injunction, and these requirements must be deemed admitted for purposes of Defendants' motion.

Each of the arguments raised by Defendants can be dismissed summarily. First, they argue that none of the claims in the Complaint can support an injunction, because the Complaint pleads only in reference to the 2014 election plan. But, as discussed in detail above, (1) the 2014 plan is still in issue because it is subject to repetition, (2) a key aspect of the 2014 plan, i.e., the limitation of early voting to Monticello is still part of the County's current plan; and (3) Defendants have not fully complied with Section 203. Thus, the relief requested in the Complaint is applicable today.

Second, Defendants argue that Plaintiffs are not entitled to certain relief requested under Section 203, because the Court has ruled that Defendants are required only "to furnish oral instructions, assistance or other information relating to registration and voting." However, the

relief requested in the complaint, i.e., audio translations in Navajo of the voter services website, the voter registration form, the ballot and other voter information are, on their face, precisely this sort of assistance and information.

Finally, Defendants claim the case is now moot. First of all, three significant practices alleged in the Complaint are ongoing:  (1) the limitation of early voting to Monticello, (2) the mail-only system; (3) the ineffective provision of language assistance; and (4) Defendants' current voting practices unduly burden residents' fundamental right to vote. Even if – contrary to Plaintiffs' argument above – the 2014 plan was no longer subject to review, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). *Accord*, *Hecht Co. v. Bowles*, 321 U.S. 321, 327 (1944) (the cessation of violations "is no bar to the issuance of an injunction"). A defendant's voluntary cessation of a challenged practice rarely moots a federal case because a "'party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1149 (10th Cir.2007) (*quoting City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n. 1 (2001)). Thus, even if Defendants had ceased all violations of Section 203, Section 2, and the First and Fourteenth Amendments, which they have not, the Court would still have authority to grant injunctive relief. And as the Supreme Court has further made clear, "an injunction may issue to prevent future wrong." *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928). *Accord*, *U.S. v. W.T. Grant Co.*, 345 U.S. at 633; *Mitchell v. Hertzke*, 254 F.2d 183, 186 (10th Cir. 1956) (a purpose of an injunction "is to prevent future violations in the public interest, not to punish for past transgressions."). Here, the evidence strongly supports issuance of an injunction to prevent future wrong. That evidence is discussed at length in Plaintiffs' Motion for Summary Judgment

and consists of: the disparate impact the mail-in voting system has had on Navajo residents of San Juan County; the extensive and severe history of official discrimination against Native Americans in Utah and San Juan County as evidenced in numerous federal court decisions; racially polarized voting in San Juan County; the use of discriminatory voting districts in San Juan County; the depressed socio-economic status of Navajos in San Juan County; the use of racial campaign appeals in San Juan County; the limited success Navajo candidates have had in being elected to office; and the failure of Defendants to provide effective language assistance to Navajo voters in violation of Section 203.    And if a challenged practice has been discontinued, a claim for injunctive relief will only be "moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." *U.S. v. W.T. Grant Co.*, 345 U.S. at 633. *Accord*, *Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*, 508 F.Supp.2d 972, 985 (D. Utah 2007); *Citizen Ctr. v. Gessler*, 770 F. 3d 900, 907 (10th Cir. 2014) (the defendants "must demonstrate mootness"). And a defendant's burden of proof "is a heavy one." *U.S. v. W.T. Grant Co.*, 345 U.S. at 633. An injunction is appropriate here because of continuing burdens on the rights of Navajo voters, to prevent future wrongs, and because Defendants have not demonstrated mootness.[18]

---

[18] In addition, Plaintiffs have asked for other relief, which Defendants have not agreed to, specifically that Defendants be "monitored by this Court." ECF No. 2 ¶ 74. San Juan County has not consented to monitoring and thus has not provided "more and better relief" than Plaintiffs asked for in their complaint. In addition, in their Complaint Plaintiffs requested that the Court: "Retain jurisdiction over Defendants for such period of time as may be appropriate to ensure Defendants' compliance with relief ordered by this Court." ECF No. 2 ¶ 5. Again, San Juan County has not consented to retention of jurisdiction by the Court and thus has not provided "more and better relief" than Plaintiffs asked for in their Complaint.

RESPECTFULLY SUBMITTED,

/s/ John Mejia
John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
American Civil Liberties Union of Utah
355 North 300 West
Salt Lake City, UT 84103
T: (801) 521–9862
jmejia@acluutah.org
lfarrell@acluutah.org

M. Laughlin McDonald*
American Civil Liberties Union Foundation
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
T: (404) 500–1235
lmcdonald@aclu.org

Ezra D. Rosenberg*
Arusha Gordon*
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., Suite 400
Washington, D.C. 20005
T: (202) 662–8600
erosenberg@lawyerscommittee.org
agordon@lawyerscommittee.org

Maya Kane*
10 Town Square, #52
Durango, Colorado 81301
T: (970) 946–5419
mayakanelaw@gmail.com

Raymond M. Williams*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
T: (215) 656–3300
raymond.williams@dlapiper.com

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of March, 2017, I electronically filed the foregoing document with the U.S. District Court for the District of Utah. Notice will automatically be electronically mailed to the following individual(s) who are registered with the U.S. District Court CM/ECF System:

Jesse C. Trentadue (#4961)
Carl F. Huefner (#1566)
Britton R. Butterfield (#13158)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532–7300


*Attorneys for Defendants*


 /s/ John Mejia
