| | |
|---|---|
| NAVAJO NATION HUMAN RIGHTS COMMISSION; PEGGY PHILLIPS; MARK MARYBOY; WILFRED JONES; TERRY WHITEHAT; BETTY BILLIE FARLEY; WILLIE SKOW; and MABEL SKOW,<br><br>Plaintiffs,<br><br>v.<br><br>SAN JUAN COUNTY; JOHN DAVID NELSON; in his official capacity as San Juan County Clerk; and PHIL LYMAN, BRUCE ADAMS, and REBECCA BENALLY, in their official capacities as San Juan County Commissioners,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DISMISSING CERTAIN CLAIMS AS MOOT, DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, and DENYING DEFENDANT BENALLY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:16-cv-00154-JNP-BCW<br><br>District Judge Jill N. Parrish |

Before the court is a Motion for Partial Summary Judgment filed by Plaintiffs Navajo Nation Human Rights Commission, Peggy Phillips, Mark Maryboy, Wilfred Jones, Terry Whitehat, Betty Billie Farley, Willie Skow, and Mabel Skow, (Docket No. 144); a Motion for Summary Judgment filed by Defendants San Juan County, John David Nelson, Phil Lyman, Bruce Adams, and Rebecca Benally (collectively, "County Defendants"), (Docket No. 141); and a Motion for Partial Summary Judgment filed by Defendant Rebecca Benally, (Docket No. 127).

## I.  BACKGROUND

San Juan County is a sparsely populated and geographically vast political subdivision of the State of Utah, occupying the state's southeastern corner. The County's southern boundaries encompass a large section of the federally established Navajo Reservation. As a result, approximately half of the County's residents are members of the Navajo Nation, a federally

recognized Indian tribe. Most of the County's Navajo residents live within the boundaries of the Reservation. Much of the rest of the County's residents are centralized in the northern half of the County. This geographic segregation has often resulted in significant political tension between Navajo and white residents, which has played out in numerous cases before this court. *See, e.g.*, *Navajo Nation v. San Juan Cty.*, 162 F. Supp. 3d 1162 (D. Utah 2016) (addressing voting rights and election districts in San Juan County).

These motions for summary judgment come before the court in the context of a lawsuit initiated by the Navajo Nation Human Rights Commission and several named plaintiffs[1] who allege that the voting procedures in place in San Juan County violate the Voting Rights Act ("VRA") and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The voting procedures at issue here span several years of elections. Prior to 2014, the County conducted elections through nine polling places open on Election Day. Each polling place provided some form of language assistance to Navajo-speaking voters. In 2014, the County transitioned to a predominantly mail-in voting system, leaving a single physical polling location operating at the County Clerk's office in Monticello, Utah. Ballots were distributed to voters through available mailing addresses approximately one month prior to Election Day. This system was in place for the 2014 election cycle.

During 2014 and early in 2015, the Navajo Nation and the Navajo Nation Human Rights Commission officially opposed the mail-in system, asserting that the closure of polling locations and switch to mailed ballots burdened rural Navajo voters. The County acknowledged the opposition, but indicated that it would continue to utilize the mail-in system for upcoming

---

[1] All of the named plaintiffs are members of the Navajo Nation, residents of San Juan County, and registered voters. They are Peggy Phillips of Oljato, Mark Maryboy of Montezuma Creek, Wilfred Jones of Red Mesa, Terry Whitehat of Navajo Mountain, Betty Billie Farley of Red Mesa, and Willie Skow and Mabel Skow, who are residents of Mexican Water.

elections. Sometime thereafter, the Commission contacted the United States Department of Justice's Voting Rights Section (the "DOJ"), requesting an evaluation of the County's mail-in voting system.[2] In October of 2015, a DOJ representative met with both Commission and County officials and inspected the voting procedures then in place. Evidently, the DOJ did not come to any definitive conclusions regarding the mail-in voting system or the Commission's concerns.

After some unfruitful back-and-forth between the County and various civil-liberties organizations opposed to the mail-in ballot system, the Commission filed the Complaint underlying this Motion on February 25, 2016, alleging that the mail-in ballot system violated the VRA and the Equal Protection Clause. (Docket No. 2). Shortly thereafter, Defendants filed their Answer, which asserted that the County was making significant changes to its election procedures in anticipation of the June 2016 primary elections.[3] (Docket No. 41 at 3–4). For the June 2016 elections, the County maintained the predominantly mail-in voting system, but also opened three physical polling locations on the Navajo Reservation in addition to the election center in Monticello, for a total of four physical polling locations. The County also provided language assistance to voters through Navajo-speaking interpreters at all four locations on Election Day. In October 2016, the court denied a motion for preliminary injunction filed by Plaintiffs seeking to enjoin these procedures and impose new procedures prior to the general election. (Docket No. 129). As a result, essentially the same procedures (with some modification) were in place for the general election in November 2016.

---

[2] As part of a 1984 consent decree, the DOJ monitored San Juan County's elections until 2002. (Docket No. 2 at 17).

[3] There is significant disagreement between Plaintiffs and Defendants regarding the timing of the County's decision to add polling places and otherwise update the election procedures used in 2014. Plaintiffs contend that the County did not decide to change the procedures until after this lawsuit was filed, while the County asserts that officials made the decision sometime in early 2016. The court will further address this dispute below.

After the parties unsuccessfully attempted to resolve the case through settlement in early 2017, the instant motions for summary judgment were filed. (Docket Nos. 141, 144). Each party filed a response and a reply to the respective cross-motions. (Docket Nos. 149, 151, 154 155). A previously filed motion for partial summary judgment on behalf of Defendant Benally alone is also before the court for resolution. (Docket No. 127). Both a response and a reply were filed to that Motion as well. (Docket Nos. 130, 133). The court heard oral argument on July 26, 2017. (Docket No. 170). The court now rules on the Motions under jurisdiction granted by 28 U.S.C. § 1331.

## II.     MOOTNESS CHALLENGES

Before addressing the merits of Plaintiffs' claims, the court must address certain challenges to its subject-matter jurisdiction raised by County Defendants. Specifically, County Defendants assert that any controversy regarding the 2014 procedures is no longer live and, as a result, any claims based thereon are moot. As the party asserting that claims regarding the 2014 procedures are moot, the County "bears the burden of coming forward with the subsequent events that have produced the alleged result." *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 891 (10th Cir. 2008) (internal quotations omitted).

To that end, the County explains that it has abandoned the 2014 procedures in favor of the 2016 procedures for an entire election cycle and that the County Clerk has "no intention to return to the 2014 procedures." (Docket No. 154, at 48). Plaintiffs respond that the County's shift from the 2014 procedures to those used in 2016 occurred "under mysterious circumstances," (Docket No. 149, at 5), and assert that the shift was "a temporary move[] intended to derail this litigation," (*id.* at 50). As explained below, the court concludes that Plaintiffs' claims regarding the 2014 procedures are indeed moot and must be dismissed for lack of subject-matter

jurisdiction. However, the court also holds that Plaintiffs' newly-minted claims regarding the legality of the 2016 procedures are fit for resolution and may be added to the complaint. Additionally, the court concludes that Plaintiffs' claims for injunctive relief are not mooted by the implementation of the 2016 procedures and may also proceed.

## A. PLAINTIFFS' CLAIMS REGARDING THE 2014 PROCEDURES ARE MOOT.

In general, "a federal court cannot give opinions absent a live case or controversy before it," *In re Overland Park Fin. Corp.*, 236 F.3d 1246, 1254 (10th Cir. 2001) (citation and quotations omitted), because "the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction," *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (internal quotations omitted) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996)). Thus, "[m]ootness is a threshold issue," *see id.*, that must be decided before addressing the merits of Plaintiffs' request for declaratory relief, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109–10 (10th Cir. 2010) ("Declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit.").

In evaluating whether a claim for declaratory judgment is moot, "[t]he crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *See id.* at 1110 (internal quotations and emphasis omitted) (quoting *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005)); *Overland Park*, 236 F.3d at 1254 ("A case is moot when it is impossible for the court to grant any effectual relief whatever to a prevailing party." (citation and quotations omitted)); *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir. 1999) ("The core question in mootness inquiry is whether granting a present determination of the issues offered . . . will have some effect in the real

world." (citation and quotations omitted)). The court must "look beyond the initial controversy which may have existed at one time and decide whether the facts alleged show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Chihuahuan Grasslands*, 545 F.3d at 891 (quoting *Beattie v. United States*, 949 F.2d 1092, 1094 (10th Cir. 1991)).

Here, the court concludes that the County's abandonment of the 2014 procedures has mooted Plaintiffs' claims for declaratory relief regarding those procedures. The County has not used the 2014 procedures for an entire election cycle, choosing instead to implement entirely different procedures for both the primary and general elections in 2016. Moreover, neither the current County Clerk nor the County government has openly expressed any intention to reinstitute the 2014 procedures. (*See* Docket No. 141-2, at 6). Given these circumstances and the fact that Plaintiffs only seek prospective relief, there is no "substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" regarding the 2014 procedures. *See Chihuahuan Grasslands*, 545 F.3d at 891. Because Plaintiffs seek only prospective relief, they "have no legally cognizable interest in the constitutional [or statutory] validity of . . . obsolete" voting procedures. *See Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000); *Schutz v. Thorne*, 415 F.3d 1128, 1138 (10th Cir. 2005) ("Constitutional mootness exists when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (quotations omitted)). Consequently, there is no "actual controversy" to adjudicate, *see Mocek v. City of Albuquerque*, 813 F.3d 912, 932 (10th Cir. 2015) (explaining that a district court must "decide whether a case

of actual controversy exists" before issuing declaratory relief), and the court must conclude that

Plaintiffs' claims for declaratory relief regarding the 2014 procedures are now moot. [4]

## B. THE VOLUNTARY CESSATION EXCEPTION DOES NOT APPLY TO PLAINTIFFS' CLAIMS REGARDING THE 2014 PROCEDURES.

Plaintiffs insist that an exception to the mootness doctrine readily applies to their case.

Plaintiffs argue that the County's shift to new voting procedures for 2016 is simply a voluntary

cessation of challenged conduct and that County officials "should not be able to evade judicial

review, or to defeat a judgment, by temporarily altering questionable behavior." (Docket No.

149, at 50 (quoting *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143,

1149 (10th Cir. 2007)).[5] As explained below, the court concludes that the voluntary cessation

exception to the mootness doctrine is inapplicable.

"An exception to the mootness doctrine can occur when a defendant voluntarily ceases a

challenged action. This exception traces to the principle that a party should not be able to evade

---

[4] At oral argument, Plaintiffs argued that their claims regarding the 2014 procedures are not moot because the County will only provide four physical polling locations instead of the nine Plaintiffs requested in the original complaint, and has otherwise failed to agree to other aspects of the injunctive relief Plaintiffs have demanded. Plaintiffs reasoned that this factual disconnect between the injunctive relief they have requested and the 2016 procedures themselves means that the validity of the 2014 procedures is still a live controversy. But this is not a sufficient reason for the court to evaluate the now defunct 2014 procedures as if they were still operative. The mootness of Plaintiffs' requests for declaratory relief regarding the 2014 procedures is analytically distinct from their request for injunctive relief, which would impose entirely different procedures on the County's election processes. The failure of the County to meet all of the demands spelled out in Plaintiffs' prayer for injunctive relief cannot somehow grant this court subject-matter jurisdiction over Plaintiffs' claims for declaratory relief regarding now-abandoned voting procedures. As will be explained further below, the court concludes that Plaintiffs' claims for injunctive relief are not moot despite the implementation of the 2016 procedures.

[5] Plaintiffs make fleeting reference to the "capable of repetition, but evading review" exception to the mootness doctrine, (*see, e.g.*, Docket No. 149, at 45), but only point to case law pertaining to the "voluntary cessation" exception in their briefing on the issue, (*see id.* at 46). As their arguments seem to align more closely with the voluntary cessation doctrine, the court addresses only that exception to the mootness doctrine in detail. Suffice it to say that the result would more than likely be the same if Plaintiffs had properly raised an argument regarding the "capable of repetition, but evading review" exception. Indeed, Plaintiffs' arguments would still fail on the likelihood of recurrence requirement which is equally applicable to the "capable of repetition" analysis. *See Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010) (holding that a "physical or theoretical possibility" that the government actor would repeat challenged actions is insufficient to demonstrate that the challenged action is "capable of repetition").

judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1121 (10th Cir. 2009) (quotations and citations omitted); *Chihuahuan Grasslands All.*, 545 F.3d at 892 ("[T]his exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct."). Nevertheless, a government defendant's voluntary cessation moots a case when the challenged policy or procedure "is repealed and the government does not openly express intent to reenact it. But a case is not moot if a challenged [procedure] is repealed and there are *clear showings* of reluctant submission by government actors and a desire to return to the old ways." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 908 (10th Cir. 2014) (brackets and quotations omitted); *see also Brown v. Buhman*, 822 F.3d 1151, 1167 (10th Cir. 2016). In other words, "[v]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Rio Grande*, 601 F.3d at 1115 (citation omitted). "The party asserting mootness bears the 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (internal alteration omitted).

Still, this "heavy burden" often falls more lightly on government actors.[6] *See id.* at 1116; *Brown v. Buhman*, 822 F.3d 1151, 1167 (10th Cir. 2016) (explaining that the "formidable burden" on those claiming mootness because of voluntary cessation "is not insurmountable, especially in the context of government enforcement"). In practice, the burden "has not prevented governmental officials from discontinuing challenged practices and mooting a case."

---

[6] Certain circuits have explicitly adopted a substantially more lenient approach to government actors in the voluntary-cessation context. *See, e.g., Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009); *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006); *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1283 (11th Cir. 2004); *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988). However, the Tenth Circuit has not "definitively opine[d] on what explicit measure—if any—of greater solicitude is due [government actors] in the application of the voluntary-cessation exception." *Rio Grande*, 601 F.3d at 1117.

*Rio Grande*, 601 F.3d at 1116. Indeed, the Tenth Circuit has indicated that "government 'self-correction provides a secure foundation for mootness so long as it seems genuine.'" *Brown*, 822 F.3d at 1167–68 (alteration omitted) (quoting *Rio Grande*, 601 F.3d at 1118). Thus, "withdrawal or alteration of [governmental] policies can moot an attack on those policies." *See Rio Grande*, 601 F.3d at 1117 (alteration and quotations omitted). "And the 'mere possibility' that a[] [governmental] agency might rescind amendments to its actions or regulations does not enliven a moot controversy." *Id.*; *Sossamon*, 560 F.3d at 325 ("We will not require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct."). Ultimately, "[m]ost cases that deny mootness following government officials' voluntary cessation rely on *clear showings* of reluctant submission by government actors and a desire to return to the old ways." *Brown*, 822 F.3d at 1167 (quotations and brackets omitted, emphasis in original).

Here, County Defendants assert that the implementation of 2016 procedures shortly after this lawsuit was filed was not a litigation tactic, but a response both to "comments by voters about the [2014] vote-by-mail process" and an October 2015 meeting with DOJ officials from the Civil Rights Division who evidently evaluated the 2014 procedures. (Docket No. 154, at 9). The County Attorney and County Clerk have further testified that the decision to reopen certain polling places was made sometime in January or February of 2016—i.e., shortly before this litigation began. (*Id.* at 9–10).

Plaintiffs dispute this narrative, arguing that the only support for these assertions are the "self-serving" statements of County Officials. (Docket No. 149, at 12). They further assert that a contemporaneous County Commission meeting held on February 16, 2016 indicated that the "decision as to whether to retain the mail-only system [w]as still . . . [an] open [question]." (*Id.* at

13). Moreover, Plaintiffs point out that the first public announcement of a change in voting procedures came approximately a week after County Defendants were served with the operative complaint. (*Id.*).

But such circumstantial evidence does not in fact controvert County Defendants' general assertion that County officials made the decision to reopen polling places "on or before February 16, 2016." (*See* Docket No. 154, at 10). County officials may very well have concluded directly after their discussion of options at the County Commission meeting on February 16, 2016 that the best option would be to abandon the 2014 procedures for the upcoming elections. Indeed, the Commissioners seemed to rely on the County Clerk for information regarding the decision during the February meeting, and it appears that he made the final call. (*See* Docket No. 149, at 12–13; Docket No. 141, at 6–7). Moreover, assuming the decision to alter voting procedures was made sometime directly after that meeting, the timing of the press announcement is not at all suspicious—three weeks seems about right to draw up county-wide plans and secure new polling locations. While it is possible to construe this all as very convenient timing, there must be a "*clear showing*[] of reluctant submission" by County officials in order to avoid mootness. *See Brown*, 822 F.3d at 1167. There is simply insufficient evidence on the record to indicate that the County's abandonment of the 2014 procedures was a sham meant "merely to defeat the district court's jurisdiction" or to avoid adverse judgment. *See Rio Grande*, 601 F.3d at 1117; *Brown*, 822 F.3d at 1170 ("To find this voluntary cessation is a sham for continuing possibly unlawful conduct, we would have to conclude the highest-ranking law enforcement official in Utah County had engaged in deliberate misrepresentation to the court. We see no basis for this conclusion." (quotations and citation omitted)).

Plaintiffs protest that the County Clerk has testified that he may unilaterally change the voting procedures at any time and that the County Defendants have sought a declaration from this court that the 2014 procedures complied with the VRA. Plaintiffs argue that these facts, taken together, indicate a cognizable threat of a "return to the old ways." *See Brown*, 822 F.3d at 1151. But the fact that the County has sought to reserve the right to return to the 2014 procedures does not mean that it will certainly take that course, or even that it is likely to do so. Nor does the fact that the County Clerk has the authority to reinstitute the 2014 procedures mean that those procedures are likely to be reenacted. *See Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[T]he mere power to reenact a challenged policy is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." (brackets omitted)). As a result, the possibility of the County's reversion to the 2014 procedures is merely theoretical, *see Unified Sch. Dist.*, 491 F.3d at 1150, and the theoretical possibility of reversion is simply not "sufficient to warrant application of the voluntary-cessation exception" in this case. *Rio Grande*, 601 F.3d at 1119; *see also id.* at 1117 ("A case ceases to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency." (internal quotations and alterations omitted)); *Ala. Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983) (explaining that the "mere possibility that the state might rescind its recent amendment does not, for purpose of mootness, enliven the controversy"); *Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988) ("If the likelihood [of recurrence] is small (it is never zero), the case is moot."). For this court to opine on the legality of a discontinued election practice on the off-chance the practice might be reinstituted would be "a textbook example of advising what the law would be upon a hypothetical state of facts." *See Nat'l Advertising Co. v. City & Cty. of Denver*, 912 F2d 405, 412 (10th Cir. 1990) (internal quotation omitted). Thus, the voluntary-cessation exception is not

applicable to Plaintiffs' claims for declaratory relief regarding the 2014 procedures, and the claims are moot.

At oral argument, Plaintiffs also seemed to argue that the controversy regarding the 2014 procedures is not moot because the replacement procedures still allegedly violate the VRA and the Fourteenth Amendment. Plaintiffs appear to rely on the following rule: "Where a new statute 'is sufficiently similar to the repealed statute that it is permissible to say that the challenged conduct continues,' the controversy is not mooted by the change, and a federal court continues to have jurisdiction." *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000) (quoting *Northeastern Fla. Chapter of Associated Gen. Contractors of Amer. v. City of Jacksonville*, 508 U.S. 656, 662 & n. 3 (1993)).

While Plaintiffs are correct that their claims regarding the 2016 procedures arise under the same provisions of the VRA and the Constitution, it cannot be said that the new procedures differ "only in some insignificant respect" from the 2014 procedures. *See Ne. Fla. Chapter of Associated Gen. Contractors of Amer. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). The voting procedures in San Juan County have "changed substantially" and "there [is] therefore no basis for concluding that the challenged conduct [is] being repeated" by implementation of the 2016 procedures. *See id.* at 662 n.3. The new procedures, which place approximately equivalent focus on mail-in and in-person voting, are fundamentally different from the 2014 procedures, which essentially confined the County's voting opportunities to mail-in ballots.

Evidence of this fundamental difference can be seen in the legal deficiencies Plaintiffs attribute to the 2016 procedures. Plaintiffs allege that the new procedures result in disproportionate in-person early-voting opportunities for whites and Navajos, and that the County provided inadequate language assistance during the 2016 election cycle. By contrast, the

clear focus of Plaintiffs' original complaint against the 2014 procedures was not early-voting inequities or the inadequacy of language assistance, but the wholesale elimination of in-person polling locations on Election Day and the concomitant elimination of language assistance for Navajo-speakers. Thus, the new procedures do not allegedly disadvantage Navajos "in the same fundamental way" as the old procedures, *see id.* at 662, and it cannot be said "that the challenged conduct continues," *see id.* at 662 n.3. This is not an instance where the same allegedly harmful practice is simply being repackaged with superficial changes and reinstated under another name. The County's conduct "has been 'sufficiently altered so as to present a substantially different controversy from the one that existed when suit was filed.'" *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (citing *Ne. Fla. Chapter*, 508 U.S. at 671 (O'Connor, J., dissenting)); *Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1246–47 (10th Cir. 2009) (holding that a change between old and new rules was "fundamental to a degree that impacts our jurisdiction over the plaintiffs' challenges to the old" rules).

All told, there are significant factual and legal disconnects between what Plaintiffs have alleged regarding the 2014 procedures and the reality of the situation in San Juan County. As a result, Plaintiffs' claims for declaratory relief regarding the 2014 procedures are moot and, as explained above, the voluntary cessation exception is inapplicable. In short, any declaration by this court as to the validity of the 2014 procedures would have "no effect in the real world and [would] essentially be an advisory opinion." *See Unified Sch. Dist. No. 259*, 491 F.3d at 1150 (quotations and citations omitted). The court therefore lacks subject-matter jurisdiction over Plaintiffs' claims for declaratory relief under both the VRA and the Fourteenth Amendment regarding the 2014 procedures. Those claims, designated as the First, Second, and Third Claims for Relief found in Plaintiffs' complaint, (Docket No. 2), are hereby DISMISSED without

prejudice, *see Brown*, 822 F.3d at 1179 ("[D]ismissal for lack of jurisdiction is not an adjudication on the merits and therefore dismissal must be without prejudice.").

## C. CERTAIN CLAIMS REGARDING THE 2016 PROCEDURES SURVIVE THE COURT'S FINDING OF MOOTNESS.

Although Plaintiffs' claims for declaratory relief regarding the 2014 procedures are plainly moot, those are not the only claims Plaintiffs have raised at the summary judgment stage. As described above, the cross-motions for summary judgment also extensively address the validity of the 2016 procedures under the VRA and the Fourteenth Amendment. However, Plaintiffs have made the presumably strategic decision not to amend their complaint to describe or otherwise challenge the 2016 procedures. At oral argument, Plaintiffs made several unsuccessful attempts to link ambiguous language in their complaint with the deficiencies they allege characterized the 2016 procedures. But "the liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam). And, more fundamentally, the complaint simply cannot allege or challenge procedures that did not exist at the time of filing.

At least the First, Third, Fourth, Fifth, Sixth, Seventh, and Eleventh Circuits have held "that a plaintiff may not raise new claims after discovery has begun without amending his complaint." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (collecting cases from the Fourth, Fifth, Sixth, Seventh, and Eleventh Circuits); *Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez*, 659 F.3d 42, 53 (1st Cir. 2011) (First Circuit so holding); *Taylor v. Sanders*, 536 F. App'x 200, 203 (3d Cir. 2013) (Third Circuit so holding). However, the Tenth Circuit has emphasized that "a plaintiff should not be prevented from pursuing a valid claim just because she

did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) (quotations omitted). Thus, under Tenth Circuit law, the advancement of claims not contained in the complaint at the summary judgment stage "may be considered a request to amend the complaint, pursuant to FED. R. CIV. P. 15." *See Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998). Accordingly, the court must now decide whether to allow Plaintiffs to amend their complaint to include claims regarding the legality of the 2016 procedures so they can be evaluated at this late stage. As explained below, the court concludes that 1) Plaintiffs' new claims under the VRA may be added to the complaint, but 2) Plaintiff's new claims under the Equal Protection Clause of the Fourteenth Amendment may not be added to the complaint at this stage.

### 1. NEW CLAIMS UNDER THE VRA MAY BE ADDED TO THE COMPLAINT.

At the summary judgment stage, Plaintiffs present two new claims under the VRA regarding the County's 2016 voting procedures. The first is a claim that the County's early-voting procedures provide unequal opportunity to Navajo voters in violation of Section 2 of the VRA. The second is a claim that the language assistance provided by the County to Navajo-speaking voters is ineffective in violation of Section 203 of the VRA. The court concludes that Plaintiffs should be granted leave to amend their complaint to include these claims so that the court may address them at the summary judgment stage.

Rule 15 provides that "[t]he court should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). "The purpose of the Rule is to provide litigants the maximum

opportunity for each claim to be decided on its merits rather than on procedural niceties." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). Thus,

> [i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rule requires, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting FED. R. CIV. P. 15(a)(2)). Under ordinary circumstances, Plaintiffs' inexplicable delay would provide ample reason to refuse leave to amend. *See Minter*, 451 F.3d at 1206 ("We have held that denial of leave to amend is appropriate when the party [seeking amendment] has no adequate explanation for the delay." (quotations omitted)); *Fed. Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987) ("[C]ourts have denied leave to amend where the moving party was aware of the facts on which the amendment was based for some time prior to the filing of the motion to amend."). However, the circumstances of this case are not entirely ordinary.

As an initial matter, the new claims here arise from the unilateral conduct of County Defendants during litigation, who appear to have participated in the litigation with the understanding that the 2016 procedures were now the animating issue in the case. The court has already entertained—without objection—a preliminary injunction motion that addressed Plaintiffs' claims regarding the 2016 procedures under the VRA. The extensive briefing and subsequent memorandum decision issued regarding this motion likely provided the court and County Defendants with a sufficient understanding of the general contours of Plaintiffs' claims. (*See generally* Docket Nos. 94, 108, 112, 129).

And while the court is absolutely mystified by Plaintiffs' failure to properly amend their complaint to reflect the change in voting procedures during the course of litigation, County

Defendants do not appear to oppose a ruling on the 2016 procedures. Nor do they claim prejudice from a lack of notice regarding any of the claims for declaratory relief dealing with the 2016 procedures. Instead, County Defendants limit their mootness challenge to Plaintiffs' claims regarding the 2014 procedures, (*see* Docket No. 154, at 48–49), and make substantive arguments regarding the validity of the 2016 procedures as if the claims were properly before this court, (*see* Docket Nos. 141, at 31–39; 154, at 49–54). In fact, it appears from the parties' briefing that discovery has proceeded as if these claims were part of the operative complaint, and each side has presented extensive evidence and made substantive arguments as to the legality of the 2016 procedures.

As the court and the parties are essentially familiar with these claims, the prejudice typically associated with the summary adjudication of claims not pled in the complaint is lacking. *See Minter*, 451 F.3d at 1208 ("Courts typically find prejudice only when the amendment [to the complaint] unfairly affects the defendants in terms of preparing their defense to the amendment.") (quotation omitted); *cf. Gilmour*, 382 F.3d at 1315 (refusing to entertain new claims at summary judgment because the defendant "had no notice of a contract claim based on the tort claims set forth in the complaint"); *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 667 (6th Cir. 2012) (unpublished) ("Because the new claims are factually distinct from the original claims, [defendant] had no notice that it would have to defend against such allegations."); *Hexion Specialty Chem., Inc. v. Oak-Bark Corp.*, No. 7:09-cv-105-D, 2011 WL 4527382, at *8 (E.D.N.C. Sept. 28, 2011) (unpublished) (explaining that the general prohibition on new claims raised after discovery without amendment to the operative complaint aligns with the fundamental purpose of a complaint, which is to put the party's "opponent and the court on notice of the claims in the case."). And, again, County Defendants have not claimed

any particular prejudice to their defense from the new claims and do not otherwise oppose a summary ruling on the legality of the 2016 procedures.

For these reasons, the court concludes that the claims for declaratory relief under the VRA regarding the 2016 procedures, as outlined in Plaintiffs' briefing, are fit for resolution at this stage and will be treated as if raised in the complaint. *Cf.* FED. R. CIV. P. 15(b)(2).

### 2. NEW CLAIMS UNDER THE FOURTEENTH AMENDMENT MAY NOT BE ADDED TO THE COMPLAINT.

In addition to their new claims under the VRA, Plaintiffs also assert new claims under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs make a two-tiered argument regarding the legality of the 2016 procedures under the Equal Protection Clause. First, they claim that the County's 2014 vote-by-mail procedures burdened the right of rural County residents to vote. Second, they claim that the voting facilities provided to rural County residents were so inadequate as to abridge the fundamental right to vote. This court "may deny leave to amend where amendment would be futile." *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004) (quoting *Jefferson Cty.*, 175 F.3d at 859). Thus, a district court is "clearly justified in denying [a] motion to amend if the proposed amendment could not have withstood a motion to dismiss or otherwise failed to state a claim." *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992). Here, the court concludes that neither tier of Plaintiffs' new Equal Protection claim could survive a motion to dismiss and therefore amendment to allow the claim would be futile.

The first tier of Plaintiffs' equal protection claim argues that "[t]he County's reduction of polling places and practice of relying on primarily vote-by-mail election system" impermissibly burdens rural County residents' right to vote. (Docket No. 144, at 39). In support of this

argument, Plaintiffs present a great deal of evidence regarding the relative reliability and accessibility of mail service in rural areas of the County. This argument is little more than a vestige of Plaintiffs' now-moot arguments regarding the 2014 procedures—procedures that eliminated all polling places except the election center in Monticello and relied almost exclusively on mail-in voting. But the 2016 procedures that now animate this lawsuit do not restrict voting to mail-in ballots, they provide mail-in voting as one option among several. Even assuming that mail-in voting is as difficult for rural residents as Plaintiffs allege, the mere existence of an option that is less accessible for certain voters is not a cognizable burden on those voters' rights. *Cf. McDonald v. Bd. of Election Comm'nrs of Chi.*, 394 U.S. 802, 807–08 (1969) (explaining that laws that prevented certain detainees from receiving absentee ballots were "designed to make voting more available to some groups who cannot easily get to the polls" and did "not themselves deny appellants the exercise of the franchise"). Were mail-in voting the *only* option or even the only *accessible* option to cast a ballot, then the County's failure to provide other options could arguably be burdensome to rural voters. But that is simply not the current scenario in San Juan County, where rural voters may choose from four total in-person voting locations on Election Day, early voting in Monticello, *or* mail-in voting in order to cast their ballot.

Insofar as Plaintiffs argue that rural voters are unduly burdened by the *number* or *location* of polling locations available on Election Day and must therefore rely on the allegedly burdensome mail-in option, they have not adduced any evidence to that effect. Plaintiffs have not pointed to any statistical evidence or even a well-pled allegation that would indicate that rural voters as a class have less access to in-person voting on Election Day or otherwise. In other words, there is no indication in the record or in Plaintiffs' briefing that the four polling locations

available on Election Day are so inaccessible that rural voters must rely on the mail-in voting system and are therefore burdened by its alleged deficiencies. All told, Plaintiffs have failed to identify or plausibly allege a cognizable burden on rural residents' right to vote resulting from mail-in voting or from the relative number or location of polling places.

Plaintiffs attempt to salvage their equal protection claim by insisting that although the polling locations may be equally accessible to rural voters, the in-person polling locations provided by the County on November 8, 2016 were so inadequate as to place an impermissible burden on rural residents' right to vote. (Docket No. 144, at 42). Plaintiffs allege the following polling place inadequacies during the general election: 1) the Oljato Senior Center polling location ran out of paper ballots by 10 a.m. and voters there had access to only one functioning electronic voting machine; 2) "long lines" resulted from the limitation to a single voting machine; 3) "poll workers . . . were not trained;" and 4) Navajo interpreters were not trained resulting in inadequate translations of the ballots, "leaving some voters confused." (Docket No. 144, at 42). The first two allegations are clearly intertwined, as there is no discernible argument from Plaintiffs that the lack of paper ballots, by itself, burdened rural voters. Instead, it appears that Plaintiffs' theory is that the lack of an adequate amount of paper ballots, coupled with the malfunction of two out of three available voting machines, created "long lines," which impermissibly burdened rural voters in the exercise of their rights. (*See* Docket No. 144, at 42). As explained below, the court concludes that these allegations cannot support an equal protection claim on behalf of rural San Juan County residents and therefore any amendment to include them in the complaint would be futile.

The court notes first that many of these allegations are not clearly the result of any identifiable regulation, policy, or practice at the County level. Rather, they appear to be the result

of inadvertent human error (misapprehending the number of paper ballots needed for a particular location) and unanticipated mechanical failure (the breakdown of two out of three voting machines). Issues of inadvertent error do not fit neatly into the established framework for evaluating typical voting-related equal protection violations set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), and reaffirmed in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008). There are no laws, regulations, rules, or restrictions for the court evaluate and, by extension, no "precise interests" that the municipality may "put forward . . . as justifications for the burden imposed." *See Burdick*, 504 U.S. at 434; *see also Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) ("Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause."). Thus, every time an inadvertent error that burdens certain voters in their exercise of the franchise occurs, the error would be essentially indefensible. Accordingly, the court believes that the *Anderson/Burdick* framework is essentially inapplicable to Plaintiffs' claims here.

Instead, it appears that the appropriate analysis of an equal protection claim alleging a government entity's failure to provide some voting service or facility (as opposed to a claim alleging that a particular rule or law impermissibly burdens the right to vote) must be tied to unequal treatment among different groups. *See Citizen Ctr.*, 77 F.3d at 917–18; *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) ("If true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right *depending on where they live* in violation of the Equal Protection Clause.") (emphasis added); *Ury v. Santee*, 303 F. Supp. 119, 125 (N.D. Ill. 1969) ("The overcrowded condition in *certain of the consolidated precincts* on April 15, 1969, resulted in the

effective deprivation of plaintiffs' right to vote . . . and was a consequence of the consolidation . . . of the [municipal body's] failure to provide adequate and *equal* voting facilities for all of the qualified voters who desired to cast their ballot on such date." (emphases added)). But Plaintiffs have not provided any colorable evidence or well-pled allegation that would indicate that rural voters suffered these particular deficiencies at a rate higher than the general voting population of San Juan County. In the context of voting-rights cases, the Equal Protection Clause of the Fourteenth Amendment provides that "citizens enjoy a constitutionally protected right to participate in election on an equal basis *with other citizens in the jurisdiction*." *Citizen Ctr.*, 770 F.3d at 917–18 (quotations omitted). In other words, there must be some evidence or at least a well-pled allegation that the County imposed these burdens on one class of citizens and not the other. Plaintiffs have utterly failed to demonstrate or even allege that non-rural voters were able to vote without the delays or untrained poll workers that rural voters encountered. The court can find no discernible disparity in Plaintiffs' allegations or arguments regarding these inadequacies, fatally undermining any equal protection claims based thereon. *See Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("[T]he proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile."); *Angel v. City of Fairfield*, 793 F.2d 737, 740 (5th Cir. 1986) ("Because Angel does not allege discrimination between citizens in the same jurisdiction, he also fails to state a claim that he was denied equal protection of the laws . . . .").

Moreover, these allegations, even taken together, *cf. Clingman v. Beaver*, 544 U.S. 581, 607–08 (2005) (O'Connor, J., concurring) ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting

participation and competition."); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016) ("[T]he district court also clearly erred in finding that the *cumulative impact* of the challenged provisions . . . does not bear more heavily on African Americans." (emphasis added)), do not amount to the same kind of systemic breakdown that constituted an equal protection violation in cases that Plaintiffs cite in support. S*ee League of Women Voters*, 548 F.3d at 477–78 (finding plaintiff had adequately alleged an Equal Protection voting claim because, among numerous other severe hindrances and outright barriers to voting, a misallocation of voting machines led to delays of two to twelve hours, voting at one location "was not completed until 4:00 a.m. on the day following election day," and, as a result, certain voters had "to leave their polling places without voting in order to attend school, work, or to family responsibilities"); *Ury*, 303 F. Supp. at 124 (finding Equal Protection violation because, among other substantial hindrances and errors by officials that led to confusion and disparity, voters in certain precincts "were required to wait for periods of two to four hours to cast their ballots" and overcrowded conditions made voting nearly impossible); *see also Fleming v. Gutierrez*, No. 13-cv-222-WJ-RHS, 2014 WL 12650657, at *3–*10 (D.N.M. Sept. 12, 2014) (unpublished) (enjoining county election procedures where the previous election "was widely recognized as a complete disaster" and the county's failure to allocate proper resources resulted in wait times exceeding five hours).

Here, there is no indication from the evidence identified by Plaintiffs of how "long" the line that resulted from these errors actually were.[7] One voter apparently did not want to wait in

---

[7] Although Plaintiffs neglected to point it out to the court, a statement in the affidavit of Nelson Yellowman indicates that another voter in line at a polling location told him that he had waited in line for two hours to vote. Additionally, Mr. Yellowman indicates that he waited in line for approximately fifty minutes before being able to vote. However, Mr. Yellowman's statement does not identify which polling location he was referring to in his statement. Although the court can reasonably infer that it was the Oljato location from Mr. Yellowman's alleged residence, the court cannot be certain given the lack of any argument or allegation from Plaintiffs in their briefing. While a delay of one to two hours is not a negligible burden for an ordinary voter, it is still not an extreme burden akin to the cases cited by Plaintiffs in support.

the line because he had to attend to sick family members. Another apparently did not want to wait in line and, as a result, was told he should return home, retrieve his mail-in ballot, and return to the polling place to deliver it in person, which he eventually did. Without more, it is not clear that the "long lines" encountered by rural voters at the Oljato polling location were anything more than an incidental inconvenience that may be encountered by many voters when voter turnout is unexpectedly high.[8] *Cf. Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (explaining, in the context of a challenge to a voter ID requirement, that "[f]or most voters who need [IDs], the inconvenience of making a trip to the [agency office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting").

Similarly, there is no indication of *any* actual burden on rural voters' rights stemming from Plaintiffs' allegation of inadequate poll worker traning. Plaintiffs flatly allege that poll workers "were not trained," (Docket No. 149, at 60), as if that fact alone evinced a burden on

---

The court also notes that on summary judgment, the statement by the other voter to Mr. Yellowman is hearsay and would not be admissible for consideration by the court. Thus, even if the court were to permit the amendment and consider the equal protection claim on summary judgment, Plaintiffs have failed to present evidence that the wait-time at the Oljato polling place exceeded fifty minutes. Again, while certainly not ideal, the court cannot say as a matter of law that such a wait-time amounted to a constitutional violation.

[8] It is also possible that Plaintiffs' Equal Protection claim fails because they have not alleged or adduced any colorable proof of a discriminatory intent behind the implementation of the maladministration they challenge. Plaintiffs have made clear in both written and oral argument that their equal protection claim challenges San Juan County's voting procedures "as applied"—meaning they only challenge the facially neutral voting procedures insofar as the procedures apply unequally to rural voters. (*See* Docket No. 155, at 61 & 61 n.10). They do not argue or allege that the voting procedures burden San Juan County voters *generally*, only those who live in rural areas. This challenge may be incomplete, however, without some allegation or proof of a discriminatory purpose. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 207 (2008) (Scalia, J., concurring) ("A voter complaining about a [facially neutral] law's effect on him has no valid equal-protection claim because, without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional."); *Gamza*, 619 F.2d at 453–54 (holding that a claim of "inadvertent errors" in administration of election procedure, without some allegation of intentional discriminatory conduct, did not properly allege a denial of equal protection of the laws); *Harris Cty. Dep't of Educ. V. Harris Cty.*, Civ. Action No. H-12-2190, 2012 WL 3886427, at *6–*7 (S.D. Tex. Sept. 6, 2012) (holding that amendment was futile because plaintiff failed to allege facts showing that county defendants "intentionally sought to deprive any voter of constitutionally protected voting rights"). However, given the *Crawford* Court's apparent dissonance on this issue, the court declines to make it the basis of denying leave to amend.

rural voters. But Plaintiffs have not demonstrated or even explained how the lack of some unidentified training for poll workers burdened any rural voter. *Cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (finding that an allegation that "[p]oll workers received inadequate training, causing them to provide incorrect instructions *and leading to the discounting of votes*" along with other severe polling problems sustained a claim for relief under the Equal Protection Clause) (emphasis added). Moreover, this argument is not supported by the record. Plaintiffs' own affidavits supporting this contention indicate that poll workers received training on "how to look up prospective voters and check identification." (Docket No. 144-6, at 3). It is not clear what additional training Plaintiffs believe the poll workers should have received, but did not. Thus, this allegation, even in combination with the purported "long lines" at the Oljato polling location, does not amount to a constitutional violation.

The final allegation—that the language assistance provided to Navajo-speaking voters was inadequate—is puzzling, because it appears to fundamentally alter the nature of Plaintiffs' claim. This allegation shifts the focus of the claim from the rights of rural voters generally to Navajo-speaking voters specifically. But Plaintiffs emphatically denied in their reply brief that their equal protection claim had anything to do with unequal treatment of Navajo voters. They repeatedly emphasized that their claim was that certain voting procedures "violate the rights of *all* of San Juan County's rural residents." (Docket No. 155, at 61 (emphasis added)). And, while it is clear from the record that many, if not most, Navajos live in rural areas, there is no evidence in the record or plausible allegation in the briefing that an injury to the right of Navajo-speaking voters can be construed as an injury to rural voters generally. Accordingly, these allegations cannot support an equal protection claim premised on the rights of rural voters generally. While the allegations regarding inadequate language assistance could perhaps support an equal

protection claim regarding Navajo-speakers in particular, the court declines to cobble together such a claim on Plaintiffs' behalf. It is evident from briefing that Plaintiffs did not wish to bring such a claim. (*See* Docket No. 155, at 61 ("Plaintiffs do not contend that San Juan County's voting procedures violate only Navajo residents' constitutionally protected right to vote. Rather, Plaintiffs assert that these procedures violate the rights of all of San Juan County's rural residents.")).

Finally, the court believes that the addition of a newly-minted equal protection claim, with differing factual and legal parameters than those alleged in the original complaint, is ill-advised at this late stage. While County Defendants do not raise any particular procedural objection to the inclusion of this claim for summary judgment, it is not clear to the court that much, if any, discovery has revolved around Plaintiffs' claims of inadequate voting facilities during the general election in November 2016. Moreover, unlike Plaintiffs' claims under the VRA, this particular claim was not touched upon at all in Plaintiffs' motion for preliminary injunction, leaving the court and County Defendants to guess as to the contours of Plaintiffs' claims until summary judgment. And Plaintiffs have provided no satisfactory explanation for their failure to amend their complaint to include this claim. *See Minter*, 451 F.3d at 1206 ("We have held that denial of leave to amend is appropriate when the party [seeking amendment] has no adequate explanation for the delay." (quotations omitted)). These factors, coupled with the legal deficiencies outlined above, indicate that leave to amend to include the equal protection claim is inappropriate. *See id.* at 1208 ("Courts typically find prejudice only when the amendment [to the complaint] unfairly affects the defendants in terms of preparing their defense to the amendment."); *Evans*, 936 F.2d at 1090–91 ("[A] plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she

could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.") (quotations omitted).

In sum, Plaintiffs' briefing on the matter fails to state a claim for relief under the Equal Protection Clause and therefore amendment to allow inclusion of such a claim would be futile. *See Ketchum*, 961 F.2d at 920 (explaining that a district court may deny amendment "if the proposed amendment could not have withstood a motion to dismiss or otherwise failed to state a claim"). And, in any event, the equitable factors described above militate against allowing an amendment to include this claim. The court therefore declines to consider this proposed claim at the summary judgment stage. Instead, the court will consider only the new claims for declaratory relief under Section 2 and Section 203 of the VRA.

### D. PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF ARE NOT MOOT.

Before proceeding to a summary judgment analysis, the court pauses to address one final challenge to its subject matter jurisdiction over Plaintiffs' claims. In addition to their arguments regarding the mootness of Plaintiffs' claims for declaratory relief, County Defendants similarly argue that Plaintiffs' claims for injunctive relief were also mooted by the implementation of the 2016 procedures. (Docket No. 154, at 55 & 55 n.90). They insist that the 2016 procedures "provide more and far better relief than Plaintiffs have asked for in their Complaint." (*Id.* at 55). The court disagrees.

Plaintiffs' prayer for injunctive relief spells out the steps they believe the County *must* take in order to comply with the VRA. In this way, Plaintiffs allege that they will be subject to "continuing, present adverse effects" until the injunctive relief they have requested is fully implemented. *See Beattie v. United States*, 949 F.2d 1092, 1094 (10th Cir. 1991). Further, the procedures Plaintiffs ask this court to impose on the County go well beyond those actually

implemented by the County in the 2016 election cycle. And the court has already allowed for the addition of certain new claims for declaratory relief regarding the legality of the 2016 procedures. Thus, assuming a violation of Plaintiffs' voting rights may be found, it is not "impossible [for the court] to grant any effectual relief" regarding the 2016 procedures. *Chihuahuan Grasslands*, 545 F.3d at 891. In sum, Plaintiffs' claims for injunctive relief are distinct from their claims for declaratory relief regarding the 2014 procedures and are not mooted by the implementation of the 2016 procedures.

Having narrowed the claims at issue on summary judgment to those under the VRA dealing with the 2016 procedures, the court now turns to the substance of the parties' motions for summary judgment. The court will first briefly outline the summary judgment standard, then address certain evidentiary disputes, and then apply the summary judgment standard to each of Plaintiffs' claims under the VRA.

## III. SUMMARY JUDGMENT STANDARD

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, the court must "construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002); *see also Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) ("The nonmoving party is entitled to all reasonable inferences from the record."). However, the nonmoving party "is entitled to only those inferences that are 'reasonable.'" *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury

could find in favor of the nonmoving party on the evidence presented." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).

"[T]he movant bears the burden of showing the absence of a genuine issue of material fact, [but] the movant need not negate the nonmovant's claim." *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996). "[A] movant may make its prima facie demonstration by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). Once the movant meets this initial burden, the "nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Jenkins*, 81 F.3d at 990. The court also recognizes that "conclusory allegations without specific supporting facts have no probative value" and that a conclusory affidavit is "insufficient to support summary judgment." *Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134, 1143-45 (10th Cir. 2005) (internal citations and quotations omitted). Ultimately, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). "When the parties file cross motions for summary judgment, [the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atl. Richfield Co.*

*v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotations omitted). At the same time, Rule 56 permits courts to consider materials in the record other than those cited by the parties. FED. R. CIV. P. 56(c)(3).

## IV.    EVIDENTIARY DISPUTES

In their memorandum in opposition to Plaintiffs' Motion for Partial Summary Judgment, County Defendants make several evidentiary objections regarding purported affidavits and expert reports filed by Plaintiffs in support of their Motion. County Defendants also filed a Motion to Strike and reiterated their previously lodged evidentiary objections. Because "[m]otions to strike evidence as inadmissible are no longer appropriate" under local rules, DUCivR 7-1(b)(1)(B), the court DENIES the Motion to Strike as improper. As for the additional or otherwise expanded evidentiary objections introduced in the Motion to Strike, the court concludes that they are untimely under DUCivR 7-1(b)(1)(B). That local rule requires that objections to new evidence introduced in a reply memorandum "be filed within seven (7) days after service of the reply." DUCivR 7-1(b)(1)(B). The reply memorandum in this instance was filed in early April 2017, while County Defendants' Motion to Strike was filed at the end of June 2017. (*Compare* Docket No. 155 *with* Docket No. 158). Accordingly, the court will consider only the objections properly raised by County Defendants in their briefing on the underlying Motion for Partial Summary Judgment. The court will first address County Defendants' objections to certain translated statements, then their objections to the introduction of Plaintiffs' expert reports.

### A.    COUNTY DEFENDANTS' OBJECTIONS TO THE COURT'S CONSIDERATION OF CERTAIN TRANSLATED DECLARATIONS

County Defendants lodge several objections to the statements of Betty Billie Farley, Bonnie B. Charley, Mabel Skow, and Willie Skow, which were attached in support of Plaintiffs'

Motion for Partial Summary Judgment and labeled as affidavits. (*See* Docket Nos. 144, 144-11, 144-13, 144-16, 144-17). In support of or opposition to a motion for summary judgment, either party may present evidence in the form of an affidavit or a declaration. *See* Fed. R. Civ. P. 56(c)(4). Whichever form the document takes, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.*

Here, County Defendants rest their objections on several theories. First, County Defendants assert that the statements, labeled as "Affidavit[s]," are not properly sworn under oath and lack any signature by an officer authorized to administer oaths. The court rejects this argument because the documents, though erroneously labeled as affidavits, are nonetheless admissible at the summary judgment stage as unsworn declarations pursuant to 28 U.S.C. § 1746. Each statement includes the declaratory language required by § 1746 and makes direct reference to that section in the body of the document. (*See, e.g.*, Docket No. 144-13, at 2–3 ("Pursuant to 28 U.S.C. § 1746, I declare as follows . . . . I declare under penalty of perjury that the foregoing is true and correct, as translated to Navajo by Leonard Gorman. Executed on 11/21/16[.]")). The objection on this basis is therefore overruled.

Next, County Defendants argue that, even if the statements are properly considered "Declarations" pursuant to 28 U.S.C. § 1746, they lack foundation, cannot be authenticated, and should be ignored for purposes of summary judgment. *See Rosario-Guerro v. Orange Blossom Harvesting*, 265 F.R.D. 619, 623 (M.D. Fla. 2010) ("At the summary judgment stage, a translation must be properly authenticated and shown to be an accurate translation by a qualified interpreter.") (internal quotations omitted). More specifically, County Defendants assert that these statements lack foundation for three reasons: 1) because they were translated from Navajo

into English by Leonard Gorman, the executive director of Plaintiff Navajo Human Rights Commission, an individual who County Defendants assert "had motive to distort the evidence;" 2) there is no indication in the record of Mr. Gorman's qualifications to translate; and 3) there is no evidence that the declarants actually knew what they were signing because the documents are in English and the declarants ostensibly do not speak English fluently or at all. While the court agrees that the declarations are problematic as drafted, the court finds County Defendants' arguments ultimately unpersuasive.

First, County Defendants' argument that Mr. Gorman, as executive director of Plaintiff Navajo Nation Human Rights Commission, has reason to "distort" the translations in favor of his organization is unavailing. Mr. Gorman has affirmatively sworn to the accuracy of the translations in a new declaration submitted by Plaintiffs in reply to County Defendants' objections. Beyond pointing to Mr. Gorman's position in the Plaintiff organization, County Defendants have not provided any colorable evidence to contradict this sworn statement. The court declines to disregard the contested declarations on this basis. *See Lakah v. UBS AG*, 996 F. Supp. 2d 250, 258 (S.D.N.Y. 2014) (finding that documents translated by defense counsel were admissible where opponents of admissibility "offer[ed] no credible evidence of bias").

Second, the court acknowledges, as County Defendants assert, that there is no information regarding Mr. Gorman's qualifications to translate on the face of any of the declarations. However, Plaintiffs have cured this deficiency by submitting a new declaration containing Mr. Gorman's averment that he is a certified court interpreter for the State of Arizona. County Defendants protest that this does not conclusively prove Mr. Gorman's qualifications, but the court is satisfied with this showing of translation ability, however bare-bones it may be. The substantively uncontested assertion of Mr. Gorman's certification reasonably indicates that

the State of Arizona trusts him to translate legal documents and/or court proceedings. County Defendants' bare assertion that Mr. Gorman's declaration is insufficient for purposes of FED. R. EVID. 604 is not enough to undermine this showing of basic competence. Accordingly, the court declines to disregard the declarations on this basis. *Cf. Lakah*, 996 F. Supp. 2d at 258 (finding that otherwise deficient translation was cured by submission of supplemental declaration of accuracy by translator); *Matsuda v. Wada*, 101 F. Supp. 2d 1315, 1323 (D. Haw. 1999) (finding that translation by declarant's son was sufficient despite the absence of any evidence as to the son's skills or qualifications as a translator.); *Barbosa v. Nat'l Beef Packing Co.*, Civ. No. 12-2311-KHV, 2015 WL 4920292, at *4 & *4 n.3 (D. Kan. Aug. 18, 2015) (unpublished) (finding that deficiencies in translated affidavits were cured by introduction of translator's identity and oath and affirmation of accuracy via supplemental affidavit).

Finally, the court is satisfied that the translated declarations are admissible for purposes of summary judgment despite the fact that the Navajo-speaking declarants signed a document presented solely in English. "Nothing in § 1746 requires that a non-English speaking affiant provide evidence that the declaration was translated into the affiant's native language before signing it. Moreover, . . . such an argument would go to the weight of the declaration and not its admissibility." *Collazos-Cruz v. U.S.*, 117 F.3d 1420 (unpublished table opinion), 1997 WL 377037, a *3 (6th Cir. Jul. 3, 1997) (holding that a translated declaration was validly admitted at summary judgment despite the fact that there was no "evidence that the declaration was translated to [the Spanish-speaking declarant] from English to Spanish"); *see also Ahn v. Hanil Dev., Inc.*, 471 F. App'x 615, 618–19 (9th Cir. 2012) ("There is no authority for Ahn's argument that Huh was required to use his native language of Korean in his declaration."); *Matsuda*, 101 F. Supp. 2d at 1323; *Coach, Inc. v. Weng*, No. 13 Civ. 445, 2014 WL 2604032, at *8 (S.D.N.Y.

Jun. 9, 2014) (unpublished); *but see, e.g., Cruz v. Aramak Servs., Inc.*, 213 F. App'x 329, 334 (5th Cir. 2007) (supplying a four-factor balancing test for determining whether a translator acted as a "mere conduit" for hearsay purposes). While the court acknowledges that a more clear showing could be made by Plaintiffs regarding the translation process, the scenario that County Defendants advance—one in which Mr. Gorman potentially falsified declarations and coaxed Navajo-speaking declarants into signing them—is not sufficiently supported to justify further evaluation at this stage. Ultimately, there is sufficient indicia, including a declaration of accuracy by a qualified translator, individualized and distinct factual averments, as well as signatures or fingerprinting by each of the declarants, to allow the court to infer that these documents are what Plaintiffs purport them to be, i.e., the more or less accurately translated statements of Navajo-speaking declarants. In the absence of any truly contrary evidence, County Defendants' objection on this basis is overruled.

### B. COUNTY DEFENDANTS' OBJECTIONS TO THE COURT'S CONSIDERATION OF CERTAIN EXPERT REPORTS

County Defendants next object to the court's consideration of certain expert reports referenced by Plaintiffs in their Motion for Partial Summary Judgment. Specifically, County Defendants object that the expert reports of Dr. Dan McCool, Gerald Webster, Dr. Richard Engstrom, and Joanna Manygoats are unsworn hearsay and should not be considered by the court for purposes of summary judgment. As explained below, this objection is partially unavailing.

At the summary judgment stage, a party may support its factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[.]" FED. R. CIV. P. 56(c)(1). In opposition, "[a] party may object that the material

cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Id.* 56(c)(2). Evidence supporting a motion for summary judgment

> need not be submitted in a form that would be admissible at trial. Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form. Nonetheless, the content or substance of the evidence must be admissible. Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form.

*See Agro v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (emphasis in original, internal citations and quotations omitted).

Based on Rule 56(c) and the corresponding framework supplied by the Tenth Circuit, the court concludes that the expert reports at issue are ultimately admissible for purposes of summary judgment. While County Defendants are correct that expert reports themselves would likely be inadmissible at trial as hearsay lacking any applicable exception, *see Ariz., Dep't of Law, Civil Rights Div. v. ASARCO, L.L.C.*, 844 F. Supp. 2d 957, 965 (D. Ariz. 2011) (finding an expert report inadmissible at trial "because it represent[ed] Dr. Pitt's out of court declaration offered for its truth"), the *substance* of the reports would plainly be admissible at trial in the form of expert testimony regarding methodology, opinions, and ultimate conclusions, *see Cent. Weber Sewer Improvement Dist. V. Ace Fire Underwriters Ins. Co.*, No. 1:12-cv-166-TS, 2014 WL 495152, at *7 (D. Utah Feb. 6, 2014) (unpublished) (finding expert reports admissible at summary judgment stage because the reports "may ultimately be presented at trial in admissible form," i.e., through testimony by the experts regarding the substance of their reports). And, while County Defendants are correct that portions of certain expert reports submitted by Plaintiffs contain flatly inadmissible hearsay statements, experts are often entitled to rely on otherwise inadmissible evidence to explain and support their ultimate opinions and conclusions. *See*

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

As the substance of these reports may ultimately be admissible at trial through the testimony of each report's expert author, the court finds that the reports themselves are properly considered under Rule 56(c)(1). However, the court will disregard any statements recorded in the expert reports that would not be otherwise admissible at trial as hearsay. *See Agro*, 452 F.3d at 1199 ("[A]t summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form." (emphasis in original)). Instead, the court will consider those statements only insofar as they support or otherwise explain the reasoning and ultimate conclusions of the expert. *See Daubert*, 509 U.S. at 592. Thus, County Defendants' objection is overruled in part and sustained in part.

## V.     ANALYSIS

The court will first address the parties' cross-motions for summary judgment regarding Plaintiffs' claims under Section 2 of the VRA and their claims under Section 203 of the VRA. Next, the court will address County Defendants' Motion for Summary Judgment regarding Plaintiffs' claims for injunctive relief. Finally, the court will address Defendant Benally's Motion for Partial Summary Judgment on Plaintiffs' Second Claim for Relief.

### A.  CLAIMS UNDER SECTION 2 OF THE VOTING RIGHTS ACT

First, Plaintiffs and County Defendants have both moved for summary judgment regarding Plaintiffs' claims under Section 2 of the VRA. These claims focus almost exclusively on the County's current procedures for administering early in-person voting.

Plaintiffs argue that, under the totality of the circumstances, the undisputed facts reveal that the availability of early in-person voting only in the predominately white county seat of Monticello means that the average Navajo voter has "less opportunity" to participate in the political process in violation of 52 U.S.C. § 10301(b). (*See* Docket No. 144, at 19–20). More specifically, Plaintiffs argue that Navajos have less opportunity to participate in at least two ways. First, they assert that the provision of early in-person voting only in Monticello means that the average white voter, who lives closer to Monticello, has proportionately more days in which to vote than the average Navajo voter, who is more likely to live further from Monticello. Second, Plaintiffs assert that the provision of early in-person voting only in Monticello provides the average white voter with "additional benefits, including the ability to request a [new] ballot (if, for instance, the ballot was lost in the mail) or receive troubleshooting help if a [voting] problem arises." (*Id.* at 19). Plaintiffs also argue that the option of mail-in voting does not alleviate this inequity, because, among other barriers, the average Navajo lives more distant from post office locations than the average white voter and certain majority-Navajo precincts lack sufficient post office boxes to accommodate demand. Based on these arguments, Plaintiffs request summary judgment on their Section 2 claims.

Also relying to the totality of the circumstances, County Defendants argue that the fact that three Election Day polling locations are located on the Reservation, as compared with one polling location off the Reservation, taken together with the option of mail-in voting, "afford at least equal, if not greater opportunity for Navajo voters to participate in the election process, notwithstanding the lack of multiple early voting locations or even a greater distance or more difficult travel conditions." (Docket No. 154, at 51). Accordingly, they request summary judgment in their favor on Plaintiffs' Section 2 claims. As explained below, the court finds that

genuine disputes of material fact, as well as the complex evaluation of the totality of circumstances required by Section 2, indicate that summary judgment is inappropriate.

Section 2 prohibits affected jurisdictions from imposing or applying a "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A plaintiff claiming a violation of Section 2 need not demonstrate that the affected jurisdiction acted with discriminatory intent. *See Sanchez v. State of Colo.*, 97 F.3d 1303, 1309 (10th Cir. 1996); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002) ("Section 2, unlike other federal legislation that prohibits racial discrimination, does not require proof of discriminatory intent.") Instead, a violation of Section 2 is established on a showing of discriminatory effect alone:

> A violation of . . . [Section 2] is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*See* 52 U.S.C. § 10301(b); *Sanchez*, 97 F.3d at 1309. Section 2 has been interpreted to proscribe both "vote dilution" and "vote denial." *Ohio Democratic Party v. Husted*, —F.3d—, 2016 WL 4437605 at *12 (6th Cir. 2016). "Vote-dilution" claims typically arise in the context of election district gerrymandering, *see, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752 (1986); *Baca v. Berry*, 806 F.3d 1262 (10th Cir. 2015), which may deny minority populations the right to "elect representatives of their choice," *see* 52 U.S.C. § 10301(b). By contrast, a "vote-denial" claim alleges that a "voting qualification or prerequisite to voting or standard, practice, or procedures . . . deni[es] or abridg[es] the right" of minorities "to participate in the political process." *See id.* § 10301(a)–(b).

Three decades ago, in *Gingles*, the Supreme Court established a detailed test for evaluation of vote-dilution claims under Section 2, which can involve analysis of the so-called "Senate Factors" in order to determine whether electoral "devices result in unequal access to the electoral process." *See* 478 U.S. at 43–46. Thus, much of "vote-dilution jurisprudence is well-developed," but "numerous courts and commentators have noted that applying Section 2's 'results test' [based on *Gingles*] to vote-denial claims is challenging, and a clear standard for its application has not been conclusively established." *Ohio Democratic Party*, 2016 WL 4437605 at *12. Still, several circuits have employed a two-part test to establish whether a voting procedure constitutes a denial or abridgement of voting rights under Section 2. *See Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014) (unpublished); *Veasey v. Abbott*, 830 F.3d 216, 244–45 (5th Cir. 2016); *League of Women Voters v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014). The Fourth, Fifth, and Sixth Circuits articulate the test as follows:

> First, 'the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' Second, that burden 'must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.'

*League of Women Voters*, 769 F.3d at 240 (internal citations and quotations omitted) (quoting *Ohio State Conference*, 768 F.3d at 553); *see also Veasey*, 830 F.3d at 244–45.

"The first step essentially reiterates Section 2's textual requirement that a voting standard or practice, to be actionable, must result in an adverse disparate impact on protected class members' opportunity to participate in the political process." *Ohio Democratic Party*, 2016 WL 4437605 at *13. Once a disparate impact is established, the second step asks whether the voting

standard or practice, "albeit not designed or maintained for a discriminatory purpose," nonetheless effectually denies or abridges the right to vote "as it interacts with social and historical conditions." *Id.* (emphasis omitted). "In assessing both elements, courts should consider 'the totality of the circumstances.'" *Ohio State Conference*, 768 F.3d at 554 (quoting 52 U.S.C. § 10301(b), formerly 42 U.S.C. 1973(b)); *see also Gingles*, 478 U.S. at 79 ("This determination is peculiarly dependent upon the facts of each case, and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms." (internal quotations and citation omitted)).

The Supreme Court describes the basic inquiry as follows:

As both amended [Section] 2 and its legislative history make clear, in evaluating [whether a violation has occurred], the trial court is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters.

*Gingles*, 478 U.S. at 79 (internal citations and quotations omitted) (discussing the standard of inquiry under Section 2 in vote-dilution cases). In sum, "[t]he essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Id.* at 47.

Here, the court concludes that neither side has adequately demonstrated a lack of genuine dispute of material fact regarding Plaintiffs' claims under Section 2. For example, there is a genuine dispute as to the relative availability of certain voting services to Navajo voters, even in the absence of an early in-person voting location on the reservation. On one hand, Plaintiffs contend that the location of early in-person voting solely in Monticello effectively prevents Navajo voters from obtaining new ballots or otherwise availing themselves of the administrative

services of the County Clerk prior to Election Day. On the other, County Defendants have presented evidence that the County's Navajo liaison, Edward Tapaha, "provides the same service[s] during his routine visits to Navajo Nation Chapter Houses." (*See* Docket No. 151, at 12 (citing a declaration that indicates that Mr. Tapaha visits chapter houses "to answer questions, register voters, and explain voting procedures")). Moreover, the testimony cited by Plaintiffs plainly indicates that voters can request a ballot through Mr. Tapaha, (Docket No. 144-1, at 4), and that he provides certain registration services to remote voters.[9] It is unclear to the court whether this provision of services by Mr. Tapaha adequately substitutes for the provision of services from the County Clerk's office, but a trial on the merits will certainly flesh out this and other questions bearing on the "totality of the circumstances" in San Juan County. *See* 52 U.S.C. § 10301(b).

---

[9] While the declaration cited by County Defendants does not explicitly so state, the following testimony from the County Clerk, John David Nielson, indicates that voters can obtain ballots through Mr. Tapaha:

> Q. And so for the 2015 municipal election, in the primary the people could vote [at the Clerk's office in Monticello] once the ballots were mailed out?
>
> A. They could turn in their ballots here [at the Clerk's office].
>
> Q. And if they needed a—if they needed to request a ballot, they could do that here?
>
> A. They could do that here.
>
> Q. And are there any other locations where that's available in San Juan County?
>
> A. No.
>
> Q. And—
>
> A. Define. Any other locations to do what?
>
> Q. To walk in and either turn in your ballot or request a ballot.
>
> A. No. People have requested ballots through Ed [Tapaha].

(Docket No. 144-1, at 4).

Since Plaintiffs have not fully specified which services beyond access to replacement ballots they believe are available only at the County Clerk's office, the court assumes from the cited materials that the provision of services includes both the provision of replacement ballots and the option of resolving voter registration status issues. (*See* Docket No. 94-4, at 190–91 (testimony of Deputy County Clerk regarding inactive voters)). The declaration cited by County Defendants indicates that voters may register through Mr. Tapaha and testimony from Mr. Tapaha in the record seems to generally support that assertion. (*See, e.g.*, Docket No. 109, at 195, 205–06 (testimony of Mr. Tapaha indicating that he instructed Navajo voters to call him directly if they did not receive a voter-ID card for the 2014 elections and that he periodically set up registration drives at various locations on the Reservation and helped the County Clerk to update registration information for individual voters)).

As a more fundamental matter, the court also concludes that the analysis of this Section 2 claim is not readily amenable to summary resolution. Indeed, at least one federal circuit has toyed with the idea that summary judgment is inappropriate when evaluating the totality of the circumstances under Section 2. *See McNeil v. Springfield Park Dist.*, 851 F.2d 937, 940–43 (7th Cir. 1988). Though the Seventh Circuit ultimately concluded that "summary judgment is sometimes proper in Section 2 cases" because certain threshold criteria in vote dilution cases are amendable to summary resolution, *see id.* at 943, the court acknowledged that the totality of the circumstances evaluation "generally call[s] for substantial and complex factual determinations" that may make summary judgment improper, *see id.* at 940. The Senate Factors and the broader "totality of the circumstances" analysis necessary under Section 2, 52 U.S.C. § 10301(b) reflect "Congress's intent to provide courts with a means of identifying voting practices that have the effect of shifting racial inequality from the surrounding social circumstances into the political process." *Farrakhan v. Washington*, 338 F.3d 1009, 1020 (9th Cir. 2003). "Congress, in amending [S]ection 2, expressed its preference for a searching practical evaluation of the past and present reality, and a functional view of the political process." *McNeil*, 851 F.2d at 940 (internal quotations omitted); *see also Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 585 (E.D. Va. 2016) ("The Supreme Court has continually counseled that vote-denial cases brought under Section 2 should not be viewed in isolation, but should be evaluated in light of the totality of circumstances."). This "searching practical evaluation" is inherently complex and widely variable depending on circumstances: "Whatever factors are to be considered, and indeed they are many and varied as explained by the Supreme Court, none is talismanic, none alone has controlling weight, none provides safe harbor, and none yields per se violation." *Old Person v. Brown*, 312 F.3d 1036, 1050 (9th Cir. 2002). In other words, "the ultimate conclusions about

equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Sanchez v. State of Colo.*, 97 F.3d 1303, 1311 (10th Cir. 1996) (quoting *Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994)).

Based on the foregoing, the court declines to grant summary judgment to either party, believing instead that "the better course would be to proceed to a full trial" on Plaintiff's Section 2 claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zapata v. IBP, Inc.*, No. Civ. A. 93-2366-EEO, 1998 WL 717621, at *9 (D. Kan. Sept. 29, 1998) (unpublished) ("Out of an abundance of caution, therefore, we deny summary judgment on [plaintiff's] . . . claim, under the belief that we will be in a much better position to make a definitive ruling after hearing the evidence at trial.").

## B. CLAIMS UNDER SECTION 203 OF THE VOTING RIGHTS ACT

Next, Plaintiffs and County Defendants have both moved for summary judgment regarding Plaintiffs' claims under Section 203 of the VRA. These claims focus on the adequacy of the language assistance provided to Navajo-speaking voters at the polls during 2016, as well as the methods used by the County to publicize election procedures to Navajo-speaking voters.

Plaintiffs assert that the undisputed facts show that the language assistance and Navajo-language publicity efforts by the County during the 2016 election cycle were ineffective and therefore inadequate under Section 203. Plaintiffs argue that there is no formal training for Navajo interpreters, that certain pre-election publicity provided by the County in Navajo was confusing to voters, and, among other issues, that certain voters did not receive adequate assistance from the interpreters available at polling locations. (Docket No. 144, at 34–36).

County Defendants counter that the undisputed facts indicate that their efforts, taken as a whole, substantially complied with the requirements of Section 203.[10]

Section 203 of the Voting Rights Act seeks to "enable members of applicable language minority groups to participate effectively in the electoral process." 28 C.F.R. § 55.2(b); *see also U.S. v. Sandoval Cty., N.M.*, 797 F. Supp. 2d 1249, 1250 (D.N.M. 2011) ("In enacting [Section] 203 of the Voting Rights Act (VRA), . . . Congress intended that language minority populations have substantive access to the ballot." (internal quotations omitted)). In evaluating national voting practices, Congress determined that,

> through the use of various practices and procedures, citizens of language minorities have been effectively excluded from participation in the electoral process. Among other factors, the denial of the right to vote of such minority group citizens is ordinarily directly related to the unequal educational opportunities afforded them resulting in high illiteracy and low voting participation.

52 U.S.C. § 10503(a). Accordingly, Section 203 prohibits discriminatory voting practices related to English literacy and requires that voting materials provided in English also be provided in the languages of relevant minority language populations. *See id.* § 10503(a), (c).

The applicable requirements of Section 203 are as follows:

> Whenever any State or political subdivision subject to the prohibition . . . of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable minority group as well as in the English language: *Provided,* That where the language of the applicable minority group is oral or unwritten or in the case of Alaskan natives and American Indians, if the predominant language is historically unwritten, the

---

[10] The court pauses briefly to correct a misinterpretation of its previous order denying Plaintiffs' motion for preliminary injunction. County Defendants seem to be under the mistaken impression that they are doing *more* than Section 203 requires and that this court has already ruled that the County's efforts in the June 2016 primaries were "effective" under Section 203. The court did not so hold. The court held only that the statute does not require that language assistance take any particular form so long as it is effective in assisting voters in their exercise of the franchise. The court also held that Plaintiffs had failed, at that preliminary stage in the proceedings, to prove that the efforts of the County were ineffective. (*See* Docket No. 129, at 34–36). Plaintiffs have provided new evidence at this stage that may, if uncontroverted at trial, necessitate a different ruling.

State or political subdivision is only required to furnish oral instructions, assistance, or other information relating to registration and voting.

*Id.* § 10503(c). The plain language of this section provides two separate standards, one to be applied to written minority languages and one to be applied to oral minority languages. The first standard requires *all* written voting materials to be provided "in the language of the applicable minority group as well as the English language." *See id.* However, in the context of minority languages that are "oral or unwritten or in the case of Alaskan natives and American Indians, . . . historically unwritten, the State or political subdivision is *only* required to furnish oral instructions, assistance, or other information relating to registration and voting." *Id.* (emphasis added); *see also United States v. McKinley Cty., N.M.*, 941 F. Supp. 1062, 1066–67 (D.N.M. 1996) (applying the standard to the Navajo and Zuni languages). Thus, where the relevant minority language is unwritten or historically unwritten, the State or subdivision is not required to provide *all* materials orally in the minority language, as it would if the language were written. Instead, the State or subdivision must provide only "oral instructions, assistance, or other information relating to registration and voting." *See id.*

Defendants do not dispute that they are subject to the requirements of Section 203. Thus, in their administration of local elections, Defendants are required by Section 203 to provide "oral instructions, assistance, or other information relating to registration and voting." *See id.* This requirement extends to both pre-election publicity efforts and direct assistance provided to voters at the polls. *See* 28 C.F.R. § 55.20(a). Defendants' compliance with these requirements is measured by an "effectiveness" standard, *see id.* § 55.20(c), which requires that a jurisdiction "take[] all reasonable steps to ensure minority language voters have received information and assistance allowing them to participate effectively in voting-connected activities." *McKinley Cty.*, 941 F. Supp. at 1067 (internal quotations omitted); 28 C.F.R. § 55.2(b) (interpreting § 10503(c)

and outlining the following requirements: "(1) That material and assistance should be provided in a way designed to allow members of applicable language minority groups to be effectively informed of and participate effectively in voting-connected activities; and (2) That an affected jurisdiction should take all reasonable steps to achieve that goal"). Nevertheless, "[t]he determination of what is required for compliance with . . . [S]ection 203(c) is the responsibility of the affected jurisdiction" and the "guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction." *Id.* § 55.2(c); *see also id.* § 55.14(c). Indeed, a great deal of discretion is granted to jurisdictions seeking to implement the requirements of Section 203(c), *see id.* § 55.2(c), and only where the jurisdiction falls below the effectiveness standard will the Attorney General take action. *See Sandoval Cty.*, 797 F. Supp. 2d at 1253–54 (explaining that the reasonable effectiveness standard under Section 203 "does not demand perfection, but only . . . substantial compliance"). While the Attorney General's interpretations of the Act are not binding on this court, *see Montero v. Meyer*, 861 F.2d 603, 608–09 & 609 n.3 (10th Cir. 1988) (noting that the Attorney General's interpretations of the minority language provisions are "suggestive and not directory"), the reasonable effectiveness standard is consistent with the central purposes of Section 203 and therefore instructive in evaluating the County's compliance, *see id.* (explaining that an administrative interpretation must be consistent with statutory purposes if it is to be accorded deference).

In evaluating the effectiveness of a jurisdiction's efforts to publicize election information, the Attorney General "will consider whether public notices and announcements of electoral activities are handled in a manner that provides members of the applicable language minority group an effective opportunity to be informed about electoral activities." *Id.* § 55.18(b). Further, "[t]he Attorney General will consider whether a covered jurisdiction has taken appropriate steps

to publicize the availability of materials and assistance in the minority language." *Id.* § 55.18(e).

A covered jurisdiction "*may*" fulfill its publicity obligations under Section 203 by "display of appropriate notices, in the minority language, at voter registration offices, polling places, etc., the making of announcements over minority language radio or television stations, the publication of notices in minority language newspapers, and direct contact with language minority group organizations." *Id.* (emphasis added). Similarly, in evaluating the effectiveness of a jurisdiction's efforts to provide language assistance to voters through "helpers" or interpreters, the Attorney General considers factors such as "the number of a precinct's registered voters who are members of the applicable language minority group, the number of such persons who are not proficient in English, and the ability of a voter to be assisted by a person of his or her own choice." *See* 28 C.F.R. § 55.20(c). While these guidelines are helpful for affected jurisdictions in assisting minority language populations, they are not entirely binding on the jurisdiction if the methods actually employed by the jurisdictions are effective. *See* 28 C.F.R. § 55.2(b) (describing the effectiveness standard); *id.* § 55.2(c) ("These guidelines should not be used as a substitute for analysis and decision by the affected jurisdiction."). Thus, "[c]ompliance with the requirements of . . . [S]ection 203(c) is best measured by results." *Id.* § 55.16.

As with the previously evaluated claims under Section 2, neither party has sufficiently demonstrated that no genuine dispute of material facts exists as to Plaintiffs' Section 203 claims. For example, the parties have presented conflicting evidence regarding the availability of pre-recorded audio translations of the ballot at polling locations. Plaintiffs assert that "no working audio translations of the ballot were available at polling places in the general election for the voters or the poll workers." (Docket No. 144, at 27). To support this assertion, Plaintiffs cite to several declarations from individual Navajo-speaking voters and poll workers indicating that

they were not aware of any audio recording available to voters or that the audio recording that was made available malfunctioned.

In response, County Defendants assert that each polling location had a working audio translation available to voters. In support of this assertion, County Defendants present the declaration of the Deputy County Clerk reporting that there was no malfunction and, from his observation, the audio recording was operational and available to voters. (Docket No. 151-3, at 7–8). An additional declaration from the County Clerk indicates that his office made provisions to have an audio recording available at all of the on-Reservation polling locations, although it is not clear that he personally ensured that a recording was in fact available at each location. His declaration does, however, indicate that he personally observed that audio translations were available, but often unused at certain unspecified on-Reservation polling locations. (Docket No. 151-2, at 5–6).

As the court must determine whether the County has taken "all reasonable steps to ensure minority language voters have received information and assistance allowing them to participate effectively in voting-connected activities," *McKinley Cty.*, 941 F. Supp. at 1067 (internal quotations omitted), this dispute and others regarding the County's efforts are best left to the factfinder. Thus, the court declines to grant summary judgment to either party. Instead, these issues will proceed to a full trial on the merits of Plaintiffs' claims.

## C. CLAIMS FOR INJUNCTIVE RELIEF

Next, the court turns to County Defendants' request for summary judgment regarding Plaintiffs' claims for injunctive relief. As explained above, Plaintiffs' claims for injunctive relief against County Defendants are not mooted by the implementation of the 2016 procedures. County Defendants seek summary judgment on the basis that Plaintiffs have failed to

demonstrate irreparable injury as a matter of law. (Docket No. 141, at 41). Because Plaintiffs' claims of irreparable injury ostensibly arise from the alleged violations of their rights under the VRA and the court has already determined that summary judgment is not appropriate on those claims, Plaintiffs' entitlement to injunctive relief remains an open question. Accordingly, the court must deny summary judgment regarding Plaintiffs' claims for injunctive relief.

### D. DEFENDANT BENALLY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' SECOND CLAIM FOR RELIEF

Finally, the court turns to Defendant Benally's Motion for Partial Summary Judgment on Plaintiffs' Second Claim for Relief. (Docket No. 127). Plaintiffs' Second Claim for Relief alleges that the County's closure of certain polling places and institution of a primarily vote-by-mail system violated Section 2 of the Voting Rights Act. Plaintiffs' complaint seeks a declaration as to the legality of the voting procedures under Section 2 and further requests injunctive relief requiring the reopening of certain polling places "equally accessible to Navajo voters as to white voters." (Docket No. 2, at 21). Defendant Benally argues that she is not a proper target of any of the Section 2 claims in her official capacity and urges that she is therefore entitled to summary judgment on Plaintiffs' Second Claim for Relief. Plaintiffs filed a memorandum in opposition to Defendant Benally's Motion, (Docket No. 130), to which Defendant Benally replied, (Docket No. 133). The court heard oral argument on the Motion on July 26, 2017.

The facts pertaining to this motion are largely undisputed, despite some carping between the parties. In reality, the only material undisputed fact at issue here is Defendant Benally's position in the County Government. Neither party disputes that Defendant Benally is currently a County Commissioner. While the relevant facts are undisputed, Defendant Benally has not demonstrated that she is "entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a).

As noted above, Defendant Benally's Motion argues that she is not the proper target of Plaintiffs' Second Claim for Relief, which alleges that the County's closure of certain polling places in favor of a primarily vote-by-mail system violates Section 2 of the Voting Rights Act. As Defendant Benally seems to acknowledge in her briefing, (*see* Docket No. 133, at 8–9), this Motion appears to be a retooling of positions articulated in a previous motion to dismiss, (Docket No. 42), which was denied by this court last year, (Docket No. 92).

The court has already explained in a previous order in this case that "[a] suit against a government official in h[er] official capacity 'generally represents merely another way of pleading the action against the entity of which the official is an agent.'" (Docket No. 92, at 3 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))). Defendant Benally's attempts to resurrect her previous arguments on this point are unavailing. Taken to their logical conclusion, these arguments would require the dismissal of not just Defendant Benally, but Defendants Nielson, Lyman, and Adams as well. There is simply no authority *requiring* dismissal of an allegedly redundant official capacity claim; indeed, such a decision appears to be within the court's discretion. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (upholding dismissal of official-capacity claims where the claims "would have been redundant and possibly confusing to the jury"); *Capresecco v. Jenkintown Borough*, 261 F. Supp. 2d 319, 322 (E.D. Pa. 2003) (finding that redundancy alone "is not a persuasive basis for dismissal under Rule 12(b)(6)").

Defendant Benally argues that she should nonetheless be dismissed from this Claim for two reasons: First, she argues that she had no involvement in the 2014 determination to close polling places and institute a primarily vote-by-mail voting system and therefore is not "liable for any alleged violations of the Voting Rights Act" relating to that determination. (Docket No. 133,

at 15; *see also* Docket No. 127, at 4). Second, she argues that her position as County Commissioner does not provide any legal "right, power, or authority" to alter voting procedures that are determined and overseen exclusively by the County Clerk. (Docket No. 127, at 6). Because she allegedly has no authority to alter voting procedures, Defendant Benally reasons that she has no authority to bring the County into compliance with Section 2 should the court eventually mandate alterations to the voting procedures. The court finds these arguments unpersuasive.

First, Plaintiffs do not seek to hold Defendant Benally "liable" for violations of the Voting Rights Act. This is not a lawsuit pursuant to 42 U.S.C. § 1983 or § 1985, where Plaintiff could be held *personally* liable for damages resulting from an alleged constitutional violation. Instead, Plaintiffs' Second Claim for Relief alleges that the County itself has, by its voting policies and procedures, violated the voting rights of its Navajo residents. Even if the court were to grant all of the relief requested by Plaintiffs, Defendant Benally would not be "liable" for any damages or other relief—she would only be required, as a County official, to comply with any injunction issued by the court. Because Plaintiffs are not seeking to hold Defendant Benally "liable" for any of the events of 2014, her personal connection to those events is irrelevant. *See Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 195 n.6 (2d Cir. 2006) (explaining that the fact that a county employee "did not hold office at the time of these events" was "of no matter" because he was "sued only in his official capacity, not in his personal capacity").

Likewise, whether or not Defendant Benally has legal authority to alter certain voting procedures is beside the point. Because she is being sued in her official capacity, she is only being sued as an agent of the County itself. *Graham*, 473 U.S. at 165. Arguing that Defendant Benally has no official authority to respond to the injunctive relief sought here is just another

way of insisting that her presence in the case is redundant—which the court has already explained is not a sufficient reason, standing alone, to dismiss her from the action. *See Capresecco*, 261 F. Supp. 2d at 322 (finding that redundancy alone "is not a persuasive basis for dismissal").

Moreover, Defendant Benally's assertion that she has no official role in election procedures is not reflective of Utah law. Even assuming that Defendant Nielson has "exclusive" authority over the decision to conduct an election by mail-in voting or to impose other voting procedures, that is not the only function that must be performed to put voting policy into practice. Under Utah law, both the County Clerk and the County Commission have duties and responsibilities to ensure the proper administration of elections. Indeed, a ruling from this court granting the relief sought by Plaintiffs' Second Claim for Relief would not simply require the reversal of certain voting policies and procedures, it would also require the implementation of new procedures in compliance with Section 2. This implementation process would require the opening of new polling locations, which, under Utah law, requires the approval of the "county . . . legislative body"— in this case, the County Commission. *See* UTAH CODE § 20A-5-403(1)(b) (requiring the County Clerk to "obtain the approval of the county or municipal legislative body . . . for . . . polling places"). It would also require the Commission to "provide for the appointment of individuals to serve as poll workers," *see id.* § 20A-5-601(2), "establish compensation for poll workers," *see id.* § 20A-5-601(15), and to appoint various other election functionaries to manage and count ballots, *see id.* § 20A-5-601(3)–(6); *see also generally id.* § 20A-5-602 (outlining responsibilities of the "county legislative body" regarding poll workers and other functionaries). Thus, under Utah law, it is clear that the County Commission, and, by

extension, Defendant Benally, have some role to play in the implementation of voting procedures.

All told, Defendant Benally has not demonstrated that she is "entitled to judgment as a matter of law" on Plaintiffs' Second Claim for Relief. *See* FED. R. CIV. P. 56(a). While the court is puzzled by Plaintiffs' fervent insistence that Defendant Benally remain a defendant in this action, the court is equally puzzled by Defendant Benally's insistence that she is harmed by a suit against her in her official capacity. Even if she were dismissed from this action as a party, she would still be subject to all of the strains of the litigation process by virtue of her position as an agent of the County and her current participation in the implementation of the County's policies. In any event, the court concludes that Defendant Benally's Motion for Partial Summary Judgment must be denied.

## VI.    CONCLUSION

Based on the foregoing, the court concludes as follows:

1) Plaintiffs' claims regarding the 2014 procedures, designated as the First, Second, and Third Claims for Relief found in their complaint, (Docket No. 2), are hereby **DISMISSED** without prejudice.

2) Plaintiffs' claims under Sections 2 and 203 of the VRA regarding the 2016 procedures are to be treated as if properly raised in the pleadings.

3) Plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment regarding the 2016 procedures are not to be treated as if raised in the pleadings.

4) County Defendants' Motion to Strike (Docket No. 158) is **DENIED**.

5) Plaintiffs' Motion for Partial Summary Judgment (Docket No. 144) is **DENIED**.

6) County Defendants' Motion for Summary Judgment (Docket No. 141) is **DENIED**.

7) Defendant Benally's Motion for Partial Summary Judgment (Docket No. 127) is

   **DENIED**.

   IT IS SO ORDERED.

   Signed September 7, 2017

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge